UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------x
JUAN F., et al.,              :
                              :
            Plaintiffs,       :
                              :
      v.                      :        CIVIL NO. H89-859 (AHN)
                              :
JOHN G. ROWLAND, et al.,      :
                              :        January 27, 2004
            Defendants.       :
---------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF COURT ORDER

Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Reconsideration of Court Order, dated January 8, 2004 ("Defendants' Motion for Reconsideration"), and Defendants' Memorandum of Law in support of that motion ("Def. Mem.") also dated January 8, 2004.

### INTRODUCTION

Remarkably, after years of Defendants' dismal failure to comply with Court-ordered relief dating back to 1991 in this action, and barely 90 days after entering into an extraordinary new Court-ordered agreement that carries great potential to actually improve outcomes for abused, neglected and at-risk children and their families in Connecticut, Defendants challenge the Court's Order adopting and approving a new Exit Plan–the cornerstone of that new agreement.

Defendants' Motion for Reconsideration fails at the threshold because Defendants completely ignored and failed to exhaust the mandated dispute resolution process that governs this case. Even assuming, for the sake of argument, that the Court addresses the merits of Defendants' motion, their

-1-

arguments woefully fail to meet the strict standard for reconsideration.

Defendants' Motion for Reconsideration is baseless, if not frivolous, and should be denied.[1] As this Court has found before, "[M]embers of the plaintiff class, as well as the public in general, would be better served if the defendants devoted their time and resources to insuring that the DCF provides the services it agreed to under the Consent Decree instead of challenging its clear and unambiguous provisions."[2]

## FACTUAL BACKGROUND

The Consent Decree in this action, so-ordered in 1991, has been met by Defendants' repeated failure to comply with its terms.[3] In February of 2002, after intense, arms-length negotiations, the parties agreed to an 18-month experiment that attempted a new strategy aimed at improving outcomes for children in the Juan F. class and their families. Under the so-ordered Performance and Outcome Measures, Transition, and Exit Plan (the "2002 Transition/Exit Plan"), the monitoring of the Juan F. Consent Decree and Manuals focused upon a set of "outcome measures" and minimum resource requirements that provided Defendants greatly increased management discretion.

Unfortunately, Defendants' non-compliance with the caseload and staffing requirements of the 2002 Transition/Exit Plan led to a hearing before the Monitor in July 2003, and, ultimately, a

---

[1] It is unclear what order the Defendants seek to have reconsidered. The Court has signed two orders with respect to the Exit Plan dated December 23, 2003 (Exhibit A): on December 23, 2003, the Court "adopted and so ordered" the Exit Plan (Exhibit B); on January 7, 2004, the Court adopted and approved the Exit Plan "as an Order of this Court, nunc pro tunc, as of December 23, 2003" (Exhibit C). Addressed to either Order, Defendants' motion fails.

[2] See Ruling on Motion for Stay of Order dated February 9, 2001 at 2-3 (attached as Exhibit D).

[3] For an exhaustive description of Defendants' pattern of non-compliance during the life of the case, see Plaintiffs' Assertion of Substantial Non-Compliance with the Juan F. Transition/Exit Plan and Request for Additional Remedies (letter from Plaintiffs' counsel to Ray Sirry), dated September 11, 2003 (attached as Exhibit I).

Court order adopting the Monitor's recommendations with a finding that "defendants are in non-compliance with both fundamental issues in dispute and that their non-compliance is significant." (A copy of the July 29, 2003 order is attached as Exhibit E.) Several weeks later, the Court Monitor issued a report on compliance with adoption-related requirements, finding:

> When these children first entered DCF custody, the issues and problems confronting them were relatively simple in the majority of cases. However, the multiple traumas associated with long lengths of stay in DCF custody, such as multiple placements, separations from siblings, abuse in custody, and multiple social workers, worsened their emotional and mental health.[4]

In August of 2003, the Court Monitor released his exhaustive findings concerning the outcome measures in the 2002 Transition/Exit Plan, and found that Defendants had failed to meet 28 of 37 outcomes.[5]

As a result of these failures, following the established procedures for the exhaustion of alternate resolution procedures[6], by letter of September 11, 2003, Plaintiffs asserted Defendants' substantial non-compliance with and contempt of the 2002 Transition/Exit Plan, and sought as a remedy, among other things, the placement of DCF into receivership. See Ex. I. Under the direction of the Court Monitor, the parties undertook a period of intensive, arms-length negotiations, including the personal involvement of the Governor and his counsel.[7] The result of the negotiations was the

---

[4] See A Review of a Cohort of Children in DCF Custody Whose Parental Rights Had Been Terminated and Who Had a Goal of Adoption as of March 31, 2002, dated August 1, 2003 (attached as Exhibit F).

[5] See Juan F. V. Rowland Comprehensive Case Review, dated August 12, 2003 (attached as Exhibit G).

[6] See Monitoring Order, dated December 1, 1992 (attached as Exhibit H).

[7] See Hamilton, Elizabeth, Agency Failures Forced Rowland's Hand, Hartford Courant, October 8, 2003 (attached as Exhibit J-1):

> Tuesday, Rowland and his administration were presented as "wholehearted partners" in the renewed effort to salvage DCF. Apparently this is true. When asked what the new partnership

-3-

avoidance of a hearing on Plaintiffs' charge of contempt and a Stipulation dated October 7, 2003, signed by the Governor, the DCF Commissioner and counsel for the parties, approved by the Court Monitor, and so-ordered by the Court (the "October 7 Order"). (A copy of the October 7 Order is attached as Exhibit K.)

Among other things, the October 7 Order gives the Monitor "express management authority" over DCF. See Ex. K at ¶ 2. A Transition Task Force was created, consisting of the Monitor, the DCF Commissioner, and the Secretary of the Office of Policy Management. Id. at ¶ 2, bul. 1. The DCF Commissioner is to implement the decisions of the Transition Task Force. Id. at ¶ 2, bul. 2. The Monitor is to develop modifications to the 2002 Transition/Exit Plan, including outcome measures, standards, and a final exit plan. Id. at ¶ 2, bul. 5. <u>The Monitor's final decision on these issues are binding on all the parties.</u> Id. The Consent Decree, Manuals, and the 2002 Transition/Exit Plan were vacated and replaced by the October 7 Order and the soon-to-be-created Exit Plan. Id.

Throughout the rest of 2003, the Monitor developed and drafted the new Exit Plan. Various drafts of the exit plan were shared with the parties, and the Monitor had multiple <u>ex parte</u> conversations with the parties regarding the drafts. The parties had several opportunities to provide written input as well as oral comments. The Monitor also indicated that he was consulting with many members of the community regarding the plan's contents, including a 20-member Advisory

---

with the federal monitor would cost the state, Rowland gave an answer that seemed to sum up best his willingness, now, to cooperate: "Whatever it takes," the governor said.

See also Dunbar, Darlene, <u>DCF is Up to the Challenge</u>, commentary dated October 26, 2003, at www.state.ct.us/dcf/Good_News/challenge.htm (last visited Jan. 25, 2004) (attached as Exhibit J-2); Press Release, Executive Office of Gov. John G. Rowland, <u>Governor Rowland Announces Consent Decree Transition Team for DCF</u> (Oct. 7, 2003) ("This voluntary structure is also a recognition of our commitment to improving the services we provide to children and families in need") (attached as Exhibit J-3).

Board. The Court Monitor distributed his final Exit Plan, dated December 23, 2003, and the Court approved and so-ordered the Exit Plan the same day. See Ex.'s A, B.

Additionally, the Monitor revised the Monitoring Order of December 1, 1992, in accordance with the terms of the October 7 Order. See Ex. K at ¶ 2. On December 31, 2003, the Court so-ordered the Revised Monitoring Order without objection. (A copy of the Revised Monitoring Order is attached as Exhibit L.) Among other things, the Revised Monitoring Order provides that any disputes not covered by the terms of the October 7 Order are to be resolved, in the first instance, with a 30-day negotiation period led by the Monitor. Only following this period, if the dispute cannot by resolved, is the Monitor to present the issue to the Court with recommendations. See Ex. L at ¶ IV. Additionally, the Revised Monitoring Order provides that the parties remain free to seek relief from the Court under applicable federal law after exhausting all alternative dispute resolution procedures of the Revised Monitoring Order and the October 7 Order. Id. at ¶ IX.

By Order filed January 7, 2004, the Court adopted and approved the Exit Plan as an Order of the Court, nunc pro tunc, as of December 23, 2003 (the "January 7, 2004 Order"). In the January 7, 2004 Order, the Court noted that the Monitor had shared drafts of the Exit Plan with counsel for all parties and had sought the input of a 20-member advisory board. The Court further noted that the Monitor had provided all parties with a "meaningful opportunity for input" in the development of the Exit Plan. See Ex. C.

Defendants then filed the instant Motion for Reconsideration dated January 8, 2004.

## ARGUMENT

**I.     DEFENDANTS' MOTION FOR RECONSIDERATION IS PROCEDURALLY BARRED FOR THEIR FAILURE TO FOLLOW THE MANDATED DISPUTE RESOLUTION PROCESS IN THIS CASE.**

Since this action was settled by Consent Decree in 1991, a critical component in resolving disputes and obtaining compliance has been the existence of the Court Monitor. For years, the Monitor has maintained wide-ranging authority to review and analyze DCF's operations and has had the responsibility to report to the Court on the Defendants' compliance and non-compliance with the Consent Decree and with various other orders. The Court Monitor serves as a Rule 53 special master in this case. Juan F. v. Weicker, 37 F.3d 874, 880 (2d Cir. 1994). The Monitor has also played a key role as the mediator of disputes between the parties. This role came to the Monitor not by accident, but by explicit design: the Court signed a Monitoring Order, dated December 1, 1992, that gave the Monitor these duties. See Ex. H. The Monitor's important, multiple roles in this case were explicitly upheld by the Second Circuit. See Juan F., 37 F.3d at 880 ("the court monitor has the power to hold meetings, request information, issue reports, hear evidence, and issue findings of fact"). See also Juan F. v. Rowland, No. H-89-859 (AHN), slip. op. at 4 n.2 (D. Conn. Dec. 21, 2000) (attached as Exhibit M).

In December 2003, the Monitor developed a Revised Monitoring Order, to comport with the terms of the October 7 Order.[8] The Revised Monitoring Order was filed by the Court on December 31, 2003–over a week before the Defendants filed their Motion for Reconsideration. See Ex. L. The Revised Monitoring Order is unambiguous: all issues in dispute must be resolved, in the first instance, by the Monitor. Simply put, the Defendants have failed to exhaust the mandated dispute resolution process and are procedurally barred from filing their reconsideration motion directly with the Court.

---

[8] "The Monitoring Order of December 1, 1992, shall be modified to conform to the terms of this Stipulation, and to give the Court Monitor express management authority." See Ex. K at ¶ 2.

The Revised Monitoring Order states: "It is the intent of the parties and the Court Monitor that the parties, the Transition Task Force, and the Court Monitor shall work together to try to resolve disputes without the intervention of the Court, in accordance with the terms of the October 7, 2003 Order." Ex. L at ¶ IV. The required process is clearly set forth as follows:

> Any disputes not covered by the terms of the October 7, 2003 Order shall be resolved in the following manner: the issue shall be presented to the Court Monitor, who shall engage the parties in negotiation for a period of 30 days (unless extended upon agreement of the parties and the Court Monitor), to try to resolve disputes without the intervention of the Court. If the matter cannot be so resolved, the Monitor shall present the issue to the Trial Judge with recommendations for resolution by the Trial Judge.

Ex. L at ¶ IV.[9] The Revised Monitoring Order further states that the parties are not precluded from "exercising their rights to seek Court enforcement of the [October 7] Orders under applicable federal law <u>after exhausting all compliance and resolution procedures of this Order and the Orders of October 7, 2003</u>." Id. at ¶ IX (emphasis added).

Thus the issues Defendants raise in their Motion for Reconsideration must all be presented to the Court Monitor before they may be heard by the Trial Judge. Because the Defendants have failed to exhaust these required procedural remedies, their motion must be denied.[10]

## II. ASSUMING, ARGUENDO, THAT THIS COURT ADDRESSES THE MERITS OF DEFENDANTS' MOTION, THE MOTION PATENTLY FAILS TO MEET THE STRICT STANDARD FOR RECONSIDERATION.

The Court need not address the merits of Defendants' motion because it is procedurally

---

[9]The only disputes that are covered by the October 7 Order itself are disagreements among members of the Transition Task Force, which was created by the October 7 Order. The dispute raised by Defendants in their Motion for Reconsideration concerns the Exit Plan as created by the Monitor and so-ordered by the Court; it is plainly unrelated to any decision of the Transition Task Force.

[10]Similarly, the Court should exercise its discretion and deny Defendants' request for oral argument on their motion. D.Conn. L.R. 7(a)(1).

barred. Even assuming, for the sake of argument, that the Court does consider the merits, Defendants plainly fail to meet the high standard for such motions.

The standard for granting a motion for reconsideration is extremely high, with good reason: without a high standard, the finality of judgments and the rule of law itself would be severely undermined. Thus, the standard is "strict." Shrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995); Colon v. Tucciarone, No. CIV 3:02CV891 (PCD), 2003 WL 22439588 at *1 (D.Conn. Oct. 27, 2003) (attached as Exhibit O). Reconsideration should be denied "unless the moving party can point to <u>controlling</u> decisions or data that the court overlooked–matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader, 70 F.3d at 257 (emphasis added). Defendants' motion fails on its face because it is not enough, as Defendants suggest, that the court "might have reached a different conclusion." Def. Mem. at 8. Reconsideration is reserved for matters in which it is necessary to "correct a clear error of law or to prevent manifest injustice." United States v. Sanchez, 35 F.3d 673, 677 (2d Cir. 1994). The Defendants have failed entirely to make such a showing here.

Defendants essentially raise three arguments: (1) the Court's January 7, 2004 Order, which approved and adopted the Monitor's Exit Plan as a court order <u>nunc pro tunc</u> as of December 23, 2003, deprived Defendants of due process (Def. Mem. at 4-6); (2) the Court was bound by the terms of the October 7 Order which "neither requires nor permits" the Court to adopt the Exit Plan as an order (Def. Mem. at 6-8); and (3) paragraph 7 of the introductory section of the Exit Plan, which requires the Defendants to "provide funding and other resources necessary to implement the Exit Plan," exceeds the scope of the October 7 order and "may" require appropriation of funds in violation of state law. (Def. Mem. at 9-11). As set forth below, each of these arguments is without

merit and completely fails to meet the high standard for reconsideration.

    A.    **By Adopting the Exit Plan as a Court Order, the Court Did Not Alter Defendants' Substantive Rights and No Hearing Was Required.**

Underlying Defendants' due process argument is the false assertion that by issuing an Order adopting and approving the Exit Plan as a Court order, the Court altered the nature of Defendants' obligations under the Exit Plan because Defendants could be held in contempt for non-compliance. (Def. Mem. at 4-5.) This assertion is easily rejected because the creation and terms of the Exit Plan are referred to in–and are part of–the October 7 Order itself. Defendants do not dispute the validity of the October 7 Order itself.

Moreover, the October 7 Order made clear that the Exit Plan was explicitly intended to replace the Consent Decree, Manuals, and the 2002 Transition/Exit Plan–all of which were undisputably Court orders. Ex. K at ¶ 2, bul. 5. Because the Exit Plan is an agreed-upon modification of the original Consent Decree in this case, it has aspects both of a contract and a judicial decree. Local Number 93, International Ass'n of Firefighters v. Cleveland, 478 U.S. 501, 519 (1986). It is both "an agreement of the parties" as well as "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Rufo v. Inmates of Suffolk Co. Jail, 502 U.S. 367, 378 (1992).

As a matter of law, any modification of a court order must also be court-ordered, particularly in a class action. The court is the guardian of the rights of class members, and as such is "vested broad administrative, as well as adjudicative powers." Greenfield v. Villager Industries, Inc., 483 F.3d 824, 832 (2d Cir. 1973). The court serves as the fiduciary of the class. Watson v. Ray, 90

F.R.D. 143, 146 (S.D.N.Y. 1981). Having previously ordered certain relief for the plaintiff class, the court cannot allow counsel for the parties to re-negotiate and modify that relief without also approving the changes.

Additionally, Defendants' assertion is belied by the circumstances that led to the October 7 Order and the Exit Plan: Defendants' substantial and admitted non-compliance with the 2002 Transition/Exit Plan. The 2002 Transition/Exit Plan was, of course, a Court order; it was an 18-month long modification of the Defendants' obligation under the Consent Decree and Manuals. Defendants' non-compliance with the 2002 Transition/Exit Plan led to Plaintiffs' request for a finding of contempt and the imposition of a receiver. See Ex. I. In their Motion for Reconsideration, Defendants essentially argue that while they stipulated to the October 7 Order to avoid a finding of contempt, they nevertheless did _not_ agree that the new Exit Plan–the cornerstone of the October 7 Order–could ever be enforced with a finding of contempt. This argument has no basis in law, fact or common sense.[11]

Defendants' obligations under the October 7 Order were not "materially change[d]" by the Court's adopting the Exit Plan as a Court order as Defendants contend (Def.Mem. at 5); they remained the same. Indeed, under the October 7 Order, if the Court Monitor becomes unwilling or unable to continue as the Monitor, the October 7 order becomes null and void and the Exit Plan "shall continue to be implemented and shall be in full force and effect." Ex. K at ¶ 5. Thus, if the Monitor were to become unwilling or unable to continue in his position, and if the Defendants' theory prevailed, then the Juan F. Class of abused, neglected, and at-risk children would have no

---

[11] Similarly, Defendants' assertion that the "October 7 order contemplates no court order with respect to the Exit Plan except to nullify it" (Def. Mem. at 8) is absurd.

enforceable Court order protecting their rights. Again, Defendants' argument is simply nonsensical.

Far from creating a clear error of law or a manifest injustice, then, the Court's adoption and approval of the Exit Plan as a Court Order was reasonably expected by all parties and was necessary since the Exit Plan, like the October 7 Order of which it is a part, is a modification of the Consent Decree. Defendants' argument is baseless and fails to support reconsideration.

B.  **The Court Had the Clear Authority to Adopt and Approve the Exit Plan as a Court Order.**

Defendants' argument that the plain language of the October 7 Order neither "requires nor permits" the approval and adoption of the Exit Plan as an enforceable Court order is also fatally flawed. First, as discussed previously, the Exit Plan is referred to in, and is part of, the October 7 Order. Also as discussed above, as a matter of law, the Exit Plan had to be approved as a Court Order because (1) it modified the Consent Decree; and (2) in the event the Monitor is no longer able or willing to continue as the Monitor, the Exit Plan may one day stand alone as the only replacement of the Consent Decree and so must also stand alone as an Order establishing the Defendants' enforceable obligations to the Plaintiff class of children.

Additionally, Defendants ignore the well-established law giving the Court "broad administrative, as well as adjudicative powers." Greenfield, 483 F.3d at 832. Defendants have no basis in fact or law to challenge the authority or appropriateness of the Court's adoption and approval of the Exit Plan as an Order of the Court.

C.  **Defendants Agreed To and are Bound By the Terms of the Exit Plan.**

Defendants' final arguments are an attempt to back out of the legal obligations of a bargained-for, Court-ordered agreement. Paragraph 7 of the Exit Plan provides: "The Defendants

shall provide funding and other resources necessary to fully implement the Exit Plan." See Ex. A at ¶ 7. This is almost identical to the language contained in the Consent Decree, which governed this case for over a decade: "The State of Connecticut shall pay for, and fund, the costs for the establishment, implementation, compliance, maintenance, and monitoring of all mandates in this Consent Decree and all determinations and directives of the DCYS Monitoring Panel as may be set forth in Manuals, memoranda, or other materials issued in the performance of its duties."[12] Paragraph 7 of the Exit Plan is well within the scope of the October 7 Order, and there is nothing facially unlawful about this provision. There is nothing in the October 7 Order that limits the authority of the Monitor to include this provision.

    **1.**     **Nothing in the October 7 Order limits the Monitor's authority to include paragraph 7 in the Exit Plan.**

The Defendants bargained for the October 7 Order, which expressly authorized the Monitor to create final outcome measures, standards and an Exit Plan. Ex. K at ¶ 2, bul. 5. By agreeing to the October 7 Order, the Defendants waived any and all rights to contest and complain about the final outcome measures, standards, or other provisions of the Exit Plan. Nothing in the "four corners" of the October 7 Order limits the provisions or topics that the Monitor was authorized to include in the Exit Plan.

Additionally, Defendants cannot credibly assert they were denied a "meaningful opportunity for input" into the creation of the Exit Plan. Id. This is precisely what both parties were given, as the Court Monitor shared various drafts with each party and had various ex parte telephone conferences with each party, and the parties submitted written comments to the drafts as well.

---

[12] See Consent Decree at ch. XXIV, p. 114 (attached as Exhibit N).

Nothing in the October 7 Order required the Court Monitor to show every possible permutation of every possible provision to the parties ahead of his final submission to the Court, nor did it direct the Monitor to obtain the agreement of the parties as to anything in the Exit Plan. The Court's January 7, 2004 Order indicates that the Monitor fulfilled the mandate of the October 7 Order for "meaningful input."[13]

### 2. Paragraph 7 of the Exit Plan is not facially unlawful and Defendants' arguments concerning this provision are not ripe for review.

On its face, there is nothing unlawful about a provision requiring the Defendants to "provide funding and other resources necessary to fully implement the Exit Plan." Ex. A at ¶ 7.[14] Defendants appear to challenge a hypothetical circumstance under which paragraph 7 "may" be enforced. Def. Mem. at 9. Defendants have not alleged any current factual inability to comply with its provisions, and they do not face a substantial hardship if the Court does not hear their arguments about paragraph 7 now. Thus, to review that provision now would "entangl[e]" the Court prematurely in "abstract disagreements." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977). Should the issue

---

[13] Having bargained for the Exit Plan, and having signed onto the October 7 stipulation, the Defendants have incurred a contractual obligation to fulfill the terms of the Exit Plan. Firefighters, 478 U.S. at 519. The Governor and the Commissioner agreed to the October 7 order, agreed to be bound by the Monitor's Exit Plan before seeing the final details of that plan, and are now subject to federal court enforcement of the plan.

[14] Despite Defendants' bluster about "appropriations" being solely a legislative branch function, Def. Mem. at 9-10, paragraph 7 of the Exit Plan does not refer to "appropriations" as a noun or "appropriate" as a verb or any other form of that word. "Provide funding" can mean a number of different things other than "appropriate legislatively." For example, the Governor has the authority to move funds within an agency's appropriation from one line item to another. Conn. Gen. Stat. § 4-87(a). The Governor can also spend money directly from the state's contingency fund "as he deems necessary and for the best interest of the public." Conn. Gen. Stat. § 4-84. Additionally, the Exit Plan's mandate that the Defendants "provide funding and other resources" could be interpreted as a requirement that the Governor and the Commissioner undertake all zealous efforts to convince the General Assembly to increase DCF's appropriations. Plaintiffs suggest that, at the very least, paragraph 7 undisputedly obligates the Defendants to do all they can do, within the powers of their offices, to obtain all necessary resources and to prevail upon the legislative branch to provide the necessary resources to enable DCF to comply with the Exit Plan.

become ripe at a future time, the Defendants will be free to argue legal or factual impossibility as a defense. Until then, the provision is not ripe for review.[15]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for reconsideration in its entirety.

RESPECTFULLY SUBMITTED,

PLAINTIFFS

BY: _____  _____ with express
Ira P. Lustbader                Martha Stone            permission by
Federal Bar No. ct23551         Federal Bar No. ct00080  Erik Pitchal
ilustbader@childrensrights.org  mstone@law.uconn.edu
Erik S. Pitchal                 CENTER FOR CHILDREN'S ADVOCACY
Federal Bar No. ct20513         University of Connecticut School of Law
epitchal@childrensrights.org    65 Elizabeth Street
CHILDREN'S RIGHTS               Hartford, CT 06105
404 Park Ave. South, 11th Fl.   Tel 860-570-5327
New York, NY 10016              Fax 860-570-5256
Tel 212-683-2210
Fax 212-683-4015

THEIR ATTORNEYS

---

[15] By arguing that Defendants' assertions regarding paragraph 7 are not ripe for review, Plaintiffs do not concede—rather Plaintiffs vehemently dispute—the merits of Defendants' contention that this provision of the Exit Plan is unlawful in any way. Firstly, there are many ways that paragraph 7 could be enforced against Defendants and not violate Connecticut law. See supra, note 14. Secondly, "Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." Frew v. Hawkins, 540 U.S. ___, No. 02-628, slip op. at 9 (Jan. 14, 2004). Federalism does not require that federal courts "enforce their decrees only by sending high state officials to jail." Id. at 8 (citing Hutto v. Finney, 437 U.S. 678, 690-91 (1978)). Moreover, state officials may agree to a consent decree which contains provisions that go beyond the minimum requirements of federal law, and if they do so, the decree is still enforceable by a federal court. Id. at 7. Further, the Court has the power to direct states to take measures that may be ancillary to appropriate prospective relief. Quern v. Jordan, 440 U.S. 332 (1979). Should the Court decide that Defendants' assertions regarding paragraph 7 of the Exit Plan are currently ripe for review, then Plaintiffs would respectfully request the opportunity to fully brief this issue.

## CERTIFICATE OF SERVICE

The undersigned counsel for plaintiffs hereby certifies that the foregoing Plaintiffs' Memorandum of Law in Opposition to Motion for Reconsideration was served upon the following by Federal Express, on January 28, 2004, addressed as follows:

Ann H. Rubin, Esq.
Carmody & Torrance LLP
195 Church Street
New Haven, CT 06590-1950
(203) 777-5501
Counsel for Defendants

David P. Atkins, Esq.
Zeldes, Needle & Cooper P.C.
1000 Lafayette Boulevard
P.O. Box 1740
Bridgeport, CT 06601-1740
Counsel for Court Monitor

D. Ray Sirry
DCF Court Monitor
300 Church St., 4th Floor
Wallingford, CT 06492

_____
Erik S. Pitchal