UNITED STATES DISTRICT COURT    FILED

DISTRICT OF CONNECTICUT

2004 FEB 10  P 2: 57

JUAN F., by and through his
next friends Brian Lynch and
Isabel Romero, on behalf of
themselves and all others
similarly situated, et al.    :

US Di...
ERP...

v.    :    Civil No. H-89-859(AHN)

JOHN G. ROWLAND, ET AL.    :


RULING AND ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION

The standard for granting a  motion for reconsideration is

strict.  See Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d

Cir. 1995).  Reconsideration is generally denied "unless the

moving party can point to controlling decisions or data that the

court overlooked – matters, in other words, that might reasonably

be expected to alter the conclusion reached by the court."  Id.

The defendants have not met this standard -- they have not

presented any change in controlling law, new evidence, or the

need to correct a clear error of law or to prevent manifest

injustice.  See United States v. Adegbite,  877 F2d. 174, 177 (2d

Cir. 1989).  Accordingly, their motion for reconsideration [doc.

# 459] is DENIED.  Nonetheless, the court believes it is

appropriate to state on the record the reasons why entry of the

Exit Plan as an order of the court is appropriate, necessary, and

required.

First, the defendants were given notice and an opportunity

to be heard before the Exit Plan was ordered.  It is clear from the language of the Exit Plan itself, as well as from the facts leading up to the final Exit Plan as detailed by the Court Monitor at the hearing today, that the parties were heard before the Exit Plan was presented to the court.  Each measure in the Exit Plan was discussed at length with the defendants.  Each of the numerous drafts of the Exit Plan were reviewed by the defendants.  The Court Monitor had many discussions with the defendants concerning the provisions of the Exit Plan, and the defendants had several opportunities to comment on those provisions.  As a result of those discussions, the Court Monitor made changes in the draft Exit Plan, many of which were based on the defendants' comments and concerns.

Further, the October 7, 2003 Order, which was an agreed-upon solution that avoided court-ordered receivership for DCF as a remedy for the defendants' significant, undisputed, and repeated failures to comply with the 1991 Consent Decree, Manuals, and 2002 Transition/Exit Plan, expressly provides that the Court Monitor's final decision on outcome measures, standards and exit plan would be binding on all parties.  In addition, the plain language of the October 7, 2003 stipulation and order unambiguously states that it <u>and</u> the Exit Plan described therein would replace the 1991 Consent Decree, Manuals, and 2002 Transition/Exit Plan, all of which were vacated by the October 7,

2

2003 Order.

The defendants' suggestion that the court could not enter the Exit Plan as an order without their express consent borders on frivolous.  The defendants are not exposed to any new, different, or additional penalties for non-compliance with the terms of the Exit Plan than they were exposed to under the prior orders.  Indeed, because the Exit Plan replaces and modifies the 1991 Consent Decree, Manuals, and 2002 Transition/Exit Plan, all of which were court orders, a fortiori, the Exit Plan must be a court order.

This is also true with regard to the provision of the Exit Plan that the defendants say exceeds the scope of the October 7, 2003 Order and allegedly offends the constitution and laws of Connecticut.  This provision, which states that the defendants shall "provide funding and other resources necessary to fully implement the Exit Plan" is almost identical to a provision in the original 1991 Consent Decree.[1]  Moreover, this funding provision does not require the Commissioner and the Governor to illegally appropriate state funds.  There are numerous ways the Governor may lawfully obtain the funding to implement the State's

---

[1]The 1991 Consent Decree at ch. XXIV, p. 114 provides: "The State of Connecticut shall pay for, and fund, the costs for the establishment, implementation, compliance, maintenance, and monitoring all of the mandates in this Consent Decree and all determinations and directives of the DCYS Monitoring Panel as may be set forth in Manuals, memoranda, or other materials issued in the performance of its duties."

agreement other than by "appropriation." For example, he may
request the funds from the General Assembly as he did, albeit
grudgingly,[2] in his 2004-05 budget. He may also move funds from
within an agency's appropriation from one line item to another,
see Conn. Gen. Stat. § 4-87(a), and may spend money directly from
the State's contingency fund "as he deems necessary and for the
best interest of the public." See Conn. Gen. Stat. § 4-84. In
addition, even if the funding provision was not included in the
Exit Plan, the court could, under its equitable powers, require
state officials to provide the necessary funds. As the Supreme
Court recently noted in a case involving judicial enforcement of

---

[2]The comments that accompany the 2004-05 budget for DCF
hardly constitute a zealous attempt to convince the legislature
that DCF's increased appropriations are necessary, i.e.:
"Unfortunately, the Exit Plan developed by the federal court
monitor and adopted by the court in December 2003 is, at best,
questionably attainable, and at worst, unrealistic - particularly
in its expectations about speeding adoptions and reducing the
number or children in residential treatment. At least one other
measure is unrealistic and several more are extremely difficult
to attain. In addition, the Exit Plan ordered by the court also
requires the state to provide carte blanche funding to implement
it: a provision that gives the court monitor judge powers
reserved to the legislature under the State Constitution, and
which could violate the state's constitutional cap on spending.
The far-reaching financial provisions, which shows wholesale
disregard for the budgetary process and threatens to siphon
funding from other agencies and important needs, was never
included in draft plans as required by the October order before
the Exit Plan was handed down. . . ." FY 2004-2005 Governor's
Midterm Budget Adjustments, Connecticut, Feb. 4, 2004,
Introduction, Investing in Child Protection & Welfare, The Exit
Plan, at 99-100. Statements such as these do not seem designed
to encourage the legislature to enact the necessary funding. To
the contrary, these statements convey a message that the
administration does not actually support its funding request.

a federal consent decree against a state agency, federal courts
are not reduced to merely hoping for compliance.  Rather, if a
state agency refuses to adhere to a consent decree, the court may
impose such prospective ancillary relief, including financial
sanctions, that is necessary to insure compliance.  See Frew v.
Hawkins, ___ U.S. ___, 124 S.Ct. 899, 905 (2004).  "The
principles of federalism that inform the Eleventh Amendment
doctrine surely do not require federal courts to enforce their
decrees only by sending high state officials to jail.  The less
intrusive power to impose a fine is properly treated as ancillary
to the federal court's power to impose injunctive relief."  Id.
(quoting Hutto v. Finney, 437 U.S. 678, 690-91 (1978)).

     Finally, the filing of the motion for reconsideration,
coupled with the comments the administration made to the
legislature in presenting the 2004-05 budget for DCF, and
comments such as those recently made by the House minority
leader,[3] do not bode well for the new era of cooperation that was
supposedly ushered in by the agreement that led to the October 7,
2003 Order.  This motion and such comments cause the court to

─────────────────

     [3]As reported in the Journal Inquirer, the main concern of
the House Minority Leader is not funding.  Rather, as he stated:
"'I've been upset all along that we've been trying to operate the
DCF with a federal judge who thinks he can manage the agency. . .
.  They've been managing it for the last 15 years under the
consent decree and they're as much at fault as anyone else' for
the agency's troubles."  Kym Soper, Gov Grudgingly Gives DCF
Funds to Meet Consent Decree Mandates, Journal Inquirer, Feb. 5,
2004.

question the sincerity of the remarks made at the time the
agreement was announced -- that it put "for the first time, the
Court Monitor and administration officials . . . on the same
team[,]" raised "the mission of DCF to the highest possible level
within [the] administration[,]" and that as far as the
administration was concerned "there is nothing more important . .
. than taking care of children in Connecticut."  Colin Poitras, A
Sharp Turn For State DCF  The Deal: State, U.S. to Share Control
of Agency Child-Care Crisis, The Hartford Courant, Oct. 8, 2003.

      In conclusion, the court reminds the parties of the
sentiments expressed by the Court of Appeals ten years ago which
are just as appropriate today.  "Resolution of this complex case
by consent decree would not have been possible without the
admirable cooperation of the parties and the careful, diligent
work of the court monitor.  Their joint efforts have effectively
addressed over one-hundred issues that plaintiffs have advanced
in their broad-scale challenge on behalf of Connecticut's foster
care and adoptive children.  Because of the parties' cooperation,
wisdom, and good faith displayed so far in dealing with these
important problems, lengthy and expensive formal judicial
proceedings have been avoided, and relief to the plaintiff class
has been expedited.  We fully expect that the same attitudes will
continue to prevail as the parties, the court monitor, and the
district court continue to wrestle with the problems that still

6

remain to be resolved under the consent decree." Juan F. v.
Weicker, 37 F.3d 874, 881 (2d Cir. 1994). The court is
optimistic that the parties will continue to cooperate and employ
the same good faith and wisdom as we move towards full
implementation of the Exit Plan.

SO ORDERED this 10th day of February, 2004 at Bridgeport,
Connecticut.

_____
            Alan H. Nevas
   United States District Judge

7