FILED

2004 SEP -2 A 11: 44

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JUAN F., et al.

       Plaintiffs

  v.                              CIVIL NO. H-89-859 (AHN)

M. JODI RELL, et al.

       Defendants                 August 3, 2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER

The Juan F. Court Monitor's Office has completed the fifth review of the DCF adoption cohort that began in March of 2002. It is respectfully requested that the Court accept this report and officially order it to be filed with the Clerk as a formal document related to this case.

Approved and So Ordered: _____  Date: 9/2/04
                             The Honorable Alan H. Nevas
                             Senior United States District Court Judge

# DCF Children Waiting for Adoption

**The DCF Court Monitor's Report
of the Fifth Review of a Cohort of Children
in DCF Custody Whose Parental Rights Have Been Terminated,
and Who Had a Goal of Adoption on March 31, 2002**

August 2, 2004

Respectfully Submitted
DCF Court Monitor's Office
300 Church Street
Wallingford, CT  06492
Telephone:  203-741-0458
Facsimile:  203-741-0462
E-Mail:  Ray.Sirry@po.state.ct.us

**Introduction**
This is the fifth review of a cohort of children whose parental rights have been terminated and who had a permanency goal of adoption on March 31, 2002. The first report, dated August 1, 2002, described the methodology and the protocol for the review, so it will not be repeated here. This review covers the six-month period from January 2, 2004 through July 1, 2004.

**Current Status**
Substantial numbers of children are adopted in the Connecticut DCF system and this number has improved in recent years.

Of the 155 children in the cohort, 99 (63.9%) have been adopted as of July 1, 2004. On July 1, 2004, twenty-three children in the cohort continued to have the goal of adoption. One medically complex child died during the prior reporting period. As of July 1, 2004, thirty-two children have had one or more goal changes since March 2002 resulting in a stated permanency goal of LTFC (14), Other Permanent Living Arrangement (17) or UTD (1). In addition, at the point of this review, there were six cases open due to CPS or voluntary service issues.

**Table 1: Children adopted during the study period (April 1, 2002 – July 1, 2004)**

| Time Frame of Finalized Adoption | Frequency | % Of Cohort | Cumulative % of Cohort |
|---|---|---|---|
| Prior to 8/01/2002 | 56 | 36.1 | 36.1 |
| 8/02/2002 through 1/01/2003 | 15 | 9.7 | 45.8 |
| 1/02/2003 through 7/01/2003 | 17 | 10.1 | 56.8 |
| 7/02/2003 through 1/01/2004 | 6 | 3.9 | 60.6 |
| 1/02/2004 through 7/01/2004 | 5 | 3.2 | 63.9 |
| Total | 99 | | |

The conclusions of the August 1, 2003 report and those of the May 20, 2004 report remain valid and are incorporated here by reference.

- The overall time frame for the adoption to occur remains too long with more than 25% of the children waiting four years or more (See Table 2).
- Most of that time is consumed by DCF before filing TPR petitions and after TPR is granted. The court terminated parental rights on average in less than 2 months for the five cohort children adopted between January 2, 2004 and July 1, 2004. The average time for the court to terminate rights following the filing of petitions for all children in the study is 8.5 months.
- Only 9 of the 99 cohort children adopted met the federal standard of adoption within 24 months.
- The number of adoption disruptions is unacceptable high and suggests that additional or more effective adoptive parent support services, for a longer period of time, are necessary to ensure that adoptions are permanent. (See Table 3 and Table 4)

- The role of the courts and the Attorney General's Office in the excessive time frame to find these children permanent homes cannot be determined from these data. Arguably, multiple continuances and inadequate coordination between the superior courts, probate courts, the Attorney General's Office, and DCF plays a role in the excessive time frames, the extent to which is unknown. This is an area for future study.

**Monitor's Conclusions and Recommended Action Steps for Transition Task Force**
1. The Technical Advisory Committee, National Resource Center for Adoptions, American Bar Association, or other similar organizations should conduct an expedited comprehensive study of the adoption process in Connecticut, to determine what changes Connecticut must make to meet the 24 month federal and Exit Plan schedule. Some changes are already known to be essential and are a focus of the DCF Positive Outcomes for Children Plan.
2. Too much time is consumed making the decision as to whether to seek termination of parental rights. Concurrent planning seems to be more of a concept that a reality. Clearly, too much time is consumed finalizing an adoption after the children are free for adoption. The adoption process must be streamlined to shorten the time between the child's entry into DCF custody and the finalization of adoption.
3. The current practice of further delaying the adoption finalization process of children who have passed the 24-month benchmark in favor of processing those who have not must cease. To do otherwise belies the Department's expressed desire to improve practice rather than "work merely to achieve the numbers in the Exit Plan"
4. When DCF recognizes that a pre-adoptive placement is at risk of disruption, they should immediately convene a family conference to determine what services and supports are necessary to preserve the placement in the pre-adoptive home. Table 3 and Table 4 strongly suggest that adoptive parents need more support and services for a longer period of time.
    a. One obvious necessary improvement is the increased use of permanency planning services programs (PPSP). Once the referral to PPSP is currently made, and the adoption finalized, there is no follow up by DCF to see if parents are getting a beneficial service or even if the contractor has fulfilled the obligation.
    b. An aftercare plan should be developed which explains DCF's future service options available to both adoptees and adoptive parents during the first year PPSP contract period and beyond. This would emphasize that DCF is truly a partner in the adoption and that the adoptive parents and child have the right to future support services.
5. DCF must end the informal practice of waiting at least 12 months after placement in an adoptive home before seeking finalization of the adoption. This is most clearly unnecessary in cases where the adoptive resource has been a long time foster care resource but is not officially identified as an adoptive resource until the TPR is finalized.

6. DCF must adopt a user-friendly, culturally competent, adoptive family recruitment, training and retention model.
7. Initial and subsequent treatment planning is inadequate when 21% of the children who are wards of DCF saw their permanency goal changed from adoption to another goal as they waited for a permanent resource. The fact that many of the goals were changed from adoption to long-term foster care or independent living emphasizes that children wait too long for adoption.
8. Adoptive children should have the same benefits as children in foster care to remove the disincentive for foster parents to adopt rather than opt for long term foster care.
9. In many of the disruptions, it was noted in the record that the DCF social worker had concerns about the "fit" of the child with the family prior to adoption. The adoptions proceeded with no identified services provided to address these concerns.
10. The frequency of visitation declines when a child is placed in a pre-adoptive setting and is nearing finalization and as a result, documentation is often poor during this period. This makes it difficult to know why some of the pre-adoption or post adoption disruptions occur and perhaps, minimizes the opportunities for the adoption to succeed via identification of appropriate supports. This also reduces DCF's chances of meeting the visitation outcome measure.

**Table 2: Overall timeframe to adopt children in Connecticut**

| Time | Frequency | Percentage |
|---|---|---|
| Less than 12 months from time of latest removal | 3 | 1.9 |
| At least 12 months but less than 24 months | 9 | 5.8 |
| At least 24 months but less than 36 months | 21 | 13.5 |
| At least 36 months but less than 48 months | 26 | 16.8 |
| 48 months or more from time of latest removal | 40 | 25.8 |

**Table 3: If disruption (both pre and post adoption) occurred in the six months ending July 1, 2004, what was the stated reason?**

| Reason | Frequency | Percentage |
|---|---|---|
| Child's behavior beyond parental/caretaker control | 19 | 90.4 |
| Parent's physical or emotional condition required removal | 1 | 4.8 |
| Child maltreatment substantiated | 1 | 4.8 |
| Total | 21 | 100.0 |

**Table 4: Disruptions during entire study period**

| Period of Disruption | Pre-Adoptive Disruptions | Post Adoptive Disruptions |
|---|---|---|
| Prior to 3/02 | Not Captured | 2 (prior to review period) |
| 4/1/03 – 7/1/03 | 12 | 2 |
| 7/2/03 – 1/1/04 | 19 | 2 |
| 1/2/04 – 7/1/04 | 8 | 3* |
| Total | 39 | 9** |

\* One adopted child disrupted in two periods of the review.
\*\* Nine (9) or 9.1% of children with finalized adoptions experienced post adoption disruptions.