The Overwhelming Majority of Flex Funds Are
Used to Meet Essential Needs of DCF Clients:
The Findings of the *Juan F.* Court Monitor's Office
Regarding the Use of Flex Funds
Expended April – August 2004

October 5, 2004

*Juan F.* Court Monitor's Office
300 Church Street
Wallingford, CT  06518
Phone:  203-741-0458
Fax:  203-741-0462
Email:  Ray.Sirry@po.state.ct.us

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

## Table of Contents

| Section | Page |
|---|---|
| Table of Contents | 2 |
| Executive Summary | 3 |
| The Findings of the *Juan F.* Court Monitor's Office Regarding the Use of Flex Funds Expended April – August 2004 | 6 |
| Introduction and Methodology | 6 |
| Demographics | 6 |
| Identified Needs | 7 |
| Timeframe to Payment | 9 |
| Workers' Perspective of Obstacles to Service Provision | 9 |
| Flex Payments in Relation to Case Goal | 13 |
| Conclusions and Recommendations | 16 |
| Appendix B – Review Tool and Directions | 18 |

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

## Executive Summary

The Monitor's Office, and DCF's Quality Improvement and Exit Planning Divisions jointly sampled recent flex funds requests to inform the budget process. In large part, the findings positively reflect the good social work being done statewide. This a brief overview of the findings of the review:

**Key Findings:**
1. In 89% of the cases, the reviewer concluded that the use of flex funds were in line with good practice (defined as meeting the needs of the family in a meaningful manner – addressing the core issues bringing the family to the attention of DCF).

2. Social Workers are enthusiastic in their support of flex funds. All workers indicated that flex funds provide workers with a much needed resource to assist in instances of service gaps, wait lists, and immediate client need which cannot be accommodated via limited community resources.

3. In 79% of the cases reviewed, the funds were spent in a manner that would directly support goal achievement. This focus on core issues appears to be more problematic in the investigation cases. However, additional study is recommended given the small numbers of investigation cases reviewed in this sample.

4. This review found that payments often supported Exit Plan Measures (one request could serve multiple measures) as well as the case goal, in that:
    - 41% directly related to keeping a family intact
    - 16% were directly related to reunification
    - 20% were directly related to preservation of placement
    - 8% were directly related to placement of a child with a relative or special study resource known to the child.

2. 70% of the cases reviewed had documentation that the worker attempted to seek out services or funding by mechanisms other than flex funds prior to requesting the payment. The request policy differs from office to office indicating the need for a clear directive on the policy related to access to flex funds.

3. Worker's understanding of available DCF Child Welfare Accounting funds is considered a barrier by only 4.3% of the workers, yet clearly there is a void of information available in this regard. In reviewer discussions with Fiscal prior to beginning this review, it was stated that there are accounting codes for such things as summer camps, and that those funds did exist for each area office during this timeframe. Workers were not aware of such availability and after seeking outside assistance and scholarships sought flex funds to secure summer programs to meet the developmental and social needs of the children on their caseloads. This raises two issues: First a need for a clear description of the DCF funds available within

Case 2:89-cv-00859-AHN     Document 474     Filed 10/07/2004     Page 4 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

each area office needs to be accessible to the frontline staff. Second, to avoid over utilization of flex funds where other available DCF funds are present, a similar $1000.00 threshold for approved use of those funds already allocated to flex funds and discretionary funds should be instituted.

4. In 93% of the cases reviewed, the reviewer was able to document that the funding met the need as identified by the worker.

5. In 83% of the cases reviewed, social workers indicated at least one barrier to providing services, goods or financial assistance to clients in a timely manner resulting in the need to utilize flex funds. Workers had the option to select multiple responses from a menu of options related to internal processes or informational deficits as well as an "other" category. The majority selected "other" and identified barriers related to service gaps and limited resources. 76.6% of workers indicated "other" as the obstacle to service provision via funding sources other than flex funds. [1]

> 8.5% of workers indicated the "bureaucratic approval process"[2] as an obstacle to service provision via existing resources.
> 6.4% of workers indicated the "lack of identification of alternative providers" as an obstacle.
> 4.3% of workers indicated the "lack of identification of existing DCF service contracts" and funding as an obstacle.
> 3.2% of workers indicated the "lack of identification of other state agencies' responsibilities" as an obstacle.
> 11.7% of the workers indicated that there were "no barriers" to seeking provision of services or funds to meet clients' needs.

6. 59% of cases reviewed had more than one flex request payment made during the period of April through August 2004.

---

[1] This included: Limited Community Resources (35); No Resource in Area (19); DSS/Section 8 Housing (12); Insurance issues (9); Lack of Spanish Speaking providers (8); Criteria for Assistance via Community Providers (7); Immediate Need/Emergency (7); Worker did not seek alternative to Flex Funds (7); Landlords don't accept DSS voucher, interstate issues, vendor assignment process, transportation (all identified twice); and lastly, Corrections discharge planning, Board of Education, Foster Parent, Client limitations, Clothing allowance policy inadequate, agencies require DCF case to be open to continue/start services (all indicated 1 time)

[2] This references the Department's chain of approval from social worker to the required authorization level – Social Work Supervisor, Program Supervisor, Program Director, Area Director.

4

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Recommendations:**

*Recommendation 1:  Flex funds should continue to be available for utilization.*

*Recommendation 2:  The flex fund request process needs clarity and the enforcement of consistent statewide guidelines.  This would likely address some of the utilization issues during investigation mentioned earlier.*

*Recommendation 3:  More information about the Child Welfare Accounting funds available in each area office needs to be shared if the flex fund pool is to remain true to its purpose of supporting case needs in the absence of other funding sources available.*

*Recommendation 4:  Institute a $1000 approval threshold for all flex fund and discretionary fund accounts.*

*Recommendation 5:  Identify a responsible party in each area office to provide oversight of these ongoing service expenses for needs assessment purposes.*

*Recommendation 6:  The Interagency Task Force should look at the responsibility of all state agencies and clarify roles to ensure that the safety net is in place to support DCF involved clients in providing safe and nurturing environments for their children.*

*Recommendation 7:  The on-line resource directory needs to be updated and kept current using what Infoline has already compiled and adding community resources as identified by each area office.*

Case 2:89-cv-00859-AHN   Document 474   Filed 10/07/2004   Page 6 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

# The Findings of the *Juan F.* Court Monitor's Office Regarding the Use of Flex Funds Expended April – August 2004
(n=100)

**Introduction & Methodology**

The Monitor's Office and Quality Improvement and Exit Planning Divisions of DCF jointly sampled recent flex funds requests to inform the budget process. A random sample of 100 requests was selected from the list of 1,089 payments supplied from DCF's Fiscal Division made during the period of April 2004 through August 2004.

During the period of September 14 through September 27, 2004 the three person team consisting of DCF's Exit Planning Program Supervisor Debra Collins, Quality Assurance Social Work Supervisor Lisa Hofferth, and Joni Beth Roderick, *Juan F*. Court Monitoring Specialist, reviewed one hundred case records, and interviewed 84 social work staff[3] to provide additional insight into the utilization of flex funds across the state. The tool collected information regarding the appropriateness of the requests as they related to the case goal as well as the barriers workers faced in attempts to use alternate sources of payment (other than flex).

**Demographics**

The randomly selected sample had the following demographics:

**Table 1: Area Office**

|  | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Bridgeport | 24 | 24.0 | 24.0 |
| Hartford | 23 | 23.0 | 47.0 |
| Manchester | 7 | 7.0 | 54.0 |
| Meriden | 5 | 5.0 | 59.0 |
| Middletown | 7 | 7.0 | 66.0 |
| New Haven | 7 | 7.0 | 73.0 |
| Norwich | 10 | 10.0 | 83.0 |
| Stamford | 1 | 1.0 | 84.0 |
| Torrington | 2 | 2.0 | 86.0 |
| Waterbury | 9 | 9.0 | 95.0 |
| Willimantic | 5 | 5.0 | 100.0 |
| Total | 100 | 100.0 |  |

---

[3] Response rate was high in this review process. Only 6 of the social work staff contacted did not respond by the required deadline of September 31, 2004. A total of 89 social work staff were contacted, as 9 workers had 2 cases pulled, and 1 worker had 3 cases pulled in the random selection.

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Table 2: Case Type at Point of Flex Request**

|  | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| CPS In-Home Case (IHF) | 43 | 43.0 | 43.0 |
| CPS Child In Placement Case (CIP) | 43 | 43.0 | 86.0 |
| Voluntary Services In-Home Case (VSIHF) | 4 | 4.0 | 90.0 |
| Voluntary Services Child In Placement Case (VSCIP) | 2 | 2.0 | 92.0 |
| Open in Investigation Only | 8 | 8.0 | 100.0 |
| Total | 100 | 100.0 |  |

**Table 3: Case Participant for Whom Need Was Identified?**

|  | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Child(ren) - In Home | 29 | 29.0 | 29.0 |
| Child in Placement | 32 | 32.0 | 61.0 |
| Parent/Legal Guardian/Caretaker | 7 | 7.0 | 68.0 |
| Family Unit | 31 | 31.0 | 99.0 |
| Other | 1 | 1.0 | 100.0 |
| Total | 100 | 100.0 |  |

[4]

**Identified Needs**

Of the 100 cases reviewed, the average number of requests for flex funds during the period for each case was 2.5[5]. As seen in Table 4, the most frequent number of requested payments was one payment during the period of review (n=41). For those cases in which more than one payment was made, reviewers found that requests were either individualized to each child in the case, or were the result of a series of payments required for a specific service unable to be secured via the existing resources within the region.

---

[4] Relative Resource undergoing licensing process.
[5] This average is calculated after eliminating the two highest outlayers: in these two cases the payments provided ongoing individual counseling services (33 individual payments), and In-home supports from a nurse/home health aide for a family struggling with mental health and parenting deficits (30).

Case 2:89-cv-00859-AHN    Document 474    Filed 10/07/2004    Page 8 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Table 4: How many times were flex funds requested to serve the needs of the case participants during the period of April-August 2004?**

| # Of Requests Paid | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 1 | 41 | 41.0 | 41.0 |
| 2 | 26 | 26.0 | 67.0 |
| 3 | 13 | 13.0 | 80.0 |
| 4 | 2 | 2.0 | 82.0 |
| 5 | 7 | 7.0 | 89.0 |
| 6 | 2 | 2.0 | 91.0 |
| 7 | 3 | 3.0 | 94.0 |
| 9 | 3 | 3.0 | 97.0 |
| 12 | 1 | 1.0 | 98.0 |
| 30 | 1 | 1.0 | 99.0 |
| 33 | 1 | 1.0 | 100.0 |
| Total | 100 | 100.0 | |

The needs were categorized into 16 categories, allowing for an "other" response for those that could not be generalized. See Table 5, below for full details.

**Table 5: Per the reviewer, what category of services or payment was requested?**

| | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Food | 1 | 1.0 | 1.0 |
| Clothing | 6 | 6.0 | 7.0 |
| Emergency shelter | 2 | 2.0 | 9.0 |
| Rent to Avoid Eviction | 6 | 6.0 | 15.0 |
| Security Deposit | 12 | 12.0 | 27.0 |
| Heating/Electricity Bill | 10 | 10.0 | 37.0 |
| Counseling | 6 | 6.0 | 43.0 |
| Daycare | 4 | 4.0 | 47.0 |
| Transportation | 1 | 1.0 | 48.0 |
| Camp/Recreational Program | 18 | 18.0 | 66.0 |
| Medical or Dental Need | 3 | 3.0 | 69.0 |
| Phone Bill/Utility | 2 | 2.0 | 71.0 |
| Other | 29 | 29.0 | 100.0 |
| Total | 100 | 100.0 | |

Of those "other" requests, five were related to beds/furniture, four were related to therapeutic mentor and educational expenses, three were recorded for licensing related fees and supervised visitation, and two were for 1:1 services. The remaining payments

8

Case 2:89-cv-00859-AHN     Document 474     Filed 10/07/2004     Page 9 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

were all documented one time: baby room necessities, court ordered payment to Maternal Grandmother, drivers license examination, employment assistance, graduation expense, in-home supports, prom, and respite.

The amount of funds requested in the payments reviewed ranged from $24.00 (reimbursement for a cap & gown rental for a foster child) to $4,200.00 (therapeutic mentoring services). The average payment was $556.30. In the process of review, it was noted that the request as identified on the LINK request form did not always correctly indicate the need. Further, the requirement to always identify one child does not always correctly identify the recipient benefiting from the service or funds.

**Timeframe to Payment**
The timeframe from the Social Worker's determination to seek flex funds, to provision of funds was most frequently greater than 15 days (37%). In many of these cases, payment was made after the service was rendered, and did not impact service onset.

**Table 6: Once the determination was made to seek flex funds, how long did the process of securing funds take?**

|  | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 1-3 Days | 15 | 15.0 | 15.0 |
| 4-6 Days | 9 | 9.0 | 24.0 |
| 7-9 Days | 18 | 18.0 | 42.0 |
| 10-12 Days | 13 | 13.0 | 55.0 |
| 13-15 Days | 8 | 8.0 | 63.0 |
| Greater than 15 days | 37 | 37.0 | 100.0 |
| Total | 100 | 100.0 |  |

This review finds that the majority of delay in payments still rests with the area office processes rather than the administrative payment process. In many cases the identification of an issue, the determination to seek funds, and the actual date of request in LINK were spread across weeks or even months. Documentation in relation to additional resources sought during that time was inconsistently provided from worker to worker. In some cases workers indicated multiple avenues of search, in others there was little to suggest that the issue was being followed up on. Some specific notes identified difficulty with vendor assignments, or the need to obtain additional approval for those 12 requests exceeding $1000.00 prior to LINK request.

Case 2:89-cv-00859-AHN     Document 474     Filed 10/07/2004     Page 10 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Workers' Perspective of Obstacles to Provision of Services**
The review asked the workers to provide their perspective of obstacles to providing services or goods via the established DCF accounting codes, or through state or other community agencies rather than from the flex funds. The following provides a summary of those responses. Please note that a worker could identify more than one obstacle category during interview.

- 76.6% indicated "other" as the obstacle to service provision. The various responses were categorized as follows:
    - Limited Community Resources (35)
    - No Resource in Area (19)
    - DSS/Section 8 (12)
    - Insurance issues (9)
    - Lack of Spanish Speaking providers (8)
    - Criteria for Assistance via Community Providers (7)
    - Immediate Need/Emergency (7)
    - Worker did not seek alternative to Flex Funds (7)
    - Landlords don't accept DSS voucher, interstate issues, vendor assignment process, transportation (Each identified twice)
    - Corrections discharge planning, Board of Education, foster parent, client limitations, clothing allowance policy is inadequate, agencies require DCF case to be open to continue/start services (all identified once)
- 11.7% workers indicated "no barriers" present to service provision
- 8.5% workers indicated the "bureaucratic approval process[6]" was an obstacle to service provision via existing resources.
- 6.4% workers indicated the "lack of identification of alternative providers" as an obstacle
- 4.3% workers indicated the "lack of identification of existing DCF service contracts and funding" as an obstacle
- 3.2% workers indicated the "lack of identification of other state agencies' responsibilities" as an obstacle

---

[6] This references the Department's chain of approval from social worker to the required authorization level – Social Work Supervisor, Program Supervisor, Program Director, Area Director.

Case 2:89-cv-00859-AHN    Document 474    Filed 10/07/2004    Page 11 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

In response to the question, *"Were alternate funding sources sought to meet this need in the area office during the period of this review?"* 70% of the cases reviewed had documentation that the worker attempted to seek out services or funding by mechanisms other than flex funds prior to requesting the payment. Workers indicate that varying levels of effort and documentation are required in the 14 offices prior to seeking Social Work Supervisor's approval for payment.

**Table 7: Area Office * Were alternate resources sought to meet the identified need? Crosstabulation**

| Count Area Office | Were alternate resources sought to meet the identified need? | | | | Total |
|---|---|---|---|---|---|
| | Yes | No | N/A | Unable to Determine | |
| Bridgeport | 17 | 5 | 1 | 1 | 24 |
| Hartford | 19 | 3 | 0 | 1 | 23 |
| Manchester | 2 | 4 | 1 | 0 | 7 |
| Meriden | 4 | 1 | 0 | 0 | 5 |
| Middletown | 5 | 1 | 0 | 1 | 7 |
| New Haven | 3 | 2 | 0 | 2 | 7 |
| Norwich | 6 | 3 | 1 | 0 | 10 |
| Stamford | 1 | 0 | 0 | 0 | 1 |
| Torrington | 2 | 0 | 0 | 0 | 2 |
| Waterbury | 8 | 1 | 0 | 0 | 9 |
| Willimantic | 3 | 2 | 0 | 0 | 5 |
| Total | 70 | 22 | 3 | 5 | 100 |

In response to the question, *"Were alternate funding sources available to meet this need in the area office during the period of this review?"* As stated earlier, 70% of the cases indicated the social worker's effort to seek out resources, however, LINK documentation and interviews found 50% of the cases had documentation of one or more alternative funding sources identified for possible use. See Table 8 for details. In all 50 cases, the provision of service or funds via that alternative source was ruled out due one or more of the reasons identified under the "other" category on page 6 of this report.

11

Case 2:89-cv-00859-AHN     Document 474     Filed 10/07/2004     Page 12 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Table 8: Area Office * Were alternate resources available to meet the identified need? Crosstabulation**

| Area Office | Were alternate funding sources available to meet this need during the period reviewed? | | | | Total |
|---|---|---|---|---|---|
| | Yes | No | N/A | Unable to Determine | |
| Bridgeport | 7 | 14 | 0 | 3 | 24 |
| Hartford | 15 | 6 | 1 | 1 | 23 |
| Manchester | 2 | 5 | 0 | 0 | 7 |
| Meriden | 4 | 1 | 0 | 0 | 5 |
| Middletown | 3 | 3 | 0 | 1 | 7 |
| New Haven | 2 | 3 | 0 | 2 | 7 |
| Norwich | 5 | 4 | 1 | 0 | 10 |
| Stamford | 1 | 0 | 0 | 0 | 1 |
| Torrington | 1 | 1 | 0 | 0 | 2 |
| Waterbury | 9 | 0 | 0 | 0 | 9 |
| Willimantic | 1 | 4 | 0 | 0 | 5 |
| Total | 50 | 41 | 2 | 7 | 100 |

Looking at this information from the area office perspective, Table 8 provides social workers' perceptions of service gaps in their areas. As the table indicates, there is variability among the offices' perception of service gaps. In only 50 of the 100 cases, were workers able to identify and pursue at least one possible alternative to service provision or funding needs in their office communities. This clearly varies among the 14 offices. Willimantic workers found only 20% of the 5 cases in their region had at least one alternative avenue for possible provision. Hartford social workers indicated that 65% of the 23 cases had at least one alternative resource to pursue, and Stamford and Waterbury workers indicated 100% of their cases had at least one alternative resource available for consideration. This discrepancy among the area offices in the identification of and requirement to pursue alternate service provision (via non-flex options) may be due, in part, to the way in which the individual offices have operationalized the current flex fund policy.

In all, 136 alternate service or funding options were identified for the 50 cases in which the worker identified at least one alternate option available at the point of request. Of those cited, the five most frequented options were: DSS (17), Covenant to Care (11), Salvation Army (9), Church (7), and Care 4 Kids, CRT and DPH each identified three times.

It was clear that the identification of potential funds or services in the office area did not guarantee accessibility, as in many of these instances, barriers existed, such as wait lists, lengthy approval processes, or the acceptance criteria for funds – all requiring delays that the client could not accommodate without undue hardship or risk to safety and well being

to the identified children. In 29 cases, there was no barrier identified. The recorded

Case 2:89-cv-00859-AHN     Document 474     Filed 10/07/2004     Page 13 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

areas of barriers identified via case review were:
> 22 Community Providers were unable to assist due to limited funding, lack of materials, time frames or intensity of services needed.
> 16 DSS denied services.
> 9 Community Provider denied request.
> 8 Scholarships unavailable or application deadline exceeded and
> 8 Insurance Issues
> 6 Wait list
> 5 Church or Community Resource offered limited assistance.
> 4 Utilities (CL&P, Phone, Yankee Gas) unwilling to assist with payment and
> 4 Board of Education denied request or paid minimal %.
> 2 Vendors unwilling to accept voucher, and
> 2 Infoline unable to assist
> 1 DPH refused assistance for 5 days due to holiday, and
> 1 Mother failed to follow through in timely manner, and
> 1 Medically Complex child required nurse during supervised visitation, and
> 1 Approval process, and
> 1 DCF covered 1:1 until no longer feasible.

**Flex Payments Relation to Case Goal**
The review sought to capture whether the flex payment contributed to the provision of service for a medical/dental/mental health need, or other need impacting the ability of the child or family to achieve their goal. In some cases the service may have impacted both a medical/dental/mental health need as well as another need (concrete need or support). The review found that:
> 18% of the requests were directly related to medical/dental/ mental health needs, and
> 75% were related to concrete or support needs impacting goal achievement.

More specifically, the review asked the reviewer, "was the use of flex funds necessary to meet support goal achievement?" The review indicated that in 79% of the cases reviewed, the funds were spent in a manner that would directly support goal achievement. The tool captured some items directly related to the Exit Plan Outcome measures as follows:
> 41% directly related to keeping a family intact
> 16% were directly related to reunification
> 20% were directly related to preservation of placement
> 8% were directly related to placement of a child with a relative or special study resource known to the child.

In 89% of the cases, the reviewer found that the use of flex funds was in line with good practice (defined as meeting the needs of the family in a meaningful manner via addressing the core issues bringing the family to the attention of DCF). In 93% of the

13

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

cases reviewed, the reviewer was able to document that the funding met the need as identified by the worker.

**Table 8: In the opinion of the reviewer, was the use of flex funds in line with good practice (did the expenditure meet the needs of the family in a meaningful manner-addressing core issues bringing the family to the attention of DCF?**

|  | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Yes | 89 | 89.0 | 89.0 |
| No | 7 | 7.0 | 96.0 |
| N/A | 2 | 2.0 | 98.0 |
| Unable to Determine | 2 | 2.0 | 100.0 |
| Total | 100 | 100.0 |  |

[7] The review looked at flex requests in light of the case goal. This appears to be more problematic for investigation cases as 4 of the 8 investigation cases were found not to deal directly with the support of goal achievement or the identified allegations but were rather related to ameliorating poverty issues impacting the homes. The investigation cases reviewed had the following flex fund requests:

**Table 9: Per the reviewer, what category of services or payment was requested for the Investigation Cases Reviewed?**

|  | Frequency | Barriers | Percent | Cumulative Percent |
|---|---|---|---|---|
| Rent to Avoid Eviction | 3 | Client denied assistance via DSS, Salvation Army, or other Community Resources | 7.5 | 37.5 |
| Security Deposit | 1 | DSS denied assistance | 12.5 | 50.0 |
| Heating/Electricity Bill | 2 | CL&P required full payment, Community Resources denied assistance | 25.0 | 75.0 |
| Other (Beds/Furniture) | 2 | Community providers could not provide immediate assistance, UTD – no interview | 25.0 | 100.0 |
| Total | 8 |  | 100.0 |  |

The reviewers caution, that while there may be an issue with investigation cases, additional study is necessary given the small number of cases reviewed in this sample and the lack of information about the specific income levels of the families in these cases.

Table 10 provides information in relation to the DCF's use of flex funds to support goal achievement across all case types reviewed.

**Table 10: Case Type at Point of Flex Request * Was the use of flex funds necessary to support goal achievement? Crosstabulation**

| Count |  | Was the use of flex funds necessary to support goal achievement? | | | Total |
|---|---|---|---|---|---|
|  | Case Type at Point of Flex Request | Yes | No | N/A |  |
|  | CPS In-Home Case (IHF) | 34 | 9 | 0 | 43 |

---

[7] Payment was court ordered in one case and in the other was the result of authorized clothing voucher not being accepted out of state.

14

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

| | | | | |
|---|---|---|---|---|
| CPS Child In Placement Case (CIP) | 36 | 6 | 1 | 43 |
| Voluntary Services In-Home Case (VSIHF) | 3 | 1 | 0 | 4 |
| Voluntary Services Child In Placement Case (VSCIP) | 2 | 0 | 0 | 2 |
| Open in Investigation Only | 4 | 4 | 0 | 8 |
| Total | 79 | 20 | 1 | 100 |

Case 2:89-cv-00859-AHN     Document 474     Filed 10/07/2004     Page 16 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Conclusions and Recommendations:**

*Recommendation1:  Flex funds should continue to be available for utilization.*
As evidenced by the 89% of "yes" responses to the reviewer opinion question cited prior, this review finds that the overwhelming majority of flex requests are addressing circumstances in which the identified item or service was directly related to the circumstances bringing the child(ren) to DCF's attention or to case goal.  Workers wholehearted positive response to the flex funds is also clear indication that the availability of such funds enhances their ability to assist clients.

*Recommendation 2:  The flex fund request process needs clarity and the enforcement of consistent statewide guidelines.  This would likely address some of the utilization issues during investigation mentioned earlier.*
While the majority of requests were found to be appropriate in this review process, the flex fund request process appears to fluctuate from area office to area office.  Some of the workers clearly document research into other possible resources, how funds support the case goal, and identify barriers to service provision or assistance prior to request.  Others do not.   In addition, the reviewers found that the LINK requests are not always correctly identifying the need or identified recipient.  There is a need to operationalize the current flex fund policy in a consistent manner in all area offices.

*Recommendation3:  More information about the Child Welfare Accounting funds available in each area office needs to be shared if the flex fund pool is to remain true to its purpose of supporting case needs in the absence of other funding sources available.*
There is a disconnect between workers actual knowledge of available DCF funds and perception of knowledge for such resources.  Worker's understanding of available DCF funds via Child Welfare Accounting is not considered a barrier by the workers, yet clearly there is a void of information available in this regard.

*Recommendation4:  Institute a similar $1000 approval threshold for all flex fund and discretionary fund accounts.*
Once clarification is provided to the regions related to established accounting codes and availability of DCF funds in those areas, the Department should establish a similar $1000 approval threshold for all flex fund and discretionary funds to better account for services and needs of the population served.

*Recommendation5:  Identify a responsible party in each area office to provide oversight of these ongoing service expenses for needs assessment purposes.*
As indicated prior, the number of requests ranged from 1 to 33 requests for a case during the five months period.  The ongoing requests need to be captured for needs assessment purposes going forward in each area office. So that when budget development requires feedback on service gaps and deficits in the area offices, it can easily be provided.

Case 2:89-cv-00859-AHN   Document 474   Filed 10/07/2004   Page 17 of 19

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

***Recommendation 6: The Interagency Task Force should look at the responsibility of all state agencies and clarify roles to ensure that the safety net is in place to support DCF involved clients in providing safe and nurturing environments for their children.***
The role of DSS needs to be clarified regarding payments, for Daycare, Utility Assistance, and Housing issues as several workers noted DSS denial based on the availability of DCF funds. While only 3.2% of the workers indicated a need for "role clarification of other state agencies" there appears to be a barrier in this regard. This review found that two foster parents were denied assistance based on their income rather than on that of the foster child, with DSS then citing the DCF flex funds policy. As reviewers looked at payment information across CIP cases, use of flex funds for daycare does not appear to be just a few isolated instances. Likewise workers indicated that in some of the 16 DSS denials for assistance for basic needs (housing, utilities, cash assistance) DSS denied clients and referred them back to DCF for flex funds.

***Recommendation 7: The on-line resource directory needs to be updated and kept current using what Infoline has already compiled and adding community resources as identified by each area office.***
Area offices do not have an accessible resource that can provides up to date information on alternative providers within their area. The Resource Directory would meet this need but has not been updated regularly. While InfoLine is helpful, it cannot always meet the informational needs of area offices. Fluctuation in knowledge can be seen not only from office to office, but also unit to unit within the area office. Information should include identification of all local providers, services, and their criteria for acceptance. Service standards and appropriate rates for individualized services should also be made available to assist workers who identify a need for funding but do not have the expertise to determine appropriateness of cost. Identification of vendors within the state that should be used for purchase of household items when community resources are unable to provide assistance should also be included. A clear identification of the DCF accounting codes and available funds is also needed to ensure that workers seek funds from available DCF codes with available allocated funds prior to requesting flex funding.

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004

**Appendix B:  Review Tool and Directions**

The Findings of the *Juan F.* Court Monitor's Office Regarding
the Use of Flex Funds Expended April – August 2004
October 7, 2004