*Juan F.* v Rell Exit Plan
Quarterly Report
January 1, 2005 – March 31, 2005

June 17, 2005

Respectfully submitted:
DCF Court Monitor's Office
300 Church Street ~ 4th Floor
Wallingford, CT 06492
Tel: 203-741-0458
Fax: 203-741-0462
E-Mail: Ray.Sirry@po.state.ct.us

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005
_____

# Table of Contents
## Monitor's Office Quarterly
## Exit Plan Report Summary

|  | Page |
|---|---|
| **Highlights** | 3 |
| **Table 1** | 5 |
| **Data Sources** | 7 |
| **Monitor's 2005 Case Review** | 7 |
| **Exit Plan Outcome Measures** | 8 |
| **Other Notable Accomplishments** | 9 |

Case 2:89-cv-00859-AHN    Document 485-2    Filed 06/21/2005    Page 3 of 10

Monitor's *Juan F.* vs. Rell Quarterly Exit Report
June 17, 2005
_____

## *Juan F.* v Rell Exit Plan Quarterly Report
## January 1, 2005 – March 31, 2005

### Highlights

1. The Department of Children and Families (DCF) continues to make significant advances toward achieving the outcome measures and improving service delivery to Connecticut's children and families. A number of noteworthy improvements and developments will provide a solid foundation to continue the Department's reform efforts.

2. The approval of $55 million additional funding for the DCF in the FY06 budget proposed by Governor Rell and approved by the General Assembly provides tangible evidence that Connecticut intends to exit from the Consent Decree through improving services to children.

3. The DCF has achieved compliance with six (6) outcome measures:
    - Commencement of investigations (92.5%);
    - Completion of investigations (92.3%);
    - Maltreatment of children in out-of-home care (0.8%);
    - Multiple placements (96.2%);
    - Foster parent training (100%); and,
    - Caseload standards (100%).

4. The DCF has now maintained compliance for at least two (2) consecutive quarters with each of the outcome measures referenced in 3 above.

5. During this quarter, the DCF has achieved compliance with two (2) measures with which they had not previously been in compliance: (see Table 1)
    - Adoption (33%); and
    - Placement within licensed capacity (97%).

6. The Monitor will continue to focus on the following areas of concern in the next quarter:
    - Improving performance on worker visitation; and,
    - Completing the review of data elements necessary to ensure that the accuracy of the data for outcome measures 7 (Reunification) and 11 (Re-entry into DCF custody) improves.

7. Despite the generous influx of new monies, and the Department's progress toward achieving the outcome measures, emerging information confirms the need for more preventive services, additional specialized placement resources, internal reallocation of funds, and for services to eliminate extensive wait lists. Otherwise outcome measure 15 (Children's needs met) will be very difficult, if not impossible, to meet.

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005
_____

The Department's full unedited, but verified, report to the Court Monitor is incorporated at the end of this Monitor's Report to the Court. Table 1 on the following page shows the DCF's compliance history over the past five quarters.

Case 2:89-cv-00859-AHN    Document 485-2    Filed 06/21/2005    Page 4 of 10

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005

Page 4 of 10

Monitor's *Juan F.* vs. Rell Quarterly Exit Report
June 17, 2005
_____

| Table 1: 1Q January 1 – March 31, 2005 Exit Plan Report | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Outcome Measure Overview** | | | | | | | | |
| Measure | Measure | Target Dates | Baseline | 1Q 2004 | 2Q 2004 | 3Q 2004 | 4Q 2004 | 1Q 2005 |
| 1: Commencement of Investigation* | >=90% | 2/15/05 | X | X | X | X | 91.2% | 92.5% |
| 2: Completion of the Investigation | >=85% | 2/15/05 | 73.7% | 64.2% | 68.8% | 83.5% | 91.7% | 92.3% |
| 3: Treatment Plans** | >=90% | 8/15/05 | X | X | X | 10% | 17% | X |
| 4: Search for Relatives* | >=85% | 8/15/05 | 58% | 93% | 82% | X | 8/15/05 | 11/15/05 |
| 5: Repeat Maltreatment of In-Home Children | <=7% | 5/15/06 | 9.3% | 9.4% | 8.9% | 9.4% | 8.9% | 8.2% |
| 6: Maltreatment of Children in Out-of-Home Care | <=2% | 8/15/04 | 1.2% | 0.5% | 0.8% | 0.9% | 0.6% | 0.8% |
| 7: Reunification* | >=60% | 2/15/06 | 57.8% | X | X | X | X | X |
| 8: Adoption | >=32% | 2/15/06 | 12.5% | 10.7% | 11.1% | 29.6% | 16.7% | 33% |
| 9: Transfer of Guardianship | >=70% | 2/15/06 | 60.5% | 62.8% | 52.4% | 64.6% | 63.3% | 64.0% |
| 10: Sibling Placement* | >=95% | 2/15/06 | 57% | 65% | 53% | 5/15/05 | 8/15/05 | 11/15/05 |
| 11: Re-Entry into DCF Custody* | <=7% | 5/15/06 | 6.9% | X | X | X | X | X |
| 12: Multiple Placements | >=85% | 5/15/04 | X | X | 95.8% | 95.2% | 95.5% | 96.2% |
| 13: Foster Parent Training | 100% | 10/15/04 | X | X | 100% | 100% | 100% | 100% |
| 14: Placement Within Licensed Capacity | >=96% | 5/15/05 | 94.9% | 88.3% | 92.0% | 93.0% | 95.7% | 97% |
| 15: Children's Needs Met | >=80% | 2/15/06 | X | 53% | 57% | 53% | 56% | X |
| 16: Worker-Child Visitation (Out-of-Home)* | >=85% 100% | 5/15/05 | X | Monthly-72% Quarterly-87% | Monthly-86% Quarterly-98% | Monthly-73% Quarterly-93% | Monthly-81% Quarterly-91% | X |
| 17: Worker-Child Visitation (In-Home)* | >=85% | 10/15/05 | X | 39% | 40% | 46% | 33% | X |
| 18: Caseload Standards+ | 100% | 5/15/04 | 348 | 298 | 12 | 16 | 16 | 17 |
| 19: Reduction in the Number of Children Placed in Residential Care | <=11% | 5/15/06 | 13.5% | 13.9% | 14.3% | 14.7% | 13.9% | 13.7% |
| 20: Discharge Measures | >=85% | 5/15/05 | 61% | 74% | 52% | 93% | 83% | X |
| 21: Discharge of Mentally Ill or Retarded Children | 100% | 5/15/05 | X | 43% | 64% | 56% | 60% | X |
| 22: Multi-disciplinary Exams (MDE) | >=85% | 10/15/05 | 5.6% | 19.0% | 24.5% | 48.9% | 44.7% | 55.4 % |

Case 2:89-cv-00859-AHN   Document 485-2   Filed 06/21/2005   Page 6 of 10

Monitor's *Juan F.* vs. Rell Quarterly Exit Report
June 17, 2005
_____

Results based on Case Reviews ****For 1Q and 2Q 2005 case reviews will be conducted for outcome measures #: 3, 4, 15, 16, 17, 20 and 21 via the Court Monitor's Case Review with a release date of October 1, 2005.*****

**NOTE:** Case reviews will continue to be conducted for two quarters following the LINK build (this will allow for a two quarter testing period). A LINK report will be conducted for the third quarter following the LINK Build.

\*    OM 4    Case reviews. First LINK Report 4Q 2004 (Six Month Lapse) due 8/15/05.
      OM 7, 11  Interim report due 4/15/05, LINK report available for 3Q due 11/15/05.
      OM 10   Case Reviews. First LINK Report for 3Q 2005 due 11/15/05.
      OM 16, 17 Case reviews. LINK Report available for 3Q 2005 due 11/15/05.

## Treatment Plans\*\*

\*\* Treatment Plans were evaluated based on four (4) major categories (including elements a-o):

**2004**
**1Q** Background Information (53%), Assessment Information (52%), Treatment Services (47%), and Progress Toward Case Goals (18%). (Approved and Not Approved treatment plans)
**2Q** Background Information (60%), Assessment Information (37%), Treatment Services (43%), and Progress Toward Case Goals (32%). (Approved and Not Approved treatment plans)
**3Q** Background Information (66%), Assessment Information (52%), Treatment Services (55%), and Progress Toward Case Goals (35%). (Approved treatment plans only – 86)
**4Q** Background Information (69%), Assessment Information (67%), Treatment Services (54%), and Progress Toward Case Goals (34%). (Approved treatment plans only – 86)

**2005**
**1Q** Court Monitor Comprehensive Case Review due 10/1/05.

In addition, two (2) additional areas were evaluated: Treatment plan must be written and treatment conference conducted in the family's primary language and treatment plans developed in conjunction with parents/child/service providers (for example, treatment plan modifications as a result of input from the ACR).

**2004**
**1Q** Treatment Plan Written in the family's primary language n/a and Treatment Plan Conference conducted in the family's primary language (95%)
**2Q** Treatment Plan Written in the family's primary language (91%) and Treatment Plan Conference conducted in the family's primary language (98%)
**3Q** Treatment Plan Written in the family's primary language (89%) and Treatment Plan Conference conducted in the family's primary language (97%)
**4Q** Treatment Plan Written in the family's primary language (97%) and Treatment Plan Conference conducted in the family's primary language (100%)

**2005**
**1Q** Court Monitor Comprehensive Case Review due 10/1/05.


**X**    OM 3 and OM 15 - No LINK report expected. Case Review Only.

### Caseload Standards +
**2004**
**1Q** Data results for baseline and 1Q only reflect cases over 100% not those that meet exception criteria.
**2Q** As of August 1, 2004 the Department has achieved caseload standards – 100% (in accordance with the exception criteria). On August 1, 2004 fifteen (15)
cases, over 100% caseload utilization, met the exception criteria (cases over 100% and not over for 30 days or more).
**3Q** As of November 15, 2004 the Department remains at the 100% compliance mark. The sixteen (16) cases over 100% caseload utilization meet the exception
criteria (cases over 100% and not over for 30 days or more).
**4Q** As of February 15, 2005 the Department continues to meet the 100% compliance mark. The sixteen (16) cases over 100% caseload utilization meet the exception

**2005**
**1Q** As of May 15, 2005 the Department continues to meet the 100% compliance mark. The seventeen (17) cases over 100% caseload utilization meet the exception

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005
_____

## Data Sources

Beginning in May 2005 the Court Monitor's Office initiated a joint comprehensive review of investigation and on-going service cases. Several staff from the DCF Continuous Quality Improvement Division are assisting the Monitor's Office in conducting this review. Since the period being reviewed encompasses the first and second quarters (February 15, 2005 to May 15, 2005), it was jointly agreed the smaller case reviews would be suspended for those quarters. Thus, the Department has only reported on 12 of the 22 measures this quarter. The 12 measures reported on do not require case reviews and are predominately produced from LINK reports.

## Monitor's 2005 Case Review

Work on the Monitor's 2005 Case Review of the DCF's progress toward achieving the 22 outcome measures has already begun. Integral to this process is a comprehensive qualitative review, as mandated by the Exit Plan. Its purpose is to reach a deeper understanding of the information and issues behind the quantitative data, further define the areas in which the Department is doing well, and articulate those areas that need more work. Beginning in late 2004, the Monitor's Office began to solicit input from Area and Central Office staff, Plaintiffs and the Child Advocate's Office. The data collection protocols were reviewed by the Defendants and the Plaintiffs prior to finalizing the documents. The review itself began in May 2005. The report will be issued by the Monitor's Office in September 2005. Although the Monitor's Office is responsible for the review, it has been developed and is being conducted collaboratively with the Department.

The case review will focus primarily on outcome measures #3 (Treatment plans) and #15 (Needs met) because these measures will never be captured through LINK reporting due to their qualitative nature. This statistically valid statewide sample will review the period of February 15, 2005 through May 15, 2005. Record reviews of ongoing service cases commenced on June 1, 2005 and are LINK based. Each review will include a thorough reading of the LINK record, treatment plans and Treatment Planning Conference and Administrative Case Review documentation for a period of 60 days to 12 months prior to May 15, 2005. 569 cases will be reviewed. This is a 95% statistically valid statewide sample with an error rate of +/- 4%.

In addition, a separate review of 50 randomly selected investigation cases has been conducted regarding the quality of practice for the investigation outcome measures 1 & 2. The sample was drawn from all reports accepted at the DCF Hotline during January 1, 2005 - March 31, 2005.

Finally, the remaining 18 measures will be reviewed for qualitative benchmarks through a series of questions developed in conjunction with the DCF. These data elements will be collected only when applicable to a given case selected for the outcome measure #3 and outcome measure #15 case record review. And, while the data collected for these measures may not be statistically valid, it will offer the

Case 2:89-cv-00859-AHN   Document 485-2   Filed 06/21/2005   Page 8 of 10

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005
_____

Monitor's Office an opportunity to evaluate the quality of case practice as well as provide information related to continuous quality improvement efforts.

To supplement the LINK record review, a random sub-sample of 100 Ongoing Services Social Workers will be interviewed. This component is important to gather worker insight that may not be available through a record-only review process. Likewise, 25 Investigation Social Workers will be randomly selected from the investigation sample to participate in an interview process. Interviews will be held in May, June and July.

Social Workers will be contacted after the reviewer has completed the record review. It is expected that the interview will take between 45 - 90 minutes. The data from this process will be reported in aggregate form and will not identify any individual worker. A team of 4 reviewers will conduct the interviews. Each interviewer will be assigned to specific cases from the sub-sample sets so that they will have read the LINK documentation and will be able to conduct the interviews with basic knowledge of the case-specifics. The interviews will be held at a location and time most convenient to the worker.

## **Exit Plan Outcome Measures**

For the fourth consecutive quarter, the Department has met outcome measure 18- (Caseload standards). During the past quarter, the Department did not have any worker exceed the caseload standard for more than a 30-day period. This remains an integral foundation for meeting the overall goals of the Exit Plan and the Department's focus on this work component has been impressive.

The Department achieved compliance with outcome measure #8 (Adoption), for the first time this quarter. This accomplishment is significant and demonstrates increased focus on timely permanency work by DCF staff. It remains to be seen if future quarterly data will demonstrate whether it is sustainable. As noted in the Department's report, this permanency measure is dependent on a number of systems besides DCF including Juvenile Court, Probate Court and the Attorney General's Office.

The recently approved budget included a number of significant adoption initiatives that Governor Rell had proposed, including:
- Eliminating the reimbursement differential between foster care and subsidized adoptions.
- Readily available post adoption services to minimize adoption disruptions; and
- Post secondary educational benefits will be made available to adoptees so that these children will have the best chance of ending the cycle of poverty permanently.

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005
_____

These major accomplishments in collaboration with increased and sustained recruitment and retention activities should have very positive impact on timely permanency efforts for children. The Monitor's review of the first quarter adoption data demonstrates that the Department is not merely focusing on permanency for those children that will meet the measure but rather continue to complete adoptions on a significant number of children who have been placed beyond the outcome goal of 24 months.

The DCF also met compliance goals for outcome measure 14 (Placement within licensed capacity) for the first time. While the Department has made some progress in limiting the instances in which they exceed foster home capacity, significant additional work is required to build a reliable recruitment and retention system. This is acknowledged in the Department's report.

Four measures that were not in compliance this quarter all showed improved performance with respect to the previous quarter data. Outcome measure 22 (Multi-disciplinary exams – MDE's) has continued to show improvement. Over the past year the Department's efforts enabled the number of completed and timely MDE's to increase by almost 40%. The expansion of the number of sites providing MDE's has begun. A number of new sites are already serving children and two more contracts will soon be finalized. In conjunction with the Department's much improved efforts to provide on-going assessment of children in its care, this expansion of early assessment and needs identification is another pivotal milestone that will assist the Department in identifying and meeting children's needs in a sustained systemic manner.

Finally, the Department's efforts to provide accurate data for outcome measures 7 (Reunification) and 11 (Re-entry into DCF's custody) have been hampered by inconsistent data. The work to identify and resolve this problem has taken longer than anticipated, but it appears that the short-term (data entry issues) and long-term (systemic changes) approaches identified by the Department will address the problem in the next six months.

**Other Notable Accomplishments**

The Department has made great strides in developing individual assessments of children in their care. This has been accomplished through a number of initiatives. Each area office is conducting regular Managed Service System (MSS) meetings where the needs of children in placement, primarily residential, are triaged and action plans are developed. The MSS process is done jointly with DCF providers and has provided a new opportunity for collaborative and timely advocacy on behalf of children. In addition, weekly meetings are convened by the Bureau Chief of Behavioral Health with the Mental Health Program Directors from each office and their Area Resource Group Staff. These meetings are utilized to triage and develop action

Case 2:89-cv-00859-AHN    Document 485-2    Filed 06/21/2005    Page 10 of 10

Monitor's *Juan F*. vs. Rell Quarterly Exit Report
June 17, 2005
_____

plans for all of the children placed in SAFE Homes, shelters and the three (3) state facilities. Both of these processes in conjunction with increased utilization of individual case conferences have allowed the Department to be better positioned today then ever before to articulate the individual and aggregate needs of the children in their care.

The development of new therapeutic group homes, the expansion of in-home services, and a renewed focus on implementing prevention strategies are only a few of the tangible results from the Department's focused efforts with respect to individualized assessments.

Similarly, the move to adopt an Administrative Service Organization (ASO) for Connecticut Community Kid Care was buoyed by the General Assembly's approval of the behavioral health waiver and the inclusion of funding for this initiative for FY06 and FY07. Through the use of an ASO the Department of Children and Families and the Department of Social Services will integrate the administration of behavioral health services funded through the two Departments under Husky A, Husky B, and Voluntary Services program. The use of an ASO will give the behavioral health system the capability to:
- Improve access to services, quality of services, and outcomes;
- Coordinate care for youths in transition to the adult system;
- Coordinate care for children who fall through the cracks;
- Develop community based alternatives to institutional care; and
- Measure the system's performance

The ability to meet children's needs has been greatly enhanced by the states decision to utilize an ASO system. The efforts to bring this to fruition are the result of the dedication and hard work of a large cadre of professionals and parents committed to improving the service delivery system.


Respectfully submitted,



D. Ray Sirry
*Juan F*. Court Monitor