# *Juan F.* v Rell

Exit Plan Outcome Measures
2005 Annual Progress Report

## Civil Action No. H-89-859 (AHN)

November 7, 2005

Submitted by:
DCF Court Monitor's Office
300 Church Street ~ 4th Floor
Wallingford, CT 06492
Tel: 203-741-0458
Fax: 203-741-0462
E-Mail: Raymond.Mancuso@po.state.ct.us

# Table of Contents

|  | Page |
|---|---|
| **Executive Summary** | 3 |
| **Key Findings** | 9 |
| **Introduction** | 12 |

| **Outcome Measures** | **Page** |
|---|---|
| 1.  Commencement of Investigation | 17 |
| 2.  Completion of Investigation | 23 |
| 3.  Treatment Plans | 33 |
| 4.  Search for Relatives | 38 |
| 5.  Repeat Maltreatment | 40 |
| 6.  Maltreatment of Children in Out-of-Home Care | 42 |
| 7.  Reunification | 43 |
| 8.  Adoption | 49 |
| 9.  Transfer of Guardianship | 55 |
| 10.  Sibling Placement | 62 |
| 11.  Re-Entry into DCF Custody | 64 |
| 12.  Multiple Placements | 66 |
| 13.  Foster Parent Training | 68 |
| 14.  Placement Within Licensed Capacity | 70 |
| 15.  Needs Met | 72 |
| 16.  Worker-Child Visitation (Out-of-home) | 77 |
| 17.  Worker-Child Visitation (In-home) | 81 |
| 18.  Caseload Standards | 87 |
| 19.  Residential Reduction | 95 |
| 20.  Discharge Measures | 98 |
| 21.  Discharge of Mentally Ill or Retarded Children | 100 |
| 22.  Multi-Disciplinary Examinations | 103 |

**Appendix**

- *Appendix 1*:  Exit Plan Outcome Measures Summary Report, Second Quarter 2005, April 1, 2005 – June 30, 2005
- *Appendix 2*:  Crosswalk of Services to Category of Needs Identified
- *Appendix 3*:  Case Review Tools

**Executive Summary**

The *Juan F.* v. Rell Exit Plan requires the Monitor's Office to produce two annual reports (2005 and 2006) documenting the Department of Children and Families' progress in implementing the 22 Exit Plan Outcome Measures. The planning for this first report commenced in late 2004, when the Monitor's Office began to solicit questions and information from DCF Facility staff, Area Office and Central Office staff and the Plaintiffs related to a review of the quality of the work associated with the stated outcomes. Review protocols were drafted and submitted to both parties for review and comment before they were finalized in April 2005.

In all, eleven reviewers took part in the record review process. The review team included five members of the Department's Quality Improvement Division, four contracted reviewers with prior DCF experience, the DCF Liaison to the Court Monitor, and our Monitoring Specialist. Of that group, four individuals conducted interviews with front line social workers. Prior to the review, the team trained on the tool via a series of interrator testing. This resulted in several minor revisions to the tool, and a clarification of several definitions and directions that improved the reliability of the tool and reliability of reviewer response.

The results of this comprehensive case review process confirm the significant improvements in case practice that have been noted in prior quarterly reports. The analysis offers considerable insight into the strengths and weaknesses of the Department's overall performance in meeting the Exit Plan Outcome Measures. The concentrated, coordinated, and focused approach the Department has employed to implement fundamental and sustainable changes is evident throughout our review of all 22 Outcome Measures. Nevertheless, considerable effort will be required to address areas of the work that although improved, clearly remain a major challenge, especially within the timeframe outlined in the Exit Plan.

The record review began in May 2005 and concluded in August 2005. The methodological process is detailed within the full report but in brief includes the following components:

**LINK Reports:**

Exit Outcome Measures one through 22 were evaluated per the requirements outlined in the bolded text box fields of the Revised *Juan F.* v. Rell Exit Plan dated July 2004. All Outcome Measures, with the exception of 3,4,7,10,11,13[1], 15, 20 and 21 were reviewed for compliance via the LINK automated reports[2] as outlined in the Exit Plan. The Monitor has continuously verified the accuracy of the LINK reporting and with the exception of methodological differences, LINK data entry errors, and slight deviations in reporting periods; our case review

---

[1] Outcome Measure 13 is reported via scheduled submission/memorandum of OFAS/CAFAP.
[2] DCF Exit Plan Outcome Measures Summary Report, Second Quarter 2005, April 1 – June 30, 2005.

findings are consistent with LINK reports.[3]  The quantitative performance scores
provided by LINK automated reporting are supplemented with a qualitative
review as required by the Exit Plan methodology.

**LINK Record Review:**
To review the quality of practice for investigation Outcome Measures 1 & 2, a LINK
record review of 50 investigation cases was conducted via a sample from the universe of
all reports accepted at the DCF Hotline during the period of January 1, 2005 through
March 31, 2005.

Outcome Measures 3 and 15 were the primary focus of this case review.  Findings for
these two Outcome Measures are based upon a sample drawn at a 95% statewide
confidence level with a ± 4% margin of error.  These two measures cannot be captured
and reported on via an automated system and will always require case review.  The
Monitor's statistically valid statewide review of 569 cases focuses on the period of
February 15, 2005 through May 15, 2005.  Record reviews commenced in June 2005.
The record review was LINK based and included a thorough reading of the LINK record,
treatment plans and Treatment Planning Conferences/Administrative Case Review
(ACR/TPC) documentation for a period of 60 days to 12 months prior to May 15, 2005.

In addition to the statistically valid sampling and data analysis for Outcome
Measure 3 and Outcome Measure 15, the remaining Outcome Measures were
reviewed for qualitative benchmarks via a series of questions developed with
input from the Department and the Plaintiffs.  These data elements were collected
only when applicable to a given case selected for the Outcome Measure 3 and
Outcome Measure 15 case record review.  While the data collected for these
measures may not represent a statistically valid sample, it offers the Monitor's
Office an opportunity to evaluate the quality of case practice, LINK reporting
reliability, information related to continuous quality improvement efforts, and the
opportunity to assess the progress for Outcome Measures where data is currently
lacking.  Since the Department has been unable to provide an automated report
for Outcome Measures 4, 7, 10 and 11, this data, while limited by the number of
cases included for each measure, can help inform the parties on the current status
of the Department's progress.

Outcome Measures 20 and 21 were measured on the full universe of 29
individuals over the age of 18 who were discharged from care during the period
of February 15, 2005 through May 15, 2005.  The universe was identified
through LINK data and the adolescent units statewide.  This review was
undertaken as an additional task, as the Department is not able to produce
automated information on these measures, and our preliminary data analysis

---

[3] The primary data entry errors involve missing removal dates and legal status and discharge data
inaccuracies.  The Department recently completed a clean up of legal status data but errors persist.
Additionally, approximately 6% of the children in placement have no removal date recorded in LINK.
These errors will have varying impact on automated reporting of Outcome Measures 4, 7, 8, 9, 10, 11, 12,
20, 21, and 22.

revealed that the sample selected did not include any children discharged from care.

**Interviews:**

To supplement the LINK record review, a random sub-sample of 100 Ongoing Service Social Workers were contacted and asked to participate in an interview. This component was included so that reviewers could gather Ongoing Service Social Worker insight that may not be available through a LINK record review process. In all, 96 of the 100 Ongoing Service Social Workers contacted for interview chose to participate in the process.

As with the interview component in the 569 ongoing service cases, there was also an interview component related to investigative practices. Twenty-five Investigation Social Workers were randomly selected from the investigation sample (n=50) to participate in an interview. All 25 Investigation Service Social Workers participated in the process.

Interviews were held in June, July and early August 2005. Social Workers were contacted after the reviewer had completed the record review to set up an appointment for interview. The data from this process is reported in aggregate form and will not identify any individual worker.

A team of four reviewers conducted the interviews. Each of the four interviewers was assigned specific cases to review and interview so that they had read the LINK documentation, and could conduct the interviews with basic knowledge of the case specifics. The interviews were held at a location and time most convenient to the worker.

**Exit Plan Second Quarter Results:**

Compliance was measured upon the Department's verified LINK reports on the full universe of affected populations where that data was available (Outcome Measures 1, 2, 5, 6, 8, 9, 12, 14, 16, 17, 18, 19, and 22). The remaining scores were based upon the Court Monitor's case review findings (Outcome Measures 3, 4, 7, 10, 11, 15, 20, and 21). Refer to Table 2 for the sample size information.

Table 1 reflects the Department's submitted data report for the second quarter 2005. Table 2 reflects the Court Monitor's case review findings, and Table 3 represents the scores as determined by the methodology outlined in the Exit Plan document. Those Outcome Measures with a "√" to the right of the score indicate the verified achievement of the measure for the timeframe indicated by the automated LINK report or the Court Monitor's case review.

The Department submitted the following progress report for performance during the quarter ending June 30, 2005. Percentages are reflective of the Department's performance on the given measure based upon the LINK universe of cases.[4] An "X" indicates that the Department did not report on the measure via automated reports.

**Table 1: Department of Children & Families Second Quarter Progress Report 2005 of the Exit Plan Outcome Measures**

| Outcome Measure | Requirement | Department of Children & Families 2Q 2005 Report |
|---|---|---|
| **1: Commencement of Investigation** | >=90% | 95.1% |
| **2: Completion of the Investigation** | >=85% | 92.3% |
| **3: Treatment Plans** | >=90% | X |
| **4: Search for Relatives** | >+85% | X |
| **5: Repeat Maltreatment of In-Home Children** | <=7% | 8.5% |
| **6: Maltreatment of Children in Out-of-Home Care** | <=2% | 0.7% |
| **7: Reunification** | >=60% | X |
| **8: Adoption** | >=32% | 25.2% |
| **9: Transfer of Guardianship** | >=70% | 72.8% |
| **10: Sibling Placement** | >=95% | X |
| **11: Re-Entry into DCF Custody** | <=7% | X |
| **12: Multiple Placements** | >=85% | 95.7% |
| **13: Foster Parent Training** | 100% | 100.0% |
| **14: Placement Within Licensed Capacity** | >=96% | 95.9% |
| **15: Children's Needs Met** | >=80% | X |
| **16: Worker-Child Visitation (Out-of-Home)** | >=85% 100% | M: 86.7% Q: X |
| **17: Worker-Child Visitation (In-Home)** | >=85% | 78.0% |
| **18: Caseload Standards** | 100% | 100.0% |
| **19: Reduction in the Number of Children Placed in Residential Care** | <=11% | 12.6% |
| **20: Discharge Measures** | >=85% | X |
| **21: Discharge of Mentally Ill or Retarded Children** | 100% | X |
| **22: Multi-disciplinary Exams (MDE)** | >=85% | 55.4% |

---

[4] LINK reporting results are impacted by data entry errors in legal status and the failure to enter correct removal and discharge dates.

The Court Monitor's review included data collection for all 22 Outcome Measures as reported below.  As there are no automated LINK reports on Outcome Measures 3, 4, 7, 10, 11, 15, 20, and 21, compliance for these outcomes were measured via the Court Monitor's Case Review findings.  While the numbers reported in our case review findings provide insight into Departmental practice, I caution that some findings are based on small samples.  Please refer to the table below.

**Table 2:  Juan F. Court Monitor's 2005 Exit Plan Case Review Findings**

| Measure | Requirement | Sample Size | Findings |
|---|---|---|---|
| **1**: Commencement of Investigation | >=90% | 50 | 96.0% |
| **2**: Completion of the Investigation | >=85% | 50 | 94.0% |
| **3**: Treatment Plans | >=90% | 569 | 6.9% |
| **4**: Search for Relatives | >+85% | 27 | 88.3% |
| **5**: Repeat Maltreatment of In-Home Children | <=7% | 211 | 6.6% |
| **6**: Maltreatment of Children in Out-of-Home Care | <=2% | 313 | 0% |
| **7**: Reunification | >=60% | 9 | 66.7% |
| **8**: Adoption | >=32% | 8 | 50.0% |
| **9**: Transfer of Guardianship | >=70% | 7 | 42.9% |
| **10**: Sibling Placement | >=95% | 61 | 65.6% |
| **11**: Re-Entry into DCF Custody | <=7% | 19 | 15.8% |
| **12**: Multiple Placements | >=85% | 332 | 96.0% |
| **13**: Foster Parent Training | 100% | 195 | 100.0% |
| **14**: Placement Within Licensed Capacity | >=96% | 255 | 87.8% |
| **15**: Children's Needs Met | >=80% | 569 | 55.8% |
| **16**: Worker-Child Visitation (Out-of-Home) | >=85% 100% | 319 | M: 89.5% Q: 99.1% |
| **17**: Worker-Child Visitation (In-Home) | >=85% | 267 | 73.2% |
| **18**: Caseload Standards | 100% | 569 | 100.0% |
| **19**:  Reduction in the Number of Children Placed in Residential Care | <=11% | 286 | 11.9% |
| **20**: Discharge Measures | >=85% | 29[5] | 61.5% |
| **21**: Discharge of Mentally Ill or Retarded Children | 100% | 29[6] | 50.0% |
| **22**:  Multi-disciplinary Exams (MDE) | >=85% | 84 | 57.7% |

---

[5] The sample of 29 individuals for OM20 and OM21 represent the full universe for the period.
[4] The sample of 29 individuals for OM20 and OM21 represent the full universe for the period.

Table 3 below represents the verified scores for the period.  Those with a "√" to the right of the score have achieved compliance with that measure as outlined within this report.

**Table 3:  Court Monitor's Findings related to compliance with Exit Plan Outcome Measures for the period ending June 30, 2005**

| Outcome Measure | Requirement | Score Achieved |
|---|---|---|
| **1**: Commencement of Investigation  (LINK) | >=90% | 95.1% √ |
| **2**: Completion of the Investigation  (LINK) | >=85% | 92.3% √ |
| **3**: Treatment Plans  (n=569) | >=90% | 6.9% |
| **4**: Search for Relatives  (n=27) | >+85% | 88.3%√ |
| **5**: Repeat Maltreatment of In-Home Children (LINK) | <=7% | 8.5% |
| **6**: Maltreatment of Children in Out-of-Home Care (LINK) | <=2% | 0.7% √ |
| **7**: Reunification  (n=9) | >=60% | 66.7%√ |
| **8**: Adoption  (LINK) | >=32% | 25.2%[7] |
| **9**: Transfer of Guardianship  (LINK) | >=70% | 72.8%[8] |
| **10**: Sibling Placement  (LINK) | >=95% | 65.6% |
| **11**: Re-Entry into DCF Custody | <=7% | 15.8% |
| **12**: Multiple Placements  (LINK) | >=85% | 95.7% √ |
| **13**: Foster Parent Training  (DCF/CAFAP REPORT) | 100% | 100.0% √ |
| **14**: Placement Within Licensed Capacity  (LINK) | >=96% | 95.9% √ |
| **15**: Children's Needs Met  (n=569) | >=80% | 55.8% |
| **16**: Worker-Child Visitation (Out-of-Home)  (M: LINK)        (Q: n=319) | >=85% 100% | M: 86.7%√ Q: 99.1% |
| **17**: Worker-Child Visitation (In-Home)  (LINK) | >=85% | 78.0% |
| **18**: Caseload Standards  (LINK) | 100% | 100.0%√ |
| **19**:  Reduction in the Number of Children Placed in       Residential Care  (LINK) | <=11% | 12.6% |
| **20**: Discharge Measures  (N=29) | >=85% | 61.5% |
| **21**: Discharge of Mentally Ill or Retarded Children   (N=29) | 100% | 50.0% |
| **22**:  Multi-disciplinary Exams (MDE)  (LINK) | >=85% | 55.4% |

---

[7] The Department's quarterly report indicated that 25.2% met the adoption measure.  However, this report excluded 10 children with no removal date from their analysis.  Given the missing data, the performance is adjusted to 23.4% (33 of 141 children adopted during the quarter).

[8] The Department reports that 72.8% of all transfer of guardianships during the quarter were completed within 24 months.  However, a review of the LINK data indicates that an additional 31 children with no removal date had a transfer of guardianship during this period.  These individuals were excluded from the LINK quarterly reports submitted.  Given this missing data, the performance is adjusted to 50% (63 of 126 children with transfer of guardianship during the quarter).  The Monitor cannot confirm compliance with this measure.

**Key Findings**

The Monitor, upon review of all available information obtained and utilizing the prescribed methodology, finds the following:

- The Department is in compliance with the following outcome measures:
  - ➢ Commencement of Investigation (Outcome Measure 1)
  - ➢ Completion of Investigation (Outcome Measure 2)
  - ➢ Search for Relatives (Outcome Measure 4)
  - ➢ Maltreatment of Children in Out-of-Home Care (Outcome Measure 6)
  - ➢ Reunification (Outcome Measure 7)
  - ➢ Multiple Placements (Outcome Measure 12)
  - ➢ Foster Parent Training (Outcome Measure 13)
  - ➢ Placement Within Licensed Capacity (Outcome Measure 14)
  - ➢ Worker-Child Visitation (Out-of-Home)[9] (Outcome Measure 16)
  - ➢ Caseload Standards (Outcome Measure 18)
- The results of the comprehensive case review confirm and verify the overall accuracy of the automated LINK reports. Differences between the case review and the automated data can be traced to differences in the methodology, LINK data entry errors, and slight differences in the reporting periods. The primary LINK data entry errors involve missing removal dates, legal status inaccuracies, and discharge data mistakes. The Department is aware of these issues and has begun the necessary steps to resolve them.
- The analysis of investigation data reveals some improvement in a number of quality indicators including the percentage of victims and perpetrators interviewed, contact with prior social workers in cases with a prior DCF history, completion of initial risk assessments and documentation of investigation activities. The Department has sustained the goal for both investigation measures for three consecutive quarters.
- Only 6.9% of the treatment plans reviewed included the minimal requirements outlined by the Exit Plan. Reviewers' indicated that despite the low level of overall compliance, the quality and completeness of treatment plans had improved since the last comprehensive review of treatment plans two years ago. In previous reviews there were often no treatment plans less than seven months old, and those that were less than seven months old were many times of such poor quality that they did not reflect the circumstances in the case. Clear articulation of the action steps and goals is the weakest component of the treatment plans reviewed.
- 5% of the cases reviewed did not have a current treatment plan.
- Case participants in-person attendance or teleconferencing at the Administrative Case Reviews/Treatment Planning Conferences remains low: 43.1% of the mothers, 21% of the fathers, 14.9% of children aged 12 or older, 35.1% of the current caretakers, 15.2% of the active service provider agencies and 5.1% of the identified attorneys participated in the 504 Administrative Case Reviews (ACR) or Treatment Planning Conferences (TPC) documented in the sample cases.
- Relative searches for children entering placement January 1, 2005 or later, were conducted in 88.3% of the 27 cases in our sample.

---

[9] The monthly requirement was achieved.

9

- The Department has sustained achievement of the goal for maltreatment of children in out-of-home care for six consecutive quarters. None of the 313 children in the sample who were in placement during the period of February 15, 2005 through May 15, 2005 had a substantiated report of abuse or neglect by a substitute caretaker.

- 91% of the cases with a goal of reunification had identified concurrent plans, and 74% of the cases with concurrent plans had documentation that both plans were actively being pursued.

- The Department has improved the practice of finalizing adoptions within 24 months. Additionally, the case review data and Monitor's review of the Department's quarterly data indicate that the Department continues to pursue adoption for those children with adoption as their goal, regardless of whether they will meet the measure.

- At the time of the initial placement, sibling groups were placed together in 65.6% of the sample cases. The review data indicated that 23.8% of those not initially placed together later had been reunited, 42.9% of those not placed together had subsequently documented therapeutic reasons for being separated, and 33.3% still remained separated on May 15, 2005. In addition, 72.7% of the sibling cases that required visitation plans had them documented and 67.3% had documentation that sibling visitation was consistently occurring.

- The review of quarterly data confirms that as required, the Department has offered the required foster parent training (Outcome Measure 13) to the pool of DCF foster parents statewide. However, the case review data indicates that foster parent provider records do not reflect completion of required training. Despite the requirement for nine hours per year of post licensing training, 76.9% of the foster parents in our sample had no documented training last year. The review found that 58.1% of the homes in our sample that were re-licensed during the period of February 15, 2005 through May 15, 2005 did not have documentation of the required post-licensing training.

- The Department has reported achievement of the goal for multiple placements for five consecutive quarters.

- Despite the support of the Governor and Legislature in providing additional resources to the Department, the case review data indicates that children and families had all of their service needs met in slightly more than half of the cases reviewed. This finding is overstated since the reviewers found a significant number of cases where a clearly identifiable need was documented in the case record but not incorporated into the treatment plan. In addition, 5% of the cases did not have a current treatment plan to review and 9.8% of cases had Administrative Case Review/Treatment Planning Conference documentation of a service need that was not documented in the treatment plan. The current inadequacy of treatment plans seriously undermines determining whether children and families needs are met.

- The Department has made dramatic improvements in visitation with children and families. The review found that 99.1% of the children in out-of-home care had been seen quarterly. 89.5% of the out-of-home cases had been seen monthly. 73.2% of the in-home cases had been successfully visited twice a month.

- A sufficient amount of Social Workers and Social Work Supervisors are essential to make the improvements necessary to meet the outcome measures.  The Department has maintained caseload standards for five quarters.
- The Department has made a significant reduction in children placed in residential care.  The Monitor's case review data indicated that 11.9% of children are in residential care.  On August 14, 2005, there were 722 children in residential placement.  This is an 18.8% reduction from the April 11, 2004 total of 889 children in residential care.  In addition, consistent oversight of out-of-state placements has allowed the Department to considerably reduce its' number of out-of-state placements.
- The Monitor found that 10 of the 29 youth discharged from care in the time period of February 15, 2005 through May 15, 2005 required adult services.  Of those 10, only two youth's records had documentation that adult services were in place at the point of discharge.
- Five of the ten youth in the discharge universe had written discharge plans submitted to either Department of Mental Health and Addiction Services (DMHAS) or Department of Mental Retardation (DMR).
- 57.7% of the children entering care for the first time received a Multi-Disciplinary Exam (MDE) within 30 days of placement.  This outcome measure is central to the assessment of children's needs and implementation of appropriate services.  Nine additional MDE sites were opened recently in an effort to improve performance on this measure.

**Introduction**

The *Juan F.* v. Rell Exit Plan requires the Monitor's Office to produce two annual reports (2005 and 2006) documenting the Department of Children and Families' progress in implementing the 22 Exit Plan Outcome Measures. The planning for this first report commenced in late 2004, when the Monitor's Office began to solicit questions and information from DCF Facility staff, Area Office and Central Office staff and the Plaintiffs related to a review of the quality of the work associated with the stated outcomes. Review protocols were drafted and submitted to both parties for review and comment before they were finalized in April 2005.

In all, eleven reviewers took part in the record review process. The review team included five members of the Department's Quality Improvement Division, four contracted reviewers with prior DCF experience, the DCF Liaison to the Court Monitor, and our Monitoring Specialist. Of that group, four individuals conducted interviews with front line social workers. Prior to the review, the team trained on the tool via a series of interrator testing. This resulted in several minor revisions to the tool, and a clarification of several definitions and directions that improved the reliability of the tool and reliability of reviewer response.

The results of this comprehensive case review process confirm the significant improvements in case practice that have been noted in prior quarterly reports. The analysis offers considerable insight into the strengths and weaknesses of the Department's overall performance in meeting the Exit Plan Outcome Measures. The concentrated, coordinated, and focused approach the Department has employed to implement fundamental and sustainable changes is evident throughout our review of all 22 Outcome Measures. Nevertheless, considerable effort will be required to address areas of the work that although improved, clearly remain a major challenge, especially within the timeframe outlined in the Exit Plan.

The record review began in May 2005 and concluded in August 2005. The methodological process is detailed within the full report but in brief includes the following components:

**LINK Reports:**

Exit Outcome Measures one through 22 were evaluated per the requirements outlined in the bolded text box fields of the Revised *Juan F.* v. Rell Exit Plan dated July 2004. All Outcome Measures, with the exception of 3,4,7,10,11,13[10], 15, 20 and 21 were reviewed for compliance via the LINK automated reports[11] as outlined in the Exit Plan. The Monitor has continuously verified the accuracy of the LINK reporting and with the exception of methodological differences, LINK data entry errors and slight differences in the reporting periods; the case

---

[10] Outcome Measure 13 is reported via scheduled submission/memorandum of OFAS/CAFAP.
[11] DCF Exit Plan Outcome Measures Summary Report, Second Quarter 2005, April 1 – June 30, 2005.

review findings are consistent with LINK reports.[12]  The quantitative performance scores provided by LINK automated reporting are supplemented with a qualitative review as required by the Exit Plan methodology.

**LINK Record Review:**
To review the quality of practice for investigation Outcome Measures 1 & 2, a LINK record review of 50 investigation cases was conducted via a sample from the universe of all reports accepted at the DCF Hotline during the period of January 1, 2005 through March 31, 2005.

Outcome Measures 3 and 15 were the primary focus of this case review.  Findings for these two Outcome Measures are at a 95% statewide confidence level of +/- 4%.   These two measures cannot be captured and reported on via an automated system and will always require case review.  The Monitor's statistically valid statewide review of 569 cases focuses on the period of February 15, 2005 through May 15, 2005.  Record reviews commenced in June 2005.  The record review was LINK based and included a thorough reading of the LINK record, treatment plans and Treatment Planning Conferences/Administrative Case Review (ACR/TPC) documentation for a period of 60 days to 12 months prior to May 15, 2005.

In addition to the statistically valid sampling and data analysis for Outcome Measure 3 and Outcome Measure 15, the remaining Outcome Measures were reviewed for qualitative benchmarks via a series of questions developed with input from the Department and the Plaintiffs.  These data elements were collected only when applicable to a given case selected for the Outcome Measure 3 and Outcome Measure 15 case record review.  While the data collected for these measures may not represent a statistically valid sample, it offers the Monitor's Office an opportunity to evaluate the quality of case practice, LINK reporting reliability, information related to continuous quality improvement efforts, and the opportunity to assess the progress for Outcome Measures where data is currently lacking.  Since the Department has been unable to provide an automated report for Outcome Measures 4, 7, 10, and 11, this data, while limited by the number of cases included for each measure, can help inform the parties on the current status of the Department's progress.

Outcome Measures 20 and 21 were measured on the full universe of 29 individuals over the age of 18 that were discharged from care during the period of February 15, 2005 to May 15, 2005.  The universe was identified through LINK data and the adolescent units statewide.  This review was undertaken as an additional task, as the Department is not able to produce automated information on these measures, and our preliminary data analysis revealed that the sample selected did not include any children discharged from care.

---

[12] The primary data entry errors involve missing removal dates and legal status and discharge data inaccuracies. The Department recently completed a clean up of legal status data but errors persist. Additionally, approximately 6% of the children in placement have no removal date recorded in LINK. These errors will have varying impact on automated reporting of Outcome Measures 4, 7, 8, 9, 10, 11, 12, 20, 21, and 22.

**Table 4:  In-home universe of cases open in ongoing services at any point during February 15, 2005 through May 15, 2005**

| Area Office | Universe | % of Caseload | Sample Set |
|---|---|---|---|
| Bridgeport | 424 | 8.8% | 22 |
| Danbury | 156 | 3.2% | 8 |
| Greater New Haven | 393 | 8.1% | 20 |
| Hartford | 448 | 9.3% | 24 |
| Manchester | 416 | 8.6% | 22 |
| Meriden | 206 | 4.3% | 11 |
| Middletown | 226 | 4.7% | 12 |
| New Britain | 482 | 10.0% | 25 |
| New Haven | 616 | 12.7% | 32 |
| Norwalk | 120 | 2.5% | 6 |
| Norwich | 432 | 8.9% | 23 |
| Stamford | 186 | 3.9% | 10 |
| Torrington | 122 | 2.5% | 6 |
| Waterbury | 261 | 5.4% | 14 |
| Willimantic | 343 | 7.1% | 18 |
| Statewide | 4831 | 100.0% | 253 |

**Table 5: Universe of open ongoing service cases with an identified child in placement February 15 through May 15, 2005**

| | Universe | % of Caseload | Sample Set |
|---|---|---|---|
| Bridgeport | 514 | 8.5% | 27 |
| Danbury | 145 | 2.4% | 8 |
| Greater New Haven | 379 | 6.3% | 20 |
| Hartford | 872 | 14.4% | 45 |
| Manchester | 627 | 10.4% | 33 |
| Meriden | 242 | 4.0% | 13 |
| Middletown | 162 | 2.7% | 8 |
| New Britain | 643 | 10.6% | 33 |
| New Haven | 643 | 10.6% | 33 |
| Norwalk | 94 | 1.6% | 5 |
| Norwich | 555 | 9.2% | 29 |
| Stamford | 69 | 1.1% | 4 |
| Torrington | 157 | 2.6% | 8 |
| Waterbury | 575 | 9.5% | 30 |
| Willimantic | 379 | 6.3% | 20 |
| Statewide | 6056 | 100.0% | 316 |

An oversample of 10% was selected in the event that a case did not meet the criteria set for review and required replacement.  Although requested, the Department's universe did not exclude cases open a minimum of 60 days during the period.  As a result, multiple exclusions were required as a treatment plan was not required during the period and the case could not be subject to measurement for Outcome Measures 3 or 15.

**Investigation Cases Sampling Process:**
The Monitor's Office requested a data file including *"all reports accepted at the DCF Hotline during the period of January 1, 2005 through March 31, 2005."*

The investigation universe provided included a total of 6,940 reports accepted at the Hotline during the first quarter of the 2005 calendar year. The Monitor's Office, determined that a sample of 50 cases would provide an adequate snapshot of the quality of the Department's practice. To determine the distribution of the cases, the universe was broken down by area office assignment, and the resulting percentage was used to calculate each region's portion of the 50 case sample. Additionally, 25 of the fifty cases were randomly selected for social worker interview to obtain information related to case practice that we would not be able to glean from the LINK case record. Table 6 below provides the details related to the distribution of the universe (N=6,940) and sample set (n=50). A 10% oversample was selected in the event that substitutions were required.

**Table 6: Universe of all accepted reports at Hotline and resulting sample allocation for case review**

| Area Office | Total investigations | Percentage | Sample | Subsample |
|---|---|---|---|---|
| Bridgeport Office | 649 | 9.35% | 5 | 2 |
| Danbury Office | 254 | 3.66% | 2 | 1 |
| Gen'l Administration | 6 | 0.09% | 0 | 0 |
| Greater New Haven | 592 | 8.53% | 4 | 2 |
| Hartford Office | 690 | 9.94% | 5 | 3 |
| Hotline | 141 | 2.03% | 1 | 0 |
| Manchester Office | 630 | 9.08% | 5 | 2 |
| Meriden Office | 287 | 4.14% | 2 | 1 |
| Middletown Office | 280 | 4.03% | 2 | 1 |
| New Britain Office | 660 | 9.51% | 5 | 3 |
| New Haven Metro | 520 | 7.49% | 4 | 2 |
| Norwalk Office | 182 | 2.62% | 1 | 1 |
| Norwich Office | 573 | 8.26% | 4 | 2 |
| Stamford Office | 193 | 2.78% | 1 | 1 |
| Torrington Office | 247 | 3.56% | 2 | 1 |
| Waterbury Office | 622 | 8.96% | 4 | 2 |
| Willimantic Office | 414 | 5.97% | 3 | 1 |
| **Grand Total** | **6,940** | **100%** | **50** | **25** |

**Discharge Measures Universe – Outcomes 20 and 21:**
When it became apparent from early data analysis that data would not be included on the population of children discharged from care (Outcome Measures 20 and 21) the Monitor's Office determined a separate review would be required.  Therefore, on July 18, 2005 our office requested the following data file from the Department's Information Systems Unit:

> … *the universe of all children discharged at age 18 or older during the period of February 15, 2005 through May 15, 2005.  Per the Exit Measure parameters, exclusions from this universe would be any child that is committed delinquent or children exiting voluntary services placements.*

The data file was then shared with the adolescent units statewide to verify the accuracy, as there is ongoing concern with the reliability of data files based on legal status and placement end dates.  The resulting corrected file included a universe of 29 children.  The full universe was studied using the questions developed for the larger tool for Outcome Measures 20 and 21.

**Interviews:**
To supplement the LINK record review, a random sub-sample of 100 Ongoing Service Social Workers were contacted and asked to participate in an interview.  This component was included so that reviewers could gather Ongoing Service Social Worker insight that may not be available through a LINK record review process.  Ninety-six of the 100 Ongoing Service Social Workers contacted for interview chose to participate in the process.

As with the interview component in the 569 ongoing service cases, there was also an interview component related to investigative practices.  A subset of 25 Investigation Social Workers was randomly selected from the investigation sample (n=50) to participate in an interview.  All 25 Investigation Social Workers participated in the process.

Interviews were held in June, July and early August 2005.  Social Workers were contacted after the reviewer had completed the record review to set up an appointment for interview.  The data from this process is reported only in aggregate form so as not to identify any individual worker.

A team of four reviewers conducted the interviews.  Each of the four interviewers was assigned specific cases to review and interview so that they had read the LINK documentation, and could conduct the interviews with basic knowledge of the case specifics.  The interviews were held at a location and time most convenient to the worker.

**Outcome Measure 1:  Commencement of Investigation**

*Court Monitor's Case Review Findings: 96.0% (Sample Size: 50)*
*DCF LINK Report for the period of April – June 2005: 95.1%*

The *Juan F*. Exit Plan requires that at least 90% of all reports[13] must be commenced on the same calendar day, within 24 hours, or 72 hours depending on the response time designation.

The Department's automated reports for the last three quarters indicate that the investigations requirement for the response time has been consistently exceeded.  In fact, the Department's LINK reporting for the second quarter 2005 indicates that **95.1%** of all investigations met this measure.

In all **96.0%** of the sample set (n=50) met or exceeded the response time set at Hotline, or modified response time if changed by area office management.  The details of the case review are provided below to provide information related to both the numeric requirements and quality of case practice as it relates to the sample data.

**Sample Demographics (n=50):**
As detailed in the Methodology section, our review included fifty reports accepted at Hotline during the first quarter 2005.   All fifty cases were reviewed during the period of May 14, 2005 through May 19, 2005.

Reports selected included calls that were received at the Hotline from January 3, 2005 through March 30, 2005.  The calls were most frequently received between 2:00 p.m. – 3:00 p.m. (7 calls).  Forty-one of the reports (82.7%) were involving a report of abuse or neglect by the biological parent(s), adoptive parent(s) or legal guardian(s).  Three reports (6.0%) involved foster family providers, two (4.0%) were school settings and four (8.0%) were "other" (Domestic Violence Shelter, Group Home, Hospital, non-custodial parent).

Of the 50 cases opened for investigation, the LINK person maintenance record indicated that of the named case participants, 36 spoke English as their primary language, six were primarily Spanish speaking, two spoke primarily Portuguese, two French, one Chinese, and one was identified as Bilingual (English/Spanish).  In two cases there was no documentation in the person maintenance record related to language.

The Hotline documentation indicated a total of 66 allegations within the 50 case sample.  Physical neglect was alleged most frequently.  It was alleged in 29 of the 50 cases (58.0%).  The table below provides the total number of allegations documented and the percentage of the sample that included each specific allegation.

---

[13] Except Probate and Voluntary cases.

**Table 7:  Allegations as identified by Hotline**

| Allegations | Number | % of Cases |
|---|---|---|
| Physical Neglect | 29 | 58% |
| Physical Abuse | 16 | 32.0% |
| Emotional Neglect | 14 | 28.0% |
| Emotional Abuse | 3 | 6.0% |
| Medical Neglect | 2 | 4.0% |
| Sexual Abuse | 2 | 4% |
| Education Neglect | 0 | 0% |
| Moral Neglect | 0 | 0% |
| **Total Allegations** | **66** | ------ |

In one case, the report was accepted at Hotline and then determined not to be appropriate for investigation.  The family's case was open in Ongoing Services with a child out of control and neglect petitions recently filed.

At the time of acceptance of the report at Hotline, 11 of the 50 cases (22.0%) were already open in Ongoing Services, of which five cases had a substantiation within the 12 months prior to the referral included in our sample.  Three cases (6.0%) were open in investigations at the point of acceptance of the report included in our sample.  Eighteen (36.0%) were newly opened, with no prior CPS history. The remaining 18 reports (36.0%) included alleged perpetrators with a DCF history, but with no open case at the point of acceptance at the Hotline.

**Alleged Perpetrators:**
There were 63 identified alleged perpetrators in the reports transmitted from Hotline.  Alleged perpetrators were more frequently female, as there were 36 female and 27 male perpetrators included in the sample.

There were 13 cases in which two perpetrators were identified. Thirty-seven cases identified one perpetrator.  Perpetrators ranged from age 16 to age 53 with an average age of 33.5.

Race of perpetrators was predominately white, with 39 alleged perpetrators identified as white (61.9%), and nine identified as African American/Black (14.3%).  One perpetrator was identified as unknown, 14 were identified as UTD (22.2%) as there was no race information located in the LINK record.  16 alleged perpetrators were identified as Hispanics, 43 Non-Hispanics and four unknown.

**Identified Victims:**
A total of 107 victims were identified in the protocol documentation[14].  The population was almost equally split, with 53 males and 54 females identified.  Ages ranged from newborn to 17, with the most frequently reported age being one (10 children) and the average (mean) age being 7.5 years old.

---

[14] Our tool allowed for up to five identified victims per case.  In a few instances, the number exceeded the maximum allowed.   Therefore the number of identified victims may be slightly underreported.

**Table 8:  Age of identified victims within the 50 reports of abuse/neglect accepted at Hotline during the first quarter 2005**

| Age (years) | Number of Children |
|---|---|
| 0-2 | 22 |
| 3-5 | 17 |
| 6-8 | 24 |
| 9-11 | 14 |
| 12-14 | 16 |
| 15-17 | 14 |

Each case designates a reference child at the point of acceptance.  This is generally the youngest child, but may be otherwise if the abuse is not directed at the youngest household member.

In the 50 cases reviewed, the relationship between that referenced child and the alleged perpetrator(s) of the abuse or neglect was most frequently a parent/child relationship.

**Table 9: Relationship between identified victims to the 63 identified perpetrator(s)**

| Alleged perpetrator's relationship to victim | Number of children having this relationship |
|---|---|
| Custodial Parent | 44 |
| Caretaker | 8 |
| Step Parent | 4 |
| School Personnel | 2 |
| Other Relatives | 2 |
| Guardian | 1 |
| Group Home Staff | 1 |
| Paramour | 1 |

**Outcome Measure One Issues:**
Supervisory conferences at the point of Social Worker assignment were documented in 41 investigations (82.0%) of the sample.  The response time designated by Hotline was most frequently 72 hours (52.0%), followed by 24 hours (38.0%) and finally, same day response (10.0%).  Modification of the response time was documented in seven cases (14.0%).

The required response time was met in 96.0% of the sample.  Eight of the 50 cases had one or more additional reports accepted during the quarter.  Three were accepted within seven days of the first report.  One was appropriately merged with the prior accepted report.

The interviews with the 25 Investigation Social Workers provided some insight into the challenges faced by Investigation Units in attempting to meet the requirement of Outcome Measure 1.  At the beginning of our interview, the reviewers asked the

Investigation Social Worker "Do you feel the Hotline's system for establishing the response time is valid?"

- 64.0% indicated that they did indeed feel the response time designation[15] was valid.
- 36.0% indicated that they did not feel it was valid, as there seemed to be some issues with reliability/consistency in the process for assigning response designation among Hotline workers.

Using a Likert Scale[16] the interview asked the investigators "How would you rate the general quality of information that was received upon transfer of the referral to investigation services, and then "Specific to the identified case, how would you rate the quality of information provided".  The investigators overwhelmingly indicated the quality to be good or higher for both questions (92.0%), but the ranking scores for the general question were consistently lower than the ranking assigned to the specific case responses. In the general question, three cases ranked as superior and one case ranked as outstanding, while in the specific case ranking question ten workers indicated superior quality and five outstanding. See the crosstabulation below for details.

**Table 10:  Crosstabulation:  Specific to this case, how would you rate the quality of information provided to you from Hotline with in general, how do you rate the quality of information that you receive from the Hotline**

| *Count* | | Specific to this case, how would you rate the quality of information provided to you from Hotline | | | | |
|---|---|---|---|---|---|---|
| | | Poor | Good | Superior | Outstanding | Total |
| **In general, how do you rate the quality of information that you receive from the Hotline** | **Poor** | 0 | 1 | 1 | 0 | 2 |
| | **Good** | 2 | 7 | 7 | 3 | 19 |
| | **Superior** | 0 | 0 | 2 | 1 | 3 |
| | **Outstanding** | 0 | 0 | 0 | 1 | 1 |
| **Total** | | **2** | **8** | **10** | **5** | **25** |

The interviewer went on to ask, "Is there any information that is consistently lacking in the reports that you receive, or are there quality issues in the work produced at Hotline that negatively impacts your ability to perform your job?"  Of the 25 investigators, 21 or 84.0% indicated that there are some issues related to the quality of information they receive.  When asked to identify or elaborate on those areas, the following list of issues was collected (please note that this was an open ended question with no restriction on the number of issues to be identified).

---

[15] The Department has policy that establishes a protocol for assigning response time.
[16] Tools provided in appendix for reference.

**Table 11: Issues identified by the Investigation Social Worker related to the Hotline**

| Issue Identified | # of times identified | % of cases in which this issue was identified |
|---|---|---|
| Incorrect or missing address information | 11 | 44.0% |
| Inaccurate or missing Case Participant information | 11 | 44.0% |
| LINK searches improperly conducted resulting in poor historical perspective, duplication of participants in the system, and data merges later in the process | 4 | 16.0% |
| Hotline Worker misrepresents/incorrectly captures reporters comments | 4 | 16.0% |
| No issues identified | 4 | 16.0% |
| Language/Ethnicity information is not provided | 2 | 8.0% |
| Allegations are not clear | 1 | 4.0% |
| Basic questions are not asked of the reporter | 1 | 4.0% |
| Safety issues are not documented | 1 | 4.0% |
| Spelling and grammar are so poor that the report is hard to understand | 1 | 4.0% |
| Hotline response after hours/weekends is not adequately documented and leads to gaps in information or duplication of efforts | 1 | 4.0% |

Some investigators did indicate that they could not be certain if the inaccuracies were the result of the work at Hotline or the reporter's accuracy.

When asked how frequently the investigator met the required response time[17] for their assigned cases, 14 (56.0%) indicated that they met the designated response time 100% of the time, while the remaining 11 workers indicated that they met the response time between 75.0%-99.9% of the time.

Our interview captured information relative to the barriers/obstacles that Investigation Social Workers faced in meeting the designated response time. Investigation Social Workers could identify up to three barriers. In 14 of the cases (56.0%) the worker indicated the reason for failing to meet the designated response time was the result of demands of other cases. Table 12 provides the full list of barriers/obstacles identified by the Investigation Social Worker.

---

[17] Response time is met upon the SW attempt to make physical contact with the parent or person responsible for the child's care, and or the child(ren). DCF Policy 34-4.

**Table 12:  Barriers to meeting response time as identified by Investigation Social Work interview**

| Barrier/Obstacle | # of Times Identified | % of workers citing this issue |
|---|---|---|
| Other case emergencies/caseload demands | 14 | 56.0% |
| Incorrect address or case participant information | 8 | 32.0% |
| Delays in assignment (Hotline or SWS) | 7 | 28.0% |
| Inability to interview/family not home | 6 | 24.0% |
| Coordination with Police or DPH required | 5 | 20.0% |
| Car availability | 4 | 16.0% |
| No barriers to meeting response time | 2 | 8.0% |
| Court | 2 | 8.0% |
| Worker illness | 1 | 4.0% |

**Outcome Measure 2:  Completion of the Investigation**

***Court Monitor's Case Review Findings: 94.0% (Sample Size: 50)***
***DCF LINK Report for the period of April – June 2005: 92.3%***

The *Juan F.* Exit Plan requires that at least 85% of all reports shall have their
investigation completed within 45 calendar days of acceptance by Hotline.

The Department's automated reports for the last three quarters indicate that the
requirement for response time has been consistently exceeded.  In fact, the Department's
LINK reporting for the second quarter 2005 indicates that **92.3%** of all investigations met
this measure.  In all, **94.0%** of the 50 cases selected for review were completed with the
45-day requirement.

The range of days to completed investigation was four days to 55 days.  In all, 47 of the
50 reports were completed within 45 days.  See Table 13 below for more details:

**Table 13:  Length of investigation (acceptance at Hotline to Social Work Supervisor
approval)**

| Days | Number of Cases |
|---|---|
| 1-5 | 1 |
| 6-10 | 2 |
| 11-15 | 4 |
| 16-20 | 2 |
| 21-25 | 5 |
| 26-30 | 4 |
| 31-35 | 12 |
| 36-40 | 8 |
| 41-45 | 9 |
| 46-50 | 1 |
| 51+ | 2 |

For each interview with the Investigation Social Worker, the interviewer captured the
barriers to closing a case within the 45-day Consent Decree mandate. Table 14 below
provides the list in order of the frequency of response by the Investigation Social Worker.
Please note that the workers were not limited to one response.

**Table 14:  Barriers to achieving Outcome Measure 2**

| Barriers | Percentage of Investigation Social Workers Identifying Barrier |
|---|---|
| Caseload/other case emergencies | 64.0% |
| Resistant client | 36.0% |
| Families schedules (work/school) | 28.0% |
| ABH evaluations delays | 24.0% |
| Court | 24.0% |
| LINK issues | 16.0% |
| Wait Lists | 16.0% |
| Supervision | 16.0% |
| Placement | 12.0% |
| Police collaboration | 12.0% |
| Cannot locate family | 8.0% |
| Forensic evaluations | 8.0% |
| Transfer conference | 4.0% |
| Cars | 4.0% |
| Illness | 4.0% |

The documentation within LINK indicates that the Investigation Social Worker contacted the Ongoing Service Social Worker in all cases in which an open ongoing services case was under investigation.  In 18 cases (36.0%) this was the first involvement with DCF.  Findings indicate that 32 of the cases involved allegations on families with a known CPS history (64.0%).  Of these 32 cases with a history of DCF involvement, 87.5% of the investigations had documentation of a record review prior to disposition.

In the 14 cases in which the history included DCF involvement in the 12-month period preceding the report selected for our sample only eight cases (57.1%) had documented contact with the prior DCF worker.   Five of the alleged perpetrators had a substantiated report in the 12-months preceding the report included in this review.

In 48 cases the primary caretakers were interviewed prior to establishing the disposition of the report (96.0%).  Of the 48 documented interviews with primary caretakers, 93.6% were interviewed in their primary language.  Secondary caretakers were interviewed in 89.7% of the cases in which such an individual was identified.

The 63 alleged perpetrators identified within our 50 case sample were interviewed prior to the disposition of the case in 88.9% of the sample.  Documentation indicates that three of the 56 interviews held were not conducted in the primary language of the alleged perpetrator.

All identified victims were seen face-to-face at least once during the course of the investigation in 90.6% of the sample cases.  However, only 88.0% of the cases had documentation of the required interview with the identified victim.

While there is no requirement in current DCF policy regarding a required number of visits during an investigation of a report of abuse or neglect, this was an area of case

practice for which data was collected during our review.  When asked during the interview process, "How often do you visit a home during an investigation?"  All 25 workers indicated that they visit two to four times during an investigation.  When looking at the actual visits on the identified cases, only 64.0% of the workers recorded a minimum of two visits.  28.0% had one recorded visit and 8.0% had no visits to the home.

Ten workers (40.0%) interviewed felt that there was often a shift in purpose during later visits, when the focus became more concentrated on assessment of service needs rather than the informational gathering process that is the focus during the initial visit.  Table 15 below provides the frequency of contact with the 107 identified child victims within the case sample.

**Table 15: Frequency of visitation during investigation**

| Frequency of face to face contacts | Number of children having the indicated frequency of visits |
|---|---|
| **0** | 10 |
| **1** | 52 |
| **2** | 38 |
| **3** | 5 |
| **4** | 2 |
| **Total** | **107** |

Documentation also indicates an additional 22 adults and 30 other (non-victim) children living in the homes in which the alleged abuse/neglect took place were interviewed by the assigned Investigation Social Worker.

Reviewers searched for documentation of interview or assessment of the case participants identified within each case.  In 34 cases (68.0%), all identified participants were interviewed and/or visually assessed.  Fifteen cases (30.0%) had some record of interviews, but did not document all needed interviews, and one case did not include any interviews.

While Outcome Measure One measures the commencement of the investigation, our tool also captured the time frame from acceptance of the case at Hotline to the time the identified reference child victim was seen/interviewed.  The data indicates that:

- The range of time documented from assignment to successful contact was "same day" to 32 days from assignment (0…32).
- Three cases did not have successful contact documented.
- The most frequently documented time frame to contact (mode) is same day of assignment (11 cases).
- The average length of time to successful contact (excluding the three cases with no contact) is 4.64 days.

**Removals:**
Eleven children (10.3%) that were participants in six investigations were removed from their home at some point during the investigations within this sample. Six children were removed at the onset, four at the first face-to-face meeting with the investigator, and one at some point later in the investigation. Three of the children remained in placement with commitment pending at the time of review. Of the 11 children with placement activity, only one had more than one placement during the placement episode. In one case, the child was able to remain in the home as the perpetrator was asked to leave. The documentation in the investigation protocols indicates that the investigators documented a search for relative placement resource in three of the six cases with removals.

Two sibling groups were impacted by placement. One group was maintained together in placement, the other group was separated.

In reply to questions regarding interaction with FASU during the placement process, 72.0% of Investigation Social Workers report that they work closely or very closely with their Foster and Adoptive Service Unit during the matching process.

**Services During Investigations:**
In 24 cases, the Investigation Social Worker offered the family/child a service referral to help address conditions in the home and avoid placement. In 19 of the 24 cases with a referral (79.2%), the documentation indicates that family engaged in at least one of the referred services.

The needs identified by the documentation in these 50 cases was collected, as was the number of cases in which the needs identified had corresponding referrals made. Data indicates that 76.5% of the needs identified during investigation result in a referral to service. The protocol used did not provide additional data regarding whether the referral may not have been made, as services were sought by the family or through a provider active with the family. This may be an issue to be considered in future reviews.

In the interview with the 25 Investigation Social Workers, we asked, "With whom did you share your assessment of needs?" Only 52.0% of the Investigation Social Workers indicated that a family member was provided with the information.

**Table 16:  Needs identified during investigation**

| Services | # of cases in which need was identified | # of cases in which referral was made | Percentage of Referrals to Need |
|---|---|---|---|
| Substance abuse treatment | 14 | 11 | 78.6% |
| Mental health – child | 11 | 8 | 72.7% |
| Mental health – adult | 9 | 6 | 66.7% |
| Domestic Violence | 5 | 4 | 80.0% |
| Foster care placement | 4 | 4 | 100.0% |
| Parent education | 4 | 3 | 75.0% |
| Family support center | 3 | 2 | 66.7% |
| Financial Assistance/Concrete Needs | 3 | 3 | 100.0% |
| Shelter/Housing | 2 | 1 | 50.0% |
| Early childhood (Birth to 3) | 2 | 1 | 50.0% |
| FAST (Foster & Adoptive Support Team) | 1 | 1 | 100.0% |
| Parent aide | 1 | 1 | 100.0% |
| Extended day treatment | 1 | 1 | 100.0% |
| EMPS | 1 | 1 | 100.0% |
| Other needs | 7 | 5 | 71.4% |
| **Total** | **68** | **52** | **76.5%** |

Our interview also included a general question:  "In general, what service(s) do you most often identify for families during an investigation?"  The following table identifies the Investigation Social Workers response:

**Table 17:  Investigation Social Workers most frequently identified needs during investigation process**

| Need | # of times need was cited | % of workers identifying |
|---|---|---|
| Substance Abuse Treatment | 15 | 60.0% |
| Individual Counseling | 14 | 56.0% |
| Parent Aide | 13 | 52.0% |
| Domestic Violence | 10 | 40.0% |
| Parent Education | 9 | 36.0% |
| ABH/Substance Abuse Evaluation | 7 | 28.0% |
| Intensive Family Preservation | 6 | 24.0% |
| Anger Management | 3 | 12.0% |
| Financial Assistance/Concrete Needs | 3 | 12.0% |
| Mentor | 2 | 8.0% |
| Placement | 2 | 8.0% |
| Family Counseling | 2 | 8.0% |
| Couples Therapy | 2 | 8.0% |
| Respite, Systems of Care, Adolescent Shelters, Birth to 3, CJR, Hartford Street Youth Project, Behavior Therapy, Info Line, Group Counseling, Juvenile Court, Transportation, EMPS, Housing (*each reported once*) | 1 | 4.0% |

Investigators identified substance abuse treatment as a need in 60.0% of the interviews. This is followed by individual counseling (56.0%), parent aide service (52.0%) and domestic violence service (40.0%).

When asked if "the area office had sufficient services to meet identified needs?" 80.0% of the investigators replied "no".

Ninety-two percent of investigators interviewed indicated that the Area Resource Group could be helpful during the investigation process. However, utilization rates (as identified by the investigators) differed dramatically. One investigator indicated use in only 5.0% of his cases while another investigator indicated 100% utilization. The average (mean) utilization rate is calculated at 43.0%.

**Table 18:  What percentage of time do you use the Area Resource Group on investigations either in accompanying you on a home visit or in consultation?**

| ISW Utilization of ARG | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 5.0% | 1 | 4.0% | 4.0% |
| 10.0% | 2 | 8.0% | 12.0% |
| 15.0% | 1 | 4.0% | 16.0% |
| 20.0% | 1 | 4.0% | 20.0% |
| 25.0% | 2 | 8.0% | 28.0% |
| 30.0% | 4 | 16.0% | 44.0% |
| 40.0% | 2 | 8.0% | 52.0% |
| 50.0% | 3 | 12.0% | 64.0% |
| 60.0% | 4 | 16.0% | 80.0% |
| 65.0% | 2 | 8.0% | 88.0% |
| 70.0% | 1 | 4.0% | 92.0% |
| 75.0% | 1 | 4.0% | 96.0% |
| 100.0% | 1 | 4.0% | 100.0% |

Our tool asked the reviewers, "Were there service needs clearly warranted by the facts of the investigation, but for which there was no documented offer to provide service?"  In 15 cases (30.0%) the reviewer answered "yes".  All 15 of these cases had investigations completed within the 45-day mandate.  The services they noted as not being addressed included:

- Mental Health/Counseling:  5
- Domestic Violence Services:  3
- Substance Abuse Evaluation/Treatment: 3
- Intensive Family Preservation:  2
- Parent Education:  2
- Anger Management: 1
- Family Coach (recommended by child's therapist during investigation): 1
- Court Intervention to change visitation:  1
- Sexual Abuse Treatment - victim:  1
- Teen support group:  1
- Birth to three:  1

- Board of Health:  1
- Parent Aide:  1
- DCF Case Management: 1
- Daycare:  1
- Educational Assessment/Program:  1

**Table 19:  Crosstabulation:  What percentage of the time do you seek out and provide services to reduce immediate safety risks or prevent removal of children from families during investigation? * How often do you identify service needs for families investigated?**

| Count | | How often do you identify service needs for families investigated? | | | | |
|---|---|---|---|---|---|---|
| | | **Sometimes (25% - 49%)** | **Usually (50%-74%)** | **Almost Always (75%-99%)** | **Always (100%)** | **Total** |
| **What percentage of the time do you seek out and provide services to reduce immediate safety risks or prevent removal of children from families during investigation?** | **0-15** | 0 | 0 | 3 | 0 | 3 |
| | **16-30** | 1 | 0 | 0 | 1 | 2 |
| | **31-45** | 1 | 0 | 2 | 0 | 3 |
| | **46-60** | 0 | 2 | 4 | 0 | 6 |
| | **61-75** | 0 | 0 | 1 | 0 | 1 |
| | **76-90** | 0 | 1 | 2 | 1 | 4 |
| | **91+** | 1 | 2 | 2 | 1 | 6 |
| **Total** | | **3** | **5** | **14** | **3** | **25** |

One hundred percent of transferred cases had an initial assessment completed prior to transfer.  In the seven cases that were opened in Ongoing Services, three cases included documentation of an invitation to the Investigation Social Worker to participate in the treatment planning conference.  The Investigation Social Worker participated in only one case.

**Disposition:**
Of the 50 reports, 13 resulted in substantiation (24.0%).  The allegations included in those substantiated reports included:
- 3 counts of emotional neglect
- 1 count of physical abuse
- 9 counts of physical neglect
- 1 count of moral neglect
- 1 regulatory violation

**Documentation:**
The review found that 98.0% of the 50 case sample cases contained documentation that addressed the specific allegations outlined in the Hotline report.  The review looked at several requirements of the investigation documentation to determine the level of compliance with practice standards.  The review found that:
- 98.0% of all cases had completed the risk assessment
- 96.0% of all cases had a documented criminal check
- 80.0% of all cases had documentation of the domestic violence screen
- 76.0% of all cases had documentation of the substance abuse screen

- 75.6% of the cases requiring educational contacts documented the collateral contact.
  - 38.5% of the school age children identified in the report subsequently had the educational icon created in LINK
- 72.0% of the sample cases had the required medical collateral contact documented prior to disposition.
  - 42.0% of the sample cases had the medical icon created in LINK for all children identified as victim within the report.
- 48.0% of the alleged perpetrators were contacted with information related to the disposition of the case.

Interviewees cited several explanations or barriers to documentation of the medical collateral contact requirement. The top four reasons cited by the Investigation Social Workers are: 1) large clinics have poor response time; 2) medical provider response is received after we close the case; 3) parents refuse to sign a release of information; and, 4) contact with medical providers is not initiated if case is open in ongoing services.

During our 25 interviews, the Investigation Social Workers were asked their opinion on the effectiveness/usefulness of the tools available to them in conducting investigations. See Tables 20 and 21 below for their response.

**Table 20:  Investigation Social Workers' ratings of investigation screening tools (n=25)**

| Screening Tool | Poor | Fair | Good |
|---|---|---|---|
| Substance Abuse Screen | 9 | 5 | 11 |
| Domestic Violence Screen | 10 | 4 | 11 |
| Risk Assessment | 11 | 4 | 10 |

**Table 21:  Investigation Social Workers' opinion of current DCF protocol**

| Comment | Number | Percentage |
|---|---|---|
| Redundant | 10 | 40.0% |
| Good/thorough/useful | 8 | 32.0% |
| Okay/fair | 4 | 16.0% |
| Inconsistency in use among units is troublesome | 2 | 8.0% |
| Don't use format/not user friendly | 1 | 4.0% |
| LINK issues/doesn't retain all info entered | 1 | 4.0% |
| Outdated | 1 | 4.0% |
| Needs to link to other key documents | 1 | 4.0% |

In 11 cases (22.0%), reviewers identified a level of abuse/neglect allegation, which would have required contact/collaboration with law enforcement or the Assistant Attorney General. In eight of the cases, this documentation was found (72.7%). In three cases, the reviewer indicated there was no such documentation.

In 45 of the 50 reports (90.0%), the reporter was identified. In 33 of those 45 cases (73.3%) there was documented contact between the Investigation Social Worker and the reporter.

During interviews, 44% of the Investigation Social Workers indicated that they never or almost never (0%-24%) make joint visits to the home at the time of or following the transfer to Ongoing Services. We also collected data on the gap in visitation between Investigations Social Workers and the assigned Ongoing Services Social Worker. Two of the cases transferred (33.3%) had the visit within seven days of the last Investigation Social Worker visit. There was a range of 20 days that elapsed between contacts for the cases reviewed (days: 1,6,9,16,18,21).

**Supervision:**
The review captured several data elements related to supervision as well as the Investigation Social Worker's perception of the supervision that they received during the quarter. When asked, 60.0% of the 25 Investigation Social Workers interviewed indicated that they received supervision three or more times per month. In looking at the documentation in LINK narratives however, the majority (16) had two documented supervisory sessions (64.0%) within the case selected for our sample. Of the remaining workers, four had one supervisory session documented (16.0%), four had three supervisory sessions documented (16.0%) and one worker had four supervisory sessions documented (4.0%).

84.0% of the workers interviewed indicated that their Social Work Supervisor was helpful and enhanced their performance. The 16.0% who did not feel their supervisor was helpful indicated the following concerns:
- I get little to no input from the Social Work Supervisor – supervision is just my reporting out what I have done.
- Social Work Supervisor is not focused
- Social Work Supervisor sees every case as high risk
- Social Work Supervisor is too laid back and doesn't offer help.

When asked to rank the Social Work Supervisor on a scale of one to four with one being "unacceptable", two being "poor/fair", three being "good" and four being "superior". 60% of the Investigation Social Workers ranked their supervisors as "good"; 28% ranked their Social Work Supervisor as "superior, and 12% ranked their Social Work Supervisor as poor/fair. No Investigation Social Workers felt their supervision was "unacceptable."

When asked to identify the traits or characteristics that lead to effective and meaningful supervision, the workers identified clear direction as the most important factor in supervision, followed by the social worker's availability, knowledge of the cases, and Social Work Supervisor's support of the worker.

All 25 Investigation Social Workers felt their work was valued by the Ongoing Service units and community providers.

**Reviewers Ranking:**

Having read the record and holding the interview with the assigned investigator, the reviewer was asked to rank the overall performance of the investigative practices.  The overall score for each case is based on the average of the 6 rankings assigned for each component identified in Table 22 below.  Of the 25 investigations reviewed in this manner, reviewers scored 22 investigations as "good" or "superior", and three as "poor". On a percentage basis:

- 8% of investigations as "Superior"
- 80% of investigations as "Good"
- 12% investigations as "Poor"

The components that were captured to determine the rankings above are shown with their individual rankings in Table 22 below:

**Table 22:  Reviewers rankings for investigation subsample components**

|  | Poor | Good | Superior | N/A to Case |
|---|---|---|---|---|
| **Completeness of Investigation Data** | 0 | 22 | 3 | ---- |
| **Assessment of Safety Risk** | 2 | 18 | 5 | ---- |
| **Assessment of Needs** | 3 | 17 | 5 | ---- |
| **Provision of Services to Meet Needs** | 5 | 14 | 6 | ---- |
| **Communication of Findings to Case Participants** | 8 | 14 | 3 | ---- |
| **Communication with Ongoing Services or Providers as warranted** | 2 | 9 | 6 | 8 |

**Outcome Measure 3:  Treatment Plans**

*Court Monitor's Case Review Findings: 6.9% (Sample Size: 569)*

The *Juan F*. Exit Plan requires at least 90% of cases shall have treatment plans that are clinically appropriate, individualized, developed in conjunction with family and community members and approved within 60 days of opening in treatment, or a child's placement out of home.

The Department does not provide LINK data related to the elements of Outcome Measure 3, and has previously conducted case reviews on small samples of treatment plans to determine their compliance with this measure.  The latest review in the fourth quarter 2004 indicated that **17.0%** of the plans were in compliance with all requirements.

The Monitor's Office conducted the statewide statistically valid review of 569 cases open during the period of February 15, 2005 – May 15, 2005.  Data has been captured on all of the elements as outlined in the Exit Plan.  In all, **6.9%** (39 plans) met all criteria. This means that the plans were written in the language of the client; and were "clinically appropriate per the definition on page nine of the Revised Exit Plan (elements "a-o")[18]; were developed in conjunction with at least one of the active family case participants (mother, father or child age 12 or older); were approved by the Social Work Supervisor; and were less than seven months old on May 15, 2005 (or the date of case closure if prior to May 15, 2005).

The Department is aware of the deficits in practice in this area and is in the process of revising the treatment planning format and re-training staff over the next few months. The training will re-emphasize the importance of family engagement in developing appropriate treatment plans, focusing on the family conferencing model.

The performance of the Department in treatment planning requires much improvement. However, in looking at each element as identified within the Exit Plan, the performance on individual elements (a-o) does show some improvement since the last review. Reviewers' indicated that despite the low level of overall compliance, the quality and completeness of treatment plans had improved since the last comprehensive review of treatment plans two years ago.  In previous reviews there were often no treatment plans less than seven months old, and those that were less than seven months old were many times of such poor quality that they did not reflect the circumstances in the case.  Our results show that clear articulation of the timelines for the action steps and goals is the weakest component of the treatment plans reviewed.

---

[18] Individual elements are found in Table 23 on the following page.

**Table 23:  Department's compliance with identified elements of treatment plans for cases reviewed in the Court Monitor's sample (n=569)**

| Background Information | February 15, 2005 to May 15, 2005 |
|---|---|
| a.  A clear description of household members and each identified member's status | 43.4% |
| b.  Prior relevant case history | 78.4% |
| c.  Reason for most recent case opening | 88.0% |
| **Assessment Information** | |
| d.  Presenting issues and problem areas as identified by DCF or provider assessment | 82.2% |
| e.  Family issues as perceived by the parent/caretaker/child (if over 12) | 57.5% |
| f.  Family or child's strengths | 86.1% |
| g.  Family or child's needs (medical, dental, mental health, educational, other service needs – housing, childcare, employment, transportation, etc.) | 69.4% |
| **Treatment** | |
| h.  Reasonable efforts as determined by the court, to prevent out-of-home placement and/or reunify documented (where applicable) | 87.7% |
| j.  Clearly stated case goal/permanency plan goal | 78.4% |
| m.  Proposed services and identified responsible parties | 65.0% |
| o.  Parental visitation schedules | 80.1% |
| o.  Sibling visitation schedules | 50.8% |
| **Progress Toward Case Goals** | |
| i.  Responsibilities of children, parents, caretakers, service providers and DCF for reaching the identified case goals (tasks required during the planning period) | 68.5% |
| k.  Identification of the measurement of participants' progress toward and achievement of stated goal (for those adolescents where applicable, this includes the attachment of a completed Independent Living Plan DCF-2091) | 52.2% |
| l.  Timelines for completing tasks/expectations related to the case goal | 41.1% |
| j.  Legal activity and status during the preceding treatment planning period. | 81.4% |
| **Other** | |
| Plan approved by the SWS | 83.0% |
| Plan written/translated to the primary language of the client[19] | 83.7% |
| Plan developed in conjunction with mother (where applicable) | 57.9% |
| Plan developed in conjunction with father (where applicable) | 37.1% |
| Plan developed in conjunction with child over 12 (where applicable) | 46.6% |
| Plan less than 7 months old on May 15, 2005 (or date closing if earlier) | 73.3% |

**Administrative Case Reviews/Treatment Planning Conference (ACR/TPC)**

569 sample cases were reviewed to establish documentation of an Administrative Case Review/Treatment Planning Conference (ACR/TPC).   Of the sample, 513 cases (90.2%) had documentation of an ACR/TPC from November 15, 2004 through May 15, 2005.

Of the 569 cases, compliance with the primary language requirement could not be determined in 19 cases as they lacked appropriate documentation. Further, 56 cases had no recorded date of an ACR/TPC from November 15, 2004 through May 15, 2005. In

---

[19] Denominator excludes plans for children with TPR legal status under 12.

reviewing the compliance with the requirement to hold the ACR/TPC in the primary language of the client, the Department achieved 83.8% compliance (466 of 556 cases)[20]. In all, 10 conferences were documented in a language other than English.

The case reviewers utilized case maintenance information as well as narratives to establish active case participants and measure the frequency with which those participants are invited to and participate in ACR/TPC.  Table 24 below provides an overview of that information:

**Table 24:  Per the reviewers reading of the LINK narratives, and case maintenance information, were all appropriate parties officially invited to participate in the most recent ACR/TPC via the DCF-556 letter.**

| Invitations documented | Frequency | Percent |
|---|---|---|
| Yes | 203 | 35.7% |
| No | 300 | 52.7% |
| UTD or No TPC/ACR documented | 66 | 11.6% |
| All | 569 | 100.0% |

In 18 of the cases in which participants were not invited via invitation letters, there is documentation that a verbal invitation was extended, bringing the invitation rate of active participants to 38.8%.

Of the ACR/TPC meetings held:
- 88.8% of the mothers were issued invitations to participate and 43.1% attended in person or teleconferenced.
- 64.5% of the fathers were issued invitations to participate and 21.0% attended in person or teleconferenced.
- 54.4% of the children aged 12 or older were issued invitations to participate and 14.9% attended in person or teleconferenced.
- 84.2% of the current caretakers (out-of-home placement) were issued invitations to participate and 35.1% attended in person or teleconferenced.
- 60.7% of the cases had invitations issued to active provider agency participants and 15.2% attended in person or teleconferenced.
- 76.4% of the child's attorneys were issued invitations to participate.
- 36.7% of the father's attorneys were issued invitations to participate.
- 47.2% of the mother's attorneys were issued invitations to participate.
- 5.1% of all attorneys identified attended in person or teleconferenced.

In 94 cases, there was documentation that the Department was notified by the family or child at least 24 hours in advance of a scheduled ACR/TPC and indicated that they could not attend.  In 14 cases (14.9%), there is documentation that the meeting was rescheduled.

---

[20] Denominator excludes case conferences for children under the age of 12 with TPR status.

Due to educational programming, many children cannot attend their ACR/TPC. The review protocol asked the question, "If the ACR/TPC was held for a child in placement age 12 or older, was the conference scheduled at a time that accommodated the educational program so that he/she could participate in person or via phone conference?" Of the 113 cases that included a child 12 or older that could participate, 31.0% were held at a time that would allow for participation.

According to the facilitators' DCF-553 documentation, 252 of the plans developed at the ACR/TPC required some change/amendment as a result of the meeting. Of that total, 101 of those requiring change (40.1%) incorporated the facilitator's recommendations at the point of our review.

**Table 25: Permanency goals as identified on the most recent treatment plan reviewed**

| Permanency Goal | Frequency | Percent |
|---|---|---|
| In-home Goals | 236 | 41.5% |
| Reunification | 102 | 17.9% |
| Adoption | 71 | 12.5% |
| Other Permanent Living Arrangement: LTFC | 64 | 11.2% |
| Other Permanent Living Arrangement: Independent Living | 40 | 7.0% |
| UTD – No plan during this period | 28 | 4.9% |
| Transfer of Guardianship | 22 | 3.9% |
| Other | 6 | 1.1% |

Interviews with 96 Ongoing Service Social Workers provided insight and information related to treatment planning efforts. Findings include:

- While 96.9% of the Ongoing Service Social Workers indicated that they allow the family/child to have a role in the decision making process related to goal development, when asked, *"How do you arrive at the determination of the treatment goal for an assigned case?"* Only 46.9% of the Ongoing Service Social Workers described a process that included soliciting input from the family or child.
- 79.2% of the Ongoing Service Social Workers interviewed indicated that the family agreed with the stated treatment plan goal in the case identified for review. In each of these cases, the Ongoing Service Social Worker indicated that they knew of the family position as a result of a conversation with the identified case participants.
- In 66.7% of the cases the goal had been in effect for more than six months. In 12.5% of the cases the goal had been in effect longer than two years.
- 85.0% of the Ongoing Service Social Workers interviewed felt that the time frame to achieve the goal as established at the most recent ACR/TPC was realistic, and that 88.5% of the goals were appropriate for the clients given the current state of progress/needs. Reviewers concurred with the Ongoing Service Social Worker assessment on these two areas.

- 84.4% of the Ongoing Service Social Workers interviewed indicated that they felt that their families/children had made some progress toward goal achievement in the prior six months.
- When asked if they update the treatment plan if significant events occur in the case that impact or change the direction of treatment or goal, the majority of the Ongoing Service Social Workers (61.5%) indicated that they do not change the plan document until the ACR/TPC cycle requires the change.
- In looking at issues of permanency, the reviewers asked the Ongoing Service Social Workers, *"Do you always wait a specific time to file TPR?"*   Of the 96 workers interviewed 20.8% indicated that they do have a set timeframe that they follow, 49.0% indicated that they base each TPR on the individual circumstances in the case, and 30.2% had never filed a TPR and could not comment.

Workers were asked to identify the barriers they face in achieving the permanency goals for the children in placement on their caseloads.  The following chart provides the top three barriers for each approved permanency goal and the percentage of the 96 Ongoing Service Social Workers identifying such a barrier:

**Table 26:  Workers identification of the top three barriers to achieving permanency goals**

| **Adoption** | **Transfer of Guardianship** | **Reunification** | **Independent Living** | **LTFC** |
|---|---|---|---|---|
| Finding the Resource (22.9%) | Non-cooperative parents (26.0%) | Parents' lack of consistency/follow through (52%) | Don't know (do not have experience with these cases) (43.8%) | Foster Parents not willing to be long term resource (22.9%) |
| Court/Appeals Process (18.8%) | Identifying appropriate family resource (21.9%) | Lack of services to meet identified needs and/or wait lists (37.5%) | Level of maturity and adolescents not taking necessary steps (both 19.8%) | Child's Behaviors (19.8%) |
| Determination of Subsidy (5.2%) | Court delays, documentation process and identified relative indecision (each 5.2%) | Housing (22.9%) | Not enough CHAPS/group homes/foster homes (12.5%) | Don't know (do not have experience with these cases) (17.7%) |

Specific service needs will be identified in the reporting for Outcome Measure 15.

**Outcome Measure 4:  Search for Relatives**

*Court Monitor's Case Review Findings: 88.3% (Sample Size: 27)*

The *Juan F*. Exit Plan requires that for at least 85% of children in placement, DCF shall document a search for relatives, extended or informal networks, friends, family, former foster parents or other significant persons known to the child to identify possible placement and visiting resources.  This Measure excludes Voluntary Service cases.

The Department's last reporting on this measure was for the second quarter of 2004 when it was reported that the Department had **82.0%** compliance with this measure.

Per the Exit Plan methodology, the case review determined compliance utilizing the data from the most recent time period (for those 27 children that came into care on or after January 1, 2005).  The percentage of the cases documenting search for relatives for this sample is **88.3%**.

Due to the sample size of children coming into care during this period, the Monitor's review analyzed data for the pool of 132 children entering care on or after January 1, 2004 (the begin date for the measure).  Those findings indicate that 77.3% of the 132 cases had searches conducted and documented in LINK during the first six months of placement.

There was documentation of the relative search beginning in the investigatory phase for 78.8% of the 132 children, or there is verification that the search had already taken place by an assigned Ongoing Services worker if the case was already active in Ongoing Services at the time of placement.

None of the 132 cases had documentation that the worker used the Locate Plus technology in the search process.  This is a newly available software package.  In interviews with the 96 Ongoing Service Social Workers, in June and July 2005 where the question was posed, *"Is the new relative search technology (Locate Plus) helpful?"* 46.9% of workers had never heard of the software, 36.5% had used the software and indicated it was useful. In all, 16.7% of Ongoing Service Social Workers interviewed had used it and thought it was not useful.

Of the 132 children in the sample who entered DCF out-of-home care on or after January 1, 2004, 31.1% of the children were placed with a relative (n=38) or in a special study home (n=3) on May 15, 2005.  Fourteen of the children or 10.6% were reunified by May 15, 2005.  Two of the located relative caretakers had backgrounds that did not meet the licensing standards.  Both workers requested waivers from Central Office.  These were appropriately granted to allow the placement to proceed.

The reviewers reported that 82.6% of the cases with children who entered DCF out-of-home care on or after January 1, 2004 contained documentation that the Department considered all appropriate family or other persons known to the child to secure a placement.  In 23 (17.4%) instances the reviewer felt that persons known to the family or child were not given appropriate consideration, where to be a resource to the child.

When looking at the pool of 27 children entering after January 1, 2005 the number of times in which the reviewer indicated that all appropriate resources had not been considered was six (22.2%).  However, for each of these six children, the 6 month requirement mark had not been completed (dates of entry from February 6, 2005 through April 2, 2005), and there could have been additional documentation added since our record review, and still within the six month requirement.

The 96 Ongoing Service Social Workers described various methods of searching for relatives during interviews.   In response to "How do you search for relatives?"  Workers indicated:

- 100% of the 96 Ongoing Service Social Workers interviewed specified that they ask the parent(s) if there are any family or friends that could step in to be a resource for the child.
- 97.9% of the Ongoing Service Social Workers interviewed indicated that they research both sides of the family even if there is a non-custodial parent who is not in favor of the custodial parent.
- 63.5% of Ongoing Service Social Workers interviewed included other family members in their description of who they hold discussions with related to possible placement resources.
- 49.0% of Ongoing Service Social Workers interviewed specified that they ask the child/adolescent for their input on relatives or other resources.
- 20.8% of Ongoing Service Social Workers interviewed review the LINK record for clues as to possible resources.
- 20.8% of Ongoing Service Social Workers interviewed use some form of Internet search in their attempts to locate possible resources.
- 9.4% of Ongoing Service Social Workers interviewed use Department of Social Services and/or Department of Correction databases.
- 7.3% of Ongoing Service Social Workers interviewed include friends of the family in the discussion of possible placement resources.
- 5.2% of Ongoing Service Social Workers interviewed speak with school personnel and/or providers to get leads on possible placement resources.
- 3.1% of Ongoing Service Social Workers interviewed contact Life Long Family Ties for assistance.
- 2.1% of Ongoing Service Social Workers interviewed use a genogram or family tree to create a visual picture for the family and gather more information.
- 1.0% of Ongoing Service Social Workers interviewed talk to the prior worker regarding possible resources.

## Outcome Measure 5: Repeat Maltreatment

**Court Monitor's Case Review Findings: 6.6% (Sample Size: 211)**
**DCF LINK Report for the period of April – June 2005: 8.5%**

The *Juan F*. Exit Plan requires that no more than 7% of children who are victims of substantiated maltreatment during a six-month period shall be the substantiated victims of additional maltreatment within six months.

The Department's automated LINK reporting for the second quarter 2005 indicates that the current rate of repeat maltreatment is **8.5%**.

The Monitor's Office case review included 211 cases with 684 identified victims of substantiated abuse or neglect during the 12 months ending May 15, 2005 to determine if more than one substantiation occurred within a six month period.  The review asked, "Has this child been identified as a victim of substantiated maltreatment in the twelve months ending May 15, 2005?"  It then captured the total number of substantiations, and queried, "Were any of the instances of maltreatment (date of incident or acceptance date at Hotline if date is not recorded) separated by less than a six month time frame?"  Forty-five of the 684 victims, or **6.6%**, were the subject of additional substantiated abuse or neglect within six months of the initial substantiation.

In 149 (70.6%) of the 211 cases reviewed, the family was offered services by the Investigation Social Worker.  In 21 cases, services had already been put in place by the Ongoing Service Social Worker assigned to the family at the time of the report to Hotline.  In 85.2% of the cases in which the investigator offered the family services, there is documentation that there was a referral made to the identified service provider.

Participation rates for services identified by the Investigation Social Worker for the 211 families with substantiations during the year ending May 15, 2005 are provided below:

**Table 27:  Participation in referred services by family members in the initial substantiation during the period of May 15, 2004 – May 15, 2005**

| Participation | Frequency | Percent |
|---|---|---|
| N/A - No services needs identified/required | 17 | 8.1% |
| All members participated in all referred services | 48 | 22.7% |
| All members participated in at least one of the referred services | 44 | 20.9% |
| Some members participated in at least one service | 62 | 29.4% |
| No members participated in referred services | 26 | 12.3% |
| No services were referred for identified needs | 14 | 6.6% |
| **Total** | 211 | 100.0% |

Of the 211 families in our sample with one or more substantiation during the year ending May 15, 2005, 33 were already open in Ongoing Services at the time of the substantiation. A total of 175 cases were transferred to the Ongoing Services Unit.  Three cases were not transferred.

In 94.2% of the cases open in ongoing services, there is documentation of an ongoing risk assessment during the face-to-face visits with the family in the six months following the substantiation. Reviewers felt that this risk assessment activity was adequate in 95.4% of the cases reviewed.

Of the 96 Ongoing Service Social Workers interviewed, our protocol asked the interviewer, related to the identified case, *"Do you feel that the social worker adequately conveyed their concerns related to the safety risks to all active participants and collaterals?"* Reviewers felt that 85 of the Ongoing Service Case Workers (88.6%) did in fact convey necessary information and concerns to <u>all</u> necessary case participants and collaterals in their cases as it related to escalation of safety issues or issues related to client well-being.

**Outcome Measure 6: Maltreatment of Children in Out-of-home Care**

*Court Monitor's Case Review Findings: 0% (Sample Size: 313)*
*DCF LINK Report for the period of April – June 2005: 0.7%*

The *Juan F.* Exit Plan requires that no more than 2% of children in out-of-home care shall be the victims of substantiated maltreatment by a substitute caregiver while in out-of-home care.

The Department's automated LINK reporting[21] found that **0.7%** of the children in the out- of- home population was subjected to repeat maltreatment at the hands of a substitute caretaker during the second calendar quarter of 2005.

The Monitor's Office sample of children in placement during the period of February 15, 2005 through May 15, 2005 included 313 children.  None of the 313 children (**0%**) had a substantiated report of abuse or neglect at the hands of a substitute caretaker.

There were 14 occasions (4.5%) that a worker documented conversations with the Foster and Adoptive Support Unit or Program Review and Evaluation Unit related to concerns with a child's placement. These concerns did not result in a referral to the Hotline.  The data collection tool did not include questions related to the appropriateness of the worker's determination to refer the matter to FASU or Hotline.

Social Workers comments were very consistent with this level of performance in that 97.7% of the workers with children in placement felt that the foster homes housing children on their caseloads were of a good or superior level as it relates to safety.

---

[21] LINK methodology for capturing data on this measure has recently been improved so that the system can recognize the relationship of the perpetrator to the child in placement and screen out any substantiation at the hands of biological, adoptive parents or guardians during visits while they are in care.  This will be effective in the third quarter 2005.

**Outcome Measure 7:  Reunification**

***Court Monitor's Case Review Findings: 66.7% (Sample Size: 9)***

The *Juan F.* Exit Plan requires that at least 60% of children who are reunified with parents/guardians shall be reunified within 12 months of their most recent removal from home.  This measure excludes children placed via Voluntary Services.

The Department has been unable to report on Outcome Measure 7 due to the reliability of legal status, and removal and discharge data.  Removal and discharge dates as well as the correct legal status are necessary to calculate reunification.  Currently approximately 6.0% of the children in placement do not have removal dates entered in LINK.  The legal status must also be current to properly determine when a child has been discharged from custody.  The Department has recently completed a clean up of legal status data but errors still persist.  A child also cannot be considered reunified if the discharge indicator is not selected as "discharge from all placements".

The Court Monitor's review included nine cases in which reunification occurred during the period of February 15, 2005 through May 15, 2005.  Of the nine cases, six children or (**66.7%**) were reunified within 12 months of removal from their home.

The range of the lengths of stay for the nine children was one month to 54 months.  Reunifications were accomplished within six months of removal in 55.6% of the sample.  Delays in reunification were noted in several cases.  Reviewers identified the following causes for delays in those cases with a reunification during the period (note: more than one barrier could be identified in a given case):
- Other (3) – birth of baby delayed services, employment, lack of service
- Parent's treatment needs (2)
- Child's therapeutic needs (1)
- Failure to rehabilitate (1)
- DCF case management (1)
- Incarceration (1)

Due to the low number of reunifications during the quarter, we also examined those cases with the identified goal of reunification on the most recent approved treatment plan during the period of February 15, 2005 through May 15, 2005.  This included 102 children in placement of the following racial and ethnic background.

**Table 28:  Racial/Ethnic background of children in placement with goal of reunification**

|  | Hispanic | Non-Hispanic | All |
|---|---|---|---|
| **Black/African American** | 5 | 16 | 21 |
| **White** | 17 | 39 | 56 |
| **UTD** | 20 | 0 | 20 |
| **Multi-Racial** | 2 | 3 | 5 |
| **All** | **44** | **58** | **102** |

The most recent case open date for these cases ranged from March 15, 1993 to March 2, 2005.  62.7% of the children had been in care at least six months as of May 15, 2005. Dates of removal within our sample ranged from November 1, 2000 to April 6, 2005.

While nine children (8.8% of children with goal of reunification) were reunified with their parent(s) during the review period, the majority of the children (64.7%) remained in DCF foster care on the date of review. Other placements in order of frequency are found in Table 29 below:

**Table 29:  Residence of children with stated goal of reunification on the most recent treatment plan in place February 15, 2005 through May 15, 2005 as of the date of review**

| Residence | Frequency | Percent |
|---|---|---|
| Biological or Adoptive Parent/Legal Guardian[22] | 14 | 13.7% |
| DCF Foster Care | 66 | 64.7% |
| Detention | 1 | 1.0% |
| Group Home | 1 | 1.0% |
| Out of State Foster Care Placement | 2 | 2.0% |
| Pre-Adoptive Placement | 1 | 1.0% |
| Private Provider Foster Care | 8 | 7.8% |
| Residential (in State) | 2 | 2.0% |
| Residential (Out of State) | 4 | 3.9% |
| Safe Home | 1 | 1.0% |
| Shelter | 2 | 2.0% |
| **All** | **102** | **100.0%** |

Concurrent plans were identified in 93 of the 102 cases reviewed.  In cases of court involvement, 94.9% of the plans coincided with the court-approved goal.  A total of 9.8% of the 102 cases had a change in goal from the prior approved plan.  TPR had been filed in 5.9% of the cases with a stated goal of reunification. Table 30 below provides the frequencies with which alternate plans to reunification were cited.

**Table 30:  Concurrent plans to reunification as stated in the most current treatment plan in place February 15, 2005 through May 15, 2005**

| Concurrent Plan | Frequency | Percent |
|---|---|---|
| Adoption | 33 | 32.4% |
| Independent Living | 9 | 8.8% |
| Long Term Foster Care | 18 | 17.6% |
| Other Permanent Living Arrangement | 2 | 2.0% |
| Transfer of Guardianship | 31 | 30.4% |
| No Concurrent Plan | 9 | 8.8% |
| **All** | **102** | **100.0%** |

---

[22] This includes the nine individuals officially reunified, and five other children who remained committed to DCF but were in the care of their parent/guardian at the time of review.

In response to the question, "Did the Ongoing Service Social Worker actively manage the case so that both goals were concurrently being pursued?" the reviewers found 69 of the 93 Ongoing Service Social Workers (74.2%) did have documentation of efforts toward each plan. In 24.7% of the cases, it did not appear that concurrent planning efforts were being pursued.

In reviewing the population of 102 children with a primary goal of reunification, there were 25 cases in which the reviewers indicated that a filing of TPR could be appropriate given the stated goal/concurrent goal in the case. In 6 of those 25 cases, the TPR had already been filed at the point of our review. No child had a legal status of TPR on May 15, 2005. The most frequently occurring legal status of the group of 102 children was Committed (63.7%) followed by OTC (25.5%) and then Not Committed or Voluntary Services (10.8%). Those included in the Not Committed category would include children reunified prior to May 15, 2005 and for which legal status had been changed in LINK.

In looking at the supervision of cases with a goal of reunification, the review data indicates that 77.5% of the 102 cases had supervisory conferences that were reflective of the events documented in LINK in the period leading up to the date of the review. A total of 21.6% of the 102 cases did not reflect a discussion of the risk factors documented, and one case (1.0%) had no supervisory conferences. The rank score assigned by the reviewer after reviewing the record was most frequently "good" with 54.9% of the cases having what the reviewer considered to be good or adequate supervision. This was followed by 28.4% being assigned a "poor" ranking, 11.8% having an "excellent" ranking and 4.9% being ranked "negligible".

Of those children in care with a goal of reunification on May 15, 2005 the largest percentage were in care less than 6 months (44.1%) and were most likely to fall into the age range of one to three years old (20.6%). Seven of the 102 children had already exceeded the 24-month mark.

**Table 31: Crosstabulation of Age of Children (on 5/15/2005) having a goal of reunification * Length of stay in out of home placement**

| Count | | Length of Stay in Placement as of May 15, 2005 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | ≤ 6 months | 7-12 months | 13-18 months | 19-24 months | 25-30 months | 31-36 months | ≥ 37 months | All |
| **Age of Child on May 15, 2005.** | **< 1 Year** | 8 | 2 | 2 | 0 | 0 | 0 | 0 | 12 |
| | **1-3** | 8 | 4 | 4 | 2 | 2 | 1 | 0 | 21 |
| | **4-6** | 7 | 2 | 2 | 1 | 0 | 0 | 0 | 12 |
| | **7-9** | 6 | 7 | 4 | 2 | 0 | 1 | 0 | 20 |
| | **10-12** | 8 | 4 | 3 | 1 | 1 | 0 | 1 | 18 |
| | **13-15** | 7 | 3 | 4 | 2 | 0 | 0 | 1 | 17 |
| | **16-18** | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| | **19+** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **All** | 45 | 22 | 20 | 8 | 3 | 2 | 2 | 102 |

In all, 99.0% of the group of 102 children with a goal of reunification had an approved treatment plan.  In only 30.4% of the cases, however, did the reviewer document that all appropriate parties were invited to participate at the most recent ACR/TPC prior to May 15, 2005.   In examining the individual elements of the Treatment Plan that are detailed in the Exit Plan document, the group of 102 children with a goal of reunification fared as follows:

**Table 32:  Department's compliance with identified elements of treatment plans for cases reviewed in the Court Monitor's sample for those cases with a stated goal of Reunification (n=102)**

| Background Information | February 15, 2005 to May 15, 2005 |
|---|---|
| a.  A clear description of household members and each identified member's status | 50.0% |
| b.  Prior relevant case history | 80.4% |
| c.  Reason for most recent case opening | 92.2% |
| **Assessment Information** | |
| d.  Presenting issues and problem areas as identified by DCF or provider assessment | 88.2% |
| e.  Family issues as perceived by the parent/caretaker/child (if over 12) | 42.2% |
| f.  Family or child's strengths | 93.1% |
| g.  Family or child's needs (medical, dental, mental health, educational, other service needs – housing, childcare, employment, transportation, etc.) | 78.4% |
| **Treatment** | |
| h.  Reasonable efforts as determined by the court, to prevent out of home placement and/or reunify documented (where applicable) | 83.3% |
| j.  Clearly stated case goal/permanency plan goal | 85.3% |
| m.  Proposed services and identified responsible parties | 69.6% |
| o.  Parental visitation schedules (where applicable) | 92.1% |
| o.  Sibling visitation schedules (where applicable) | 63.0% |
| **Progress Toward Case Goals** | |
| i.  Responsibilities of children, parents, caretakers, service providers and DCF for reaching the identified case goals (tasks required during the planning period) | 75.5% |
| k.  Identification of the measurement of participants' progress toward and achievement of stated goal (for those adolescents where applicable, this includes the attachment of a completed Independent Living Plan DCF-2091) | 55.9% |
| l.  Timelines for completing tasks/expectations related to the case goal | 36.3% |
| j.  Legal activity and status during the preceding treatment planning period. | 91.2% |
| **Other** | |
| Plan approved by the SWS | 99.0% |
| Plan written/translated to the primary language of the client | 87.3% |
| Plan developed in conjunction with mother (where applicable) | 67.3% |
| Plan developed in conjunction with father (where applicable) | 43.5% |
| Plan developed in conjunction with child over 12 (where applicable) | 64.0% |

Nine of the treatment plans (8.8%) had all elements listed above.  Of the 102 cases, 62 (60.8%) required changes or amendments as noted by the ACR Coordinator on the DCF-

553 documentation.  Of the 62 requiring changes, 18 plans (29.0%) reflected the required changes as of the date of the review.

The data also shows that reviewers felt there were clearly documented needs not incorporated into the treatment plan in 17.7% of the 102 cases.

The review was able to capture the identified needs for this population (n=102), and whether those needs were in fact met.  Table 33 below provides that information.  The final column in the table provides the full population percentage to give perspective of this group to the whole population of DCF cases reviewed (n=569)

**Table 33:  Needs Identified and whether or not those needs were met in the time frame specified on the current treatment plan for those children with a goal of reunification.**

| Service Category | # Met | # Not Met | # TBD | Total Needs | % Met in population with reunification goal | % Met in the full population |
|---|---|---|---|---|---|---|
| Mental Health | 111 | 26 | 17 | 154 | 72.1% | 70.6% |
| Out of Home Placement | 97 | 2 | 2 | 101 | 96.0% | 93.2% |
| Substance Abuse Treatment | 46 | 16 | 3 | 65 | 70.8% | 72.2% |
| Support Services – Out of Home | 45 | 10 | 3 | 58 | 77.6% | 75.5% |
| Medical | 36 | 4 | 4 | 44 | 81.8% | 84.5% |
| Education | 26 | 7 | 5 | 38 | 68.4% | 76.4% |
| Domestic Violence Treatment | 12 | 8 | 4 | 24 | 50.0% | 43.8% |
| Support Services – In Home | 10 | 3 | 0 | 13 | 76.9% | 71.7% |
| Housing | 9 | 12 | 0 | 21 | 42.9% | 46.7% |
| Child Care | 7 | 0 | 0 | 7 | 100.0% | 74.2% |
| Training | 5 | 3 | 1 | 9 | 55.5% | 58.8% |
| Dental | 4 | 6 | 3 | 13 | 30.8% | 28.1% |
| Employment | 1 | 1 | 0 | 2 | 50.0% | 37.0% |
| **Combined Service Needs** | **409** | **98** | **42** | **549** | **74.5%** | **73.5%** |

**Outcome Measure 8:  Adoption**

***Court Monitor's Case Review Findings: 50.0% (Sample Size: 8)***
***DCF Report for the period of April – June 2005: 25.2%***

The *Juan F*. Exit Plan requires that at least 32% of children who are adopted shall have their adoptions finalized within 24 months of their most recent removal from home.  This measure excludes children in care via Voluntary Services.

The Department's automated LINK reports for the second quarter 2005 indicate that **25.2%** of all adoptions completed during the quarter were finalized within 24 months of the most recent removal from home[23].

The Court Monitor's review included eight cases in which there was a completed adoption during the period of February 15, 2005 through May 15, 2005.  Of the eight cases, four (**50%**) occurred within 24 months of initial placement.  Table 34 provides the information related to all eight cases successfully achieving adoption during the quarter.

**Table 34:  Time frame to adoption finalization for the eight cases successfully achieving adoption**

| Months to Adoption | Frequency | % of Cases | Cumulative % |
|---|---|---|---|
| 18 | 1 | 12.5% | 12.5% |
| 22 | 1 | 12.5% | 25.0% |
| 23 | 1 | 12.5% | 37.5% |
| 24 | 1 | 12.5% | 50.0% |
| 32 | 1 | 12.5% | 62.5% |
| 33 | 1 | 12.5% | 75.0% |
| 36 | 1 | 12.5% | 87.5% |
| 46 | 1 | 12.5% | 100.0% |

Three of the adoptions in the sample were finalized utilizing a legal risk home.  In the eight cases, the finalization of adoption occurred within three to nine months of the Termination of Parental Rights.  Seven of the eight children had one pre-adoptive placement prior to adoption; one child had two pre-adoptive placements.  All eight adoptions were subsidized adoptions.  One of the cases had post adoption services identified in LINK, and one had documentation that the adoptive parents declined post adoptive services.  Six cases (75.0%) did not document the issue of post-adoptive services.

Delays in the adoptive process for the eight cases were identified as follows:
- ICPC process
- Pre-adoptive parent indecision

---

[23] Department's findings are based on 33 of the 141 finalized adoptions occurring within 24 months. However, the universe includes 10 children for whom there is no removal date.  The actual number may vary upward if the Department conducts further review.  At this time, we are assuming all 10 individuals did not meet the measure.

- Determination of subsidy rate

Due to the low number of adoptions in our sample that were finalized during the quarter, we also examined the population of children with the goal of adoption on the most current treatment plan in place during the quarter of February 15, 2005 through May 15, 2005. A total of 71 children in the sample were in out-of-home care during that period with the goal of adoption. Ages, race and ethnicity of this population is provided in the Tables 35 and 36 below:

**Table 35: Age of children in placement within the sample set with the goal of adoption**

| Age of Child | Frequency | Percentage |
|---|---|---|
| < 1 | 2 | 2.8% |
| 1-3 | 16 | 22.5% |
| 4-6 | 19 | 26.8% |
| 7-9 | 16 | 22.5% |
| 10-12 | 11 | 15.5% |
| 13+ | 6 | 8.5% |

**Table 36: Racial/Ethnic background of children in placement with goal of adoption**

| | Hispanic | Non-Hispanic | Total |
|---|---|---|---|
| Black/African American | 0 | 24 | 24 |
| White | 9 | 24 | 33 |
| Unknown | 1 | 0 | 1 |
| UTD | 10 | 0 | 10 |
| Multi-Racial | 0 | 3 | 3 |
| **Total** | **20** | **51** | **71** |

Of the 71 children in care with a goal of adoption, 40 children (56.3%) had been in care less than 24 months on May 15, 2005. Therefore, 43.6% of this population had already exceeded the 24-month requirement at the time of the review. The range of the length of time in care for this population was five months to eight years eight months.

While not required by DCF Policy, four of the 71 children had a clearly stated concurrent plan on the most recently approved treatment plan. These concurrent plans included: long term foster care (2), reunification (1), and transfer of guardianship (1). In all four cases, the reviewer found evidence that both plans were being pursued. Termination of Parental Rights had been filed for 85.9% of the 71 children and had been granted for 62.0% of the children with the goal of adoption. Forty-seven of the children (66.2%) had an identified adoptive resource. 45 of the children (63.4%) were in placement with that identified resource on May 15, 2005.

As a point of comparison, prior reports on the Adoption Cohort in March 2002 (n=155) had 49% of the cohort in their identified adoptive placement, and an additional 7.1% had