a resource identified, but were not in that placement. A total of 43.9% had no resource identified.

In 15 of the cases (21.1%), the plan had been changed to adoption within the last Administrative Case Review cycle (with the most recent treatment plan approved during the period). Eight of the DCF plans identifying the goal of adoption (11.3%) were not in agreement with the current court approved permanency goal.

In 85.9% of the cases, the TPR had been filed prior to our review. Dates of filing ranged from June 1998 to June 2005. Forty-four of the children had TPR granted at the point of review, with dates of TPR ranging from August of 1998 to March of 2005. Of the children with TPR status, during the period, only 30% had evidence that a Life Book was created/initiated for the child as of the date of the review.

Of the 71 cases of children with the most recent treatment goal of adoption, the legal status identified on May 15, 2005 was most frequently still TPR (52.1%). This legal status was next followed by: Committed (36.6%), Not Committed (8.5%) and OTC (2.8%). Those children with a status of not committed would include children that were adopted as of May 15, 2005 and for which the worker had changed the legal status.

In looking at the supervision of cases with a goal of adoption, the review data indicates that 33.8% of the cases did not reflect a supervisory conference reflective of the risks and issues identified in the workers LINK narratives leading up to the date of the supervisory conference. Of the 71 cases with the goal of adoption, the supervision rating assigned by the reviewer was considered to be good or excellent in 57.7% of the cases, poor in 36.6% of the cases and Negligible in 5.6% of the cases.

In looking at the treatment plans of the cases with goal of adoption, the data shows that the social work supervisor approved 94.4% of the plans developed. In 56.3% of the cases, there was evidence that all appropriate parties were invited to participate in the treatment planning conference/administrative case review.

Of those children in care with a goal of adoption on May 15, 2005 the largest percentage were in care 37 or more months (28.2%) and were most likely to fall into the age of one to three years old (33.8%).  54.9% of the 71 children with the goal of adoption in our sample had already exceeded the 24-month mark.  One child was in care less than six months (1.4%).

**Table 37:  Crosstabulation of Age of Children (on 5/15/2005) having a goal of adoption * Length of stay in out of home placement**

| Count | | Length of Stay in Placement as of May 15, 2005 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | ≤ 6 months | 7-12 months | 13-18 months | 19-24 months | 25-30 months | 31-36 months | ≥ 37 months | All |
| Age of Child on May 15, 2005. | < 1 Year | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 4 |
| | 1-3 | 1 | 1 | 4 | 5 | 4 | 6 | 3 | 24 |
| | 4-6 | 0 | 1 | 3 | 3 | 2 | 0 | 4 | 13 |
| | 7-9 | 0 | 4 | 1 | 2 | 0 | 5 | 2 | 14 |
| | 10-12 | 0 | 0 | 0 | 3 | 0 | 1 | 7 | 11 |
| | 13-15 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| | 16-18 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 |
| | 19+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | All | 1 | 9 | 8 | 14 | 6 | 13 | 20 | 71 |

Table 38 below indicates the level of compliance that the Department had for those children with the goal of adoption for each of the individual elements.

**Table 38:  Department's compliance with identified elements of treatment plans for cases reviewed in the Court Monitor's sample for those cases with a stated goal of adoption (n=71)**

| Background Information | February 15, 2005 to May 15, 2005 |
|---|---|
| a.  A clear description of household members and each identified member's status | 63.4% |
| b.  Prior relevant case history | 85.9% |
| c.  Reason for most recent case opening | 95.8% |
| **Assessment Information** | |
| d.  Presenting issues and problem areas as identified by DCF or provider assessment | 85.9% |
| e.  Family issues as perceived by the parent/caretaker/child (if over 12) | 49.3% |
| f.  Family or child's strengths | 93.0% |
| g.  Family or child's needs (medical, dental, mental health, educational, other service needs – housing, childcare, employment, transportation, etc.) | 85.9% |
| **Treatment** | |
| h.  Reasonable efforts as determined by the court, to prevent out of home placement and/or reunify documented (where applicable) | 77.5% |
| j.  Clearly stated case goal/permanency plan goal | 90.1% |
| m.  Proposed services and identified responsible parties | 67.6% |
| o.  Parental visitation schedules (where applicable) | 85.3% |
| o.  Sibling visitation schedules (where applicable) | 40.5% |
| **Progress Toward Case Goals** | |
| i.  Responsibilities of children, parents, caretakers, service providers and DCF for reaching the identified case goals (tasks required during the planning period) | 73.2% |
| k.  Identification of the measurement of participants' progress toward and achievement of stated goal (for those adolescents where applicable, this includes the attachment of a completed Independent Living Plan DCF-2091) | 69.0% |
| l.  Timelines for completing tasks/expectations related to the case goal | 66.2% |
| j.  Legal activity and status during the preceding treatment planning period. | 90.1% |
| **Other** | |
| Plan approved by the SWS | 94.4% |
| Plan written/translated to the primary language of the client[24] | 95.2% |
| Plan developed in conjunction with mother (where applicable) | 37.9% |
| Plan developed in conjunction with father (where applicable) | 21.7% |
| Plan developed in conjunction with child over 12 (where applicable) | 75.0% |

Of the 71 cases, 15.5% had a treatment plan inclusive of all of the elements listed above. Of the 70 plans found within LINK documentation, 44 plans (62.0%) required changes or amendments as noted by the ACR Coordinator on the DCF-553 documentation.  Of the 44 requiring changes, 18 plans (40.9%) reflected the required changes as of the date of the review.

---

[24] Denominator excludes 8 plans for children with TPR legal status under 12.

The data also indicates that 8 of the 71 cases (11.3%) had needs that the reviewers felt were clearly documented within the case record but that were not incorporated into the treatment plan.

The review was able to capture the identified needs for this population (n=71), and whether those needs were in fact met. Table 39 below provides that information. The final column in the table provides the full population percentage to give perspective of this group to the whole population of DCF cases reviewed (n=569).

**Table 39:  Needs Identified and whether or not those needs were met in the time frame specified on the current treatment plan for those children with a goal of adoption.**

| Service Category | # Met | # Not Met | # TBD | Total Needs | % Met in population with adoption goal (n=71) | % Met in the full population (n=569) |
|---|---|---|---|---|---|---|
| Out of Home Placement | 73 | 5 | 3 | 81 | 90.1% | 93.2% |
| Mental Health | 48 | 1 | 7 | 56 | 85.7% | 70.6% |
| Medical | 27 | 2 | 1 | 30 | 90.0% | 84.5% |
| Support Services – Out of Home | 25 | 0 | 1 | 26 | 96.2% | 75.5% |
| Education | 22 | 2 | 1 | 25 | 88.0% | 76.4% |
| Support Services – In Home | 7 | 0 | 0 | 7 | 100.0% | 71.7% |
| Child Care | 3 | 0 | 2 | 5 | 60.0% | 74.2% |
| Domestic Violence Treatment | 1 | 0 | 0 | 1 | 100.0% | 43.8% |
| Employment | 1 | 0 | 0 | 1 | 100.0% | 37.0% |
| Housing | 1 | 1 | 0 | 2 | 50.0% | 46.7% |
| Substance Abuse Treatment | 1 | 1 | 1 | 3 | 33.3% | 72.2% |
| Dental | 0 | 2 | 1 | 3 | 0% | 28.1% |
| Training | 0 | 0 | 0 | 0 | N/A | 58.8% |
| **Combined Service Needs** | **209** | **14** | **17** | **240** | **87.1%** | **73.5%** |

**Outcome Measure 9:  Transfer of Guardianship**

*Court Monitor's Case Review Findings: 42.9% (Sample Size: 7)*
*DCF LINK Report for the period of April – June 2005: 72.8%*

The *Juan F.* Exit Plan requires that at least 70% of all children whose custody is legally transferred shall have their guardianship transferred within 24 months of their most recent removal from home.  This measure excludes Voluntary Service cases.

The Department's quarterly LINK report for the second quarter 2005 indicates that **72.8%** of all transfers of guardianship were completed within the 24-month period outlined in the Exit Plan[25].  However, a review of the LINK data indicates that an additional 31 children with no removal date had a transfer of guardianship during this period.  These individuals were excluded from the LINK quarterly reports submitted.  Given this missing data, the performance is adjusted to 50% (63 of 126 children with transfer of guardianship during the quarter).  The Monitor cannot confirm compliance with this measure.

Our sample included only seven cases in which a transfer of guardianship occurred during the period of February 15, 2005 through May 15, 2005.  Of the seven cases, three (**42.9%**) occurred within 24 months.  The range of length of stay in custody of DCF was less than one month to 75 months.  The average length of time in custody of DCF for the sample was 31.3 months.

Race and ethnicity of the children for whom guardianship was transferred is shown in crosstabulation table below:

**Table 40:  Crosstabulation:  Racial/Ethnic background of children with successful transfer of guardianship**

|  |  | Ethnicity | |  |
|---|---|---|---|---|
|  |  | Hispanic | Non-Hispanic | Total |
| Race | Black/African American | 0 | 2 | 2 |
|  | White | 1 | 2 | 3 |
|  | UTD | 2 | 0 | 2 |
| | Total | 3 | 4 | 7 |

Five of the seven transfers of guardianships were subsidized.  One of the seven cases had documentation that services were being provided via community collaboratives at the time of the transfer of guardianship.  When asked to identify barriers to completion of the transfer within the required 24-month period, the reviewers noted the following barriers within the four cases that were not transferred in the time frame:

- Approval Process (2)

---

[25] Department's findings are based on 63 of the 126 children with a transfer of guardianship during the quarter that occurred within 24 months.  However, this universe of 126 includes 31 children with no removal date.  Therefore the actual number may vary upward if the Department conducts further review on these 31 cases.  At this time we are assuming all 31 cases did not meet the measure.

- Court delays (1)
- Disruption due to abuse/neglect (1)
- Guardian indecision (1)
- Identification of the family resource (1)

When looking at the number of placements that the child had prior to placement with the family to which guardianship was transferred, the review found that for four of the children (57.7%), the placement with the guardian was the only placement that the child experienced during the period of DCF custody. One child (14.3%) had one prior placement, and two children (28.6%) had two placements prior to placement with the guardian.

Due to the low number of cases of guardianship transfers in the sample during the period of February 15, 2005 through May 15, 2005, our review also looked at information related to all children for which transfer of guardianship was the goal on the most recent treatment plan in place during that period. This was the permanency plan for 22 children. Cases involving these 22 children were open from a range of one year three months to eight years three months. Children's length of stay in placement was anywhere from six months to just over five years.

Of the 22 cases with a goal of transfer of guardianship, 21 children (95.5%) had an identified resource for transfer of guardianship, and 18 of the children (81.8%) were in placement with that resource as of May 15, 2005 (including the seven children who had successful transfer of guardianship).

The range of ages for this group of children was seven months old to 17 years. More details related to age can be found in Table 41 below.

**Table 41: Age of child on May 15, 2005 with goal of transfer of guardianship**

| Age of Child | Frequency | Percentage |
|---|---|---|
| <1 | 1 | 4.5% |
| 1-3 | 2 | 9.0% |
| 4-6 | 3 | 13.6% |
| 7-9 | 4 | 18.2% |
| 10-12 | 2 | 9.0% |
| 13+ | 10 | 45.5% |

Racial and ethnic information collected on this sample indicates that 50% of the children in the sample with a goal of transfer of guardianship are Black/Non-Hispanic. This is a slightly higher proportion than for adoption (33.8%) or reunification (15.7%).

**Table 42:  Racial/Ethnic background of children in placement with goal of transfer of guardianship**

|  | Hispanic | Non-Hispanic | All |
|---|---|---|---|
| Black/African American | 0 | 11 | 11 |
| White | 1 | 7 | 8 |
| Unknown | 0 | 1 | 1 |
| UTD | 1 | 0 | 1 |
| Multi-Racial | 0 | 1 | 1 |
| All | 2 | 20 | 22 |

While not required by DCF Policy, four of the 22 children had a concurrent plan indicated on the most recent treatment plan during the period.  Two plans indicated adoption as the concurrent plan, one indicated reunification and one independent living.  All four of these cases had documentation that the Ongoing Service Social Worker was pursuing both plans during the period of review.  Three of the 22 children had a change in plan goal at the time of the most recent ACR.  All 22 cases had goals that coincided with the court approved treatment goal. None of the child had a legal status of Termination of Parental Rights.

Of those children in care with a goal of transfer of guardianship on May 15, 2005 the largest percentage (22.7%) were in care 13 to 18 months, and were most likely to fall into the age of 13-15 years old (36.4%).  50.0% of the 22 children had already surpassed the 24-month mark on May 15, 2005. See the crosstabulation table below for details.

**Table 43:  Crosstabulation of Age of Children (on 5/15/2005) having a goal of transfer of guardianship * Length of stay in out of home placement**

| Count | | Length of Stay in Placement as of May 15, 2005 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | ≤ 6 months | 7-12 months | 13-18 months | 19-24 months | 25-30 months | 31-36 months | ≥ 37 months | All |
| Age of Child on May 15, 2005. | < 1 Year | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 1-3 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 3 |
| | 4-6 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 |
| | 7-9 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 4 |
| | 10-12 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 3 |
| | 13-15 | 0 | 1 | 3 | 0 | 0 | 1 | 3 | 8 |
| | 16-18 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 19+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | All | 1 | 1 | 5 | 4 | 3 | 4 | 4 | 22 |

In reviewing the population of 22 children with a primary goal of transfer of guardianship, there were two cases in which the reviewers indicated that a filing of TPR could be appropriate given the stated goal/concurrent goal in the case.  In neither of those two cases, was the TPR filed at the point of our review.  No child had a legal status of TPR on May 15, 2005.  The most frequently occurring legal status of the group of 22 children was Committed (81.8%) followed by Not Committed (18.2%).  Those included in the Not Committed category would include children with transfer of guardianship prior to May 15, 2005 and for which legal status had been changed in LINK.

In looking at the supervision of cases with a goal of transfer of guardianship, the review data indicates that 68.2% of the 22 cases had supervisory conferences that were reflective of the events documented in LINK in the period leading up to the date of the review.  A total of 31.8% of the 22 cases did not reflect a discussion of the risk factors documented.  The rank score assigned by the reviewer after reviewing the record was most frequently "good" with 50.0% of the cases having what the reviewer considered to be good or adequate supervision.  This was followed by 45.5% being assigned a "poor" ranking, 4.5% having an "excellent" ranking.  No supervision was ranked "negligible".

In all, 90.9% of the group of 22 children with a goal of transfer of guardianship had an approved treatment plan.  In only 27.3% of the cases, however, did the reviewer document that all appropriate parties were invited to participate at the most recent ACR/TPC prior to May 15, 2005.   In looking at the individual elements of the Treatment Plan that are detailed in the Exit Plan document, the group of 22 children with a goal of reunification fared as follows:

**Table 44:  Department's compliance with identified elements of treatment plans for cases reviewed in the Court Monitor's sample for those cases with a stated goal of Transfer of Guardianship (n=22)**

| Background Information | February 15, 2005 to May 15, 2005 |
|---|---|
| a.  A clear description of household members and each identified member's status | 54.5% |
| b.  Prior relevant case history | 90.9% |
| c.  Reason for most recent case opening | 95.5% |
| **Assessment Information** | |
| d.  Presenting issues and problem areas as identified by DCF or provider assessment | 90.9% |
| e.  Family issues as perceived by the parent/caretaker/child (if over 12) | 54.5% |
| f.  Family or child's strengths | 90.9% |
| g.  Family or child's needs (medical, dental, mental health, educational, other service needs – housing, childcare, employment, transportation, etc.) | 72.7% |
| **Treatment** | |
| h.  Reasonable efforts as determined by the court, to prevent out of home placement and/or reunify documented (where applicable) | 81.8% |
| j.  Clearly stated case goal/permanency plan goal | 86.4% |
| m.  Proposed services and identified responsible parties | 59.1% |
| o.  Parental visitation schedules (where applicable) | 61.9% |
| o.  Sibling visitation schedules (where applicable) | 50.0% |
| **Progress Toward Case Goals** | |
| i.  Responsibilities of children, parents, caretakers, service providers and DCF for reaching the identified case goals (tasks required during the planning period) | 72.7% |
| k.  Identification of the measurement of participants' progress toward and achievement of stated goal (for those adolescents where applicable, this includes the attachment of a completed Independent Living Plan DCF-2091) | 63.6% |
| l.  Timelines for completing tasks/expectations related to the case goal | 40.9% |
| j.  Legal activity and status during the preceding treatment planning period. | 95.5% |
| **Other** | |
| Plan approved by the SWS | 90.9% |
| Plan written/translated to the primary language of the client | 90.9% |
| Plan developed in conjunction with mother (where applicable) | 50.0% |
| Plan developed in conjunction with father (where applicable) | 37.5% |
| Plan developed in conjunction with child over 12 (where applicable) | 22.2% |

None of the treatment plans in these 22 cases had all elements listed above (0.0%).  Of the 22 cases, 13 (59.0%) required changes or amendments as noted by the ACR Coordinator on the DCF-553 documentation.  Of the 13 requiring changes, seven plans (53.9%) reflected the required changes as of the date of the review.

The data also shows that reviewers felt there were clearly documented needs not incorporated into the treatment plan in 18.2% of the 102 cases.

The review was able to capture the identified needs for this population (n=22), and whether those needs were in fact met. Table 45 below provides that information. The final column in the table provides the full population percentage to give perspective of this group to the whole population of DCF cases reviewed (n=569)

**Table 45: Needs Identified and whether or not those needs were met in the time frame specified on the current treatment plan for those children with a goal of reunification.**

| Service Category | # Met | # Not Met | # TBD | Total Needs | % Met in population with reunification goal (n=22) | % Met in the full population (n=569) |
|---|---|---|---|---|---|---|
| Out of Home Placement | 23 | 1 | 0 | 24 | 95.8% | 93.2% |
| Mental Health | 13 | 2 | 2 | 19 | 76.5% | 70.6% |
| Support Services – Out of Home | 11 | 2 | 1 | 14 | 78.6% | 75.5% |
| Medical | 5 | 1 | 1 | 7 | 71.4% | 84.5% |
| Substance Abuse Treatment | 3 | 0 | 1 | 4 | 75.0% | 72.2% |
| Education | 2 | - | 1 | 3 | 66.7% | 76.4% |
| Child Care | 1 | 1 | 0 | 2 | 50.0% | 74.2% |
| Dental | 1 | 0 | 1 | 2 | 50.0% | 28.1% |
| Housing | 1 | 0 | 0 | 1 | 100.0% | 46.7% |
| Domestic Violence Treatment | 0 | 0 | 0 | 0 | N/A | 43.8% |
| Employment | 0 | 0 | 0 | 0 | N/A | 37.0% |
| Support Services – In Home | 0 | 0 | 0 | 0 | N/A | 71.7% |
| Training | 0 | 1 | 0 | 1 | 0.0% | 58.8% |
| **Combined Service Needs** | **60** | **7** | **7** | **77** | **77.9%** | **73.5%** |

**Outcome Measure 10: Sibling Placement**

*Court Monitor's Case Review Findings: 65.6% (Sample Size: 61)*

The *Juan F.* Exit Plan requires that at least 95% of siblings currently in or entering out-of-home placement shall be placed together unless there are documented clinical reasons for separate placements. This measure excludes Voluntary Service cases and children for whom Termination of Parental Rights has been granted.

The Department is unable to provide automated data on Outcome Measure 10 at this time. They have indicated that reporting will be available for Outcome Measure 10 beginning November 15, 2005. The last case review conducted on placements of siblings during the second quarter of 2004 by the Quality Improvement Division reported that **53.0%** of all siblings were maintained upon initial placement.

Our sample included 130 cases in which a child's placement episode occurred on or after January 1, 2004. Sibling groups were present in 98 of the cases requiring placement. Of the 98 cases with the existence of a sibling group, 29 cases involved a placement episode in which only one member of the sibling group was removed from the home. Further, eight of the 69 cases included a separation of siblings based on clinical/therapeutic reasons. Therefore the final pool upon which to base compliance for Outcome Measure 10 is the 61 children entering placement as part of a sibling group on or after January 1, 2004. Of that total,

- 40 initial placements (**65.6%**) maintained the sibling group at the point of entry.
- 21 initial placements (34.4%) separated the sibling group at the point of entry.

In analyzing the data for the cohort of 21 children that were separated at the time of initial placement the review found that as of May 15, 2005 the Department had reunited five sibling groups (23.8%) or had, in nine others, subsequently documented therapeutic reasons for the continued separation of the siblings (42.9%). On May 15, 2005 this left seven (33.3%) of those 21 children not initially placed together separated for reasons other than allowed by the clinical/therapeutic exception.

While the requirement for this measure is based on the initial placement of siblings, our review also examined point-in-time data (the date of the record review) to determine the status of siblings in care regardless of date of entry. The review asked the question, *"As of the date of this review, is the sibling group placed together?"* See Table 46 below for the details on the 130 children entering care on or after January 1, 2004.

**Table 46: As of the date of this review, is the child that entered care on or after January 1, 2004 in placement with his sibling group**

|  | Frequency | Percent |
|---|---|---|
| **Yes** | 37 | 28.5% |
| **N/A –clinical/therapeutic reasons documented** | 25 | 19.2% |
| **N/A – only one child of the sibling group remains in care** | 18 | 13.8% |
| **N/A – no siblings or TPR** | 34 | 26.2% |
| **No** | 16 | 12.3% |

Fifty-five cases should have had documentation related to sibling visitation during the quarter ending May 15, 2005. Forty of those 55 cases (72.7%) had a sibling visitation plan documented. The data indicates that 37 cases (67.3%) had evidence that sibling visitation was consistently occurring.

Our interviews with the 96 Ongoing Service Social Workers captured data related to barriers to sibling and parental visitation. Workers were not limited to one response. Table 47 below provides the frequency with which workers identified a given barrier. Please note that this was a question that focused on all supervised visitation (both sibling and parental).

**Table 47:  Barriers to familial visitation as identified by ongoing services social workers during interview**

| Barrier to Visitation | Number of Times Identified |
|---|---|
| Parents do not show up for visit | 55 |
| Coverage for Supervision | 36 |
| Transportation | 26 |
| More case aides needed | 24 |
| Family's schedule (school/ work/sports/recreation) | 23 |
| Other caseload demands | 17 |
| Parent/Child does not want the visits as scheduled | 16 |
| Inappropriate behaviors displayed | 13 |
| Geographical distance or traffic/logistics | 8 |
| Foster parents | 7 |
| Substance abuse | 6 |
| Mental health | 5 |
| Availability of cars | 4 |
| Illness | 4 |
| Therapist recommendation | 4 |
| No visiting rooms available for supervised visit | 4 |
| Therapy/services | 3 |
| Miscommunication or Inability to contact by phone | 3 |
| Hours of availability | 3 |
| Changes in family situation | 3 |
| No barriers | 3 |
| Incarceration/police involvement/court orders | 3 |
| Weather | 2 |
| Resistance to DCF involvement | 2 |
| Placement changes | 1 |
| Childcare | 1 |
| Lack of money | 1 |

## Outcome Measure 11: Re-Entry into DCF Custody

### *Court Monitor's Case Review Findings: 15.8% (Sample Size: 19)*

The *Juan F.* Exit Plan requires that no more than 7% of all children entering DCF custody shall re-enter care within 12 months of a prior out-of-home placement. This measure excludes Voluntary Service cases.

The Department has been unable to report on Outcome Measure 11 due to the reliability of legal status, and removal and discharge data. Removal and discharge dates as well as the correct legal status are necessary to calculate re-entry data. Currently approximately 6.0% of the children in placement do not have removal dates entered in LINK. The legal status must also be current to properly determine when a child has been discharged from custody. The Department has recently completed a clean up of legal status data but errors still persist. Re-entry cannot be calculated if the entry date is blank, or prior discharge indicator was not selected as "discharge from all placements".

Our review included 19 children with a date of removal between February 15, 2005 and May 15, 2005. Of this total, four of the children had re-entered care during the period. Three of the four had a prior placement episode in the 12 months preceding placement during the period (re-entering care at three, four and seven months from reunification). Therefore, the Department's rate of performance for this measure based on the small sample available is **15.8%**.

All four of the children placed were involved in an active in-home Ongoing Service case at the time of re-entry, and the reason(s) for re-entry were similar in nature to the prior placement episode. Two were open cases with protective supervision in place at the time of re-entry. In three of the four cases, the reviewer indicated that there were support services involved in the home at the time of the re-entry.

Reasons identified by reviewer based on record review of those cases in which re-entry occurred during the period of February 15, 2005 through May 15, 2005 are shown by case below:

**Table 48:  Cases in which re-entry occurred during the period of February 15, 2002 through May 15, 2005**

|  | Period of time from reunification to re-entry to care | Parent's substance abuse | Child's needs beyond parent's ability | Other |
|---|---|---|---|---|
| **Case 1** | 4 months | No | Yes | No |
| **Case 2** | 7 months | Yes | No | Parent's Homelessness |
| **Case 3** | 20 months | Yes | No | No |
| **Case 4** | 3 months | No | Yes | No |

During interviews with the 96 Ongoing Services Social Workers, the question was posed, *"From your own experience in general, what events lead to additional entries into*

*care?"* Workers were allowed up to five responses.  Table 49 below charts the responses in order of frequency of response.

**Table 49:  Social Workers responses to the question,** *"From your own experience, in general, what events lead to additional entries into care?"*

| Response | Frequency of Workers Identifying Issue | Percentage of Workers Identifying Issue |
|---|---|---|
| Substance abuse relapse | 52 | 54.2% |
| Parent overwhelmed and unable to meet/maintain child's needs | 26 | 27.1% |
| Repetition of abuse/neglect | 26 | 27.1% |
| Domestic violence | 16 | 16.7% |
| Mental health issues resurfacing | 15 | 15.6% |
| Lack of community supports/services | 14 | 14.6% |
| Poor decision making skills of parents | 14 | 14.6% |
| Service not meeting the needs/quality of providers | 13 | 13.5% |
| Housing | 10 | 10.4% |
| Economic factors | 9 | 9.4% |
| Services end at close of DCF involvement | 8 | 8.3% |
| Child's behaviors | 7 | 7.3% |
| Refusal of services | 7 | 7.3% |
| Parent's inability to apply training to real life | 6 | 6.3% |
| Parents attitude/level of motivation | 6 | 6.3% |
| Poor DCF or provider assessment | 6 | 6.3% |
| Change in family composition/birth, death or divorce | 6 | 6.3% |
| Failure to rehabilitate | 5 | 5.2% |
| No aftercare plan/services referred | 5 | 5.2% |
| Unsafe adults in the home | 5 | 5.2% |
| Lack of family supports | 4 | 4.2% |
| Premature reunification | 4 | 4.2% |
| Child's delinquent/criminal activity | 3 | 3.1% |
| Incarceration | 3 | 3.1% |
| Abandonment | 3 | 3.1% |
| Unemployment | 3 | 3.1% |
| Age of Parents (young) | 2 | 2.1% |
| Child does not want to be home | 2 | 2.1% |
| Court ordered return against DCF advice | 1 | 1.0% |
| Cultural beliefs | 1 | 1.0% |
| Don't Know/No Comment | 1 | 1.0% |
| Family dysfunction | 1 | 1.0% |
| Fear of asking for help after reunification | 1 | 1.0% |

**Outcome Measure 12:  Multiple Placements**

*Court Monitor's Case Review Findings: 96.0% (Sample Size: 332)*
*DCF LINK Report for the period of April – June 2005: 95.7%*

The *Juan F*. Exit Plan requires that at least 85% of children in DCF custody shall experience no more than three placements during any 12-month period, excluding respite, hospitalizations lasting less than seven days, runaways, home visits, and CJTS.  This measure also excludes Voluntary Service cases.

The Department's automated LINK reporting[26] for the second quarter 2005 found that **95.7%** of children did not experience more than three placements in the previous 12-month period.

332 children in this sample were in DCF custody in the 12 month period ending May 15, 2005.  Of that number, 319 children or **96.0%** did not experience more than three placements during the 12- month period. Thirteen children (3.91%) experienced more than three disruptions in placement.

Of the 332 children, 202 (60.8%) children remained stable in their placements and did not experience any movements during the 12 month period. 92 (27.7%) children experienced one change in placement, 25 (7.5%) children had two changes in placement, seven (2.1%) children had three changes in placement and six children (1.8%) had four placements during the twelve-month period ending May 15, 2005.

**Table 50: How many placements has this child experienced in the 12 month period ending May 15, 2005**

| # Of Placements | # Of Children | % Of Children |
|---|---|---|
| 1 | 202 | 60.8% |
| 2 | 92 | 27.7% |
| 3 | 25 | 7.5% |
| 4 | 7 | 2.1% |
| 5 | 6 | 1.8% |
| **Total** | **332** | **100%** |

Per the DCF Policy 36-55-20 (Placement Disruption Conferences), when a child experiences two or more foster home disruptions during an 18 month period for reasons related to the child's behavior, a disruption conference shall be convened. Of the 332 children in custody during the 12 month period, 323 (97.3%) did not require a case conference. Of the nine that did, three conferences (33.3%) were held and six conferences (66.7%) were not held.

---

[26] Approximately 6.0% of the placements do not have a removal date and therefore the LINK reported performance is subject to some level of error.  This is under review by the Department's IS Division and the Department has been notified by the Court Monitor's office that this reporting issue must be resolved. This issue also impacts the Department's automation of reporting for Outcome Measures 4, 7, 8, 9, 10, 11, 12, 20, 21, and 22 to varying degrees, as indicated prior.

The results of the three disruption conferences held indicated that two children required temporary placement or hospitalization and an evaluation of the child to determine if a higher level of care was necessary. One child required respite and in-home supports.

There were a number of additional supports that workers identified to preserve placements.   The services identified most frequently are as follows:
- Referrals for or an increase in therapeutic sessions.
- Partial Hospitalization Program
- Medication Management
- Home Schooling
- Referral to Job Corps
- Additional DCF case management
- Exploration of Placement Options
- Implementation of the IICAPS Program
- Implementation of the FAST Program

The sample also looked at those children who required one or more placement changes during the eighteen months for reasons other than the child's behavior or condition. The four most often identified reasons for a change in placement were: planned move to a higher or lower level of care: moved from a temporary placement: foster family life circumstances: or placement with a relative. The list in its entirety is outlined in Table 51.

**Table 51: If moves were not the result of disruption for reasons related to child's behavior or condition, what was the reason for the child's multiple placements: (N/A was selected if there were no moves for causes other than child's behaviors).**

| Applicable Reasons | # Of Yes | % Of Yes | # Of No | % Of No | # Of N/A | % Of N/A |
|---|---|---|---|---|---|---|
| Planned move to higher/lower level of care | 32 | 9.6% | 54 | 16.3% | 246 | 74.1% |
| Temporary Placement | 31 | 9.3% | 55 | 16.6% | 246 | 74.1% |
| Foster family life circumstances | 21 | 6.3% | 64 | 19.3% | 247 | 74.4% |
| Relative placement | 17 | 5.1% | 68 | 20.5% | 247 | 74.4% |
| Reunited with siblings | 7 | 2.1% | 78 | 23.5% | 247 | 74.4% |
| Moved to pre-adoptive home | 6 | 1.8% | 79 | 23.8% | 247 | 74.4% |
| Placement in closer proximity to home | 4 | 1.2% | 81 | 24.4% | 247 | 74.4% |
| Special study home | 4 | 1.2% | 81 | 24.4% | 247 | 74.4% |
| Overcapacity/Lack of resources | 2 | 0.6% | 83 | 25.0% | 247 | 74.4% |
| Substantiated Abuse/Neglect | 2 | 0.6% | 83 | 25.0% | 247 | 74.4% |

Additional reasons for identified placement changes were:
- Three children were reunited with their parents.
- Child made an allegation towards another child in the home.
- Child moved to a different residential placement.
- Better placement match found for three children.
- Child committed a crime and was placed in detention.
- Child removed from home due to inadequate supervision.
- Siblings separated for therapeutic reasons.

**Outcome Measure 13:  Foster Parent Training**

*Court Monitor's Case Review Findings: 100.0% (Sample Size: 195)*
*DCF LINK Report for the period of April – June 2005: 100.0%*

The *Juan F.* Exit Plan requires that foster parents shall be offered 45 hours of post-licensing training within 18 months of initial licensure and at least nine hours each subsequent year.  Relative, special study and independently licensed foster parents require only nine hours pre-service.

The Department indicates that there have been training opportunities available statewide to allow foster parents to meet the training requirements for licensure/relicensure as detailed in the paragraph above, and they are at **100%** compliance with the requirement to offer training opportunities.

While our review of the Connecticut Association of Foster and Adoptive Parents (CAFAP) documentation submitted to the Department confirms that this measure has been met (**100%**), our data analysis reveals deficits in relation to the actual foster parent support and training utilized by the DCF foster parents.

In all, 195 cases in the sample included DCF foster parent involvement during the period of February 15, 2005 through May 15, 2005.  The pool includes a range of foster parenting experience from less than one month to 30 years. The mode of experience is nine years (16 foster parents).  The average length of experience (mean) is 3.5 years.

The review asked, "Has this provider attended ANY foster parent trainings in the year of May 15, 2004 through May 15, 2005?"  76.9% of the sample had no documentation of training in the last year.  For the 45 foster parents that did have documented training, the tool asked, " How many hours of training are documented for this foster parent in the period of May 15, 2004 – May 15, 2005?"  The results are found in Table 52 below:

**Table 52:  Hours of Training[27] documented for DCF foster parents in the 12 month period ending May 15, 2005**

| Hours of Training | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| **0** | 153 | 78.5% | 78.5% |
| **1-5** | 4 | 2.1% | 80.5% |
| **6-10** | 24 | 12.3% | 92.8% |
| **11-15** | 3 | 1.5% | 94.4% |
| **16-20** | 0 | 0.0% | 94.4% |
| **21-25** | 1 | 0.5% | 94.9% |
| **26-30** | 5 | 2.6% | 97.4% |
| **31-35** | 1 | 0.5% | 97.9% |
| **36-40** | 3 | 1.5% | 99.5% |
| **41-45** | 1 | 0.5% | 100% |
| **All** | **195** | **100%** | -------- |

---

[27] This could include both pre and post licensing training activities depending upon the length of time the foster parents had been licensed.

In reviewing the provider record for documentation of barriers to attendance at training offered, the reviewers found 18 cases in which the Foster and Adoptive Service Unit Support Worker documented a reason for a foster parent's failure to attend training. These were:

- Work schedules: 5
- Language (needed Spanish speaking module):  3
- Foster Parent refusing:  3
- Withdrew application/no license: 3
- Relinquishing License: 3
- Daycare: 2
- Transportation/Distance: 2

In response to the question, "Was this provider re-licensed during the period of February 15, 2005 through May 15, 2005 without documentation that they completed the required number of foster parent training hours?"  The review found that 54 of the 93 foster homes relicensed during the period had been relicensed without having documentation of the required training in their record.  This is 58.1% of the homes relicensed.

In looking at the Foster and Adoptive Service Unit support documented in the provider records, the review found that 33.8% of the 195 homes had evidence that a support plan was developed with the family during the twelve-month period ending May 15, 2005.

In the 96 interviews with the Ongoing Service Social Workers, several questions were posed regarding the Foster and Adoptive Service Unit support in the foster homes. Briefly here are some of the key findings:

- 97.7% of Ongoing Service Social Workers with children in placement felt that the foster homes housing children on their caseloads were of a good or superior level as it relates to safety.
- 74.7% of Ongoing Service Social Workers with children in placement felt that the Foster and Adoptive Service Unit adequately supported the DCF foster parents. Comments throughout the interview sample did indicate, however, that some foster parents do not know who their support workers are due to changes in staffing and lack of contact.
- 89.1% of Ongoing Service Social Workers with children in placement felt that the Foster and Adoptive Service Unit workers adequately address concerns raised to them, with the following caveats:
  - Inconsistency in response depending on support worker assigned
  - Timeliness of response can be an issue
  - Ongoing Services Social Workers felt that Foster and Adoptive Service Unit workers "hands are tied" in resolving issues due to shortage of foster parent resources

**Outcome Measure 14:  Placement Within Licensed Capacity**

*Court Monitor's Case Review Findings: 87.8% (Sample Size: 255)*
*DCF LINK Report for the period of April – June 2005: 95.9%*

The *Juan F*. Exit Plan requires that at least 96% of all children placed in foster homes shall be in foster homes operating within their licensed capacity, except when necessary to accommodate siblings.

The Department's automated LINK reporting indicates that **95.9%** of all licensed foster homes were within licensed capacity with the exception of those placements made to accommodate sibling groups.

Our review found that 255 of the 569 cases had a placement episode in a foster home during the period of February 15, 2005 through May 15, 2005 (both DCF and private provider homes).  Of this number, 50 children (19.6%) were at some point of time in an overcapacity placement situation.  19 of the 50-overcapacity situations were a result of sibling placement.  Therefore, with the sibling exception factored in, our review found that **87.8%** (224 of the 255 children) were in foster homes within licensed capacity throughout the quarter.

**Table 53:  Crosstabulation:  During the quarter of February 15, 2005 through May 15, 2005 was the identified child in placement in an overcapacity home? *Was this overcapacity the result of sibling placement?**

| *Count* | | Was this overcapacity the result of a sibling group placement? | | | |
|---|---|---|---|---|---|
| During the quarter of February 15, 2005 – May 15, 2005 was the identified child in placement in an overcapacity home? | | **Yes** | **No** | **N/A**[28] | **Total** |
| | **Yes** | 19 | 31 | 0 | 50 |
| | **No** | 0 | 0 | 205 | 205 |
| | **Total** | **19** | **31** | **205** | **255** |

We believe the discrepancy in performance reported between the automated reports and our case review may be due to the case review methodology.  The review examined the three-month period of time and asked whether the home was overcapacity at any point over the period.  LINK reporting is a point-in-time report.  As such, our numbers would be subject to some level of discrepancy.

Reviewers did note several homes with zero capacity as a result of a lapsed license or unlicensed placement.  The issue of lapsed license/unlicensed placement is a matter that will need to be reviewed by the Department.

In 12% of the cases with overcapacity recorded, there was evidence of FASU efforts to reduce the overcapacity in the provider record. Eighteen percent of the provider records for these 50 children in overcapacity situations had documented changes in the support plan related to the overcapacity status in the foster home.  In none of the situations of

---

[28] No placements in overcapacity.

overcapacity did the Ongoing Services Social worker or FASU indicate there was a risk of disruption as a result of the overcapacity situation.

The length of time recorded for the overcapacity in the foster home varied, with the majority being greater than 28 days (88.0%).  See Table 54 below for full details:

**Table 54:  Length of time recorded for overcapacity in the foster home**

| Length of placement | Frequency | Percent |
|---|---|---|
| < 7 days | 1 | 2% |
| 7-14 days | 3 | 6% |
| 22-28 days | 2 | 4% |
| >28 days | 44 | 88% |
| **All** | **50** | **100%** |

**Outcome Measure 15: Needs Met**

*Court Monitor's Case Review Findings: 55.8% (Sample Size: 569)*

The *Juan F.* Exit Plan requires that at least 80% of all families and children shall have their medical, dental, mental health and other service needs provided as specified in the most recently approved, clinically appropriate treatment plan.

The Department does not provide LINK data related to the elements of Outcome Measure 15, and has previously conducted case reviews on small samples of treatment plans to determine their compliance with this measure. The latest review in the fourth quarter 2004 indicated **56.0%** of children's and families' needs (as specified in the most recent treatment plan) were met.

The Monitor's Office conducted the statewide statistically valid review of 569 cases open during the period of February 15, 2005 through May 15, 2005. Data has been captured on all of the elements as outlined in the Exit Plan. Of the total number of cases reviewed, 39 plans met the requirement for Outcome Measure 3. Of those 39 plans, 21 cases (53.9%) had all identified needs met.

However, early in the Exit Plan implementation, there was agreement between DCF and D. Ray Sirry that until DCF asserts compliance with all 22 outcome measures, the Monitor's Office would review Outcome Measure 15 utilizing the most recent treatment plan (less than seven months old) due to the methodological issues that would require unrealistic oversampling to provide a statistically valid sample of treatment plans meeting the requirements as detailed in Outcome Measure 3. When the Department asserts compliance with all Outcome Measures, the Monitor will use the strict requirements as outlined in the Exit Plan (plan must first meet the requirements of Outcome Measure 3) when calculating performance for this measure.

Therefore, in looking at the 539 cases in which there was a current plan present, our review found that in 301 cases (**55.8%**) children and families had all service needs as identified on that plan met within the time frame specified or six months of approval when no time frame was indicated. The 30 cases in which we were unable to determine needs due to lack of a treatment planning document could impact this performance by plus or minus three percentage points depending on the circumstances within those cases.

The record found that 538 cases (94.6%) of the sample had a current treatment plan with clearly indicated needs identified. In 30 cases (5.3%), there was no plan less than seven months old to review. In one case (0.2%), the plan had no identified service needs. In all, 494 cases (86.8%) had a planning process that included an ACR/TPC held from November 15, 2004 through May 15, 2005.

Reviewers found that in 79.6% of the plans reviewed (n=539) they concurred with the needs as identified by the Ongoing Service Social Worker on the treatment plan document. In 15.1% of the cases, the reviewers felt that there was a need clearly identifiable within the case record documentation but that was not incorporated into the plan. (This percentage was considerably improved to 2.6% in the 39 cases that met the

requirement for Outcome Measure 3.)  In 5.3% of the cases, there was no plan less than seven months old to review.   Further, in 48 instances in which there was a plan and an ACR/TPC documented, the ACR Coordinator documented a service need on the DCF-553 that was not incorporated into the plan document (9.8%).

While the measure focuses on needs met per family (55.8%), the Monitor's review also examined all identified needs involving all sample cases to determine the Department performance in each of the service categories and across all identified needs.  In all, 2,366 needs were identified in the 539 cases with LINK treatment plans.  Of that number, 1,739 of the identified needs were met (73.5%) and 157 (6.6%) were "to be determined", as the time frame for provision of service had not expired at the point of our review.  The following table provides the frequency with which service needs were identified, and the percentage of time each need was met.

**Table 55:  Needs identified and whether or not those needs were met in the time frame specified on the current treatment plan**

| Service Category | # Met | # Not Met | # TBD | Total Needs | % Met |
|---|---|---|---|---|---|
| Mental Health | 475 | 147 | 51 | 673 | 70.6% |
| Out-of-home Placement | 315 | 12 | 11 | 338 | 93.2% |
| Medical | 191 | 23 | 12 | 226 | 84.5% |
| Support Services – In-home | 175 | 57 | 12 | 244 | 71.7% |
| Substance Abuse Treatment | 169 | 54 | 11 | 234 | 72.2% |
| Support Services – Out-of-home | 142 | 35 | 11 | 188 | 75.5% |
| Education | 133 | 28 | 13 | 174 | 76.4% |
| Housing | 35 | 32 | 8 | 75 | 46.7% |
| Domestic violence treatment | 32 | 34 | 7 | 73 | 43.8% |
| Training | 30 | 14 | 7 | 51 | 58.8% |
| Child Care | 23 | 7 | 1 | 31 | 74.2% |
| Employment | 10 | 14 | 3 | 27 | 37.0% |
| Dental | 9 | 13 | 10 | 32 | 28.1% |
| Combined Service Needs | 1739 | 470 | 157 | 2366 | 73.5% |

As shown in Table 55 above, the Department is most successful in achieving timely provision of service when providing out-of-home placement (93.2%), medical treatment (84.5%), and education (76.4%).  The largest challenges seem to be in the provision of timely dental services (28.1%), employment (37.0%) and domestic violence treatment (43.8%).

In looking at the barriers that were identified by the reviewers, the data shows that the most frequently cited barrier is client refusal, followed by the collective category of "other", and then wait lists.  See Table 56 below for full breakdown:

73

**Table 56:  Barriers to service provision as noted by the reviewers in the case record review**

| Barrier | Frequency | % of all Barriers |
|---|---|---|
| Client refusal | 239 | 35.1% |
| Other | 138 | 20.3% |
| Wait lists | 78 | 11.5% |
| UTD | 55 | 8.1% |
| Delay in referral by worker | 38 | 5.6% |
| No service identified | 32 | 4.7% |
| Service deferred pending completion of another | 31 | 4.6% |
| No slots available | 17 | 2.5% |
| Provider unwilling to accept client | 17 | 2.5% |
| Insurance | 11 | 1.6% |
| Approval process | 8 | 1.2% |
| Hours of operation | 4 | 0.6% |
| Transportation | 3 | 0.4% |
| No service for age group | 3 | 0.4% |
| Language | 3 | 0.4% |
| Financing unavailable | 2 | 0.3% |
| Provider does not exist for service | 1 | 0.1% |
| Child hospitalized | 1 | 0.1% |
|  | 681 | 100.0% |

In interviews with 96 Ongoing Service Social Workers, the interviewer asked:

> "*Are there adequate services in the area office to address the safety and well being needs of the families and clients that you serve*?"

59.4% of the workers responded, "no".  40.6% indicated that "yes" they did feel there were adequate services in the area office community.

In looking at the quality of service, the review asked, *"Are there service providers that go unused in your area due to poor quality of service?"*   The majority of Ongoing Service Social Workers (60.4%) responded "no". However, 13 of that 58 who responded "no" followed up with a statement indicating that they refer families to poor quality services due to the immediate needs of the clients.  Therefore, 53.1% of Ongoing Service Social Workers did indicate some awareness of lesser quality service providers in their provider community that they would prefer not to use, if other options were available.

In response to the question, "Do you ever find that you need to substitute an alternate services for one that you initially determined to be the most appropriate?"  Eighty Ongoing Service Social Workers (83.3%) indicated that they have had this happen on at least one occasion.  The frequency of this substitution process is detailed below:

**Table 57:  Frequency with which Ongoing Services Social Workers use a substitute service for one initially deemed most appropriate.**

| Substitution Required | Frequency | Percent |
|---|---|---|
| 0% of my cases | 16 | 16.7% |
| < 20% of my cases | 43 | 44.8% |
| 21-40% of my cases | 20 | 20.8% |
| 41-60% of my cases | 13 | 13.5% |
| 61-80% of my cases | 3 | 3.1% |
| 81-100% of my cases | 1 | 1.0% |

Twenty-six Ongoing Service Social Workers indicated that substitution was most frequently used when the service need is identified as Intensive Family Preservation (IFP).  This was indicated by 26 (32.5%) of the 80 Ongoing Service Social Workers who indicated that substitutions had been made.  Individual counseling was indicated next, with 20 of the 80 workers (25.0%) having made a substitution for this service.

Workers were asked to identify up to three reasons for failed interventions as they related to the safety and well being of the children and families that they serve.  The five most frequently cited reasons for failure of interventions attempted are:

- 45.8% of Ongoing Service Social Workers interviewed identified resistant/non-compliant clients
- 24.0% of Ongoing Service Social Workers interviewed identified inconsistency in family/child participation in services.
- 24.0% of Ongoing Service Social Worker interviewed indicated wait lists for services referred
- 14.6% of Ongoing Service Social Workers interviewed identified the family or child's ability (or lack thereof) to understand the risk factors that were present
- 12.5% of Ongoing Service Social Workers interviewed identified the quality of providers
- 12.5% of Ongoing Service Social Workers identified poor communication.

Specific to the case reviewed, the interviewer asked, *"Were there services that you would have preferred to use that were not available?"*  66.7% of workers indicated that there were no other services that they would have used.  33.3% indicated that they could identify at least one service that they would have preferred to use, but that was not available.  These are in order of frequency of response:  residential placement (noted by six workers); housing and substance abuse treatment (each noted three times); individual counseling, Intensive In-home-Child Adolescent Psychiatric Service (IICAPS), evaluations, parent education, therapeutic mentor (each noted two times); and group home, locked psychiatric facility, daycare, Department of Mental Retardation, Headstart, parent support for single fathers, therapeutic foster care, visiting nurse, mediation, maternity home, youth services, adolescent services, and transportation for visitation center (all noted once).

Social workers were asked, specific to the case we reviewed, *"How successful were the identified services and interventions in meeting the clients stated needs?"* Workers responses are found in Table 58 below:

**Table 58: Ongoing Services Social Workers rate the success of interventions provided in the identified cases of the record review (n=96)**

| Rate of Success | Frequency | Percent |
|---|---|---|
| Successful | 44 | 45.8% |
| Partially Successful | 42 | 43.8% |
| Not Successful | 9 | 9.4% |
| No Needs Identified | 1 | 1.0% |

**Outcome Measure 16:  Worker-Child Visitation (Out-of-Home)**

*Court Monitor's Case Review Findings: (Sample Size: 319) Quarterly 99.1%*
*Monthly:  89.5%*

*DCF LINK Report for the period of April – June 2005:  Monthly 86.7%*

The *Juan F.* Exit Plan requires that a DCF Social Worker must see all children quarterly. At least 85% of children in out-of-home care shall be visited at least once monthly. Private agency social worker visits may count for monthly visits if the content of the visit is documented in LINK.

The Department's automated LINK reports indicate that the Department met the requirement and achieved **86.7%** compliance with the monthly visitation requirement. Quarterly visitation was not reported.

The Monitor's case review includes 319 children in care during the period of February 15, 2005 through May 15, 2005.  Of that total, there were five children in placement via Voluntary Services and 19 children placed out-of-state.  Of the 319 children, **99.1%** were seen on a quarterly basis.

To determine compliance with the monthly visitation requirement, the Monitor's review captured all visits documented from February 1, 2005 through May 31, 2005.  This was necessary as the designated period of February 15, 2005 through May 15, 2005 truncated months and could have resulted in an underreporting of the Department's efforts. Looking at those children placed in-state due to child protection issues, there was a total of 285 children upon which to calculate the monthly visitation requirement. As with Outcome Measure 17, our review looked at the four full months, portion of which are included in the quarter of February 15, 2005 through May 15, 2005 to avoid an overrepresentation of negative responses that may fall outside of the range dates, but within the months of February and May.

The average rate of documented monthly visitation for the sample during the four months reviewed is **89.5%** (Visits were documented by the assigned Ongoing Service Social Worker, Social Work Supervisor or other DCF personnel, or Other Provider[29]). Looking across the individual months, the Department had the following rate of performance for meeting the monthly standard:
- February:  89.5%
- March: 90.2%
- April:  90.2%
- May:  88.1%

All 285 children had a least one recorded visit in the period of February 1, 2005 through May 31, 2005.  There were, however 89 children that did not have one visit per month during each month reviewed.

---

[29] Interstate Compact on the Placement of Children (ICPC) excluded as the out of state population is not included in the 285 children subject to this measure.

- 64 children (22.5 %) had one month in which there was no documented visit.
- 19 children (6.7%) had two months in which there was no documented visit.
- 6 children (2.1%) had three months in which there was no documented visit

In February there were a total of 513 documented visits.  In March there were a total of 634 visits.  In April there were a total of 603 visits, and in May a total of 648 visits.  The frequency of each type of visit for the full population of 319 children in placement is shown in Tables 59 through 62 below:

**Table 59:  February visits with children in placement**

| Visits Documented | With Assigned DCF social worker | With other DCF personnel | With ICPC | With Private Provider |
|---|---|---|---|---|
| 0 | 48 | ---- | 3 | 43 |
| 1 | 183 | 30 | 4 | 7 |
| 2 | 46 | 15 | ---- | 1 |
| 3 | 17 | 3 | ---- | 2 |
| 4 | 10 | 3 | ---- | ---- |
| 5 | 1 | ---- | ---- | ---- |
| 6 | 1 | ---- | ---- | ---- |
| 7 | 1 | ---- | ---- | ---- |
| 8 | ---- | ---- | ---- | ---- |
| 9 | 1 | ---- | ---- | 1 |
| 10 | ---- | ---- | ---- | ---- |
| 11 | 1 | ---- | ---- | ---- |

**Table 60:  March visits with children in placement**

| Visits Documented | With Assigned DCF social worker | With Other DCF personnel | With ICPC | With Private Provider |
|---|---|---|---|---|
| 0 | 38 | ---- | 6 | ---- |
| 1 | 157 | 35 | 2 | 11 |
| 2 | 64 | 6 | ---- | ---- |
| 3 | 25 | 6 | ---- | 4 |
| 4 | 13 | 3 | ---- | 1 |
| 5 | 7 | 2 | ---- | ---- |
| 6 | 3 | ---- | ---- | ---- |
| 7 | 1 | 1 | ---- | ---- |
| 8 | 1 | ---- | ---- | ---- |
| 9 | ---- | ---- | ---- | 1 |
| 10 | ---- | ---- | ---- | ---- |
| 11 | ---- | ---- | ---- | ---- |
| 22 | 1 | ---- | ---- | ---- |

**Table 61:  April visits with children in placement**

| Visits Documented | With Assigned DCF social worker | With Other DCF personnel | With ICPC | With Private Provider |
|---|---|---|---|---|
| 0 | 39 | ---- | 6 | ---- |
| 1 | 160 | 43 | 3 | 10 |
| 2 | 61 | 10 | ---- | 4 |
| 3 | 22 | 5 | ---- | 1 |
| 4 | 12 | 4 | ---- | 1 |
| 5 | 5 | 2 | ---- | ---- |
| 6 | 2 | 1 | ---- | ---- |
| 7 | 1 | ---- | ---- | ---- |
| 8 | ---- | ---- | ---- | ---- |
| 9 | 1 | ---- | ---- | ---- |
| 10 | ---- | ---- | ---- | ---- |
| 11 | ---- | ---- | ---- | ---- |
| 16 | 1 | ---- | ---- | ---- |

**Table 62:  May visits with children in placement**

| Visits Documented | With Assigned DCF social worker | With Other DCF personnel | With ICPC | With Private Provider |
|---|---|---|---|---|
| 0 | 47 | ---- | 6 | 42 |
| 1 | 154 | 26 | 2 | 10 |
| 2 | 57 | 57 | ---- | ---- |
| 3 | 22 | 4 | ---- | 2 |
| 4 | 7 | 3 | ---- | 2 |
| 5 | 4 | ---- | ---- | ---- |
| 6 | 4 | 1 | ---- | ---- |
| 7 | 1 | ---- | ---- | ---- |
| 8 | 1 | ---- | ---- | ---- |
| 9 | ---- | 1 | ---- | ---- |
| 10 | ---- | ---- | ---- | ---- |
| 11 | ---- | ---- | ---- | ---- |
| 22 | 1 | ---- | ---- | ---- |

In 53 cases, (16.9%) the narratives related to the visit identified a possible risk to the safety or well-being of the child placed.  In 37 of the 53 cases (69.8%), the worker raised the issue with the Social Work Supervisor in the subsequent supervisory conference or other informal contact documented in the LINK record.  Of the 37 cases documented in the supervisory session, 23 cases (62.2%) went on to further document the worker's follow through on directives that were identified by the Social Work Supervisor.

In 82 cases, the child or provider asked the worker for some form of assistance or service to support the placement or provide needed items or services for the child.  In 66 of the 82 cases (80.5%) the LINK documentation reflected the workers efforts to follow up on the request.

Visitation is also required with the parents or guardian to whom the child is to be reunified.  Of the 112 children in the custody of the Department and having a goal of reunification, the Department had monthly visitation with that parent or guardian a minimum of once per month in 69 cases (61.6%).  Ninety-eight cases (87.5%) had a quarterly contact with the parent or guardian.

**Outcome Measure 17:  Worker-Child Visitation (In-Home)**

*Court Monitor's Case Review Findings: 73.2% (Sample Size: 267)*
*DCF LINK Report for the period of April – June 2005: 78.0%*

The *Juan F*. Exit Plan requires that at least 85% of all in-home cases shall have a DCF Social Worker visit at least twice a month.[30]  All visits must be documented in LINK.

The LINK report for the second calendar quarter of 2005 indicated that the Department had achieved **78.0%** compliance for this outcome measure.

The Monitor's review looked at the four months of February through May 2005.  Using the designated period (February 15, 2005 through May 15, 2005) truncated months, and could have resulted in an underreporting of the Department's efforts.  The number of cases open for a full month during the period fluctuated, ranging from 197 applicable cases in May to 227 applicable cases in February.  The range of visits during the four months was zero to 12 visits.  The average number of visits during February through May was 1.99 visits.  The resulting score achieved in the cases reviewed during this period is **73.2%**.  On a monthly basis the Department's percentage of compliance with achieving successful visitation (as newly defined) at least twice per month was:

- February:  60.8%
- March:  81.0%
- April:  77.7%
- May:  74.4%

The full breakdown per month is shown below in Tables 63 through 65 below.  Each month contains only those cases that were open as child protective service cases for the full month so as to avoid underreporting of the visitation efforts.

---

[30] D. Ray Sirry had agreed to a definitional change in what constitutes "successful" which deviates from the definitions within the Exit Plan document.  "Successful" is a home visit in which the worker gains entry into the home and meets with at least one family member.  Our methodology captured both this definition of "successful" and data regarding whether all child participants (under age 18) in the home were seen twice per month (per the Exit Plan document).  The compliance score reported above is based upon the new definition of successful.

**Table 63: Number of successful visits the DCF social worker made with the in-home family[31] during February 2005**

| # Of Visits | Frequency | Percentage | Cumulative Percentage |
|---|---|---|---|
| **5** | 2 | 0.9% | 0.9% |
| **4** | 6 | 2.6% | 3.5% |
| **3** | 34 | 15.0% | 18.5% |
| **2** | 96 | 42.3% | 60.8% |
| **1** | 70 | 30.8% | 91.6% |
| **0** | 19 | 8.4% | 100.0% |
| **Total** | **227** | **100.0%** | **100.0%** |

During the February visits with the in-home family sample population, the Ongoing Service Social Workers met with each active child participant a minimum of two times in 51.4% of the cases open during the full month.

**Table 64: Number of visits the DCF Social Worker made with the in-home family[32] during March 2005**

| # Of Visits | Frequency | Percentage | Cumulative Percentage |
|---|---|---|---|
| **8** | 1 | 0.5% | 0.5% |
| **7** | 1 | 0.5% | 0.9% |
| **6** | 1 | 0.5% | 1.4% |
| **5** | 1 | 0.5% | 1.9% |
| **4** | 15 | 6.9% | 8.8% |
| **3** | 46 | 21.3% | 30.1% |
| **2** | 110 | 50.9% | 81.0% |
| **1** | 29 | 13.4% | 94.4% |
| **0** | 12 | 5.6% | 100.0% |
| **Total** | **216** | **100%** | **100%** |

During the March visits with the in-home family sample population, the Ongoing Service Social Workers met with each active child participant a minimum of two times in 66.4% of the cases open during the full month.

---

[31] There were 255 in-home cases during February. Findings exclude 28 cases open as Voluntary Service cases, which are excluded from the measure. The average number of visits for Voluntary Services cases during the period is 0.5 visits, as 17 cases had no visits during the month, nine cases had one visit during the month and two cases had three visits during the month.

[32] There were 244 in-home cases during the month of March. Findings exclude 28 cases open as Voluntary Service Cases, which are outside of the measure. The average number of visits for Voluntary Services cases during the period is 0.9 visits, as eight cases had no visits during the month, 15 cases had one visit during the month and five cases had two visits during the month.

**Table 65: Number of visits the DCF Social Worker made with the in-home family[33] during April 2005**

| # Of Visits | Frequency | Percentage | Cumulative Percentage |
|---|---|---|---|
| 12 | 1 | 0.5% | 0.5% |
| 5 | 2 | 1.0% | 1.5% |
| 4 | 8 | 4.1% | 5.6% |
| 3 | 32 | 16.2% | 21.8% |
| 2 | 110 | 55.8% | 77.7% |
| 1 | 38 | 19.3% | 97.0% |
| 0 | 6 | 3.1% | 100.0% |
| **Total** | **197** | **100%** | **100%** |

During the April visits with the in-home family sample population, the Ongoing Service Social Workers met with each active child participant a minimum of two times in 63.2% of the cases open during the full month.

**Table 66: Number of visits the DCF Social Worker made with the in-home family[34] during May 2005**

| # Of Visits | Frequency | Percentage | Cumulative Percentage |
|---|---|---|---|
| 5 | 1 | 0.6% | 0.6% |
| 4 | 6 | 3.3% | 3.9% |
| 3 | 21 | 11.7% | 15.6% |
| 2 | 106 | 58.9% | 74.4% |
| 1 | 29 | 16.1% | 90.6% |
| 0 | 17 | 9.4% | 100.0% |
| **Total** | **180** | **100.0%** | **100.0%** |

During the May visits with the in-home family sample population, the Ongoing Service Social Workers met with each active child participant a minimum of two times in 59.7% of the cases open during the full month.

239 cases were open as an in-home child protective service case at some point during the period of February 15, 2005 through May 15, 2005. Table 67 below provides an accounting of the total number of successful visits to the home[35] during this three-month period of February 15, 2005 through May 15, 2005.

---

[33] There were 223 in-home cases during the month of April. Findings exclude 26 cases open as Voluntary Service Cases, which are excluded from the measure. The average number of visits for Voluntary Services cases during the period is 1.0 visits, as six cases had no visits during the month, 16 cases had one visit during the month and three cases had two visits and one case had six visits during the month.

[34] There were 206 in-home cases during the month of May. Findings exclude 26 cases open as Voluntary Service Cases, which are excluded from the measure. The average number of visits for Voluntary Services cases during the period is 0.9 visits, as nine cases had no visits during the month, 12 cases had one visit during the month and four cases had two visits, and one case had four visits during the month.

[35] Successful indicating the worker actually met face to face with one or more of the identified case participants living in the home.

**Table 67: How many successful visits were recorded by a DCF Ongoing Services Social Worker or Social Work Supervisor with this in-home family[36] during the period of February 15, 2005 through May 15, 2005**

| # of Visits | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 12 - 13 | 7 | 2.9% | 2.9% |
| 10 - 11 | 10 | 4.2% | 7.1% |
| 8 - 9 | 45 | 18.8% | 25.9% |
| 6 - 7 | 76 | 31.8% | 45.2% |
| 4 - 5 | 56 | 23.4% | 81.2% |
| 2 - 3 | 28 | 11.7% | 92.9% |
| 0 - 1 | 17 | 7.1% | 100.0% |
| **Total** | 239 | 100.0% | 100.0% |

In addition to the successful visits reported prior, 134 (56.1%) of the 239 cases had documentation of the social worker unsuccessfully attempting a visit to the home. Unsuccessful attempts ranged from one and fourteen visits for the cases in this sample.

The data also provides an option for analysis of successful visits for those identified in-home cases where any of the children were under an Order of Protective Supervision. The findings show that 42 of the 239 cases were currently under an Order of Protective Supervision on May 15, 2005. Of those cases under protective supervision, 78.6% had 6 or more visits during the period of February 15, 2005 through May 15, 2005.

**Table 68: Crosstabulation: How many successful visits were recorded in LINK during February 15, 2005 through May 15, 2005. On May 15, 2005 were any children in this in-home case under protective supervision?**

| | | On May 15, 2005 were any children in this case under protective supervision? | | | |
|---|---|---|---|---|---|
| *Count* | | Yes | No | No longer an In-home Case[37] | Total |
| How many successful visits were recorded by a DCF social worker or supervisor during 2/15-5/15/05? | **0** | 0 | 6 | 2 | 8 |
| | **1** | 0 | 7 | 2 | 9 |
| | **2** | 0 | 11 | 1 | 12 |
| | **3** | 2 | 14 | 0 | 16 |
| | **4** | 2 | 26 | 0 | 28 |
| | **5** | 5 | 20 | 3 | 28 |
| | **6** | 11 | 33 | 2 | 46 |
| | **7** | 9 | 20 | 1 | 30 |
| | **8** | 6 | 23 | 0 | 29 |
| | **9** | 3 | 13 | 0 | 16 |
| | **10** | 0 | 7 | 0 | 7 |
| | **11** | 0 | 3 | 0 | 3 |
| | **12** | 1 | 1 | 0 | 2 |
| | **13** | 3 | 2 | 0 | 5 |
| | **Total** | **42** | **186** | **11** | **239** |

---

[36] Excludes 28 Voluntary Services families.
[37] Child placed in out-of-home care or case closed on May 15, 2005.

**Table 69: Unsuccessful home visit attempts for families with child protective service cases as documented in LINK during the period of February 15, 2005 through May 15, 2005**

| # Of Unsuccessful Visits Documented | Frequency | % of Cases |
|---|---|---|
| 0 | 105 | 43.9% |
| 1 | 43 | 18.0% |
| 2 | 39 | 16.3% |
| 3 | 22 | 9.2% |
| 4 | 11 | 4.6% |
| 5 | 6 | 2.5% |
| 6 | 3 | 1.3% |
| 7 | 4 | 1.7% |
| 8 | 3 | 1.3% |
| 9 | 1 | 0.4% |
| 10 | 1 | 0.4% |
| 14 | 1 | 0.4% |
| **Total** | **239** | **100.0%** |

There were 267 cases open for part or all of the period as an in-home family case within our sample.  Of that total:

- 45 cases had a lapse in visits for a period of one month (16.9%)
- 19 cases had a period of two months with no recorded visitation (7.1%)
- 10 cases had a period of three months with no recorded visitation (3.8%)
- Two cases had no visitation documented during any month of the four months reviewed (0.8%)

The majority of cases (64.0%) had no barriers identified related to visitation.  However in 36.0% of the cases there were barriers documented in the LINK narratives that identified issues that prevented either DCF Social Workers or Supervisors from achieving the visitation requirement during February 15, 2005 through May 15, 2005.  The lists of barriers noted in the review are provided below in order of the frequency of documentation.

**Table 70:  Barriers to achieving the visitation standard as documented in the case review**

| Barrier | Frequency | Percentage |
|---|---|---|
| No Barriers Identified | 171 | 64.0% |
| Other[38] | 47 | 17.6% |
| Families Not Cooperative | 18 | 6.7% |
| Sport/Recreational Activity | 11 | 4.1% |
| Work Schedule(s) | 11 | 4.1% |
| Academic Activity | 8 | 3.0% |
| Medical Appointments | 4 | 1.5% |
| Court/Incarceration | 3 | 1.1% |
| Religious Activities | 2 | 0.8% |
| SW Workload/Emergency | 1 | 0.4% |

The review also collected data related to a change in social worker assignment between February 15, 2005 and May 15, 2005. This looked at all cases regardless of protective service or voluntary status.  Twenty-two cases (8.2%) included one or more reassignments. Of those 22, one (4.5%) had a lapse in visitation, in part due to the case transfer.

**Table 71:  Did this change in primary social worker result in a lapse in visitation, so that the benchmark was not met during February 15, 2005 through May 15, 2005?**

| | | Did this change in primary social worker result in a lapse in visitation, so that the benchmark was not met during 2/15-5/15/05? | | | | | |
|---|---|---|---|---|---|---|---|
| | | N/A | Yes | No | Case Open less than a full month | No Change in Worker | Total |
| Was there a change in primary social worker assignment during 2/15-5/15/05? | Yes | 0 | 1 | 20 | 0 | 1 | 22 |
| | No | 0 | 0 | 1 | 2 | 242 | 245 |
| | Total | 1 | 1 | 21 | 2 | 243 | 267 |

---

[38] The significant "other" reasons that were listed as barriers were: Family unavailable for unannounced visits; Illness of one or more family members; Illness of social worker; Voluntary requirements for in-home cases are monthly visits; Weather (especially during February, 2005); Parents daily schedules; Location of home required the presence of two social workers; Difficult to coordinate; Families transient or evicted and difficult to locate; Family Emergency

**Outcome Measure 18:  Caseload Standards**

*Court Monitor's Case Review Findings: 100.0 (Sample Size: 569)*
*DCF LINK Report for the period of April – June 2005: 100.0%*

By July 1, 2004 the caseload of no DCF social worker shall exceed the following
caseload standards, with exceptions for emergency reasons on caseloads, lasting no more
than 30 days:

    A.  Investigators shall have no more than 17 investigative cases at any time.
    B.  In-home treatment workers shall have no more than 15 cases at any time.
    C.  Out-of-home treatment workers shall have no more than 20 individual children
        assigned to them at any time.  This includes voluntary placements.
    D.  Adoption and adolescent specialty workers shall have no more than 20 cases at
        any time.
    E.  Probate workers shall have no more than 35 cases at any time. When the probate
        or interstate worker is also assigned to provide services to the family, those
        families shall be counted as in-home treatment cases with a ratio of 1:20 cases.
    F.  Social workers with in-home voluntary and interstate compact cases shall have no
        more than 49 cases at any time.
    G.  A worker with a mixed caseload shall not exceed the maximum weighted
        caseload derived from the caseload standards in A through F above.
    H.  These standards supercede those of Order No. 441 dated July 29, 2003.

The LINK report for the second quarter 2005 found the Department to be at **100%**
compliance with this requirement.  The Court Monitor's review confirmed the
Department's report in that there were 18 Social Workers over 100%, but none for a
period greater than 30 days (**100%**).

At the point each selected case was reviewed, the reviewer determined through LINK
what the caseload percentage was for the social worker assigned to the case on May 15,
2005.  The caseload percentages documented by the review ranged from 13% to 112%.
The average (mean) caseload percentage was 88.9%.  See Table 72 below for the full
accounting of caseload percentages on the 569 workers identified.

**Table 72: What caseload percentage did the social worker assigned to this case on
May 15, 2005 have at the point of review?**

| Range of Caseload %'s | # of Workers | % of Workers |
|---|---|---|
| 0 - 49 | 9 | 1.6 % |
| 50 - 75 | 80 | 14.0 % |
| 76 - 99 | 408 | 72.0 % |
| 100 | 53 | 9.3 % |
| Over 100 | 18 | 3.1 % |

Data indicates that 535 Ongoing Service Social Workers (94.0 %) were assigned a mixed
caseload. 34 Ongoing Service Social Workers (6.0%) were assigned specific caseloads.

Of the cases reviewed, 345 (60.6%) families had one Ongoing Service Social Worker assigned to their case in the twelve months ending May 15, 2005. 169 (29.7%) had two assigned; 41 (7.2%) had three assigned; 11 (1.9%) had four assigned and three (0.5%) had five social workers assigned.

**Table 73: How many Ongoing Services Social Workers were assigned to this case in the 12 months ending May 15, 2005?**

| # Of primary social workers assigned | #of Cases | % of workers |
|---|---|---|
| 1 | 345 | 60.6% |
| 2 | 169 | 29.7% |
| 3 | 41 | 7.2% |
| 4 | 11 | 1.9% |
| 5 | 3 | .5% |
| **Total** | **569** | **100.0%** |

A number of reasons were documented for case reassignments.

- 62 cases (10.9%) were transferred to a specialized unit.
- 56 Ongoing Service Social Workers (9.8%) transferred out of the unit, were promoted, or were on agency-sanctioned leave.
- 23 Ongoing Service Social Workers (4.0%) left the agency.
- 15 cases (2.6%) were transferred for the identified purpose of caseload equalization.
- Two cases (0.4%) were reassigned due to worker safety issues. Reviewers were unable to determine the reason for reassignment in 66 cases (11.6%).  A total of 345 cases (60.6%) had no worker reassignment during the year.

**Table 74: What was the most recent reassignment related to?**

| Reason for Case Reassignment | # of Cases | % of Cases |
|---|---|---|
| No Change in Worker | 345 | 60.6% |
| Case Transferred to a Specialized Unit | 62 | 10.9% |
| Worker Transferred, Promoted or on Leave | 56 | 9.8% |
| Worker Left the Agency | 23 | 4.0% |
| Caseload Equalization | 15 | 2.6% |
| Worker Safety | 2 | .4% |
| Unable to Determine | 66 | 11.6% |

Of those cases requiring reassignment, 558 (98.1%) families did not experience a gap in assignment of a primary Social Worker for more than five days.

**Case Practice Issues Related to Outcome Measure 18:**
Of the 96 interviews, 82 Ongoing Service Social Workers (85.4%) indicated they have never been asked to close a case they felt maintained a level of risk, still requiring DCF services. Fourteen Ongoing Service Social Workers (14.6%) stated they had been asked to close a case with heightened risk factors. Of the 14 that responded yes to this question the Ongoing Service Social Worker's had the following comments:

- Domestic Violence issues were the focus of the investigation and we addressed those issues, but did not address mother's substance abuse – closed case too early.
- DCF is more focused on numbers than on families – In-home families need to stay open a bit longer even when there is no court involvement to ensure stability can be maintained.
- There was one protective supervision case that I was told to close.  I objected and talked with Social Work Supervisor about my concerns.  This resulted in an extension of six months protective supervision.
- Family did not want services so we had to close.
- Child with severe mental health needs and sexually perpetrating behaviors remains in the home with other children.
- Case with mental health needs – no longer had CPS issues, but should be open as voluntary services case.
- Case closed by Social Work Supervisor without discussion.
- After discussion with Social Work Supervisor, in which I detailed my concerns and case needs – it stayed open.
- Sometimes we need to back off and respect families' rights even though we may feel otherwise about risks they do not see.
- 19 year old was in school out of state and dropped out – policy does not allow Social Worker to pursue issue as child is 19.  Social Worker feels child still needs DCF support.
- Called in referral to New Jersey Department of Youth and Family Services as some family members had left the state.
- Cases are appropriately closed per policy, but with some personal discomfort.
- There was a point a short while ago when case closings were a priority and some cases were closed that seemed like they shouldn't have been, but this is not a current issue.

Ongoing Service Social Workers were asked, "If they had gone over 100% utilization and if so, for how long and how was the caseload reduced?" Thirty-seven (38.5%) workers indicated that cases were transferred to other unit members or new trainees and eighteen (19.0%) indicated cases were closed. Ten (10.0%) stated that they had not been over 100% or it was for less than 48 hours.

Ten of those interviewed stated that when their caseloads reached 100%, they were removed from the assignment rotation, given 30 days to process cases ready for closure or if a case transfer was necessary, the Social Work Supervisor asked for input prior to any decision making.

A third of the Ongoing Service Social Workers interviewed (32.2%) expressed concerns regarding a perceived manipulation of caseload data. Concerns included:
- Cases are removed from the Ongoing Service Social Workers assignment to decrease caseload percentage, but the Ongoing Service Social Worker still retains responsibility for case management.
- Part-time Ongoing Service Social Workers frequently maintain full caseloads that sometimes exceed 100%.

- Cases are temporarily transferred among unit members in order to maintain caseloads under 100%, which impacts the quality of work.
- When caseloads exceed 100%, cases are quickly transferred to other unit members without using the 30-day timeframe to appropriately plan. They are transferred without Ongoing Service Social Worker input or consideration of case issues and without transitional planning with clients.
- Assigned cases do not always appear on Ongoing Service Social Workers assignment tab or are assigned as N/A's. The caseload percentage can be higher than what is recorded in LINK.

**Supervision:**

The number of documented supervisory sessions from February 15, 2005 through May 15, 2005 for the Ongoing Service Social Workers interviews ranged from no documented sessions to 10 sessions during the quarter. The mode of supervision frequency for those 96 Ongoing Service Social Workers interviewed was three Social Work Supervisory conferences documented during the period (31.3%). See Table 75 below for full details.

**Table 75: Frequency of documented supervision**

| # Of Supervisory Sessions Between February 15, 2005 through May 15, 2005 | # Of Workers | % Of Workers |
|---|---|---|
| 10 | 1 | 1.0% |
| 9 | 3 | 3.1% |
| 8 | 0 | 0.0% |
| 7 | 1 | 1.0% |
| 6 | 3 | 3.1% |
| 5 | 9 | 9.4% |
| 4 | 15 | 15.6% |
| 3 | 30 | 31.3% |
| 2 | 16 | 16.7% |
| 1 | 15 | 15.6% |
| 0 | 3 | 3.1% |
| **Total** | **96** | **100%** |

When Ongoing Service Social Workers were asked, "How often do you normally have scheduled supervision during a month?" 48 Ongoing Service Social Workers (50.0%) stated they meet with their supervisors four times during the month, which would be a total of 12 for a quarter. Six (6.3%) Ongoing Service Social Workers indicated they met three times, seventeen (17.7%) met twice a month, twenty-four (25.0 %) met once a month and one worker indicated they did not meet with their supervisor each month.

Ongoing Service Social Workers were asked to describe the supervision process and what a typical supervisory session entailed. A total of 65 Ongoing Service Social Workers (67.7%) indicated that their entire caseload is reviewed, including prior directives, case requirements, needs to be met, and the worker's "to do" list. Fifteen Ongoing Service Social Workers (15.6%) indicated that the above process is followed with three to six cases on their caseload and four (4.2%) review one to three cases per meeting. One (1%) Ongoing Service Social Worker indicated that half of caseload reviewed. Five (5.2%)

Ongoing Service Social Workers felt that they merely update the Social Work Supervisor and discussion does not take place. Four (4.2%) Ongoing Service Social Workers indicated their supervisors had too many workers assigned and little formal supervision took place. Two (2.1%) Ongoing Service Social Workers felt the process was repetitive and that there was no follow through or a consistent supervisory schedule.

Using a Likert scale, Ongoing Service Social Workers were asked to rate the level of supervision they had received during the quarter, forty-six (47.9%) Ongoing Service Social Workers indicated their supervision was superior, forty-one (42.7%) felt their level of supervision was good/average, seven (7.3%) felt their supervision was poor and two (2.1%) felt their level of supervision was unacceptable.

**Table 76:  Ongoing Service Social Workers ratings of the level of supervision they received during the period of February 15, 2005 through May 15, 2005 (n=96)**

| Scale | # Of workers | % Of workers |
|---|---|---|
| Superior | 46 | 47.9% |
| Good/Average | 41 | 42.7% |
| Poor | 7 | 7.3% |
| Unacceptable | 2 | 2.1% |
| Total | 96 | 100.0% |

The 96 Ongoing Service Social Workers were asked to identify what factors they felt were necessary for meaningful supervision. Up to three factors could be identified.  The top seven factors cited are included below in order of frequency of identification.
- Respect/Support and Good Communication
- Knowledge of Cases and Policy; Experience
- Active Discussion and Collaboration
- Clear Direction and Feedback
- Consistent Supervision and Leadership
- Availability and Assistance
- Creative Case Planning, Assessment & Decision Making

When asked to suggest additional steps improve their current supervision, Ongoing Service Social Workers had the following thoughts:
- Increase formal supervision
- Decrease distractions during supervision
- Improve Social Work Supervisor knowledge of available resources
- Decrease Social Work Supervisor reassignments to improve cohesiveness of units.
- Additional role modeling/mentoring by supervisors in a field setting.
- Improve communication in the chain of command
- Record informal supervisory sessions in LINK
- Improve active listening
- Improve the support of Social Work Supervisor by Management
- Better case knowledge is needed by the Social Work Supervisor

Social workers were asked if the work environment in their offices was conducive to good case practice. 62 (64.6%) responded that it was and gave the following reasons:

- Colleagues share knowledge and are supportive of one another.
- Assigned unit is a cohesive group who are team oriented.
- Office is quiet and has a family environment due to its size.
- Supervisor goes above and beyond and provides hands-on assistance.
- Monthly unit meetings are helpful and allow the Social Workers the opportunity to vent.
- Caseloads are more manageable when under 100%.
- Unit members share cars, work cooperatively and are respectful of one another.
- Office morale has improved and there is less tension.
- Improvement seen because the agency is focusing on strength based practice that is still a compliance-based atmosphere.

34 Ongoing Service Social Workers (35.4%) responded that the atmosphere was not conducive to good case practice, and gave the following reasons:

- Noise level intense and there are many distractions
- Office is too small and the work area is overcrowded.
- Ongoing Service Social Workers have experienced many supervisors, unit members and workspace changes in the past year.
- Cubicles afford no privacy for professional conversations.
- Buildings are unhealthy. The air quality is poor, heat uncontrollable during winter and air conditioning broken during summer.
- Offices do not have enough equipment or the equipment has broken and is not repaired.
- Parking is very limited at some offices.
- Additional support staff such as case aides, certain ARG staff and office assistants are needed.
- Morale is poor among the workers.

Ongoing Service Social Workers were then asked, "What is the biggest obstacle that you as a DCF social worker has to overcome to attain the level of practice required by the outcome measures?" Obstacles documented were:

- Time Management
- Ability to assimilate all of the changes and meet agency expectations, including documentation
- Lack of provider resources (placements, wrap around services)
- Court Delays which impact permanency
- Visitation mandates
- Bureaucratic delays in decision making
- Lack of Agency Resources
- Emotion – stress/anxiety/cynicism/fear

Reviewers were asked to rank the level of supervision for the 569 cases reviewed using the scale detailed in the directional guide[39].  The reviewers found 53.3% of the supervision to be good or excellent.  See Table 77 for details.

**Table 77:  Reviewer's Ranking of Supervision Documented in 569 Cases Reviewed**

| Rank | Frequency | Percentage | Cumulative Percentage |
|------|-----------|------------|------------------------|
| Excellent | 31 | 5.4% | 5.4% |
| Good | 272 | 47.8% | 53.3% |
| Poor | 222 | 47.8% | 92.3% |
| Negligible | 44 | 7.7% | 100.0% |

**Training:**
Ongoing Service Social Workers were asked if they felt they had received adequate training in certain areas, as well as identifying additional areas of training and supervision that would assist them in improving their work performance.

**Table 78:  Ongoing Service Social Workers identified if they received adequate training on specific categories as identified during interviews**

| Type of Training Received | # Of Yes | % Of Yes | # Of No | % Of No |
|---------------------------|----------|----------|---------|---------|
| Case Management | 87 | 90.6% | 9 | 9.4% |
| Treatment Planning | 87 | 90.6% | 9 | 9.3% |
| LINK | 82 | 85.4% | 14 | 14.6% |
| Legal Matters | 75 | 78.1% | 21 | 21.9% |
| On-site Assessment | 75 | 78.1% | 21 | 21.9% |
| Service Availability | 73 | 76.0% | 23 | 24.0% |
| Policy | 67 | 69.8% | 29 | 30.2% |

Ongoing Service Social Workers indicated a need for the following additional trainings:
- Ongoing Modeling/Mentoring (in the field when possible)
- General legal and the adoption process
- Medical & Mental Health Disorders/Diagnosis/DSM IV
- Community Resources/Service Directory
- Time & Case Management
- DCF Policy & Child Welfare Regulations
- Substance Abuse & Domestic Violence
- Assessment
- Treatment Planning
- Competent/Consistent Supervision

---

[39] The following scale was utilized to determine the rank scores:
- Negligible – no entries or cut and paste entries with no relevance to case events
- Poor/Fair – sporadic Social Work Supervisor entries with little substance or direction
- Good – monthly entry reflecting understanding of case events and appropriate direction
- Excellent – monthly (or more frequent) Social Work Supervisor notes with in-depth understanding of case events.  Creative direction to improve case practice – follow up and discussion of prior directives.

- Adolescent Services
- Sexual Abuse Training
- Special Education/IEP's

**Outcome Measure 19:  Residential Reduction**
*Court Monitor's Case Review Findings: 11.9% (Sample Size: 286)*
*DCF LINK Report for the period of April – June 2005: 12.6%*

The *Juan F.* Exit Plan requires that no more than 11% of the total number of children in out-of-home care shall be in residential placements.  This measure includes Voluntary Service cases.

The LINK report for the second quarter indicated that the Department had achieved **12.6%** compliance with this requirement.

Case Review data indicates that 321 children in the sample were in out-of-home care, at some point during the period of February 15, 2005 through May 15, 2005.  At the point of review, 31 children had been returned to the home of their biological or adoptive parent or legal guardian and four were placed in detention.  These children were removed from the overall sample universe bringing the total to 286 children in out-of-home care both within and outside of Connecticut. Of those 286 children, 34 **(11.9%)** were in residential care, with 22 children were placed in an in-state residential setting, and twelve children placed in an out-of-state residential setting.

**Table 79:  Type of placement on date of record review (n=286)**

| Type of Placement | # Of Cases | % Of Cases |
|---|---|---|
| In-state hospital setting | 2 | 0.6% |
| Group Home | 17 | 5.9% |
| In-state DCF foster care | 156 | 54.5% |
| In-state private provider | 49 | 17.1% |
| Out-of-state foster care | 7 | 2.4% |
| Pre-adoptive placement | 14 | 4.9% |
| Safe Home | 1 | 0.3% |
| Shelter | 4 | 1.4% |
| TLAP/CHAPS | 2 | 0.6% |
| In-state Residential setting | 22 | 7.7% |
| Out-of-state residential setting | 12 | 4.2% |
| **Total** | **286** | **99.6%** |

The review also examined the children who were newly placed in residential care at any point during the six-month period of time ending May 15, 2005. During the period, there were 46 children (16.0%) in residential placement at some point from November 15, 2004 through May 15, 2005.

Of those 46 children, 30 cases (65.2%) had been reviewed during a residential case conference in the six months prior to May 15, 2005 to determine if their needs could be met in a less restrictive setting and 16 children (34.8%) did not have their cases reviewed. The review collected data on who was involved in the review process for the 30 cases having a documented review. They are as follows:

**Table 80: Who was involved in the review process for those thirty cases with documented residential case conference(s)**

| Type of Participant | Frequency of Participation | % of Participation |
|---|---|---|
| DCF Social Worker | 30 | 100% |
| Residential Therapist or Physician | 23 | 76.7% |
| DCF Supervisor | 19 | 63.3% |
| Area Resource Group Member | 14 | 4.7% |
| Other Participants | 13 | 43.3% |
| Parent(s) | 8 | 26.7% |
| DCF Manager | 7 | 23.3% |
| Managed Service System (MSS) | 6 | 20.0% |
| Lawyer/GAL | 5 | 16.7% |
| Court Personnel | 4 | 13.3% |
| Community Collaborative | 1 | 3.3% |

Some of the participants who fell under the "other" category included residential case managers, Department of Mental Retardation Staff, Department of Mental Health and Addictive Service Staff, juvenile justice staff, private clinicians and foster parents.

Nineteen of the 46 children (41.3%), who were in a residential setting during the six-months ending May 15, 2005, were approved for discharge. Of the 19 children, ten (52.6%) were discharged to a less restrictive setting during that six-month time period. Nine children (47.3%) remained in placement. Of those nine children, two had no placement resource available, two had an identified placement resource and were having transitional visits and two children had a newly identified placement resource. Two children remained in placement due to delays by social workers in completing the CPT packet. One child's reason for delay in discharge was unable to be determined from documentation available in the LINK record.

Of the 46 identified children, ten (21.7%) will require residential care until they transition to adult programs. Five children (10.9%) will transition to DMR and five children will transition to DMHAS. Four children are in a placement at the request of their families via Voluntary Services (8.7%).

In all, 40 of the 46 cases (87.0%) were reviewed at an ACR/TPC during the period of November 15, 2004 to May 15, 2005. In 32 of the cases (69.6%) Administrative Case Coordinators documented that children were placed in the least restrictive setting. Administrative Case Review Coordinators indicated that eight children (17.4%) were not in the least restrictive placement setting. Of those eight cases, two children required step-down programs. One child required a less restrictive setting until transition to Department of Mental Retardation. Two placement settings did not meet the children's needs. Three cases had reasons that were unable to be determined from the DCF-553 documentation. Six of the 46 cases did not have ACR/TPC's during that time period.

During the interview process, 96 Ongoing Service Social Workers were asked, "When you have a child in residential placement, when do you begin planning for their discharge?" 52 Ongoing Service Social Workers (54.2%) indicated they begin discharge planning at the point of admission. Ten Ongoing Service Social Workers (10.4%) indicated that the discharge plan is based on the residential assessment and provider reports (timing determined by the provider). Nine (9.4%) Ongoing Service Social Workers stated that you begin planning for the child's discharge one to three months prior to discharge and eight (8.3%) begin planning after the first six months in the residential setting.  Five (5.2%) Ongoing Service Social Workers indicated that once the child has shown progress, they begin to plan for discharge. Two (2.1%) Ongoing Service Social Workers indicated that each case is unique and there is no set time, and two (2.1%) indicated that they begin planning prior to the child's admission to the facility. Of the 96 Ongoing Service Social Workers, eight (8.3%) had not been assigned a case of a child in residential placement.

**Table 81: If you have a child in residential, when do you begin planning for their discharge?**

| Discharge Planning Timetable | # Of Workers | % Of Workers |
|---|---|---|
| At the time of admission | 52 | 54.2% |
| Decision based on residential assessment/provider reports | 10 | 10.4% |
| Several months prior to discharge | 9 | 9.4% |
| After first six months | 8 | 8.3% |
| No children in residential | 8 | 8.3% |
| Once progress is shown | 5 | 5.2% |
| Prior to admission | 2 | 2.1% |
| No set time to plan | 2 | 2.1% |
| **Total** | **96** | **100%** |

Ongoing Service Social Workers were asked, "What are the biggest barriers to timely discharge from residential?"  More than 50.0% of the workers identified the lack of step-down placements.  Other responses included:

- Lack of community resources to support child at home or in the subsequent placement setting.
- Difficulty in collaboration/communication with providers
- Child's lack of progress in the program
- Parent's ability/motivation to comply with expectations
- Educational programming needs
- Short notice of intended discharge

Of the 96 Ongoing Service Social Workers, three stated they felt that there were no barriers.

97

## Outcome Measure 20:  Discharge Measures

### *Court Monitor's Case Review Findings: 61.5% (Universe: 29)*

The *Juan F.* Exit Plan requires that at least 85% of all children age 18 or older shall have
achieved one or more of the following prior to discharge from DCF custody:
    A.  Graduation from High School
    B.  Acquisition of a GED
    C.  Enrollment in or completion of college or other post secondary training
        program full-time.
    D.  Enrollment in college or other post secondary training program part-time with
        part-time employment.
    E.  Full-time Employment
    F.  Enlistment full-time member of the military

There is no LINK automated data available for this measure. The Quality Improvement
Division's last review completed during the fourth quarter 2004 found **83%** compliance
with this measure.

Upon request, the DCF Information System Unit supplied the Court Monitor's Office
with the universe of all youth, age 18 or older that were discharged from DCF custody
between February 15, 2005 and May 15, 2005. The Court Monitor's Office confirmed the
status of the identified youth with DCF's Program Supervisor of Adolescent Services.
This process resulted in a total population of 29 cases[40].  Our review includes this full
universe.

Of the 29 cases reviewed where a child was discharged, one youth (3.8%) was too
impaired to participate in school or be employed.  One youth was successfully
transitioned to Department of Mental Retardation. Two youth (7.6%) who did not meet
the measure, had refused services upon reaching age 18. As described in the Exit Plan
document, these three youth (11.5%) were removed from the overall universe.

Of the 26 youth discharged between February 15, 2005 through May 15, 2005, 16 youth
**61.5%** achieved one or more of the outcomes for the discharge measure.  Fourteen youth
(53.8%) had graduated from high school and 11 youth (42.3%) were employed full-time.
Of the 26 youth, nine (34.6%) had graduated from high school and were employed full-
time. It should be noted that the timeframe of our sample would lend itself to a higher
negative outcome, as it does not incorporate the end of a school year or semester.

---

[40] Universe data may be impacted by the reliability of legal status and discharge data.

**Table 82: Crosstabulation: At the time of discharge, was the youth employed? What was the youth's educational status at the time of discharge?**

|  | Yes/Full-time [41] | Yes/Part-time [42] | No | UTD | Total |
|---|---|---|---|---|---|
| **Attended High School** | 0 | 0 | 1 | 1 | 2 |
| **Graduated High School** | 9 | 4 | 0 | 1 | 14 |
| **Dropped out** | 0 | 0 | 10 | 0 | 10 |
| **Total** | 9 | 4 | 11 | 2 | 26 |

Additionally, three youth (11.5%) were attending high school or working toward their GED at the point of discharge; four (15.2%) were employed part-time; two (7.6%) were incarcerated. Adolescent Discharge Plans (DCF2092) were completed in 11 cases (42.3%). Four cases (15.3%) had Independent Living Plans (DCF2091) completed. These plans are required by DCF Policies 42-10-1 and 42-10-2.

Independent Living Services were provided to 13 of the adolescents (50%). In the remaining 13 cases, there was no documentation of such service provision. Nine youth (34.6%) participated in a Community Housing Program Services (CHAP) program. Five of the nine had successfully completed the program prior to discharge.

A number of general needs were identified at the time of discharge. However, this review found that a large percentage of needs were "unable to be determined" due to lack of documentation in the LINK record. See Table 83 below for details.

**Table 83: Needs identified for youth discharged from care February 15, 2005 through May 15, 2005 (n=26)**

|  | % of Yes | % of No | % of UTD |
|---|---|---|---|
| **Mental Health** | 34.6% | 57.6% | 7.6% |
| **Psychiatric Disorder** | 26.9% | 57.6% | 15.3% |
| **Substance Abuse** | 15.3% | 61.5% | 23.0% |
| **Special Education** | 11.5% | 76.9% | 11.5% |
| **Medically Complex** | 7.6% | 92.3% | 0% |
| **Psychiatric Medication** | 7.6% | 50% | 42.3% |

[41] Full-time is defined as more than 35 hours per week.
[42] Part-time is defined as less than 35 hours per week.

**Outcome Measure 21:  Discharge of Mentally Ill or Retarded Children**

*Court Monitor's Case Review Findings: 50.0% (Universe: 29)*

The *Juan F.* Exit Plan requires that DCF submit a written discharge plan to the
Department of Mental Health and Addictive Services or the Department of Mental
Retardation for all committed or dually committed children[43] who are mentally ill or
retarded and require adult services, within 180 days prior to anticipated discharge date.

There is no automated LINK reporting on Outcome Measure 21. The last Quality
Improvement Division review completed during the fourth quarter 2004 found **60.0%**
compliance with this outcome measure.

Our review found that in ten of the 29 cases (34.5%) where a youth was discharged, the
submittal of a discharge plan for adult services upon discharge from DCF was required.
Of those ten cases, five (**50.0%**) had documentation of a written discharge plans
submitted to either Department of Mental Health and Addictive Services or Department
of Mental Health.

Of the ten youth needing adult services, two youth were provided service by the adult
system at the point of discharge without a lapse of service.  One youth was transitioned to
a DMR group home; a second youth was transitioned to a Department of Mental Health
and Addictive Services apartment. A third youth was accepted but refused Department of
Mental Health and Addictive Services. Of the remaining seven referred, none were
receiving adult services at the time of discharge.

**Table 84:  Crosstabulation:  Was youth picked up by the referred adult system at the
point of discharge so that there was no lapse in services to the youth? Was the
youth in need of continuing services due to severe or persistent major mental illness,
or other developmental disorders?**

| *Count* | | Was youth picked up by the referred adult system at the point of discharge so that there was no lapse in services to the youth? | | | | |
|---|---|---|---|---|---|---|
| | | **Yes** | **No** | **N/A- did not qualify** | **Referral accepted client refused** | **Total** |
| **Child is in need of continuing clinical services due to severe or persistent major mental illness, or other developmental disorders** | **Yes** | 2 | 7 | 0 | 1 | 10 |
| | **No** | 0 | 0 | 19 | 0 | 19 |
| **Total** | | **2** | **7** | **19** | **1** | **29** |

At the point of discharge, one youth (3.4%) had a mental retardation diagnosis.  Two
youth (6.9%) had an IQ under 70.  Nine youth (31.0%) had an identified psychiatric
disorder.  Four youth's diagnosis (13.8%) could not be determined from the LINK
documentation.  No youth had been hospitalized for psychiatric reasons during the prior
twelve months.  Four youth (13.8%) were being administered psychiatric medication. The

---

[43] Except Probate, Interstate and Voluntary cases

issue of medication management could not be determined due to lack of documentation in 11 cases (37.9%).

**Table 85:  Was child referred to Department of Mental Retardation?**

| Count | | Was child referred to DMR? | | |
|---|---|---|---|---|
| | | **Yes** | **N/A- did not qualify** | **Total** |
| **Child is in need of continuing clinical services due to severe or persistent major mental illness, or other developmental disorders** | **Yes** | 2 | 8 | 10 |
| | **No** | 0 | 19 | 19 |
| **Total** | | **2** | **27** | **29** |

Ten youth required Department of Mental Health and Addictive Services. Seven youth were referred.   Of the three remaining youth, one packet was completed but the referral was not made, one youth did not qualify for Department of Mental Retardation and the third youth refused services from Department of Mental Health and Addictive Services, so the referral was not made.

**Table 86:  Was child referred to Department of Mental Health and Addiction Services?**

| Count | | Was child referred to DMHAS? | | | |
|---|---|---|---|---|---|
| | | **Yes** | **No** | **N/A- did not qualify** | **Total** |
| **Child is in need of continuing clinical services due to severe or persistent major mental illness, or other developmental disorders** | **Yes** | 7 | 2 | 1 | 10 |
| | **No** | 0 | 0 | 19 | 19 |
| **Total** | | **7** | **2** | **20** | **29** |

**Issues Relating to Outcome Measures 20 & 21:**
A separate universe was utilized for Outcome Measures 20 & 21. Therefore, the case practice issues are specific to this universe. Reviews ranked[44] the quality of Social Work Supervisor Conference narratives and directives for these 26 cases. Supervision was ranked as follows:
- Supervision was "excellent" in 3.8%
- Supervision was "good" in 23.0%
- Supervision was ranked "poor" in 46.1%
- Supervision was ranked "negligible" in 26.9%

---

[44] The following scale was utilized to determine the rank scores:
Negligible – no entries or cut and paste entries with no relevance to case events
Poor/Fair – sporadic Social Work Supervisor entries with little substance or direction
Good – monthly entry reflecting understanding of case events and appropriate direction
Excellent – monthly (or more frequent) Social Work Supervisor notes with in-depth understanding of case events.  Creative direction to improve case practice – follow up and discussion of prior directives.

Social Work Supervisors documented risk factors in five of the conferences (19.2%). Five Social Work Supervisors (18.2%) did not have a documented supervisory conference with the social worker between February 15, 2005 and May 15, 2005.  Our review found 15 cases (57.6%) where the Social Work Supervisor did not document any risks or issues regarding the youth at supervisory conferences documented during the period.  In 11 of the 15 cases, the reviewer found that the LINK narrative entries leading up to the conference contained clearly identified risks that remained unaddressed.

Of the 21 Social Work Supervisors (80.7%) who had documented supervisory conferences with their social workers during the period of February 15, 2005 through May 15, 2005, 42.3% documented three conferences, 23% documented two and 15.3% documented one conference during the quarter.

## Outcome Measure 22:  Multi-disciplinary Exams (MDE)

### *Court Monitor's Case Review Findings: 57.7% (Sample Size: 84)*
### *DCF LINK Report for the period of April – June 2005: 55.4%*

The *Juan F.* Exit Plan requires that at least 85% of the children entering the custody of DCF for the first time shall have an MDE conducted within 30 days of placement.  All cases should have a MDE even if one cannot be done within 30 days.

The Department reports that **55.4%** of the children that came into care in the quarter ending June 30, 2005 received a timely MDE.

The Monitor's sample included 84 children who entered placement in the year ending May 15, 2005 and who had been in care for a period of more than 60 days.  Thirteen of the 84 children were exempt[45] from this measure; as 11 children were placed directly from a hospital setting and two had prior placement episodes.

In all, 71 children required MDE's.  The MDE was documented for 66 children (93.0%). 41 children received the MDE within the 30-day requirement (**57.7%**).  25 received the MDE later than 30 days in placement.  Five children did not receive an MDE (5.9%).

The primary barriers to meeting the measure were: five cases (16.6%) noted delays by social workers in making referrals; one child was placed on a waiting list (3.3%); two children (6.6%) had the initial appointments cancelled and rescheduled outside of the timeframe, two cases (6.6%) had no barriers documented; and in 19 of the cases (63.3%) reviewed, the lack of documentation in LINK precluded the identification of barriers. The nine additional MDE sites recently opened will assist in the Department's efforts to meet this outcome measure.

The reviewers found LINK documentation of the MDE results for 56 children (78.8%) of the 66 cases with completed MDE's.  Of the 56, workers documented their implementation of the recommendations in 36 cases, either in LINK and/or the treatment plans.  Seven of the MDE's (12.5%) required no service referrals following the exam.  One MDE (1.8%) required additional monitoring. Three cases (5.3%) had no documentation that reflected follow through with MDE recommendations and nine (16%) either had no treatment plan developed or no narratives documented in LINK following the completion of the MDE upon which to base our conclusions.

---

[45] Exemption agreed upon and documented within the development of the Exit Plan.  Includes all children entering care from hospital settings of greater than seven days, children having prior placement episodes, or children in placement for less than 30 days.

**Table 87: Was the necessary follow up on the MDE recommendations documented in LINK narratives or in the treatment plan resulting from the TPC? (n=56)**

| Follow through on recommendations | # of Cases | % of Cases |
|---|---|---|
| N/A - No Recommendations Made | 7 | 12.5% |
| Yes – Follow Through of Recommendations Documented | 36 | 64.3% |
| No Documentation of Follow Through with Recommendations | 3 | 5.3% |
| To be Determined – Ongoing Monitoring | 1 | 1.8% |
| No Treatment Plan/Narratives in LINK post MDE | 9 | 16.0% |
| Total | 56 | 100% |

Therefore in looking at the 71 children who required a MDE, 43 children (60.6%) had a MDE completed (whether within 30 days or not) and documentation existed that there was follow up or service provision as specified in the MDE report.

The Ongoing Service Social Worker interviews provided insight as to the value and importance line staff place on Multi-Disciplinary Exams in the Department's treatment planning process.  Of the 96 Ongoing Service Social Workers interviewed, 47 placed major importance on the results of the Multi-Disciplinary Exams (49%).  Thirty Ongoing Service Social Workers (31.3%) placed moderate importance on the Multi-Disciplinary Exams and Ongoing Service Social Workers (10.4%) placed minimal importance on the results of the Multi-Disciplinary Exams.  Nine Ongoing Service Social Workers (9.4%) were in specialized units and did not comment.  They do not have cases of initially placed children that require the examinations.

**Table 88:  What level of importance do you place on the MDE in influencing the early stages of treatment planning?**

| Level of Importance | Number | Percentage |
|---|---|---|
| Major | 47 | 49% |
| Moderate | 30 | 31.3% |
| Minimal | 10 | 10.4% |
| Not Applicable | 9 | 9.4% |
| Total | 96 | 100% |

The Ongoing Service Social Workers interviewed were asked to elaborate about the importance of MDE's; responses are categorized as follows:
- 48 Ongoing Service Social Workers (50%) feel MDE's provide a baseline for needs and recommendations and give an overall sense of the child.
- 24 Ongoing Service Social Workers (25%) indicated that MDE's were often completed prior to their being assigned.
- 15 Ongoing Service Social Workers (15.6%) felt that MDE results were too often general and not very helpful.
- 4 Ongoing Service Social Workers (4.1%) indicated that results were not received in a timely manner, which diminished importance as the initial plans were already developed prior to receipt.

- 3 Ongoing Service Social Workers (3.1%) stated that exams were completed because they were an expectation or requirement of the Department.
- 2 Ongoing Service Social Workers (2%) indicated the exams were helpful, as prior to placement some children had not received medical care in a long time, and there was no information available.

When the Ongoing Service Social Workers were asked what they did with the information they received, 65 or (68%) indicated that they discussed results with foster parents or residential caretakers and providers and then followed through with the MDE recommendations.  Sixteen Ongoing Service Social Workers (17%) indicated that they discussed the results with Social Work Supervisor, Area Resource Group as well as the providers and/or caretakers.  Seven workers (7.2%) indicated that they only documented the results in LINK and the treatment plan (no discussion noted).

105