*Juan F.* v. Rell Exit Plan
Quarterly Report
October 1, 2005 – December 31, 2005

Civil Action No. H-89-859 (AHN)
March 23, 2006

Submitted by:
DCF Court Monitor's Office
300 Church Street ~ 4th Floor
Wallingford, CT 06492
Tel: 203-741-0458
Fax: 203-741-0462
E-Mail: Raymond.Mancuso@po.state.ct.us

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
March 23, 2006
_____

Table of Contents
*Juan F*. v Rell Exit Plan Quarterly Report
October 1, 2005 – December 31, 2005

|  | Page |
|---|---|
| Highlights | 3 |
| Outcome Measure Overview Chart | 5 |
| Introduction | 6 |
| Structured Decision Making (SDM) | 7 |
| Governor's Recommended Budget Adjustments for FY 2007 | 8 |
| Re-Entry into DCF Custody (Outcome Measure 11) | 9 |
| Outcome Measure 3 (Treatment Planning), Outcome Measure 15 (Needs Met) and ACR Attendance 4th Quarter Data | 10 |
| Monitor's Current Reviews in Progress | 16 |

*Appendix 1* – The Department's Exit Plan Outcome Measures
Summary Report Fourth Quarter 2005

Case 2:89-cv-00859-AHN     Document 513-2     Filed 03/29/2006     Page 3 of 16

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
March 23, 2006
_____

*Juan F*. v Rell Exit Plan Quarterly Report
October 1, 2005 – December 31, 2005

### **Highlights**

1. The Monitor's quarterly review of the Department of Children and Families' (DCF) performance during the period of October through December 2005 indicates a vigorous effort across the 14 Area Offices. There has been continuing progress for many outcome measures and sustained performance in many outcome areas where compliance was attained in prior reporting periods. During this quarter, two measures have been met for the first time: Search for Relatives (89.6%) and Worker to Child Visitation in In-Home Cases (85.6%). Additionally, there are five (5) other measures in which the DCF is reporting performance levels that are just shy of compliance targets.

2. The Monitor's quarterly review of DCF for the period of October through December 2005 indicates that DCF has achieved compliance with 13 of the Outcome Measures.
    - Commencement of Investigation (96.1%)
    - Completion of Investigation (94.2%)
    - Search for Relatives (89.6%)
    - Maltreatment of Children in Out-of-Home Care (0.6%)
    - Reunification (60.4%)
    - Transfer of Guardianship (72.4%)
    - Multiple Placements (96%)
    - Foster Parent Training (100%)
    - Placement within Licensed Capacity (96.2%)
    - Worker to Child Visitation in Out-of-Home Cases (85.6%)
    - Worker to Child Visitation in In-Home Cases (85.6%)
    - Caseload Standards (100%)
    - Discharge Measure (92%)

3. DCF has maintained compliance for at least two (2) consecutive quarters[1] with eight (8) of the Outcome Measures referenced above:
    - Commencement of Investigation
    - Completion of Investigation
    - Maltreatment of Children in Out-of-Home Care
    - Reunification
    - Multiple Placements
    - Foster Parent Training
    - Caseload Standards
    - Discharge Measure

---

[1] The Defendants must be in compliance with all of the outcome measures, and in sustained compliance with all of the outcome measures for at least two quarters (six months) prior to asserting compliance and shall maintain compliance through any decision to terminate jurisdiction.

3

4. The Department continues to be challenged to meet the placement and treatment needs for a number of children it serves. Despite the opening of new therapeutic group homes and the success of initiatives such as Managed Service Systems (MSS); hundreds of children remain in placements well beyond the time that is therapeutically indicated, and wait lists for vital community services continue to exist in many areas of the state.

5. Given the well founded policy decision to reduce utilization of residential programs there remains a heightened need for additional foster homes, especially specialized foster homes, as well as additional adoptive family resources.

6. The closing of a number of shelters and residential programs and the reduction in bed capacity at other programs has reduced the emergency placement options and exacerbated efforts to facilitate timely discharges.

7. There are a number of initiatives that have been implemented or are in the planning stages in an effort to address the issues referenced above. These include:
    o Reorganization of Foster Care efforts
    o Intensive Reunification Services
    o Continued development of therapeutic group homes
    o Implementation of the Administrative Service of Organization
    o Revisions to and additional training regarding the treatment planning process including continued efforts to integrate family conferencing.
    o Conversion of the existing shelter system into small short-term assessment and respite centers.
    o Continued development of Managed Service Systems
    o Implementation of additional in-home services
    o Efforts to implement both Quality Service Reviews (QSR) and an accreditation process.

8. One other effort that is underway will provide tremendous benefit for children, families and DCF staff. The Department is in the initial stage of implementing Structured Decision Making (SDM). SDM provides an opportunity for the Department to improve the manner and consistency with which case decisions are made. Utilization of reliable, evidence-based tools will foster consistency in making critical case decisions and will enable the Department to appropriately target resources and services to children and families.

9. The Court Monitor attended 42 Administrative Case Review/Treatment Planning Conferences this past quarter and reviewed the case record narratives and treatment plans associated with the cases for compliance with Outcome Measures 3 & 15. Analysis of the data is incorporated later in this report.

The Department's full, unedited, but verified report to the Court Monitor is incorporated at the end of this Monitor's Report to the Court.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
March 23, 2006
_____

| 4Q October 1-December 31, 2005 Exit Plan Report<br>Outcome Measure Overview ||||||||||
|---|---|---|---|---|---|---|---|---|---|---|
| Measure | Measure | Baseline | 1Q 2004 | 2Q 2004 | 3Q 2004 | 4Q 2004 | 1Q 2005 | 2Q 2005 | 3Q 2005 | 4Q 2005 |
| 1: Commencement of Investigation | >=90% | X | X | X | X | 91.2% | 92.5% | 95.1% | 96.2% | 96.1% |
| 2: Completion of the Investigation | >=85% | 73.7% | 64.2% | 68.8% | 83.5% | 91.7% | 92.3% | 92.3% | 93.1% | 94.2% |
| 3: Treatment Plans | >=90% | X | X | X | 10% | 17% | X | X | X | X |
| 4: Search for Relatives | >+85% | 58% | 93% | 82% | 44.6% | 49.2% | 65.1% | 89.6% | 5/15/06* | 7/15/06* |
| 5: Repeat Maltreatment | <=7% | 9.3% | 9.4% | 8.9% | 9.4% | 8.9% | 8.2% | 8.5% | 9.1% | 7.5% |
| 6: Maltreatment of Children in Out-of-Home Care | <=2% | 1.2% | 0.5% | 0.8% | 0.9% | 0.6% | 0.8% | 0.7% | 0.8% | 0.6% |
| 7: Reunification | >=60% | 57.8% | X | X | X | X | X | X | 64.2% | 61% |
| 8: Adoption | >=32% | 12.5% | 10.7% | 11.1% | 29.6% | 16.7% | 33% | 25.2% | 34.4% | 30.7% |
| 9: Transfer of Guardianship | >=70% | 60.5% | 62.8% | 52.4% | 64.6% | 63.3% | 64.0% | 72.8% | 64.3%* | 72.4% |
| 10: Sibling Placement | >=95% | 57% | 65% | 53% | X | X | X | X | 96% | 94% |
| 11: Re-Entry | <=7% | 6.9% | X | X | X | X | X | X | 7.2% | 7.6% |
| 12: Multiple Placements | >=85% | X | X | 95.8% | 95.2% | 95.5% | 96.2% | 95.7% | 95.8% | 96% |
| 13: Foster Parent Training | 100% | X | X | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 14: Placement Within Licensed Capacity | >=96% | 94.9% | 88.3% | 92.0% | 93.0% | 95.7% | 97% | 95.9% | 94.8% | 96.2% |
| 15: Needs Met | >=80% | X | 53% | 57% | 53% | 56% | X | X | X | X |
| 16: Worker-Child Visitation (Out-of-Home) | >=85%<br>100% | X | Monthly-72%<br>Quarterly-87% | Monthly-86%<br>Quarterly-98% | Monthly-73%<br>Quarterly-93% | Monthly-81%<br>Quarterly-91% | Monthly 77.9%<br>Quarterly 93.3% | Monthly 86.7%<br>Quarterly 95.7% | Monthly 83.3%<br>Quarterly 92.8% | Monthly 85.6%<br>Quarterly 93.1% |
| 17: Worker-Child Visitation (In-Home) | >=85% | X | 39% | 40% | 46% | 33% | X | 81.9% | 78.3% | 85.6% |
| 18: Caseload Standards+ | 100% | 69.2% | 73.1% | 100% | 100% | 100% | 100% | 100% | 99.80% | 100% |
| 19: Reduction in Residential Care | <=11% | 13.5% | 13.9% | 14.3% | 14.7% | 13.9% | 13.7% | 12.6% | 11.6% | 11.6% |
| 20: Discharge Measures | >=85% | 61% | 74% | 52% | 93% | 83% | X | X | 96% | 92% |
| 21: Discharge of Mentally Ill or Retarded Children | 100% | X | 43% | 64% | 56% | 60% | X | X | 78% | 70% |
| 22: Multi-disciplinary Exams (MDE) | >=85% | 5.6% | 19.0% | 24.5% | 48.9% | 44.7% | 55.4% | 52.1% | 54.6% | 72.1% |

## **Introduction**

I recently completed my third visit to all of the DCF area offices, facilities and Central Office. Each of these all-staff meetings consisted of a brief presentation and a question and answer session. My consistent message to staff stressed the tremendous progress that has been documented in meeting the Exit Plan Outcome Measures. Child Welfare is complex and challenging work and there are no simple solutions. The successes and concerns that they share during these visits reveal a passion for their work. I am constantly impressed by the unending commitment and effort demonstrated by Department staff to improve DCF's delivery of service to children and families. The Exit Plan has provided a framework to focus the Department's efforts on a finite number of foundational pieces. The work of improving the agency will not end with achievement of these 22 Outcome Measures. The complex set of circumstances and factors that result in abuse or neglect of a child will not, and can not be, wholly ameliorated. Continuous efforts to build on the foundation that the Exit Plan has provided is critical. The area offices and the facilities understand this, as demonstrated by their decisions to set new targets for improvement well beyond the scope of the Exit Plan measures. The need for implementation of new or improved models of service, creative new service options and improved methods of quality improvement will not diminish with achievement of the 22 Outcome Measures or exit from the Consent Decree.

The Department will be in position to assert that they are complying with most of the Outcome Measures in the next few quarters. Meeting the planning, placement, permanency, and service needs (Outcome Measures 3 & 15) for children and families will likely be the final measures to be fully accomplished. A great deal of work remains to achieve these measures.

## Structured Decision Making (SDM)

DCF has undertaken an ambitious schedule to implement Structured Decision Making this year. The Department is being assisted in this important initiative by the Children's Research Center (CRC). The Monitor's Office has been part of the planning and pre-implementation work, and regularly attends the Steering Committee Meetings. SDM provides workers with straightforward objectives and reliable evidence-based tools to make informed decisions for their assigned cases. Further, it will supply managers with data and information for improved planning, evaluation, and resource allocation.

Decisions by workers will be improved due to:
- Clearly defined and consistently applied decision making criteria
- Measurable practice standards
- Assessment results being utilized to directly influence case and agency decision making

In order to customize the model for Connecticut's unique needs, three planning committees, each with a cross-section of staff from the area offices, have been established. The SDM tools are being adapted to reflect Connecticut's practice in On-Going Services, Investigations, and the Hotline. Tasks undertaken also include drafting practice standards and policy recommendations. This work is to be completed by June 2006. The SDM tools will be automated in LINK and implementation of the SDM is scheduled for January 2007.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
March 23, 2006
_____

### **Governor's Recommended Budget Adjustments for FY 2007**

The work of the Transition Task Force and more recently the Budget Development and Implementation Team which consists of the DCF Commissioner, Darlene Dunbar; the Secretary of the Office of Policy and Management, Robert Genuario; and the DCF Court Monitor, Ray Mancuso, has assisted in identifying and recommending key service initiatives necessary to meet the child protection and mental health needs of Connecticut's children and position DCF for a successful exit from the *Juan F*. Consent Decree.

Governor Rell's Recommended Budget Adjustments for FY 2007 has proposed considerable new funding for DCF. The FY 2006-2007 budget will provide a net increase of $24.7 million for new and expanded programs. Some key options for additional funding recommended in the Governor's Budget for children are in the following areas:

- Group Homes – The budget proposes an additional $12.3 million in funding to support the annualized cost of group homes anticipated opening prior to June 30, 2006. This will provide a total of 155 beds as an additional 91 beds are developed in FY 2006-2007. Also, an additional $4.75 million is recommended for group homes to be opened during FY 2007 - 2008. The budget also provides $250,000 to conduct an evaluation of this new model.

- In Home Services – The budget proposes an additional $500,000 for intensive in-home services for abused and neglected child and their families. The addition of these services will assist in addressing the significant wait lists that currently exist in some areas of the state, and are crucial to helping families remain intact through support, education, and training.

- Shelters – The budget proposes an additional $1.55 million to support the conversion of the existing shelter system into 14 sites with six short term assessment/respite (STAR) beds. The Monitor has had long standing concerns with the provision of emergency placement services for adolescents. The request for proposals (RFP) recently released addresses many of these concerns. We note, however, that the success of this revamping will be dependent on navigating the zoning barriers and DCF and private providers' development of alternative specialized family placements for adolescents to transition out of the STAR centers in a timely manner.

- COLA – The budget proposed a 2% COLA for private providers. This supports the State's private providers, who remain the backbone of a complex service delivery system that struggles to meet the enormous needs of Connecticut's children and families.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
March 23, 2006
_____

## Re-Entry into DCF Custody (Outcome Measure 11)

The Department has provided an automated and verified report for Outcome Measure 11 for the first time this quarter. The data verification involved a review of cases with discrepant data involving removal documentation, legal status, discharge data and re-entry corrections. The original universe of cases included 544 cases. The original finding was 509 met (93.6%) and 35 not met (6.4%). After accounting for the changes indicated by the case review, the adjusted compliance numbers are **502 met (92.4%) and 41 not met (7.6%)**.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
March 23, 2006
_____

**Treatment Planning (Outcome Measure 3), Needs Met (Outcome Measure 15), and ACR Attendance 4th Quarter Data**

The *Juan F.* parties have been engaged in negotiations regarding changes to the methodology for Outcome Measures 3 and 15. The parties together with the Court Monitor and the Technical Advisory Committee (TAC) have reviewed a number of possible alternatives that would result in a more qualitative review that can better measure the most important elements of treatment planning and the ability of DCF to meet children and families' needs. The Court Monitor intends to begin using this new methodology for the second quarter 2006 reporting.

The data reported below, (October through December 2005) is based upon the previously piloted methodology. While we are abandoning this approach, there are a number of elements highlighted by the data analysis that offer insight into area's of strength and those needing improvement. The overall percentages for each measure are less important than the lessons learned. January through March 2006 data will be reported using the current draft methodology recently shared with the parties for comment.

The review of Outcome Measure 3 for the fourth quarter utilized a tool that was developed for piloting in November 2005. The tool utilizes a rating scale of 1-5 for each section of a treatment plan and has the added element of allowing a reviewer over-ride of the scoring mechanism. The all or nothing scoring previously utilized is counterbalanced at the discretion of the reviewer. The review tool for Outcome Measure 15 was the same tool that had been utilized in previous reviews. A total of 42 cases were reviewed for Outcome Measure 3 and 15 during the fourth quarter of 2005.

The Supplemental ACR review protocol was also utilized for this quarter's review process. Logistical issues prevented Administrative Case Review (ACR) attendance for 4 of the cases. Thus the Supplemental ACR review protocol was utilized for 38 cases.

Demographically, the sample population of treatment plans reviewed had the following characteristics:
- 36 or 85.7% of the sample cases were that of a child in placement
    - One case was a voluntary placement

- Cases had been open for various lengths of time ranging from January 1994 to November 2005.
    - 6 plans reviewed were the initial plan (created at 60 days after case opening or placement)
    - 36 were subsequent treatment plans
    - 5 plans indicated that closure was likely in the upcoming six-month time frame

Based on the elements required, 15 or 35.7% of the 42 plans achieving a satisfactory rating based upon all components required. In four cases, the reviewer felt the unsatisfactory score was not an accurate reflection given the all or nothing scoring process. In one case, the plan passed based on the minimal criteria required, but the reviewer felt that plan should not have passed. After adjusting for these changes, **42.8% of the plans achieved a satisfactory score.**

The average score for Section 1 of the scoring tool is 3.7. Individual elements of Section 1 of the treatment plan follow in Table 2, with an indication of the percentage of plans that achieved a passing score:

*Table 1:  Percentage of Plans Achieving Passing Scores for Section 1 Categories*

| Section | Description | Passing Score | % Achieving Passing Score |
|---|---|---|---|
| I.1 | Description of Current Referral/Substantiation | .25 | 95.2% |
| I.2 | Identifying Information | .75 | 73.8% |
| I.3 | Issues/Needs/Strengths of Child/Family | 1.0 | 47.6% |
| I.4 | Present Situation/Assessment of Child or Family in prior six months | 3.0 | 81.0% |

The average score for Section 2 of the scoring tool is 3.03. Individual elements of Section 2 of the treatment plan follow in Table 2, with an indication of the percentage of plans that achieved a passing score:

*Table 2:  Percentage of Plans Achieving Passing Scores for Section 2 Categories*

| Section | Description | Passing Score | % Achieving Passing Score |
|---|---|---|---|
| II.1 & II.3 | Determining the Goals and Action Steps to achieving them (logical combination of sections 1 and 3 as provided in E-Help reference guide) | 3.0 | 50.0% |
| II.2 | Progress of child/family in meting the goals specified on prior plan | 1.0 | 76.2% |
| II.4 | Planning for Permanency | 1.0 | 76.2% |

Of the 42 case treatment plans, 17 cases, or *40.5% had documentation all identified needs were met; a combination of met and pending (TBD)*; *or a combination of needs met and client refusal of a service DCF recommended/referred at the point of review* Each of the remaining 25 cases (59.5%) had one or more identified needs not met for reason other than client refusal or a service that was pending completion of another service.

The review also looked at the needs across service categories and in total rather than within individual cases. In all, 271 individual needs were identified. Twenty-eight or 10.3% of the needs identified had not yet reached the timeframe for implementation as indicated in the plan, and therefore could not be measured. Of the 243 needs that could

11

be measured during this period, 77.8% were met in the time frame indicated. Needs were not met in 22.2% instances.

*Table 3: Needs Met as Identified in the Current Treatment Plan Document (n=243)*

| Need | Were Needs Met as Stated? | | Total | % of Needs Met |
|---|---|---|---|---|
| | Yes | No | | |
| Child Care | 2 | 0 | 2 | 100.0% |
| Dental | 8 | 4 | 12 | 66.7% |
| Domestic Violence | 0 | 0 | 0 | ---- |
| Education | 20 | 8 | 28 | 71.4% |
| Employment | 1 | 1 | 2 | 50.0% |
| Housing | 2 | 1 | 3 | 33.3% |
| Medical | 36 | 8 | 44 | 81.8% |
| Mental Health | 41 | 14 | 55 | 74.5% |
| Out of Home Care | 41 | 3 | 44 | 93.2% |
| Substance Abuse | 1 | 0 | 1 | 100.0% |
| Out of Home Support | 27 | 6 | 33 | 81.8% |
| In-Home Support | 8 | 4 | 12 | 66.7% |
| Training | 2 | 5 | 7 | 28.6% |
| Total | 189 | 54 | 243 | 77.8% |

Though further review would be required, it appears that the decline in the percentage of needs met may reflect the impact of improvements in the treatment planning process. Assessments within the treatment plans are improving and identified needs and services are included with more frequency – even when services may not be immediately available. In the past, such information would not likely have been included as the practice was to only include those services that were identified and secured.

Comparing this quarter's data to our recent annual report findings, one can see the shift in practice. In our 2005 Annual Report, which focused on treatment plans completed in the period of November 15, 2004 through May 15, 2005, the average number of needs identified for the sample cases (n=539) was 4.4. In the current quarter, the average number of needs identified has increased to 6.5.

Reviewers identified 80 instances where barriers existed that impacted the Department's ability to meet the needs as specified. Please note that more than one barrier barriers could be indicated for situations where a need was not met, or was still pending completion. These barriers are identified below.

*Table 4:  Barriers to Service Provision*

| Barrier | Frequency | Percentage of all Barriers |
|---|---|---|
| UTD from documentation | 17 | 21.3% |
| Client Refusal | 13 | 16.3% |
| Service Deferred pending completion of another service | 10 | 12.5% |
| Other | 8 | 10.0% |
| No Service Provider Identified | 8 | 10.0% |
| Wait List | 7 | 8.8% |
| Delay in Referral by SW | 6 | 7.5% |
| Approval Process | 5 | 6.3% |
| Referred Service Unwilling to engage client | 2 | 2.5% |
| Service does not exist in community | 2 | 2.5% |
| Service Not available in primary language | 1 | 1.3% |
| Financing unavailable | 1 | 1.3% |
|  | 80 |  |

While there has been a notable improvement within the assessment section of the treatment plans reviewed, the reviewers still felt that some plans did not accurately reflect needs that were clearly documented in the LINK record during the six months prior to the plan date, or as discussed at the ACR.  In 15 of the plans (35.7%) reviewers identified 27 needs through the record review or attendance at the ACR that were not incorporated into the treatment plan document.  These needs included:

*Table 5:  Needs not incorporated into the Treatment Plan, but identified within the Case Documentation*

| Need | Frequency |
|---|---|
| Change in Placement Needed | 3 |
| In-Home Services (FAST, IFP, Etc.) | 3 |
| Mental Health Treatment | 3 |
| Dental | 2 |
| Medical Need (CIP) | 2 |
| Sexual Abuse Treatment – Victim | 2 |
| Sibling Visitation | 2 |
| Dietician | 1 |
| DMHAS Referral | 1 |
| Domestic Violence Treatment | 1 |
| Life Skills | 1 |
| SAT preparation | 1 |
| Housing | 1 |
| Legal | 1 |
| Post Adoptive Services | 1 |
| Pre-Natal Care | 1 |
| Substance Abuse | 1 |

In eight cases, these needs were identified at the ACR, but not incorporated into the treatment plan document approved in LINK.

Participation rates of case participants were noted as follows:
- 57.1% of the 42 cases had evidence that all active providers were invited to participate in the treatment planning process. 47.6% of those cases had evidence of at least one active provider participating.

- Twenty of the cases were children in placement age 12 or older who were able to participate in the treatment planning process. Of those 20 cases, 13 children or 65% were invited to participate in their case planning. Only one child (5%) had documented participation in the planning process.

- 84% of the cases reviewed that included an active mother/guardian participant (n=25) had evidence of an invitation to participate in the process. In all 48% of the cases had documentation of participation by the mother or guardian.

- 53.9% of the cases reviewed that included an active father participant (n=26) had evidence of an invitation to participate in the process. In all 23.1% of the cases had documentation of participation by this identified participant.

- Other DCF staff, active in case in the six months leading up to the review period, were identified in the case records for 26 of the cases reviewed. Of those 26 cases, the identified staff participated in the planning process in 38.5% instances.

- 41 cases involved one or more identified legal counsel. Of those, 28 cases included invitation to all active legal counsel related to the case (68.3%). In three instances (7.3%) the record indicated participation by any lawyer associated to a case.

Provider participants most frequently document use of the teleconference option. In 19% of the cases in which a provider was included in the meeting, participation was via teleconferencing. 16.7% of the cases utilized teleconferencing by a family member. One case required translation services, and this was provided at the meeting, a second had a documented need for sign language, which was accommodated, but the client failed to show up for the meeting.

In looking at whether the SW subsequently applied all of the changes noted on the DCF-553 documentation, we were able to respond to 41 of our 42 cases. One case did not contain DCF-553 documentation in LINK. Of the 41 cases, three had no required changes to the plan (7.3%). 46.3% of workers did a "Good" job of incorporating needed changes. 26.8% did a "Fair" job of incorporating the necessary changes, and 19.5% of the plans were ranked as "Unacceptable" in light of the changes that were required and not incorporated.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
March 23, 2006
_____

The level of participatory development of the treatment plan was ranked as "Superior" in 2.4% of the 42 cases reviewed, "Good" in 66.7% of cases reviewed, "Fair" in 23.8% of the cases reviewed, and "Unacceptable" in 7.1% of cases reviewed. This is based on observed participation at the review, but also includes consideration of LINK documented contact/participation outside of the meeting process leading up to the finalized treatment plan.

Reviewers felt that the family/child understood the expectations for their case for the upcoming six months in 11 of the 15 cases in which the client attended the review (73.3%). In the 11 cases in which the plan incorporated a concurrent planning element, the client appeared to understand this concurrent planning in 63.6% of the reviews.

In nine cases the reviewer assessed a need for discussion of flex funds to address an unmet service need. In eight or 88.9% of these cases, the ACR coordinator raised the topic for discussion. These needs were: Security Deposit/Rent (2), DBT therapy (1), Car repair (1), In-Home Respite (1), Spanish speaking family counseling (1), travel/telephone cards (1) and YMCA membership (1).

The supervisor approved 85.7% of the 42 plans at the point of our review. This follow-up review was conducted 14 days after the meeting to allow for the process to take place.

Reviewers felt that 73.7% of the 38 reviews attended resulted in DCF-553's that accurately reflected the comments of participants at the meeting/decisions made, etc. The reviewers have commented that the 'disconnect' appears to be in the placement of where the comments are entered in the 553. It would seem that issues raised, discussed and resulting decisions arrived at by participants during the course of the meetings often appear in viewpoint/reflective sections rather than in required additions or changes to the plan. Therefore, workers are not including such edits as they finalize the plan for SWS approval.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
March 23, 2006
_____

**<u>Monitor's Current Reviews in Progress</u>**

In addition to the quarterly reviews required for Outcome Measures 3 and 15, the Monitor's Office is involved with reviews for:

- Riverview Hospital:
    - A collaborative review process is underway with DCF Program Review and Evaluation Unit and the Connecticut Child Advocate's Office to address concerns related to systemic issues impacting the safety, treatment and well-being of children and adolescents requiring hospitalization for mental health issues. Protocol development, sampling, and introductory meetings with staff and children are currently in progress. The data collection portion of the review is likely to span a period of six to eight weeks. While data and findings will be consensus-based and include input from the three participating agencies, recommendations may differ based on the individual mandates of each group.

- Flex Funding:
    - The Monitor's Office has selected a sample of 100 cases in which funding was requested for flex or non-categorical expenses during the third quarter 2005. The record review, currently underway, will look at the payment and subsequent impact of the service or item in relation to goal achievement. As an added source of information, social workers who requested the funds are contacted via email to request additional feedback via email, fax or phone as their schedule permits. It is expected that a report on findings will be forthcoming by the close of the second quarter.

- Emergency Placements:
    - During the three month period of December 2005 through February 2006, the area offices were asked to maintain monthly logs of situations in which children were forced to wait extended periods of time at the office, or required several temporary stays in emergency foster home placements prior to securing an appropriate placement. In the next week we should have received all logs from the offices, and can begin to analyze the data.

- 2006-2007 Case Review:
    - The methodology and time-table for a series of focused reviews to verify LINK reporting, and explore qualitative issues impacting the 22 Outcome Measures is currently being developed.