*Juan F*. v Rell Exit Plan
Quarterly Report
January 1, 2006 – March 31, 2006

Civil Action No. H-89-859 (AHN)

Submitted by:
DCF Court Monitor's Office
300 Church Street ~ 4th Floor
Wallingford, CT 06492
Tel:  203-741-0458
Fax:  203-741-0462
E-Mail:  Raymond.Mancuso@po.state.ct.us

_____

Table of Contents
*Juan F.* v Rell Exit Plan Report
January 1, 2006 – March 31, 2006

|  | Page |
|---|---|
| Highlights | 3 |
| Outcome Measure Overview Chart | 6 |
| A Report on Emergency Placement Requests (December 1, 2005 through February 28, 2006). | 7 |
| Executive Summary - The Findings of the *Juan F.* Court Monitor's Office Regarding the Use of Discretionary and Flex Funds Expended July 1, 2005 through September 30, 2006 | 13 |
| *Appendix A* – The Department's Exit Plan Outcome Measures Summary Report First Quarter 2006 January 1, 2006 – March 31, 2006 | 15 |
| *Appendix B* - The Findings of the *Juan F.* Court Monitor's Office Regarding the Use of Discretionary and Flex Funds Expended July 1, 2005 through September 30, 2006 | 22 |
| *Appendix C* - Flex Funds Review Instrument | 38 |

*Juan F*. v Rell Exit Plan Quarterly Report
January 1, 2006 – March 31, 2006

**Highlights**

1. The Monitor's quarterly review of the Department of Children and Families (DCF) performance in meeting the Exit Plan measures during the period of January 2006 through March 2006 confirms the strong performance reported by DCF for the quarter. During this reporting period, three Outcome Measures were met for the first time:
   o Repeat Maltreatment (6.3%)
   o Re-entry into Care (6.7%)
   o Multi-disciplinary Exams (91.1%)

2. The Monitor's quarterly review of DCF for the period of January through March 2006 indicates that DCF has achieved compliance with a total of 15 Outcome Measures:
   o Commencement of Investigations (96.2%)
   o Completion of Investigations (94.2%)
   o Search for Relatives (89.9%)
   o Repeat Maltreatment (6.3%)
   o Maltreatment of Children in Out-of-Home Care (0.4%)
   o Reunification (66.4%)
   o Adoption (40.8%)
   o Re-entry into Care (6.7%)
   o Multiple Placements (96.2%)
   o Foster Parent Training (100%)
   o Worker-to-Child Visitation in Out-of-Home Cases (86.8%)
   o Worker-to-Child Visitation in In-Home Cases (96.5%)
   o Caseload Standards (100%)
   o Discharge Measures (95%)
   o Multi-Disciplinary Exams (91.1%)

3. DCF has maintained compliance for at least two (2) consecutive quarters[1] with 11 of the Outcome Measures shown above:
   o Commencement of Investigations
   o Completion of Investigations
   o Search for Relatives
   o Maltreatment of Children in Out-of-Home Care
   o Reunification
   o Multiple Placements
   o Foster Parent Training
   o Worker-to-Child Visitation in Out-of-Home Care
   o Worker-to-Child Visitation in In-Home Care
   o Caseload Standards
   o Discharge Measures

---

[1] The Defendants must be in compliance with all of the outcome measures, and in sustained compliance with all of the outcome measures for at least two (2) consecutive quarters (six months), prior to asserting compliance, and shall maintain compliance through any decision to terminate jurisdiction.

_____

4.  The Department continues to be challenged to meet the placement and treatment needs for a number of children it serves.  Despite the opening of new therapeutic group homes and the success of initiatives such as Managed Service Systems (MSS); hundreds of children remain in placements well beyond the time that is therapeutically indicated, and wait lists for essential community services continue to exist in many areas of the state.

5.  The need to recruit and retain foster homes is evidenced by the Department's difficulty in sustaining the Exit Plan measures Placement within Licensed Capacity (Outcome Measure 14) and Sibling Placement (Outcome Measure 10); their difficulty in meeting the emergency placement needs of children, the lack of sufficient homes to employ the principles of matching; and the continued challenge of providing foster care placement options for children returning from residential care or as an alternative to entering residential care.

6.  The Department's achievement of the Exit Plan measure Multi-disciplinary Exams (Outcome Measure 22) for the first time is significant.  Provision of an initial mutli-disciplinary exam for every child who enters care (placement) for the first time has been a fundamental and foundational case practice expectation of the *Juan F*. Consent Decree since the agreement of 1991.  The Department performance on this measure was abysmal at the start of this Exit Plan (5.6%).  The sustained focus of front line staff, coordination and collaboration of DCF and service providers, concentrated efforts of the DCF management team, and the support of the Governor's Office and the legislature have made it possible for the Department to improve from 5.6% to 91.1% in a little over two (2) years.

7.  The Court Monitor attended 40 Administrative Case Review/Treatment Planning Conferences this past quarter, and reviewed the case record narratives and treatment plans associated with the cases.  Formal analysis of the data was not done for this quarter given the imminent agreement of the parties regarding an improved methodology for Treatment Planning (Outcome Measure 3) & Needs Met (Outcome Measure 15).  The Department's need to focus its efforts on these two (2) measures has been well documented by previous reviews.  Informal review of the data collected this quarter indicates improvement in the treatment planning process and the continued challenge the Department faces in meeting the needs of children and families.

_____

8.  Two additional reports are included in this quarterly Exit Plan Report:
    o A Report on Emergency Placement Requests (December 1, 2005 through February 28, 2006). Our findings are included as a section within this report beginning on page seven.
    o The Findings of the *Juan F*. Court Monitor's Office Regarding the Use of Flex Funds Requested (July 1, 2006 – September 30, 2005).  A brief executive summary of this review is provided for reference on page 13.  The full report is attached in Appendix B.

The Department's full, unedited, but verified report to the Court Monitor is incorporated at the end of this Quarterly Report.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

## 1Q January 1 – March 31, 2006 Exit Plan Report
## Outcome Measure Overview

| Measure | Measure | Baseline | 1Q 2004 | 2Q 2004 | 3Q 2004 | 4Q 2004 | 1Q 2005 | 2Q 2005 | 3Q 2005 | 4Q 2005 | 1Q 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: Commencement of Investigation* | >=90% | X | X | X | X | 91.2% | 92.5% | 95.1% | 96.2% | 96.1% | 96.2% |
| 2: Completion of the Investigation | >=85% | 73.7% | 64.2% | 68.8% | 83.5% | 91.7% | 92.3% | 92.3% | 93.1% | 94.2% | 94.2% |
| 3: Treatment Plans** | >=90% | X | X | X | 10% | 17% | X | X | X | X | X |
| 4: Search for Relatives* | >+85% | 58% | 93% | 82% | 44.6% | 49.2% | 65.1% | 89.6% | 89.9% | 7/15/06* | |
| 5: Repeat Maltreatment | <=7% | 9.3% | 9.4% | 8.9% | 9.4% | 8.9% | 8.2% | 8.5% | 9.1% | 7.3% | 6.3% |
| 6: Maltreatment of Children in Out-of-Home Care | <=2% | 1.2% | 0.5% | 0.8% | 0.9% | 0.6% | 0.8% | 0.7% | 0.8% | 0.6% | 0.4% |
| 7: Reunification* | >=60% | 57.8% | X | X | X | X | X | X | 64.2% | 61% | 66.4% |
| 8: Adoption | >=32% | 12.5% | 10.7% | 11.1% | 29.6% | 16.7% | 33% | 25.2% | 34.4% | 30.7% | 40.8% |
| 9: Transfer of Guardianship | >=70% | 60.5% | 62.8% | 52.4% | 64.6% | 63.3% | 64.0% | 72.8% | 64.3%* | 72.4% | 60.7% |
| 10: Sibling Placement* | >=95% | 57% | 65% | 53% | X | X | X | X | 96% | 94% | 75% |
| 11: Re-Entry | <=7% | 6.9% | X | X | X | X | X | X | 7.2% | 7.6% | 6.7% |
| 12: Multiple Placements | >=85% | X | X | 95.8% | 95.2% | 95.5% | 96.2% | 95.7% | 95.8% | 96% | 96.2% |
| 13: Foster Parent Training | 100% | X | X | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 14: Placement Within Licensed Capacity | >=96% | 94.9% | 88.3% | 92.0% | 93.0% | 95.7% | 97% | 95.9% | 94.8% | 96.2% | 95.6%[2] |
| 15: Needs Met | >=80% | X | 53% | 57% | 53% | 56% | X | X | X | X | X |
| 16: Worker-Child Visitation (Out-of-Home)* | >=85% 100% | X | Monthly- 72% Quarterly- 87% | Monthly- 86% Quarterly- 98% | Monthly- 73% Quarterly- 93% | Monthly- 81% Quarterly- 91% | Monthly 77.9% Quarterly 93.3% | Monthly 86.7% Quarterly 95.7% | Monthly 83.3% Quarterly 92.8% | Monthly 85.6% Quarterly 91.9% | Monthly 86.8% Quarterly 93.1% |
| 17: Worker-Child Visitation (In-Home)* | >=85% | X | 39% | 40% | 46% | 33% | X | 81.9% | 78.3% | 85.6% | 96.5% |
| 18: Caseload Standards+ | 100% | 69.2% | 73.1% | 100% | 100% | 100% | 100% | 100% | 99.80% | 100% | 100% |
| 19: Reduction in Residential Care | <=11% | 13.5% | 13.9% | 14.3% | 14.7% | 13.9% | 13.7% | 12.6% | 11.8% | 11.6% | 11.2%[3] |
| 20: Discharge Measures | >=85% | 61% | 74% | 52% | 93% | 83% | X | X | 96% | 92% | 85% |
| 21: Discharge of Mentally Ill or Retarded Children | 100% | X | 43% | 64% | 56% | 60% | X | X | 78% | 70% | 95% |
| 22: Multi-disciplinary Exams (MDE) | >=85% | 5.6% | 19.0% | 24.5% | 48.9% | 44.7% | 55.4% | 52.1% | 54.6% | 72.1% | 91.1% |

[2] The Monitor's review of the data indicates that some foster home bed capacities were incorrectly coded. The percentage listed above reflects the corrections to the capacity numbers.
[3] The Monitor's review noted one residential placement that was ended during the quarter but not updated in LINK until April. The percentage listed above takes into account the correction.

_____

## **Emergency Placement Requests**

**Methodology:**

Every child welfare system struggles to meet the emergency placement needs of the children and families they serve.  Readily available and appropriate foster care resources and emergency placement options are necessary to minimize the impact of trauma to children and promote stabilization and transitional work.  Despite the overall effort of the DCF work force and the dedication and hard work of the foster parent and placement services network there are ongoing difficulties in meeting the immediate placement needs of significant numbers of children.  As a result of anecdotal information received by the Monitor's Office related to an increase in emergency placement requests in the area offices, the Monitor determined that a review of such situations was warranted in an attempt to determine the scope and nature of such requests.  On December 14, 2005 our office sent out a memorandum to the DCF Area Directors requesting that they maintain a log of requests for emergency placements.  The relevant text of that letter is shown below:

> *As a follow up to conversations in the Area Directors meeting earlier in the week, I am requesting that each area office use the attached Excel spreadsheet to capture data related to children that are experiencing emergency placements due to the lack of available placement resources, and who are waiting for extended periods of time in the office as the placement for the night is not yet secured.  This would include any child that has had two or more consecutive emergency placements, or the child that may continue to be placed on a day to day basis with a foster parent(s) unable to meet the child's placement needs.*
>
> *I would like this data to be collected for a period of 3 months (December 1, 2005 through February 28, 2006)....*

A follow up email of clarification was sent to the area offices on January 11, 2006, which indicated:

> *It has come to our attention that there may be confusion related to our request for emergency placement data.  The data should include all children waiting for placement for extended periods of time during a given day(s). This could be either in the office, at school or daycare, or with 1:1 somewhere outside of the office.  We acknowledge that many offices are creative and in the best interest of the child, may take steps to mitigate long wait periods through transporting a child to such places outside of the area office.  The key consideration is that the non-emergency placement resource for that night is unknown/unavailable; the child is bouncing back and forth between emergency placement resources, or is on a night by night placement status with an emergency resource.  We are looking to establish the level of need, so all of these circumstances could fit the criteria.*

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
June 8, 2006
_____

**Universe Data Submitted from Area Offices:**

All offices provided their responses or data files by April, 2006. Several offices provided incomplete Excel spreadsheets. Some offices reported no instances of emergency placement situations meeting the criteria during the three-month period. In spite of anecdotal reporting by area office personnel and external individuals which suggested a much larger population of emergency placement situations, area offices reported a total of 141 individual requests. Most striking is that 52.5% of the requests were recorded from the Hartford Office, and 22.7% were reported from the Meriden Office. Each of the remaining area offices has 5.0% or less of the universe.

After reconciling the data provided and entering missing data fields from a review of LINK records, there were 141 discrete requests for emergency placement reported to the Monitor's Office during the three-month period. 66.7% of the requests for placement were the result of a disruption rather than an initial removal from the home. More than half of the population is aged 14 or older with the most frequently reported age reported as 14 years old. Within the 141 requests, there are 11 sibling groups identified of two to four siblings.

The type of non-emergency placement that resulted after the period of temporary placement(s) was identified for the 141 requests. Most frequently this placement was foster care (58.2%), followed by Shelter/Safe Home Placements (27.7%), DCF Facility (5.0%), none (4.3%), Residential Setting (2.8%), CHAP Apartment (1.4%) and lastly Reunification (0.7%). Relative Searches were documented in LINK (narratives or treatment plan documentation) for 87.2% of the children.

Given the limitations described and our concern with the reliability of the data, including the fact that minimal emergency placement activity was reported by 13 of the 15 offices statewide, this report will focus only on those cases reported from Hartford and Meriden. We feel the data from these offices represent a more accurate description of the situation facing area offices to appropriately match placements to children's known behavioral needs, accommodate sibling groups, and locate a non-temporary resource to avoid multiple placements.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Hartford and Meriden Data:**
The three-month average (December 2005 – February 2006) for children in placement for
Hartford and Meriden LINK reported data for the three-month period is shown in Table 1
below.

**Table 1:  Children in Placement during this period**

| Area Office | Average # of Children In Placement (all types) (Dec 2005 – Feb 2006) |
|---|---|
| **Hartford** | 915 |
| **Meriden** | 242 |

Of the 106 requests that resulted from Hartford and Meriden, the emergency placement requests
were received with the following frequency:

**Table 2:  Crosstabulation: Office * Month of Placement Issue**

| Office | Dec-05 | Jan - 06 | Feb-06 | Total | % of Total Requests |
|---|---|---|---|---|---|
| **Hartford** | 32 | 23 | 19 | 74 | 69.8% |
| **Meriden** | 14 | 7 | 11 | 32 | 30.2% |
| **Total** | 46 | 30 | 30 | 106 | 100.0% |

The 106 requests represent 87 children.  The racial background for these children is:
40.2% Black, 35.6% White, 20.7% Unable to Determine, and 3.5% Bi-Racial. Ethnicity
is identified as Hispanic for 41.4% of the population.

**Table 3:  Crosstabulation Children's Race*Children's Ethnicity**

| Count | Child's Race | | | | Total |
|---|---|---|---|---|---|
| | **Bi-Racial** | **Black** | **UTD** | **White** | |
| **African American** | 0 | 27 | 0 | 0 | 27 |
| **Caucasian** | 0 | 0 | 0 | 18 | 18 |
| **Caucasian/African American** | 3 | 0 | 0 | 0 | 3 |
| **Hispanic** | 0 | 5 | 18 | 13 | 36 |
| **Unknown** | 0 | 1 | 0 | 0 | 1 |
| **UTD** | 0 | 2 | 0 | 0 | 2 |
| **Total** | 3 | 35 | 18 | 31 | 87 |

The ages of the children in this cohort of 87 reveals that 66.7% of the population is adolescent,
with the most frequently reported age on February 28, 2006 being 14 years old. More
information related to age can be found in the table below.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Table 4:  Age of the Children requiring Emergency Placement during the Period of December 1, 2005 – February 28, 2006**

| Age | Frequency | Percent |
|-----|-----------|---------|
| **Birth to 3** | 12 | 13.8% |
| **4 to 6** | 5 | 5.7% |
| **7 to 9** | 2 | 2.3% |
| **10 to 12** | 10 | 11.5% |
| **13 to 15** | 36 | 41.4% |
| **16 to 18** | 22 | 25.3% |
| | 87 | 100.0% |

The population had been in care for as great as 13 years, 10 months to as little as less than one day (removal on the same day of the request for emergency placement).  83% of the requests indicated that a relative search was documented in the case record at the point of or following the most recent placement episode.  44.2% of those with a search completed had documentation that a relative met the criteria for foster care, however, a portion of the requests were the result of a disruption from that relative resource. Of the 106 requests for placement, 67.9% were disruptions from a placement rather than a removal from home.

Children experienced between zero to five temporary placements for each request reviewed. 52.8% of the requests were matched with a non-emergency or temporary placement on the same day of notification.  An additional 32.1% experience one temporary placement prior to placement with a non-emergency placement resource, the remaining 15.1% experienced two or more emergency placements prior to locating a non-emergency setting.

While 73 children had only one request for emergency placement during the period, an additional 14 children experienced multiple situations in which a non-emergency placement was located and subsequently disrupted and the process to find an appropriate placement was repeated. Eleven children had two emergency placement requests during the period, one had three individual requests during the three months, and two had four emergency placement requests during the three-month period.

The review of LINK did provide examples of collaborative efforts to maintain some placements in the period leading up to the request for emergency placement. However, LINK information related to many placement requests often revealed that there were signs of disruption in visits or contacts with case participants in the weeks prior to the request to the Foster and Adoptive Service Unit (FASU) for emergency placement. It did not appear that FASU support was frequently involved prior to the emergency requests.  Timely communication regarding children to be placed from detention settings appeared to be problematic.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

The identified non-emergency or non-temporary placement for the 106 requests was most frequently foster care, where 65% of the placements were facilitated. This was followed by 18.9% of the placements in a shelter or safe home setting, 4.7% of the children went to Riverview, 4.7% did not have a placement identified due to AWOL status, 3.8% were placed in a residential setting, and 0.9% were reunified.

Matching was a challenge given the limited available pool of foster care resources in the two area offices, the lack of prior notification of the impending need to seek placement options, and the documented behavioral health issues that many of these children presented. In 12.2% of the cases, AWOL behaviors led to the initial disruption or contributed to the number of placements experienced.

There were also 11 situations, which involved siblings (three of which had four siblings, three of which had two siblings and 5 which had two siblings). While the majority of placements were made on the same day, or within one day of the request, 11.3% of the requests required transport of the child to and from the DCF office for a period of greater than two days. See table 5 below for details.

**Table 5: Number of Days Child was sitting at DCF Office during the Matching Process for each Request**

| Days | Frequency | Percent | Cumulative Percent |
|------|-----------|---------|--------------------|
| **Zero**[4] | 58 | 54.7% | 54.7% |
| **1** | 36 | 34.0% | 88.7% |
| **2** | 6 | 5.7% | 94.3% |
| **4** | 1 | 0.9% | 95.3% |
| **7** | 2 | 1.9% | 97.2% |
| **13** | 1 | 0.9% | 98.1% |
| **20** | 1 | 0.9% | 99.1% |
| **26** | 1 | 0.9% | 100.0% |
| **Total** | 106 | 100.0% | |

Temporary placement situations impacted the child's school attendance in 24.7% of the situations involving school age children. However, in most cases, DCF transported the child to school daily until the non-emergency placement could be secured.

The timeframe to placement in an identified non-temporary placement occurred most frequently on the same day of the request, however, 5 placements still were not accomplished at the point of this review in late April, and 31 of the children took one week or more with the outlier of the range extending to 67 days.

_____
[4] Child was placed directly from home, prior setting or school.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Table 6:  Number of Days from Notification of FASU to Placement in a Non- Emergency Setting**

| Days | Frequency | Percent | Cumulative Percent |
|------|-----------|---------|--------------------|
| **Same Day** | 40 | 37.7% | 37.7% |
| **1-3** | 24 | 22.6% | 60.4% |
| **4-6** | 6 | 5.7% | 66.0% |
| **7-9** | 10 | 9.4% | 75.5% |
| **10-12** | 7 | 6.6% | 82.1% |
| **13-15** | 2 | 1.9% | 83.9% |
| **16-18** | 2 | 1.9% | 85.8% |
| **19-21** | 2 | 1.9% | 87.7% |
| **22-24** | 2 | 1.9% | 89.6% |
| **25-27** | 1 | 0.9% | 90.5% |
| **28-30** | 1 | 0.9% | 91.5% |
| **Greater than 30** | 4 | 3.8% | 95.3% |
| **No Placement Achieved** | 5 | 4.7% | 100.0% |
| **Total** | 106 | 100.0% | |

**Summary:**

Multiple placement episodes of a temporary nature are devastating to children who in many cases are already coping with considerable trauma.  In addition, these episodes consume an enormous amount of time and effort for area office staff.  While this study's data limitations are noted, it serves to confirm the findings and experiences of the Court Monitor's previous studies and anecdotal information provided to this Office.  There are placement crisis on a regular and recurrent basis that adversely affect the well-being of children in the Department's care.  To date, there does not appear to be a focused, concerted effort to develop the resources that are needed immediately to address this problem, and the Department continues to operate in an inefficient placement crisis driven management model.

_____

**The Findings of the <u>*Juan F.*</u> Court Monitor's Office Regarding the Use of Discretionary and Non-Categorical Funds Requested
July 1, 2005 – September 30, 2005**

<u>**Executive Summary**</u>

**Introduction & Methodology:**

The Monitor's Office and DCF Exit Planning Division jointly sampled recent requests for discretionary and non-categorical fund requests made during the third calendar quarter of 2005. A random sample of 100 cases was selected from the list of 6,534 requests supplied by DCF.

During the first quarter of 2006 DCF's Exit Planning Program Supervisor Debra Collins and *Juan F.* Court Monitoring Specialist Joni Beth Roderick, reviewed 100 case records, and received feedback from 52 social workers[5] to provide insight into the utilization of flex funds. The tool collected information regarding the appropriateness of the requests as they related to the case goal as well as the barriers workers faced in attempts to use contracted services available within the region or alternate sources of payment (other than discretionary/non-categorical).

**Key Findings:**

o  The most frequent requests appear to be for in-home family cases (30.0%).

o  There was clear documentation in 35.0% of the cases reviewed of a discussion with the family or child regarding the possible avenues to meet the need identified (through flex/discretionary or other funding sources).

o  In 67.0% of the cases reviewed, the services or goods provided via the funding met the identified need.  In 20.0% of the cases, the stated need was not met.  The review was unable to determine whether the identified need was met in 13.0% of the cases.

o  Upon review of the LINK documentation and worker feedback where provided, the review found that 61.0% of the requests within the sample set (n=100) were clearly necessary to support goal achievement.

o  Routine and extensive utilization of flex funds for ongoing services such as mental health, mentoring, and in-home services continues to be noted in this review process.  It is not known if the Department is requesting reimbursement via Medicaid management in all applicable situations.  It is our understanding that the ASO (Administrative Service Organization) will be looking into this matter.

_____

[5] The Response rate was much less than that of the prior review, in which only 6 of the 100 social work staff contacted did not respond.  In this review, the response rate was 52%.  This has an impact on the findings, as reviewer contact with the social workers often provided additional information upon which to determine the appropriateness of the request and/or relationship of fund use to case goal.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

o   Mental Health services continue to be the leading singular need identified (36.0%).  This is followed by Preservation of Placement (25.0%) and Reunification and Preventing Placement (both 21.0%).    The Department is proceeding with the establishment of credentialing for the non-contracted provider base statewide.  The Resource Allocation group is developing a rate based system with defined parameters of service and identification of the level or credential of the person who can be paid for such service.  This will be helpful in setting standards and rates so that workers can be better informed of what these providers can offer.

o   In 95% of the sample cases, there was no record of a subsequent substantiation between the period of time of service provision or receipt of goods, and the review of the LINK record during the first quarter 2006.

o   The review found that requests often misidentify the intended recipient of the service or goods requested.

The full report "The Findings of the *Juan F.* Court Monitor's Office Regarding the Use of Discretionary and Non-Categorical Funds Requested July 1, 2005 – September 30, 2005" is attached as Appendix B.

_____

# Appendix A

The Department's Exit Plan Outcome Measures
Summary Report First Quarter 2006
January 1, 2006 – March 31, 2006

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Exit Plan Outcome Measures
Summary Report
First Quarter 2006**

Cover Letter……………………………………………………………………………….

Commissioner Dunbar's Highlights for First Quarter Exit Plan Report…………………..

Outcome Measure Overview Chart………………………………………………………….

Status of Work Matrix………………………………………………………………………...

_____

May 16, 2006

Ray Mancuso
Court Monitor
DCF Court Monitor's Office
300 Church Street
Wallingford, CT 06492

Dear Mr. Mancuso,

Attached please find the Exit Plan Outcome Measures First Quarter 2006 Report. This report continues to demonstrate that by working together with families and communities, we are making important strides in the quality of our services. Enclosed, please find the following materials:

- Commissioner's Highlights of the Fourth Quarter
- Fourth Quarter Exit Outcomes Measures Overview
- Status of Work Matrix

This quarterly report shows the results of 20 of the 22 measures. Results for 3 and 15 are not included in this quarterly report. The Department continues its negotiations with the Court Monitor's Office and the Plaintiffs regarding a proposed revision of the methodology for measuring these two outcomes. The Department has long felt that the old methodology did not yield information that accurately reflected our work, nor encouraged best practice. The Department believes a more qualitative methodology would best reflect practice and the outcomes impacting families and children. As we move forward, we feel confident of the direction of our discussions and appreciate the spirit with which they are taking place. We also have a sense of urgency for completing this process as soon as possible so that our performance in these two outcome measures can be more accurately viewed.

This quarter's results show the Department is steadily building upon earlier successes and represent the highest level of achievement under the Exit Plan to date. For the quarter, staff achieved goals for 15 outcome measures of the 20 reported. We sustained many measures that met goals in the past and achieved three new measures for the first time – repeat maltreatment, re-entry into care, and multi-disciplinary exams. Having worked in this Department for more than two decades, I can say with confidence that staff are doing the best work that has ever been done.
I want to thank our staff for pushing Department performance to the best it has ever been. I am confident that progress will be continued as we remain focused on improving services for children and families.

Sincerely,


Darlene Dunbar, MSW
Commissioner

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

### First Quarter 2006 Exit Plan Report
### Commissioner Highlights

During the first three months of 2006, Department staff reached their highest level of achievement over the nine quarters of the Exit Plan. Of 20 measures captured, staff attained goals in 15 – two more than achieved at any previous point. Three outcomes were achieved for the first time. Four outcomes have been achieved consistently over a two year span and six outcomes have been achieved consistently for 18 months or more. For two of the five outcomes that the Department did not meet, we came within less than a single percent in two, specifically placement within licensed capacity and reducing reliance on residential placements. In a third, the Department has doubled the percentage of children with mental illness or mental retardation being appropriately referred for continuing services beyond the point of discharge from DCF care.

We recognize that gains can be fragile and that some outcomes will fluctuate (especially permanency measures because the Department is determined to achieve permanency for all children regardless of how long they have already been in care). However, the Department is very encouraged with the striking and consistent improvements brought by our staff's commitment to advancing the quality of services for the children and families they serve.

The three measures staff achieved for the first time are reductions in repeat maltreatment and re-entry into care as well as increasing multi-disciplinary exams for children who enter care. Meeting goals for repeat maltreatment and re-entry into care signal that our staff interventions are making a difference. Attaining the outcome for ensuring that children receive a prompt multi-disciplinary exam shows that the infusion of resources has a direct impact. Expanding the number of clinic access points from 5 to 14 has resulted in a 72 percent increase since the first quarter of 2004.

### <u>ACCOMPLISHMENTS</u>

This quarterly report shows we met the following outcomes:

- <u>Commencement Of Investigations</u>: The goal of 90 percent was exceeded for the sixth quarter in a row with a current achievement of 96.2 percent, tying the highest ever since measurement began for the Exit Plan in the Fourth Quarter of 2004.
- <u>Completion Of Investigations:</u> Workers completed investigations in a timely manner in 94.2 percent of cases, also exceeding the goal of 85 percent for the fifth consecutive quarter and also tying the highest level ever under the Exit Plan.
- <u>Search For Relatives</u>: For the second time, staff achieved the 85 percent goal for relative searches and met this requirement for 89.9 percent of children.
- <u>Repeat Maltreatment</u>: For the first time under the Exit Plan, the goal of 7 percent was is achieved with 6.3 percent of children experiencing repeat maltreatment.
- <u>Maltreatment Of Children In Out-of-Home Care:</u> The Department sustained achievement of the goal of 2 percent or less for the ninth consecutive quarter with an actual measure of 0.4 percent, the lowest ever under the Exit Plan.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

- <u>Timely Reunification</u>: For the third consecutive quarter, this measure exceeded the 60 percent goal with a mark of 66.4 percent, the highest recorded under the Exit Plan.
- <u>Timely Adoption</u>: For the second time in the last three quarters and the third time overall, staff exceeded the 32 percent goal for the timely completion of adoptions within 24 months by meeting the timeline for 40.8 percent of the children, the highest recorded under the Exit Plan.
- <u>Re-entry Into Care</u>: For the first time, the Department met the 7 percent goal for re-entry into care by recording a measure of 6.7 percent.
- <u>Multiple Placements</u>: For the eighth consecutive quarter, the Department exceeded the 85 percent goal with a rate of 96.2 percent.
- <u>Foster Parent Training</u>: For the eighth consecutive quarter, the Department met the 100 percent goal.
- <u>Worker-To-Child Visitation In Out Of Home Cases</u>: For the second consecutive quarter and three of the last four, the Department met the 85 percent goal for maintaining regular visits by meeting requirements in 86.8 percent of out of home cases, the highest to date.
- <u>Worker To Child Visitation In In-Home Cases</u>: For the second consecutive quarter, workers met required visitation frequency in 96.5 percent of cases, thereby exceeding the 85 percent standard and reaching the highest level to date. The percent of in-home cases where visitation standards were met has more than doubled since the Exit Plan began at the start of 2004.
- <u>Caseload Standards</u>: For the eighth consecutive quarter, no Department social worker carried more cases than the standard under the Exit Plan.
- <u>Discharge Measures</u>: For the third consecutive quarter and the fourth time overall under the Exit Plan, staff met the 85 percent goal for ensuring children discharged at age 18 from state care had attained either educational and/or employment goals.
- <u>Multi-disciplinary Exams</u>: For the first time, Department staff met the 85 percent goal by ensuring that 91.1 percent of children entering care received a timely multi-disciplinary exam.

Despite having reached our highest level of performance to date, we remain focused on improving the quality of our work – even in areas where we are exceeding Exit Plan standards. The percentage of children adopted in a timely manner reached its highest level in the quarter at 40 percent or more than 5 percent higher than any previous quarter, and a total of 134 children were adopted during the quarter. Nevertheless, we are working with the Technical Assistance Committee and the plaintiff's attorneys to do a better job of attaining timely permanence for each child in our care. In addition to reviewing the work of other states and identifying options to better support families who do adopt, the Department is ensuring that the permanency goal of every child is appropriate and that we take action to remove barriers to permanency. Where barriers do not exist, the Department will determine why permanency has not been achieved and will set a timeline for achieving it.  Finally, for children in care for 15 months or longer and whose parental rights have not been terminated, we will find out why and take appropriate action. If we look at the data, we see clear gains in the area of attaining permanency overall. However, we will not be satisfied until we have done everything possible for each and every child in our care.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

In addition to areas where we are meeting the goals, other measures are now close and/or show tremendous improvements since the Exit Plan began in early 2004. Reducing reliance on residential placements is within 0.3 percent of attaining the 11 percent goal. That represents less than 20 children. Progress is carrying forward into the second quarter of 2006. As of May 10, exactly 11 percent of children in care are in a residential placement reflecting continued efforts of the managed service system and the effects of the Administrative Services Organization that began January 2006. This means 224 additional children are in a more appropriate and less restrictive level of care compared to April 11, 2004 and that 25 percent fewer children are in a residential placement than at that time just 25 months ago.

Improvements in the discharge of children with mental illness and mental retardation also reflect systematic efforts. While not yet meeting a 100 percent goal, the percentage of children with a proper referral to the departments of Mental Health and Addiction Services or Mental Retardation has more than doubled since early 2004. A centralized system designed to support area office staff in making these referrals has largely contributed to bringing us to 95 percent up from 43 percent in the first quarter of 2004.

Overall, this report demonstrates our staff has internalized and embraced what were created as outcome measures and transformed them into organizational values. Changes designed to improve services have become routine in the work of our staff and institutionalized in our practice. The continued progress that has brought us to the highest level of achievement to date is a reflection of our staff's determination as well as the State's commitment on the part of its leadership and the corresponding dedication of its resources.

## <u>CHALLENGES</u>

While Department staff have taken great advantage of opportunities to make important improvements, we also recognize that great challenges remain. Continuing to consolidate gains is essential and particularly difficult because some measures are particularly prone to fluctuations given the staff's commitment to each and every child we serve. Staff continue to make great efforts to find permanency for children who may be in our care longer than the timeframes reflected in the outcome measures. While finding permanency for these children can actually make achievement of outcome goals more difficult, permanency for all our children remains a top priority. Meeting the needs of children will continue to be put ahead of meeting measures.

In addition, two outcome measures stand out as presenting special challenges – treatment planning and meeting children's needs. Because of their great complexity, both these measures require case reviews and so are not captured in this quarterly report. In a recent communication, the Court Monitor's Office indicated that it is in the final stages of methodological development to implement a new review process for these two measures that will be relied upon for the 2006 Second Quarter report. These changes are important to the Department as the original methods of measurement were rigid, overly prescriptive and lacked clear definitions to guide practice improvements. We are hopeful that these new methodologies will more appropriately capture the quality of staff work in these areas.

At the same time, we know these measures require special attention and effort on our part, and they are receiving both. Staff is continuing to benefit from the use of a new treatment plan template that was introduced last fall and ongoing training in family conferencing across all area offices is enhancing staff capacity to ensure a strengths-based approach that involves families throughout the life of the case.

A variety of new and expanded services supported by the Governor and Legislature will increase our capacity to meet the needs of children and families this fiscal year and next. In addition to the continued development of therapeutic group homes to ensure care and treatment for children in the most appropriate setting, the Department is expanding domestic violence and substance abuse services. A completely new intensive reunification program will promote quick return of children who are removed where the family can be restored to an appropriate level of functioning through intensive services and the traditional shelters, which have struggled to meet the changing needs of children, will be replaced by a system of Short Term Assessment Resource centers around the state that will offer treatment and support planning for a more effective course of care.

Longer term, staff will receive training and begin to implement a Structured Decision Making (SDM) model for child protection work that will create greater consistency in making key case decisions and support a more effective use of Department resources, both in terms of staff and services. This model uses research-based risk assessment tools to aid workers and supervisors in making critical child safety decisions while increasing consistency and addressing the issues of disproportionality often faced by child protection systems. Development of the model has begun through work across the Department that includes front-line social workers and supervisors. Planning to launch the training is underway and staff will begin to train and implement SDM early next year.

All these developments – family conferencing, SDM, an array of new and expanded services -- give the Department an extraordinary opportunity to continue to progress toward excellence in our work with children and families. Together with the methodological changes in measuring outcomes for treatment planning and meeting children's needs, we believe that rapid improvements will result even in these two most challenging areas.

While we are poised to continue our progress, I do not want to look past the accomplishments staff have made to date. There is no question that the intense efforts and unwavering commitment of staff has brought the Department to the highest level of performance in its history. Through our work as partners with children, families and communities, I am confident that we will continue what has already proven to be extraordinary improvements in the quality of our services.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
June 8, 2006

_____

<u>Appendix B</u>

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
June 8, 2006

_____

The Findings of the *Juan F*. Court Monitor's
Office Regarding Use of Discretionary and
Flex Funds Expended July 1, 2005 through
September 30, 2006

Civil Action No. H-89-859 (AHN)

Submitted by:
DCF Court Monitor's Office
300 Church Street ~ 4th Floor
Wallingford, CT 06492
Tel:  203-741-0458
Fax:  203-741-0462
E-Mail:  Raymond.Mancuso@po.state.ct.us

# Table of Contents

**Page**

**Section**

| | |
|---|---|
| Table of Contents | 2 |
| Introduction and Methodology | 3 |
| Demographics | 3 |
| Requests for Payment in Relation to Case Goal | 5 |
| Documentation of Service Need within LINK | 8 |
| Amount and Frequency of Requests | 10 |
| Service Needs Identified on Requests for Funds | 12 |
| Timeframe to Payment | 13 |
| Workers' Perspective of Obstacles to Provision of Services | 14 |
| Key Findings | 15 |
| Appendix B – Review Tool and Directions | 16 |

**Tables**

| | |
|---|---|
| Table 1:  Amounts Request by Area Office and Month of Request | 3 |
| Table 2:  Universe and Sample by Area Office Designation | 4 |
| Table 3:  Caseload Distribution on September 30, 2005 | 4 |
| Table 4:  Case Type at Point of Request for Funds | 5 |
| Table 5:  In the opinion of the reviewer, did the use of flex funds constitute good case practice…. | 7 |
| Table 6:  Was the family/child included in the decision to request funds? | 9 |
| Table 7:  Most Recent Substantiations as Designated within our Sample | 9 |
| Table 8:  Needs in Relation to Outcome Measure Goals | 10 |
| Table 9:  Providers with Greater than 50 Funding Requests…. | 11 |
| Table 10:  How many times were funds requested for each sample cases during the period? | 12 |
| Table 11:  Per the reviewer what category of services or payment was requested …. | 13 |
| Table 12:  Once the determination was made to seek flex funds in this sample case, how long did the process of securing funds take? | 14 |
| Table 13:  Social Workers' Identified Obstacles and Barriers to Service Provision …. | 14 |

**Crosstabulations**

| | |
|---|---|
| Crosstabulation 1:  Current Permanency Goal*Case Type at Point of Request for Flex Funds | 6 |
| Crosstabluation 2:  Case type at point of request for flex funds*In reviewing the record since the receipt of services or goods provided is there and indication that the funding met the identified needs? | 8 |

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

**The Findings of the <u>*Juan F.*</u> Court Monitor's Office Regarding the Use of Discretionary and Non-Categorical Funds**
**Requested July 1, 2005 – September 30, 2005**

## Introduction & Methodology:

The Monitor's Office and DCF Exit Planning Division jointly sampled recent requests for discretionary and non-categorical fund requests made during the third calendar quarter of 2005. A random sample of 100 cases was selected from the list of 6,534 requests supplied by DCF.

During the first quarter of 2006 DCF's Exit Planning Program Supervisor Debra Collins and *Juan F.* Court Monitoring Specialist Joni Beth Roderick, reviewed 100 case records, and received feedback from 52 social workers[6] to provide insight into the utilization of flex funds. The tool collected information regarding the appropriateness of requests as they related to the case goal as well as the barriers workers faced in attempts to use contracted services available within the region or alternate sources of payment (other than discretionary/non-categorical).

## Demographics:

The sample was selected based upon the frequency of area office requests within the universe provided.   In all, the universe included 6,534 requests for a total of $ 2,978,988.

**Table 1:  Amounts Requested by Area Office and Month of Request**

| Area Office | July 2005 | August 2005 | September 2005 | Grand Total |
|---|---|---|---|---|
| | | Month Requested | | |
| Hartford | $376,521.81 | $296,067.29 | $490,536.94 | $1,163,126.04 |
| Manchester | $121,903.90 | $92,373.16 | $129,905.09 | $344,182.15 |
| Waterbury | $17,615.12 | $97,412.21 | $135,143.96 | $250,171.29 |
| New Britain | $45,768.60 | $77,739.00 | $44,935.64 | $168,443.24 |
| Bridgeport | $65,348.85 | $41,443.27 | $58,600.08 | $165,392.20 |
| Meriden | $44,452.12 | $53,408.92 | $55,067.57 | $152,928.61 |
| New Haven Metro | $41,480.31 | $46,506.29 | $31,161.11 | $119,147.71 |
| Torrington | $21,195.68 | $44,718.86 | $46,910.83 | $112,825.37 |
| Norwich | $37,669.26 | $32,828.37 | $35,596.13 | $106,093.76 |
| Willimantic | $30,401.13 | $29,378.68 | $37,590.63 | $97,370.44 |
| Middletown | $26,121.54 | $21,484.32 | $34,379.76 | $81,985.62 |
| Danbury | $13,588.16 | $34,025.27 | $13,481.84 | $61,095.27 |
| Greater New Haven | $14,072.56 | $23,586.66 | $18,443.77 | $56,102.99 |
| Central Office | $9,138.25 | $3,825.15 | $32,057.53 | $45,020.93 |
| Stamford | $7,021.93 | $10,706.05 | $14,326.26 | $32,054.24 |
| Norwalk | $4,565.32 | $5,499.79 | $7,618.60 | $17,683.71 |
| CJTS | $1,300.50 | $4,064.36 | | $5,364.86 |
| Grand Total | $878,165.04 | $915,067.65 | $1,185,755.74 | $2,978,988.43 |

_____
[6] The Response rate was much less than that of the prior review, in which only 6 of the 100 social work staff contacted did not respond.  In this review, the response rate was 52%.  This has an impact on the findings, as reviewer contact with the social workers often provided additional information upon which to determine the appropriateness of the request and/or relationship of fund use to case goal.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

Tables 2 and 3 below provide the opportunity to compare/contrast the area office representation within the universe of requests and the caseload of the various offices during the period.

**Table 2:  Universe and Sample by Area Office Designation (N = 6,534, n=100)**

|  | # of Requests | Percentage of Universe | Sample |
|---|---|---|---|
| **Bridgeport** | 475 | 7.3% | 6 |
| **CJTS** | 36 | 0.6% | 0 |
| **Danbury** | 128 | 2.0% | 2 |
| **Gen'l Administration/CO** | 36 | 0.6% | 1 |
| **Greater New Haven** | 176 | 2.7% | 2 |
| **Hartford** | 1672 | 25.6% | 28 |
| **Manchester** | 960 | 14.7% | 16 |
| **Meriden** | 485 | 7.4% | 8 |
| **Middletown** | 209 | 3.2% | 3 |
| **New Britain** | 350 | 5.4% | 5 |
| **New Haven Metro** | 429 | 6.6% | 6 |
| **Norwalk** | 33 | 0.5% | 1 |
| **Norwich** | 342 | 5.2% | 5 |
| **Stamford** | 85 | 1.3% | 1 |
| **Torrington** | 208 | 3.2% | 3 |
| **Waterbury** | 569 | 8.7% | 8 |
| **Willimantic** | 341 | 5.2% | 5 |
| **Grand Total** | 6534 | 100.0% | 100 |

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Table 3:  Caseload Distribution on September 30, 2005 (N = 17,143)**

| Area Office | Caseload | % of Caseload |
|---|---|---|
| Bridgeport | 1,641 | 9.6% |
| Danbury | 471 | 2.8% |
| Greater New Haven | 1,262 | 7.4% |
| Hartford | 2,273 | 13.3% |
| Hotline | 1 | 0.0% |
| Manchester | 1,637 | 9.6% |
| Meriden | 671 | 3.9% |
| Middletown | 636 | 3.7% |
| New Britain | 1,838 | 10.7% |
| New Haven Metro | 1,703 | 9.9% |
| Norwalk | 286 | 1.7% |
| Norwich | 1,439 | 8.4% |
| Stamford | 390 | 2.3% |
| Torrington | 498 | 2.9% |
| Waterbury | 1,361 | 7.9% |
| Willimantic | 1,036 | 6.0% |
| Grand Total | 17,143 | |

The sample selected reflected a range of case types.   These included:

**Table 4:  Case Type at Point of Request for Funds (n=100)**

| | Frequency | Percent |
|---|---|---|
| CPS In-Home | 31 | 31.0% |
| Child In Placement | 53 | 53.0% |
| Voluntary Service In-Home | 10 | 10.0% |
| Voluntary Service Child In Placement | 1 | 1.0% |
| FWSN | 1 | 1.0% |
| Probate | 1 | 1.0% |
| Open in Investigation Only | 3 | 3.0% |
| Total | 100 | 100.0% |

Demographic data collected for the sample indicate that the most frequently identified participant for whom the need was identified is the child in placement.  A review of the LINK documentation often disputes that the primary recipient is in fact the child, as in many circumstances the service was actually provided to the parent or legal guardian, or the family unit.

Race, ethnicity, and language information was also collected on the identified case participant. In 48% of the cases, the identified participant was indicated as white, 31.0% were identified as Black/African American, 14.0% indicate "Unable to be Determined" in the racial identification for case participant, 4.0% were indicated as Multi-Racial in that two or more racial identifiers were selected and Asian, Unknown, and Blank were all indicated as

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

1.0% of the sample population. Ethnicity was identified as: 65.0% Non-Hispanic, 30.0% Hispanic, 3.0% Unknown, and 2.0% Blank. English was the primary language for 80.0% of the sample population, 7.0% had Spanish indicated as their primary language, 5.0% were indicated as bi-lingual, 5.0% of the case participant language information was blank, 2.0% were identified as non-verbal, and 1.0% was identified as unknown.

**Request for Payment in Relation to Case Goal:**
A crosstabulation of the case type by the permanency goal that was in effect on January 1, 2006 is provided below. In 20% of the cases, the case had closed by January 2006. In an additional 5% of the cases, the goal had changed from the goal in effect on the date of the funding request.

**Crosstabulation 1:  Current Permanency Goal * Case type at point of request for flex funds**

| Count | Case type at point of request for flex funds | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Current Permanency Goal | CPS In-Home | CIP | Voluntary Service In-Home | Voluntary Service CIP | FWSN | Probate | Open in Investigation Only | |
| Reunification | 2 | 12 | 0 | 1 | 0 | 1 | 0 | 16 |
| Adoption | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 11 |
| Transfer of Guardianship | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| APPLA: Long Term Foster Care | 1 | 8 | 0 | 0 | 0 | 0 | 0 | 9 |
| APPLA: Independent Living | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| In-Home - Safety/Well-Being | 18 | 6 | 5 | 0 | 0 | 0 | 1 | 30 |
| Other | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| UTD | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| TBD - Open in Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Case closed at January 1, 2006 | 10 | 5 | 3 | 0 | 1 | 0 | 1 | 20 |
| Total | 31 | 53 | 10 | 1 | 1 | 1 | 3 | 100 |

In 61.0% of the cases reviewed, the reviewer found that the request for funds was clearly necessary to support the goal achievement. In 69.0% of the cases, the reviewer was of the opinion that the expenditure was in line with social work good practice – defined for this purpose as the expenditure "addressing a core issue for the reason the family was involved with the DCF". A few examples of meaningful use of flex funds were narrated by the reviewers as:

- *In-Home Services/Mentor/Group Counseling:* A teenager was able to be maintained at the home of his Grandmother in Virginia for a year with the assistance of flex

funds to support the placement through counseling, mentor and group counseling with an out of state provider.

- *Summer Camp:*  Child's relationship with foster parents was declining as the school year was coming to a close.  Pre-adoptive placements were being teamed for most appropriate match.  Summer camp tuition was sought to give child some structured recreational time to reduce strain and maintain the placement until pre-adoptive home was selected.  Placement was successfully maintained until planned move to the new home was completed.

- *Substance Abuse Relapse Prevention and Parent Education:*  Mother has gotten over many hurdles to reunify with her two children and maintain a suitable home environment.  Though some risk factors remain, mother is motivated, working well with her providers and DCF.  She has greatly benefited from DCF and Urban League intervention.

- *Individual Therapy with LCSW*:  Funds provided an extension of therapy sessions for child to maintain her stability in light of criminal court case against her father and to address her upcoming adoption.


This is not to say that the "no" responses reflect a use of funds contrary to social work values, but only that it did not appear to be related to the core issues for DCF involvement.  Circumstances for this determination were narrated by the reviewer on the tool document.  Examples of such circumstances that were identified as "no" responses are provided below:

- *In-Home Services:*  Payment was provided to an agency for an autistic child who requires in-home services.  Provider was not able to staff appropriately to meet the needs of the child/family and there has been a decline in behaviors and increase in aggression as they attempt to staff appropriately.  Alternate services are being sought.

- *Utility Bill:*  Mother appears incapable of managing finances and managing her children's special needs.  DCF paid over $5,000 to assist with rent, utilities, etc and had been doing this for a period of time without legal filings.  Current worker on case concurs that situation was ongoing for an inordinate length of time and had begun legal filings shortly after case assignment.

- *Utility Bill:*  Case was opened for domestic violence between mother and boyfriend.  Boyfriend was arrested.  DCF paid all the bills to assist mother with financial strain, but did not provide any service around the domestic violence.  Case was closed after bills were paid.

- *Mattress Covers:*  While mattress covers improved the sanitary conditions of the home, the purchase does little to address father's ongoing substance abuse issues or the overall behavioral issues of the children.  Over $3,267 was used in flex funding between April 2005 and October 2005.  Multiple services have been provided to this family with a 10 year history with DCF.  Eight children are in the home with various behavioral issues surfacing.  Mother is primary caretaker and cannot work due to father's substance abuse issues.  There is a reference to protective supervision (in narrative, but there is nothing in LINK legal to corroborate this.)  Children have been in placement 3 times over the years' involvement.  Situation is not stable at the time of this review.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Table 5:  In the opinion of the reviewer, did the use of flex funds constitute good case practice? (Did the expenditure meet the needs of the family in a meaningful manner-addressing core issues bringing the family to the attention of DCF?)**

|  | Frequency | Percent |
|---|---|---|
| **Yes** | 69 | 69.0% |
| **No** | 17 | 17.0% |
| **Unable to Determine** | 14 | 14.0% |
| **Total** | 100 | 100.0 |

Due to the lower social worker response rate in this review, it was more difficult to assess whether the specific identified need was met.  The data indicates that in 67.0% of the cases reviewed, there was clear documentation and/or worker confirmation that the need was met through the provision of service or funds.  In another 13.0% of the cases, the LINK documentation is inconclusive, and the social worker elected not to participate – leaving us unable to determine with any certainty if the request was addressing a core issue.

**Crosstabulation 2:   Case type at point of request for flex funds * In reviewing the record since the receipt of services or goods provided, is there an indication that the funding met the identified need?**

| Count | | In reviewing the record since the receipt of services or goods provided, is there an indication that the funding met the identified need? | | | Total |
|---|---|---|---|---|---|
| | | **Yes** | **No** | **UTD** | |
| **Case type at point of request for flex funds** | **CPS In-Home** | 19 | 9 | 3 | 31 |
| | **CIP** | 36 | 8 | 9 | 53 |
| | **Voluntary Service In-Home** | 7 | 2 | 1 | 10 |
| | **Voluntary Service CIP** | 1 | 0 | 0 | 1 |
| | **FWSN** | 1 | 0 | 0 | 1 |
| | **Probate** | 1 | 0 | 0 | 1 |
| | **Open in Investigation Only** | 2 | 1 | 0 | 3 |
| **Total** | | 67 | 20 | 13 | 100 |

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Documentation of Service Need within LINK:**

In 11.0% of the cases reviewed, the LINK documentation did not provide insight into when the need was initially identified. In 53% of the cases reviewed, the need as identified on the request form was documented in the LINK record prior to June 30, 2005. For 22% of the cases, the need was identified prior to the end of the first quarter 2005.

Given DCF's efforts to be more inclusive of families throughout the treatment planning process, our review looked at the role of the family in the decision to request funds to meet the identified need. The review found that 35.0% of the cases had clear documentation or worker confirmation of a discussion with the child or family regarding means by which they could address the identified needs. In an additional 26.0% of the cases, there was an ambiguous reference that could not be clarified due to the social worker opting not to participate in the review. In 39.0% of the cases, there was no documentation of a discussion with family regarding the determination to seek flex funds, other than the request itself.

**Table 6: Was the family/child included in the decision to request funds? (n=100)**

|  | Frequency | Percent |
|---|---|---|
| **Yes** | 35 | 35.0 |
| **No** | 39 | 39.0 |
| **UTD** | 26 | 26.0 |
| **Total** | 100 | 100.0 |

The review examined the history of the case in relation to substantiations. Of the cases reviewed, 25% had one substantiation. 54% had more that one substantiation recorded in the life of the case. 21% had no history of substantiations at the point of request. In looking at the recent history of the cases in the period leading up to the request, 49% of the cases had not had a substantiation of abuse or neglect after January 1, 2005. The most current types of substantiations were captured for those cases in which CPS issues had been identified. These substantiations included the following:

**Table 7: Most Recent Substantiations as Designated within our Sample (n=100)**

| Category of Substantiation | Frequency of Cases |
|---|---|
| Physical Neglect | 66 |
| Emotional Neglect | 21 |
| Physical Abuse | 12 |
| Educational Neglect | 4 |
| Medical Neglect | 4 |
| Sexual Abuse | 4 |
| Emotional Abuse | 3 |
| Moral Neglect | 1 |

In reviewing all 100 cases, there are 5 cases (5.0%) in which a subsequent substantiation was recorded after the receipt of the funding/service requested.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

The review found that the identified need could meet one or more categories impacting the Exit Plan Outcome Measures. (Please note that one service could serve multiple purposes).

**Table 8:  Needs in Relation to Outcome Measure Goals (n=100)**

| Outcome Measure (OM) | Need | Frequency of Cases Identified |
|---|---|---|
| OM 15 | Other Need[7] Directly Related to Goal | 47 |
| OM 15 | Mental Health Service | 36 |
| OM15 | Preservation of Placement | 25 |
| OM 11 | Preventing Placement | 21 |
| OM7 | Reunification | 21 |
| OM 15 | Placement w/Relative or Special Study | 7 |
| OM 15 | Maintaining Family Ties | 6 |
| OM8 | Adoption | 4 |
| OM9 | Transfer of Guardianship | 3 |
| OM15 | Medical | 1 |
| OM15 | Dental | 1 |
| | UTD Need | 5 |

**Amount and Frequency of Requests:**
Within the full universe of 6,534 requests, the amount of funds requested ranged from $0 (accounting correction) to $22,582.  The average request made was for $565.20.  Similar to our findings within our 100 case sample, our brief review of the universe data indicates that there were multiple providers with frequent requests for services within the three month period.  Most notably among these providers are services such as Delta-T, My People's Clinical Services, Exchange Club, YMCA – Northern Middlesex County, Y-US, Inc, Abundant Family Center and Voices.  Routine and extensive utilization of services from a small number of providers should be reviewed.   Consideration should be given for proposing budget options for these services based upon the frequent utilization. Table 9 below provides a full list of those providers with more than 50 requests during the period.

_____

[7] These include such services as: mentoring, transportation, tutoring, utility bills, rental assistance, security deposits, furniture, assessments, parent education, social recreational programs, lodging, interpreter services, visitation, and doula care.  Additionally, as some requests listed multiple needs, it included a few counseling/therapeutic and in-home services that had multiple components.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

**Table 9:  Providers with Greater than 50 Funding Requests from the Universe of Requests Made During the Period of July 1, 2005 through September 30, 2005 (N=6,534)**

|  | Frequency of Requests | Percent of Full Universe of Requests |
|---|---|---|
| DELTA-T GROUP HARTFORD, INC. | 956 | 14.6 |
| MY PEOPLE'S CLINICAL SERVICES, | 813 | 12.4 |
| Exchange Club Center for the Prevention… | 270 | 4.1 |
| YMCA NORTHERN MIDDLESEX COUNTY | 244 | 3.7 |
| Y-US, INC. | 178 | 2.7 |
| BOB'S DISCOUNT FURNITURE | 130 | 2.0 |
| ABUNDANT FAMILY CENTER | 119 | 1.8 |
| STOP & SHOP | 114 | 1.7 |
| VOICES | 109 | 1.7 |
| COMMUNITY CHILD GUIDANCE | 79 | 1.2 |
| CONN. LIGHT & POWER | 75 | 1.1 |
| BURCHELL, LCSW, JOY M. | 73 | 1.1 |
| AMPS INC. | 69 | 1.1 |
| Wellspring Foundation Inc | 68 | 1.0 |
| BEHAVIORAL MANAGEMENT, LLC | 67 | 1.0 |
| GIBSON, ANDREW | 65 | 1.0 |
| BURLINGTON COAT FACTORY | 64 | 1.0 |
| KMART (WATERBURY) #3152 | 63 | 1.0 |
| VILLAGE FOR FAMILIES DT | 53 | .8 |
| PRIMECARE, FAMILY SUPPORT PROGRAM | 51 | .8 |

Focusing only on our sample of 100 cases, our review found that the number of requests ranged from one to 20.  68% of the cases reviewed had three or more requests during the three month period.  The average number of requests for flex funds during the period for each case was 5.49 requests.  In many of the sample cases with multiple requests over an extended period of time, reviewers found there to be similar requests for multiple children active in the case, and more frequently, a series of payments over time for a specific service unable to be secured via the existing contracted resources within the region.  This was an issue highlighted in our prior review.  The utilization of multiple and ongoing requests to provide one service for a lengthy period of time is an issue that requires further research by DCF.

The dollar amount of the checks issued in payment for the sampled requests ranged from $60.00 to $11,845.  The mathematical average of payment is $675.00.  However, the distribution of the payments was skewed in that 50% of the requests were for $300.00 or less.  Fifteen payments were for greater than $1,000.00.  As our review included both flex/discretionary funds as well as non-exceptional funds, we expected to see clear delineation in how these designations were assigned.  In fact, mentoring and therapy were found in both funding categories with no apparent determining factor assigned.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Table 10:  How many times were funds requested for each sample cases during the period?**

| # Of Requests | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 1 | 20 | 20.0 | 20.0 |
| 2 | 12 | 12.0 | 32.0 |
| 3 | 15 | 15.0 | 47.0 |
| 4 | 8 | 8.0 | 55.0 |
| 5 | 11 | 11.0 | 66.0 |
| 6 | 9 | 9.0 | 75.0 |
| 7 | 2 | 2.0 | 77.0 |
| 8 | 5 | 5.0 | 82.0 |
| 10 | 1 | 1.0 | 83.0 |
| 11 | 3 | 3.0 | 86.0 |
| 12 | 4 | 4.0 | 90.0 |
| 13 | 1 | 1.0 | 91.0 |
| 14 | 1 | 1.0 | 92.0 |
| 16 | 1 | 1.0 | 93.0 |
| 18 | 3 | 3.0 | 96.0 |
| 19 | 3 | 3.0 | 99 |
| 20 | 1 | 1.0 | 100.0 |

Our review also looked at the fiscal year ending June 30, 2005 to determine if any additional requests preceded the quarter.  The review found that in 69% of the cases, there was at least one additional request in the prior 12 month period.  The number of requests per case for that preceding 12 months ranged from one to 42 requests.

**Service Needs Identified on Requests for Funds:**
The needs identified by the social workers were categorized into 16 categories, allowing for an "other" response for those that could not be incorporated into the generalized categories developed for the tool.  In some cases, the request for flex covered one provider but identified more than one service category, hence the numbers do not total 100 service types.  See Table 11, below for full details.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

**Table 11:  Per the reviewer, what category of services or payment was requested to meet the needs identified within the sample case?**

|  | Frequency | Percentage of Services Requested |
|---|---|---|
| Counseling/Therapy | 29 | 25.9% |
| Mentor | 18 | 16.1% |
| Other[8] | 8 | 7.1% |
| Heating/Electricity Bill | 7 | 6.3% |
| In-Home Services | 7 | 6.3% |
| Supervised Visitation | 6 | 5.4% |
| Camp/Recreational Program | 5 | 4.5% |
| Transportation | 5 | 4.5% |
| Furniture | 4 | 3.6% |
| Clothing | 3 | 2.7% |
| Parent Education | 3 | 2.7% |
| Education/Tutoring | 2 | 1.8% |
| Food | 2 | 1.8% |
| Motel Room | 2 | 1.8% |
| Phone Bill/Utility | 2 | 1.8% |
| Rent to Avoid Eviction | 2 | 1.8% |
| Respite | 2 | 1.8% |
| UTD | 2 | 1.8% |
| Dental Need | 1 | 0.9% |
| Medical Need | 1 | 0.9% |
| Security Deposit | 1 | 0.9% |
| Total | 112 |  |

**Timeframe to Payment:**

The timeframe from the Social Worker's request for funds, to provision of funds was most frequently 10-12 days (34%).  In many of these cases, payment was made after the service was rendered, and did not impact service onset.

_____

[8] These included a one time occurrence of each of the following:  Attendance at ACR, Case Management, Doula, Mattress Covers, Substance Abuse Relapse/Education, Participation at Life Skills Conference, 1:1 Service, and Interpreter Services

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

**Table 12:  Once the determination was made to seek flex funds in this sample case, how long did the process of securing funds take? (n=100)**

|  | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| **1-3 Days** | 2 | 2.0% | 2.0% |
| **4-6 Days** | 2 | 2.0% | 4.0% |
| **7-9 Days** | 31 | 31.0% | 35.0% |
| **10-12 Days** | 34 | 34.0% | 69.0% |
| **13-15 Days** | 12 | 12.0% | 81.0% |
| **Greater than 15 days** | 19 | 19.0% | 100.0% |
| **Total** | 100 | 100.0 |  |

In many cases the identification of an issue requiring funding, the date of determination to seek funds, and the actual date of request in LINK were spread across weeks or even months.  The payment process was not delayed by the assignment of a vendor provider number as was indicated in the prior review.

**Workers' Perspective of Obstacles to Provision of Services:**

The review asked the workers to provide their perspective of obstacles to providing services or goods via the established DCF accounting codes, or through state or other community agencies rather than from the flex funds.  The following provides a summary of those responses specific to the sampled case, and to the general population within their area office.  Please note that a worker could identify more than one obstacle category in response to the question.

**Table 13:  Social Worker's Identified Obstacles and Barriers to Service Provision within their Area Office (n=100)**

| Obstacle/Barrier | Case Specific | General Case Practice |
|---|---|---|
| **SW Declined to Comment/Respond to our Survey** | 48 | 48 |
| **Other** | 26 | 25 |
| **No Barriers Noted** | 15 | 17 |
| **Clear identification of existing resources within DCF contracts/funded providers** | 14 | 18 |
| **Clear identification of alternate community resources** | 9 | 15 |
| **Clear identification of responsibilities of other state agencies serving DCF clients** | 8 | 17 |
| **DCF Chain of Approval** | 0 | 7 |

- "Other" barriers <u>specific to the cases sampled</u> included:
  - Insurance (8)
  - No Contracted Providers/Resources for Service Needed (5)
  - Client did not Meet Acceptance Criteria (3)
  - Wait Lists/Immediate Service Not Available (3)
  - Community Provider Funding Issues (2)
  - Poor Quality of Providers (2)
  - Hours of Operation (1)

   o   Communication Between DCF and Provider (1)
   o   Child Welfare Accounting (1)

- "Other" barriers social workers identified in their <u>general case practice</u> included:
  - o  Wait Lists/Immediate Service Not Available (10)
  - o  No Contracted Providers/Resources for Service Needed (7)
  - o  Insurance (6)
  - o  Poor Quality of Providers (3)
  - o  Community Provider Funding Issues/Cutbacks (1)
  - o  Hours of Operation (1)

**Key Findings:**

- The most frequent requests appear to be for in-home family cases (30.0%).

- There was clear documentation in 35.0% of the cases reviewed of a discussion with the family or child regarding the possible avenues to meet the need identified (through flex/discretionary or other funding sources).

- In 67.0% of the cases reviewed, the services or goods provided via the funding met the identified need. In 20.0% of the cases, the stated need was not met. The review was unable to determine whether the identified need was met in 13.0% of the cases.

- Upon review of the LINK documentation and worker feedback where provided, the review found that 61.0% of the requests within the sample set (n=100) were clearly necessary to support goal achievement.

- Routine and extensive utilization of flex funds for ongoing services such as mental health, mentoring, and in-home services continues to be noted in this review process. It is not known if the Department is requesting reimbursement via Medicaid management in all applicable situations. It is our understanding that the ASO will be looking into this matter.

- Mental Health services continue to be the leading singular need identified (36.0%). This is followed by Preservation of Placement (25.0%) and Reunification and Preventing Placement (both 21.0%). The Department is proceeding with the establishment of credentialing for the non-contracted provider base statewide. The Resource Allocation group is developing a rate based system with defined parameters of service and identification of the level or credential of the person who can be paid for such service. This will be helpful in setting standards and rates so that workers can be better informed of what these providers can offer.

- In 95% of the sample cases, there was no record of a subsequent substantiation between the period of time of service provision or receipt of goods, and the review of the LINK record during the first quarter 2006.

- The review found that requests often misidentify the intended recipient of the service or goods requested.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
June 8, 2006

_____

# Appendix C:

Flex Funds Review Instrument

_____

## Flex Funds Review Instrument

1.   Case Id for Flex Funds Request: _____

2.   For what case participant was the need identified?
     1.   ☐ Child (In home)
     2.   ☐ Child (Out of home)
     3.   ☐ Parent/Legal Guardian/Caretaker
     4.   ☐ Family Unit
     5.   ☐ Other
     5a. _____
        (write in participant if other is selected)

3.   If individual participant, identify intended recipient: _____, _____
                                                    Last Name        First Name

4.   What is the race of this identified case participant or case name if family unit is identified participant?
     1.   ☐ American Indian or Alaskan Native
     2.   ☐ Asian
     3.   ☐ Black/African American
     4.   ☐ Native Hawaiian
     5.   ☐ White
     6.   ☐ Unknown
     7.   ☐ Blank (no race selected in LINK)
     8.   ☐ UTD
     9.   ☐ Multiracial

5.   What is the Ethnicity of this identified case participant or case name if family unit is identified participant?
     1.   ☐ Hispanic
     2.   ☐ Non-Hispanic
     3.   ☐ Unknown
     4.   ☐ Blank (no ethnicity selected in LINK)

6.   What is the primary language of the identified case participant or case name if family unit is identified participant? _____

7.   How many substantiated reports of abuse or neglect are recorded for this case id? _____

8.   What is the date of the most recent substantiation? _____/_____/_____

9.   What is the most recent substantiation? (Select all that apply to the most recent report substantiated)
    a.   Educational Neglect    1. ☐ Yes    2. ☐ No

    b.   Emotional Neglect    1. ☐ Yes    2. ☐ No

    c.   Emotional Abuse/Maltreatment    1. ☐ Yes    2. ☐ No

    d.   Medical Neglect    1. ☐ Yes    2. ☐ No

    e.   Moral Neglect    1. ☐ Yes    2. ☐ No

    f.   Physical Abuse    1. ☐ Yes    2. ☐ No

    g.   Physical Neglect    1. ☐ Yes    2. ☐ No

    h.   Sexual Abuse    1. ☐ Yes    2. ☐ No

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

10.  Case Type at point of request for flex funds
     1. ☐ CPS In-home family (IHF) case
     2. ☐ CPS child-in-placement (CIP) case
     3. ☐ Voluntary Services in-home family (VSIHF) case
     4. ☐ Voluntary Services child-in-placement (VSCIP) case
     5. ☐ FWSN
     6. ☐ Probate
     7. ☐ Open in Investigation Only

11.  What is the current permanency goal for this child or family?
     1. ☐ Reunification
     2. ☐ Adoption
     3. ☐ Transfer of Guardianship
     4. ☐ Other Permanent Living Arrangement:  Long Term Foster Care
     5. ☐ Other Permanent Living Arrangement:  Independent Living
     6. ☐ In-Home Goals – Safety/Well Being Issues
     7. ☐ Other
     8. ☐ UTD – Plan incomplete, unapproved or missing for this period
     9. ☐ TBD – Open in Investigation Only
     10. ☐ N/A – Case closed at point of review

11A.  Has this goal changed as of January 1, 2006?    1. ☐ Yes    2. ☐ No

12.  Area Office
     1. ☐ Bridgeport       9. ☐ New Haven Metro
     2. ☐ Danbury       10. ☐ Norwalk
     3. ☐ Greater New Haven   11. ☐ Norwich
     4. ☐ Hartford      12. ☐ Stamford
     5. ☐ Manchester     13. ☐ Torrington
     6. ☐ Meriden      14. ☐ Waterbury
     7. ☐ Middletown     15. ☐ Willimantic
     8. ☐ New Britain

13.  Identified Worker requesting funds**:** _____,_____
                              Last Name            First Name

14.  At what point does the record indicate a need identified? _____/_____/_____
                                        mm       dd      yyyy

15.  Were alternative funding sources sought to meet this need
     prior to request for flex funding?        ☐Yes   ☐No   ☐N/A   ☐UTD

16.  If, alternative funding source was identified, and was subsequently not available, or not utilized, what was the barrier to use?
_____
_____
_____

17.  On what date was the determination made to seek flex funds? _____/_____/_____
                                           mm      dd     yyyy

18.  Did flex funding contribute to provision of services for a   ☐Yes  ☐No  ☐N/A  ☐UTD
    medical need?

19.  Did flex funding contribute to provision of services for a   ☐Yes  ☐No  ☐N/A  ☐UTD
    dental need?

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006

_____

20. Did flex funding contribute to provision of services for a
mental health need?                                         ☐Yes  ☐No  ☐N/A  ☐UTD

21. Did flex funding contribute to a need other than medical/dental/
mental health, which was directly impacting the ability of the
child/family to achieve their goal?                         ☐Yes  ☐No  ☐N/A  ☐UTD

22. Was the use of flex funds **necessary** to support goal achievement?  ☐Yes  ☐No  ☐N/A  ☐UTD

23. Did flex funding contribute to keeping a family intact
(avoiding placement)?                                       ☐Yes  ☐No  ☐N/A  ☐UTD

24. Did flex funding contribute to reunification of a child?    ☐Yes  ☐No  ☐N/A  ☐UTD

25. Did the flex funds contribute to the achievement of adoption?  ☐Yes  ☐No  ☐N/A  ☐UTD

26. Did flex funds contribute to the achievement of TOG?        ☐Yes  ☐No  ☐N/A  ☐UTD

27. Did flex funding contribute to the preservation of a placement?  ☐Yes  ☐No  ☐N/A  ☐UTD

28. Did flex funding contribute to the placement of a child with
a relative or special study caretaker known to the child?   ☐Yes  ☐No  ☐N/A  ☐UTD

29. Did flex funds contribute to the preservation of family ties?  ☐Yes  ☐No  ☐N/A  ☐UTD

30. In reviewing the record since the receipt of the service or goods
provided, is there an indication that the funding met the
identified need?                                            ☐Yes  ☐No  ☐N/A  ☐UTD

30A. Explain response to Q30 below:

_____
_____
_____
_____

31. Once the determination was made to seek flex funds, how long did the process of securing funds take?
☐  1.  1-3 Days
☐  2.  4-6 Days
☐  3.  7-9 Days
☐  4.  10 –12 Days
☐  5.  13-15 Days
☐  6.  16-18 Days
☐  7.  19-21 days
☐  7.  Greater than 21 days
☐  99. UTD

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
June 8, 2006
_____

32. Per the reviewer, what category of service or payment was requested?

☐ 1. Food                                           ☐ 12. Daycare

☐ 2. Clothing                                       ☐ 13. Transportation

☐ 3. Dental Need                                    ☐ 14. Camp/Recreation

☐ 4. Emergency shelter                              ☐ 15. Medical

☐ 5. Rent to avoid eviction                         ☐ 16. Utility (Phone)

☐ 6. Security deposit/ first and last month's rent  ☐ 17. Furniture

☐ 7. Heating/electricity bills                      ☐ 18. Mentor

☐ 8. Emergency home repairs (e.g., heating system repair)  ☐ 19. 1:1 Service

☐ 9. Emergency housekeeping services                ☐ 20. Other

☐ 10. Counseling/Therapy                            _____

☐ 11. Mental health evaluation                      (if other indicate need)


33. Was the family/child included in the decision to request flex funds?  ☐ 1. Yes    ☐ 2. No

34. What was the amount of funds requested? _____

35. What was the identified need on the request form? _____

36. What was the amount of funds provided? _____

37. What was the date of the check? _____/_____/_____

38. In the quarter of this review, how many times were flex funds requested to serve the needs of the case participant(s) identified in Q2? _____

38A.  In the fiscal year ending June 30, 2005 how many times were flex funds requested to serve the needs of the case participant(s) identified in Q2? _____

39. From the perspective of the worker, first in general, and then specific to this request what obstacles are present in attempting to use current DCF service code funding sources, or alternative funding sources (i.e. Covenent to Care, CAFAP, or other community or state agencies) to meet the needs of the clients' served? (Check all that apply)

|  | Generally | Specific to this Case |
|---|---|---|
| A.  Chain of Approval | ☐ | ☐ |
| B.  Clear identification of existing resources within established DCF service contracts or pool of funds was not available | ☐ | ☐ |
| C.  Clear identification of the responsibilities of other state agencies who jointly serve DCF clients was not available | ☐ | ☐ |
| D.  Clear identification of alternative community resources within our area office was not available | ☐ | ☐ |
| E.  Other: _____ | ☐ | ☐ |
| F.  N/A – SW has not experienced barriers to obtaining funding necessary to meet client's needs | ☐ | ☐ |

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
June 8, 2006

_____

    G. Skip – SW or SWS declined comment.     ☐      ☐

40. In the opinion of the reviewer, was the use of flex funds in line
with good case practice (did the expenditure meet the needs of the  ☐Yes  ☐No  ☐N/A  ☐UTD
family in a meaningful manner – addressing the core issues bringing
the family to the attention of DCF?)