*Juan F*. v. Rell Exit Plan
Quarterly Report
July 1, 2006 – September 30, 2006

Civil Action No. H-89-859 (AHN)
November 30, 2006

Submitted by:
DCF Court Monitor's Office
300 Church Street ~ 4th Floor
Wallingford, CT 06492
Tel:  203-741-0458
Fax:  203-741-0462
E-Mail:  Raymond.Mancuso@po.state.ct.us

Monitor's *Juan F*. v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

Table of Contents
*Juan F*. v Rell Exit Plan Quarterly Report
July 1, 2006 – September 30, 2006

|  | Page |
|---|---|
| Highlights | 3 |
| July 1, 2006 - September 30, 2006 Exit Plan Report Outcome Measure Overview Chart | 6 |
| Monitor's Office Case Review for Outcome Measure 3 and Outcome Measure 15 | 7 |

*Appendix 1* – Rank Scores for Outcome Measures 3 & 15

*Appendix 2* – The Department's Exit Plan Outcome Measures Summary Report Third Quarter 2006 July 1, 2006 – September 30, 2006

### *Juan F*. v Rell Exit Plan Quarterly Report
### July 1, 2006 – September 30, 2006

### Highlights

1. The Monitor's quarterly review of the Department of Children and Families (DCF) efforts toward meeting the Exit Plan measures during the period July through September 2006 indicates that the Department sustained most of its previous achievements and has for the first time met Discharge of Children to the Department of Mental Health and Addiction Services and the Department of Mental Retardation (Outcome Measure 21).  Outcome Measure 21 is a 100% compliance measure that requires the Department to submit written discharge plans prior to the child's discharge from DCF's care to either DMHAS or DMR for all children that require adult services.

2. The Monitor's quarterly report review of DCF for the period of July through September 2006 indicates that DCF has achieved compliance with a total of 17 measures.
    - Commencement of Investigations (98.7%)
    - Completion of Investigations (94.2%)
    - Search for Relatives (93.1%)
    - Maltreatment of Children in Out-of-Home Care (0.8%)
    - Reunification (62.5%)
    - Timely Transfer of Guardianship (70.2%)
    - Re-entry into Care (4.3%)
    - Multiple Placements (95.6%)
    - Foster Parent Training (100%)
    - Placement within License Capacity (96.7%)
    - Worker to Child Visitation in Out-of-Home Cases (92.5%)
    - Worker to Child Visitation in In-Home Cases (85.7%)
    - Caseload Standards (100%)
    - Reduction in Residential Care (10.9%)
    - Discharge Measures (100%)
    - Discharge of Mentally Ill and Mentally Retarded Children (100%)
    - Multi-disciplinary Exams (86%)

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

3. DCF has maintained compliance for at least two (2) consecutive quarters[1] with 12 of the Outcome Measures shown above (number of consecutive quarters indicated below):
   - Commencement of Investigations (eighth consecutive quarter)
   - Completion of Investigations (eighth consecutive quarter)
   - Search for Relatives (fourth consecutive quarter)
   - Maltreatment of Children in Out-of-Home Care (eleventh consecutive quarter)
   - Reunification (fifth consecutive quarter)
   - Multiple Placements (tenth consecutive quarter)
   - Foster Parent Training (tenth consecutive quarter)
   - Worker to Child Visitation in Out-of-Home Care (fourth consecutive quarter)
   - Worker to Child Visitation in In-Home Care (fourth consecutive quarter)
   - Caseloads Standards (tenth consecutive quarter)
   - Residential Reduction (second consecutive quarter)
   - Multi-Disciplinary Exams (third consecutive quarter)

4. The Monitor's quarterly review of DCF for the period of July through September 2006 indicates that DCF did not achieve compliance with five (5) of the measures:
   - Treatment Plans (54%)
   - Repeat Maltreatment (7.9%)
   - Adoption (27%)
   - Sibling Placement (83%)
   - Needs Met (62%)

5. The Monitor implemented a revised methodology to measure Needs Met (Outcome Measure 3) and Treatment Planning (Outcome Measure 15) during the third quarter. The initial review included 35 cases. Subsequent quarterly reviews will include 70 cases. The findings for the initial review of these measures are contained later in the report (Third Quarter 2006 Case Review for Outcome Measure 3 and Outcome Measure 15). The review confirms that DCF remains challenged to meet the placement, permanency and treatment needs for a number of children it serves. The Monitor is reserving specific comment on emerging issues and trends until next quarter when data for a full sample (70 cases) will be available.

---

[1] The Defendants must be in compliance with all of the outcome measures, and in sustained compliance with all of the outcome measures for at least two consecutive quarters (six months) prior to asserting compliance and shall maintain compliance through any decision to terminate jurisdiction.

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

6.  The Department sustained compliance with Reduction in Residential Care (Outcome Measure 19) for a second quarter.  There are 250 fewer children placed in residential care than in the second quarter of 2004.

7.  The Monitor has continued to participate in the ongoing program review at Riverview Hospital.  A report by the Department's Program Review team is due for dissemination in mid-December.  The Department has committed to developing a work plan in response to the recommendations of the program review team, consultative teams, and Riverview staff.

The Department's full, unedited, but verified report to the Court Monitor is incorporated at the end of this Monitor's Report to the Court.

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006

| 3Q July 1-September 30, 2006 Exit Plan Report<br>**Outcome Measure Overview** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Measure | Measure | Baseline | 1Q 2004 | 2Q 2004 | 3Q 2004 | 4Q 2004 | 1Q 2005 | 2Q 2005 | 3Q 2005 | 4Q 2005 | 1Q 2006 | 2Q 2006 | 3Q 2006 |
| 1: Investigation Commencement | >=90% | X | X | X | X | 91.2% | 92.5% | 95.1% | 96.2% | 96.1% | 96.2% | 96.4% | 98.7% |
| 2: Investigation Completion | >=85% | 73.7% | 64.2% | 68.8% | 83.5% | 91.7% | 92.3% | 92.3% | 93.1% | 94.2% | 94.2% | 93.1% | 94.2% |
| 3: Treatment Plans** | >=90% | X | X | X | 10% | 17% | X | X | X | X | X | X | 54% |
| 4: Search for Relatives* | >=85% | 58% | 93% | 82% | 44.6% | 49.2% | 65.1% | 89.6% | 89.9% | 93.9% | 93.1% | 2/15/07* | 5/15/07* |
| 5: Repeat Maltreatment | <=7% | 9.3% | 9.4% | 8.9% | 9.4% | 8.9% | 8.2% | 8.5% | 9.1% | 7.3% | 6.3% | 7.0% | 7.9% |
| 6: Maltreatment OOH Care | <=2% | 1.2% | 0.5% | 0.8% | 0.9% | 0.6% | 0.8% | 0.7% | 0.8% | 0.6% | 0.4% | 0.7% | 0.8% |
| 7: Reunification* | >=60% | 57.8% | X | X | X | X | X | X | 64.2% | 61% | 66.4% | 64.4% | 62.5% |
| 8: Adoption | >=32% | 12.5% | 10.7% | 11.1% | 29.6% | 16.7% | 33% | 25.2% | 34.4% | 30.7% | 40.8% | 36.9% | 27% |
| 9: Transfer of Guardianship | >=70% | 60.5% | 62.8% | 52.4% | 64.6% | 63.3% | 64.0% | 72.8% | 64.3%* | 72.4% | 60.7% | 63.1% | 70.2% |
| 10: Sibling Placement* | >=95% | 57% | 65% | 53% | X | X | X | X | 96% | 94% | 75% | 77% | 83% |
| 11: Re-Entry | <=7% | 6.9% | X | X | X | X | X | X | 7.2% | 7.6% | 6.7% | 7.5% | 4.3% |
| 12: Multiple Placements | >=85% | X | X | 95.8% | 95.2% | 95.5% | 96.2% | 95.7% | 95.8% | 96% | 96.2% | 96.6% | 95.6% |
| 13: Foster Parent Training | 100% | X | X | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 14: Placement Within Licensed Capacity | >=96% | 94.9% | 88.3% | 92.0% | 93.0% | 95.7% | 97% | 95.9% | 94.8% | 96.2% | 95.2% | 94.5% | 96.7% |
| 15: Needs Met | >=80% | X | 53% | 57% | 53% | 56% | X | X | X | X | X | X | 62% |
| 16: Worker-Child Visitation (OOH)* | >=85%<br>100% | Monthly<br>Quarterly | 72%<br>87% | 86%<br>98% | 73%<br>93% | 81%<br>91% | 77.9%<br>93.3% | 86.7%<br>95.7% | 83.3%<br>92.8% | 85.6%<br>91.9% | 86.8%<br>93.1% | 86.5%<br>90.9% | 92.5%<br>91.5% |
| 17: Worker-Child Visitation (IH)* | >=85% | X | 39% | 40% | 46% | 33% | X | 81.9% | 78.3% | 85.6% | 86.2% | 87.6% | 85.7% |
| 18: Caseload Standards+ | 100% | 69.2% | 73.1% | 100% | 100% | 100% | 100% | 100% | 99.8% | 100% | 100% | 100% | 100% |
| 19: Residential Reduction | <=11% | 13.5% | 13.9% | 14.3% | 14.7% | 13.9% | 13.7% | 12.6% | 11.8% | 11.6% | 11.3% | 10.8% | 10.9% |
| 20: Discharge Measures | >=85% | 61% | 74% | 52% | 93% | 83% | X | X | 96% | 92% | 85% | 91% | 100% |
| 21: Discharge to DMHAS and DMR | 100% | X | 43% | 64% | 56% | 60% | X | X | 78% | 70% | 95% | 97% | 100% |
| 22: MDE | >=85% | 5.6% | 19.0% | 24.5% | 48.9% | 44.7% | 55.4% | 52.1% | 54.6% | 72.1% | 91.1% | 89.9% | 86% |

Monitor's *Juan F*. v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

## **Monitor's Office Case Review for Outcome Measure 3 and Outcome Measure 15**

**I. Background and Methodology:**

The *Juan F.* v Rell Revised Exit Plan and subsequent stipulated agreement reached by the parties and court ordered on July 11, 2006 requires the Monitor's Office to conduct a series of quarterly case reviews to monitor Outcome Measure 3 – Treatment Planning and Outcome Measure 15 – Needs Met.   The implementation of this review began with a sample of 35 cases during the third quarter 2006.  The Monitor's Office will review a total of 70 cases in each subsequent calendar quarter.

On the first Monday of the month prior to the start of a calendar quarter, the caseloads for the area offices will be identified using the DCF LINK Caseload Detail Report.  The 70 case sample will be stratified based upon the distribution of area office caseload.  Since there are caseload shifts over time, this process will reflect the changes that may occur. The sample will incorporate both in-home and out-of-home cases based on the overall statewide percentage reflected at the point that each sample is determined.

The methodology required the pairing of DCF staff with Monitor's Review staff. Seven two member teams were selected for the quarter's reviews.  Third Quarter Teams consisted of the following pairings:

| Monitor's Staff | DCF Staff |
|---|---|
| Mary Corcoran | Barbara O'Connell |
| Tom Gallese | Deb Collins/Fred North |
| MaryAnn Hartmann | Sandra Tapia |
| Ray Mancuso | Juliann Harris |
| Susan Marks-Roberts | Kathy Acosta |
| Joni Beth Roderick | Liz Cyr |
| Michelle Turco | Jorge Martinez |

We wish to thank all participants for their efforts during this process.  The collaboration of Monitor and DCF staff is a means to further develop internal quality assurance resources as well as improve reliability.  A team process will continue into the 4th quarter process, but may be changed in future reviews as referenced below.

Our process is four fold and incorporates an inter-rater procedure to monitor the validity and reliability of the protocol and reviewers.  Each review takes approximately 7 hours to 12 hours depending upon the circumstances and complexity of the case assigned.  The process entails:

1. A review of the Case LINK Record documentation for each sample case concentrating on the most recent six months.  This includes narratives, treatment planning documentation, investigation protocols, and the provider narratives for any foster care provider during the last six-month period.
2. Attendance/Observation at the Treatment Planning Conference (TPC)/Administrative Case Review (ACR) or Family Conference (FC).

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

3. A subsequent review of the final approved plan that resulted from the meeting attended will be conducted fourteen to twenty days following attendance at the TPC/ACR/FC. The reviewers then complete an individual assessment of the treatment plan and needs met outcome measures and fill out the scoring forms for each.

4. A final meeting with the assigned teammate is held to jointly arrive at the final scores for each section and overall scoring for OM3 and 15. Individual scoring and joint scoring forms are then submitted to the Monitor. (This step may change as determined appropriate by the DCF Court Monitor after evaluation of the inter-rater findings and fiscal/staffing considerations.)

Although the criterion for scoring requires consistency in definition and process to ensure validity, no two treatment plans will look alike. Each case has unique circumstances that must be factored into the decision making process. Each reviewer has been provided with direction to evaluate the facts of the case in relationship to the standards and considerations and have a solid basis for justifying the scoring.

In situations where agreement cannot be reached, the team requests that the supervisor become a third voice on those areas of concern. They present their opinions and findings and the supervisor determines the appropriate score to reflect the level of performance for the specific item(s) and assists them in the overall determination of compliance for OM3 and OM15. If the team indicates that there are areas that do not attain the "very good" or "optimal" level, yet consensus is the overall score should be "an appropriate treatment plan" or "needs met" the team clearly outlines their reasoning for such a determination and it is reviewed by the Court Monitor for approval of an override exception. These cases are also forwarded to the Technical Advisory (TAC) for review.

Several cases resulted in submittal to the project supervisors regarding possible overrides. Five of the submitted cases were overridden using the process detailed above. The five included two situations in which OM3 was found to be appropriate, and 3 situations in which OM15 was found to have met needs despite a score less than 4 "Very Good" for a category of measurement.

To assist in determining reliability and validity, all individual documents were collected and each pairing of individual reviewers were scored using inter-rater tools within the SPSS data system. Due to the low number of cases reviewed per team, strict percentage agreement scores did not offer much insight into reliability. Where applicable, mean scores using intraclass correlation (ICC) were looked at within and across all teams' responses to the categorical ranking questions of each measure. While individual teams varied in the level of response, the overall mean indicated a generally acceptable performance as a whole. The general acceptable score for ICC is 0.70. As a rule:

- Score of 0.80 +: Outstanding Reliability
- Score of 0.60 to 0.79: Substantial Reliability

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

- Score of 0.40 to 0.59:  Moderate Reliability
- Score of <0.40:  Less than Moderate Reliability

Our results for the third quarter provide a mean average across all teams for the rankings for OM3 from .422 (Progress) to .829 (OM3 – Overall Score).   All but the lowest mean score for OM3 fell into the range of substantial or outstanding reliability (.60 or higher).

Mean average ICC scores for the rankings of OM15 ranged from .330 (Dental) to 1.00 (Safety – Children in Placement, DCF Case Management – Recruitment, and Children's Current Placement).   All but three of the mean scores for OM15 fell into the range of substantial or outstanding reliability (.60 or higher).

To address the areas of disparity, a post review team meeting was held in October to address individual reviewer's and teams' issues related to the review process.  Clarifications were provided, and a better understanding of some of the finer points of the process resulted from this trial review process and debriefing.  A sample case was jointly reviewed by all reviewers and then each subcategory was analyzed.  As necessary, additional training and clarification will be ongoing throughout the process including revisions to the instructions.

Reviewers will be reassigned to various teams/office locations so that no office has the same team consistently reviewing their cases every quarter.

## II.    Third Quarter 2006 Sampling

Using the methodology outlined above, the caseload was established on June 5, 2006.  A sample of 35 cases was selected for this trial review based upon the percentage of cases by area office and case type (in home/children in placement).  This resulted in the following distribution of cases:

**Table 1:  Area Office Designation of the Sample Set (n=35)**

| Area Office | In-Home | Child In Placement | Total Sample |
|-------------|---------|--------------------|--------------|
| Bridgeport | 1 | 2 | 3 |
| Danbury | 0 | 1 | 1 |
| Greater New Haven | 1 | 2 | 3 |
| Hartford | 1 | 3 | 4 |
| Manchester | 1 | 3 | 4 |
| Meriden | 0 | 1 | 1 |
| Middletown | 0 | 1 | 1 |
| New Britain | 1 | 2 | 3 |
| New Haven Metro | 1 | 3 | 4 |
| Norwalk | 0 | 1 | 1 |
| Norwich | 1 | 2 | 3 |
| Stamford | 0 | 1 | 1 |
| Torrington | 0 | 1 | 1 |
| Waterbury | 1 | 2 | 3 |
| Willimantic | 0 | 2 | 2 |
| **Statewide** | 8 | 27 | 35 |

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

While many demographic or descriptive elements were captured for this sample, given the small sample size we find it unnecessary to report on each element. Some key elements of interest are detailed below.

Sample cases were identified by Assignment Type. At the point of review, the data indicates that the majority of cases (71.4%) are children in care for child protective service reasons. Of the children in placement, four children (14.3%) had some involvement with the Juvenile Justice System. A full description of the sample is provided below:

**Table 2: Case Assignment Types with the Sample Set (n=35)**

| Assignment | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| **CPS In-Home Family** | 6 | 17.1 | 17.1 |
| **CPS Child in Placement** | 25 | 71.4 | 88.6 |
| **Voluntary Services In-Home Family** | 1 | 2.9 | 91.4 |
| **Voluntary Services Child in Placement** | 2 | 5.7 | 97.1 |
| **Associated Family to Child in Placement (CPS)[2]** | 1 | 2.9 | 100.0 |
| **Total** | 35 | 100.0 | |

In establishing the reason for the most recent case open date identified, reviewers were asked to identify all substantiations or voluntary service needs identified at the point of most recent case opening. The data indicates that physical neglect is the most frequent reason for a case opening in treatment, as 54.3% of the cases cited this as one of the factors for the case opening. This was followed by Parental Substance Abuse/Mental Health which was present in 34.3% of the cases reviewed, and Emotional Neglect, which was identified in 31.4% of the cases reviewed. When asked to isolate the primary reason for case opening among those identified for each case; physical neglect was identified for 40% of the sample set. This was followed by the child's TPR requiring case opening under the child's name (17.1%) and domestic violence (8.6%).

_____

[2] One case selected as an in-home case had child come into care shortly after the family conference was held. This is reflected as a difference of 1 in some charts (8 vs. 7) depending upon the time frame and focus of the question.

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

**Table 3:  Reasons for DCF Involvement at Point of Most Recent Case Opening (n=35)**

| Reason | Frequency | Frequency with which Reason was Cited as Primary Cause |
|---|---|---|
| Abandonment | 1 | 1 (death of adoptive parent) |
| Child's TPR | 7 | 6 |
| Domestic Violence | 9 | 3 |
| Educational Neglect | 4 | 1 |
| Emotional Neglect | 11 | 0 |
| Medical Neglect | 2 | 2 |
| Parental Substance Abuse/Mental Health | 12 | 3 |
| Physical Abuse | 3 | 1 |
| Physical Neglect | 19 | 15 |
| Voluntary Service Request/FWSN | 4 | 3 |
| | 72 | 35 |

Permanency/case goals were identified for 30 of the 35 cases reviewed (85.7%).  Of the seven situations in which reunification was the goal, there was a required concurrent plan documented for five cases (71.4%).  Goals for the sample set are provided below.  Of those indicated as UTD, two are in-home cases and three are CPS children in placement. All three cases with the goal of APPLA: Other were identified as Independent Living.

**Table 4:  What is the child or family's stated goal on the most recent approved treatment plan in place during the period?**

| | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Reunification | 7 | 20.0 | 20.0 |
| Adoption | 8 | 22.9 | 42.9 |
| Transfer of Guardianship | 1 | 2.9 | 45.7 |
| Long Term Foster Care with a licensed relative | 2 | 5.7 | 51.4 |
| APPLA:  Permanent Non-Relative Foster Care | 4 | 11.4 | 62.9 |
| APPLA:  Other | 3 | 8.6 | 71.4 |
| In-Home Goals - Safety/Well Being Issues | 5 | 14.3 | 85.7 |
| UTD - plan incomplete, unapproved or missing for this period | 5 | 14.3 | 100.0 |
| Total | 35 | 100.0 | |

Children in placement had various lengths of stay at the point of our review.  This ranged from less than one month, to greater than 24 months.  The distribution of length of stays is provided below with an indication of whether TPR has been filed in relation to both the ASFA requirement and overall length of time in care.  In nine of the 12 cases indicated

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

below, TPR had been granted prior to our review.  There were no children exceeding the
time frame for which either TPR or Compelling Reason had not been filed with the court.

**Crosstabulation 1:  Has child's length of stay exceeded the 15 of the last 22 benchmark set by ASFA? * For child in placement, has TPR been filed?**

| Has child's length of stay exceeded the 15 of the last 22 benchmark set by ASFA? | For child in placement, has TPR been filed? | | | | | Total |
|---|---|---|---|---|---|---|
| | yes | no | N/A – Compelling Reason noted in LINK | N/A - child's goal and length of time in care don't require | N/A - In-Home Case (CPS or Voluntary Services) | |
| yes | 1 | 0 | 5 | 0 | 0 | 6 |
| no | 2 | 1 | 1 | 9 | 0 | 13 |
| N/A - In-Home Case (CPS or Voluntary Services) | 0 | 0 | 0 | 0 | 7 | 7 |
| N/A - TPR has already been filed and granted | 9 | 0 | 0 | 0 | 0 | 9 |
| Total | 12 | 1 | 6 | 9 | 7 | 35 |

**Crosstabulation 2:   How many consecutive months has this child been in out of home placement as of the date of this review or date of case closure during the period? * For child in placement, has TPR been filed?**

| How many consecutive months has this child been in out of home placement as of the date of this review or date of case closure during the period? | For child in placement, has TPR been filed? | | | | | Total |
|---|---|---|---|---|---|---|
| | yes | no | N/A – Compelling Reason | N/A - child's goal and length of time in care don't require | N/A - In-Home Case (CPS or Voluntary Services) | |
| Less than one month | 0 | 0 | 0 | 1 | 0 | 1 |
| 1-6 months | 0 | 0 | 0 | 3 | 0 | 3 |
| 7-12 months | 0 | 0 | 0 | 2 | 0 | 2 |
| 13-18 months | 3 | 1 | 1 | 3 | 0 | 8 |
| Greater than 24 months | 9 | 0 | 5 | 0 | 0 | 14 |
| N/A - no child in placement (in-home case) | 0 | 0 | 0 | 0 | 7 | 7 |
| Total | 12 | 1 | 6 | 9 | 7 | 35 |

### III.    Monitor's Findings Regarding Outcome Measure 3 – Treatment Plans

Outcome Measure 3 requires that, *"in at least 90% of the cases, except probate, interstate and subsidy only cases, appropriate treatment plans shall be developed as set forth in the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15" dated June 29, 2006 and the accompanying "Directional Guide for OM3 and OM15 Reviews" dated June 29, 2006."*

The case review data indicates that the Department of Children and Families attained the level of "Appropriate Treatment Plan" in 54.3% of the 35 case sample. Five of the plans not passing did not have social work supervisory approval. Of those five, three would have passed based on the quality of the plan, had the approval been documented. All 35 cases (100%) had families' language needs met. Two cases had plans greater than 7 months old at the point of review as a result of the failure of the social work supervisor to approve the plan.

While the sample size is small, it is notable that the percentage of "not appropriate" plans for in-home cases (both CPS and Voluntary) is a great deal higher than those of children in placement. Of the eight cases selected as in-home family cases, only 1 case (12.5%) achieved "appropriate treatment plan" status. Eighteen of the 27 children in placement cases (both CPS and Voluntary) achieved "appropriate treatment plan" status (66.7%).

**Crosstabulation 3:    What is the type of case assignment noted in LINK? * Overall Score for OM3**

| What is the type of case assignment noted in LINK? | Overall Score for OM3 | | Total |
|---|---|---|---|
| | **Appropriate Treatment Plan** | **Not an Appropriate Treatment Plan** | |
| **CPS In-Home Family Case (IHF)** | 1 | 5 | 6 |
| **CPS Child in Placement Case (CIP)** | 16 | 9 | 25 |
| **Voluntary Services In-Home Family Case (VSIHF)** | 0 | 1 | 1 |
| **Voluntary Services Child in Placement Case (VSCIP)** | 2 | 0 | 2 |
| **Associated CIP Family Case (ACIPF)** | 0 | 1 | 1 |
| **Total** | 19 | 16 | 35 |

The review examined the level of engagement with children, families and providers in the development of the treatment plans as well as the content of the plan document itself. Each case had a unique pool of active participants for DCF to collaborate with in the process. The chart below indicates the degree to which identifiable/active case participants were engaged by the social worker and the extent to which these participants

Monitor's *Juan F*. v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

attended the TPC/ACR/FC. Percentages reflect the level or degree to which a particular participant was part of the treatment planning efforts across all the cases reviewed.

**Table 5:  Participation and Attendance Rates for Active Case Participants within the Sample Set**

| Identified Case Participant | Percentage Participating/Engaged in Treatment Planning Discussions | Percentage Attending the ACR or Family Conference |
|---|---|---|
| **Child** | 85.7% | 55.5% |
| **Mother** | 60.0% | 42.9% |
| **Father** | 40.0% | 20.0% |
| **Foster Parent** | 54.3% | 25.7% |
| **Service Provider** | 82.5% | 42.1% |
| **Attorney/GAL (Child)** | 50.0% | 3.7% |
| **Parents' Attorney** | 35.3% | 5.9% |
| **Other DCF Staff** | 84.0% | 56.0% |
| **Other Participants** | 94.4% | 72.2% |

The review process looked at eight categories of measurement when determining overall appropriateness of the treatment planning.  Scores were based upon the following rank/scale.

**Optimal Score – 5**
The reviewer finds evidence of all essential treatment planning efforts for both the standard of compliance and all relevant consideration items (documented on the treatment plan itself).

**Very Good Score – 4**
The reviewer finds evidence that essential elements for the standard of compliance are substantially present in the final treatment plan and may be further clarified or expanded on the DCF 553 (where latitude is allowed as specified below) given the review of relevant consideration items.

**Marginal Score – 3**
There is an attempt to include the essential elements for compliance but the review finds that substantial elements for compliance as detailed by the Department's protocol are not present.  Some relevant considerations have not been incorporated into the process.

**Poor Score – 2**
The reviewer finds a failure to incorporate the most essential elements for the standard of compliance detailed in the Department's protocol.  The process does not take into account the relevant considerations deemed essential, and the resulting document is in conflict with record review findings and observations during attendance at the ACR.

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

**Absent/Adverse Score – 1**
The reviewer finds no attempt to incorporate the standard for compliance or relevant considerations identified by the Department's protocol.  As a result there is no treatment plan less than 7 months old at the point of review or the process has been so poorly performed that it has had an adverse affect on case planning efforts.  "Reason for Involvement" and "Present Situation to Date" were most frequently ranked with an Optimal Score.  Deficits were most frequently noted in two of the eight categories: "Determination of Goals/Objectives" and "Action Steps to Achieve Goals".  The following table provides the scoring for each category for the sample set and the corresponding percentage of cases within the sample that achieved that ranking.

For a complete listing of rank scores for Outcome Measure 3 by case, see Appendix 1.

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

| Table 6: Measurements of Treatment Plan OM 3 – Percentage of Rank Scores Attained Across All Categories | | | | | |
|---|---|---|---|---|---|
| Category | # Ranked Optimal "5" | # Ranked Very Good "4" | # Ranked Marginal "3" | # Ranked Poor "2" | # Ranked Adverse/Absent "1" |
| I.1  Reason for DCF Involvement | 17 (48.6%) | 17 (48.6%) | 1 (2.9%) | 0 | 0 |
| I.2.  Identifying Information | 9 (25.7%) | 18 (51.4%) | 6 (17.1%) | 1 (2.9%) | 1 (2.9%) |
| I.3.  Strengths/Needs/Other Issues | 9 (25.7%) | 22 (62.9%) | 3 (8.6%) | 0 | 1 (2.9%) |
| I.4.  Present Situation and Assessment to Date of Review | 13 (37.1%) | 16 (45.7%) | 5 (14.3%) | 0 | 1 (2.9%) |
| II.1  Determining the Goals/Objectives | 7 (20.0%) | 17 (48.6%) | 9 (25.7%) | 1 (2.9%) | 1 (2.9%) |
| II.2.  Progress[3] | 5 (14.3%) | 24 (68.6%) | 5 (14.3%) | 0 | 0 |
| II.3  Action Steps to Achieving Goals Identified | 4 (11.4%) | 20 (57.1%) | 9 (25.7%) | 1 (2.9%) | 1 (2.9%) |
| II.4  Planning for Permanency | 12 (34.3%) | 15 (42.9%) | 6 (17.1%) | 1 (2.9%) | 1 (2.9%) |

_____

[3] One case was newly opened – ranked as N/A too early to note progress (2.9%).

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

### IV. Monitor's Findings Regarding Outcome Measure 15 – Needs Met

Outcome Measure 15 requires that, *"at least 80% of all families and children shall have all their medical, dental, mental health and other service needs met as set forth in the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15 dated June 29, 2006, and the accompanying 'Directional Guide for OM3 and OM15 Reviews dated June 29, 2006."*

The case review data indicates that the Department of Children and Families attained the designation of "Needs Met" in 62.9% of the 35 case sample. The percentage of "needs not met" plans for in-home cases (both CPS and Voluntary) is a slightly higher than those selected as children in placement cases. Of the eight cases selected as in-home family cases, 4 cases (50.0%) achieved "needs" status. Twenty-two of the 27 cases with children in placement (both CPS and Voluntary) achieved "needs met" status (66.7%).

Outcome Measure 15 looked at twelve categories of measurement to determine the level with which the Department was able to meet the needs of families and children. All categories are in table seven below with the frequency and percentage of applicable cases achieving each rank score below.

For a complete listing of rank scores for Outcome Measure 15 by case, see Appendix 1.

**Crosstabulation 4:  What is the type of case assignment noted in LINK? * Overall Score for Outcome Measure 15**

| What is the type of case assignment noted in LINK? | Overall Score for Outcome Measure 15 | | Total |
|---|---|---|---|
| | Needs Met | Needs Not Met | |
| CPS In-Home Family Case (IHF) | 3 | 3 | 6 |
| CPS Child in Placement Case (CIP) | 17 | 8 | 25 |
| Voluntary Services In-Home Family Case (VSIHF) | 1 | 0 | 1 |
| Voluntary Services Child in Placement Case (VSCIP) | 1 | 1 | 2 |
| Associated CIP Family Case (ACIPF) | 0 | 1 | 1 |
| Total | 22 | 13 | 35 |

Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report
November 30, 2006
_____

**Table 7:  Measurements of Treatment Plan OM 15 – Percentage of Rank Scores Attained Across All Categories[4]**

| Category | # Ranked Optimal "5" | # Ranked Very Good "4" | # Ranked Marginal "3" | # Ranked Poor "2" | # Ranked Adverse/Absent "1" | N/A To Case Reviewed |
|---|---|---|---|---|---|---|
| I.1  Safety – In Home | 0 | 10 (100.0%) | 0 | 0 | 0 | 25 |
| I.2.  Safety – Children in Placement | 13 (46.4%) | 14 (50.0%) | 1 (3.6%) | 0 | 0 | 7 |
| II.1  Securing the Permanent Placement – Action Plan for the Next Six Months | 14 (48.3%) | 12 (41.4%) | 3 (10.3%) | 0 | 0 | 6 |
| II.2.  DCF Case Management – Legal Action to Achieve the Permanency Goal During the Prior Six Months | 14 (40.0%) | 17 (48.6%) | 4 (11.4%) | 0 | 0 | 0 |
| II.3  DCF Case Management – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | 14 (58.3%) | 6 (25.0%) | 4 (16.7%) | 0 | 0 | 11 |
| II.4.  DCF Case Management – Contracting or Providing Services to achieve the Permanency Goal during the Prior Six Months | 11 (31.4%) | 19 (54.3%) | 5 (14.3%) | 0 | 0 | 0 |
| III.1  Medical Needs | 15 (42.9%) | 16 (45.7%) | 4 (11.4%) | 0 | 0 | 0 |
| III.2  Dental Needs | 23 (67.6%) | 6 (17.6%) | 4 (11.8%) | 0 | 1 (2.9%) | 1 |
| III.3  Mental Health, Behavioral and Substance Abuse Services | 18 (51.4%) | 13 (37.1%) | 4 (11.4%) | 0 | 0 | 0 |
| IV.1  Child's Current Placement | 16 (55.2%) | 11 (37.9%) | 2 (6.9%) | 0 | 0 | 6 |
| IV. 2  Educational Needs | 18 (51.4%) | 15 (42.9%) | 2 (5.7%) | 0 | 0 | 0 |

---

[4] Percentages are based on applicable cases for the individual measure.  Those cases marked N/A are excluded from the denominator.  At the point of sampling, the total number identified as in-home was 8 cases. However, the number of cases with in-home status <u>at some point</u> during the six month period of review totals 10 cases.  Additionally, post sampling, one of the in-home cases converted to child in placement - OOH status with a removal of the child, and one child was living with grandparents (not licensed) who were considering TOG (reducing the N/A category for IV.1 current placement to 6).  These facts account for the slight fluctuation in numbers that can be seen within the table on page 18.

Monitor's *Juan F.* v Rell Exit Plan Quarterly Report
November 30, 2006
_____

In addition to looking at the twelve categories of Outcome Measure 15, the review also collected data on situations in which a case had a need identified at the prior ACR, treatment plan or within the period's LINK record. Data was collected on those that remained unresolved at the point of the most recent treatment planning efforts. In 19 of the 35 cases, the reviewers identified at least one unmet need. In all there were 35 needs unmet at the point of the review. These included:

**Table 8: Unmet Service Needs Identified within 19 of the Sample Set Cases**

| Service Need | Frequency |
|---|---|
| Mental Health Treatment | 7 |
| Dental | 5 |
| Out of Home Support Service | 5 |
| Domestic Violence Services | 3 |
| Housing | 3 |
| Substance Abuse Treatment | 3 |
| Medical Services | 2 |
| In-Home Support Service | 2 |
| Educational Services | 2 |
| Out of Home Care | 1 |
| DCF Case Management | 1 |
| Training | *1* |
| **Total Unmet Needs** | 35 |

Barriers were identified for the unmet needs cited above. Most frequently (37.1%) the barrier was identified as client refusal. All those identified are included with the level of frequency in the table below:

**Table 9: Barriers Identified for Unmet Service Needs with the 19 Sample Set Cases Having One or More Unmet Needs**

| Barrier | Frequency |
|---|---|
| Client Refusal | 13 |
| Delay in Referral | 4 |
| Insurance Issues | 4 |
| Other[5] | 4 |
| UTD | 3 |
| Service Deferred Pending Completion of Another | 2 |
| Provider Unwilling to Engage Client | 2 |
| No Slots Available | 2 |
| Wait List | 1 |

In addition, when looking specifically at the current treatment planning document, ten of the 35 cases (28.6%) had evidence of a service need that was clearly identified at the ACR/TPC or within LINK documentation but not incorporated into the current treatment plan document. These 10 cases included 19 service needs as indicated below:

_____
[5] Other Reasons Included: Dental Provider under Investigation, Therapist failed to make referral, youth's level of functioning precluded service, poor communication DCF/school.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
November 30, 2006
_____

**Table 10:  Service Needs Not Incorporated into the Treatment Plan Documentation of Ten Sample Set Cases**

| Service Need | Frequency |
|---|---:|
| **Dental** | 4 |
| **Out of Home Support Service** | 3 |
| **Substance Abuse Treatment** | 3 |
| **Mental Health Treatment** | 2 |
| **Medical Services** | 2 |
| **DCF Case Management** | 2 |
| **Domestic Violence Services** | 1 |
| **Housing** | 1 |
| **In-Home Support Service** | 1 |
| **Total** | 19 |

It is important to note that while 19 needs were not incorporated into the treatment planning documents, in several cases reviewers felt that the ACR/TPC/FC discussions adequately addressed case work, and the responsibility of participants toward meeting the need.

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
November 30, 2006
_____

# Appendix 1
Rank Scores for Outcome Measure 3 & 15

Monitor's *Juan F*. v Rell Exit Plan Quarterly Report
November 30, 2006
_____

# Appendix 2
The Department's Exit Plan Outcome Measures Summary
Report Third Quarter 2006
July 1, 2006 – September 30, 2006