## *Juan F.* v Rell 2006 Comprehensive Targeted Review

| **Section** | **Page** |
| --- | --- |
| Introduction | 8 |
| Acknowledgements | 9 |
| Collective Findings | 10 |
| Monitor's Comprehensive Qualitative Report – Findings at a Glance | 13 |
| Outcome Measure 1:  Commencement of Investigations | 15 |
| Outcome Measure 2:  Completion of Investigations | 23 |
| Outcome Measure 3: (Treatment Plans) & Outcome Measure 15 (Needs Met) | 27 |
| Outcome Measure 4: Search for Relatives | 65 |
| Outcome Measure 5: Repeat Maltreatment of Children | 70 |
| Outcome Measure 6: Maltreatment in Out-of-Home Care | 78 |
| Outcome Measure 7: Reunification | 88 |
| Outcome Measure 8: Adoption | 100 |
| Outcome Measure 9: Transfer of Guardianship | 113 |
| Outcome Measure 10: Sibling Placement | 123 |
| Outcome Measure 11: Re-Entry into DCF Custody | 127 |
| Outcome Measure 12: Multiple Placements | 149 |
| Outcome Measure 13: Foster Parent Training | 164 |
| Outcome Measure 14: Placement within Licensed Capacity | 149 |
| Outcome Measure 16: Out-of-Home Visitation | 149 |
| Outcome Measure 17: In-Home Visitation | 173 |
| Outcome Measure 18: Caseload Standards | 182 |
| Outcome Measure 19: Reduction in the Number of Children Placed in Residential Care | 186 |
| Outcome Measure 20: Discharge Measures | 188 |
| Outcome Measure 21: Discharge of Mentally Ill or Retarded Children | 188 |
| Outcome Measure 22: Multi-Disciplinary Examinations (MDE's) | 203 |

# Crosstabulations, Graphs and Tables

| Item | Title | Page |
|---|---|---|
| Crosstabulation 1: | Priority Response Designation * Actual Timeframe to Face to Face Contact with Child Victim | 21 |
| Crosstabulation 2: | Priority Response Designation * Actual Timeframe to Face-to-Face Contact with Alleged Perpetrators | 22 |
| Crosstabulation 3: | Were all the Risks Factors Considered within the Course of Investigation (using the list consideration provided)? *Rank the Investigation on Overall Level of Quality Using Scale Provided | 25 |
| Crosstabulation 4: | Were all DCF Policy Requirements Met by the Worker During the Course of the Investigation? * Rank the Investigation on Overall Level of Quality Using Scale Provided | 26 |
| Crosstabulation 5: | What is the Type of Case Assignment Noted in LINK? * Does child in Placement Have Involvement with the Juvenile Justice System? | 32 |
| Crosstabulation 6: | Has Child's Length of Stay Exceeded the 15 of the Last 22 Benchmark Set by ASFA? * For Child in Placement has TPR Been Filed? | 34 |
| Crosstabulation 7: | What is the Type of Case Assignment Noted in LINK ? * Overall Score for OM3 | 35 |
| Crosstabulation 8: | Overall Score for OM 3* What is the Type of Case Assignment Noted in LINK? | 37 |
| Crosstabulation 9: | Overall Score for Outcome Measure 15 * What is the Type of Case Assignment Noted in LINK? | 40 |
| Crosstabulation 10: | What is the Child or Family's Stated Goal on the Most Recent Approved Treatment Plan in Place During the Period? * Overall Score for Outcome Measure 15 | 41 |
| Crosstabulation 11: | What is the Primary Reason Cited * There is Documentation in LINK Indicating that a Search Was Conducted for Possible Placement During the Period of Review? | 68 |
| Crosstabulation 12: | At the Time of the July 2006 Substantiation Identified for this Child, Were Services Offered to the Family to Ameliorate the Stressors or Issues Contributing to the Episode of Abuse/Neglect? * Where There Any Subsequent Substantiation Involving this Child During the Six-Month Period Following the Date of the Incident Substantiated in July 2006? | 75 |
| Crosstabulation 13: | Did DCF Make the Referrals for Services Offered? * Were There Any Subsequent Substantiations Involving this Child During the Six-Month Period Following the Date of the Incident Substantiated in July 2006? | 75 |
| Crosstabulation 14: | Did the Client(s) Participate in the Referred Services? * Were There Any Subsequent Substantiations Involving this Child During the Six-Month Period Following the Date of the Incident Substantiated in July 2006? | 76 |
| Crosstabulation 15: | Were There Any Subsequent Substantiations Involving this Child During the Six-Month Period Following the Date of the Incident Substantiated in July 2006 | 77 |
| Crosstabulation 16: | Area Office Assignment * Were There Any Substantiations Involving this Child in Out-of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006? | 80 |
| Crosstabulation 17: | Child's Race * Where There Any Substantiations Involving this Child in Out-of-Home Placement during the Quarter of October 1, 2006 through December 31, 2006? | 81 |
| Crosstabulation 18: | Does the Child Have any Diagnosed Conditions Documented? * Were There any Substantiations Involving this Child in Out-of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006? | 82 |
| Crosstabulation 19: | Current Residence of this Child on December 31, 2006 * Were There Any Substantiations Involving this Child in Out-of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006? | 83 |
| Crosstabulation 20: | Were these Concerns (OM6.1a) Addressed in Supervision with the Ongoing Services SWS? * Were there Any Substantiations Involving this Child in Out-of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006? | 84 |
| Crosstabulation 21: | Describe the Worker Visitation with the Child in Out-of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006? | 85 |
| Crosstabulation 22: | Reunification within 12-Months * Categorized Time from Case Open to Entry Date (months) | 90 |
| Crosstabulation 23: | Reunification Within 12-Months * Categorized Age at Entry (years) | 91 |

| Item | Title | Page |
|------|-------|------|
| **Crosstabulation 24:** | Reunification Within 12-Months * Child's Gender | 91 |
| **Crosstabulation 25:** | Reunification Within 12-Months * Child's Ethnicity * Child's Race | 91 |
| **Crosstabulation 26:** | Reunification Within 12-Months * Reason for Child's Removal from Home | 92 |
| **Crosstabulation 27:** | Reunification Within 12-Months * Aggregated Reasons for Child Entry | 93 |
| **Crosstabulation 28:** | Reunification Within 12-Months * Primary Placement Type | 93 |
| **Crosstabulation 29:** | Reunification Within 12-Months * How Many Placement Settings Did Child Have During the Episode Ending in Fourth Quarter 2006 Reunification? | 94 |
| **Crosstabulation 30:** | Reunification Within 12-Months * Did SW Manage the Case so that Reunification and a Concurrent Goal were Both Actively Pursued? | 94 |
| **Crosstabulation 31:** | Reunification within 12-Months * Was Visitation Between Parent/Guardian and Child Increased in Frequency and Duration as Case Progressed Toward Child's Exit from Placement? | 95 |
| **Crosstabulation 32:** | Reunification within 12-Months * Was Visitation Between Parent/Guardian and Child Progressed so that Supervision was Reduced to Unsupervised, then Overnight Visits Prior to Child's Exit from Placement? | 95 |
| **Crosstabulation 33:** | Reunification within 12-Months * Were Intensive In-Home Services (IICAPS, IFP, MST, BSF-MST) Implemented to Support Reunification of this Child? | 95 |
| **Crosstabulation 34:** | Reunification within 12-Months * CM.1 Do SC Notes Indicate that SWS/SW Discussed Risks Factors Relevant to Ensuring Safe/Stable Reunification During 6-Month Period Leading to Fourth Quarter 2006 Reunification? | 96 |
| **Crosstabulation 35:** | Reunification within 12-Months * Overall Quality of Supervision | 97 |
| **Crosstabulation 36:** | Reunification within 12-Months * Child's Legal Status Immediately Prior to Discharge | 97 |
| **Crosstabulation 37:** | Reunification within 12-Months * Area Office Assignment | 98 |
| **Crosstabulation 38:** | Reunification within 12-Months * In Reviewer's Opinion was Reunification in the Best Interest of the Child at This Time? | 98 |
| **Crosstabulation 39:** | Reunification within 12-Months * Overall Quality of Case Practice During Episode Ending in 4Q2006 Reunification | 99 |
| **Crosstabulation 40:** | Time Between Dates of Entry and TPR Filing * Child's Age on Entry Date | 102 |
| **Crosstabulation 41:** | Time Between Dates of TPR Filing and TPR Granted * Child's Age on Entry Date | 102 |
| **Crosstabulation 42:** | Child's Length of Stay * Child's Age on Entry Date | 103 |
| **Crosstabulation 43:** | Adoption Within 24 Months * Child's Age on Entry Date | 103 |
| **Crosstabulation 44:** | Adoption Within 24 Months * Child's Age on Adoption Date | 103 |
| **Crosstabulation 45:** | Adoption Within 24-Months? * Child's Gender | 104 |
| **Crosstabulation 46:** | Adoption Within 24-Months? * Child's Ethnicity * Child's Race | 105 |
| **Crosstabulation 47:** | Adoption Within 24-Months? * Was this the First Placement Episode Experienced by this Child? | 105 |
| **Crosstabulation 48:** | Adoption Within 12-Months? * For How Long Had Adoption been the Primary Permanency Goal for this Child as of the Date Child's Fourth Quarter 2006 Adoption was Finalized? | 106 |
| **Crosstabulation 49:** | Child's Length of Stay * Time from Entry to Date of TPR Filing | 106 |
| **Crosstabulation 50:** | Adoption Within 24-Months? * Time from TPR Filing to TPR Granted | 107 |
| **Crosstabulation 51:** | Adoption Within 24-Months * Time from TPR Granted to Adoption Finalized | 107 |
| **Crosstabulation 52** | Was this Adoption Resource a Legal Risk Home? * Time from Entry Date to TPR Filing | 108 |
| **Crosstabulation 53:** | Adoption Within 24-Months? * Was this Adoptive Resource a Legal Risk Home? | 108 |
| **Crosstabulation 54:** | Adoption Within 24-Months? * Total Placements During Placement Episode? | 109 |
| **Crosstabulation 55:** | Adoption Within 24-Months? * Did this Home Originally Provide Foster Care for this Child but Ultimately Decided to Adopt? | 109 |
| **Crosstabulation 56** | Adoption Within 24-Months? * Overall Quality of Supervision | 110 |
| **Crosstabulation 57:** | Adoption Within 24-Months? * Area Office Assignment | 111 |
| **Crosstabulation 58:** | Adoption Within 24-Months? * Overall Quality of Case Practice During Placement Episode Ending in Fourth Quarter 2006 Adoption | 111 |
| **Crosstabulation 59:** | TOG Within 24-Months? * Time from Case Open to Entry Date? | 115 |
| **Crosstabulation 60:** | TOG Within 24-Months? * Age at Entry? | 115 |
| **Crosstabulation 61:** | TOG Within 24-Months? * Age at TOG? | 115 |

| Item | Title | Page |
|------|-------|------|
| **Crosstabulation 62:** | TOG Within 24-Months?  Child's Gender? | 116 |
| **Crosstabulation 63:** | TOG Within 24-Months? * Child's Ethnicity * Child's Race? | 116 |
| **Crosstabulation 64:** | TOG Within 24-Months? * Was this the First Removal Episode Experienced by this Child? | 117 |
| **Crosstabulation 65:** | TOG Within 24-Months? * Reason for Child's Entry into DCF Placement? | 117 |
| **Crosstabulation 66:** | TOG Within 24-Months? * Time from Entry Date to Identification of Eventual Guardian? | 118 |
| **Crosstabulation 67:** | TOG Within 24-Months? * Time from Entry Date to Placement with Eventual Guardian? | 118 |
| **Crosstabulation 68:** | TOG Within 24-Months? * Primary Placement (>50% of the Episode) | 119 |
| **Crosstabulation 69:** | TOG Within 24 Months? * Is There Evidence that Family Conferencing or Other Engagement Activities Were Attempted by DCF to Successfully Discharge Child from Care? | 119 |
| **Crosstabulation 70:** | TOG Within 24-Months? * For How Long Had TOG Been the Primary Permanency Goal for this Child as of the Date of Child's TOG Finalization? | 120 |
| **Crosstabulation 71:** | TOG Within 24-Months? * Area Office Assignment | 121 |
| **Crosstabulation 72:** | TOG Within 24-Months? * Overall Quality of Case Practice During Placement Episode Ending in Fourth Quarter 2006 TOG | 122 |
| **Crosstabulation 73:** | Fourth Quarter 2006 Statewide Sibling Status * Placement Outcome | 126 |
| **Crosstabulation 74:** | Fourth Quarter | 126 |
| **Crosstabulation 75:** | Age at Entry * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge | 131 |
| **Crosstabulation 76:** | D.7. Child's Race * D.8. Child's Ethnicity | 132 |
| **Crosstabulation 77:** | Pre.7. How Many Unique Placement Settings Did the Child Experience Within the Timeframe Between the Start Date (Pre.2) and the Last Placement End Date (Pre.6a)? * Re.1. Did Child Come Back into DCF Custody at Any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 134 |
| **Crosstabulation 78:** | Pre.11. In What Placement Setting did this Child Spend the Majority of the Placement Episode * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 135 |
| **Crosstabulation 79:** | Pre.13. Is There Evidence that Family Conferencing or Other Engagement Activities were Attempted by DCF in Working with this Family to Successfully Discharge Child from Care? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 136 |
| **Crosstabulation 80:** | Pre.14. Who Supervised the Majority of Visits between Child and Person to Whom Child was to be Discharged in the 6-Months Leading up to Child's Placement Exit? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 137 |
| **Crosstabulation 81:** | Post.1. How Many Months Did DCF Continue to have an Open Case with the Family Between the Child's 3Q05 Legal Discharge Date and 9/30/06? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 139 |
| **Crosstabulation 82:** | Pre.12. Did the Court Decide to Return the Child Contrary to DCF Recommendations? * Post 4.4 Were There Any Accepted Referrals to Hotline (Identifying This Child as a Victim) in the 12-Month Period Following Child's 3Q05 Legal Discharge? | 140 |
| **Crosstabulation 83:** | Post.8. Were Continued or New Support Services Identified for the Post-Discharge Period to Increase the Likelihood of Successful Permanency? * Post .9. Were Identified Services Implemented? * Re.1.  Did Child Come Back into DCF Custody at Any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 142 |
| **Crosstabulation 84:** | Post.13. Considering All of the Factors and Your Review of the Post-Discharge Planning Work with the Family, How Would You Rate the Quality of DCF's After-Care Planning for this Child/Family? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 144 |

| Item | Title | Page |
|------|-------|------|
| **Crosstabulation 85:** | D.12. Area Office to Which Child was Assigned During Placement Period Ending with 3Q05 Legal Discharge * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? | 145 |
| **Crosstabulation 86:** | Pre6b. What was the Documented Placement Discharge Reason? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? * Pre.20. Were all Services/Supports Assessed as Necessary Provided to the Child/Family Prior to Legal Discharge? | 146 |
| **Crosstabulation 87:** | Post.4. Were there any Accepted Referrals to Hotline in the 12 Month Period Following Child's 3Q05 Legal Discharge? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12 Month Period Following the Child's 3Q05 Legal Discharge date? * Post.5. Were Any of these Referrals Substantiated? | 147 |
| **Crosstabulation 88:** | Race (Child or Family Case Named Individual) * Ethnicity (Child or Family Case Named Individual) | 153 |
| **Crosstabulation 89:** | For Child in Placement, Has TPR Been Filed? * Has Child's Length of Stay Exceeded the 15 of the Last 22 Month Benchmark Set by ASFA? | 154 |
| **Crosstabulation 90:** | How Many Consecutive Months has this Child Been in Out-of- Home Placement as of the Date of this Review or Date of Case Closure during the Period? * Has this Child Experienced More than Three Placements in the 12 Months Ending 12/31/06? | 155 |
| **Crosstabulation 91:** | Was the overcapacity the result of sibling group placement? * For how long was the placement(s) overcapacity during the quarter? | 158 |
| **Crosstabulation 92:** | Were there Monthly Face-to-Face Visits Documented for this Child in Placement During the Quarter of Review? * During these Visits, Did the SW Meet with the Child in Private? (alone) | 159 |
| **Crosstabulation 93:** | Did DCF Social Worker Have Documented Private Contact/Conversations with the Foster Parent/Provider During the Quarter * Did the DCF Social Worker Document that the Discussion with the Placement Provider Included Conversation Related to the Child's Well-Being and Any Services in Place at That Time? | 160 |
| **Crosstabulation 94:** | Did the Child in Placement or Placement Provider Request Assistance with Service Provision, Clothing, or Other Necessary Item? * If Yes, Did the SW Document His/Her Follow Through with Assistance or Information in a Timely Manner? | 161 |
| **Crosstabulation 95:** | Module Number * Was this class held? | 167 |
| **Crosstabulation 96:** | What was the location of training offered * Was this class held? | 168 |
| **Crosstabulation 97:** | Did the FASU Support Worker document any visits to this home during the quarter of Oct 1, 2006 through Dec 1, 2006? * Has this provider attended any foster parent trainings in the year of Jan 1, 2006 through Dec 31, 2006? | 170 |
| **Crosstabulation 98:** | Does this date (d6) place the foster care provider within the initial post licensure training period requirement or subsequent year training requirement * Has this provider attended any foster parent trainings in the year of January 1, 2006 through December 31, 2006? | 171 |
| **Crosstabulation 99:** | Does the record indicate that a support plan was developed or updated to identify the training needs at any point during the period beginning January 1, 2006 through December 31, 2006? * Has this provider attended any foster parent trainings in the year of January 1, 2006 through December 31, 2006? | 172 |
| **Crosstabulation 100:** | Does this date (d6) place the foster care provider within the initial post licensure training period requirement or subsequent year training requirement? * Was this provider licensed/re-licensed during the period of January 1, 2006 through December 31, 2006 without documentation that they had completed the required number of foster parent training hours? | 172 |
| **Crosstabulation 101:** | What is the race? * Ethnicity | 176 |
| **Crosstabulation 102:** | Did the SW document any concerns related to the child(ren) safety or wellbeing during the quarter ending December 31, 2006? * Did the SW raise these concerns to the SWS for case direction? | 179 |
| **Graph 1:** | Average ages of Children at Junctures Within the Timeline to Adoption for Children with Episodes that Met/Did Not Meet the Standard for Timely Adoption | 104 |

| Item | Title | Page |
|------|-------|------|
| **Table 1:** | Case Sample Assignments for OM1 and OM2 Case Review | 18 |
| **Table 2:** | Allegations Identified within the 100-Case Sample | 19 |
| **Table 3:** | Rank Scores within the 100 Case Sample of Investigations Accepted October 1, 2006 through December 31, 2006 | 25 |
| **Table 4:** | Second Quarter 2007 Sample based on March 1, 2007 Caseload Universe | 30 |
| **Table 5:** | Causes for DCF Involvement on Date of Most Recent Case Opening | 32 |
| **Table 6:** | What is the Primary Reason Cited for Case Opening/Reopening? | 33 |
| **Table 7:** | What is the Child or Family's Stated Permanency Goal on the Most Recent Approved Treatment Plan in Place During the Period | 34 |
| **Table 8:** | Participation and Attendance Rates for Active Case Participants within the Sample Set | 36 |
| **Table 9:** | Measurements of Treatment Plan OM 3 – Number of Percent of Rank Scores for All Cases Across All Categories of OM 3 | 39 |
| **Table 10:** | Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for Out-of-Home (CIP) Cases Across All | 39 |
| **Table 11:** | Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for In-Home Family Cases Across All Categories | 39 |
| **Table 12:** | Scoring of Categorical Sections of Outcome Measure 15 | 42 |
| **Table 13:** | Measurements of Treatment Plan OM 15 – Percentage and Ranks Scores Attained Across All Categories | 43 |
| **Table 14:** | Unmet Service Needs Identified within the Sample Set Cases | 44 |
| **Table 15:** | What was the Primary Barrier that Prevented Families or Children from Having Their Medical, Dental, Mental Health or Other Service Need Met | 45 |
| **Table 16:** | Service Needs Not Incorporated into the Current Treatment Plan | 46 |
| **Table 17:** | Compliance with OM 4 within Each of the Area Office Locations | 65 |
| **Table 18:** | Area Office Assignment | 71 |
| **Table 19:** | Case Practice Issues for Open Cases in the Period Leading Up to the July 2006 Incident | 73 |
| **Table 20:** | Substantiations for the First Incident/Episode Reported | 74 |
| **Table 21:** | Placement Settings of Children Maltreated in Out-of-Home Care | 86 |
| **Table 22:** | Universe (N=327) and Sample Set (n=81) Designation by Area Office | 89 |
| **Table 23:** | Length of Stay Prior to Reunification | 97 |
| **Table 24:** | Universe (N=131) and Sample Set (n=80) Designation by Area Office | 101 |
| **Table 25:** | Children's Length of Stay During Placement Episode Ending with Fourth Quarter 2006 Adoption | 110 |
| **Table 26:** | Universe (N=106 and Sample Set (n=80) Designation by Area Office | 114 |
| **Table 27:** | Categorized Length of Stay for Children Achieving TOG During the Period? | 120 |
| **Table 28:** | Fourth Quarter 2006 Combined Clinical Reasons | 125 |
| **Table 29:** | Distribution of Sample by Area Office Designation | 130 |
| **Table 30:** | Reasons for Entry into DCF Custody for Episode Ending Third Quarter | 133 |
| **Table 31:** | Top 10 Services in Place for the Child during the Period Leading up to the Legal Discharge in the Third Quarter 2005? | 138 |
| **Table 32:** | Conditions or Issues Which Required the Case to Remain Open for All or Part of the 12-Month Period Post-Discharge Included | 141 |
| **Table 33:** | Barriers to Providing Post Discharge Services | 143 |
| **Table 34:** | Post Discharge Service Needs Not Addressed at Point of Discharge | 143 |
| **Table 35:** | Reasons for Child's Re-entry without Substantiation of Abuse or Neglect | 147 |
| **Table 36:** | Area Office Distribution within the Sample Set (n=256) | 151 |
| **Table 37:** | Cause for DCF Involvement at Date of Most Recent Case Opening Prior to December 31, 2006 | 152 |
| **Table 38:** | What is the Child or Family's Stated Permanency Goal on the Most Recent Approved Treatment Plan in Place during the Period? | 153 |
| **Table 39:** | Has this Child Experienced More than Three Placements in the 12-Months Ending 12/31/06? | 154 |
| **Table 40:** | How Many Placements Has this Child Experienced During This 12-Month Period? | 155 |
| **Table 41:** | Statistics Related to Visitation by DCF, ICPC or Identified Private Provider within the 256 Sample Set. | 159 |

| Item | Title | Page |
|------|-------|------|
| **Table 42:** | Did the DCF Social Worker Advise FASU or the PREU of Any Serious Concerns Arising as a Result of Visits at the Provider Location? | 161 |
| **Table 43:** | Overall Rank Score for the Quality of Visitation | 163 |
| **Table 44:** | Comparison of Quality of Visitation with In-Home and Out of Home Sample Sets | 163 |
| **Table 45:** | Foster Care Providers by Area Office | 165 |
| **Table 46:** | How many hours of training are documented for this foster parent in the period of October 1, 2006 through December 31, 2006? | 170 |
| **Table 47:** | Area Office Distribution of OM 17 Sample Set (n=250) | 175 |
| **Table 48:** | Number of Cases with 2 or More Successful Worker Visitation (In-Home) | 176 |
| **Table 49:** | Visits the SW made with the family Oct 1, 2006 through Oct 31, 2006? | 178 |
| **Table 50:** | Visits the SW made with the Nov 1, 2006 through Nov 30, 2006? | 178 |
| **Table 51:** | Visits the SW made with the family Dec 1, 2006 through Dec 31, 2006? | 179 |
| **Table 52:** | Overall Quality of Visitation | 181 |
| **Table 53:** | Caseload Report on December 31, 2006 | 183 |
| **Table 54:** | Workers Exceeding OM18 Utilization by Area Office and Number of Days in Excess on December 31, 2006 | 184 |
| **Table 55:** | All Children in Placement (excluding Committed Delinquent status CIP) on December 17, 2006 | 187 |
| **Table 56:** | Outcome Measure 20, Discharged Youth who Achieved One or More Achievement Measures, by DCF Office | 192 |
| **Table 57:** | Specific Achievement Measures Met by Discharged Youth, N=44 | 193 |

## *Juan F.* v Rell 2006 Comprehensive Targeted Review

**Introduction**

The Revised *Juan F.* Exit Plan requires that the *"Court Monitor will conduct case reviews to produce annual reports documenting the Department of Children and Families' performance and progress toward achieving the Outcome Measures defined within this Exit Plan, except Outcome Measures 3 and 15 for which there will be separate quarterly case record reviews. The annual report concerning 2006 data will include a synopsis of the quantitative data provided by DCF in the third and fourth quarters of the calendar year of 2006 as well as the quantitative and qualitative findings from the research questions documented in the attached addendum document. . . . Subsequent annual reports will include a synopsis of the quantitative data provided by DCF as well as the quantitative and qualitative findings for those subsequent calendar years from the research questions documented in the attached addendum document."*

On March 23, 2006 the Court Monitor submitted an overall methodological outline for the Comprehensive Annual Review to the *Juan F.* parties.  Initially, Outcome Measure 5, Outcome Measure 6, Outcome Measure 12, Outcome Measure 16 and Outcome Measure 17 were slated for only quantitative analysis given the verified accuracy of data.  However, upon reconsidering the reporting requirements, and to provide the most informative reporting to the parties, the Monitor added these measures to the qualitative reporting schedule.  The Court Monitor's Office then began preparations to conduct the reviews with the input of all parties and with the assistance of the Technical Advisory Committee (TAC).  The TAC was identified as a component in the Revised Monitoring Order dated October 12, 2005.  Each of the measures was approached systematically with the development of protocols and methodologies which were submitted to each party with sufficient opportunity to comment and contribute to the development of the review process.

To accommodate fiscal and resource restraints within the allotted timeframes, changes were made to the sampling populations.  On December 12, 2006, the Court Monitor proposed changes to the methodology of the 2006-2007 Comprehensive Targeted Case Review.  The reductions in sampling methodology were identified as follows:
- Outcome Measures 1 and 2  - Change sample size from ~238 to a sample of 100
- Outcome Measure 7 -   Change sample size from ~160 to a sample of 80
- Outcome Measure 11 - Change sample size from ~191 to a sample of 68
- Outcome Measure 13 - Change sample size from ~237 to a sample of 70
- Outcome Measure 17 - Change sample size from ~249 to a sample of 100

All parties considered the suggested samples sufficiently robust for evaluating the qualitative aspects of each of the measures.  All quantitative data for these identified Outcome Measures was reviewed on numerous occasions, with query logic verified and corrections implemented as required.  Those measures that presented with persistent data quality issues over the course of time since the *Juan F.* Revised Exit Plan was approved on July 11, 2006, were subject to review at more stringent confidence ratios and margin of errors.  As the sample size and confidence level to review only qualitative data is not detailed in the *Juan F.* v Rell Revised Exit Plan and there is no controlling language regarding qualitative reviews, a Court Order was not required related to these methodological changes.

This unprecedented review of approximately 2,500 cases provided a unique opportunity to analyze the Department's progress with respect to the Outcome Measures and consider the expectations that we place on DCF as an organization. This review confirms that tremendous progress has been made and sustained for many of the 22 Outcome Measures, but important work remains to ensure that children permanency, well-being and service needs are effectively addressed.

A separate Executive Summary of the 2006 Comprehensive Targeted Review has been prepared due to the lengthy nature of this document. Copies of the protocols utilized for the review are not incorporated via addendum due to the volume of paperwork this would require. These documents are available upon request.

## Acknowledgements

The Court Monitor would like to acknowledge the continued collaborative efforts of the *Juan F*. parties in developing this review process and the consultations provided by the TAC. Specifically I wish to acknowledge the following individuals who contributed to the development, training, review, data collection, analysis and drafting of this document:

| **DCF Personnel** | **DCF Central Office Administration** | **Technical Advisory Committee** |
|---|---|---|
| Kathy Acosta | Lou Ando | Claire Anderson |
| Debra Collins | Rudy Brooks | Linda Arnold |
| Liz Cyr | Darlene Dunbar | Dick Matt |
| Janet Gonzalez | Susan Hamilton | Judith Meltzer |
| Juliann Harris | Karl Kemper | |
| Marcy Hogan | Brian Mattiello | |
| Doug Howard | | |
| Allon Kalisher | | |
| Stanley Kasanowski | | |
| Wanda Ladson | **Monitor's Staff and Contracted Reviewers** | **Other Stakeholders** |
| Maxine McIntyre | Mary Corcoran | Mark Horwitz |
| Jorge Martinez | Charlene Fleming | CAFAP |
| Fred North | Tom Gallese | |
| Barbara O'Connell | Mary Ann Hartmann | ***Juan F.* Attorneys** |
| Linda Raitt, RN | Susan Marks Roberts | Stephen Frederick, Esq. |
| Kim Somaroo-Rodriguez | Melodie Peet | Marcia Lowry, Esq. |
| Sandra Tapia | Joni Beth Roderick | Ira Lustbader, Esq. |
| Isabel Turmeque | Michelle Turco | Jessica Polansky, Esq. |
| Joan Twiggs | | Ann Rubin, Esq. |
| Rynep VanEldik | | |
| Maribel Vazquez | | |
| Lynette Warner | | |

A number of overarching findings emerged from the targeted reviews conducted over the last six months. The findings confirm the sustained improvements in many areas of case practice that have been highlighted during the course of our quarterly reports. The reviews offered insight into areas where progress has not been adequate, or quality of the work requires continued improvement.

Each of the targeted reviews presents a series of findings that pertain to the specific focus of that Outcome Measure. These findings are narrated within each corresponding chapter within this document. In addition, there are a number of overarching findings that span many, if not all of the measures. These are presented as collective findings below:

**Collective Findings**
- The results from the targeted review of approximately 2,500 cases confirm the tremendous progress and improvement in fundamental areas of case practice that has occurred over the course of the past three years. The Department has elevated its practice in key areas such as:
    - Visitation contact
    - Timely permanency outcomes for children
    - Provision of Multidisciplinary Exams (MDE) for children,
    - Timeliness of investigations
    - Increased emphasis on kinship resource searches,
    - Reduction of residential care placements, particularly those out of state
    - Improved educational/vocational outcomes for youth discharged after age 18
- Despite impressive improvements referenced above, the Department has not been successful in two significant and fundamental areas of practice: Treatment Planning and Needs Met.

- Appropriate treatment planning remains areas of concern. The findings indicate that the Department is performing considerably lower than the benchmarks set within the *Juan F. Revised Exit Plan.* In spite of increased training, resources and numerous initiatives to focus the work, treatment plans are regularly developed without the full participation of the active case participants and often lack:
    - Clear focused goals for the child in placement and/or family
    - Inclusive action steps for the active case participants, providers and DCF,
    - Identification of progress related to the goals set in place during the prior six months

  This is not to say that treatment planning has not shown some improvement. Several areas of the treatment plan assessment have made gradual progress since implementation of the format currently in use. Further, progress has been noted due to the statewide implementation of the Family Conference (FC) model which places the focus on appropriate engagement and empowerment of families. While there is evidence that this process now has a foothold within many area offices, much more work is required to achieve system-wide competency and consistent utilization of this practice.

- System gridlock exists in the treatment and placement service array creating a barrier to meeting children and families' needs. Discharge delays routinely occur at emergency departments (ED), group homes, residential treatment facilities, SAFE homes, and

STAR/Shelter programs.  There is a tremendous need for all levels of foster care and adoptive resources.  Wait lists for in-home services and outpatient mental or behavioral health services exist for most area offices.

- The permanency outcome measures (OM7, OM8, and OM9) have been maintained at or above the Exit Plan requirement for three consecutive quarters.  However, while the Department has greatly improved its performance in achieving timely permanency, these measures are predicated on exit cohorts.  Of those children that remain in the system, many have the non-preferred goal "Another Planned Living Arrangement" (APPLA) and are languishing in the system with insufficient focus on development of connections to lifelong resources, and inadequate life skills training and discharge planning.  More focused attention and actions must be taken on behalf of these children.

- Given the success of the Department in achieving fundamental quantitative changes required by the Exit Plan benchmarks, attention must now focus on improving the quality of efforts.  The targeted review findings suggest numerous opportunities for continued development and improvement.  Continuous quality improvement must be emphasized at all levels of the Department.

- Each targeted review identified the Social Work Supervisor (SWS) as a critical component to producing positive outcomes for children and families.  Competent guidance and support is required to navigate the multiple tasks required on the path to permanency and well-being. In every area measured, reviewers identified accurate assessment, discussion of risk, development of action steps, and follow through within the supervisory process as keys to successful outcomes.

- Appropriate use of the Area Resource Group (ARG) and external consultants in situations of substance abuse, mental health issues and domestic violence remains inconsistent across the cases sampled.  There were many opportunities for ARG consultations that were not utilized - resulting in less robust assessment of risk and safety and less effective treatment planning.

- The culmination of these review efforts provides confirmation that the automated reports produced by the Department for the Exit Plan Outcome Measures accurately represent the levels of performance.  Given the repeated confirmation and verification of the quantitative results for the majority of the measures, attention must now be focused on developing qualitative methodologies for analyzing system strengths and opportunities for development.  The Court Monitor's future reviews will focus on targeted areas of concern related to meeting the needs of children and families.

- The overwhelming expectations and complexities facing DCF staff were noted by reviewers throughout this process.  The current workload, especially for the SW and SWS level staff must be analyzed and considered in the context of producing positive outcomes.  Increasing expectations to meet multiple, overlapping, focused and unfocused, funded and unfunded mandates are compounded by layers of responsibility and new labor intensive processes.  An unmanageable workload will result in inefficient efforts by DCF

on behalf of children and families.  Left unchecked, this will create a situation that will threaten the progress that has been achieved.

The following chart provides an overview of the timeframes and populations from which all samples were drawn, as well as our qualitative findings for that measure.  Further, the Monitor's *Juan F*. v. Rell Exit Plan Quarterly Report:  April 1, 2007 – June 30, 2007 includes a table which provides the longitudinal data for each of the fourteen quarters that have been reported to date.

## Monitor's Comprehensive Qualitative Report – Findings at a Glance

| Outcome Measure | Requirement | Baseline | Universe | Sample | Findings |
|---|---|---|---|---|---|
| OM1:<br>Investigation<br>Commencement | ≥ 90% | N/A | All reports accepted at the Hotline during the period of Oct 1, 2006 – Oct 31, 2006 (N= 2,387) | 100 reports | 97.0% |
| OM2:<br> Investigation Completion | ≥ 85% | 73.7% | All reports accepted at the Hotline during the period of Oct 1, 2006 – Oct 31, 2006 (N =2,387) | 100 reports | 95.0% |
| OM3:<br> Treatment Plans | ≥ 90% | N/A | 2nd Qtr 2007 ACR schedule | 76 cases | 30.3% |
| OM4:<br>Search for Relatives | ≥ 85% | 58% | All children that entered DCF custody during the period of April 1, 2006 through June 30, 2006. (N=737) | 196 children | 94.4% |
| OM5:<br>Repeat Maltreatment | ≤ 7% | 9.3% | All children that experienced substantiated abuse or neglect during the month of July 2006. (N= 876) | 134 children:<br>(67 w/ repeat and<br>67 w/ no repeat) | 7.6% |
| OM6:<br>Maltreatment in Out-of-Home (OOH) Care | ≤ 2% | 1.2% | All children that were in out of home placement during the 3rd Qtr 2006. (N=6,688) | 27 children:<br>(12 w/maltreatment<br>and 15 w/no maltreatment) | 0.18% |
| OM7:<br>Reunification | ≥ 60% | 57.8% | All children discharged via adoption from DCF custody during the 4th Qtr 2006 (N=131) | 71 Children | 64.8% |
| OM8:<br>Adoption | ≥ 32% | 12.5% | All children discharged from care to reunification during the 4th qtr 2007 (N=327) | 80 Children | 27.5% |
| OM9:<br>Transfer of Guardianship | ≥ 70% | 60.5% | All children that were discharged from DCF custody during the quarter of Oct 1, 2006 through Dec 31, 2006. (N=106) | 80 Children | 76.3% |
| OM10:<br>Sibling Placement | ≥ 95% | 57.0% | New sibling entries and changes in sibling placement within full population of all siblings in placement during 4th Qtr 2006. (N=2,333 children) | 604 Children (all identified siblings with change in placement or new entry) | 85.5% |
| OM11:<br>Re-Entry into DCF Custody | ≤ 7% | 6.9% | All children that were discharged from DCF custody during the quarter of July 1, 2005 through Sept 30, 2005 (excluding Voluntary Service Placements) (N=639) | 113 Children<br>(55 children w/ re-entry date, and<br>58 children w/ no re-entry date) | 8.6% |
| OM12:<br>Multiple Placements | ≥ 85% | N/A | All children in DCF custody for at least 30 days in the 4th Qtr 2006 (excluding voluntary, interstate and probate cases (N=5,808) | 256 Children | 95.3% |

13

## Monitor's Comprehensive Qualitative Report – Findings at a Glance

| Outcome Measure | Requirement | Baseline | Universe | Sample | Findings |
|---|---|---|---|---|---|
| **OM13:**<br>**Foster Parent Training** | 100% | N/A | All licensed foster homes available to the Department on December 31, 2006. (N=3,723) | 75 Foster Homes | Qualitative Findings do not translate to a score. |
| **OM14:**<br>**Placement within Licensed Capacity** | ≥ 96% | 94.9% | All children in DCF custody for at least 30 days in the 4th Qtr 2006 (excluding voluntary, interstate and probate cases.) .(N=5,808) | 202 Children | 90.1% |
| **OM15:**<br>**Children and Families' Needs Met** | ≥ 80% | N/A | 2nd Qtr 2007 ACR schedule | 76 cases | 51.3% |
| **OM16:**<br>**OOH Visitation** | ≥ 85% (Month)<br>100% (Qtr) | 72.0%<br>87.0% | All children in DCF custody for at least 30 days in the 4th Qtr 2006 (excluding voluntary, interstate and probate cases). (N=5,808) | 256 Children | 99.4% (Month)<br>99.2% (Qtr) |
| **OM17:**<br>**In-Home Visitation** | ≥ 85% | N/A | All in-home treatment cases open 30 days or more as of December 31, 2006 (excluding probate, interstate and voluntary cases). (N=737) | 250 Families | 89.2% |
| **OM18:**<br>**Caseload Standards** | 100% | 69.2% | All open cases during 4th qtr 2006: 17,622 cases distributed among 1,340 workers. (including 170 trainees) | N/A | 100.0% |
| **OM19:**<br>**Residential Reduction** | ≤ 11% | 13.5% | All children in placement on Dec 31, 2006. | N/A | 11.0% |
| **OM20:**<br>**Discharge Measures** | ≥ 85% | 61.0% | All youth, 18 years of age or older, discharged from care 4th Qtr, 2006. Excluding from Juvenile Justice, Interstate, Probate, and Voluntary cases opened for the sole purpose of making monetary payments on behalf of the youth. (N=70) | 70 Youth | 100.0% |
| **OM21:**<br>**Discharge to Department of Mental Health and Addiction Services (DMHAS)/Department of Mental Retardation (DMR)** | 100% | N/A | All youth, 18 years of age or older, discharged from care 4th Qtr, 2006 and who require discharge to DMHAS or DMR. Excludes Juvenile Justice, Interstate, Probate, and Voluntary cases opened for the sole purpose of making monetary payments on behalf of the youth. (N=29) | 29 Youth | 97.0% |
| **OM22:**<br>**Multi Disciplinary Exams (MDE)** | ≥ 85% | 5.6% | All Juan F. children entering care for the first time and reaching 30 days in placement during the 4th quarter. (N=388) | 21 children identified as non-compliant with OM22 | 96.9% |

**Outcome Measure 1:  Commencement of Investigations and
Outcome Measure 2:  Completion of Investigations**

**Overview**
The _Juan F. v Rell Revised Exit Plan_ requires two performance benchmarks related to
child protective service investigations.  They are Outcome Measure 1:  Commencement
of Investigations and Outcome Measure 2:  Completion of Investigations.  The
requirements of these two measures are defined as follows:

**Outcome Measure 1:  Commencement of Investigations** requires that, **"DCF shall
assure that at least 90% of all reports of children alleged to be abused, or neglected,
shall be prioritized, assigned and the investigation shall commence within the
timeframes specified below.  If the report of child abuse or neglect is determined by
the DCF Hotline to be…**

   A. **A situation in which failure to respond immediately could result in the death
   of, or serious injury to a child , then the response time for commencing and
   investigation is _the same calendar day_ Hotline accepts the report.**
   B. **A non-life threatening situation that is severe enough to warrant a 24 hour
   response to secure the safety of the child and to access the appropriate and
   available witnesses, then the response time for commencing an investigation
   is _24 hours_.**
   C. **A non-life threatening situations that, because of the age or condition of the
   child, the response time for commencing an investigation is _72 hours_."**

In definitions within the _Juan F. v Rell Revised Exit Plan_ document, the "commencement
of the investigation" occurs when the DCF investigator attempts to make face-to-face
contact with the parent or person responsible for the child's care, and or with the
child(ren)".  The "attempt at face-to-face contact" is made "when the investigator visit
the home, school or other setting in an effort to interview the child(ren) and family
members regarding the allegation of abuse or neglect." (See DCF Policy 34-4)

The Department has reported achievement of this measure every quarter since the Fourth
Quarter 2004. This review found 97.0% of the case sample (n=100) met Outcome
Measure 1 as the response time achieved within the investigation was within the priority
established for response at Hotline.  This is consistent with the Department's reported
performance for this measure.

**Outcome Measure 2:  Completion of the Investigation** requires that **"at least 85% of
all reports of alleged child maltreatment accepted by the DCF Hotline shall have
their investigations completed within 45 calendar days of acceptance by the Hotline.**
Guidelines within the Exit Plan document indicate that completion of the investigation
occurs only after the DCF SWS verifies the determination of substantiation or non-
substantiation and enters that in LINK via the SWS approval of the investigation.

The Department has reported achievement of Outcome Measure 2 consistently since the fourth quarter 2004. **Our quantitative findings indicate that 95.0% of the reports accepted for investigation within our sample had investigations completed within 45 days of the date of acceptance at Hotline.** Of those four cases not achieving the benchmark performance, the completion was documented at 51, 53, 54 and 55 days from date of acceptance. This is consistent with the Department's LINK reporting for this measure.

**Review Findings and Trends:**
The reviewers identified that 69% of the cases within the sample incorporated a majority of the elements of the risk assessment component measured, but that only 43% incorporated all expected policy elements. The latter issue may be one of disparity of standards for documentation which vary slightly office by office rather than poor practice. Overall rankings of the quality of the investigations resulted in 49.0% at a very good or optimal level, 40% at a marginal level, 10% at a poor level and 1.0% scored as adverse.

There are data elements of the protocol left blank in many cases. Most frequently this was related to descriptive data elements, services, and notification. In some cases, this deficit was overcome by text within the investigation protocol. In others it was not. While there are variations between area offices, the differences are more apparent when the Special Investigation Unit (SIU) conducts investigations. This unit appears to have different practice guidelines regarding the data elements that are filled out within the investigation protocol document.

While 97.0% of the sample commenced investigations within the specified timeframe, actual contact with alleged child victims was 4.6 days. Investigators were most successful with the Same Day priority response, in that 92.9% of those cases had documented contact with the alleged victim on the same date of the acceptance. The 24 hour response and 72 hour response cases achieved contact with the alleged victim within the priority response designation in 54.1% and 47.0% respectively.

In 94.0% of the sample there was documented contact with the child victim. In the six cases where there was no contact with the alleged victim, reviewers felt that circumstances preventing contact in all but one case were well documented and reasonable.

In 97% of the sample, there was documented contact with the alleged perpetrator(s). In the three situations where there was no contact with the alleged perpetrator, the circumstances preventing contact were well documented and reasonable.

Use of the Area Resource Group (ARG) in situations of substance abuse, mental health issues and domestic violence remains inconsistent across the investigations sampled. Reviewers felt that there were many opportunities for ARG consultations that were not

utilized - resulting in less robust assessment of risk and safety. Specifically, reviewers noted 17 cases for which they felt ARG consultation was required, and not included within the process. As a result, the risk assessments did not appear to be comprehensive and accurate.

Key background and collateral contacts were not always documented. Fourteen percent of the cases did not have criminal background checks documented. Twenty percent did not document medical collateral contacts. Fifteen percent of the cases failed to incorporate interviews with other adult residents in the home where the alleged abuse took place.

In 31.0% of the sample, service needs were identified by the Investigator but no follow up is documented upon disposition of the case. This potentially leaves a family that is not transferred to Ongoing Services no better informed or connected with resources available in the community then when they came to the Department's attention.

In all, 88.7% of the reports with one specific incident date failed to identify that incident date in the appropriate data field. This can be a source of error when reporting on repeat maltreatment as the date of incident and report are often not the same.

The majority of reports in this sample came from mandated reporters outside of the Department. In 74.7% of the cases reported by mandated reporters there was no indication of letters of notification to the reporter regarding the determination of abuse/neglect.

Notification letters or contact with the alleged perpetrator to advise them of the investigation findings is poorly documented. In all, 42% of the sample lacked this documentation.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**
The Monitor's Office created the tool for measurement of Outcome Measure 1 and Outcome Measure 2 with input of all parties in the fall of 2006. The parties agreed with a randomly selected sample of 100 cases. On October 2, 2006 the Monitor's Office requested the universe of all reports of abuse or neglect accepted at the Hotline during the period of October 1, 2006 through October 31, 2006. This allowed an opportunity to conduct a review verifying LINK data reporting related to Outcome Measure 1 and Outcome Measure 2 as well as to provide a universe from which to sample and review more qualitative practice elements regarding investigative practices. The Department provided data which identified 2,387 accepted, unduplicated reports during the quarter. A sample was selected from that universe comprised of reports assigned for investigation as follows:

**Table 1:  Case Sample Assignments for OM1 and OM2 Case Review**

| Office | Frequency | Percent of Sample |
|---|---|---|
| Bridgeport | 10 | 10.0 |
| Danbury | 5 | 5.0 |
| Greater New Haven | 9 | 9.0 |
| Hartford | 13 | 13.0 |
| Hotline (SIU) | 4 | 4.0 |
| Manchester | 7 | 7.0 |
| Meriden | 4 | 4.0 |
| Middletown | 4 | 4.0 |
| New Britain | 8 | 8.0 |
| New Haven Metro | 5 | 5.0 |
| Norwich | 3 | 3.0 |
| Norwalk | 8 | 8.0 |
| Stamford | 3 | 3.0 |
| Torrington | 4 | 4.0 |
| Waterbury | 7 | 7.0 |
| Willimantic | 6 | 6.0 |
| Statewide | 100 | 100.0 |

The LINK record review was conducted over the first and second quarters of 2007.  DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts.  A pilot test was conducted and necessary changes resulted to improve validity and reliability of scoring.

**Descriptive Information**
The sample of 100 reports provides the opportunity to assess compliance and qualitative elements of the work of 92 Investigation Social Workers (ISW) and 48 Investigation Social Work Supervisors (ISWS).

Some sample demographics to note:
- Overall, 78.0% of the sample was the result of a report by a mandated reporter.  Of the 78 reports, five (5) were made by a DCF Social Worker's report to the Hotline.
- Hotline assisted the area office in the initial response in 10 of the 100 cases.  In 85 cases the area office made the initial response.  In five situations, the Special Investigations Unit (SIU) was assigned and responded to the allegation.
- Of the 100 reports, 24.0% resulted in a substantiation of abuse or neglect, with 21.0% transferred to Ongoing Services for case management.
- Overall, there is a substantiation rate of 24.0% however this rate varies within each category of alleged abuse or neglect.  This review captured the multiple subcategories that may be identified under each possible allegation category.   A total of 195 individually identifiable allegations were noted. As shown in the table below the rate of substantiation varies within each category.

**Table 2:  Allegations Identified Within the 100-Case Sample**

| Category | # of Subcategory Allegations | # Substantiated within the Subcategory | % Substantiated within the Subcategory |
|---|---|---|---|
| Educational Neglect | 3 | 3 | 100.0% |
| Emotional Neglect | 21 | 7 | 33.3% |
| Emotional Abuse/Maltreatment | 4 | 3 | 75.0% |
| Medical Neglect | 8 | 1 | 12.5% |
| Moral Neglect | 2 | 0 | 0.0% |
| Physical Abuse | 35 | 3 | 8.6% |
| Sexual Abuse | 12 | 4 | 33.3% |
| Physical Neglect | 110 | 31 | 28.2% |

- The majority of the cases involved reports within a family setting, with 89.0% of the cases being family oriented.  Four reports are allegations against an entrusted caretaker, three are alleged to have occurred in a school setting and four were in out of home placement (three in residential and one in a foster home).
- Within the sample set, 83.0 % were the only report on the identified alleged perpetrator during the quarter.  In 17 cases, there were additional accepted reports.  Thirteen cases had one additional report during the quarter, three had two additional reports, and one residential facility had 9 additional reports during the quarter [and was subsequently the focus of Program Review and Evaluation Unit (PREU) activity].  All reports were merged or separately investigated in accordance with DCF policy expectations.
- Open Ongoing Service cases comprised 7.0% of the sample cases. An additional five cases were open in investigations at the point of acceptance of the report at the Hotline.
- Of the 100 reports accepted, 47 had two alleged perpetrators identified for a total of 147 alleged perpetrators.  This includes 90 females and 57 males.  The sample of alleged perpetrators is predominately white (86 individuals) and non-Hispanic (102 individuals) but also includes:  33 African Americans, 18 identified as Unable to Determine, 4 Unknown, 3 Asians and 3 cases in which no racial information was entered.  Thirty-seven individuals were identified as Hispanic.
- 185 children were identified as alleged victims within the 100 reports investigated. There were 110 males and 75 females.   Children ranged in age from birth to 17 years old.   The most frequently reported age is multimodal in that ages 1, 6 and 16 are each represented 15 times.  The mean average age is 8.8 years old.

**Quantitative and Quantitative Analysis – Outcome Measure 1**
The 100 reports were prioritized and assigned response times as follows:
- Same Day:  14 Cases
- 24 Hour Response:  37 Cases
- 72 Hour Response:  49 Cases

Only two of the accepted reports were subject to modification of response time designation by the Social Work Supervisor.  In one instance the time was downgraded from same day to 24-hour response as the child was in the care of the non-custodial parent who agreed to keep the child safe in their care overnight after the close of the school day.  The second case was upgraded from 24 hours to same day, but there was no clear rationale for that change documented.

Of the 100 reports accepted at the Hotline, 98.0% had the date of acceptance at Hotline correctly documented in LINK.  In two cases, the narrative clearly identifies earlier dates of the report to the Hotline, and investigation efforts prior to the date entered in the data field for acceptance.  Time of day of the reporting appears to have little impact on the achievement of the measure.

In all, 53.0% of reports accepted had one distinct incident resulting in the report to the Hotline, the remaining 47 cases did not have one incident date or issue reported but rather a culmination of incidents that were reported. Of note, 91.0% of the reports did not correctly identify the incident date (or in absence of one incident, the date of receipt of the report) in the appropriate LINK data field.  It could be determined from text within the protocol what situation was reported, however, continued failure to use the appropriate LINK data field will impact the data reporting accuracy for repeat maltreatment outcome measures.

Of the 100 reports accepted, 83% were the only report accepted for that alleged perpetrator during the Fourth Quarter.  Thirteen cases had one additional report accepted and three cases had two additional reports accepted regarding that same alleged perpetrator during the quarter.  In seven cases, the additional report came in within a seven day period of that selected for the sample and were merged into one investigation. The remaining ten cases had multiple investigations in progress during the quarter. One case involving a residential facility had nine reports accepted for investigation during the quarter. This facility was under PREU oversight at the time.

The Hotline included LINK history within the CPS report transmitted for investigation in 95.5% of all cases with a documented history.  There are no incidences of a "Screen Out" within the sample set.  95.0% of all investigations had a supervisory conference documented in the LINK narrative or within the CPS protocol narrative.

Response time is based upon the "attempt" to make face-to-face contact with the alleged victim and perpetrator, and the Department has been consistently successful in these efforts throughout the last two years.  This review also looked at the actual face-to-face

contact with both the alleged perpetrator and victim(s).  All but one of the same day assigned cases had face-to-face contact with the alleged child victim on the same date of acceptance; the one case where face-to-face contact did not occur within the same day was achieved within 24 hours.  Twenty of the cases assigned as 24 hour response time had documented face-to-face contact with the identified child(ren) within that timeframe. Of those assigned with 72 hour response time, and where contact was made, 23 cases documented actual contact with the identified child(ren) within the 72 hour timeframe. Overall, the Department has made good progress in timely contact as a result of improvements in commencement timeframes.  The average time to contact within the sample is 4.6 days from the date of acceptance of the report.  See Crosstabulation 1, below for full scope of contact.

**Crosstabulation 1:  Priority Response Designation \* Actual Timeframe to Face-to-Face Contact with Child Victim**

| Actual Face-to-Face Contact with Alleged Child Victim | Priority Response Designation (Incorporating Modifications where present) | | | |
|---|---|---|---|---|
| | Same Day | 24 Hours | 72 Hours | All Priority Levels |
| **Same Day** | 13 | 9 | 5 | 27 |
| **<3 Days** | 1 | 12 | 17 | 30 |
| **3-7 Days** | 0 | 10 | 10 | 20 |
| **8-14 Days** | 0 | 4 | 5 | 9 |
| **>14 Days** | 0 | 1 | 7 | 8 |
| **No Contact** | 0 | 1 | 5 | 6 |
| **All** | 14 | 37 | 49 | 100 |

As indicated, six of the cases had no contact with the alleged child victim during the investigation. These included the following scenarios:

- *Child Age 6* – Case not substantiated.   Mother and child left the state following domestic violence (DV) incident.  They were believed to be in South Carolina.
- *Adolescent Age 17* – Case not substantiated.  Prominent family.  Child has anger management issues per parents report and is refusing counseling/therapy. According to the mother's report, no one in the home is speaking with child since the incident in which the child received a swollen, cut lip.  Parents indicated that neither the alleged victim nor her siblings wished to be interviewed. The ISW did not pursue a direct conversation with the adolescent as mother indicated she was afraid the adolescent would "blow up."
- *Adolescent Age 16* – Case not substantiated.  Adolescent ran away from sister's home where she was residing after the sister indicated she could not handle her behaviors in a report to the Hotline.  The adolescent returned to the sister's home and was taken back to mother in Virginia against DCF advice (long CPS history.) Virginia Interstate Compact refused to do a home study.  The Judge approved revocation back to mother.  The mother was provided with Virginia Social Services phone numbers to assist her with the child's acting out behaviors.
- *Child Age 12* – Case substantiated.  This was an open DCF case in which educational neglect was alleged by the school.  Medical issues were involved.

Parents were uncooperative and refused to meet with ISW or allow access to their children. The Ongoing Services SW also did not see child between the November 14, 2006 visit and January 25, 2007 visit as child was always "sick" and out of visual contact. The situation was resolved by February and child was attending school when case was closed.

- *Adolescent Age 17* – SIU investigation of foster home was not substantiated. Adolescent chose to return to biological mother following the incident. ISW made one documented unsuccessful attempt to contact the adolescent. There was no follow up. The Court subsequently approved revocation.
- *Child Age 1* – Case not substantiated. According to the neighbor interviewed, child and mother left their apartment for a DV shelter. Both "disappeared" into DV shelter system. The ISW attempted through maternal relatives and last known providers to get a location for the mother and child, but to no avail. Concerns were noted in that the grandfather was reporting frequent drug use when he last had contact. He was not aware of the present location of the mother and child.

Ninety-seven cases had documented face-to-face contact with the alleged perpetrator. In one additional case, where two alleged perpetrators were identified, the investigator only interviewed one of the alleged perpetrators. Reasons provided for a failure to interview the alleged perpetrator are: Domestic Violence situation - mother purportedly entered shelter and could not be located for interview; mother moved to South Carolina with child; and legal advisement of attorney. The crosstabulation below provides the approximate time to actual contact reported by the priority response designation.

**Crosstabulation 2:  Priority Response Designation \*Actual Timeframe to Face-to-Face Contact with Alleged Perpetrators**

| Actual Face-to-Face Contact with Alleged Perpetrator | Priority Response Designation (Incorporating Modifications where present) | | | |
|---|---|---|---|---|
| | Same Day | 24 Hours | 72 Hours | All Priority Levels |
| Same Day | 9 | 10 | 5 | 24 |
| <3 Days | 4 | 9 | 15 | 28 |
| 3-7 Days | 0 | 14 | 13 | 27 |
| 8-14 Days | 0 | 1 | 8 | 9 |
| >14 Days | 1 | 2 | 6 | 9 |
| No Contact | 0 | 1 | 2 | 3 |
| All | 14 | 37 | 49 | 100 |

22

**Quantitative and Quantitative Analysis - Outcome Measure 2:  Completion of Investigation**
It is important to note that this review was conducted on practices prior to implementation of Structured Decision Making (SDM).  Improvements to risk and safety assessments as a result of these new tools may already address some of the lapses in assessment reflected within our sample cases.

In reviewing compliance with DCF policy expectations and practice guidelines, our review found strengths within the investigation practices, however there are also identified areas requiring improvement. Additionally, the ambiguity created by the <u>Lovan C</u>.[1] case is reflected in some cases – including ISW's quoting pertinent sections of the finding within the determination section of the protocol document.

With respect to the appeal process, six of the cases reviewed had requests for appeal regarding substantiation.  In three cases, the appeal was upheld.  In one case, the appeal resulted in the overturning of the substantiation.  In two cases, the appeal process was still ongoing so it could not be determined at the point of review.

Our review looked at a series of requirements regarding compliance with policy and assessment during investigations.  We will highlight those we feel merit such attention. The full set is provided as an appendix document for your reference.  The culmination of these data results in an overall score reflecting the overall quality of the investigation.

---

[1] Lovan C. v Department of Children and Families is a case ruling from 2004 in which a 5 year old girl whose mother hit her with a belt 3 times, leaving a one inch bruise was reported to Department of Children and Families (DCF). The case was substantiated by DCF and upheld in a substantiation hearing. As a result, the mother's name was placed on the DCF confidential abuse/neglect registry.  On appeal, the mother's attorney, challenged the agency's definition of "abuse", The Judge upheld the ruling.  The case then moved to the Appellate Court.  The Appellate Court asked both parties to explain whether Conn. Gen. Stats. §53-18(1) and (2) applied to the circumstances of this case. The Appellate Court found it applied, and that parents maintain a common law right to use reasonable corporal punishment on their child.  It further determined that the hearing officer was bound to consider a host of factors to assess the reasonableness of the parent's actions and not merely the fact that the action led to an injury.  The court ruled that as minimal injury resulted, occurring in the absence of malice or ill motive, and the fact that the hearing officer found the mother was not a risk to children, it required DCF to remove the mother's name from the registry. The Court found that because parents in Connecticut have the right to use corporal punishment, hearing officers, when determining whether to place someone's name on the registry, must assess a host of factors regarding whether the abuse was reasonable corporal punishment.

The ranking scale used for our scoring set out the following expectations:

*Optimal Quality – 5*
*The reviewer finds evidence that all essential investigative requirements required by DCF policy are present in addition to a comprehensive assessment of needs conducted with appropriate referrals or information provided regardless of substantiation.*

*Very Good Quality – 4*
*The reviewer finds evidence that all essential investigative requirements required by DCF policy are substantially present in addition to a comprehensive assessment of needs conducted with appropriate referrals or information provided regardless of substantiation.*

*Marginal Quality – 3*
*There is an attempt to include the essential investigative requirements required by DCF policy and this results in an investigation in which requirements are substantially present during the investigation. An attempt is made to conduct an assessment of needs – but, appropriate referrals or information may not been incorporated into the process.*

*Poor Quality – 2*
*The reviewer finds a failure to incorporate essential elements essential investigative requirements required by DCF policy. The process does not include an adequate assessment of needs given the facts as reviewed in the LINK record.*

*Adverse Quality – 1*
*The reviewer finds no attempt to incorporate the essential elements essential investigative requirements required by DCF policy. The investigation and assessment process has been so poorly performed that it has had an adverse affect and fails to address the risks clearly present from the LINK record review.*

Our review found that 49.0% of the investigations fully or substantially complied with the expectations regarding compliance with policy and complete assessment practices. An additional 40% incorporated many elements expected, but failed to include some elements expected/measured by our review. In many of the marginal situations, it is unclear whether practice expectations were disregarded, modified, or whether poor documentation was the sole contributor to the incomplete information. In 1.0% of the cases reviewed (one case), the reviewer felt that practice present was adverse to the safety of the child(ren).

The case ranked "adverse" and several of the cases ranked "poor" were forwarded on to the Child Welfare Bureau Chief for administrative review within the area office. Additionally, one was forwarded on to the Ombudsman for follow-up. In each situation, DCF provided clarification and/or outlined actions steps to address the identified case concerns in a timely and complete manner.

**Table 3:  Rank Scores for Investigations Within the 100-Case Sample of Investigations Accepted October 1, 2006 through December 31, 2006**

| Rank | Frequency | Percentage | Cumulative Percentage |
|---|---|---|---|
| Optimal | 15 | 15.0% | 15.0% |
| Very Good | 34 | 34.0% | 49.0% |
| Marginal | 40 | 40.0% | 89.0% |
| Poor | 10 | 10.0% | 99.0% |
| Adverse | 1 | 1.0% | 100.0% |
| | 100 | 100.0% | |

The following table looks at the combination of factors related to risk assessment only in relation to the overall rank scoring.  In this situation, there were 31 cases (31%) in which the reviewers indicated some lapse in risk assessment activity[2] during the investigation.

**Crosstabulation 3:   Were All Risk Factors Assessed Within the Course of Investigation (using list of considerations provided)? * Rank the Investigation on Overall Level of Quality Using Scale Provided**

| Were all risk factors assessed within the course of investigation (using list of considerations provided)? | Rank the Investigation on overall level of quality using scale provided | | | | | |
|---|---|---|---|---|---|---|
| | Adverse Quality | Poor Quality | Marginal Quality | Very Good Quality | Optimal Quality | All Quality |
| Yes | 0 | 0 | 22 | 32 | 15 | 69 |
| No | 1 | 10 | 18 | 2 | 0 | 31 |
| Total | 1 | 10 | 40 | 34 | 15 | 100 |

In regard to compliance with policy and procedures[3], the review found that there were lapses in 57 cases, or 57.0%.  Of note:

---

[2] The tool captured data regarding the ISW assessment process based upon identified risk and safety issues documented within the allegation or presenting upon interview with the case participants.  It included a review of documentation of conversations with Ongoing Services SW in open cases,  a review of prior history, identification of support networks including both maternal and paternal relatives, collaboration with law enforcement if required, contact with the reporter (when known), criminal background checks documented, substance abuse and domestic violence screenings, medical and educational contacts and use of supervision or ARG when warranted by case situation.

[3] Policy and procedure issues includes items such as: Hotline transmittal incorporating LINK history, Acceptance Decisions appropriately documented, supervisory conferences at point of assignment, adequate documentation regarding modification to time frames for response, merging of reports, interviews with alleged perpetrators, other adult victims in the home and all children in the home in their primary language, and with interviews of child victims out of earshot of the alleged perpetrators.  Visual assessments documented, family conferencing and services offered as necessary, completion of all substantial sections of the protocol tool, supervisory and transfer conferences, and notification letters on the disposition to the mandated reporter and alleged perpetrator.

- Fourteen cases did not have documentation of receipt of criminal background checks within the protocol document or assessment icons.
- In 17 cases, it was felt a safety assessment was not accurately completed regarding the child and family.
- In 20 cases there was no medical collateral contact documented, and
- In 17 cases, the reviewers felt that due to the circumstances of the allegations, ARG involvement or consultation was warranted, but was not utilized by the investigation worker.

**Crosstabulation 4:  Were all DCF Policy Requirements Met by the Worker During the Course of the Investigation? * Rank the Investigation on Overall Level of Quality Using Scale Provided**

| Were all DCF policy requirements met by the worker during the course of the investigation? | Rank the Investigation on overall level of quality using scale provided | | | | | |
|---|---|---|---|---|---|---|
| | Adverse Quality | Poor Quality | Marginal Quality | Very Good Quality | Optimal Quality | All Quality |
| **Yes** | 0 | 0 | 5 | 23 | 15 | 43 |
| **No** | 1 | 10 | 35 | 11 | 0 | 57 |
| Total | 1 | 10 | 40 | 34 | 15 | 100 |

With respect to compliance with policy, the areas most problematic to the Department that were captured by the protocol are:

- In 50% of the cases, there were sections of the protocol left blank.  Most frequently this was related to descriptive data elements, services, and notification.  In some cases, this deficit was overcome by text within the document.  In others it was not.
- In 42% of the cases, there is no indication in the protocol or narrative entries regarding notification letters or contact being made with the alleged perpetrator to advise of the investigation findings.
- In 31% of the cases, needs were identified during the investigations, but there was no documentation to offer, refer or otherwise advise the family of services.
- Mandated reporter letters were required in 79 cases.  In 59 cases (74.7%) there was no evidence of letters being sent.
- In 15 % of cases, other significant adults living in the home were not included in the investigation interview process.

**Monitor's Office Case Review for Outcome Measure 3 and Outcome Measure 15**

**Overview**

The *Juan F*. v Rell Revised Exit Plan and subsequent stipulated agreement reached by the parties and court ordered on July 11, 2006, requires the Monitor's Office to conduct a series of quarterly case reviews to monitor Outcome Measure 3 (Treatment Planning) and Outcome Measure 15 (Needs Met).   The implementation of this review began with a pilot sample of 35 cases during the third quarter 2006 and has been conducted quarterly since that time with samples of approximately 70-75 cases.  For the Third Quarter 2007 the sample included 76 cases.

**Outcome Measure 3 requires that,  "….*in at least 90% of the cases, except probate, interstate and subsidy only cases, appropriate treatment plans shall be developed as set forth in the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15" dated June 29, 2006 and the accompanying "Directional Guide for OM3 and OM15 Reviews" dated June 29, 2006.*"**

**Review Findings and Trends**

The fourth quarter case review data for Outcome Measure 3 indicates that the Department attained the level of "Appropriate Treatment Plan" in 23 of the 76-case sample or **30.3%.**

- This reduction in the treatment plan scores reflects the overarching issue raised by reviewers – the need for greater supervisory oversight in the development of and approval of plans.  Currently, plans are often approved that clearly are not in accordance with expected practice.  Recent changes in the Administrative Case Review (ACR) SWS role in relation to reviewing plans with an eye to Outcome Measure 3, as well as fulfilling the role of the third party, objective reviewer may improve scores in coming quarters.  However, reviewers have noted many times in the past that the documentation provided by the ACR SWS often addresses action steps, goals, and services, yet fails to be incorporated prior to the approval of the plan.  The Ongoing SWS bears a great deal of the responsibility for improving the level of performance for this measure.

- Treatment plans continue to lack inclusive action steps, identified goals for the upcoming six months, identification of services, and the input of providers (other than with foster parents – who are being engaged in discussion with regularity).

- 98.7% of the cases sampled had a plan less than 7 months old at the point of review. Three of the plans not passing (3.9%) did not have SWS approval.  All three of these plans had one or more sections with less than a "very good" rating and would have been deemed inappropriate regardless of approval status.  With respect to accommodating the primary language of clients, 94.7% of the cases had documentation that families' language needs were met (4 cases did not have documentation of meeting language needs).

- In-Home cases (n=22) appear to be most problematic in regards to inclusive and appropriate treatment planning.  In all only 18.2% of the In-Home Cases were deemed as having appropriate treatment plans. Child in Placement cases with CPS designation had the greatest percentage of appropriate treatment planning for the sample set, with 69.6% of those cases deemed appropriate.  Voluntary Service Child in Placement cases were considered appropriate in 60% of the cases reviewed.

- There have been recent changes to the definitions of the APPLA goals, and changes in expectations related to assignment of these less permanent scores.  It may be that this transition along with the confusion of implementing this new policy is impacting the scoring for both treatment plans and needs met related to permanency.

- There was documented engagement of foster parents in discussions around treatment planning in 94.4% of the cases sampled.  This is the highest rate to date.  Mothers (73.8%), and identified support/kin (66.7%) are the next participants most frequently involved in discussions.  Attendance rates at the ACRs and Family Conferences remain problematic for most case participants.  Reviewers noted a failure to invite adolescents and fathers, and the overall lack of engagement with both children's and parents' attorneys.

As a result of discussion with area offices regarding the in-home cases reviewed, the Monitor has determined a need for a methodological change for the future reviews.  Area Offices were identifying cases that they felt had appropriate treatment planning but that were not passing as a result of poor or missing LINK documentation or information known to the SW or SWS that was not represented in the LINK narrative but was of importance to how the treatment planning efforts unfolded.  While we feel that scoring has given an accurate accounting of the treatment planning documents and records we reviewed, beginning with the Third Quarter 2007 reviews, we have made a change in approach.  Many in-home cases do not have a family conference that typically provides an opportunity for the reviewer to clarify issues or obtain first hand knowledge.  Therefore, for all in-home cases where there is no opportunity to attend the family conference and speak with the SWS or SW in person, we will include a brief phone interview with the SWS or SW.

**Outcome Measure 15 requires that, "….*at least 80% of all families and children shall have all their medical, dental, mental health and other service needs met as set forth in the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15 dated June 29, 2006, and the accompanying 'Directional Guide for OM3 and OM15 Reviews dated June 29, 2006."***

**Review Findings and Trends**

The case review data indicates that the Department attained the designation of "Needs Met" in **51.3%** of the 76-case sample.

- Nine of the 11 categories measured within Outcome Measure 15 showed some level of improvement over the prior quarter.  The Department shows promising practices in legal action, safety of children in placement, attending to medical needs, and recruitment efforts for the prior period.  Most problematic are provision of timely dental services, mental health, behavioral health, and substance abuse services.
- The permanency goals of children appear to have an impact on the ability of the Department to attain a level of practice and service provision that meets the identified needs of children and families.  Children with non-preferred treatment planning permanency goals more frequently do not have their identified needs met.  APPLA:  Permanent Non-Relative Foster Care, APPLA:  Other and Long Term Foster Care with a Relative are respectively 33.3%, 42.9% and 33.3% compliant.  Preferred goals are compliant at rates greater than 55.0%.
- Structured Decision Making (SDM) training is now completed across the state area offices.  The practice shows great promise if DCF maintains the integrity of the scoring protocols' definitions.  There is an expected learning curve as SW and SWS work with the assessment tools in establishing both permanency and services needs.
- Of the needs which remained unmet from the prior planning period, mental health services continued to be most prevalent.  Most frequently, the barrier documented was "client refusal"; however, reviewers noted that these circumstances often did not have documented engagement efforts such as client contact by SWS or ARG, or collaborative efforts with active providers to engage clients in needed services.
- 68.4% of the cases reviewed had clear documentation of a service need that should have been carried over to the treatment plan reviewed for this quarter, but was not.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology:**

The *Juan F.* v Rell Revised Exit Plan and subsequent stipulated agreement reached by the parties and court ordered on July 11, 2006, requires the Monitor's Office to conduct a series of quarterly case reviews to monitor Outcome Measure 3 (Treatment Planning) and Outcome Measure 15 (Needs Met).   The implementation of this review began with a pilot sample of 35 cases during the Third Quarter 2006.  During the Second Quarter 2007, the Monitor's Office reviewed a total of 76 cases[4] .  Methodology will change with

---

[4] The Exit Plan required a total of 70 cases be reviewed.  Due to rounding and ensuring that each area office had representation of both in-home and out of home case assignments, a total of 76 cases were selected.

the Third Quarter 2007 reviews in that 50 cases will be reviewed by individual reviewers. This was necessitated by changes in DCF staff assignments and additional monitoring activities resulting from the *Juan F*. v Rell Action Plan.

This quarter's 76 case sample was stratified based upon the distribution of area office caseload on March 1, 2007.   The sample incorporated both in-home and out-of-home cases based on the overall statewide percentage reflected at the point that each sample is determined.

**Table 4:  Second Quarter 2007 Sample Required Based on March 1, 2007 Caseload Universe**

| Area Office | Total Caseload | % of Caseload | % of In-Home Cases | In-Home Sample | OOH Sample | Total Sample |
|---|---|---|---|---|---|---|
| **Bridgeport** | 1,081 | 7.9% | 28.2% | 2 | 4 | 6 |
| **Danbury** | 330 | 2.4% | 14.8% | 1 | 2 | 3 |
| **Greater New Haven** | 933 | 6.8% | 25.1% | 1 | 4 | 5 |
| **Hartford** | 1,879 | 13.7% | 21.0% | 2 | 8 | 10 |
| **Manchester** | 1,245 | 9.1% | 26.3% | 2 | 4 | 6 |
| **Meriden** | 575 | 4.2% | 30.4% | 1 | 2 | 3 |
| **Middletown** | 400 | 2.9% | 26.0% | 1 | 2 | 3 |
| **New Britain** | 1,488 | 10.8% | 33.5% | 3 | 5 | 8 |
| **New Haven Metro** | 1,487 | 10.8% | 29.5% | 2 | 6 | 8 |
| **Norwalk** | 288 | 2.1% | 34.0% | 1 | 1 | 2 |
| **Norwich** | 1,147 | 8.4% | 29.3% | 2 | 4 | 6 |
| **Stamford** | 272 | 2.0% | 43.0% | 1 | 1 | 2 |
| **Torrington** | 436 | 3.2% | 12.4% | 1 | 2 | 3 |
| **Waterbury** | 1,316 | 9.6% | 20.8% | 1 | 6 | 7 |
| **Willimantic** | 850 | 6.2% | 26.6% | 1 | 3 | 4 |
|  | 13,727 | 100.0% | 26.5% | 22 | 54 | 76 |

This is the last quarter where the methodology included pairing of DCF staff with Monitor's Review staff.   Within the course of seven to twelve hours, each case was subjected to the following methodology.

1. A review of the Case LINK Record documentation for each sample case concentrating on the most recent six months.  This includes narratives, treatment planning documentation, investigation protocols, and the provider narratives for any foster care provider during the last six-month period.
2. Attendance/Observation at the Treatment Planning Conference (TPC)/Administrative Case Review (ACR) or Family Conference (FC)[5].

---

[5] Attendance at the family conference is included where possible.  In many cases, while there is a treatment plan due, there is not a family conference scheduled during the quarter we are reviewing.  To compensate for this, the monitoring of in-home cases includes hard copy documentation from any family conference held within the six month period leading up to the treatment plan due date.

3. A subsequent review of the final approved plan is conducted fourteen to twenty days following the date identified within the TPC/ACR/FC schedule from which the sample was drawn.  Each reviewer completes an individual assessment of the treatment plan and needs met outcome measures and fills out the scoring forms for each.

4. A final meeting with the assigned teammate is held to jointly arrive at the final scores for each section and overall scoring for OM3 and 15. Individual scoring and joint scoring forms are then submitted to the Monitor. (This step may change as determined appropriate by the DCF Court Monitor after evaluation of the process, feedback from review staff and fiscal/staffing considerations.)

Although the criterion for scoring requires consistency in definition and process to ensure validity, no two treatment plans will look alike.  Each case has unique circumstances that must be factored into the decision-making process.  Each reviewer has been provided with direction to evaluate the facts of the case in relationship to the standards and considerations and have a solid basis for justifying the scoring.

In situations where agreement cannot be reached, the team requests that the supervisor become a third voice on those areas of concern.  They present their opinions and findings and the supervisor determines the appropriate score to reflect the level of performance for the specific item(s) and assists them in the overall determination of compliance for OM3 and OM15.  If the team indicates that there are areas that do not attain the "very good" or "optimal" level, yet consensus is the overall score should be "an appropriate treatment plan" or "needs met" the team clearly outlines their reasoning for such a determination and it is reviewed by the Court Monitor for approval of an override exception.  These cases are also forwarded to the Technical Advisory Committee (TAC) for review. During the Fourth Quarter, there were 19 such cases submitted for consideration/assistance of supervisory oversight.  Of the 19 cases, seven resulted in the approval of an override to allow one or the other measure to achieve a passing score. These cases will be identified in the overall scoring tables later in this document.

To address the areas of disparity identified in the third quarter pilot, a post review team meeting was held in October to address individual reviewer's and teams' issues related to the review process.  Clarifications were provided, and a better understanding of some of the finer points of the process resulted from this trial review process and debriefing.  A sample case was jointly reviewed by all reviewers and then each subcategory was analyzed.  As necessary, additional training and clarification will be ongoing throughout the process.

**Descriptive Information**

As indicated earlier, the sample consisted of 73 cases distributed among the 15 Area Offices.  Sample cases are identified by Assignment Type.  At the point of review, the data indicates that the majority of cases (71.4%) are children in care for child protective service reasons. A full description of the sample is provided below:

**Crosstabulation 5: What is the Type of Case Assignment Noted in LINK? * Does Child in Placement Have Involvement with the Juvenile Justice System?**

| What is the type of case assignment noted in LINK? | Does child in placement have involvement with the juvenile justice system? | | | |
|---|---|---|---|---|
| | Yes | No | In-Home CPS or Voluntary Service Case | Total |
| CPS In-Home Family Case (IHF)[6] | 0 | 1 | 21 | 22 |
| CPS Child in Placement Case (CIP) | 10 | 39 | 0 | 49 |
| Voluntary Services Child in Placement Case (VSCIP) | 2 | 3 | 0 | 5 |
| Total | 12 | 43 | 21 | 76 |

Of the children in placement at any point during the quarter (n=55), twelve children (21.8%) had some involvement with the Juvenile Justice System during the quarter. This population had a 41.7% compliance rate with both the treatment plan and needs met outcome measures.

In establishing the reason for the most recent case open date identified, reviewers were asked to identify all substantiations or voluntary service needs identified at the point of most recent case opening. This was a multiple response question which allowed the reviewers to select more than one response as situations warranted.

**Table 5:  Causes for DCF Involvement on Date of Most Recent Case Opening**

| Cause s for DCF's Involvement | Number | Percent | Percent of Cases (n=76) |
|---|---|---|---|
| Physical Neglect | 49 | 32.7% | 64.5% |
| Substance Abuse/Mental Health (Parent) | 29 | 19.3% | 38.2% |
| Domestic Violence | 16 | 10.7% | 21.1% |
| Emotional Neglect | 14 | 9.3% | 18.4% |
| Physical Abuse | 8 | 5.3% | 10.5% |
| Child's TPR Case prompted new opening | 8 | 5.3% | 10.5% |
| Educational Neglect | 6 | 4.0% | 7.9% |
| Abandonment | 5 | 3.3% | 6.6% |
| Medical Neglect | 4 | 2.7% | 5.3% |
| Voluntary Services Request (child) | 4 | 2.7% | 5.3% |
| FWSN Referral | 4 | 2.7% | 5.3% |
| Sexual Abuse | 3 | 2.0% | 3.9% |

---

[6] Includes one child who had placement episode during the quarter but was reunified at point of review.

In total, 150 reasons were identified within the multiple response question. The data indicates that physical neglect remains the most frequent reason for a case opening in treatment, as 64.5% of the cases cited this as one of the factors for the case opening. This was again followed by Parental Substance Abuse/Mental Health which was present in 38.2% of the cases reviewed, and Domestic Violence cited in 21.1% of the cases edged out Emotional Abuse which was ranked third in the last quarter's data.

**Table 6:  What is the primary reason cited for case opening/reopening?**

| Primary Reason | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| Abandonment | 4 | 5.3 | 5.3 | 5.3 |
| Child's TPR | 8 | 10.5 | 10.5 | 15.8 |
| Domestic Violence | 10 | 13.2 | 13.2 | 28.9 |
| Educational Neglect | 3 | 3.9 | 3.9 | 32.9 |
| Emotional Neglect | 4 | 5.3 | 5.3 | 38.2 |
| FWSN Referral | 4 | 5.3 | 5.3 | 43.4 |
| Medical Neglect | 1 | 1.3 | 1.3 | 44.7 |
| Physical Abuse | 4 | 5.3 | 5.3 | 50.0 |
| Physical Neglect | 18 | 23.7 | 23.7 | 73.7 |
| Sexual Abuse | 1 | 1.3 | 1.3 | 75.0 |
| Substance Abuse | 16 | 21.1 | 21.1 | 96.1 |
| Voluntary Service Request | 3 | 3.9 | 3.9 | 100.0 |
| Total | 76 | 100.0 | 100.0 | |

When asked to isolate the primary reason for case opening among those identified for each of the 76 cases; physical neglect was identified for 23.7% of the sample set.

Permanency/case goals were identified for 74 of the 76 cases reviewed (97.4%). Of the 26 situations in which "Reunification" was the permanency goal, there was a required concurrent plan documented in 21 cases (80.8%). Of the seven cases with the goal of "APPLA: Other", six identified "Independent Living" and one identified "Specialized Care to Transition to DMHAS/DMR".

**Table 7:  What Is the Child or Family's Stated Permanency Goal on the Most Recent Approved Treatment Plan in Place During the Period?**

| Permanency Goal | Frequency | Percent |
|---|---|---|
| Reunification | 26 | 34.2 |
| In-Home Goals - Safety/Well-being Issues | 20 | 26.3 |
| Adoption | 9 | 11.8 |
| APPLA:  Permanent Non-Relative Foster Care | 9 | 11.8 |
| APPLA:  Other | 7 | 9.2 |
| Long Term Foster Care with a licensed relative | 3 | 3.9 |
| Goal indicated is not an approved DCF goal | 2 | 2.6 |
| Total | 76 | 100.0 |

Children in placement had various lengths of stay at the point of our review.  This ranged from less than one month, to greater than 24 months.  Below is a crosstab of cases by length of stay as it relates to the Termination of Parental Rights (TPR) filing and in relation to the ASFA requirement to file or identify an exception no later than 15 months into the out of home episode.  In all cases in which the child's length of stay and permanency goal required the filing of TPR, it had been done or an exception was noted in LINK.  One additional case open less than 15 months but with a goal requiring TPR still had not documented the filing as of the date of review.

**Crosstabulation 6:  Has Child's Length of Stay Exceeded the 15 of the Last 22 Month Benchmark Set by ASFA? * For Child in Placement, has TPR Been Filed?**

| Has child's length of stay exceeded the 15 of the last 22 benchmark set by ASFA? | For child in placement, has TPR been filed? | | | |
|---|---|---|---|---|
| | Yes | No | N/A - Exception noted in LINK | Total |
| Yes | 0 | 1 | 12 | 13 |
| No | 1 | 3 | 0 | 4 |
| TPR has already been filed or granted | 12 | 0 | 2 | 14 |
| Total | 13 | 4 | 14 | 31 |

**Data Reporting for Outcome Measure 3 – Treatment Plans**
Of the three case types represented within the sample, in-home cases (n=22) appear the most problematic in regards to inclusive and appropriate treatment planning. In all only four (18.2%) of the in-home family cases were deemed as having appropriate treatment plans. Child in placement cases (CIP) with CPS designation had the greatest percentage of appropriate treatment planning for the sample set, with 69.6% of those cases deemed appropriate. Voluntary Services CIP cases were considered appropriate in 60% of the cases reviewed.

**Crosstabulation 7: What is the Type of Case Assignment Noted in LINK? * Overall Score for OM3**

| What is the type of case assignment noted in LINK? | | Overall Score for OM3 | | |
|---|---|---|---|---|
| | | Appropriate Treatment Plan | Not an Appropriate Treatment Plan | Total |
| **CPS In-Home Family Case (IHF)** | Count | 4 | 18 | 22 |
| | % within case assignment | 18.2% | 81.8% | 100.0% |
| | % within Overall Score | 17.4% | 34.0% | 28.9% |
| | % of Total | 5.3% | 23.7% | 28.9% |
| **CPS Child in Placement Case (CIP)** | Count | 16 | 33 | 49 |
| | % within case assignment | 32.7% | 67.3% | 100.0% |
| | % within Overall Score | 69.6% | 62.3% | 64.5% |
| | % of Total | 21.1% | 43.4% | 64.5% |
| **Voluntary Services Child in Placement Case (VSCIP)** | Count | 3 | 2 | 5 |
| | % within case assignment | 60.0% | 40.0% | 100.0% |
| | % within Overall Score | 13.0% | 3.8% | 6.6% |
| | % of Total | 3.9% | 2.6% | 6.6% |
| **Total** | Count | 23 | 53 | 76 |
| | % within case assignment | 30.3% | 69.7% | 100.0% |
| | % within Overall Score | 100.0% | 100.0% | 100.0% |
| | % of Total | 30.3% | 69.7% | 100.0% |

Engagement with children, families and providers in the development of the treatment plans was identified within the LINK documentation, treatment plans and attendance at the ACR or Family Conference. Each case had a unique pool of active participants for DCF to collaborate with in the process. The chart below indicates the degree to which identifiable/active case participants were engaged by the SW and the extent to which active participants attended the TPC/ACR/FC. Percentages reflect the level or degree to which a valid participant was part of the treatment planning efforts across all the cases reviewed.

**Table 8: Participation and Attendance Rates for Active Case Participants within the Sample Set**

| Identified Case Participant | Percentage with documented Participation/Engagement in Treatment Planning Discussion | Percentage Attending the TPC/ACR or Family Conference |
|---|---|---|
| Foster Parent | 94.4% | 66.7% |
| Mother | 73.8% | 61.4% |
| Other Participants | 66.7% | 55.3% |
| Active Service Providers | 66.4% | 41.2% |
| Child | 64.7% | 37.5% |
| Other DCF Staff | 58.8% | 52.3% |
| Father | 39.0% | 24.0% |
| Attorney/GAL (Child) | 16.7% | 6.3% |
| Parents' Attorney | 14.9% | 4.8% |

Engagement of foster parents in treatment planning discussions was present in 94.4% of the cases sampled, the highest rate to date. Mothers, and identified support/kin are the next participants most frequently involved in discussions. Attendance rates remain problematic for most case participants. Active service providers were approached to engage in treatment planning in 66.4% of the sample, only 41.2% of these providers actually attended the administrative case review. Many, if not all private providers, develop internal treatment plans for referred DCF clients, these providers should be approached to identify specific goals for the child or family from those plans to be incorporated within the DCF treatment planning process so that various participants are not ill-informed or working at cross purposes. Reviewers also noted a failure to invite adolescents and fathers, and the overall lack of engagement with both children's and parents' attorneys.

As with the third quarter, this review process looked at eight categories of measurement when determining overall appropriateness of the treatment planning (OM3). Scores were based upon the following rank/scale:

**Optimal Score – 5**
The reviewer finds evidence of all essential treatment planning efforts for both the standard of compliance and all relevant consideration items (documented on the treatment plan itself).

**Very Good Score – 4**
The reviewer finds evidence that essential elements for the standard of compliance are substantially present in the final treatment plan and may be further clarified or expanded on the DCF 553 (where latitude is allowed as specified below) given the review of relevant consideration items.

**Marginal Score – 3**
There is an attempt to include the essential elements for compliance but the reviewer finds that substantial elements for compliance as detailed by the

Department's protocol are not present.  Some relevant considerations have not been incorporated into the process.

**Poor Score – 2**
The reviewer finds a failure to incorporate the most essential elements for the standard of compliance detailed in the Department's protocol.  The process does not take into account the relevant considerations deemed essential, and the resulting document is in conflict with record review findings and observations during attendance at the ACR.

**Absent/Adverse Score – 1**
The reviewer finds no attempt to incorporate the standard for compliance or relevant considerations identified by the Department's protocol.  As a result there is no treatment plan less than seven months old at the point of review or the process has been so poorly performed that it has had an adverse affect on case planning efforts.

Overall treatment plans of children in placement fared better in achievement of the "appropriate treatment plan" designation.  The crosstabulation below provides the percentage of appropriate and not appropriate designations for within the group as a whole and within the specific case assignment designation.

**Crosstabulation 8:  Overall Score for OM3\* What is the Type of Case Assignment Noted in LINK?**

| Overall Score | What is the type of case assignment noted in LINK? | | | |
| --- | --- | --- | --- | --- |
| | CPS In-Home Family | CPS Child in Placement | Voluntary Svcs Child in Placement | Total |
| **Appropriate Treatment Plan:** | | | | |
| Count | 4 | 16 | 3 | 23 |
| % Within Row | 17.4% | 69.6% | 13.0% | 100.0% |
| % Within Type | 18.2% | 32.7% | 60.0% | 30.3% |
| **Not an Appropriate Treatment Plan:** | | | | |
| Count | 18 | 33 | 2 | 53 |
| % Within Row | 34.0% | 62.3% | 3.8% | 100.0% |
| % Within Type | 81.8% | 67.3% | 40.0% | 69.7% |
| **Total:** | | | | |
| Count | 22 | 49 | 5 | 76 |
| % Within Row | 28.9% | 64.5% | 6.6% | 100.0% |
| % Within Type | 100.0% | 100.0% | 100.0% | 100.0% |

"Reason for Involvement" and "Present Situation to Date" were most frequently ranked with an Optimal Score.  Deficits were most frequently noted in two categories: "Determination of Goals/Objectives" and "Action Steps to Achieve Goals".  The following table provides the scoring for each category for the sample set and the corresponding percentage of cases within the sample that achieved that ranking.

There is an overall reduction in the number of "Poor" and "Adverse" scores identified across the full sample population assessed in the last quarter. However, as in prior quarters the eight categories measured indicate that DCF continues to struggle with assignment of action steps for the case participants in relation to goals and objectives (II.3); identifying the goals and objectives for the coming six month period (II.1), and in detailing progress in the previous six months(II.2).  Permanency Planning (II.4) also has shown a decline from the prior quarter's results.  It is likely the recent changes to the APPLA goal definition have had an impact upon this section's overall scoring.

The following set of three tables provide at a glance, the scores for each of the eight categories of measurement within Outcome Measure 3.  The first is the full sample (n=76), the second is the children in out of home placement (CIP) cases (n=54) and the third is the in-home family cases (n=22). For a complete listing of rank scores for Outcome Measure 3 by case, see Outcome Measure 3 - Appendix 1.

**Table 9:  Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for <u>All Cases</u> Across All Categories of OM3**

| Category | Optimal "5" | Very Good "4" | Marginal "3" | Poor "2" | Adverse/Absent "1" |
|---|---|---|---|---|---|
| I.1    Reason for DCF Involvement | 42 (55.3%) | 30 (39.5%) | 4 (5.3%) | 0 (0%) | 0 (0%) |
| I.2.   Identifying Information | 3 (3.9%) | 57 (75.0%) | 15 (19.7%) | 1 (1.3%) | 0 (0%) |
| I.3.   Strengths/Needs/Other Issues | 17 (22.4%) | 37 (48.7%) | 22 (28.9%) | 0 (0%) | 0 (0%) |
| I.4.   Present Situation and Assessment to Date of Review | 17 (22.4%) | 38 (50.0%) | 20 (26.3%) | 1 (1.3%) | 0 (0%) |
| II.1   Determining the Goals/Objectives | 15 (19.7%) | 26 (34.2%) | 29 (38.2%) | 6 (7.9%) | 0 (0%) |
| II.2.  Progress[7] | 19 (25.0%) | 30 (39.5%) | 22 (28.9%) | 2 (2.6%) | 1 (1.3%) |
| II.3   Action Steps to Achieving Goals Identified | 3 (3.9%) | 27 (35.5%) | 37 (48.7%) | 8 (10.5%) | 1 (1.3%) |
| II.4   Planning for Permanency | 24 (31.6%) | 34 (44.7%) | 14 (18.4%) | 2 (2.6%) | 2 (2.6%) |

**Table 10:   Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for <u>Out of Home  (CIP) Cases</u> Across All Categories of OM3**

| Category | Optimal "5" | Very Good "4" | Marginal "3" | Poor "2" | Adverse/Absent "1" |
|---|---|---|---|---|---|
| I.1    Reason for DCF Involvement | 25 (46.3%) | 26 (48.1%) | 3 (5.5%) | 0 (0%) | 0 (0%) |
| I.2.   Identifying Information | 1 (1.9%) | 40 (74.1%) | 12 (22.2%) | 1 (1.9%) | 0 (0%) |
| I.3.   Strengths/Needs/Other Issues | 13 (24.1%) | 26 (48.1%) | 15 (27.8%) | 0(0%) | 0 (0%) |
| I.4.   Present Situation and Assessment to Date of Review | 16 (29.6%) | 23 (42.6%) | 14 (25.9%) | 1 (1.9%) | 0 (0%) |
| II.1   Determining the Goals/Objectives | 8 (14.8%) | 19 (35.2%) | 23 (42.5%) | 4 (7.4%) | 0 (0%) |
| II.2.  Progress[8] | 13 (25.0%) | 24 (46.2%) | 13 (25.0%) | 1 (1.9%) | 1 (1.9%) |
| II.3   Action Steps to Achieving Goals Identified | 2 (3.7%) | 23 (42.6%) | 23 (42.6%) | 6 (11.1%) | 0 (0%) |
| II.4   Planning for Permanency | 14 (25.9%) | 24 (44.4%) | 13 (24.1%) | 2 (3.7%) | 1 (1.9%) |

**Table 11:  Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for <u>In-Home Family Cases</u> Across All Categories of OM3**

| Category | Optimal "5" | Very Good "4" | Marginal "3" | Poor "2" | Adverse/Absent "1" |
|---|---|---|---|---|---|
| I.1    Reason for DCF Involvement | 17 (77.3%) | 4 (18.2%) | 1 (1.3%) | 0 (0%) | 0 (0%) |
| I.2.   Identifying Information | 2 (9.1%) | 17 (77.3%) | 3 (13.6%) | 0 (0%) | 0 (0%) |
| I.3.   Strengths/Needs/Other Issues | 4 (18.2%) | 11 (50.0%) | 7 (31.8%) | 0 (0%) | 0 (0%) |
| I.4.   Present Situation and Assessment to Date of Review | 1 (4.5%) | 15 (68.2%) | 6 (27.3%) | 0 (0%) | 0 (0%) |
| II.1   Determining the Goals/Objectives | 7 (31.8%) | 7 (31.8%) | 6 (27.3%) | 2 (9.1%) | 0 (0%) |
| II.2.  Progress | 6 (27.3%) | 6 (27.3%) | 9 (40.9%) | 1 (4.5%) | 0 (0%) |
| II.3   Action Steps to Achieving Goals Identified | 1 (4.5%) | 4 (18.2%) | 14 (63.6%) | 2 (9.1%) | 1 (4.5%) |
| II.4   Planning for Permanency | 10 (45.5%) | 10 (45.5%) | 1 (4.5%) | 0 (0%) | 1 (4.5%) |

---

[7] Excludes two cases that were newly opened – ranked as N/A- too early to note progress (2.6%).

[8] Excludes two cases that were newly opened – ranked as N/A-too early to note progress (3.7%).

**Data Reporting for Outcome Measure 15 – Needs Met**
There is only a slight variation when looking at the case assignment type in relation to needs met.  Of the 22 cases selected as in-home family cases, eleven or 50.0% achieved "needs met" status.  Twenty-six of the 49 CPS cases with children in placement (53.1%) achieved "needs met" status, and two of the five Voluntary Services children in placement cases (40.0%) achieved "needs met" status.

**Crosstabulation 9:  Overall Score for Outcome Measure 15 * What is the Type of Case Assignment Noted in LINK?**

| Overall Score for Outcome Measure 15 | | What is the type of case assignment noted in LINK? | | | |
| --- | --- | --- | --- | --- | --- |
| | | CPS In-Home Family Case (IHF) | CPS Child in Placement Case (CIP) | Voluntary Services Child in Placement Case (VSCIP) | Total |
| **Needs Met** | Count | 11 | 26 | 2 | 39 |
| | % within Overall Score | 28.2% | 66.7% | 5.1% | 100.0% |
| | % within case assignment type | 50.0% | 53.1% | 40.0% | 51.3% |
| **Needs Not Met** | Count | 11 | 23 | 3 | 37 |
| | % within Overall Score | 29.7% | 62.2% | 8.1% | 100.0% |
| | % within case assignment type | 50.0% | 46.9% | 60.0% | 48.7% |
| **Total** | Count | 22 | 49 | 5 | 76 |
| | % within Overall Score | 28.9% | 64.5% | 6.6% | 100.0% |
| | % within case assignment type | 100.0% | 100.0% | 100.0% | 100.0% |

The overall score was also looked at through the filter of the stated permanency goal.  This quarter's plans were still operating under the guidelines including subcategories of the APPLA goals.  Clearly demonstrated, as in the prior quarter, the less permanent the goal, the more frequently "needs met" was not achieved (APPLA:  "Permanent Non-Relative Foster Care", APPLA:  "Other", and "Long Term Foster Care with a Licensed Relative" are 33.3%, 42.9%, and 33.3% compliant).  The full breakdown is shown below:

**Crosstabulation 10:  What is the child or family's stated goal on the most recent approved treatment plan in place during the period? * Overall Score for Outcome Measure 15**

| What is the child or family's stated goal on the most recent approved treatment plan in place during the period? | | Overall Score for Outcome Measure 15 | | |
|---|---|---|---|---|
| | | Needs Met | Needs Not Met | Total |
| **Reunification** | Count | 15 | 11 | 26 |
| | % within goal | 57.7% | 42.3% | 100.0% |
| | % within Overall Score | 38.5% | 29.7% | 34.2% |
| **Adoption** | Count | 6 | 3 | 9 |
| | % within goal | 66.7% | 33.3% | 100.0% |
| | % within Overall Score | 15.4% | 8.1% | 11.8% |
| **Long Term Foster Care with a licensed relative** | Count | 1 | 2 | 3 |
| | % within goal | 33.3% | 66.7% | 100.0% |
| | % within Overall Score | 2.6% | 5.4% | 3.9% |
| **APPLA:  Permanent Non-Relative Foster Care[9]** | Count | 3 | 6 | 9 |
| | % within goal | 33.3% | 66.7% | 100.0% |
| | % within Overall Score | 7.7% | 16.2% | 11.8% |
| **APPLA:  Other[10]** | Count | 3 | 4 | 7 |
| | % within goal | 42.9% | 57.1% | 100.0% |
| | % within Overall Score | 7.7% | 10.8% | 9.2% |
| **In-Home Goals - Safety/Well-being Issues** | Count | 11 | 9 | 20 |
| | % within goal | 55.0% | 45.0% | 100.0% |
| | % within Overall Score | 28.2% | 24.3% | 26.3% |
| **Goal indicated is not an approved DCF goal** | Count | 0 | 2 | 2 |
| | % within goal | .0% | 100.0% | 100.0% |
| | % within Overall Score | .0% | 5.4% | 2.6% |
| **Total** | Count | 39 | 37 | 76 |
| | % within goal | 51.3% | 48.7% | 100.0% |
| | % within Overall Score | 100.0% | 100.0% | 100.0% |

Outcome Measure 15 looks at eleven categories of measurement and an overall score to determine the level with which the Department is able to meet the needs of families and children.  When looking at a break between passing scores (5 or 4) and those not passing

---

[9] This APPLA goal is no longer an acceptable permanency goal, but given the crossover of area office training and our review process for this quarter, we are not identifying them as "unapproved goals" at this juncture.

[10] This APPLA goal is no longer an acceptable permanency goal, but given the crossover of area office training and our review process for this quarter, we are not identifying them as "unapproved goals" at this juncture.

(3 or less) there is a marked difference in performance among the categories. The Department shows promising practices in legal action, safety of children in placement, attending to medical needs, and recruitment efforts for the prior period. Most problematic are provision of timely dental services, mental health, behavioral health, and substance abuse services. Though the majority of reviewers identified children in intact family situations as safe, there were uncertain or marginal safety situations in 26.9% of the cases. In only one case did the reviewer score the in-home situation "poor". There are no adverse scores noted related to safety.

**Table 12:  Scoring of Categorical Sections of Outcome Measure 15**

| Category | # Passing (Scores 4 or 5) | # Not Passing (Scores 3 or Less) | Improved over prior Qtr? |
|---|---|---|---|
| **DCF Case Management – Legal Action to Achieve the Permanency Goal During the Prior Six Months (II.2)** | 97.4% | 2.6% | Yes |
| **Safety – Children in Placement (I.2)** | 89.7% | 10.3% | Yes |
| **Medical Needs (III.1)** | 82.9% | 17.1% | Yes |
| **DCF Case Management – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months (II.3)** | 82.5% | 17.5% | Yes |
| **Child's Current Placement (IV.1)** | 76.8% | 23.2% | No |
| **DCF Case Management – Contracting or Providing Services to achieve the Permanency Goal during the Prior Six Months (II.4)** | 74.7% | 25.3% | Yes |
| **Educational Needs  (IV. 2)** | 74.6% | 25.4% | Yes |
| **Securing the Permanent Placement – Action Plan for the Next Six Months (II.1)** | 74.1% | 25.9% | No |
| **Safety – In Home (I.1)** | 73.1% | 26.9% | Yes |
| **Dental Needs (III.2)** | 71.1% | 28.9% | Yes |
| **Mental Health, Behavioral and Substance Abuse Services (III.3)** | 71.0% | 29.0% | Yes |

There are some notable shifts in performance from the last quarter. "Safety" for both in-home cases and children in placement has improved since the prior quarter. The in-home population achieved passing scores in 60.9% in the prior quarter and was ranked 73.1% during this quarter. Children in placement cases achieved passing scores related to safety in 81.5% of the cases reviewed last quarter and achieved passing scores in  89.7% of the cases this quarter.  While there is still room for improvement, the Department scores within the "Mental Health, Behavioral and Substance Abuse Services" category increased from 60.6% in the First Quarter to71.0% in the Second Quarter's review.

On the other hand, declines were noted in two categories:  the "Child's Current Placement" which was ranked as 80.8% in the 1st Quarter vs. the 2nd Quarter passing rate of 76.8%; and not surprisingly given the deficits in action plans within OM3, "Securing the Permanent Placement – Action Plan for the Next Six Months" dropped from 79.6% to 74.1%.  All categories are in Table 13 below with the frequency and percentage of applicable cases achieving each rank score below.

**Table 13:  Measurements of Treatment Plan OM 15 – Percentage of Rank Scores Attained Across All Categories[11]**

| Category | # Ranked Optimal "5" | # Ranked Very Good "4" | # Ranked Marginal "3" | # Ranked Poor "2" | # Ranked Adverse/Absent "1" | N/A To Case |
|---|---|---|---|---|---|---|
| I.1   Safety – In Home | 8 (30.8% | 11 (42.3%) | 6 (23.1%) | 1 (3.8%) | 0 (0%) | 50 |
| I.2   Safety – Children in Placement | 28 (48.3%) | 24 (41.4%) | 5 (8.6%) | 1 (1.7%) | 0 (0%) | 18 |
| II.1   Securing the Permanent Placement – Action Plan for the Next Six Months | 25 (43.1%) | 18 (31.0%) | 14 (24.1%) | 1 (1.7%) | 0 (0%) | 18 |
| II.2.   DCF Case Management – Legal Action to Achieve the Permanency Goal During the Prior Six Months | 54 (71.1%) | 20 (26.3%) | 1 (1.3%) | 1 (1.3%) | 0 (0%) | 0 |
| II.3   DCF Case Management – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | 38 (60.3%) | 14 (22.2%) | 11 (17.5%) | 0 (0%) | 0 (0%) | 13 |
| II.4   DCF Case Management – Contracting or Providing Services to achieve the Permanency Goal during the Prior Six Months | 29 (38.7%) | 27 (36.0%) | 19 (25.3%) | 0 (0%) | 0 (0%) | 1 |
| III.1  Medical Needs | 35 (46.1%) | 28 (36.8%) | 10 (13.2%) | 1 (1.3%) | 2 (2.6%) | 0 |
| III.2  Dental Needs | 43 (56.6%) | 11 (14.5%) | 15 (19.7%) | 3 (3.9%) | 4 (5.3%) | 0 |
| III.3  Mental Health, Behavioral and Substance Abuse Services | 19 (27.5%) | 30 (43.5%) | 15 (21.7%) | 5 (7.2%) | 0 (0%) | 7 |
| IV.1  Child's Current Placement | 25 (44.6%) | 18 (32.1%) | 13 (23.2%) | 0 (0%) | 0 (0%) | 20 |
| IV.2  Educational Needs | 25 (42.4%) | 19 (32.2%) | 10 (16.9%) | 4 (6.8%) | 1 (1.7%) | 17 |

For a complete listing of rank scores for Outcome Measure 15 by case, see appended document.

---

[11] Percentages are based on applicable cases for the individual measure.  Those cases marked N/A are excluded from the denominator in each row's calculation of percentage.  At the point of sampling, the total number identified for the in-home sample was 23 cases. However, a number of cases had both in-home and out of home status at some point during the six month period of review.

In addition to looking at the twelve categories in Outcome Measure 15, the review also collected data on situations in which a case had a need identified at the prior ACR, treatment plan or within the period's LINK record.  Data was collected on those that remained unresolved at the point of the most recent treatment planning efforts.  In 37 of the 76 cases, the reviewers found no unmet needs.  Within the remaining 39 cases (51.3%) a total of 81 discrete needs were identified.  Of those identified needs remaining unmet during the last treatment planning cycle, "mental health services" was the most frequently cited. Others included in the data collection are listed below:

**Table 14:  Unmet Service Needs Identified within the Sample Set Cases**

| Identified Category of Service Need Type | Frequency | % within Unmet Needs (n=39) |
|---|---|---|
| **Mental Health Services** | 20 | 51.3% |
| **Out of Home Care** | 11 | 28.2% |
| **Substance Abuse Treatment** | 11 | 28.2% |
| **Dental** | 10 | 25.6% |
| **Education** | 9 | 23.1% |
| **Medical** | 5 | 12.8% |
| **Out of Home Support Services** | 4 | 10.3% |
| **Housing** | 3 | 7.7% |
| **In-Home Support Services** | 3 | 7.7% |
| **Domestic Violence Treatment** | 2 | 5.1% |
| **Training** | 2 | 5.1% |
| **DCF Case Management** | 1 | 2.6% |
| Total | 81 | |

Barriers were identified for the unmet needs cited above.  Most frequently the barrier was identified as client refusal (as identified by the SW), followed by delay in referral.   We again note that instances of "client refusal" often fail to incorporate additional engagement efforts such as use of the SWS or ARG, or collaborative efforts with active providers to engage clients in needed services.

**Table 15:  What Was the Primary Barrier that Prevented Families or Children from Having Their Medical, Dental, Mental Health or Other Service Need Met?**

| Barrier | Frequency | % of Barriers Identified |
|---|---|---|
| Client Refused Service | 19 | 23.5% |
| Delay in Referral by Worker | 17 | 21.0% |
| UTD from treatment plan or narrative | 10 | 12.3% |
| Wait List | 5 | 4.9% |
| No Slots Available | 4 | 4.9% |
| Scheduling Issues of Family | 3 | 3.7% |
| Child AWOL | 3 | 3.7% |
| No service Identified | 2 | 2.5% |
| BOE/School not providing timely/adequate services | 2 | 2.5% |
| Provider Delay in referral | 2 | 2.5% |
| Parent's Incarceration/Criminal Activity | 2 | 2.5% |
| Requires more intensive level then engaged | 1 | 1.2% |
| Approval Process | 1 | 1.2% |
| Insurance | 1 | 1.2% |
| Referred service is unwilling to engage client | 1 | 1.2% |
| Service deferred pending completion of another | 1 | 1.2% |
| Service not available in primary language | 1 | 1.2% |
| Client not consistent with contact/attendance | 1 | 1.2% |
| Delays in Special Study process | 1 | 1.2% |
| Immigration issues | 1 | 1.2% |
| Transient lifestyle | 1 | 1.2% |
| Lack of engagement between DCF and Child | 1 | 1.2% |
| Truancy | 1 | 1.2% |
| Total | 81 | |

In addition, when looking specifically at the current treatment planning document, 52 cases (68.4%) had evidence of a service need that was clearly identified at the ACR/TPC or within LINK documentation, but not incorporated into the current treatment plan document.  This included 117 service needs that the reviewers felt were clearly identifiable as a carried over unmet need, or a need recently identified at the ACR or within the LINK record.  This was most frequently noted as an out-of-home support service followed by mental health service needs.  It is important to note that while there were many needs that may not have been incorporated into the treatment planning document, in many cases, discussions observed at the ACR/TPC/FC adequately addressed casework and or the responsibility of participants toward meeting the identified needs.

**Table 16:  Service Needs Not Incorporated into the Current Treatment Plan**

| Identified Category of Service Needs | Frequency | % within Cases with Missing Service Needs (n=52) |
|---|---|---|
| Out of Home Support Services | 18 | 34.6% |
| Mental Health services | 17 | 32.7% |
| Dental | 15 | 28.8% |
| Medical | 15 | 28.8% |
| In-home Support services | 11 | 21.2% |
| DCF | 10 | 19.2% |
| Education | 9 | 17.3% |
| Substance Abuse Treatment | 6 | 11.5% |
| Training | 6 | 11.5% |
| Domestic Violence Treatment | 4 | 7.7% |
| Out of home care | 4 | 7.7% |
| Childcare | 1 | 1.9% |
| Employment | 1 | 1.9% |
| | 117 | |

The failure to include these services in treatment plan action steps to achieve stated goals for the current cycle leads to a subsequent failure to address the engagement and progress of these items in future treatment planning documents.  It also misrepresents the level of expectation for clients, providers and DCF during the period to follow.

Rank Scores for Outcome Measure 3
And
Outcome Measure 15
# Appendix 1

## Outcome Measure 3:  Treatment Plan Case Summaries

| Area Office | | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bridgeport | 1 | yes | yes | Optimal | Very Good | Optimal | Very Good | Very Good | Too early to note progress | Very Good | Very Good | Appropriate |
| | 2 | yes | yes | Marginal | Very Good | Very Good | Very Good | Marginal | Optimal | Marginal | Very Good | Not Appropriate |
| | 3 | yes | yes | Optimal | Marginal | Very Good | Very Good | Very Good | Optimal | Marginal | Optimal | Not Appropriate |
| | 4 | yes | yes | Optimal | Very Good | Very Good | Very Good | Marginal | Optimal | Marginal | Very Good | Not Appropriate |
| | 5 | yes | yes | Optimal | Marginal | Very Good | Very Good | Optimal | Optimal | Very Good | Optimal | Appropriate |
| | 6 | yes | yes | Very Good | Very Good | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Appropriate |
| Danbury | 1 | yes | yes | Very Good | Very Good | Marginal | Very Good | Marginal | Very Good | Marginal | Very Good | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Very Good | Very Good | Optimal | Optimal | Marginal | Marginal | Not Appropriate |
| | 3 | yes | yes | Optimal | Very Good | Very Good | Very Good | Marginal | Marginal | Marginal | Optimal | Not Appropriate |

## Outcome Measure 3:  Treatment Plan Case Summaries

| What is the SW's area office assignment? | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Greater New Haven **1** | yes | yes | Optimal | Marginal | Very Good | Optimal | Optimal | Very Good | Marginal | Marginal | Not Appropriate |
| **2** | yes | yes | Marginal | Very Good | Marginal | Marginal | Marginal | Marginal | Marginal | Marginal | Not Appropriate |
| **3** | yes | yes | Very Good | Very Good | Very Good | Very Good | Very Good | Marginal | Marginal | Optimal | Not Appropriate |
| **4** | yes | yes | Very Good | Very Good | Very Good | Marginal | Marginal | Marginal | Marginal | Marginal | Not Appropriate |
| **5** | yes | yes | Very Good | Very Good | Marginal | Very Good | Marginal | Very Good | Very Good | Very Good | Not Appropriate |

**Outcome Measure 3: Treatment Plan Case Summaries**

| What is the SW's area office assignment? | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hartford 1 | yes | no | Very Good | Marginal | Very Good | Very Good | Marginal | Marginal | Marginal | Very Good | Not Appropriate |
| 2 | yes | yes | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Marginal | Marginal | Not Appropriate |
| 3 | yes | yes | Very Good | Marginal | Very Good | Very Good | Marginal | Very Good | Marginal | Marginal | Not Appropriate |
| 4 | yes | yes | Optimal | Very Good | Marginal | Marginal | Poor | Marginal | Marginal | Marginal | Not Appropriate |
| 5 | yes | yes | Optimal | Very Good | Optimal | Very Good | Very Good | Very Good | Optimal | Very Good | Appropriate |
| 6 | yes | yes | Very Good | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Appropriate |
| 7 | yes | yes | Very Good | Very Good | Very Good | Very Good | Very Good | Marginal | Marginal | Very Good | Not Appropriate |
| 8 | yes | yes | Very Good | Very Good | Optimal | Very Good | Very Good | Very Good | Very Good | Optimal | Appropriate |
| 9 | yes | yes | Optimal | Very Good | Marginal | Very Good | Very Good | Very Good | Marginal | Very Good | Not Appropriate |
| 10 | yes | yes | Very Good | Very Good | Marginal | Marginal | Optimal | Marginal | Marginal | Very Good | Not Appropriate |

**Outcome Measure 3:  Treatment Plan Case Summaries**

| What is the SW's area office assignment? | | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manchester | 1 | yes | yes | Very Good | Marginal | Very Good | Marginal | Marginal | Marginal | Absent/Averse | Very Good | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Very Good | Marginal | Very Good | Very Good | Very Good | Very Good | Appropriate |
| | 3 | yes | yes | Very Good | Very Good | Very Good | Optimal | Very Good | Very Good | Very Good | Very Good | Appropriate |
| | 4 | yes | yes | Very Good | Very Good | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Appropriate |
| | 5 | yes | yes | Very Good | Marginal | Marginal | Very Good | Very Good | Very Good | Marginal | Very Good | Not Appropriate |
| | 6 | yes | yes | Optimal | Marginal | Marginal | Very Good | Marginal | Marginal | Marginal | Marginal | Not Appropriate |
| Meriden | 1 | yes | yes | Optimal | Very Good | Very Good | Marginal | Marginal | Marginal | Poor | Very Good | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Appropriate |
| | 3 | no | yes | Optimal | Marginal | Very Good | Marginal | Marginal | Marginal | Poor | Very Good | Not Appropriate |

## Outcome Measure 3:  Treatment Plan Case Summaries

| What is the SW's area office assignment? | | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Middletown | 1 | yes | yes | Very Good | Very Good | Marginal | Marginal | Poor | Marginal | Marginal | Optimal | Not Appropriate |
| | 2 | yes | yes | Very Good | Marginal | Very Good | Marginal | Marginal | Marginal | Marginal | Marginal | Not Appropriate |
| | 3 | yes | yes | Optimal | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Appropriate |
| New Britain | 1 | yes | yes | Very Good | Marginal | Marginal | Very Good | Marginal | Marginal | Poor | Absent/Averse | Not Appropriate |
| | 2 | yes | yes | Very Good | Very Good | Marginal | Marginal | Marginal | Marginal | Marginal | Very Good | Not Appropriate |
| | 3 | yes | yes | Optimal | Very Good | Very Good | Marginal | Marginal | Optimal | Marginal | Optimal | Not Appropriate |
| | 4 | yes | yes | Marginal | Marginal | Very Good | Optimal | Marginal | Marginal | Marginal | Marginal | Not Appropriate |
| | 5 | yes | yes | Optimal | Marginal | Marginal | Marginal | Marginal | Absent/Averse | Poor | Very Good | Not Appropriate |
| | 6 | no | yes | Marginal | Very Good | Marginal | Very Good | Poor | Poor | Marginal | Absent/Averse | Not Appropriate |
| | 7 | no | yes | Optimal | Very Good | Optimal | Very Good | Very Good | Very Good | Marginal | Optimal | Not Appropriate |
| | 8 | yes | yes | Very Good | Very Good | Very Good | Optimal | Marginal | Marginal | Marginal | Optimal | Not Appropriate |

**Outcome Measure 3:  Treatment Plan Case Summaries**

| What is the SW's area office assignment? | | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Haven Metro | 1 | yes | yes | Optimal | Optimal | Very Good | Very Good | Optimal | Very Good | Marginal | Very Good | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Marginal | Marginal | Optimal | Marginal | Very Good | Very Good | Not Appropriate |
| | 3 | yes | yes | Optimal | Very Good | Very Good | Marginal | Very Good | Very Good | Very Good | Optimal | Appropriate |
| | 4 | yes | no | Optimal | Very Good | Very Good | Very Good | Marginal | Optimal | Very Good | Very Good | Not Appropriate |
| | 5 | yes | yes | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Appropriate |
| | 6 | yes | yes | Optimal | Very Good | Marginal | Poor | Poor | Marginal | Marginal | Very Good | Not Appropriate |
| | 7 | yes | yes | Very Good | Very Good | Marginal | Optimal | Marginal | Very Good | Marginal | Very Good | Not Appropriate |
| | 8 | yes | yes | Optimal | Very Good | Very Good | Optimal | Very Good | Optimal | Very Good | Very Good | Appropriate |
| Norwalk | 1 | yes | no | Very Good | Marginal | Marginal | Very Good | Marginal | Poor | Poor | Very Good | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Optimal | Very Good | Optimal | Optimal | Marginal | Optimal | Not Appropriate |

## Outcome Measure 3:  Treatment Plan Case Summaries

| What is the SW's area office assignment? | | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Norwich | 1 | yes | yes | Optimal | Very Good | Marginal | Marginal | Very Good | Optimal | Very Good | Optimal | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Optimal | Optimal | Marginal | Optimal | Very Good | Very Good | Appropriate |
| | 3 | yes | yes | Optimal | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Optimal | Appropriate |
| | 4 | yes | yes | Optimal | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Optimal | Appropriate |
| | 5 | yes | yes | Optimal | Very Good | Optimal | Very Good | Optimal | Very Good | Marginal | Optimal | Not Appropriate |
| | 6 | yes | yes | Optimal | Optimal | Marginal | Optimal | Marginal | Optimal | Marginal | Optimal | Not Appropriate |
| Stamford | 1 | yes | yes | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Marginal | Not Appropriate |
| | 2 | yes | yes | Optimal | Very Good | Very Good | Very Good | Optimal | Optimal | Very Good | Very Good | Appropriate |
| Torrington | 1 | yes | yes | Optimal | Marginal | Very Good | Marginal | Very Good | Too early to note progress | Very Good | Optimal | Not Appropriate |
| | 2 | yes | yes | Very Good | Very Good | Optimal | Optimal | Very Good | Very Good | Very Good | Very Good | Appropriate |
| | 3 | yes | yes | Optimal | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Very Good | Appropriate |

## Outcome Measure 3:  Treatment Plan Case Summaries

| What is the SW's area office assignment? | | Was the family or child's language needs accommodated? | Has the treatment plan been approved by the SWS? | Reason for DCF Involvement | Identifying Information | Strengths, Needs and Other Issues | Present Situation and Assessment to Date of Review | Determining the Goals/Objectives | Progress | Action Steps to Achieving Goals Identified for the Upcoming Six Month Period | Planning for Permanency | Overall Score for OM3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Waterbury | 1 | yes | yes | Very Good | Very Good | Optimal | Optimal | Very Good | Very Good | Very Good | Optimal | Appropriate |
| | 2 | yes | yes | Very Good | Very Good | Very Good | Very Good | Poor | Very Good | Poor | Marginal | Not Appropriate |
| | 3 | yes | yes | Very Good | Poor | Very Good | Marginal | Marginal | Very Good | Marginal | Poor | Not Appropriate |
| | 4 | no | yes | Optimal | Very Good | Very Good | Very Good | Marginal | Very Good | Marginal | Very Good | Not Appropriate |
| | 5 | yes | yes | Optimal | Very Good | Marginal | Marginal | Marginal | Very Good | Poor | Marginal | Not Appropriate |
| | 6 | yes | yes | Optimal | Very Good | Marginal | Very Good | Marginal | Very Good | Marginal | Optimal | Not Appropriate |
| | 7 | yes | yes | Optimal | Very Good | Marginal | Very Good | Very Good | Marginal | Poor | Very Good | Not Appropriate |
| Willimantic | 1 | yes | yes | Very Good | Very Good | Very Good | Marginal | Poor | Very Good | Marginal | Poor | Not Appropriate |
| | 2 | yes | yes | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Appropriate |
| | 3 | yes | yes | Very Good | Very Good | Optimal | Optimal | Very Good | Very Good | Very Good | Very Good | Appropriate |
| | 4 | yes | yes | Optimal | Very Good | Optimal | Very Good | Very Good | Marginal | Very Good | Marginal | Not Appropriate |

## Case Summaries for Outcome Measure 15 Categories by Area Office Assignment

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt - Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt - Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt - Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bridgeport** | Very Good | Optimal | Optimal | Optimal | N/A to Case Type | N/A to Case Type | Optimal | Optimal | Optimal | Very Good | Very Good | Needs Met |
| **Bridgeport** | N/A to Case Type | Very Good | Very Good | Optimal | N/A to Case Type | Optimal | Optimal | Optimal | Very Good | Marginal | Very Good | Needs Not Met |
| **Bridgeport** | Optimal | Optimal | Optimal | Optimal | N/A to Case Type | Optimal | Very Good | Very Good | Optimal | N/A to Case Type | Optimal | Needs Met |
| **Bridgeport** | Optimal | N/A to Case Type | N/A to Case Type | Optimal | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | N/A to Case Type | N/A to Case Type | Needs Met |
| **Bridgeport** | N/A to Case Type | Optimal | Optimal | Optimal | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Needs Met |
| **Bridgeport** | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Very Good | Very Good | Needs Met |

## Case Summaries for Outcome Measure 15 Categories by Area Office Assignment

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt – Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt – Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Danbury** | N/A to Case Type | Very Good | Very Good | Very Good | Optimal | Marginal | Very Good | Optimal | Very Good | Very Good | Very Good | Needs Not Met |
| **Danbury** | Optimal | Optimal | Very Good | Optimal | Very Good | Optimal | Marginal | Poor | Very Good | Optimal | Very Good | Needs Not Met |
| **Danbury** | Marginal | N/A to Case Type | N/A to Case Type | Marginal | Very Good | Marginal | Very Good | Absent/Averse | Marginal | N/A to Case Type | Very Good | Needs Not Met |
| **Greater New Haven** | N/A to Case Type | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | N/A to Case Type | Optimal | N/A to Case Type | Needs Met |
| **Greater New Haven** | N/A to Case Type | Optimal | Very Good | Optimal | Optimal | Optimal | Very Good | Marginal | Optimal | Very Good | Optimal | Needs Not Met |
| **Greater New Haven** | Very Good | N/A to Case Type | N/A to Case Type | Optimal | Optimal | Very Good | Very Good | Very Good | Very Good | N/A to Case Type | Optimal | Needs Met |
| **Greater New Haven** | N/A to Case Type | Very Good | Very Good | Very Good | Marginal | Marginal | Optimal | Optimal | Very Good | Marginal | Very Good | Needs Not Met |
| **Greater New Haven** | N/A to Case Type | Optimal | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Needs Met |

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt – Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt – Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hartford | N/A to Case Type | Marginal | Marginal | Optimal | Very Good | Very Good | Marginal | Marginal | Poor | Marginal | Marginal | Needs Not Met |
| Hartford | N/A to Case Type | Very Good | Very Good | Optimal | N/A to Case Type | Very Good | Optimal | Marginal | Very Good | Marginal | Poor | Needs Not Met |
| Hartford | N/A to Case Type | Very Good | Optimal | Optimal | Optimal | Marginal | Very Good | Marginal | Marginal | Optimal | Optimal | Needs Not Met |
| Hartford | N/A to Case Type | Marginal | Marginal | Optimal | Marginal | Marginal | Marginal | Optimal | Marginal | Marginal | Marginal | Needs Not Met |
| Hartford | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Needs Met |
| Hartford | N/A to Case Type | Optimal | Very Good | Optimal | Optimal | Very Good | Optimal | Optimal | Optimal | Very Good | Optimal | Needs Met |
| Hartford | N/A to Case Type | Very Good | Optimal | Optimal | Very Good | Very Good | Very Good | Optimal | Very Good | Very Good | Very Good | Needs Met |
| Hartford | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | N/A to Case Type | Very Good | N/A to Case Type | Needs Met |
| Hartford | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | N/A to Case Type | Optimal | Needs Met |
| Hartford | Very Good | N/A to Case Type | N/A to Case Type | Optimal | Optimal | Very Good | Absent/Averse | Absent/Averse | Marginal | N/A to Case Type | Poor | Needs Not Met |

**Case Summaries for Outcome Measure 15 Categories by Area Office Assignment**

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt - Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt - Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt - Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Manchester** | Marginal | N/A to Case Type | N/A to Case Type | Very Good | Very Good | Very Good | Very Good | Optimal | Optimal | N/A to Case Type | N/A to Case Type | Needs Met |
| **Manchester** | N/A to Case Type | Very Good | Optimal | Optimal | Optimal | Very Good | Very Good | Optimal | Optimal | Optimal | Optimal | Needs Met |
| **Manchester** | N/A to Case Type | Very Good | Very Good | Optimal | Very Good | Very Good | Optimal | Optimal | Marginal | Marginal | Marginal | Needs Not Met |
| **Manchester** | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Needs Met |
| **Manchester** | N/A to Case Type | Very Good | Marginal | Optimal | Very Good | Very Good | Very Good | Marginal | Very Good | Very Good | Optimal | Needs Not Met |
| **Manchester** | Poor | N/A to Case Type | N/A to Case Type | Poor | Optimal | Very Good | Optimal | Marginal | Marginal | N/A to Case Type | Very Good | Needs Not Met |
| **Meriden** | Very Good | N/A to Case Type | N/A to Case Type | Optimal | N/A to Case Type | Marginal | Marginal | Poor | Poor | N/A to Case Type | Marginal | Needs Not Met |
| **Meriden** | Optimal | Very Good | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Needs Met |
| **Meriden** | N/A to Case Type | Marginal | Marginal | Very Good | Optimal | Marginal | Optimal | Optimal | Poor | Very Good | Marginal | Needs Not Met |

**Case Summaries for Outcome Measure 15 Categories by Area Office Assignment**

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement – Action Plan for the Next Six Months | Permanency: DCF Case Mgmt – Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt – Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Middletown | Very Good | N/A to Case Type | N/A to Case Type | Optimal | N/A to Case Type | Very Good | Very Good | Marginal | Marginal | N/A to Case Type | Marginal | Needs Not Met |
| Middletown | N/A to Case Type | Very Good | Marginal | Optimal | Marginal | Marginal | Very Good | Optimal | Marginal | Very Good | Very Good | Needs Not Met |
| Middletown | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Very Good | Very Good | Marginal | Optimal | Very Good | Very Good | Needs Met |
| New Britain | N/A to Case Type | Very Good | Marginal | Optimal | Marginal | Marginal | Very Good | Very Good | Marginal | Marginal | Marginal | Needs Not Met |
| New Britain | N/A to Case Type | Optimal | Marginal | Very Good | Optimal | Very Good | Very Good | Marginal | Marginal | Optimal | Very Good | Needs Not Met |
| New Britain | Very Good | N/A to Case Type | N/A to Case Type | Optimal | N/A to Case Type | Optimal | Optimal | Optimal | Very Good | N/A to Case Type | N/A to Case Type | Needs Met |
| New Britain | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Marginal | Optimal | Optimal | Optimal | Needs Met |
| New Britain | N/A to Case Type | Very Good | Marginal | Optimal | Marginal | Marginal | Very Good | Optimal | Marginal | Marginal | Marginal | Needs Not Met |
| New Britain | Marginal | Marginal | Very Good | Very Good | N/A to Case Type | Marginal | Absent/Averse | Absent/Averse | Poor | Marginal | Absent/Averse | Needs Not Met |
| New Britain | Optimal | N/A to Case Type | N/A to Case Type | Optimal | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Needs Met |

60

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt - Legal Action to Achieve the Permanency Goal During the Prior Six Months | Mgmt - Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Mgmt - Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **New Britain** | N/A to Case Type | Very Good | Optimal | Very Good | Optimal | Optimal | Very Good | Optimal | N/A to Case Type | Optimal | N/A to Case Type | Needs Met |
| **New Haven Metro** | Very Good | N/A to Case Type | N/A to Case Type | Very Good | Optimal | Optimal | Very Good | Optimal | Very Good | N/A to Case Type | Optimal | Needs Met |
| **New Haven Metro** | Marginal | N/A to Case Type | N/A to Case Type | Optimal | Very Good | Very Good | Marginal | Absent/ Averse | Poor | N/A to Case Type | Poor | Needs Not Met |
| **New Haven Metro** | N/A to Case Type | Very Good | Optimal | Optimal | Optimal | Marginal | Optimal | Optimal | Very Good | Optimal | Optimal | Needs Not Met |
| **New Haven Metro** | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | N/A to Case Type | Needs Met |
| **New Haven Metro** | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | N/A to Case Type | Needs Met |
| **New Haven Metro** | N/A to Case Type | Optimal | Marginal | Very Good | Marginal | Marginal | Optimal | Very Good | Very Good | Optimal | Optimal | Needs Not Met |
| **New Haven Metro** | N/A to Case Type | Optimal | Marginal | Optimal | Marginal | Very Good | Marginal | Very Good | Very Good | Optimal | N/A to Case Type | Needs Not Met |
| **New Haven Metro** | N/A to Case Type | Very Good | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Very Good | Very Good | Needs Met |
| **Norwalk** | N/A to Case Type | Poor | Marginal | Very Good | Marginal | Very Good | Marginal | Poor | Marginal | Marginal | Marginal | Needs Not Met |
| **Norwalk** | Very Good | Optimal | Optimal | Optimal | Optimal | Marginal | Marginal | Optimal | N/A to Case Type | N/A to Case Type | N/A to Case Type | Needs Not Met |

**Case Summaries for Outcome Measure 15 Categories by Area Office Assignment**

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement – Action Plan for the Next Six Months | Permanency: DCF Case Mgmt – Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt – Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Norwich | N/A to Case Type | Very Good | Marginal | Optimal | Very Good | Marginal | Very Good | Marginal | Very Good | Marginal | Optimal | Needs Not Met |
| Norwich | N/A to Case Type | Optimal | Very Good | Optimal | Very Good | Optimal | Very Good | Very Good | Very Good | Very Good | Optimal | Needs Met |
| Norwich | Very Good | N/A to Case Type | N/A to Case Type | Very Good | Very Good | Very Good | Optimal | Optimal | Very Good | N/A to Case Type | Optimal | Needs Met |
| Norwich | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | N/A to Case Type | Needs Met |
| Norwich | Optimal | N/A to Case Type | N/A to Case Type | Optimal | Optimal | Optimal | Very Good | Very Good | Very Good | N/A to Case Type | N/A to Case Type | Needs Met |
| Norwich | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | N/A to Case Type | Optimal | N/A to Case Type | Needs Met |
| Stamford | N/A to Case Type | Very Good | Marginal | Optimal | Marginal | Marginal | Optimal | Marginal | Very Good | Marginal | Very Good | Needs Not Met |
| Stamford | Very Good | N/A to Case Type | N/A to Case Type | Very Good | Very Good | Very Good | Very Good | Marginal | Very Good | N/A to Case Type | Very Good | Needs Not Met |

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt - Legal Action to Achieve the Permanency Goal During the Prior Six Months | Mgmt - Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Mgmt - Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Torrington** | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | N/A to Case Type | Needs Met |
| **Torrington** | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Very Good | Very Good | Optimal | Optimal | Very Good | Optimal | Needs Met |
| **Torrington** | Marginal | N/A to Case Type | N/A to Case Type | Very Good | N/A to Case Type | Very Good | Marginal | Very Good | Marginal | N/A to Case Type | Very Good | Needs Not Met |
| **Waterbury** | N/A to Case Type | Optimal | Very Good | Optimal | Optimal | Optimal | Very Good | Optimal | Very Good | Optimal | Optimal | Needs Met |
| **Waterbury** | N/A to Case Type | Marginal | Very Good | Very Good | Very Good | Marginal | Optimal | Very Good | Marginal | Very Good | Marginal | Needs Not Met |
| **Waterbury** | N/A to Case Type | Very Good | Marginal | Optimal | Marginal | Marginal | Very Good | Optimal | Very Good | Very Good | Optimal | Needs Not Met |
| **Waterbury** | N/A to Case Type | Very Good | Very Good | Optimal | Optimal | Very Good | Very Good | Optimal | Very Good | Very Good | Very Good | Needs Met |
| **Waterbury** | N/A to Case Type | Very Good | Very Good | Optimal | N/A to Case Type | Marginal | Marginal | Optimal | N/A to Case Type | Marginal | N/A to Case Type | Needs Not Met |
| **Waterbury** | N/A to Case Type | Very Good | Optimal | Optimal | Optimal | Very Good | Optimal | Very Good | N/A to Case Type | Optimal | N/A to Case Type | Needs Met |
| **Waterbury** | Marginal | N/A to Case Type | N/A to Case Type | Very Good | Marginal | Very Good | Poor | Marginal | Marginal | N/A to Case Type | Poor | Needs Not Met |

**Case Summaries for Outcome Measure 15 Categories by Area Office Assignment**

| Area Office | Safety: In-Home | Safety: Child In Placement | Permanency: Securing the Permanent Placement - Action Plan for the Next Six Months | Permanency: DCF Case Mgmt - Legal Action to Achieve the Permanency Goal During the Prior Six Months | Permanency: DCF Case Mgmt - Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months | Permanency: DCF Case Mgmt - Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months | Medical | Dental | Mental Health, Behavioral and Substance Abuse Services | Child's Current Placement | Education | Overall Score for Outcome Measure 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Willimantic** | N/A to Case Type | Very Good | Poor | Very Good | Very Good | Very Good | Very Good | Marginal | Very Good | Optimal | Optimal | Needs Not Met |
| **Willimantic** | Optimal | N/A to Case Type | N/A to Case Type | Optimal | Optimal | Optimal | Optimal | Optimal | Very Good | N/A to Case Type | N/A to Case Type | Needs Met |
| **Willimantic** | N/A to Case Type | Optimal | Very Good | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Optimal | Needs Met |
| **Willimantic** | N/A to Case Type | Very Good | Very Good | Very Good | Optimal | Very Good | Optimal | Very Good | Very Good | Optimal | Optimal | Needs Met |

**Outcome Measure 4 – Search for Relatives**

**Overview**
This review of Outcome Measure 4 – Search for Relatives, is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding the Department's efforts to conduct thorough searches for possible familial and social resources for placement or support of a child who requires out of home placement. **Outcome Measure 4 requires that DCF comply and sustain the following level of practice:**

> *If a child(ren) must be removed from his/her home, DCF shall conduct and document a search for maternal and paternal relatives, extended formal or informal networks, friends of the child or family, former foster parents, or other persons known to the child. The search period shall extend through the first six months following removal from home. The search shall be conducted and documented in at least 85% of the cases.*

The Department has reported compliance with the search for relatives measure in each quarter reported to date from the second quarter 2005 through the third quarter 2006. Our review is consistent with the Department's reporting of Outcome Measure 4, in that **94.4%** of the children who were in our sample had a documented relative search narrative entered within the LINK record.

**Review Findings and Trends**
As shown below, all but one of the area offices has attained compliance with the measure defined as an entry in the appropriate narrative form regarding relative search.

**Table 17:  Compliance with OM 4 within Each of the Area Office Locations**

| Area Office | Sample | % of Compliance with Measure |
|---|---|---|
| **Bridgeport** | 9 | 100.0% |
| **Danbury** | 3 | 100.0% |
| **Greater New Haven** | 12 | 100.0% |
| **Hartford** | 26 | 80.8% |
| **Manchester** | 25 | 96.0% |
| **Meriden** | 5 | 100.0% |
| **Middletown** | 4 | 100.0% |
| **New Britain** | 22 | 95.5% |
| **New Haven Metro** | 26 | 96.2% |
| **Norwalk** | 4 | 100.0% |
| **Norwich** | 11 | 100.0% |
| **Stamford** | 4 | 100.0% |
| **Torrington** | 4 | 100.0% |
| **Waterbury** | 27 | 88.9% |
| **Willimantic** | 14 | 100.0% |
| **Grand Total** | 196 | 94.4% |

Relative search entries are most often noted in investigation or early after the transfer of the cases with little or no subsequent follow up. While the measure is met, concerted activity appears minimal in a number of cases with regard to follow up on all potential resources identified. In some cases this is due to placement with a resource early in the process. The failure to thoroughly pursue potential

resources impacts identification of placement opportunities in the event of disruption. Even with these limitations, results yielded are impressive. There were 75 foster placements, 5 respite resources and 43 visiting resources identified within the 196 case sample.

In situations where documentation offered insight, the following barriers or issues were identified:

- There is considerable improvement in the consistency of conducting at least one preliminary relative search in comparison with prior reviews. In all, 168 (85.7%) of the cases identified at least one possible relative or known party to be researched. Within these 168 cases, 146 had indication of contact attempted with that resource, and 135 documented interest of the identified resource to be considered for placement or visitation.
- Relative search was too often a once and done entry. In some instances, the narrative entry briefly indicates "no relative resources identified by mother". There is little discussion documented, or follow up once a rapport has been established to revisit the issue with the parent, guardian, other known relatives or children. Reviewers identified 21.4% of the cases as having resources identified, but not pursued.
- Parents sometimes refuse to provide information when first approached and documented follow up at a later date is not readily evident.
- Children and adolescents are often not included in the dialogue to identify relative resources. Only 68.6% of the cases documented any conversation with a child about possible resource.
- Unknown fathers often present challenges and delays in resource identification.
- In many cases relatives often had many of the same CPS, criminal backgrounds, and mental health or substance abuse issues and were therefore not viable options.
- When placements with relatives are made early in the investigation or Ongoing Services case, further exploration of additional relatives is frequently not documented to prepare for the possible disruption. This lack of planning inhibits timely consideration of alternate placement options which could have been researched and assessed for appropriateness during the initial six month period.
- A portion of the children or adolescents were in a high level of care due to mental health or physical needs. The review found that given this fact, the search was not conducted immediately or was postponed in light of lengthy treatment process. This inappropriate deferral of research inhibits the timely identification of visiting resources and preparation to potentially prepare and meaningfully plan the discharge.
- Paternal relatives are pursued with less frequency than maternal relatives.
- Situations of relatives coming forward and then rescinding the offer to be a resource were noted. Delays in placement with viable relatives can result from these interruptions in planning.
- Interstate compact issues cause delays in assessment of resources.
- Criminal and CPS background checks are sometimes not documented in conjunction with placements. There were 54 instances within this sample that failed to document the criminal background check. It is assumed they are completed by FASU as part of the process, but documentation is not consistently incorporated into the LINK record.
- Documentation indicates that prior foster parents are not often considered as possible resource.
- Appropriately, non-custodial parents are given preferential option to become resource. However, it appears in several situations that resource searches are not concurrently pursued when this option is being explored.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all children that entered DCF custody during the period of April 1, 2006 through June 30, 2006. This request was fulfilled with the Department's submittal of an Excel Database including 737 children. Sampling methodology required a sample at a 95% confidence level (+/-6%). This resulted in the need to identify 196 children for the sample.

The LINK record review was conducted in the second quarter of 2007. This allowed for a six-month window of practice upon which to measure the level of performance in regard to "Search for Relatives." Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted and necessary changes and training resulted to improve validity and reliability of scoring.

**Sample Demographics**

The sample included 196 children who were participants in 179 cases opened or reopened from August 1999 through March 2007.[12]

- The work of 161 SW staff and 110 SWS is represented in the sample.
- The majority of cases were designated as Child in Placement cases at the point of review (162 or 82.7%). There were, however 29 in-home family cases (14.8%), four Voluntary Child in Placement cases (2.0%), and one Voluntary in-home family case (0.5%).
- 16 sibling groups were identified.
- Legal status as of the date of review was most frequently "committed" which accounted for 138 children or 70.4% of the population.
- The majority had not been in care for 15 months or more with a goal requiring TPR (72.4%). However, TPR had been filed for 12 of the children in the sample, and another 15 children had an exception noted in LINK.
- Children's ages ranged from newborn to 17, with a median age of six years old at the point of entry into care. Age did not appear to have significance in the achievement of the measure.
- Race was most frequently identified as white (53.1%) and ethnicity as Non-Hispanic (61.7%). 29.1% of the sample was identified as Black/African American. 11.2% were indicated as UTD and 6.1% were identified as multiracial. Racial and ethnic background showed no significance in achievement of the measure.
- Thirty-five of the children within the sample were involved with the juvenile justice system during the six month period of review.
- The permanency goal for the child was most frequently identified as reunification (74.0%).

When looking at the reasons for DCF involvement on the case open date prior to the removal from home during the quarter of April 1, 2006 through June 30, 2006, physical neglect was most frequently the factor, identified 162 times, followed by parents' mental health or substance abuse which was indicated in 122 of the cases. Looking at the primary issue identified within the sample, analysis found no significance between reason for involvement and the Department's compliance with documentation of the relative resource search.

---

[12] Case open dates after June 30, 2006 occurred in situations where a case had been open and closed within the period, and subsequently had a report of abuse or neglect investigation that resulted in a reopening of the case prior to our review.

**Crosstabulation 11:  What is the Primary Reason Cited? * There is documentation in LINK Indicating that a Search Was Conducted for Possible Placement During the Period of Review?**

| What is the primary reason cited? | There is documentation in LINK indicating that a search was conducted for possible placement during the period of review? | | |
|---|---|---|---|
| | Yes | No | Total |
| Abandonment | 2 | 1 | 3 |
| Domestic Violence | 20 | 0 | 20 |
| Educational Neglect | 6 | 0 | 6 |
| Emotional Neglect | 4 | 0 | 4 |
| Emotional Abuse/Maltreatment | 1 | 0 | 1 |
| Medical Neglect | 5 | 1 | 6 |
| Moral Neglect | 1 | 0 | 1 |
| Physical Abuse | 9 | 1 | 10 |
| Physical Neglect | 38 | 4 | 42 |
| Sexual Abuse | 5 | 0 | 5 |
| Parent's Mental Health Substance Abuse | 74 | 3 | 77 |
| Voluntary Services Request | 16 | 1 | 17 |
| FWSN Referral | 2 | 0 | 2 |
| Child's TPR | 2 | 0 | 2 |
| **Total** | 185 | 11 | 196 |

While children were most likely in a non-relative foster care placement on December 31, 2006 (37.2%), relative foster care placements accounted for 22.4% of the sample set.  A total of 13.8% had reunified with a parent or guardian.  Thirty-one of the children (15.8%) had been legally discharged from DCF custody as of the date of review.  Nine cases were closed at the point of review:  five due to reunification, two had been open for a period as in-home protective service cases and achieved the stated family goals, and one child was adopted.  Of these cases, the average length of time to achieve closure was 7.67 months.

**Qualitative Findings Related to Relative Search**
The following characteristics were identified for the sample set:
- In 75.0% of the cases there was some level of relative search documented in the investigation phase of the case.
- A total of 61.2% of the cases included a search for both maternal and paternal relative resources, although paternal searches often were not as vigorously conducted.
- In 96.4% of the cases there was no identified search via "Locate Plus" software.
- In 94.9% of the cases LINK narrative documented a conversation with the parent or guardian regarding a contingency plan/placement, but few provided information regarding content or follow-up.
- Of the cases with a verbal child having the ability to express their opinions to the worker (105 children) regarding possible placement options, only 68.6% of the cases documented a conversation about who the child would like to care for them in the absence of the parent/guardian.

Once the relative search was initiated, the record review indicated that of the 196 cases:
- 168 (85.7%) were able to establish one or more possible candidates for placement resource.

- Of the 168 cases in which possible candidates were identified, 146 cases (86.9%) indicated actual contact with those identified parties (86.9%).
- 135 of those identified resources (72.5%) expressed any interest in being a placement resource.
- 98 CPS/Criminal background checks were documented on the pool of resources identified, however, there were 54 instances in which this requirement was not documented.
- 87 requests (51.8%) were forwarded to FASU for consideration of relative/special study licensure.  In two situations, where waiver was requested, it was granted.
- Reviewers also identified 42 instances (21.4%) in which it did not appear that all identified resources were exhausted, but no further efforts were ongoing.

A total of 61 relative foster home placements and 14 special study homes were attempted during the period as a result of search efforts.  Not all of these placements were successful.   At the point of review, there were 50 relative placements and 11 special study placements within the sample.  In addition to placement, other resources were identified; respite was identified/approved in five cases.  Forty-three cases located visiting resources that were approved to provide support to the children in care.

There were 33 instances in which the case met the measure, but it appeared from the LINK review that workers overlooked possible resources identified during case management activities.  These included maternal and paternal aunts, cousins, grandparents, Godparents, and family friends who were identified within the case record, but were not explored as possible resources.

## Outcome Measure 5 Case Review:
## Repeat Maltreatment of Children

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F*. v Rell Exit Plan</u> to conduct a series of reviews on the 22 outcome measures resulting in a full status report in April 2007.  This review, Outcome Measure 5 Case Review:  Repeat Maltreatment of Children is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding instances of repeat maltreatment**.  Outcome Measure 5:  Repeat Maltreatment of Children requires that DCF comply and sustain the following level of practice related to re-entry:**
> *"No more than 7% of the children who are victims of substantiated maltreatment during any six month period shall be the substantiated victim of additional maltreatment during any subsequent six month period.  This outcome shall begin to be measured within the six month period beginning January 1, 2004."*

**Review Findings and Trends**
The Court Monitor's findings indicate performance at a rate of **7.6%.** This is highly compatible to the Department's automated reports.  Our analysis included the full universe of children with repeat maltreatment (Children with Repeat Maltreatment (N=67) and a like number of Children in Care with No Repeat Maltreatment (n=67).  The review results showed no major factors of significance distinguishing cases with repeat maltreatment from those that did not have repeat maltreatment.  There were, however, several noteworthy trends and qualitative information that resulted from the review:

- Documentation of risk and safety assessments within the supervisory conferences or in the LINK entries for visits with children and families were often lacking.  In 39% of the cases open during the interim period between substantiations the SW and SWS failed to document identification of risks.  In many situations, red flags are identified, but were not incorporated into supervisory discussions.
- Within the sample set, 74.5% of the cases were deemed to have adequate risk assessment activity in the period following the July substantiation.  Of those cases scored as adequate by reviewers, the rate of repeat maltreatment is 50.6%.  Of those deemed inadequate, the rate of repeat maltreatment was higher, at 80%.
- Reviewers identified 14 cases where children in the sample set were reunified yet information documented within the case record raising concerns related to the reunification being rushed, or premature.  Thirteen of these 14 children were in the repeat maltreatment group.
- None of the instances of repeat maltreatment documented in this sample were at the hands of an out of home care provider.  All occurred within the home or community setting.
- The most frequently cited form of repeat abuse or neglect is "physical neglect", often the result of parents' substance abuse or domestic violence episodes.  In all, 41 of the 67 cases documenting repeat maltreatment had the same or very similar allegations raised as identified in the allegation substantiated in July 2006.
- A total of 34.3% of all perpetrators in the sample had three or more substantiations in the last 12-month period.
- Determining the level of impact of service provision as a factor in repeat maltreatment presents unique challenges.  Engagement opens families up to additional scrutiny by mandated reporters, and at the same time offers opportunities for growth or rehabilitation.   There are also factors beyond program attendance that are related to clients' ability to apply or comprehend the intent and lessons provided.  These are not captured through this record review process but could  be well served by a methodology incorporating interviews of stakeholders in each case sampled.

- The rate of collaboration between the DCF ISW and the Ongoing Services SW was quite high, with 92.6% of the cases sampled documenting some level of contact during the investigation.

For more details regarding each of these areas of measurement see the analysis within this chapter.

### Methodology

The Monitor's Office requested the DCF provide the universe of all children that experienced substantiated abuse or neglect during July 2006. On March 28, 2007, the Department provided a universe from the Performance Outcomes for Children (POC) Outcome Measure 5 database of 876 children identified as victims of substantiated abuse or neglect. Of that number, a system query identified 69 children, or 7.9% of that population as having a repeat incident of substantiation within 6 months of the first incident. The Monitor's Office initiated a process to review those 69 cases as well as 69 cases in which the system did not identify a subsequent episode. Upon initial review of the 138 cases, our office found cause to eliminate two cases due to episodes with incidents outside of the period of review. To be equitable, we also eliminated two cases in which there was no subsequent episode. The resulting sample therefore includes 134 cases with equal number of repeat maltreatment situations and no repeat maltreatment.

The DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted to ensure issues of reliability and validity can be addressed prior to initiating the full review. Minor edits resulted to both the tool and directional guide as a result of this process.

### Sample Demographics

The sample was determined by the inclusion of all repeat victims, and a random selection of the remaining universe. The resulting statewide distribution is provided below:

**Table 18:  Area Office Assignment**

| Area Office | Frequency | Percent |
|---|---|---|
| Bridgeport | 8 | 6.0 |
| Danbury | 2 | 1.5 |
| Greater New Haven | 5 | 3.7 |
| Hartford | 16 | 11.9 |
| Manchester | 14 | 10.4 |
| Meriden | 13 | 9.7 |
| Middletown | 4 | 3.0 |
| New Britain | 10 | 7.5 |
| New Haven Metro | 17 | 12.7 |
| Norwalk | 4 | 3.0 |
| Norwich | 14 | 10.4 |
| Stamford | 5 | 3.7 |
| Torrington | 4 | 3.0 |
| Waterbury | 10 | 7.5 |
| Willimantic | 8 | 6.0 |
| Total | 134 | 100.0 |

This sample represents the case management of 104 Ongoing Treatment SWs reporting to 85 Social Work Supervisors.

The review included 134 children, participant to 109 cases (15 sibling sets).  Ages at the date of the July incident ranged from newborn to 17 with a median age of 6.2 years.   For those children identified with repeat maltreatment (N=67) the mean age identified at the point of the July incident was 5.86 years with a median age of five years.  For those children with no repeat maltreatment their mean age at the point of the July incident was 6.54 years with a median age of 6.0 years.

When looking at the combined total sampled, investigations of the initial incident were completed on average 35.2 days from the date of the incident.  Individually, those within the repeat maltreatment group were completed within an average of 35.6 days; those completed for the non-repeat maltreatment group were completed on average of 34.9 days.  No significant differences are noted within the populations.

Following the July incident date, children were placed out-of-home in 42 of the cases reviewed. Twenty-six of these children were the subject of repeat maltreatment, and 16 were not the subject of repeat maltreatment during the review period.  When looking at the case open date to the date of the placement episode resulting from the July investigation, the range of time was from same day to 3.95 years.  The mean timeframe between case open date and the placement episode (where applicable) was 165 days.  Accounting for the range, the median time frame is 95 days.  Differences between the two sub groups reviewed were insignificant.  The repeat population with OOH placements (n=26) had a median of 95 days to placement, and the non-repeat group with OOH placement (n=16) had an average timeframe of 92 days to placement

As of the February 1, 2007 cut-off date for this review, 70.9% of the sample was living with their parent or guardian.   The rate of those living with their parent/guardian within the repeat maltreatment group was 65.7%.  The rate of those living with their parent/guardian in the non-repeat group was 76.1%.   One hundred and two cases remained open or re-opened as of February 1, 2007.  As expected the rate of cases with open status for the universe of children with repeat maltreatment is much higher, with 92.5% of cases remaining open/reopened on February 1, 2007 versus 59.7% of the non-repeat sub-sample.

Twenty-three children were noted as having a diagnosed mental health or behavioral condition. Thirteen of these children were within the set of children with repeat maltreatment and ten were not. The most frequently appearing diagnosis is Attention Deficit Hyperactivity Disorder (ADHD) with 8 of the 23 having this disorder as part of their diagnosis.  It is felt that this number is much lower than what is actually present within the full population but as a result of the methodology which did not include interviews, our reviewers replied positively based upon what information they could find within the medical icon, treatment plan and narratives reviewed.  Many behaviors were identified or noted, but were not documented as a "diagnosed" behavioral or mental health disorder so they were not included.

**Case Management Prior to July 2006 Incident**
Of the 134 cases within the sample there were 23 cases that were open in Ongoing Services at the point of the incident.  Fourteen of the cases were within the non-repeat maltreatment universe, and nine were in the repeat sample.

In 14 or 60.9% of the cases, the SW had documented concerns for the safety of the child during the three month period preceding the incident date.  Six of these situations were within the repeat

maltreatment group and eight were within the non-repeat sample set.  In the remaining nine cases, there was no documentation of assessed safety concerns.

The concerns noted did not differ significantly within the two groups.  Concerns noted within these applicable cases include:

- 10 cases of parental/caretaker impairment (mental health or substance abuse)
- 6 cases with episodes of domestic violence
- 3 cases with observation of abuse/neglect by the caretaker
- 3 cases where the child was beyond the control of the caretaker's discipline or parenting ability
- 3 cases with high risk for substance abuse relapse given history of parent
- 2 cases with parent failing to keep important appointments, non-responsive
- 2 cases with housing issue
- 1 case with poverty noted as placing family at risk
- 1 case with father recently released from prison – historically domestic violence
- 1 case with parent/caretaker stating they were overwhelmed by child's behaviors
- 1 case with parent unable to perform common/everyday parenting responsibilities with any regularity

Case practice related to the assessment of risk, and collaborative discussion with supervisors, family and providers shows slight variations in practice, but these are not statistically significant in nature.

**Table 19:  Case Practice Issues for Open Cases in the Period Leading Up to the July 2006 Incident (n=23)**

| Sub-sample of children in open cases in the three month period leading up to the July 2006 incident | Repeat Maltreatment Cohort (n=9) | Non-Repeat Maltreatment Cohort (n=14) | Total (n=23) |
|---|---|---|---|
| Supervisory Discussion of Risks and Concerns Documented | 88.9% | 78.5% | 82.6% |
| Discussion of Risks and Concerns with Parent/Guardian | 88.9% | 78.5% | 82.6% |
| Discussion of Risks Concerns with Active Providers (where applicable[13]) | 100% | 72.7% | 82.4% |
| No Concerns or Risks Identified | 11.1% | 21.4% | 17.4% |
| Action Documented in Relation to Risks or Concerns | 87.5% | 81.8% | 84.2% |
| Reviewers' Opinion:  % of cases with appropriate level of action given information/assessments found within the LINK documentation? | 87.5% | 100.0% | 94.7% |

Reviewers concurred with the SW's level of response or action in all but one case.  This was a case within the repeat maltreatment cohort.  This case presented unusual circumstances.   In this situation, the case was open as a Probate case in early June with study ordered on young mother with a history of substance abuse and domestic violence and who had, herself, been in foster care from age 3 to 17. Mother was seeking re-instatement of her parental rights.  A referral subsequently was received at the end of June.  The Probate SW did not make a home visit until mid-July.  On that date it was apparent that mother could not effectively parent two additional children.  The home was impoverished with low food supplies and poor living conditions.  The family requested a food voucher (provided on 7/15/07).  The day after the Probate SW visited an anonymous call came into the Hotline indicating

---

[13] Providers were active in 6 of the Repeat Maltreatment Cohort and 11 of the 14 Non-Repeat Maltreatment Cohort.

that the child had a series of bruises which the Probate worker did not document at the time of the visit.  The case was accepted for investigation.  The on-call ISW happened to be the Probate SW assigned to the case.  The ISW's actions and subsequent Ongoing Services SW efforts were appropriate.  The reviewer felt that the delays in visit from early June through July 14 and apparently obvious safety issues not reported to Hotline by the Probate SW on the date of her visit were not representative of best case practices.

The sample had no instance of abuse or neglect at the hands of a foster parent or residential caretaker.  In fact, of the 185 identified perpetrators, 164 were identified as parent/adoptive parent or guardian.  21 "other" perpetrators were also identified.  These included 17 paramours, two entrusted persons, one neighbor and a non-custodial step-father.

Substantiations for the July incident included all but the abandonment and moral neglect categories.  In total, 250 elements of abuse or neglect were substantiated.  Most frequently cited is physical neglect, often as a result of the parent's substance abuse or domestic violence episodes.  The frequency for each type of substantiation is shown for each of the cohorts in the table below.

**Table 20:  Substantiations for the First Incident/Episode Reported**

| Category of Abuse/Neglect | Substantiations Within Repeat Maltreatment Cohort (N=67) Count/% of Cases | | Substantiations Within Non-Repeat Cohort (n=67) Count/% of Cases | | Total Substantiations |
|---|---|---|---|---|---|
| Physical Neglect | 56 | 83.6% | 54 | 80.6% | 110 |
| Parent's Substance/Mental Health Abuse | 24 | 35.8% | 23 | 34.3% | 47 |
| Domestic Violence | 17 | 25.4% | 19 | 28.4% | 36 |
| Emotional Neglect | 11 | 16.4% | 19 | 28.4% | 30 |
| Physical Abuse | 6 | 9.0% | 5 | 7.5% | 11 |
| Emotional Abuse/Maltreatment | 4 | 6.0% | 2 | 3.0% | 6 |
| Medical Neglect | 2 | 3.0% | 3 | 4.5% | 5 |
| Sexual Abuse | 4 | 6.0% | 0 | 0.0% | 4 |
| Educational Neglect | 1 | 1.5% | 0 | 0.0% | 1 |
| All Substantiations | 125 | | 125 | | 250 |

During the investigation, there was evidence of collaboration between the ISW and the Ongoing Services SW in 92.6% of the cases in which there was an open case.  The two instances in which this was not documented were found within the non-repeat cohort.

Reviewers indicated that in the majority of cases, DCF offered services or already had begun to implement services to ameliorate the stressors or risks that were identified by the investigation and maintain the children in the home or had removed the children appropriately.  In 24 cases, or 17.9%, reviewers felt needed services were not offered.  Of the 110 cases that were not open in treatment at the time of the substantiation, 71 cases were transferred to Ongoing Services at the close of the investigation.   An additional 15 cases documented and offer by the ISW for a referral or provision of information related to community services.

**Crosstabulation 12:  At the Time of the July 2006 Substantiation Identified for this Child, Were Services Offered to the Family to Ameliorate the Stressors or Issues Contributing to the Episode of Abuse/Neglect? * Were There Any Subsequent Substantiations Involving this Child during the Six-Month Period Following the Date of the Incident Substantiated in July 2006?**

| At the time of the July 2006 substantiation identified for this child, were services offered to the family to ameliorate the stressors or issues contributing to the episode of abuse/neglect? | Were there any subsequent substantiations involving this child during the six month period following the date of the incident substantiated in July 2006? | | | | | |
|---|---|---|---|---|---|---|
| | Yes | | No | | Total | |
| **Yes** | 43 | 55.1% | 35 | 44.9% | 78 | 100.0% |
| **No** | 8 | 33.3% | 16 | 66.7% | 24 | 100.0% |
| **Total[14]** | 51 | 50.0% | 51 | 50.0% | 102 | 100.0% |

The rate of referrals for services identified follows in the table below.  Table excludes those situations in which children were removed, or were already in place:

**Crosstabulation 13:  Did DCF Make the Referrals for Services Offered? * Were There Any Subsequent Substantiations Involving this Child During the Six-Month Period Following the Date of the Incident Substantiated in July 2006?**

| Did DCF make the referrals for services offered? | Were there any subsequent substantiations involving this child during the six month period following the date of the incident substantiated in July 2006? | | | | | |
|---|---|---|---|---|---|---|
| | Yes | | No | | Total | |
| Yes | 37 | 59.7% | 25 | 40.3% | 62 | 100.0% |
| No | 7 | 36.8% | 12 | 63.2% | 19 | 100.0% |
| Total | 44 | 54.3% | 37 | 45.7% | 81 | 100.0% |

There were 19 situations in which reviewers felt that the documentation warranted referrals but they were never offered.  This happened at a rate of 19.4% in the non-repeat cohort and 9.0% in the repeat cohort.

An offer of service did not always translate to the engagement of services.  Only 30 of the cases or 32.3% actually participated in all referred services; 44 cases or 47.3% had some services engaged while refusing others referred.  In 19 cases with referrals (20.4%) no family member participated in referred services.

---

[14] Table excludes twelve situations in which immediate removal was required for safety reasons (2 in repeat cohort/10 in non-repeat cohort), and 20 cases (14 repeat cohort/6 non-repeat cohort) in which services were already in implementation at the point of the substantiation.

**Crosstabulation 14:  Did the Client(s) Participate in the Referred Services? * Were there any Subsequent Substantiations Involving this Child during the Six Month Period Following the Date of the Incident Substantiated in July 2006?**

| Did the client(s) participate in the referred services? | Were there any subsequent substantiations involving this child during the six month period following the date of the incident substantiated in July 2006? | | | | | |
|---|---|---|---|---|---|---|
| | Yes | | No | | Total | |
| All members participated in all of the referred services | 16 | 53.3% | 14 | 46.7% | 30 | 100.0% |
| All members participated in at least one of the referred services | 11 | 64.7% | 6 | 35.3% | 17 | 100.0% |
| Some members participated in at least one of the services | 15 | 55.5% | 12 | 44.4% | 27 | 100.0% |
| No members participated in referred services | 10 | 52.6% | 9 | 47.3% | 19 | 100.0% |
| Total | 52 | 55.9% | 41 | 44.1% | 93 | 100.0% |

The impact of service provision as a factor in repeat maltreatment presents unique challenges. Engagement opens families up to additional scrutiny by mandated reporters at the same time as it offers opportunity for assistance or rehabilitation.   There are also factors other than attendance of programs related to clients' ability to apply or comprehend the intent and lessons provided which are not captured within this review process.  Future methodologies will incorporate an interview of stakeholders within each case.

**Subsequent Episode of Substantiated Maltreatment**
Of the 67 children with documented repeat maltreatment, six had two additional substantiations. Forty-one of the subsequent incidents documented were similar in nature to that identified in the initial July incident and 85.1% of the substantiations were at the hands of the same perpetrator identified in the initial July incident.  The timeframe to repeat substantiation ranged 14 days to 201 days, with a mean average timeframe to repeat maltreatment at 101.4 days, and a median of 96 days.  A total of 34.3% perpetrators identified in a subsequent episode of abuse or neglect actually had three or more substantiations in the last twelve month period.

In 14 cases, where a child had been placed out of home as a result of the initial incident, and was reunified during the period, reviewers identified issues raised within the LINK documentation which indicated that reunification was rushed, or premature.  Thirteen of the 14 cases had a subsequent substantiation.

Reviewers rated the level of risk assessment activity in Ongoing Services during the period following the July substantiation as "Adequate" in 74.5% or 79 of the cases transferred to Ongoing Services.   In 25 cases, reviewers felt there were some inadequacies as documented concerns were left unaddressed, or risk assessment activities were not documented during the period.  In two cases, there was not enough information upon which to base a determination.  Of those cases that reviewers felt were adequate, 50.6% resulted in repeat maltreatment – suggesting the need to properly assess the capability of caretakers to address chronic issues and address the quality of services provided to ameliorate rates of repeat maltreatment.

**Crosstabulation 15:  Were There Any Subsequent Substantiations Involving this Child During the Six Month Period Following the Date of the Incident Substantiated in July 2006? * Based on the Review of the Record, the Risk Assessment Activity During this Six-Month Period Was...**

| Were there any subsequent substantiations involving this child during the six month period following the date of the incident substantiated in July 2006? | | Based on the review of the record, the risk assessment activity during this six month period was... | | | |
|---|---|---|---|---|---|
| | | Adequate | Inadequate | Inconclusive | Total |
| Yes | Count | 40 | 20 | 1 | 61 |
| | % | 65.6% | 32.8% | 1.6% | 100.0% |
| No | Count | 39 | 5 | 1 | 45 |
| | % | 86.6% | 11.1% | 2.2% | 100.0% |
| Total | Count | 79 | 25 | 2 | 106 |
| | % | 74.5% | 23.6% | 1.9% | 100.0% |

Of those 25 cases deemed as having inadequate risk assessment activity across the six month period, 20, or 80.0%, had repeat maltreatment.  This latter finding supports the anecdotal comments of reviewers regarding the need for more comprehensive follow through on the red flags that often are documented within narratives, but not raised in supervision or done with little supervisory monitoring after initial instructions are provided.

**Outcome Measure 6 – Maltreatment in Out of Home Care**

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct an Outcome Measure 6 Case Review:  Maltreatment of Children in DCF Care.  This is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding the instances of maltreatment while in DCF custody.  **Outcome Measure 6:  Maltreatment of Children in DCF Care requires that DCF comply and sustain the following level of practice related to re-entry:**

> *"No more than 2% of the children in out of home care on or after January 1 2004 shall be the victims of substantiated maltreatment by substitute caregivers while in out of home care."*

**Review Findings and Trends**
The Court Monitor's findings indicate compliance was achieved at a rate of 0.18%.  This is highly comparable to the Department's automated reports.

An analysis of the two subsets within the population reviewed (Children Maltreated in Out of Home Care (N=12) and a like number of Children in Care with No Substantiated Maltreatment (n=15) did not identify any major factors of significance distinguishing those cases with repeat maltreatment, from those with not repeat maltreatment.

As the maltreatment rate of 0.18% suggests, there are positive notes regarding case practice. The reviewers indicated that the majority of cases had appropriate action taken by the Ongoing SW in the period of time leading up to the report of alleged abuse or neglect (whether substantiated or not).   In one case, the reviewer noted that the SW proactively used supervision, documented assessment, documented the resulting plan to address "red flags", and initiated consultation within the Department and among providers as necessary to prevent the abuse of the child.  Issues were addressed, and the child was prevented from experiencing maltreatment while in out-of-home placement.

Worker-Child visitation appears to have a positive impact on the rate of maltreatment in care.  Across the two subsets, visitation met or exceeded monthly standards in 24 cases (88.8%).

Within the 12 cases of substantiated abuse or neglect there were additional regulatory violations cited against the provider.  None of the cases reviewed in either cohort had stand alone regulatory violations.  Reviewers noted that none of the six DCF foster care providers that were substantiated, had documentation of updates to their annual support plans.

Throughout this process, reviewers observed four trends related to maltreatment of children in out of home care.
- The first issue was the lack of coordinated communication between the DCF Ongoing SW, FASU SWs and service providers.  In the three month period leading up to the report to the Hotline and during the period shortly thereafter, documented contacts were often limited to narrative lacking collaborative assessment.  In only 50% of the 12 cases was there documentation that the Foster and Adoptive Services Unit (FASU) or Program Review and Evaluation Unit (PREU) was informed by the SW or ISW of the incident.
- The second trend relates to workers not assessing or even minimizing the "red flags" that they often document within their own narratives.

- The third trend is related to effective use of supervision. While supervisory conferences are documented in most cases, the actual use of this time to create action steps and follow-up on prior concerns is not often documented as it relates to "red flags". The three month period under review had an average of 3.44 supervisory sessions documented. Frequency of supervision in itself, however, was not felt to be a driving factor in the rate of maltreatment. It was the content of discussion that was significant. In 14 of the cases in which risks were identified by the SW there was no documentation that these issues were raised to the SWS, and 100% had maltreatment substantiations.

- And finally, the reviewers noted that Case Aides' documentation of transport and visitation are routinely not addressed by the SW or SWS. Situations detailed by the case aides are not recognized or discussed at the supervisory level in spite of the noted risks and safety. The role of the Case Aide in contributing to the overall risk assessment ongoing during the life of the case needs to be examined.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all children that were in out of home placement during the third quarter 2006. The Department had some difficulty in provision of the data for this request which resulted in delay. This necessitated changing the period of review to the fourth quarter, 2006. The request was fulfilled with the submission of an Excel Database including 6,688 children (excluding committed delinquent, children in placement as result of ICO, and Probate cases).

DCF provided a universe of 14 children in out of home placement identified as victims of substantiated abuse or neglect and a total population of 6,688 children in care over the period. Per the automated reporting, 0.2% of the population in care during the quarter was victims of substantiated abuse or neglect. This is correct given the logic implemented for reporting which substitutes the reporting date if no incident date is identified. However, upon initial review of the identified cases, two cases actually had an incident of abuse/neglect with an incident date that preceded the start of the period (but were incorrectly reported during the period). Therefore the rate of maltreatment while in care during the fourth quarter was revised to 0.18%.

In order to provide a basis for comprehensive analysis of this outcome measure, the sample included all 12 children who had an incident in the fourth quarter resulting in substantiation and an additional 15 cases randomly selected from the statewide population of children in care, with or without an investigation undertaken during the period.[15] This was done to allow a review of case practice issues that may impact the success or barriers of DCF in meeting OM 6. Due to the low number of maltreatment in care cases upon which this measure can be assessed, we caution against the use of this data for anything other than qualitative or descriptive purposes. Statistical significance should not be determined from one quarter's performance.

A LINK record review was conducted during April-May 2007. DCF Court Monitor review staff and two DCF personnel assisted in the data collection efforts. A pilot test was conducted during December to ensure issues of reliability and validity can be addressed prior to initiating the full review. Minor edits resulted to both the tool and directional guide as a result of this process.

---

[15] The two cases originally identified as having incidents within the period were included in the sample of 15.

**Demographics**

The sample included 27 cases with assignments to 24 SWs reporting to 23 social work supervisors with at least one case from each area office.  The crosstabulation below provides a breakdown of the sample by area office indicating those that had substantiation in the quarter and those that did not.

**Crosstabulation 16:  Area Office Assignment * Were There Any Substantiations Involving this Child in Out-of-Home Placement in the Quarter of October 1, 2006 through December 31, 2006?**

| Area Office Assignment | | Were there any substantiations involving this child in out of home placement in the quarter of October 1, 2006 through December 31, 2006? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| Bridgeport | Count | 1 | 2 | 3 |
| | % of Total | 3.7% | 7.4% | 11.1% |
| Danbury | Count | 1 | 1 | 2 |
| | % of Total | 3.7% | 3.7% | 7.4% |
| Greater New Haven | Count | 2 | 1 | 3 |
| | % of Total | 7.4% | 3.7% | 11.1% |
| Hartford | Count | 2 | 1 | 3 |
| | % of Total | 7.4% | 3.7% | 11.1% |
| Manchester | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| Meriden | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| Middletown | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| New Britain | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| New Haven Metro | Count | 1 | 1 | 2 |
| | % of Total | 3.7% | 3.7% | 7.4% |
| Norwalk | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| Norwich | Count | 4 | 1 | 5 |
| | % of Total | 14.8% | 3.7% | 18.5% |
| Stamford | Count | 1 | 0 | 1 |
| | % of Total | 3.7% | .0% | 3.7% |
| Torrington | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| Waterbury | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| Willimantic | Count | 0 | 1 | 1 |
| | % of Total | .0% | 3.7% | 3.7% |
| Total | Count | 12 | 15 | 27 |
| | % of Total | 44.4% | 55.6% | 100.0% |

The higher than might be expected number of substantiations while in care for Norwich was the result of two sibling groups of two with substantiated abuse while in placement.

The date of the most recent removal for the children within the sample ranged from April 1995 through September 2006. The children had a range of ages spanning 16 years, and an average age of 7.04 years. Within the full sample set of 27, the children were most likely to be white of Non-Hispanic ethnicity (44.4%).

Children of color, however, have a higher rate of maltreatment as 100.0% of the UTD population, 66.7% of multi-racial and 50% of the Black African American children were victims of repeat maltreatment, while only 33.3% of White children were victims while in care during the quarter. Given the small numbers of the samples it is impossible to determine if this is statistically significant. A further look at the ROM longitudinal data may be warranted.

**Crosstabulation 17: Child's Race * Were There Any Substantiations Involving this Child in Out- Of-Home Placement during the Quarter of October 1, 2006 through December 31, 2006?**

| Child's Race | | Were there any substantiations involving this child in out of home placement during the quarter of October 1, 2006 through December 31, 2006? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| Black/African American | Count | 5 | 5 | 10 |
| | % within Race | 50.0% | 50.0% | 100.0% |
| | % of Total | 18.5% | 18.5% | 37.0% |
| White | Count | 4 | 8 | 12 |
| | % within Race | 33.3% | 66.7% | 100.0% |
| | % of Total | 14.8% | 29.6% | 44.4% |
| Unknown | Count | 0 | 1 | 1 |
| | % within Race | .0% | 100.0% | 100.0% |
| | % of Total | .0% | 3.7% | 3.7% |
| UTD | Count | 1 | 0 | 1 |
| | % within Race | 100.0% | .0% | 100.0% |
| | % of Total | 3.7% | .0% | 3.7% |
| Multiracial | Count | 2 | 1 | 3 |
| | % within Race | 66.7% | 33.3% | 100.0% |
| | % of Total | 7.4% | 3.7% | 11.1% |
| Total | Count | 12 | 15 | 27 |
| | % within Race | 44.4% | 55.6% | 100.0% |
| | % of Total | 44.4% | 55.6% | 100.0% |

Children were identified as having a diagnosed mental health or a medical condition in 12 of the 27 cases reviewed (44.4%). This did not appear to have impact on the maltreatment of children while in care, as 50.0% of those cases substantiated had no diagnosed conditions.

**Crosstabulation 18:  Does this Child Have any Diagnosed Conditions Documented? * Were There Any Substantiations Involving this Child in Out-of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006?**

| | | Were there any substantiations involving this child in out of home placement during the quarter of October 1, 2006 through December 31, 2006? | | |
|---|---|---|---|---|
| **Does this child have any diagnosed mental health or medical conditions?** | | **Yes** | **No** | **Total** |
| **Yes** | Count | 6 | 7 | 13 |
| | % within Does this child have any diagnosed conditions? | 46.2% | 53.8% | 100.0% |
| | % of Total | 50.0% | 46.7% | 48.1% |
| **No** | Count | 6 | 8 | 14 |
| | % within Does this child have any diagnosed conditions? | 42.9% | 57.1% | 100.0% |
| | % of Total | 50.0% | 53.3% | 51.9% |
| **Total** | Count | 12 | 15 | 27 |
| | % within Does this child have any diagnosed conditions? | 44.4% | 55.6% | 100.0% |
| | % of Total | 100.0% | 100.0% | 100.0% |

On December 31, 2006 the most frequently identified placement was that of In-State DCF Licensed Foster Home (37.0%), followed by In-State Private Provider (18.5%).  The full sample data related to placement on that date is provided in Crosstabulation 18 below:

**Crosstabulation 19:   Current Residence of this Child on December 31, 2006 \* Were There Any Substantiations Involving this Child in Out of Home Placement During the Quarter of October 1, 2006 through December 31, 2006?**

| Current residence of this child on December 31, 2006 | | Were there any substantiations involving this child in out of home placement during the quarter of October 1, 2006 through December 31, 2006? | | |
|---|---|---|---|---|
| | | **Yes** | **No** | **Total** |
| **In-state DCF foster home** | **Count** | 3 | 7 | 10 |
| | **%** | 30.0% | 70.0% | 100.0% |
| **In state private provider foster home** | **Count** | 4 | 1 | 5 |
| | **%** | 80.0% | 20.0% | 100.0% |
| **Group Home** | **Count** | 2 | 1 | 3 |
| | **%** | 66.7% | 33.3% | 100.0% |
| **Home of biological/adoptive parent or legal guardian** | **Count** | 1 | 1 | 2 |
| | **%** | 50.0% | 50.0% | 100.0% |
| **Pre-adoptive placement** | **Count** | 0 | 2 | 2 |
| | **%** | .0% | 100.0% | 100.0% |
| **In-state residential** | **Count** | 0 | 1 | 1 |
| | **%** | .0% | 100.0% | 100.0% |
| **Out of state residential** | **Count** | 1 | 0 | 1 |
| | **%** | 100.0% | .0% | 100.0% |
| **Safe Home** | **Count** | 0 | 1 | 1 |
| | **%** | .0% | 100.0% | 100.0% |
| **Shelter** | **Count** | 1 | 0 | 1 |
| | **%** | 100.0% | .0% | 100.0% |
| **TLAP/CHAPS** | **Count** | 0 | 1 | 1 |
| | **%** | .0% | 100.0% | 100.0% |
| **Total** | **Count** | 12 | 15 | 27 |
| | **%** | 44.4% | 55.6% | 100.0% |

As shown in the table above, children were reunified in two of the cases during the period.  These two cases were closed prior to December 31, 2006.  It is interesting to note that those with substantiations appear to have a greater likelihood of therapeutic placement in a higher level of care as of December 31, 2006 than those children that did not.   Of the ten children in private provider foster care, residential or group home settings, seven had experienced maltreatment while in care. Four of these

seven children had a documented diagnosed condition that could merit the level of placement. Reviewers indicated no documented diagnosed conditions in three of the seven children.

The review examined the possible impact that the role supervisory conferencing may play in cases of maltreatment while in care.  Reviewers found that on the whole, the average number of supervisory sessions during the three month period was 3.44 sessions. There was a range of frequency from two to 11 documented within the cases.  Frequency of supervision as a factor (regardless of content) does not appear to have an impact upon repeat maltreatment.   However, of the 14 situations in which risks were identified in social worker or case aide narratives with no documentation that they were brought to the attention of the supervisor, 100% had maltreatment substantiations during the quarter versus 54.5% of the cases that were raised in supervision.

**Crosstabulation 20: Were these Concerns (OM6.1a) Addressed in Supervision with the Ongoing Services SWS? * Were there Any Substantiations Involving this Child in Out-Of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006?**

| Were these concerns (OM6.1a) addressed in supervision with the Ongoing services SWS? | Were there any substantiations involving this child in out of home placement during the quarter of Oct 1, 2006 through Dec 31, 2006? | | |
|---|---|---|---|
| | yes | no | Total |
| **Yes** | 6 | 5 | 11 |
| **No** | 3 | 0 | 3 |
| **Total[16]** | 9 | 5 | 14 |

A second consideration regarding impact on maltreatment was the frequency of visitation between worker and child in out-of-home care.  The review found all but three cases met or exceeded the monthly requirement for visitation (88.8%).  Looking at the two populations of those children with substantiations (N=12) and those without (n=15) there is a slight difference in the rate of those achieving met or exceeding status. For the N=12 group, the rate of compliance with the visitation standard is 83.3%.  For those in the n=15 set, the visitation was met or exceeded in 93.3% of the cases.

Of the 24 cases that met or exceeded the standard, the rate of maltreatment is 41.7%.  When looking at the three cases that did not meet visitation standards the rate of maltreatment is 66.7%.  Given the small numbers, it is difficult to determine if this is a contributory factor or not.  A review of the available longitudinal data would provide more insight into this matter.

---

[16] There were an additional 13 cases with no risks or concerns identified in worker narratives in the period prior to the substantiation.

**Crosstabulation 21:  Describe the Worker Visitation with the Child in Out-Of-Home Placement During the Period? * Were There Any Substantiations Involving This Child in Out-Of-Home Placement During the Quarter of October 1, 2006 through December 31, 2006?**

| Describe the worker visitation with the child in out of home placement during the period. | Were there any substantiations involving this child in out of home placement during the quarter of Oct 1, 2006 through Dec 31, 2006? | | |
|---|---|---|---|
| | Yes | No | Total |
| **Exceeded monthly requirement** | 5 | 8 | 13 |
| **Met monthly requirement** | 5 | 6 | 11 |
| **Did not meet monthly requirement** | 2 | 1 | 3 |
| **Total** | 12 | 15 | 27 |

A review of the narratives related to the child during documented visits, provider contacts, and supervision, found that nine of the 12 instances of maltreatment had documented concerns by the worker during the period leading up to the report to Hotline.  In three cases, there was no documentation of identified risks/concerns noted prior to the report to Hotline.

For those cases with no maltreatment in care, issues related to risk or safety are identified in five of the fifteen cases.  Reviewers felt that in the majority of cases, regardless of substantiation documented, there were appropriate actions taken  by the Ongoing Services SW during the period of time leading up to the report of abuse neglect (whether substantiated or not).  In five cases (18.5%), however, the reviewers noted issues that they felt were not appropriately addressed.  Four of the five did have maltreatment in care documented.  These scenarios included:

- Two situations in which children reported to the biological mother and Ongoing Services SW that they were being mistreated by the foster parents (physically disciplined).  In both situations, the worker did not discuss the statements directly with the children, or collateral contacts to determine if they had any concerns.  In these cases, the mother reported incidents to Hotline.   Of specific concern was a 21 month old who was in a DCF foster home placement assessed by the ARG as malnourished while in the foster home at the point of the Multi-Disciplinary Exam (MDE) review.  In pediatrician visit documented shortly after the MDE, the medical practitioner shared similar concerns as those noted by the ARG Nurse.  Child was seemingly obsessed with food at supervised visits with mother.  The child's sibling (age 5) realized there was something wrong with his sister and (per narratives) asked during a visit, "what was wrong" with his sister?  The SW did not take action to move the child until two weeks passed when the ARG conducted a second evaluation, and a third week passed before moving the child because approval for overcapacity  was needed to allow the siblings to be placed together.  On the date of removal from the foster home, the child required an emergency room visit to address dehydration and elevated liver enzymes.
- The Ongoing SW documented concerns without actually assessing the risk. After identifying multiple red flags, the SWCA made the referral regarding concerns within the foster home.
- The DCF SW was made aware of a situation in a group home requiring referral to the Hotline. The DCF SW advised the Group Home staff to make a referral. The DCF SW never followed up to ensure that a referral had, in fact, been done, nor was there documentation of any discussion of the matter with the child in subsequent visits.
- Documentation was entered noting a cutting incident by a child in a group home.  The SW did not document follow up contact with the child's therapist or group home staff regarding the circumstances of the incident.

In the twelve cases with reports of abuse or neglect during the quarter, there were eight regulatory violations cited along with the 12 substantiations of abuse or neglect. The regulatory violations were secondary to the substantiations, and there was no case in which only regulatory violation was cited.

There was documentation that the Investigation SW contacted the Ongoing SW regarding the child in ten of the cases investigated or 83.3% of the time.

Maltreatment occurred in a variety of settings. For the group of 12 children substantiated as abuse or neglect victims in out-of-home placement, these settings included:

**Table 21:  Placement Setting of Children Maltreated in Out of Home Care**

| Placement Setting | Frequency | Percent |
|---|---|---|
| In State DCF Non-Relative Foster Home | 4 | 33.3% |
| In State Private Provider Foster Home | 3 | 25.0% |
| In State DCF Relative Foster Home | 2 | 16.7% |
| Group Home | 2 | 16.7% |
| Private Provider Agency Therapist (Entrusted) | 1 | 8.3% |
| Total | 12 | 100.0% |

There were seven substantiated instances in which the abuse or neglect was the result of one perpetrator and five instances in which two perpetrators were identified. Included were four relative foster parents, five non-relative foster parents, and three "other" adults (group home staff and therapist). Investigation findings included:

- Physical Neglect Substantiations – 6
- Emotional Neglect Substantiations – 5
- Physical Abuse Substantiations – 2
- Emotional Abuse/Maltreatment Substantiation – 1
- Medical Neglect Substantiation – 1
- Regulatory Violations – 8

The tool captured the reviewers' opinions on whether there was appropriate action after the substantiation was documented. In ten of the 12 cases substantiated (83.3%), the reviewers felt that appropriate action was taken to reduce the likelihood of additional safety risks involving the child and identified provider/perpetrator. In two cases, the reviewers felt that additional follow up or action was required. Of the six of the seven situations involving DCF foster homes, there were quarterly visits made to the home during the fourth quarter 2006. However, there was no documentation highlighting annual support plan updates as a result of the substantiations. None of the providers involved in the substantiations had a history of substantiated reports or regulatory violations cited over the prior year.

Our data included data elements regarding the Department's decision to remove a child as a result of substantiation.

- In eight situations, the child was removed from the placement as a result of the substantiation.
- In two of the twelve substantiated cases (16.7%), the placement at the time of substantiation was overcapacity at the time of the incident.
- In 6 of the cases substantiated (50%) there was documentation that the PREU or the FASU was notified of the substantiated incident.
- There were no removals in four of the cases. In one case it was the provider therapist that was the perpetrator, and therefore no removal was required (therapist subsequently resigned). Two of the situations were at group home locations, where group home administration dealt with the

matter via sanctions – but it is unclear from the record what follow up was done between the child and the SW or Group Home staff.  The last situation occurred within a special study/relative foster home.  The FASU SW and ISW did work with the Ongoing Services SW to set up a plan of action to address the issue of medication management.  However, there is no follow-up in narratives by the Ongoing Services SW regarding the issue so we are unable to determine how successful the plan was.  As of December 31, 2006 all four of these children remained in the same placement where the substantiation occurred.

## Outcome 7 - Reunification

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F*. v Rell Revised Exit Plan</u> to conduct a series of reviews on the 22 Outcome Measures resulting in a full status report in April 2007. This review, Outcome Measure 7:  Reunification, is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor regarding the instances of Reunification.  **Outcome Measure 7:  Reunification requires that DCF comply and sustain the following level of practice related to reunification:**

> *"At least 60% of the children who are reunified with their parents or guardians shall be reunified within 12 months of their most recent removal from home."*

The Monitor's Office conducted a qualitative review of 80[17] of the 327 universe of children reunified during the quarter of October 1, 2006 to December 31, 2006 (the universe excludes all children in placement and reunified via Voluntary Service).  A pilot test was conducted during the last week of February to ensure that issues of reliability and validity were addressed prior to initiating the full review.  Following that test, necessary changes and training were made to the review instrument and instructions to improve validity and reliability of scoring.  The LINK record review was conducted between April and June, 2007 by the DCF Court Monitor reviewers and assigned DCF staff.

**Review Findings and Trends**

Our review found that 64.8% of children within our sample reunified within the twelve month timeframe. Since the sample is composed entirely of children that exited DCF custody during the Fourth Quarter 2006, the results are solely applicable to the children within the exit cohort.  Results should not be generalized to the entire population of children entering or in DCF custody, though certainly the findings can point to systemic factors in a qualitative manner.

Reviewers felt that the most important element of supervision lacking in the documented notes was a synthesis of factors critical to the case that would provide a thorough assessment of the case status and direction.  Cases rated as having better overall case practice throughout their episodes tended to also meet the measure for timely reunification more often more often than lower rated cases. A number of factors were found to have statistically significant relationships of varying strengths, regarding achievement of the outcome measure.  In general, cases demonstrating a higher level of complexity, which required service engagement and evaluation and those with multiple risks within the home environment at the point of removal, typically resulted in longer lengths of stay. These factors include:

- Not surprisingly, cases in which the legal status of children remained temporary (96 Hour Hold or OTC) met the measure for timely reunification significantly more often than those children that were committed.
- Cases where children experienced fewer placements resulted in significantly higher rate of reunification within 12 months.
- Situations in which the Parent or Guardian's substance abuse was at least one of the reasons for the child's entry to foster care were significantly less likely to reunify within 12 months than any other combination of reasons for removal.
- Cases that did not require intensive in-home services met the measure for timely reunification significantly more often than those that did require this service.
- Females reunified within 12 months at a significantly higher rate than males.

---

[17] Due to multiple exclusions of a number of the sample, the review actually resulted in a sample of 71 cases.

- Cases in which reviewers saw evidence that both primary and concurrent goals were actively being pursued did not meet the measure more often than those in which a concurrent goal was stated but was not being pursued.
- Cases that did not have gradually increasing visitation between parent/guardian and the child in placement met the measure for timely reunification significantly more often than those that did. (This most likely is due to the shorter lengths of time many of these cases were open)
- Cases that did not have documented discussions of risk factors related to reunification met the measure for timely reunification significantly more often than those that did.
- Four children within the sample and experiencing their first time placement in the episode ending in the Fourth Quarter 2006 re-entered care in the period leading up to our review. While it is not unexpected that reunification discharges would have the highest re-entry rates within the discharge cohort, this is not promising, given that the Exit Plan requires less than 7% within a twelve month period, and the review period was a relatively short period of time.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**
The Monitor's Office requested that DCF provide the universe of all children discharged from DCF custody during the quarter of October 1, 2006 through December 31, 2006 (excluding Voluntary Service cases). This request was fulfilled with the submittal of an Excel Database including 327 children. Sampling methodology agreed upon by the _Juan F._ parties required a sample of 80 cases. This 80 case sample size equates to a 90.0% confidence interval, $\pm$ 8% margin of error. The sample set population initially selected included children from each of the Area Offices as follows:

**Table 22:  Universe (N=327) and Sample Set (n =81) Designation by Area Office**

| Area Office | Children in Universe | % of Universe | Children in Sample Set | % of Sample Set |
|---|---|---|---|---|
| Bridgeport Office | 26 | 8% | 6 | 7% |
| Danbury Office | 7 | 2% | 2 | 2% |
| Greater New Haven | 17 | 5% | 4 | 5% |
| Hartford Office | 56 | 17% | 13 | 16% |
| Manchester Office | 26 | 8% | 6 | 7% |
| Meriden Office | 19 | 6% | 5 | 6% |
| Middletown Office | 9 | 3% | 3 | 4% |
| New Britain Office | 36 | 11% | 9 | 11% |
| New Haven Metro | 37 | 11% | 9 | 11% |
| Norwalk Office | 11 | 3% | 3 | 4% |
| Norwich Office | 18 | 6% | 5 | 6% |
| Stamford Office | 16 | 5% | 4 | 5% |
| Torrington Office | 8 | 2% | 2 | 2% |
| Waterbury Office | 25 | 8% | 6 | 7% |
| Willimantic Office | 14 | 4% | 4 | 5% |
| Grand Total | 325 | 100% | 81 | 100% |

There were 16 cases from the initial sample that were excluded from the review because they did not fit the review criteria. Eleven were actually children whose legal discharge dates fell into other quarters (both before and after the quarter), but had been included within the universe due to errors or lack of correct legal documentation. Three additional children had actually not had a legal discharge occur as of the review date, and had been included because of a combination of errors indicating

discharge on placements and missing/incorrect legal documentation.  There was also one child who actually reached his age of majority so was not technically reunified, and one child placed and reunified by Probation with no legal documentation at all.  Seven substitute cases were identified and assigned for review.  The remaining 9 cases were not replaced by the DCF supervisor assigned oversight of this measure.   This reduced the sample to 71 cases.

A pilot test was conducted during the last week of February to ensure that issues of reliability and validity were addressed prior to initiating the full review.  Following that test, necessary changes and training were made to the review instrument and instructions to improve the validity and reliability of scoring. The LINK record review was conducted between April and June, 2007.  DCF Court Monitor review staff and three DCF personnel conducted the data collection.

The results of this study must be considered qualitative due to the nature of the sample.  Since the sample is composed entirely of children that exited DCF care during Fourth Quarter 2006, the results are solely applicable to that group.  Results should not be generalized to the entire population of children either entering or already in DCF care during that time, though certainly the findings can point to systemic factors in a qualitative manner.

### Population Description

A number of data were collected in order to describe the population, and comparisons between outcome groups were drawn on each variable to evaluate those that may or may not have an impact on outcome performance.  The only factor present in the sample population that had a significant difference in outcome was gender, in that females achieved reunification within 12 months more often than males ($p < .05$).  While there were no statistically significant differences among children based on how long their case had been open prior to foster care entry, cases where children were immediately removed were returned within 12 months at the highest rate.  Reunification in such cases was possible in short timeframes mainly due to the parent/guardian's compliance with DCF treatment recommendations, specifically:

- Parents demonstrated improvement in understanding children's needs and consistency in meeting them.
- Parents demonstrated the ability to identify the issues that led to the children's removal and applied changes that needed to be made.
- Parents demonstrated improvements in employment and/or adequate safety within the home environment.

**Crosstabulation 22:  Reunification within 12 Months *Categorized Time from Case Open to Entry Date (months)**

| Categorized Time from Case Open to Entry Date (Months) | Reunification Within 12 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| **Immediate FC Entry** | 22 | 88.0% | 3 | 12.0% | 25 | 100.0% |
| **<3 Months** | 7 | 58.3% | 5 | 41.7% | 12 | 100.0% |
| **3 - 5 Months** | 4 | 44.4% | 5 | 55.6% | 9 | 100.0% |
| **6 - 11 Months** | 5 | 41.7% | 7 | 58.3% | 12 | 100.0% |
| **12 - 23 Months** | 4 | 66.7% | 2 | 33.3% | 6 | 100.0% |
| **24+ Months** | 4 | 57.1% | 3 | 42.9% | 7 | 100.0% |
| **Total** | **46** | **64.8%** | **25** | **35.2%** | **71** | **100.0%** |

While there are no statistically significant differences between groups, infants and adolescents reunified within 12 months at higher rates than preschool and latency age children.

**Crosstabulation 23: Reunification Within 12 Months * Categorized Age at Entry (years)**

| Categorized Age at Entry (Years) | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| <1 Year Old | 9 | 81.8% | 2 | 18.2% | 11 | 100.0% |
| 1 - 5 Years Old | 13 | 52.0% | 12 | 48.0% | 25 | 100.0% |
| 6 - 12 Years Old | 18 | 66.7% | 9 | 33.3% | 27 | 100.0% |
| 13 - 17 Years Old | 6 | 75.0% | 2 | 25.0% | 8 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |

There appears to be a weak difference between gender groups and reunification within 12 months, in that females reunified within 12 months at a significantly higher rate than males.

**Crosstabulation 24: Reunification Within 12 Months * Child's Gender**

| Child's Gender | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| Male | 20 | 54.1% | 17 | 45.9% | 37 | 100.0% |
| Female | 26 | 76.5% | 8 | 23.5% | 34 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p = .041; all cases valid | | | | | | |

Children with Hispanic ethnicity reunified at a higher rate than Non-Hispanics. However, differences were not found to be statistically significant between any racial or ethnic groups.

**Crosstabulation 25: Reunification Within 12 Months* Child's Ethnicity *Child's Race**

| Child's Ethnicity | Child's Race | Reunification Within 12 Months? | | | | Total | |
| | | Yes | | No | | | |
| | | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|---|
| Hispanic | Black/African American | 3 | 100.0% | 0 | .0% | 3 | 100.0% |
| | Native Hawaiian | 0 | .0% | 3 | 100.0% | 3 | 100.0% |
| | White | 11 | 78.6% | 3 | 21.4% | 14 | 100.0% |
| | UTD | 8 | 88.9% | 1 | 11.1% | 9 | 100.0% |
| | Hispanic Sub-Total | 22 | 75.9% | 7 | 24.1% | 29 | 100.0% |
| Non-Hispanic | Black/African American | 10 | 55.6% | 8 | 44.4% | 18 | 100.0% |
| | White | 11 | 55.0% | 9 | 45.0% | 20 | 100.0% |
| | Multiracial | 1 | 50.0% | 1 | 50.0% | 2 | 100.0% |
| | Non-Hispanic Sub-Total | 22 | 55.0% | 18 | 45.0% | 40 | 100.0% |
| Unknown | Black/African American | 1 | 100.0% | | | 1 | 100.0% |
| | UTD | 1 | 100.0% | | | 1 | 100.0% |
| | Unknown Sub-Total | 2 | 100.0% | | | 2 | 100.0% |
| Total | | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |

**Placement Episode Characteristics**
Data were also gathered to describe the children's placement episodes (from date of entry through legal discharge). All but three of the children were experiencing their first episode in DCF care during the time period reviewed. Two of the remaining children were on their second episode, while the last was on her third. Four of the children experiencing their first episodes in out of home placement ending with the fourth quarter reunification had actually re-entered DCF custody by the date of review. None of the children that had prior episodes in DCF custody re-entered custody by the date of review.

The reasons for children entering foster care were examined to compare differences in outcome performance. These data were collected as a set of multiple response questions and allowed for many different combinations of reasons that the children entered foster care. There appeared to be a difference in cases that have substance abuse as a factor. The data was restructured to allow for further analysis of this factor.

**Crosstabulation 26: Reunification Within 12 Months * Reason for Child's Removal from Home**

| Reason(s) for Child's Removal from Home (Multiple Response) | Reunification Within 12 Months? | | | | Total |
|---|---|---|---|---|---|
| | Yes | | No | | |
| | Count | % | Count | % | Count |
| Child's Mental Health | 7 | 77.8% | 2 | 22.2% | 9 |
| Parent/Guardian's Incarceration | 5 | 55.6% | 4 | 44.4% | 9 |
| Parent/Guardian's Whereabouts Unknown | 3 | 100.0% | 0 | .0% | 3 |
| Parent/Guardian's Mental Health | 11 | 84.6% | 2 | 15.4% | 13 |
| Parent/Guardian's Substance Abuse | 3 | 18.8% | 13 | 81.3% | 16 |
| Substantiated Abuse | 9 | 69.2% | 4 | 30.8% | 13 |
| Substantiated Neglect | 32 | 62.7% | 19 | 37.3% | 51 |
| Other | 20 | 74.1% | 7 | 25.9% | 27 |

A variable was computed to aggregate the multiple response data in a way that allowed for a comparison between cases in which Parent/Guardian's Mental Health and Parent/Guardian's Substance Abuse were issues. Cases where Parent/Guardian's Substance Abuse was at least one of the reasons for the child's entry to foster care were significantly less likely to reunify within 12 months than any other combination of reasons. In one such case, parent's refusal to participate in treatment services and continued substance abuse contributed to the child's lengthier reunification process. However, in another case the parent's ability to obtain dual diagnosis treatment and stable housing contributed to shortening the child's length of stay. Further, cases where Parent/Guardian Mental Health (in the absence of Substance Abuse) was at least one of the entry reasons were significantly more likely to reunify within 12 months. In several examples of such cases, parents were able and willing to access mental health treatment, participate in in-home services, and demonstrated stable housing and employment.

**Crosstabulation 27:  Reunification Within 12 months * Aggregated Reasons for Child Entry Into Foster Care**

| Aggregated Reasons for Child Entry Into Foster Care | Reunification Within 12 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Mental Health & Substance Abuse Both Part of Entry Reasons | 0 | .0% | 2 | 100.0% | 2 | 100.0% |
| Mental Health -Not Substance Abuse Part of Entry Reasons | 11 | 100.0% | 0 | .0% | 11 | 100.0% |
| Substance Abuse-Not Mental Health Part of Entry Reasons | 3 | 21.4% | 11 | 78.6% | 14 | 100.0% |
| No Mental Health or Substance Abuse in Entry Reasons | 32 | 72.7% | 12 | 27.3% | 44 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p =.000; all cases valid | | | | | | |

The type of placement in which a child was primarily placed (>50% of the episode) is also useful when examining time to permanency outcomes.  This data has limitations, however, as the sample was not stratified by placement type, and so may not be generalized to the entire population.  When looking solely at outcomes for children placed primarily with non-relative versus relative foster care there are no statistically significant differences found.

**Crosstabulation 28:  Reunification Within 12 Months * Primary Placement Type**

| Primary Placement Type (>50% of Episode) | Reunification Within 12 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| In-state DCF Non-Relative Foster Care | 26 | 70.3% | 11 | 29.7% | 37 | 100% |
| In-state DCF Relative Foster Care | 9 | 56.3% | 7 | 43.8% | 16 | 100% |
| In-state DCF Special Study Foster Care | 1 | 25.0% | 3 | 75.0% | 4 | 100% |
| In-state Private Provider Foster Care | 1 | 33.3% | 2 | 66.7% | 3 | 100% |
| In-state Residential | 0 | .0% | 1 | 100.0% | 1 | 100% |
| SAFE Home | 7 | 87.5% | 1 | 12.5% | 8 | 100% |
| Shelter | 2 | 100.0% | 0 | .0% | 2 | 100% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100% |

It was also found that as the number of placements increased, so did the rate of children not achieving reunification within 12 months.  One anomaly presented in this regard.  There was one child that experienced 9 placement moves (with 6 different providers) during an episode that lasted less than six months.  This was a child with significant mental health diagnoses, including Attention Deficit Hyperactivity Disorder (ADHD), Post Traumatic Stress Disorder (PTSD), Oppositional Defiance Disorder (ODD), Mood Disorder (NOS) and Dysthymia, that led to foster placement disruptions (both regular and Special Study) due to oppositional, destructive, assaultive and sexualized behaviors.  This adolescent ended the episode following a hospital stay, when the court vacated the OTC at the recommendation of service providers in spite of DCF's opposition.  The family was provided with MST services upon discharge.  This adolescent re-entered DCF custody seven months later after her mother's paramour sexually propositioned her, and after arguing with her mother about the incident, set her mother on fire.  Both she and mother were arrested, and she was placed into a different Special Study home that has remained stable for over two months as of this writing.  While this child's

episode technically met the measure for timely reunification, as DCF argued at the time of the court ordered reunification, risk factors were such that after-care services were not sufficient to prevent re-entry .

**Crosstabulation 29:  Reunification Within 12 Months * How Many Placement Settings Did Child Have During the Episode Ending in Fourth Quarter 2006 Reunification?**

| How many placement settings did child have during the episode ending in the Fourth Quarter 2006 Reunification? | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| 1 | 34 | 77.3% | 10 | 22.7% | 44 | 100.0% |
| 2 | 10 | 62.5% | 6 | 37.5% | 16 | 100.0% |
| 3 | 1 | 25.0% | 3 | 75.0% | 4 | 100.0% |
| 4 | 0 | .0% | 3 | 100.0% | 3 | 100.0% |
| 5 | 0 | .0% | 1 | 100.0% | 1 | 100.0% |
| 6 | 0 | .0% | 1 | 100.0% | 1 | 100.0% |
| 9 | 1 | 50.0% | 1 | 50.0% | 2 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p =.019; all cases valid | | | | | | |

For cases in which reviewers found an approved treatment plan identifying a concurrent planning goal, and in which both goals were actively being pursued, more often did not meet the measure than those in which a concurrent goal was stated but was not pursued by the SW.  To some degree this result should be expected, as such efforts are more often taken when reunification seems less likely during early phases of the case but is ultimately able to be achieved.  In one case, full disclosure of the pursuit of a concurrent planning goal did actually motivate the mother to improve participation in treatment services so that reunification was achieved within twelve months.  When reviewing the data below, please note that of the 15 cases where reviewers indicated "UTD – No Approved Plan" several were due to the children's complete episode lasting less than a month.

**Crosstabulation 30:  Reunification Within 12 Months * Did SW Manage the Case so that Reunification and a Concurrent Goal were Both Actively Pursued?**

| Did SW manage case so that Reunification and a concurrent goal were both actively being pursued? | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Yes | 5 | 25.0% | 15 | 75.0% | 20 | 100.0% |
| No-  A Concurrent Plan existed but was not pursued | 18 | 75.0% | 6 | 25.0% | 24 | 100.0% |
| Total | 23 | 52.3% | 21 | 47.7% | 44 | 100.0% |
| p =.001; 15 cases UTD-No Approved Plan, 12 cases NA-No Concurrent Goal Required. | | | | | | |

Cases that are more complex and/or involve greater risks to children during the reunification process often move along a continuum of increasing visitation.  As children remain in DCF custody longer, there is often a perceived need to slowly re-integrate them back into daily life at home through visitation that increases in frequency and duration.  In this way both parents and children are better prepared for a stable reunification that will not result in re-entry.  On the other hand, it can lengthen the child's placement episode.  In two examples of cases that met the measure and did not have a

94

period of increasing visitation, the children had been removed during a crisis but were able to be sent home with services in place in less than a month.

**Crosstabulation 31:  Reunification within 12 Months * Was Visitation Between Parent/Guardian and Child Increased in Frequency and Duration as Case Progressed Toward Child's Exit from Placement?**

| Was visitation between parent/guardian and child increased in frequency and duration as case progressed toward child's exit from placement? | Reunification Within 12 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Yes | 17 | 40.5% | 25 | 59.5% | 42 | 100.0% |
| No | 29 | 100.0% | 0 | .0% | 29 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p =.000; all cases valid | | | | | | |

**Crosstabulation 32:  Reunification within 12 Months * Was Visitation Between Parent/Guardian and Child Progressed so that Supervision was Reduced to Unsupervised, then Overnight Visits Prior to Child's Exit from Placement?**

| Was visitation between parent/guardian and child progressed so that supervision was reduced to unsupervised, then overnight visits prior to child's exit from placement? | Reunification Within 12 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Yes | 13 | 35.1% | 24 | 64.9% | 37 | 100.0% |
| No | 33 | 97.1% | 1 | 2.9% | 34 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p =.000; all cases valid | | | | | | |

Cases with higher risk and/or need for intensive services may also result in significantly more delays in reunification beyond twelve months.  As with the increasing visitation reported prior, implementing intensive in-home services may help ensure the safety of children and stability of reunification, but often increases the time it takes for reunification to occur.  Chronic substance abuse issues and the availability of adequate housing prior to reunification were major factors in delaying reunification in two such cases.  In another case the initial efforts to reunify with mother did not prove to be possible, so DCF assessed the father to be a viable resource and the child was reunified with father instead.

**Crosstabulation 33:  Reunification within 12 Months * Were Intensive In-Home Services (IICAPS, IFR, MST, BSF-MST) Implemented to Support Reunification of this Child?**

| Were Intensive In-Home services (IICAPS, IFR, MST, BSF-MST) implemented to support Reunification of this child? | Reunification Within 12 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Yes | 12 | 41.4% | 17 | 58.6% | 29 | 100.0% |
| No | 34 | 81.0% | 8 | 19.0% | 42 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p =.001; all cases valid | | | | | | |

In cases where the SW and SWS consistently documented discussions of risk factors related to reunification, fewer cases achieved reunification within 12 months.  This supports the notion that DCF

is more cautious in returning children in cases of increasing complexity and higher risks.  It should be noted that ten of the 16 cases (62.5%) that met the measure, but did not have identified risks in supervisory notes, had lengths of stay of three months or less.  In one such example, the youth had been removed due to inadequate supervision and the parent did not want the youth to return home.  It should be noted that both "UTD" cases, were short episodes that had documented supervisory conferences shortly before and after the placement episodes.

**Crosstabulation 34:  Reunification within 12 Months *  CM.1. Do SC Notes Indicate that SWS/SW Discussed Risk Factors Relevant to Ensuring Safe/Stable Reunification During 6 Month Period Leading to Fourth Quarter 2006 Reunification?**

| CM.1. Do SC notes indicate that SWS/SW discussed risk factors relevant to ensuring safe/stable Reunification during 6 month period leading to Fourth Quarter 2006 Reunification? | OM.11. Reunification Within 12 Months? | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | Total | |
| | Count | % | Count | % | Count | % |
| Yes | 28 | 56.0% | 22 | 44.0% | 50 | 100% |
| No | 16 | 84.2% | 3 | 15.8% | 19 | 100% |
| Total | 44 | 63.8% | 25 | 36.2% | 69 | 100% |
| p =.026; 2 cases UTD-No SWS Narratives During Time Period | | | | | | |

Reviewers were asked to rate the overall quality of supervision during the six months leading up to reunification.  At first review there does not appear to be a connection between higher quality supervision and improved timeliness of reunification.  Comments fielded from the completed protocols, however, indicate that reviewers felt that important elements of supervision were lacking in respect to thorough assessment of the case, directional instructions and follow-up.  The apparent disconnect may be in the restriction to a record review only methodology.  Basis was formed on the level and quality of the documented supervisory narratives.  Narratives may not be reflective of actual practice regarding assessment, directives and follow-up that occurs outside of the documented conference.  Future methodologies should incorporate interviews to examine this construct's relationship to timely reunification.

**Crosstabulation 35:  Reunification within 12 months * Overall Quality of Supervision**

| Overall Quality of Supervision | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | # | % | # | % | # | % |
|---|---|---|---|---|---|---|
| Excellent | 8 | 61.5% | 5 | 38.5% | 13 | 100.0% |
| Good | 20 | 60.6% | 13 | 39.4% | 33 | 100.0% |
| Poor | 16 | 72.7% | 6 | 27.3% | 22 | 100.0% |
| Negligible | 2 | 66.7% | 1 | 33.3% | 3 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |

There was a significant relationship found between child's legal status during their episode and timely reunification.  This was expected, in that it simply takes longer for a case to work its way through the court process.   Children who are committed are much more likely to withstand longer episodes in placement prior to reunifying than children who go home following a 96-hour hold or order of temporary custody (OTC).

**Crosstabulation 36:  Reunification within 12 Months * Child's Legal Status Immediately Prior to Discharge**

| Child's Legal Status immediately prior to legal discharge | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| 96-Hour Hold | 5 | 100.0% | 0 | .0% | 5 | 100.0% |
| Order of Temporary Custody | 33 | 94.3% | 2 | 5.7% | 35 | 100.0% |
| Committed | 8 | 25.8% | 23 | 74.2% | 31 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |
| p = <.000; all cases valid | | | | | | |

**Timely Reunification Outcome:**
Overall, 46 of the 71 reunified children sampled (64.8%) had lengths of stay less than twelve months, ranging from less than one month for 17 cases (23.9%) to one case at 44 months (1.4%).  The average length of stay was just over eleven months, with a median of seven months.

**Table 23:  Length of Stay Prior to Reunification**

| Categorized Length of Stay (Months) | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| <3 Months | 27 | 38.0 | 38.0 |
| 3 - 5 Months | 6 | 8.5 | 46.5 |
| 6 - 11 Months | 13 | 18.3 | 64.8 |
| 12 - 23 Months | 12 | 16.9 | 81.7 |
| 24+ Months | 13 | 18.3 | 100.0 |
| Total | 71 | 100.0 | |

Given the relatively small sample size, it was not possible to produce a valid comparison among offices, so the following table should be considered strictly descriptive.

**Crosstabulation 37: Reunification Within 12 Months * Area Office Assignment**

| Area Office | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| Bridgeport | 9 | 81.8% | 2 | 18.2% | 11 | 100.0% |
| Danbury | 13 | 52.0% | 12 | 48.0% | 25 | 100.0% |
| Greater New Haven | 18 | 66.7% | 9 | 33.3% | 27 | 100.0% |
| Hartford | 6 | 75.0% | 2 | 25.0% | 8 | 100.0% |
| Manchester | 9 | 81.8% | 2 | 18.2% | 11 | 100.0% |
| Meriden | 13 | 52.0% | 12 | 48.0% | 25 | 100.0% |
| Middletown | 18 | 66.7% | 9 | 33.3% | 27 | 100.0% |
| New Britain | 6 | 75.0% | 2 | 25.0% | 8 | 100.0% |
| New Haven Metro | 9 | 81.8% | 2 | 18.2% | 11 | 100.0% |
| Norwalk | 13 | 52.0% | 12 | 48.0% | 25 | 100.0% |
| Norwich | 18 | 66.7% | 9 | 33.3% | 27 | 100.0% |
| Stamford | 6 | 75.0% | 2 | 25.0% | 8 | 100.0% |
| Torrington | 9 | 81.8% | 2 | 18.2% | 11 | 100.0% |
| Waterbury | 13 | 52.0% | 12 | 48.0% | 25 | 100.0% |
| Willimantic | 18 | 66.7% | 9 | 33.3% | 27 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |

Reviewers were also asked their opinion regarding whether they felt the child's reunification was in the best interest of the child at the time of the reunification. Reviewers disagreed with the reunification decision in 17 (23.9%) cases. However, there was no significant difference in whether reunification occurred within the 12-Month period between the groups in which they agreed with the determination to reunify, and those with which they did not agree.

**Crosstabulation 38: Reunification Within 12 Months * In Reviewer's Opinion was Reunification in the Best Interest of the Child at This Time?**

| In reviewer's opinion, was Reunification in the best interest of the child at this time? | Reunification Within 12 Months? | | | | Total | |
| | Yes | | No | | Yes | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| Yes | 34 | 63.0% | 20 | 37.0% | 54 | 100.0% |
| No | 12 | 70.6% | 5 | 29.4% | 17 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |

While there were no significant differences found in outcomes based on reviewer responses to the question concerning the overall quality of case practice during the child's placement episode, there does seem to be a tendency for cases rated as having better overall case practice to meet the measure at a higher rate.

**Crosstabulation 39:  Reunification within 12 Months * Overall Quality of Case Practice During Episode Ending in 4Q06 Reunification**

| Overall quality of case practice during episode ending in Fourth Quarter 2006 Reunification. | Reunification Within 12 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | Yes | |
| | Count | % | Count | % | Count | % |
| Optimal | 10 | 71.4% | 4 | 28.6% | 14 | 100.0% |
| Very Good | 22 | 64.7% | 12 | 35.3% | 34 | 100.0% |
| Marginal | 14 | 60.9% | 9 | 39.1% | 23 | 100.0% |
| Total | 46 | 64.8% | 25 | 35.2% | 71 | 100.0% |

The success of a child's reunification must also be measured by the stability of permanency after discharge.  Reviewers were asked to identify whether a child had re-entered foster care following their fourth quarter reunification.  Since this review was not designed to measure "Re-Entry" it could measure only the three to six months of observation time elapsed between the children's discharge and date of review.  This limits the interpretation of the results of this question to only re-entries that occurred within a relatively short period of time following reunification and is therefore not an evaluation of all re-entries that may occur over time as required by OM 11.

There were four children (5.6%) within the 71 child sample that had re-entered care by the date of the record review.  This is not promising given that the Revised *Juan F.* Exit Plan standard for re-entry is less than 7% of children discharged should re-enter within 12 months.  However, it is also not unexpected that reunification result in higher rates of re-entry than other forms of discharge.

**Outcome Measure 8 - Adoption**

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* Exit Plan</u> to conduct a series of reviews on the 22 outcome measures. This review of Outcome Measure 8: Adoption is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor regarding instances of adoption. **Outcome Measure 8: Adoption requires that DCF comply and sustain the following level of practice related to adoption:**

> *"At least 32% of the children who are adopted shall have their adoptions finalized within 24 months of the child's most recent removal from his/her home."*

The Monitor's Office conducted a qualitative review of 80 of the 131 children adopted during the quarter of October 1, 2006 through December 31, 2006. A pilot test was conducted during in March to ensure that issues of reliability and validity could be addressed prior to initiating the full review. Following that test, necessary changes and training were made to improve the validity and reliability of scoring. The LINK record review was conducted between April and June 2007 by DCF Court Monitor review staff and DCF personnel.

**Review Findings and Trends**
Since the sample is composed entirely of children that exited DCF care during Fourth Quarter 2006, the results are solely applicable to that group. Results should not be generalized to the entire population of children either entering or already in DCF care at that time, though certainly the findings can point to systemic factors in a qualitative manner. A number of factors were found to have statistically significant relationships with the achievement of the outcome measure standard for the group of children reviewed. These factors include:

- 27.5% of the sample (n=80) achieved adoption within the 24 month period. Compliance for this measure, however is determined on the full universe of children adopted during that period (N=131). In all, 33.6%of the children adopted during this quarter did so within the 24-month period.
- Children who were less than a year old upon entry into foster care had significantly shorter lengths of time pass between the filing and granting of TPR by the court.
- Younger children were adopted within 24 months significantly more often than older children. Children's gender, race and ethnicity do not appear to have such a relationship.
- The cases of children that were adopted within 24 months had several factors related to timely decision-making that lead to adoption. These included:
  - Significantly shorter times from foster care entry to the identification of adoption as their primary permanency goal
  - Significantly shorter times from foster care entry to the filing of TPR
  - Increased use of Legal Risk pre-adoptive foster homes
  - Identification of pre-adoptive resource families more often occurring prior to filing TPR
  - Significantly shorter times from TPR being granted to finalization of the adoption were present within the sample. In fact, average times from TPR to adoption within this sample were much faster than nationally reported and improved over the previously reported averages for CT.
- Although all seven children that experienced six or more placements did not have timely adoptions, children who were adopted within 24 months did not have significantly better placement stability than those that did not meet the measure

- Children who were adopted within 24 months were <u>not</u> adopted by former foster parents more often than those that did not have timely adoptions.
- The cases of children who were adopted within 24 months had supervision documented within the LINK record that was rated higher than those that did not achieve adoption within the benchmark. Supervision in such cases was characterized by reviewers as providing a thorough assessment of the case with clear directives and timeframes for social workers that ensured the children's needs were met.
- Children who were adopted within 24 months had cases that were notably higher rated for overall case practice than those that did not meet the measure.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all children that were discharged from DCF custody during the quarter of October 1, 2006 through December 31, 2006. This request was fulfilled with the submittal of an Excel Database including 131 children. Sampling methodology agreed upon by the parties allowed for a qualitative sample of 80 cases, though quantitatively this sample size equates to an 84.5% confidence interval, $\pm$ 5% margin of error.

A pilot test was conducted during the last week of February to ensure that issues of reliability and validity could be addressed prior to initiating the full review. A pilot test was conducted and necessary changes and training resulted in improving validity and reliability of scoring. The LINK record review was conducted during between April and June 2007. DCF Court Monitor review staff and five DCF personnel assisted in the data collection efforts.

The sample set population includes children from each of the Area Offices as follows:

**Table 24: Universe (N=131) and Sample Set (n =80) Designation by Area Office**

| Area Office | Number of Children in Universe | % of Universe | Number of Children in Sample Set | % of Sample Set |
|---|---|---|---|---|
| Bridgeport | 6 | 5% | 4 | 5% |
| Danbury | 4 | 3% | 3 | 4% |
| Greater New Haven | 2 | 2% | 2 | 3% |
| Hartford | 19 | 15% | 11 | 14% |
| Manchester | 13 | 10% | 8 | 10% |
| Meriden | 7 | 5% | 4 | 5% |
| Middletown | 5 | 4% | 3 | 4% |
| New Britain | 15 | 11% | 9 | 11% |
| New Haven Metro | 5 | 4% | 3 | 4% |
| Norwalk | 4 | 3% | 3 | 4% |
| Norwich | 19 | 15% | 11 | 14% |
| Stamford | 3 | 2% | 2 | 3% |
| Torrington | 8 | 6% | 5 | 6% |
| Waterbury | 7 | 5% | 4 | 5% |
| Willimantic | 14 | 11% | 8 | 10% |
| Total | 131 | 100% | 80 | 100% |

**Limitations**

As stated prior, the results of this study must be considered qualitative due to the nature of the sample methodology. Since the sample is composed entirely of children that exited DCF care during Fourth

Quarter 2006, the results are solely applicable to that group. Results should not be generalized to the entire population of children either entering or already in DCF care during that time, though certainly the findings can point to systemic factors in a qualitative manner.

**Population Description**

A number of data were collected in order to describe the population, and comparisons between outcome groups were drawn on each variable to evaluate those variables that may or may not have an impact on outcome performance. While children younger at the point of entry to foster care generally had shorter times between entry and filing of TPR, there were no statistically significant differences between age groups.

**Crosstabulation 40: Time Between Dates of Entry and TPR Filing * Child's Age on Entry Date**

| Child's Age on Entry Date (Categories) | Time Between Dates of Entry and TPR Filing | | | | | | Total | |
| | <12 Months | | 12 - 23 Months | | 24+ Months | | | |
| | # | % | # | % | # | % | # | % |
| **<1 Year Old** | 16 | 53.3% | 9 | 30.0% | 5 | 16.7% | 30 | 100.0% |
| **1 - 5 Years Old** | 12 | 35.3% | 14 | 41.2% | 8 | 23.5% | 34 | 100.0% |
| **6 - 11 Years Old** | 2 | 15.4% | 6 | 46.2% | 5 | 38.5% | 13 | 100.0% |
| **13 - 17 Years Old** | 0 | .0% | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| **Total** | 30 | 37.5% | 30 | 37.5% | 20 | 25.0% | 80 | 100.0% |

However, there does appear to be a relationship between children's ages on entry and how quickly the court process takes from the point of filing to having TPR granted. In general, those children less than a year old at entry had much shorter amounts of time pass between the filing and granting of TPR by the court. However, the same relationship is not found when examining how long children of differing ages wait for adoption to occur once TPR has been granted.

**Crosstabulation 41: Time Between Dates of TPR Filing and TPR Granted * Child's Age on Entry Date**

| Child's Age on Entry Date (Categories) | Time Between Dates of TPR Filing and TPR Granted | | | | | | Total | |
| | <12 Months | | 12 - 23 Months | | 24+ Months | | | |
| | # | % | # | % | # | % | # | % |
| **<1 Year Old** | 28 | 93.3% | 2 | 6.7% | 0 | .0% | 30 | 100.0% |
| **1 - 5 Years Old** | 17 | 50.0% | 13 | 38.2% | 4 | 11.8% | 34 | 100.0% |
| **6 - 11 Years Old** | 10 | 76.9% | 3 | 23.1% | 0 | .0% | 13 | 100.0% |
| **13 - 17 Years Old** | 2 | 66.7% | 1 | 33.3% | 0 | .0% | 3 | 100.0% |
| **Total** | 57 | 71.3% | 19 | 23.8% | 4 | 5.0% | 80 | 100.0% |
| p =.011; all cases valid | | | | | | | | |

Finally, there is a significant relationship between children's age (both upon entry and at adoption) and whether or not an adoption occurred within 24 months. It appears from this data that significantly more of the children adopted within 24 months were younger than those whose adoptions took longer to finalize. The national trends in age at adoption had been showing a steady increase from 6.53 in 1996 until hitting a high of 6.96 in 2002. The average age at adoption since that time has been decreasing, however, though not to the ages seen in this study. The average age at adoption for children adopted within 24 months was just over 3 years old, while the average for those adopted in longer timeframes was almost 7 years old. The overall average age at adoption for the entire sample was 5.85 years old, which is somewhat younger than the most recently reported national average of

6.7 years old (AFCARS 2005 Preliminary Estimate).  This is an important positive finding, since numerous research studies have shown that being adopted at an older age is the primary determinant of disruption and dissolution of adoptions (AFCARS Adoption Data Research Brief #2).  Despite this fact, the number of children adopted over age 15 grew by more than five times between 1996 and 2003 nationally and some studies report high rates of satisfaction among adoptive parents of older children.

**Crosstabulation 42:  Child's Length of Stay * Child's Age on Entry Date**

| Child's Age on Entry Date (Categories) | Child's Length of Stay (Categories) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6 - 11 Months | | 12 - 23 Months | | 24 - 35 Months | | 36 - 47 Months | | 48+ Months | | Total | |
| | # | % | # | % | # | % | # | % | # | % | # | % |
| <1 Year Old | 3 | 10.0% | 11 | 36.7% | 10 | 33.3% | 3 | 10.0% | 3 | 10.0% | 30 | 100.0% |
| 1 - 5 Years Old | 0 | .0% | 5 | 14.7% | 5 | 14.7% | 12 | 35.3% | 12 | 35.3% | 34 | 100.0% |
| 6 - 11 Years Old | 0 | .0% | 3 | 23.1% | 2 | 15.4% | 4 | 30.8% | 4 | 30.8% | 13 | 100.0% |
| 13 - 17 Years Old | 0 | .0% | 0 | .0% | 0 | .0% | 2 | 66.7% | 1 | 33.3% | 3 | 100.0% |
| Total | 3 | 3.8% | 19 | 23.8% | 17 | 21.3% | 21 | 26.3% | 20 | 25.0% | 80 | 100.0% |
| p =.027; all cases valid | | | | | | | | | | | | |

**Crosstabulation 43:  Adoption Within 24 Months* Child's Age on Entry Date**

| Child's Age on Entry Date (Categories) | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <1 Year Old | 14 | 46.7% | 16 | 53.3% | 30 | 100.0% |
| 1 - 5 Years Old | 5 | 14.7% | 29 | 85.3% | 34 | 100.0% |
| 6 - 11 Years Old | 3 | 23.1% | 10 | 76.9% | 13 | 100.0% |
| 13 - 17 Years Old | 0 | .0% | 3 | 100.0% | 3 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.01; all cases valid | | | | | | |

**Crosstabulation 44:  Adoption within 24 months* Child's Age on Adoption Date**

| Child's Age on Adoption Date (Categories) | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <1 Year Old | 3 | 100.0% | 0 | .0% | 3 | 100.0% |
| 1 - 5 Years Old | 13 | 35.1% | 24 | 64.9% | 37 | 100.0% |
| 6 - 11 Years Old | 6 | 18.8% | 26 | 81.3% | 32 | 100.0% |
| 13 - 17 Years Old | 0 | .0% | 8 | 100.0% | 8 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.002; all cases valid | | | | | | |

Another method of summarizing the effects of children's age on how children progress towards adoption is by comparing the average ages of children whose episodes met or did not meet the standard at various important points in time.  The specific elements of case practice are further examined in the next section, but the following chart illustrates how much younger children whose episodes met the measure were at crucial decision points during their placement episodes than those

who did not meet the measure. It is also noteworthy that for children whose episodes are longer than 24 months, the filing for TPR usually happens at slightly earlier ages than when a pre-adoptive placement has been identified. This pattern is reversed for children whose episodes met the standard for timely adoption.

**Graph 1: Average Ages of Children at Junctures Within the Timeline to Adoption for Children with Episodes that Met/Did Not Meet the Standard for Timely Adoption**



While age appears to be playing a significant role in timely adoption, the children's gender, race and ethnicity do not appear to have such a relationship.

**Crosstabulation 45: Adoption within 24 months?* Child's Gender**

| Child's Gender | Adoption Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| **Male** | 8 | 19.5% | 33 | 80.5% | 41 | 100.0% |
| **Female** | 14 | 35.9% | 25 | 64.1% | 39 | 100.0% |
| **Total** | **22** | **27.5%** | **58** | **72.5%** | **80** | **100.0%** |

While children with Hispanic ethnicity were adopted within 24 months at a somewhat lower rate than non-Hispanics, there were no statistically significant differences found between racial or ethnic groups even when these variables were evaluated individually.

**Crosstabulation 46:  Adoption Within 24 Months?* Child's Ethnicity*Child's Race**

| Child's Ethnicity | Child's Race | Adoption Within 24 Months? | | | | Total | |
| | | Yes | | No | | | |
| | | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|---|
| Hispanic | Black/African American | 1 | 50.0% | 1 | 50.0% | 2 | 100.0% |
| | White | 1 | 9.1% | 10 | 90.9% | 11 | 100.0% |
| | UTD | 1 | 12.5% | 7 | 87.5% | 8 | 100.0% |
| | Multiracial | 0 | .0% | 1 | 100.0% | 1 | 100.0% |
| | Hispanic Sub-Total | 3 | 13.6% | 19 | 86.4% | 22 | 100.0% |
| Non-Hispanic | Asian | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| | Black/African American | 2 | 14.3% | 12 | 85.7% | 14 | 100.0% |
| | White | 11 | 35.5% | 20 | 64.5% | 31 | 100.0% |
| | Multiracial | 4 | 57.1% | 3 | 42.9% | 7 | 100.0% |
| | Non-Hispanic Sub-Total | 18 | 32.7% | 37 | 67.3% | 55 | 100.0% |
| Unknown | Black/African American | 0 | .0% | 1 | 100.0% | 1 | 100.0% |
| | UTD | 1 | 50.0% | 1 | 50.0% | 2 | 100.0% |
| | Unknown Sub-Total | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| | Total | 22 | 27.5% | 58 | 72.5% | 80 | |

**Placement Episode Characteristics:**

Data were also gathered to describe the children's placement episodes (from date of entry through legal discharge).  All but 16 (20%) of the children were experiencing their first episode in DCF care during the time period reviewed.  Twelve of the remaining children were on their second episode, while the remaining four were on their third.  While only three of the children on their second episode passed the measure, there were no statistically significant differences found between these groups and achieving timely adoption.

**Crosstabulation 47:  Adoption Within 24 Months? * Was this the First Placement Episode Experienced by this Child?**

| Was this the first placement episode experienced by this child? | Adoption Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| Yes | 18 | 28.1% | 46 | 71.9% | 64 | 100.0% |
| No | 4 | 25.0% | 12 | 75.0% | 16 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |

It was not surprising to find a significant relationship between identification of adoption as the child's primary permanency goal and the achievement of timely adoption.  Further, on average the identification of an adoptive resource family for children that did not meet the standard occurred after TPR had already been filed, while the opposite is true for children with timely adoptions.

105

**Crosstabulation 48:  Adoption Within 24 Months? * For How Long Had Adoption been the Primary Permanency Goal for this Child as of the Date Child's Fourth Quarter 2006 Adoption was Finalized?**

| For how long had Adoption been the primary permanency goal for this child as of the date child's Fourth Quarter 2006Adoption was finalized? | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <6 Months | 2 | 100.0% | 0 | .0% | 2 | 100.0% |
| 6 to <12 Months | 10 | 76.9% | 3 | 23.1% | 13 | 100.0% |
| 12 to <18 Months | 7 | 33.3% | 14 | 66.7% | 21 | 100.0% |
| 18 to <24 Months | 3 | 30.0% | 7 | 70.0% | 10 | 100.0% |
| ≥24 Months | 0 | .0% | 34 | 100.0% | 34 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p <.000; all cases valid | | | | | | |

Similarly, cases in which DCF has filed for TPR more quickly have significantly shorter lengths of stay than those with longer periods of time between a child's entry to foster care and TPR filing. While this should be interpreted as highlighting the need to ensure timely decision-making, children's best interest at the time of such decision-making should still be the most important consideration at that time.

**Crosstabulation 49:  Child's Length of Stay * Time from Entry to Date of TPR Filing**

| Time from Entry Date to TPR Filing (Categories) | Child's Length of Stay (Categories) | | | | | | | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6 - 11 Months | | 12 - 23 Months | | 24 - 35 Months | | 36 - 47 Months | | 48+ Months | | | |
| | # | % | # | % | # | % | # | % | # | % | # | % |
| <6 Months | 3 | 21.4% | 5 | 35.7% | 3 | 21.4% | 3 | 21.4% | 0 | .0% | 14 | 100.0% |
| 6 - 11 Months | 0 | .0% | 8 | 50.0% | 4 | 25.0% | 3 | 18.8% | 1 | 6.3% | 16 | 100.0% |
| 12 - 23 Months | 0 | .0% | 6 | 20.0% | 9 | 30.0% | 9 | 30.0% | 6 | 20.0% | 30 | 100.0% |
| Total | 3 | 5.0% | 19 | 31.7% | 16 | 26.7% | 15 | 25.0% | 7 | 11.7% | 60 | 100.0% |
| p =.024; all cases valid | | | | | | | | | | | | |

It is also more likely that timely adoption occurs in cases where the time from TPR filing to when the court grants the petition lasts between 3 and 6 months.  Cases with short times from filing to petition granted often already had experienced longer times in foster care, and those with longer times from filing to petition granted simply had less time until the 24 month mark was passed.  Further, there were nine cases in which the court process was lengthened by an appeal of the court's decision by a parent; none of which achieved timely adoptions.

**Crosstabulation 50:  Adoption Within 24 Months? * Time from TPR Filing to TPR Granted**

| Time from TPR Filing to TPR Granted (Categories) | Adoption Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| <3 Months | 7 | 33.3% | 14 | 66.7% | 21 | 100.0% |
| 3 - 6 Months | 8 | 61.5% | 5 | 38.5% | 13 | 100.0% |
| 6 - 11 Months | 5 | 21.7% | 18 | 78.3% | 23 | 100.0% |
| 12 - 17 Months | 2 | 14.3% | 12 | 85.7% | 14 | 100.0% |
| 18 - 23 Months | 0 | .0% | 5 | 100.0% | 5 | 100.0% |
| 24+ Months | 0 | .0% | 4 | 100.0% | 4 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.024; all cases valid | | | | | | |

The process following the court's appointment of DCF as a child's statutory parent that leads to adoption also had a significant relationship with ensuring timely adoption.  Cases where this process was shorter were adopted within 24 months significantly more often than those that were longer. Nationally (see AFCARS resources cited above), there has been little change in the average time from TPR to adoption, with an average of 1.32 years from 2001 – 2004, then dropping to 1.27 in 2005.  It should also be noted that only 16 states reported shorter times from TPR to adoption in 2005, with CT reporting an average of 1.08 years (see AFCARS Time Between TPR and Finalization, 2005).  The average of .82 years observed in this review sample was therefore much faster than both the national average and the last reported state average.  Further, the average time for children that met the standard was only 4 months, and those that didn't meet the standard were just under 12 months.

**Crosstabulation 51:  Adoption within 24 months? * Time from TPR Granted to Adoption Finalized**

| Time from TPR Granted to Adoption Finalized (Categories) | OM.10b. Adoption Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| <3 Months | 5 | 55.6% | 4 | 44.4% | 9 | 100.0% |
| 3 - 6 Months | 14 | 56.0% | 11 | 44.0% | 25 | 100.0% |
| 6 - 11 Months | 3 | 13.0% | 20 | 87.0% | 23 | 100.0% |
| 12 - 17 Months | 0 | .0% | 11 | 100.0% | 11 | 100.0% |
| 18 - 23 Months | 0 | .0% | 7 | 100.0% | 7 | 100.0% |
| 24+ Months | 0 | .0% | 5 | 100.0% | 5 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.024; all cases valid | | | | | | |

**Crosstabulation 52: Was this Adoptive Resource a Legal Risk Home? * Time from Entry Date to TPR Filing**

| Time from Entry Date to TPR Filing (Categories) | Was this adoptive resource a Legal Risk home? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <6 Months | 9 | 64.3% | 5 | 35.7% | 14 | 100.0% |
| 6 - 11 Months | 8 | 50.0% | 8 | 50.0% | 16 | 100.0% |
| 12 - 23 Months | 7 | 23.3% | 23 | 76.7% | 30 | 100.0% |
| 24 - 35 Months | 1 | 8.3% | 11 | 91.7% | 12 | 100.0% |
| 36 - 47 Months | 2 | 50.0% | 2 | 50.0% | 4 | 100.0% |
| 48+ Months | 0 | .0% | 4 | 100.0% | 4 | 100.0% |
| Total | 27 | 33.8% | 53 | 66.3% | 80 | 100.0% |

Legal Risk foster homes were more often used when times from child's entry date to TPR filing were short. While the use of Legal Risk homes did not also significantly shorten time from TPR granted to adoption, cases where they were used did meet the adoption measure significantly more often than those that did not. This likely should be interpreted as a proxy for earlier decision-making, rather than an effect of the placement type on the adoption process. Of the cases that achieved adoption within 24 months, there were several cases where children (mostly infants) were moved to a legal risk or pre-adoptive home within 6 months from their initial placement. In these cases it was also observed that the legal process was expedited either by parents' consent to TPR, and/or TPR being filed relatively quickly after the child entered care. These cases also had uniformly positive reviews and comments concerning supervisory practices, including clear directives, timelines and thorough ongoing assessments of the case.

Several of the cases that did not achieve adoption within 24 months were moved into legal risk homes much later during their episodes, which also meant that the decision to file TPR came later as well. In some of these cases, the court had required DCF to provide more intensive reunification efforts prior to TPR. In other cases, the parents contested the TPR once filed which also delayed the adoption process. In many of these cases, poor supervision played a role as reviewers also observed that supervisory narratives lacked a thorough assessment, directives, and clear timeframes for workers. There also was at least one occasion when a Legal Risk home was not used because DCF worked well to identify a former foster parent as an adoptive resource for the child.

**Crosstabulation 53: Adoption within 24 months? * Was this Adoptive Resource a Legal Risk Home?**

| CM.22. Was this adoptive resource a Legal Risk home? | OM.10b. Adoption Within 24 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Yes | 12 | 44.4% | 15 | 55.6% | 27 | 100.0% |
| No | 10 | 18.9% | 43 | 81.1% | 53 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.017; all cases valid | | | | | | |

A child's primary placement type (the type of placement in which they spent >50% of their episode) did not have a significant relationship with achieving the outcome. All primary placement types were some form of family foster care, most often in-state non-relative (33) followed by in-state relatives (18). Both had adoptions within 24 months at almost same rate, 24 and 22% respectively. It is possible that if children whose primary placement types were some form of congregate care had been included in the sample, these results would have been different.

Only five children experienced multiple pre-adoptive placements and none had more than two such placements. None of the children that experienced two pre-adoptive placements achieved timely adoption, which is not surprising in light of the time and effort expended in matching children to pre-adoptive families. There was no statistically significant relationship between the amount of placement instability experienced by children and whether timely adoption was achieved, though all those episodes with six or more placements did not meet the standard. In one case that had more than six placements documented, the child had significant mental/behavioral health problems and was difficult to maintain in a stable placement. Reviewers also noted in this case that the supervision provided poor assessments of the case situation over time. That child's parents ultimately consented to TPR so the length of the court process was not a barrier. Conversely, in another case where the child was maintained in one placement the parents contested the TPR and the legal process did contribute much more to the overall length of stay. Supervision in that case was noted by reviewers to be of high quality, with consistently thorough case assessments.

**Crosstabulation 54: Adoption Within 24 Months? * Total Placements During Placement Episode**

| Total Placements During Placement Episode | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| 1 Placement | 8 | 34.8% | 15 | 65.2% | 23 | 100.0% |
| 2 Placements | 8 | 29.6% | 19 | 70.4% | 27 | 100.0% |
| 3 - 5 Placements | 6 | 26.1% | 17 | 73.9% | 23 | 100.0% |
| 6+ Placements | 0 | .0% | 7 | 100.0% | 7 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |

Even though the foster parents for 50 children (62.5%) ultimately decided to adopt, the percentage of children meeting the measure was not significantly better than for children adopted by people that had never cared for the children previously. In fact, these rates were slightly lower at meeting the measure overall.

**Crosstabulation 55: Adoption Within 24 Months? * Did this Home Originally Provide Foster Care for this Child but Ultimately Decided to Adopt?**

| OM.9b. Did this home originally provide Foster Care for this child, but ultimately decided to adopt? | OM.10b. Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Yes | 12 | 24.0% | 38 | 76.0% | 50 | 100.0% |
| No | 10 | 33.3% | 20 | 66.7% | 30 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |

Reviewers found documented discussions of risk factors in supervision notes in 56 (70%) cases, but clearly documented directives re: the handling of those factors in only 16 cases. There did not appear to be a relationship between these factors and timely adoption. Reviewers were also asked to provide their overall impression of the quality of supervision, which shows that cases with more highly rated supervision had significantly better results in achieving the outcome.

**Crosstabulation 56:  Adoption Within 24 months? * Overall Quality of Supervision**

| Overall Quality of Supervision | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Excellent | 7 | 41.2% | 10 | 58.8% | 17 | 100.0% |
| Good | 15 | 31.3% | 33 | 68.8% | 48 | 100.0% |
| Poor | 0 | .0% | 15 | 100.0% | 15 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.022; all cases valid | | | | | | |

There were two cases in which the children were not registered with Adoption Resource Exchange (ARE). Both had stable placements with relatives who ended up adopting them. In both cases reviewers found that the quality of supervision provided was good, although neither supervisor directed workers to register the children with ARE in accordance with DCF policy and procedure.

Only 18 (22.5%) children received post-adoptive services, and while all but three of them did not achieve a timely adoption there was not a statistically significant relationship between these two variables. It was also found that only three children were receiving services through the Community Collaboratives, and none of those passed the measure either. On the other hand, all but two of the adoptive families reviewed are receiving subsidy payments and/or medical benefits for their adopted children. In both the remaining two cases, the children were adopted as perfectly healthy infants with no siblings so they did not have a need for a subsidy.

**Timely Adoption Outcome**
Overall, 22 children (27.6%) in the sample achieved their adoptions within the required 24 month standard. Lengths of stay ranged from 6 – 112 months, with a median length of stay of 36 months. All but one case had lengths of stay less than 77 months, except one outlier at 112 months to finalization.

**Table 25:  Children's Length of Stay During Placement Episode Ending with Fourth Quarter 2006 Adoption**

| Categorized Length of Stay (Months) | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 6 - 11 Months | 3 | 3.8 | 3.8 |
| 12 - 23 Months | 19 | 23.8 | 27.6 |
| 24 - 35 Months | 17 | 21.3 | 48.9 |
| 36 - 47 Months | 21 | 26.3 | 75.2 |
| 48+ Months | 20 | 25.0 | 100.0 |
| Total | 80 | 100.0 | |

Given the relatively small sample size, it was not possible to produce a valid comparison among offices, so the following table should be considered strictly descriptive.

**Crosstabulation 57:  Adoption Within 24 Months? * Area Office Assignment**

| Area Office Assignment | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Bridgeport | 0 | .0% | 4 | 100.0% | 4 | 100.0% |
| Danbury | 0 | .0% | 3 | 100.0% | 3 | 100.0% |
| Greater New Haven | 1 | 50.0% | 1 | 50.0% | 2 | 100.0% |
| Hartford | 3 | 27.3% | 8 | 72.3% | 11 | 100.0% |
| Manchester | 3 | 37.5% | 5 | 62.5% | 8 | 100.0% |
| Meriden | 1 | 25.0% | 3 | 75.0% | 4 | 100.0% |
| Middletown | 0 | .0% | 2 | 100.0% | 2 | 100.0% |
| New Britain | 1 | 11.1% | 8 | 88.9% | 9 | 100.0% |
| New Haven Metro | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| Norwalk | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| Norwich | 6 | 54.5% | 5 | 45.5% | 11 | 100.0% |
| Stamford | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| Torrington | 2 | 40.0% | 3 | 60.0% | 5 | 100.0% |
| Waterbury | 1 | 25.0% | 3 | 75.0% | 4 | 100.0% |
| Willimantic | 1 | 12.5% | 7 | 87.5% | 8 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |

Reviewers believed adoption was in the child's best interest at this time in all but four cases, none of which met the measure.  Reviewers observed poorly documented supervision in all of these cases, and several of the adoptive families had histories of substantiated neglect allegations overturned on appeal. Two of the families had also been initially rejected by the Permanency Planning Teams (PPT), whose decisions were later overturned by Area Office managers.  On a more positive note, all four adoptive families are receiving subsidies to assist with ensuring stable adoptions.

Reviewers also provided their opinions on the overall quality of case practice during the child's episode in care.  It is important to note both that relatively few, 17 (21.3%), cases had less than desirable quality according to reviewers.  Further, it was found that higher levels of quality for overall case practice had a significant relationship with achieving timely adoptions.

**Crosstabulation 58:  Adoption Within 24 Months? * Overall Quality of Case Practice During Placement Episode Ending in Fourth Quarter 2006 Adoption**

| Overall quality of Case Practice during placement episode ending in Fourth Quarter 2006 Adoption | Adoption Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Optimal | 10 | 45.5% | 12 | 54.5% | 22 | 100.0% |
| Very Good | 12 | 29.3% | 29 | 70.7% | 41 | 100.0% |
| Marginal | 0 | .0% | 17 | 100.0% | 17 | 100.0% |
| Total | 22 | 27.5% | 58 | 72.5% | 80 | 100.0% |
| p =.007; all cases valid | | | | | | |

The success of a child's adoption must also be measured by the stability of permanency after discharge, so reviewers were also asked to determine whether a child had re-entered foster.  However, this review was not designed to measure "Re-Entry", only discharge, and only three to six months of observation time elapsed between the children's discharges and dates of review.  None of the children reviewed had re-entered as of the date of this review, however, this should be interpreted only as an indication that children who exit to adoption might take longer to re-enter than from other types of permanent exits.

## Outcome Measure 9 - Transfer of Guardianship

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct a series of reviews on the 22 outcome measures resulting in a full status report in April 2007. This review, Outcome Measure 9: Transfer of Guardianship (TOG) is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor regarding the instances of Transfers of Guardianship (TOG). **Outcome Measure 9: Transfer of Guardianship requires that DCF comply and sustain the following level of practice related to TOG:**

> *"At least 70% of all children whose custody is legally transferred shall have their guardianship transferred within 24 months of the child's most recent removal from his/her home."*

The Monitor's Office conducted a qualitative review of 80 of the 106 children that were discharged from DCF custody to TOG during the quarter of October 1, 2006 through December 31, 2006. A pilot test was conducted during March to ensure that issues of reliability and validity could be addressed prior to initiating the full review. The LINK record review was then conducted between May and July, 2007, by DCF Court Monitor review staff and DCF personnel.

**Review Findings and Trends**
Since the sample is composed entirely of children that exited DCF care during Fourth Quarter 2006, the results are solely applicable to that group. Results should not be generalized to the entire population of children either entering or already in DCF care at that time, though certainly the findings can point to systemic factors in a qualitative manner. A number of factors were found to have statistically significant relationships with achievement of the outcome measure standard for the group of children reviewed. These factors include:

- Children within the sample achieved timely TOG in 76.3% of the cases reviewed (n=80). The full universe of children with TOG during the quarter (N=106) had timely permanency via TOG in 76.4% cases.
- Children who had TOG occur within 24 months had no statistically significant differences in demographics when compared to those whose episodes lasted longer. However, children within the exit cohort did tend to be slightly older, and were predominantly children of color.
- Cases of children who had TOG occur within 24 months exhibited several signs of timely decision-making by social work staff that included:
  - Shorter times between entry to foster care and identification of the guardian resource
  - Shorter times between entry to foster care and placement with the guardian resource
  - More evidence of family conferencing and other engagement practices
  - Shorter time between identification of TOG as the primary permanency goal and court approval of the TOG
- In only 8 cases (10%) did reviewers believe that TOG was not in the child's best interest at the time of the child's TOG. While all of these cases met the measure, reviewers felt that the children's discharges occurred too quickly for a variety of reasons that most often had to do with concerns about what the families would do after DCF closed its case.
- Reviewers felt that the vast majority of these children received better than average quality case practice from DCF throughout their placement episodes. There were 64 (80%) rated as "Very Good" or "Optimal", and only two cases rated as "Poor." Further, approximately 80% of the 64 cases rated positively achieved the standard for timely guardianship, as did both cases that were rated as receiving "Poor" quality case practice.

**Methodology**

The Monitor's Office requested that the Department provide the universe of all children that were discharged from DCF custody during the quarter of October 1, 2006 through December 31, 2006. This request was fulfilled with the submittal of an Excel Database including 106 children. Sampling methodology agreed upon by the parties allowed for a qualitative sample of 80 cases, though quantitatively this equates to a 92.5% Confidence Interval with a 5% margin of error.

The LINK record review was conducted between May and July 2007. DCF Court Monitor review staff and six DCF personnel assisted in the data collection efforts. A pilot test was conducted during the last week of February to ensure that issues of reliability and validity could be addressed prior to initiating the full review. Necessary changes and training were conducted to improve validity and reliability of scoring.

The sample set population includes children from each of the Area Offices as follows:

**Table 26: Universe (N=106) and Sample Set (n =80) Designation by Area Office**

| Area Office | Number of Children in Universe | % of Universe | Number of Children in Sample Set | % of Sample Set |
|---|---|---|---|---|
| Bridgeport Office | 11 | 10% | 8 | 10% |
| Danbury Office | 6 | 6% | 5 | 6% |
| Greater New Haven | 11 | 10% | 8 | 10% |
| Hartford Office | 5 | 5% | 4 | 5% |
| Manchester Office | 17 | 16% | 12 | 15% |
| Meriden Office | 7 | 7% | 5 | 6% |
| Middletown Office | 2 | 2% | 2 | 3% |
| New Britain Office | 9 | 8% | 7 | 9% |
| New Haven Metro | 15 | 14% | 11 | 14% |
| Norwalk Office | 5 | 5% | 4 | 5% |
| Norwich Office | 7 | 7% | 5 | 6% |
| Stamford Office | 0 | 0% | 0 | 0% |
| Torrington Office | 1 | 1% | 1 | 1% |
| Waterbury Office | 8 | 8% | 6 | 8% |
| Willimantic Office | 2 | 2% | 2 | 3% |
| Grand Total | 106 | 100% | 80 | 100% |

**Descriptive Information**

Reviewers collected several pieces of data that described the population reviewed. The first of these was the date each case was opened for services (starting with investigation) by DCF. There were significant differences between groups of cases that met the measure and those that did not in terms of how long it took from the time the case opened until the child actually entered DCF care. Cases met the standard for timely guardianship at a much higher rate when children entered care at either the one to three month mark or more than one year after the family case opening when compared to those entering care immediately or after an intermediate length of time. In cases of immediate removal, the importance of immediate exploration of kinship resources was observed as crucial to meeting the standard for timely guardianship. In one such case, the DCF investigator was able to identify several resources right away and placed the child with a relative almost immediately. Unfortunately that placement was unable to keep the child due to the caregiver's frail health. The child was able to transition to a second relative's home with little difficulty or delay as they were already assessed as appropriate. The second relative eventually took guardianship of the child within 15 months of the

114

child's removal from the parents. In another example of an immediate removal that did not result in timely guardianship, the reasons for delay had everything to do with the parent's inability to rehabilitate and nothing to do with exploration of kin resources as the child had been placed with a grandparent only two months after entry to DCF care. Other reasons for delay observed by reviewers included poor supervision and complex mental health and substance abuse issues of parents.

**Crosstabulation 59: TOG Within 24 Months? * Time from Case Open to Entry Date**

| Time from Case Open to Entry Date (Categories) | TOG Within 24 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Same Day | 14 | 58.3% | 10 | 41.7% | 24 | 100.0% |
| 1 – 3 Months | 19 | 100.0% | 0 | .0% | 19 | 100.0% |
| 4 – 6 Months | 2 | 28.6% | 5 | 71.4% | 7 | 100.0% |
| 7 – 11 Months | 8 | 72.7% | 3 | 27.3% | 11 | 100.0% |
| 12+ Months | 18 | 94.7% | 1 | 5.3% | 19 | 100.0% |
| **Total** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |
| p =.000; all cases valid | | | | | | |

There were no statistically significant differences among children of different age groups in meeting the outcome standard for timely guardianship. However, children in older age ranges did tend to have guardianships finalized at slightly higher rates than younger children.

**Crosstabulation 60: TOG Within 24 Months? * Age at Entry**

| Age at Entry (Categories) | TOG Within 24 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <1 Year Old | 9 | 64.3% | 5 | 35.7% | 14 | 100.0% |
| 1 – 5 Years Old | 19 | 65.5% | 10 | 34.5% | 29 | 100.0% |
| 6 – 11 Years Old | 21 | 87.5% | 3 | 12.5% | 24 | 100.0% |
| 12 – 17 Years Old | 12 | 92.3% | 1 | 7.7% | 13 | 100.0% |
| **Total** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

**Crosstabulation 61: TOG Within 24 Months? * Age at TOG**

| Age at TOG (Categories) | TOG Within 24 Months? | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <1 Year Old | 2 | 100.0% | 0 | .0% | 2 | 100.0% |
| 1 – 5 Years Old | 24 | 72.7% | 9 | 27.3% | 33 | 100.0% |
| 6 – 11 Years Old | 19 | 70.4% | 8 | 29.6% | 27 | 100.0% |
| 12 – 17 Years Old | 16 | 88.9% | 2 | 11.1% | 18 | 100.0% |
| **Total** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

The gender of children also had no statistically significant impact on achieving the outcome standard for timely guardianship.

**Crosstabulation 62: TOG Within 24 Months? Child's Gender**

| Child's Gender | TOG Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| Male | 27 | 73.0% | 10 | 27.0% | 37 | 100.0% |
| Female | 34 | 79.1% | 9 | 20.9% | 43 | 100.0% |
| Total | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

There is no statistically significant difference related to racial or ethnic groups and achievement of timely TOG. However, it is important to note that African-Americans (31.3%) and Hispanic children (42.5%) comprise the vast majority of the children reviewed within our sample.

**Crosstabulation 63: TOG Within 24 months? * Child's Ethnicity * Child's Race**

| Child's Ethnicity | Child's Race | TOG Within 24 Months? | | | | Total | |
| | | Yes | | No | | | |
| | | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|---|
| Hispanic | Black/African American | 4 | 100.0% | 0 | .0% | 4 | 100.0% |
| | White | 16 | 72.7% | 6 | 27.3% | 22 | 100.0% |
| | UTD | 2 | 40.0% | 3 | 60.0% | 5 | 100.0% |
| | Multiracial | 1 | 33.3% | 2 | 66.7% | 3 | 100.0% |
| | Hispanic Total | 23 | 67.6% | 11 | 32.4% | 34 | 100.0% |
| Non-Hispanic | American Indian/Alaskan Native | 1 | 100.0% | 0 | .0% | 1 | 100.0% |
| | Asian | 1 | 100.0% | 0 | .0% | 1 | 100.0% |
| | Black/African American | 18 | 90.0% | 2 | 10.0% | 20 | 100.0% |
| | White | 14 | 73.7% | 5 | 26.3% | 19 | 100.0% |
| | UTD | 1 | 100.0% | 0 | .0% | 1 | 100.0% |
| | Multiracial | 1 | 100.0% | 0 | .0% | 1 | 100.0% |
| | Non-Hispanic Total | 36 | 83.7% | 7 | 16.3% | 43 | 100.0% |
| Unknown | Black/African American | 1 | 100.0% | | | 1 | 100.0% |
| | White | 1 | 100.0% | | | 1 | 100.0% |
| | Unknown Total | 2 | 100.0% | | | 2 | 100.0% |
| Blank | White | | | 1 | 100.0% | 1 | 100.0% |
| | Blank Total | | | 1 | 100.0% | 1 | 100.0% |
| | Total | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

**Placement Episode Characteristics**

There were no statistically significant differences found between children who were experiencing their first placement episode and those that had previous episodes on outcome compliance. No children had more than two prior episodes, and all five of those with two prior episodes met the standard for timely guardianship. In fact, those five children's lengths of stay ranged from only ten months to 19 months, with an average of 14.5 months.

**Crosstabulation 64:  TOG Within 24 Months? * Was this the First Removal Episode Experienced by this Child?**

| Was this the first removal from home experienced by this child? | TOG Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| **Yes** | 45 | 75.0% | 15 | 25.0% | 60 | 100.0% |
| **No** | 16 | 80.0% | 4 | 20.0% | 20 | 100.0% |
| **1 Prior Episode** | 11 | 73.3% | 4 | 26.7% | 15 | 100.0% |
| **2 Prior Episodes** | 5 | 100.0% | | | 5 | 100.0% |
| **Total** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

Substance abuse as a reason for children's entry into foster care figured prominently in the episodes of the children reviewed.  It was second only to substantiated neglect.  In 29 of the 42 cases (69%) where substance abuse was a reason for entry the case met the measure.  While this is somewhat worse than the 32 (84%) of the remaining 38 cases for which substance abuse was not an entry reason, there is no statistically significant relationship on this variable.  In several of the cases where substance abuse was a reason, but the child's episode met the standard for timely TOG, parents had extensive and well-documented substance abuse histories and exhibited little sign of engaging in recovery.  In one such case that did not meet the standard, DCF had placed the children with a relative soon after entry but that placement disrupted before TOG could occur.  After several more months another relative was found, but then DCF had to wait the required six months prior to finalizing a TOG so that subsidy could be given to support the relative and help prevent re-entry.

**Crosstabulation 65:  TOG within 24 months? * Reason for Child's Entry into DCF Placement**

| Reasons for Child's Entry into DCF Placement (Multiple Response) | TOG Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| **Child's Mental Health** | 3 | 100.0% | 0 | .0% | 3 | 100.0% |
| **Parent/Guardian's Incarceration** | 4 | 50.0% | 4 | 50.0% | 8 | 100.0% |
| **Parent/Guardian's Whereabouts Unknown** | 3 | 100.0% | 0 | .0% | 3 | 100.0% |
| **Parent/Guardian's Mental Health** | 9 | 90.0% | 1 | 10.0% | 10 | 100.0% |
| **Parent/Guardian's Substance Abuse** | 29 | 69.0% | 13 | 31.0% | 42 | 100.0% |
| **Substantiated Abuse** | 10 | 66.7% | 5 | 33.3% | 15 | 100.0% |
| **Substantiated Neglect** | 41 | 73.2% | 15 | 26.8% | 56 | 100.0% |
| **Other** | 25 | 96.2% | 1 | 3.8% | 26 | 100.0% |
| **Total[18]** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

As expected, the more quickly Social Workers were able to identify a potential guardianship resource as such following a child's entry and the more quickly they were able to place the child in their home, the more likely they were to exit within 24 months.

---

[18] *Total is based on cases; counts of individual reasons are based on responses.

**Crosstabulation 66: TOG Within 24 Months? * Time From Entry Date to Identification of Eventual Guardian**

| Time from Entry Date to Identification of eventual Guardian (Categories) | TOG Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Day of Entry | 11 | 91.7% | 1 | 8.3% | 12 | 100.0% |
| 1 - 3 Months | 19 | 90.5% | 2 | 9.5% | 21 | 100.0% |
| 4 - 6 Months | 12 | 75.0% | 4 | 25.0% | 16 | 100.0% |
| 7 - 11 Months | 15 | 75.0% | 5 | 25.0% | 20 | 100.0% |
| 12+ Months | 4 | 36.4% | 7 | 63.6% | 11 | 100.0% |
| Total | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |
| p =.009; all cases valid | | | | | | |

**Crosstabulation 67: TOG Within 24 Months? * Time From Entry Date to Placement with Eventual Guardian**

| Time from Entry Date to Placement with eventual Guardian (Categories) | TOG Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Day of Entry | 35 | 87.5% | 5 | 12.5% | 40 | 100.0% |
| 1 - 3 Months | 7 | 70.0% | 3 | 30.0% | 10 | 100.0% |
| 4 - 6 Months | 7 | 87.5% | 1 | 12.5% | 8 | 100.0% |
| 7 - 11 Months | 8 | 88.9% | 1 | 11.1% | 9 | 100.0% |
| 12+ Months | 4 | 30.8% | 9 | 69.2% | 13 | 100.0% |
| Total | 61 | 76.3% | 19 | 23.8% | 80 | **100.0%** |
| p =.001; all cases valid | | | | | | |

As expected, most of these children spent the majority of their episodes in either relative or special study type placements. There were actually only two children that primarily spent their episodes in special study homes, both of which achieved the standard for timely guardianship. Further, both of the children that primarily spent their time in SAFE Homes also met the standard for timely guardianship, although their lengths of stay in those SAFE Homes were mixed; one being less than a month and the other remaining in the SAFE Home for just over seven months. The latter child had significant mental health issues for which he received treatment while in the SAFE Home, and he benefited from the stability of staying in that placement his entire episode. The sole child with an "Other" primary type had actually been placed with a relative in an unlicensed placement during his episode. The grandparents were not able to be licensed due to past DCF and criminal history, but all parties felt it in the best interest of the children to allow the court to transfer guardianship to them anyway.

**Crosstabulation 68:  TOG Within 24 Months? * Primary Placement (> 50% of the episode)**

| Primary Placement (>50%) (Categories) | TOG Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| **Relative/Special Study Foster Care** | 52 | 74.3% | 18 | 25.7% | 70 | 100.0% |
| **Non-Relative Foster Care** | 6 | 85.7% | 1 | 14.3% | 7 | 100.0% |
| **SAFE Home/Other** | 3 | 100.0% | 0 | .0% | 3 | 100.0% |
| **Total** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

Reviewers were asked several questions concerning their opinions about supervision based on their reading of the case.  None of these factors showed a significant relationship with achieving timely transfers of guardianship.

- There were 16 cases (20%)  where reviewer felt identified risk factors were not discussed/documented in supervisory conferences.
- There were 14 cases (18%) where reviewer felt there were additional risk factors not identified by the SW or SWS.
- In 4 cases (7%) the reviewer felt there were no clear directives to deal with known risks.
- In 17 cases (21%) the reviewer felt the overall quality of supervision was "Poor".

However, reviewers found documentation of family conferencing and other engagement strategies employed in 53 (67%) cases.  Cases where at least some form of engagement strategies were documented as employed were significantly more likely to achieve TOG within 24 months.  In most of these cases, employment of such strategies resulted in early identification of, and placement into relative (mostly maternal) homes.  In two such cases reviewed, extensive contact with and ongoing support of relative providers assisted in ensuring timely discharge for the child.  In another, mother's acknowledgement of her substance abuse issues and inability to provide long-term care for her child also contributed to timely discharge.

**Crosstabulation 69:  TOG Within 24 Months? * Is There Evidence that Family Conferencing or Other Engagement Activities Were Attempted by DCF to Successfully Discharge Child from Care?**

| Is there evidence that family conferencing/other engagement activities attempted by DCF to successfully discharge child from care? | TOG Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| **Family Conference Part of Engagement** | 16 | 88.9% | 2 | 11.1% | 18 | 100.0% |
| **Other Forms of Engagement Only** | 29 | 82.9% | 6 | 17.1% | 35 | 100.0% |
| **No Engagement Strategies Documented** | 16 | 59.3% | 11 | 40.7% | 27 | 100.0% |
| **Total** | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |
| p =.035; all cases valid | | | | | | |

As expected, most cases that achieved the outcome measure had only had TOG as the primary permanency goal for 12 months or less as of the date the child's TOG was finalized.

**Crosstabulation 70:  TOG Within 24 Months? * For How Long Had TOG Been the Primary Permanency Goal for this Child as of the Date of Child's TOG Finalization?**

| For how long had TOG been the primary Permanency goal for this child, as of the date child's TOG finalization? | TOG Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| <6 months | 17 | 89.5% | 2 | 10.5% | 19 | 100.0% |
| 6 to <12 months | 36 | 90.0% | 4 | 10.0% | 40 | 100.0% |
| 12 to <18 months | 7 | 58.3% | 5 | 41.7% | 12 | 100.0% |
| 18 to <24 months | 1 | 14.3% | 6 | 85.7% | 7 | 100.0% |
| ≥24 months | 0 | .0% | 2 | 100.0% | 2 | 100.0% |
| Total | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |
| p =.000; all cases valid | | | | | | |

There were 15 (18.8%) cases that were not subsidized guardianships, and all but one of these met the standard for timely guardianship.  In that case, there were concerns with the caregiver's health that delayed finalization past 24 months.  Only three cases were documented as having some form of after-care services provided, though there is documentation that such services were offered and declined by the families in eleven additional cases.  However, none of these children had re-entered DCF care as of the dates of their review, so at least the short-term stability appears to be positive in spite of the lack of services.

Overall, 61 (76.3%) of the 80 children reviewed had lengths of stay less than 24 months, with a range from less than 1 month to 46 months.  The average length of stay was 18.2 months, with a median of 17 months.

**Table 27:  Categorized Length of Stay for Children Achieving TOG During the Period**

| Categorized Length of Stay (Months) | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| <6 Months | 5 | 6.3 | 6.3 |
| 6 - 11 Months | 14 | 17.5 | 23.8 |
| 12 - 23 Months | 42 | 52.5 | 76.3 |
| 24 - 35 Months | 15 | 18.8 | 95.0 |
| 36 - 47 Months | 4 | 5.0 | 100.0 |
| Total | 80 | 100.0 | |

Given the relatively small sample size, it was not possible to produce a valid comparison among offices, so the following table should be considered strictly descriptive.

**Crosstabulation 71:  TOG Within 24 Months? * Area Office Assignment**

| Area Office | TOG Within 24 Months? | | | | Total | |
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|
| Bridgeport | 5 | 71.4% | 2 | 28.6% | 7 | 100.0% |
| Danbury | 5 | 100.0% | 0 | .0% | 5 | 100.0% |
| Greater New Haven | 8 | 100.0% | 0 | .0% | 8 | 100.0% |
| Hartford | 1 | 25.0% | 3 | 75.0% | 4 | 100.0% |
| Manchester | 10 | 76.9% | 3 | 23.1% | 13 | 100.0% |
| Meriden | 2 | 40.0% | 3 | 60.0% | 5 | 100.0% |
| Middletown | 2 | 100.0% | 0 | .0% | 2 | 100.0% |
| New Britain | 6 | 75.0% | 2 | 25.0% | 8 | 100.0% |
| New Haven Metro | 10 | 90.9% | 1 | 9.1% | 11 | 100.0% |
| Norwalk | 4 | 100.0% | 0 | .0% | 4 | 100.0% |
| Norwich | 3 | 60.0% | 2 | 40.0% | 5 | 100.0% |
| Torrington | 1 | 100.0% | 0 | .0% | 1 | 100.0% |
| Waterbury | 3 | 60.0% | 2 | 40.0% | 5 | 100.0% |
| Willimantic | 1 | 50.0% | 1 | 50.0% | 2 | 100.0% |
| Bridgeport | 5 | 71.4% | 2 | 28.6% | 7 | 100.0% |
| Total | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

In only 8 (10%) of the cases did reviewers believe that TOG was not in the child's best interest at the time of their finalization.  While all of these cases met the measure, reviewers felt that the children's discharges occurred too quickly for a variety of reasons that most often had to do with concerns about what the families would do after DCF closed its case.  In several instances, reviewers thought that families would allow parents greater access to children than was safe or would terminate children's involvement in therapeutic services with which they disagreed.  In one case regarding a pair of siblings, the reviewer felt that social work staff did not recognize warning signs of ongoing substance abuse within the relative families and worried about repeat maltreatment within the guardian's home.

Reviewers felt that the vast majority of these children received better than average quality case practice from DCF throughout their placement episodes.  There were 64 (80%) rated as "Very Good" or "Optimal", and only two cases rated as "Poor."  Further, approximately 80% of the 64 cases positively rated achieved the standard for timely guardianship, as did both cases that were rated as "Poor" quality case practice.  Those two cases are the same as those briefly described above where the reviewer did not feel that TOG was in the children's best interest due to warning signs of substance abuse in the relative family.

**Crosstabulation 72:  TOG Within 24 Months? * Overall Quality of Case Practice During Placement Episode Ending in Fourth Quarter 2006 TOG**

| Overall quality of Case Practice during placement episode ending in Fourth Quarter 2006 TOG | TOG Within 24 Months? | | | | Total | |
|---|---|---|---|---|---|---|
| | Yes | | No | | | |
| | Count | % | Count | % | Count | % |
| Optimal | 17 | 81.0% | 4 | 19.0% | 21 | 100.0% |
| Very Good | 34 | 79.1% | 9 | 20.9% | 43 | 100.0% |
| Marginal | 8 | 57.1% | 6 | 42.9% | 14 | 100.0% |
| Poor | 2 | 100.0% | 0 | .0% | 2 | 100.0% |
| Total | 61 | 76.3% | 19 | 23.8% | 80 | 100.0% |

## Outcome Measure 10:  Sibling Placement

**Overview**

The DCF Court Monitor's Office is required by the Revised *Juan F*. v Rell Exit Plan to monitor the Department's performance related to Outcome Measure 10:  Sibling Placement.  **Outcome Measure 10 requires that,**

*"At least 95% of the siblings entering out-of-home placement shall be placed together unless there are documented therapeutic reasons for separate placements."*

1. *Therapeutic reasons include such things but are not limited to situations where siblings are placed with multiple relatives, one (1) sibling requires hospitalization and others do not, one (1) sibling requires detention, or where siblings were abused by another sibling, etc.  The therapeutic reason siblings must be placed apart shall be documented in LINK by the DCF supervisor.*

2. *Siblings are defined as at least two children who share, at minimum, one biological or adoptive parent, or who reside in the home and have relationship through parents/guardians who have an adult legal relationship.*

3. *The universe of siblings is limited to children under the custody of DCF with a legal status of "OTC", "committed", or "commitment-dual."  TPR children are excluded from this universe."*

The Department's Office of Results Management and the Quality Improvement Division conducted a 100% review of siblings in placement during the third quarter 2006.  The Court Monitor reviewed, edited and approved the methodology prior to the implementation of the internal review.  As configured, the review of all subsequent quarters includes only the population of new sibling entries and changes in sibling placement in effort to establish qualitative practice issues related to siblings in placement.  The Monitor's Office is incorporating the Office of Results Management Fourth Quarter Analysis below in its entirety with redaction of any name-specific data and minor grammatical edits.

**Review Findings and Trends**

For the Fourth Quarter 2006 the Monitor verifies the process that was undertaken and finds DCF to have achieved a statewide rate of **85.5%** compliance with Outcome Measure 10.

- Two Area Offices: Bridgeport and Meriden, achieved the 95% mandate for the Fourth Quarter.
- The main trend surfacing from this review relates to the inaccuracy of data entry by the social work staff.  80% of the 604 siblings reviewed, had valid clinical reasons for separation.  However, reviewers found that 75% of those 459 children, who actually did have valid clinical reasons for separation at the time of their placement entry/move during Fourth Quarter 2006, were not properly documented.  (If DCF relied solely on the automated results, a compliance rate of 49.9% would have resulted.)
- 10% of the cases identified as having clinical or therapeutic reasons for sibling separation were found to be related to reasons outside of the agreed upon definition.
- Anecdotal information from contacts with providers and DCF staff alike singled out the inability to recruit a sufficient number of appropriate foster homes as a barrier to maintaining siblings in placement.

It is the Monitor's expectation that as these errors are uncovered, the Department will seek remedies via training and corrections to the problematic data fields to ensure accuracy in the case records and data reporting.  Our office will follow up with the Department to understand the specific action steps that will be taken to address this deficiency.

**Office of Results Management Methodology**
A review file was pulled from LINK on January 4, 2007, representing all *Juan F*. children in care on that date. This population excluded youth who were over age 18 on that date, as well as those with a legal status of "Statutory Parent", as agreed upon in the Exit Plan definitions for this measure. Since all children identified as "in the sibling population" and "not with all his/her siblings" were reviewed for the 3Q06 review, only those siblings that experienced new placements (either new removals or placement moves) since the last review were reviewed at this time. Initially a total of 613 siblings were identified as meeting the review criteria. Upon review six children were excluded as the service codes entered were incorrectly identified as placements. The Office of Results Management trained all review staff, and provided ongoing supervision and consultation during the review as needed.

**Fourth Quarter 2006 Sibling Placement Data Analysis**
There were a total of 4,550 *Juan F*. children in placement (excluding youth over age 18, and children with legal status of "Statutory Parent") on 1/4/07 when the data was drawn. Of these, 25 records were excluded because they did not represent actual placements but In-Home services, and one additional record was excluded because the placement came from an adoption subsidy case. The query logic was amended to exclude these records from future reports. This left a final universe of 4,524 *Juan F*. children in placement.

Of these children, 2,191 (48.4%) did not have any other siblings in placement on that date, and so were excluded from the measurement of this outcome. [19] There were 2,333 (51.6%) children who were members of sibling groups, where at least one other sibling was in placement on that date. These 2,333 children represent the sibling population on 1/4/07.

Of the sibling population, 1,013 (43.4%) siblings were placed with the same provider as all of their other siblings. The remaining 1,320 (56.6%) children had at least one sibling in the group placed with a different provider than the rest. Of these children, 604 (46%) had at least one member of the sibling group enter care or change placements between the date of the 3Q06 review and 1/4/07, and so were reviewed for the Fourth Quarter 2006 period. The remaining 716 (54%) had already been reviewed in 3Q06, and since nothing had changed for them since that time the 3Q06 review results continue to be valid.

Between January 11 and January 22, 2007, members of several units within the Bureau of Quality Improvement reviewed the cases of the 604 children placed apart from each other to verify whether or not a clinical reason existed for these children to be separated. Clinical reasons were documented by the SW in LINK for 62 of these cases. The reviewers confirmed that the reasons given by the SW matched the definition for 52 (84%) of these children. The remaining 10 (16%) cases were actually found to have only non-clinical reasons for separating the child from his/her siblings.

On the other hand, issues remain with correctly indicating clinical reasons when one actually exists. Of the 542 children that did not originally have a clinical reason indicated by the SW in LINK, reviewers found that 407 (75%) of those children actually did have valid clinical reasons that existed at the time of their placement entry/move during Fourth Quarter 2006. There also continue to be a number of children placed in therapeutic foster homes due to their own needs with no apparent

---

[19] It should be noted that 3 of these children were originally part of what was considered to be sibling groups of 2 each, but their "sibling" was actually not in placement but receiving an In-Home Service as described above.

consideration given for siblings to move with that child into the therapeutic home, and no indication that separation was in the best interest of the sibling(s).

In this review, specific information was gathered to allow for the counting of particular types of clinical reasons found by reviewers. Of the 604 siblings reviewed, there were 459 for which reviewers found a valid clinical reason. The majority of separated siblings with valid clinical reasons are covered by two discreet scenarios:

- At least one member of the sibling group was placed in a relative or special study home, or
- At least one member of the sibling group was placed in some form of restrictive care setting (i.e. detention, group home, hospital or residential) AND had a safety or behavioral reason for separation from the group.

It should also be noted that the vast majority of "Other Best Interest" reasons were comprised of children either remaining in or being placed into homes that were committed to their long-term care (though not necessarily adoption). In these scenarios, reviewers believed that the child's need for permanency overrode the need to remain placed with all siblings.

The complete breakdown of all possible combinations found by reviewers is presented in Table 26.

**Table 28:  Fourth Quarter 2006 Combined Clinical Reasons**

| Combined Clinical Reason(s) | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Relative or Special Study Only | 164 | 35.7% | 35.7% |
| Restrictive Care Only | 62 | 13.5% | 49.2% |
| Restrictive Care AND Safety/Behavioral | 42 | 9.2% | 58.4% |
| Other Best Interest Only | 38 | 8.3% | 66.7% |
| Relative or Special Study AND Restrictive Care | 25 | 5.4% | 72.1% |
| Relative or Special Study AND Other Best Interest | 22 | 4.8% | 76.9% |
| Safety or Behavioral Only | 21 | 4.6% | 81.5% |
| Relative or Special Study AND Safety/Behavioral | 17 | 3.7% | 85.2% |
| Restrictive Care, Safety/Behavioral AND Other Best Interest | 17 | 3.7% | 88.9% |
| Restrictive Care AND Other Best Interest | 15 | 3.3% | 92.2% |
| Safety/Behavioral AND Other Best Interest | 13 | 2.8% | 95.0% |
| Relative/Special Study, Safety/Behavioral AND Other Best Interest | 10 | 2.2% | 97.2% |
| Relative/Special Study, Restrictive Care AND Safety/Behavioral | 8 | 1.7% | 98.9% |
| Relative/Special Study, Restrictive Care AND Other Best Interest | 5 | 1.1% | 100.0% |
| Grand Total | 459 | 100.0% | |

Overall, there were 1,013 (43.4%) siblings placed together with the same provider, and an additional 981 (42.1%) that were separated with a valid Clinical Reason for doing so; resulting in 2054 (85.5%) children for whom DCF is in compliance with the standard for the Exit Plan Outcome Measure for Sibling Placement. It should be noted that without the results of this review, only 152 separated siblings had a clinical reason indicated in the most recent placement for their group. This would have resulted in only 1,165 (49.9%) siblings in compliance with the standard absent the findings of this case review.

**Crosstabulation 73:  Fourth Quarter 2006 Statewide Sibling Status *Placement Outcome Performance**

| Sibling Status | Outcome Met? | | |
| --- | --- | --- | --- |
| | No | Yes | Total |
| Some/All Separated | 339 | 981 | 1320 |
| | 25.7% | 74.3% | 100.0% |
| All Placed Together | 0 | 1013 | 1013 |
| | 0.0% | 100.0% | 100.0% |
| Total | 339 | 1994 | 2333 |
| | 14.5% | 85.5% | 100.0% |

Results for individual Area Offices are provided below.  It should be noted that two offices, Bridgeport and Meriden, have achieved the $\geq$ 95% standard for Fourth Quarter 2006.

**Crosstabulation 74:  Fourth Quarter 2006 Sibling Placement Outcome* Area Office**

| Area Office | Outcome MET | | Outcome NOT MET | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | # | % | # | % | # | % |
| Bridgeport | 147 | **96.1%** | 6 | 3.9% | 153 | 100.0% |
| Danbury | 38 | 84.4% | 7 | 15.6% | 45 | 100.0% |
| Greater New Haven | 113 | 83.7% | 22 | 16.3% | 135 | 100.0% |
| Hartford | 269 | 81.8% | 60 | 18.2% | 329 | 100.0% |
| Manchester | 172 | 86.9% | 26 | 13.1% | 198 | 100.0% |
| Meriden | 113 | **95.8%** | 5 | 4.2% | 118 | 100.0% |
| Middletown | 47 | 83.9% | 9 | 16.1% | 56 | 100.0% |
| New Britain | 240 | 85.7% | 40 | 14.3% | 280 | 100.0% |
| New Haven Metro | 206 | 88.4% | 27 | 11.6% | 233 | 100.0% |
| Norwalk | 40 | 83.3% | 8 | 16.7% | 48 | 100.0% |
| Norwich | 152 | 87.4% | 22 | 12.6% | 174 | 100.0% |
| Stamford | 19 | 65.5% | 10 | 34.5% | 29 | 100.0% |
| Torrington | 63 | 79.7% | 16 | 20.3% | 79 | 100.0% |
| Waterbury | 245 | 78.8% | 66 | 21.2% | 311 | 100.0% |
| Willimantic | 130 | 89.7% | 15 | 10.3% | 145 | 100.0% |
| Grand Total | 1994 | 85.5% | 339 | 14.5% | 2333 | 100.0% |

**Outcome Measure 11 Case Review:  Re-Entry into DCF Custody**

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct a series of reviews on the 22 outcome measures resulting in a full status report in April 2007.  This review, Outcome Measure 11 Case Review:  Re-Entry into DCF Custody, is a qualitative review that will supplement the quarterly data provided by DCF and is verified by the Court Monitor, regarding the instances of re-entry into DCF custody.

**Outcome Measure 11 requires that DCF comply and sustain the following level of practice related to re-entry:**

> ***"Of the children who enter DCF custody, seven (7) percent or fewer shall have re-entered care within 12 months of the prior out-of-home placement."***

**Review Findings and Trends**

The Department has asserted compliance with the requirement in two of the quarters reported since the Third Quarter 2005.  The reported performance has ranged from 4.3% to 8.2% during the seven quarters that this automated reporting has been available.  While the automated reports logic accuracy has been verified by the Monitor's Office, placement beginning and end dates and the legal status data entry remain problematic.

For the Fourth Quarter 2006 the Department's re-entry rate was 8.6%.  The following major trends regarding re-entry into DCF custody were observed within the 113 case sample.

- 63.8% of the 80 reunifications to primary caretaker re-entered care within 12 months.  Clearly this is the discharge type most likely to result in re-entry.
- None of the 14 adoptions disrupted within the twelve months from finalization.
- 49.1% of the re-entry population (n=55) had different safety factors identified at the time of re-entry to care.
- 29.9% of the re-entry cases (n=55) were related to similar/chronic neglect issues as identified in the initial episode.
- 10.9% of the cases identified parent substance abuse as the primary reason for both episodes of placement.
- Forty-eight of the 55 re-entry cases (87.2%) were open in treatment at the point of re-entry with 30 cases (55.4%) under an order of protective supervision.
- In 36.4% of the re-entries (n=55), reviewers indicated that the discharge from care was premature.  In 16 cases (29.1%), the reviewers indicated that progress had been made and discharge was appropriate, but known risk factors still remained placing the child at risk for re-entry.
- In many re-entry cases, there was a lack of follow up by the assigned SW with service providers prior to reunification.  DCF SW's often did not communicate with community service providers regarding progress or status on the reunifying families post reunification.  This is highlighted in the data which indicates 9.1% of those that re-entered did so primarily due to the child's mental health needs.

- DCF SW and SWS staff are often aware of the risk factors in a case (i.e. Substance Abuse, Domestic Violence, Mental Health of parents or child), yet they are not fully addressed prior to reunification. Frequently, this leads to the same issues resurfacing upon reunification – making positive outcomes more tenuous. This is highlighted in a case in which a child was reunified in spite of the parent's mental health issues not being fully addressed prior to reunification. Despite services utilized by the mother, housing remained an issue, and there were signs that her mental health remained unstable (suicidal statements documented). The child re-entered DCF's custody in less than two months when mother attempted suicide at the local shelter.

- In 78.8% of all cases reviewed, reviewers felt that the overall quality of after care planning was of very good or optimal quality. This rate is 84.5% when looking only at the cases which did not re-enter. It drops to 72.7% when looking only at the population which re-entered care.

- There is a lack of post reunification services provided for families. In 28.8% of the cases reviewed, there were service needs identified but not provided post-discharge. Reviewers identified inadequate post-discharge planning and contract limitations in which providers do not serve clients once DCF involvement concludes. In 31 cases that identified service needs, where one or more of these needs was not planned for during discharge, 74.2% re-entered care. Of those cases where identified supports were provided, the rate of re-entry was 39.0%. It was observed that in cases where reunification efforts were successful; DCF often implemented services post reunification that continued for three to six months post reunification. The following case example from the review, documented sound discharge planning in the face of contract limitations. The SW argued that a support service was needed for a successful reunification. The Department arranged to pay for services using flex funds when it was recognized that contractors could not continue with services upon DCF exit. No re-entry was documented.

- Of those 44 instances in which abuse or neglect was alleged in the post discharge period, 28 were substantiated. This is 63.6% of the total reported to Hotline for this sample, and is a much higher rate of substantiation than is found for the general population of reports received at the Hotline.

- The reviewers found that closing summaries were adequate for only 51.3% of the cases closed prior to September 30, 2006. Fourteen cases had no closing summary documented. An additional five cases had inadequate closing summaries when policy expectations were considered.

- In cases where visitation was regularly occurring, protective supervision appears to be a useful tool to maintain and provide ongoing assessments post reunification. However, after reunification, and upon a determination of case closing (which is often a month or so before the actual closing is approved), the frequency of visits declined and narration of assessments was poor during the visits that are documented.

- In 91 cases it was clearly documented that the Supervisor was aware of and discussed some level of risk per the supervisory narrative (this may or may not have been a comprehensive assessment). Of that total, 51.6% re-entered. In the remaining cases, there was no discussion of risk, and the re-entry rate was lower

at 31.8%.  This is logical, as those cases with documented discussion would have likely have more complex or serious risk associated with it, and therefore would be more at risk for re-entry.  The role of supervision during the period leading up to the third quarter 2005 discharge, as it relates to re-entry is, however, difficult to establish.  This review did not incorporate SW or SWS interviews.  While reviewers pointed to apparent shortcomings of supervision related to assessment, planning, or follow up on directives, we cannot determine if this is an issue of poor documentation or poor practice.   Future reviews will incorporate interviews with the SW and SWS staff to further explore issues related to supervision.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the Department provide the universe of all children who were discharged from DCF custody during the quarter of July 1, 2005 through September 30, 2005 (excluding Voluntary Service Placements).  This request was fulfilled with the submittal of an Excel Database including 639 children.  Sampling methodology submitted to the parties for approval, required a sample of all children with a re-entry date – and a like number exited during the period, but for which there was no re-entry date.

In order to provide a basis for comprehensive analysis of OM11, the sample included all children who had a re-entry documented (regardless of meeting/not meeting the measure) and a like number of children randomly selected from the statewide population who were discharged, but had no documented re-entry.  This allowed for a review of case practice issues that could impact the success or barriers of the Department in meeting OM 11. The Department identified 80 children with a re-entry date.  Several were eliminated due to age (over 18) or voluntary service status at the point of re-entry.  Fourteen additional cases were subsequently eliminated from the re-entry cohort early in the review process, as they did not actually exit or re-enter within the specified time frames.  As a result, the sample size was reduced to 55 children with re-entry dates within twelve months, and 58 children who did not re-enter during the twelve month period following discharge in the third quarter 2005.  See Table 29 for area office distribution of the sample.

**Table 29:  Distribution of Sample by Area Office Designation**

| Area Office | Frequency | Percent |
|-------------|-----------|---------|
| Waterbury | 17 | 15.0 |
| Hartford | 14 | 12.4 |
| Norwich | 14 | 12.4 |
| Manchester | 11 | 9.7 |
| Bridgeport | 10 | 8.8 |
| Middletown | 8 | 7.1 |
| Greater New Haven | 7 | 6.2 |
| New Britain | 7 | 6.2 |
| New Haven Metro | 7 | 6.2 |
| Willimantic | 6 | 5.3 |
| Danbury | 3 | 2.7 |
| Meriden | 3 | 2.7 |
| Norwalk | 3 | 2.7 |
| Torrington | 3 | 2.7 |
| Total | 113 | 100.0 |

**This final cohort of children with re-entry dates would result in an overall rate of re-entry for the exit cohort or 8.6% (56 children of the 639 universe of children exiting care).**  Findings cannot be directly compared with the Department's reporting for the third quarter which consists of entry cohort populations rather than exit cohorts.

A LINK record review was conducted during the first quarter 2007.  DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts.  A pilot test was conducted during the last week of November to ensure that issues of reliability and validity were addressed prior to initiating the full review.

The review protocol capture three periods within the life of the case:  the period leading up to the initial entry into DCF custody, the period from that placement to the date of reunification and for those that re-entered or remained participant in an active in-home case, the twelve month period following that reunification date.

**Identifying Information and Pre-Discharge Case Descriptives**
The sample represents the work of 95 Ongoing Service SWs reporting to 77 SWS.  The population consists of 113 children participant to 98 cases (11 sets of siblings) who ranged from newborn to 17 at the point of entry into care for the episode ending with the third quarter 2005 exit from custody.  The average age at point of entry into DCF out-of-home placement for the episode ending with the third quarter exit is five years old.  The mode was less than one year (23 of the children exiting from care identified as less than one) at the point of entry during the episode ending in the third quarter 2005.

**Crosstabulation 75: Age at Entry  * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| Age at Entry | | | Did child come back into DCF custody at any point in the 12 month period following the child's 3Q05 legal discharge date? | | |
| --- | --- | --- | --- | --- | --- |
| | | | Yes | No | Total |
| < 1 | | Count | 9 | 14 | 23 |
| | | % | 39.1% | 60.9% | 100.0% |
| 1 | | Count | 4 | 5 | 9 |
| | | % | 44.4% | 55.6% | 100.0% |
| 2 | | Count | 7 | 5 | 12 |
| | | % | 58.3% | 41.7% | 100.0% |
| 3 | | Count | 2 | 5 | 7 |
| | | % | 28.6% | 71.4% | 100.0% |
| 4 | | Count | 2 | 2 | 4 |
| | | % | 50.0% | 50.0% | 100.0% |
| 5 | | Count | 2 | 7 | 9 |
| | | % | 22.2% | 77.8% | 100.0% |
| 6 | | Count | 2 | 4 | 6 |
| | | % | 33.3% | 66.7% | 100.0% |
| 7 | | Count | 5 | 2 | 7 |
| | | % | 71.4% | 28.6% | 100.0% |
| 8 | | Count | 3 | 1 | 4 |
| | | % | 75.0% | 25.0% | 100.0% |
| 9 | | Count | 3 | 0 | 3 |
| | | % | 100.0% | .0% | 100.0% |
| 10 | | Count | 3 | 3 | 6 |
| | | % | 50.0% | 50.0% | 100.0% |
| 11 | | Count | 3 | 1 | 4 |
| | | % | 75.0% | 25.0% | 100.0% |
| 12 | | Count | 2 | 2 | 4 |
| | | % | 50.0% | 50.0% | 100.0% |
| 13 | | Count | 3 | 3 | 6 |
| | | % | 50.0% | 50.0% | 100.0% |
| 14 | | Count | 1 | 1 | 2 |
| | | % | 50.0% | 50.0% | 100.0% |
| 15 | | Count | 3 | 2 | 5 |
| | | % | 60.0% | 40.0% | 100.0% |
| 16 | | Count | 0 | 1 | 1 |
| | | % | .0% | 100.0% | 100.0% |
| 17 | | Count | 1 | 0 | 1 |
| | | % | 100.0% | .0% | 100.0% |
| Total | | Count | 55 | 58 | 113 |
| | | % | 48.7% | 51.3% | 100.0% |

The racial and ethnic identification of the sample is largely white (60.2%) with 64.6% identified as non-Hispanic.

**Crosstabulation 76:   D.7. Child's Race * D.8. Child's Ethnicity**

| Child's Race | Child's Ethnicity | | | |
|---|---|---|---|---|
| | Hispanic | Non–Hispanic | Unknown | Total |
| Black/African American | 2 | 29 | 0 | 31 |
| White | 27 | 40 | 1 | 68 |
| UTD | 9 | 0 | 0 | 9 |
| Multi-Racial | 1 | 4 | 0 | 5 |
| Total | 39 | 73 | 1 | 113 |

Rates of re-entry for this sample ranged from 35.0% to 100.0% across the various racial and ethnic categories.  While statistically insignificant (p=.064), it is interesting to note that all five of the children identified as multi-racial re-entered care.

89.7% of the verbal children spoke English as their primary language.  Three children were primarily Spanish-speaking, four were considered bi-lingual, one child spoke Portuguese, and three children were identified as "Unable to Determine" from the documentation available.

The data indicates 202 identifiable issues bringing the children into care with the episode ending the third quarter 2005.  The most frequently cited reason for entry into care was substantiated neglect, with 73.5% of the cases identifying this issue as the reason for coming into DCF custody.  Parent's substance abuse was cited next in the frequency of issues; identified in 38.9% of the sample set.

**Table 30:  Reasons for Entry into DCF Custody for Episode Ending Third Quarter 2005**

| Entry Reason | Cases in which Reason was Identified | Re-entry Rate | No Re-entry | Total |
|---|---|---|---|---|
| Substantiated Neglect | 73.5% | 43 (51.3%) | 40 (48.2%) | 83 (100.0%) |
| Parent's Substance Abuse | 38.9% | 16 (36.4%) | 28 (63.6%) | 44 (100.0%) |
| Parent's Mental Health | 10.6% | 4 (33.3%) | 8 (66.7%) | 12 (100.0%) |
| Child's Mental Health (Beyond Caretaker's Ability) | 9.7% | 7 (63.6%) | 4 (36.4%) | 11 (100.0%) |
| Parent/Guardian's Incarceration | 8.8% | 4 (40.0%) | 6 (60.0%) | 10 (100.0%) |
| Substantiated Abuse | 8.0% | 4 (44.4%) | 5 (55.6%) | 9 (100.0%) |
| Other[20] | 8.0% | 1 (11.1%) | 8 (88.9%) | 9 (100.0%) |
| Parent's Whereabouts Unknown | 7.1% | 3 (37.5%) | 5 (62.5%) | 8 (100.0%) |
| Domestic Violence | 6.2% | 2 (28.6%) | 5 (71.4%) | 7 (100.0%) |
| Housing/Homeless/Transient | 4.4% | 2 (40.0%) | 3 (60.0%) | 5 (100.0%) |
| Child's Medical Condition | 1.8% | 1 (50.0%) | 1 (50.0%) | 2 (100.0%) |
| Parent/Guardian's Death | 0.9% | 0 (0%) | 1 (100.0%) | 1 (100.0%) |
| Abandonment | 0.9% | 0 (0%) | 1 (100.0%) | 1 (100.0%) |

The 113 review cases were open from one day to 92 months at the point of entry to the episode ending with discharge from custody during the third quarter 2005. The most frequently reported period of time from the date of case open to the date of this placement episode was less than one month (45 cases).  The average length of time from case open to date of placement episode was 6.58 months.  For 93 children this was the first removal episode experienced.  Of the twenty children with prior removal history, 18 had one prior placement episode, one had two prior episodes, and one had four episodes prior to this removal.

The length of the placement episode ending during the third quarter ranged from one day to 11.64 years.  The mean average length of stay was 1.46 years, and the median length of stay was calculated at 279 days.   Fifty-nine cases (52.2%) remained open or were reopened over one year later at the close of the third quarter, September 30, 2006.  Documented placement discharge reasons were identified for all 113 children.  The most frequently identified is "reunified with parent(s)/primary caretaker (70.8%), followed by

---

[20] "Other" responses were reviewed and incorporated in specified categories above if applicable.  Situations that did not fit neatly into the categories that were identified by reviewers include: DMR parents, prior TPR, refusal of child to return home, High Risk Newborn, OTCs, and parents non-compliant with DCF visitation standards

133

"Adoption" and "Transfer of Guardianship" which were each identified for 12.4% of the children.

The range of placements experienced within the episode ending in the third quarter 2005 was from one placement to 16 placements over the course of the episode. 89.4% of the sample did not exceed the 3 placement maximum set by Outcome Measure12. The number of placements was not statistically significant in relation to Outcome Measure 11 given the low numbers available for analysis.

**Crosstabulation 77:  Pre.7. How Many Unique Placement Settings Did the Child Experience Within the Timeframe Between the Start Date (Pre.2) and the Last Placement End Date (Pre.6a)? * Re.1. Did Child Come Back into DCF Custody at Any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| How many unique placement settings did the child experience within the timeframe between the start date (Pre.2) and the last placement end date (Pre.6a)? | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| 1 Placement | Count | 31 | 25 | 56 |
| | % | 55.4% | 44.6% | 100.0% |
| 2 Placements | Count | 14 | 17 | 31 |
| | % | 45.2% | 54.8% | 100.0% |
| 3 Placements | Count | 5 | 9 | 14 |
| | % | 35.7% | 64.3% | 100.0% |
| 4 Placements | Count | 1 | 5 | 6 |
| | % | 16.7% | 83.3% | 100.0% |
| 5 Placements | Count | 1 | 1 | 2 |
| | % | 50.0% | 50.0% | 100.0% |
| 7 Placements | Count | 0 | 1 | 1 |
| | % | .0% | 100.0% | 100.0% |
| 10 Placements | Count | 1 | 0 | 1 |
| | % | 100.0% | .0% | 100.0% |
| 12 Placements | Count | 1 | 0 | 1 |
| | % | 100.0% | .0% | 100.0% |
| 16 Placements | Count | 1 | 0 | 1 |
| | % | 100.0% | .0% | 100.0% |
| Total | Count | 55 | 58 | 113 |
| | % | 48.7% | 51.3% | 100.0% |

Data was collected on the types of placements experienced as well as the number of placements. Most frequently, children spent the majority of time in placement with non-relative foster care settings. On a positive note, although initial placements did not always occur with relative foster care providers, there is a significant percentage of the sample population (27.4%) who spent the majority of their time in placement with relative resources.

**Crosstabulation 78: Pre.11. In What Placement Setting did this Child Spend the Majority of the Placement Episode * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| In what placement setting did this child spend the majority of the placement episode | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| **Group Home** | Count | 1 | 0 | 1 |
| | % | 100.0% | .0% | 100.0% |
| **In-state Hospital Setting** | Count | 1 | 0 | 1 |
| | % | 100.0% | .0% | 100.0% |
| **In-state DCF non-relative foster care setting** | Count | 26 | 28 | 54 |
| | % | 48.1% | 51.9% | 100.0% |
| **In-state DCF relative foster care setting** | Count | 14 | 17 | 31 |
| | % | 45.2% | 54.8% | 100.0% |
| **In-state DCF special study foster care setting** | Count | 1 | 0 | 1 |
| | % | 100.0% | .0% | 100.0% |
| **In-state private provider foster care setting** | Count | 0 | 3 | 3 |
| | % | .0% | 100.0% | 100.0% |
| **In-state residential setting** | Count | 5 | 2 | 7 |
| | % | 71.4% | 28.6% | 100.0% |
| **Out-of-state residential setting** | Count | 0 | 1 | 1 |
| | % | .0% | 100.0% | 100.0% |
| **Pre-Adoptive placement** | Count | 0 | 4 | 4 |
| | % | .0% | 100.0% | 100.0% |
| **SAFE Home** | Count | 7 | 2 | 9 |
| | % | 77.8% | 22.2% | 100.0% |
| **Shelter** | Count | 0 | 1 | 1 |
| | % | .0% | 100.0% | 100.0% |
| **Total** | Count | 55 | 58 | 113 |
| | % | 48.7% | 51.3% | 100.0% |

While it initially appears that SAFE Home placement stays have a higher rate of re-entry (77.8%), further analysis indicates that the higher rate of re-entry was a factor of sibling groups within the sample. The SAFE Home population who re-entered included a sibling group of 4, a sibling group of 2, and one single child in care.

While there were 10 substantiations identified during the period of the episode, only one case was at the hands of a substitute caretaker. The remaining substantiations were related to the biological or adoptive family, and were generally the reason for entry into care. This is impressive given that the cases included in this review had episodes in placement that spanned periods greater than 6 month standard for repeat maltreatment.

In preparing for the third quarter discharge, there is documentation that DCF attempted family conferencing in 15 of the 113 cases (13.3%). This low number is not unexpected

given the staggered rollout of the FC model across the area offices in early 2005, and the subsequent learning curve. Current data submitted to the Monitor's Office indicated that during April through September 2006 there were a total of 640 conferences convened. 73 of those were convened with the purpose of supporting a reunification plan. A further review of this more recent population of families engaged in family conferencing at the point of discharge should be undertaken to establish its statistical significance relating to re-entry.

In 66 cases (58.4%), there was evidence of other engagement activities with case participants and providers. In 32 cases (28.3%) reviewers indicated that there was no documented attempt to engage the family in family conferencing or any other treatment or discharge planning activities. Nineteen of these cases did not have protective supervision and did not come back into care. The majority of these 19 (68.4%), were closed within 5 months of the discharge from care.

**Crosstabulation 79: Pre.13. Is There Evidence that Family Conferencing or Other Engagement Activities were Attempted by DCF in Working with this Family to Successfully Discharge Child from Care? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| Is there evidence that family conferencing or other engagement activities were attempted by DCF in working with this family to successfully discharge child from care? | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|
| | Yes | No | Total |
| Both family conferencing and other engagement activities were attempted | 8 | 5 | 13 |
| Only family conference was attempted | 2 | 0 | 2 |
| Family conferences not attempted, but other engagement activities are documented | 32 | 34 | 66 |
| No family conference attempted or other family engagement activities documented | 13 | 19 | 32 |
| Total | 55 | 58 | 113 |

Parent/child visits during the placement episode were most frequently supervised by DCF (54.9%). Additionally supervised visitation was provided by private provider agencies, foster parents, or SAFE home staff. Visitation was increased in frequency and duration as the case progressed toward the child's placement exit in 36.3% of the cases. Reduction in supervised visits and increase in unsupervised and overnight visits as the case progressed was documented in 33.6% of the cases. Trial home visits (return of the child to the parent or guardian while maintaining commitment) were used in 31.9% of the cases. Transportation for visitation or therapeutic intervention was provided in 98.3% of the cases when it was deemed to be a need (n=60).

While it appears that private provider and SAFE home supervision resulted in a higher rate of re-entry, this fluctuation is not statistically significant (p =.793). See Crosstabulation 78 for details below.

**Crosstabulation 80:   Pre.14. Who Supervised the Majority of Visits between Child and Person to Whom Child was to be Discharged in the 6 Months Leading up to Child's Placement Exit? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 legal Discharge Date?**

| Who supervised the majority of visits between child and person to whom child was to be discharged in the 6 months leading up to child's placement exit? | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
| --- | --- | --- | --- | --- |
| | | **Yes** | **No** | **Total** |
| **DCF SW or SWS** | Count | 31 | 23 | 54 |
| | % | 57.4% | 42.6% | 100.0% |
| **DCF SW Case Aide** | Count | 5 | 3 | 8 |
| | % | 62.5% | 37.5% | 100.0% |
| **Foster Parent** | Count | 2 | 1 | 3 |
| | % | 66.7% | 33.3% | 100.0% |
| **Private Provider (Visitation Center)** | Count | 5 | 1 | 6 |
| | % | 83.3% | 16.7% | 100.0% |
| **Safe Home** | Count | 4 | 1 | 5 |
| | % | 80.0% | 20.0% | 100.0% |
| **UTD** | Count | 2 | 1 | 3 |
| | % | 66.7% | 33.3% | 100.0% |
| **Total [21]** | Count | 49 | 30 | 79 |
| | % | 62.0% | 38.0% | 100.0% |

Worker/child visits were captured for the six months prior to legal discharge in the third quarter.  The number of visits ranged from zero[22] to 34.  The average number of visits recorded (mean) was 10.7 visits over the course of the episode.  75.2% of the cases had six or more visits with the child in placement during the six-month period.

Supervision during the six months preceding the third quarter discharge was also assessed.  Frequency of supervision during the six-month period ranged from one SWS Conference documented, to 20 SWS conferences documented.  The average number documented is 6.7, while  66.4% had at least six conferences documented over the six month period.

Reviewers documented whether risks noted in narratives during the period were referenced and discussed in supervision.  In 80.5% of the cases, reviewers found that noted risks or concerns were incorporated into the supervision documentation.  In 22 cases (19.5%), the narratives did not contain references or instruction related to concerns or risks identified during the period.  Reviewers indicated that in fourteen of the cases reviewed (12.4%), there was a clear risk factor not documented in supervisory narratives prior to, or immediately after discharge.

---

[21] Excludes 34 cases in which no supervised visitation is documented.

[22] All cases with zero are cases with investigation accept at Hotline and placement date in common with short stay in placement.  No Ongoing Service worker assignment during the period.

Flex funds necessary for achieving discharge from placement were provided in 64.0% of the cases that reviewers identified as needing a service or concrete item necessary for successful discharge (n=50). Within the 113 case sample, reviewers indicated that 72.6% of the cases had all necessary services or supports provided prior to discharge. Such services most frequently included individual counseling (36.3%) and family reunification services (17.7%). The top ten identified services included:

**Table 31: Top 10 Services In Place for the Child during the Period Leading up to the Legal Discharge in the Third Quarter 2005?**

| Service provided | Frequency | % of cases |
|---|---|---|
| Individual counseling | 41 | 36.3% |
| Family reunification | 20 | 17.7% |
| Worker/child visitation | 20 | 17.7% |
| Case management/support/advocacy | 16 | 14.2% |
| Outpatient substance abuse treatment | 14 | 12.4% |
| Family or marital counseling | 13 | 11.5% |
| In-home parent education and support | 11 | 9.7% |
| Provider contact | 11 | 9.7% |
| Substance abuse screening/evaluation | 11 | 9.7% |
| Family preservation | 10 | 8.8% |
| Mentoring | 10 | 8.8% |

Nine cases had no services identified or in place at the point of reunification except for routine DCF Case Management.

The overall quality of case practice during the placement episode ending with the third quarter 2005 legal discharge is considered very good or optimal in 73.5% of the cases reviewed. Of those that did not achieve the expected higher levels of practice, 21.2% were deemed "marginal" – meaning the attempt to comply with policy and practice expectations was clear, but that substantial elements were lacking. Five cases, or 4.4%, were deemed "poor" indicating a lack of regard for policy or practice expectations. Only one case (0.9%) identified practice at the lowest level of "adverse", indicating a negative impact on the direction of the case.

**12-Month Post-Discharge Period**
In 101 of the 113 cases within the sample (89.4%) the case remained open at least one month post discharge in the third quarter 2005. The length of time cases remained open after discharge ranged from zero months to 15 months (still remaining open on September 30, 2006) with an average of 8.07 months open post discharge. Protective Supervision was approved for 66 of the 113 cases (58.4%) following legal discharge in the third quarter 2005. The majority of these 66 cases sought protective supervision for a period of time not exceeding six months (75.4%). There were 16 instances of protective supervision extending from seven through 12 months.

**Crosstabulation 81:  Post.1. How Many Months Did DCF Continue to have an Open Case with the Family between the Child's 3Q05 Legal Discharge Date and 9/30/06? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| How many months did DCF continue to have an open case with the family between the child's 3Q05 legal discharge date and 9/30/06? | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| ≤1 | Count | 1 | 23 | 24 |
| | % | 4.2% | 95.8% | 100.0% |
| 2-4 | Count | 6 | 10 | 16 |
| | % | 37.5% | 62.5% | 100.0% |
| 5-6 | Count | 1 | 5 | 6 |
| | % | 16.7% | 83.3% | 100.0% |
| 7-8 | Count | 0 | 7 | 7 |
| | | 0% | 100.0% | 100.0% |
| 9-10 | Count | 1 | 2 | 3 |
| | % | 33.3% | 66.7% | 100.0% |
| 11-12 | Count | 14 | 6 | 20 |
| | % | 70.0% | 30.0% | 100.0% |
| >12 | Count | 32 | 7 | 39 |
| | % | 82.1% | 17.9% | 100.0% |
| Total | Count | 55 | 58 | 113 |
| | % | 48.7% | 51.3% | 100.0% |

In 6.2% of the cases sampled, the child was returned to the parent/guardian against DCF recommendations to the Court.  These cases did not appear to represent more of a risk of repeat substantiation, as only one of the cases within the seven resulted in an accepted referral after reunification occurred.  That referral resulted in one of the 28 cases of repeat substantiation of abuse/neglect.  This was a disturbing case in which the safety issues identified by the Department at the time of revocation and return of the child were contributing factors in the subsequent substantiation, in addition to sexual abuse by the mother's paramour.

**Crosstabulation 82:   Pre.12. Did the Court Decide to Return the Child Contrary to DCF Recommendations? * Post.4. Were There Any Accepted Referrals to Hotline (identifying this child as a victim) in the 12-Month Period Following Child's 3Q05 Legal Discharge?**

| Did the court decide to return the child contrary to DCF recommendations? | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| Yes | Count | 3 | 4 | 7 |
| | % | 42.9% | 57.1% | 100.0% |
| No | Count | 52 | 54 | 106 |
| | % | 49.1% | 50.9% | 100.0% |
| Total | Count | 55 | 58 | 113 |
| | % | 48.7% | 51.3% | 100.0% |

The greater the length of time DCF maintained an open case due to the complexity of issues within the family, the higher the frequency in which children returned.  The majority of returns occurred around the twelve-month mark.

There were a multitude of issues identified for both the child and parent or caretaker during this interim period that required the case to remain open post discharge.  The issues most frequently identified are those of the parent or caretaker rather than those of the child.  In 79.6% of the cases, there were no needs identified for the child, which would require the case to remain open post discharge.  In 50.4% of the cases, there were no identified needs for the parents during this same period.  Table 32 identifies the issues or needs reviewers identified.

**Table 32:  Conditions or Issues Which Required the Case to Remain Open for All or Part of the 12-Month Period Post-Discharge Included:**

| Issue s | Frequency | Percentage of Cases (n=113) |
|---|---|---|
| Caretaker's Mental Health | 35 | 31.0% |
| Caretaker's Substance Abuse | 31 | 27.4% |
| N/A – Case closed upon discharge | 25 | 22.1% |
| Child's Mental Health | 18 | 15.9% |
| Lack of Supervision | 16 | 14.1% |
| Domestic Violence | 13 | 11.5% |
| Protective Supervision required case to be open | 13 | 11.5% |
| Child's Behavioral Health | 12 | 10.6% |
| Parenting Skills | 11 | 9.7% |
| Poverty | 10 | 8.8% |
| Child Other[23] | 6 | 5.3% |
| Excessive Discipline | 6 | 5.3% |
| Parent Other[24] | 6 | 5.3% |
| Age of Child (not visible in community) | 5 | 4.4% |
| Housing | 5 | 4.4% |
| Continuity of Service/Coordination of Services | 5 | 4.4% |
| Failure to engage services | 5 | 4.4% |
| Substantiation of neglect | 5 | 4.4% |
| Education | 4 | 3.5% |
| Unemployment | 4 | 3.5% |
| Child's Medical Issues | 3 | 2.7% |
| Child's Substance Abuse | 2 | 1.8% |
| All Issues Identified | 240 | |

For the 39 cases that closed during the period of review, reviewers looked at the closing activities and summary in relation to policy 36-110.1.1 and found that 20 cases had an adequate summary and activities related to closing (51.3%).  Fourteen cases (35.9%) that closed prior to September 30, 2006 had no closing summary incorporated into narrative. An additional 5 cases (12.8%) had some level of closing activities or summary in LINK, but reviewers indicated that they were inadequate in relation to policy expectation.

Reviewers found that there were 44 instances in which an identified child was alleged to be a victim of abuse or neglect in the period of 12 months following the discharge in the third quarter 2005.  Of those 44 instances, 28 were substantiated.  This is 63.6% of the 44 cases reported to Hotline, and is a much higher rate of substantiation than is found for the general population of reports received at the Hotline.

The 28 subsequent substantiations included the following:
- 26 cases with substantiation of Physical Neglect
- 4 cases with substantiation of Physical Abuse
- One case of substantiated Emotional Neglect
- One case of substantiated Emotional Abuse/Maltreatment

---

[23] Includes:  legal injunction, awaiting CHAPS, service requires open DCF case, delinquent behaviors, unsanitary home conditions, sibling remained in placement – required open case.
[24] Includes:  ICPC, adoption closing process, subsidy finalization, refusal to reunify with child, unsanitary living conditions, LINK computer issues, youth beyond caretaker's control

Twenty-four cases had no services identified for the post discharge period.   In the majority of these cases, reviewers agreed with the assessment resulting in no service implementation for post discharge.

**Crosstabulation 83:  Post.8. Were Continued or New Support Services Identified for the Post-Discharge Period to Increase the Likelihood of Successful Permanency? * Post.9. Were Identified Services Implemented? * Re.1. Did Child Come Back into DCF Custody at Any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | | | Were identified services implemented? | | | |
|---|---|---|---|---|---|---|---|
| | | | | **Yes** | **No** | **N/A - No Services Required** | **Total** |
| **Yes** | **Post.8. Were continued or new support services identified for the post-discharge period to increase the likelihood of successful permanency?** | **Yes** | Count | 37 | 15 | 0 | 52 |
| | | | % | 71.2% | 28.8% | .0% | 100.0% |
| | | **No** | Count | 0 | 0 | 3 | 3 |
| | | | % | .0% | .0% | 100.0% | 100.0% |
| | | **Total** | Count | 37 | 15 | 3 | 55 |
| | | | % | 67.3% | 27.3% | 5.5% | 100.0% |
| **No** | **Post.8. Were continued or new support services identified for the post-discharge period to increase the likelihood of successful permanency?** | **Yes** | Count | 28 | 9 | 0 | 37 |
| | | | % | 75.7% | 24.3% | .0% | 100.0% |
| | | **No** | Count | 0 | 0 | 21 | 21 |
| | | | % | .0% | .0% | 100.0% | 100.0% |
| | | **Total** | Count | 28 | 9 | 21 | 58 |
| | | | % | 48.3% | 15.5% | 36.2% | 100.0% |

In all, 96 cases reviewed ( 85%) were identified by reviewers as appropriately assessed and provided services given the facts of the case available in the LINK record (This includes both cases with or with no identified services and therefore cannot be correlated directly to the table above).

Of the cases with services identified but not implemented, the reviewers identified the 41 barriers to service provision via the documentation available in LINK.

142

**Table 33:  Barriers Identified to Providing Post Discharge Services**

| Barrier | Frequency |
|---|---|
| Client refused service | 19 |
| UTD from treatment plan or narrative[25] | 9 |
| Placed on waiting list | 6 |
| Events required child to re-enter care prior to start of service | 4 |
| No service identified to address this need | 2 |
| No slots were available | 1 |
| Total | 41 |

Reviewers identified 24 services they felt were necessary given the facts presented within the record of  the 17 cases that had a negative response to the question, "Were continued or new support services identified for the post discharge period to increase the likelihood of successful permanency such as:  IFP, mentor, education, respite, social recreational programming, daycare, PPSP, etc.?"  These included the following:

**Table 34:   Post Discharge Service Needs Not Addressed at Point of Discharge**

| Service Needs | Frequency |
|---|---|
| Individual Counseling | 5 |
| Stable Housing or Section 8 | 3 |
| Substance Abuse Assessment | 3 |
| Summer Camp | 2 |
| Family counseling | 2 |
| Mentor services | 2 |
| Case management for continued monitoring of  mother's treatment @ CCBC and Hispanic Center | 1 |
| Day Care | 1 |
| DV services | 1 |
| Reunification program/family preservation | 1 |
| In-home services for TOG'd youth exhibiting behavioral issues | 1 |
| Work Program | 1 |
| Youth turned 18 had no supports in place – LL Family Ties? | 1 |
| Total | 24 |

---

[25] Includes two cases identified as Skip – No barriers identified within the first available data entry option for barriers.  Additional "skip" responses not included.

In 78.8% of all cases reviewed, the reviewers felt that the overall quality of after care planning was of very good or optimal quality. This rate is 84.5% when only the cases which did not re-enter are considered. It drops to 72.7% when only the population which re-entered care is considered.

**Crosstabulation 84: Post.13. Considering All of the Factors Above and Your Review of the Post-Discharge Planning Work with the Family, How Would You Rate the Quality of DCF's After-Care Planning for this Child/Family? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| Considering all of the factors above and your review of the post-discharge planning work with the family, how would you rate the quality of DCF's after-care planning for this child/family? | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|
| | Yes | No | Total |
| Optimal | 8 | 18 | 26 |
| Very Good | 32 | 31 | 63 |
| Marginal | 7 | 6 | 13 |
| Poor | 7 | 3 | 10 |
| Adverse | 1 | 0 | 1 |
| Total | 55 | 58 | 113 |

**Re-Entry**

There are 55 cases[26] in which a child re-entered care during the 12 months post-discharge in the Third Quarter 2005.

- Forty-eight of the re-entry cases (87.3%) were open in treatment at the point of re-entry.
- Thirty children (54.5%) remained under protective supervision at the point of re-entry.
- In 19 or 34.6% of the cases, reviewers indicated that they felt that discharge had been appropriate.
- In 20 cases, or 36.4% of the re-entries, reviewers indicated that the discharge from care was premature. In 16 cases (29.1%), the reviewers indicated that progress had been made and discharge was appropriate, but known risk factors still remained.
- Twenty-three cases (41.8%) presented situations in which DCF identified services needs or supports during the pre-exit period that were not provided prior to or immediately upon discharge from custody.
- Eleven children re-entering care (20.0%) were identified by reviewers as having "unaddressed risk factors present at the point of discharge."
- Forty children (72.7%) received post discharge services to address issues arising after their exit, however, there were 15 (27.3%) where there was documentation of an assessment for post discharge services that were not implemented prior to

---

[26] In one additional the case, the time to re-entry was within the period of review, but actually exceeded the year mark – exiting care 8/5/05 and returning 9/26/06.

re-entry. (See table on prior page for listing of the services reviewers felt necessary but not provided.)

Rates of re-entry differed slightly among the various offices, however, given the sampling methodology, one cannot draw conclusions on the impact of case assignment. Examining the full population of the entry cohort populations of LINK/ROM reports would provide a more accurate portrayal of individual area office case practice.

**Crosstabulation 85:   D.12. Area Office to which Child Was Assigned during Placement Period Ending with 3Q05 Legal Discharge * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date?**

| Area Office to which child was assigned during placement period ending with 3Q05 legal discharge *(Percentage of re-entry within each area office indicated in parenthesis)* | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|
| | **Yes** | **No** | **Total** |
| **Bridgeport (40.0%)** | 4 | 6 | 10 |
| **Danbury (33.3%)** | 1 | 2 | 3 |
| **Greater New Haven (57.1%)** | 4 | 3 | 7 |
| **Hartford (35.7%)** | 5 | 9 | 14 |
| **Manchester (45.5%)** | 5 | 6 | 11 |
| **Meriden (66.7%)** | 2 | 1 | 3 |
| **Middletown (75.0%)** | 6 | 2 | 8 |
| **New Britain (42.9%)** | 3 | 4 | 7 |
| **New Haven Metro (42.9%)** | 3 | 4 | 7 |
| **Norwalk (66.7)** | 2 | 1 | 3 |
| **Norwich (42.9%)** | 6 | 8 | 14 |
| **Torrington (33.3%)** | 1 | 2 | 3 |
| **Waterbury (58.8%)** | 10 | 7 | 17 |
| **Willimantic (50.0%)** | 3 | 3 | 6 |
| **Total** | 55 | 58 | 113 |

The reviewers looked at the full sample population of 113 children exited care during the Third Quarter 2005, to determine whether the services or supports that were assessed as necessary by the worker or supervisor were actually provided to the child/family prior to discharge. In 31 instances, one or more identified supports were not provided. Of these 31 cases, 74.2% re-entered custody. Of the 82 cases where the identified supports or services were provided, the rate of re-entry was 39.0%.

The 51 discharges to a parent or primary caretaker during the third quarter exit from DCF custody resulted in the highest number of re-entries, with 63.8% of 80 reunifications to the primary caretaker/guardian returning to DCF out of home placement within 12 months. One of the two children (50.0%) discharged to "another relative" also returned to care. Two of the children with discharge via transfer of guardianship (14.3%) resulted in a return to care. One child was legally discharged after running away and refusing

services. This child returned to care within 12 months. Lastly, two children who were emancipated did not return to request placement post discharge. None of the 14 adoptions disrupted within the twelve months from finalization.

**Crosstabulation 86: Pre.6b. What Was the Documented Placement Discharge Reason * Re.1. Did Child Come Back into Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge Date? * Pre.20. Were All Services/Supports Assessed as Necessary Provided to the Child/Family Prior to Legal Discharge?**

| | | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
|---|---|---|---|---|---|
| **Were all services/supports assessed as necessary provided to the child/family prior to legal discharge?** | | | Yes | No | Total |
| **Yes** | **What was the documented Placement Discharge Reason** | **Reunified with Parent(s)/Primary Caretaker(s)** | 30 | 24 | 54 |
| | | **Living With Other Relative(s)** | 0 | 1 | 1 |
| | | **Adoption** | 0 | 14 | 14 |
| | | **Guardianship** | 2 | 11 | 13 |
| | **Total** | | 32 | 50 | 82 |
| **No** | **What was the documented Placement Discharge Reason** | **Reunified with Parent(s)/Primary Caretaker(s)** | 21 | 5 | 26 |
| | | **Living With Other Relative(s)** | 1 | 0 | 1 |
| | | **Emancipation** | 0 | 2 | 2 |
| | | **Guardianship** | 0 | 1 | 1 |
| | | **Runaway** | 1 | 0 | 1 |
| | **Total** | | 23 | 8 | 31 |

The presence of a referral to the Hotline and a substantiation of abuse or neglect during the post discharge period were analyzed as it related to re-entry into care. In all, there were 28 substantiations as a result of 44 referrals made to Hotline during the period. Of these 28 substantiations, 24 children re-entered care within 12-months of their third quarter 2005 discharge. An additional 14 children with a non-substantiated referral re-entered custody, and, 17 children with no referral to Hotline during the period re-entered care.

**Crosstabulation 87:  Post.4. Were there any Accepted Referrals to Hotline in the 12-Month Period Following Child's 3Q05 Legal Discharge? * Re.1. Did Child Come Back into DCF Custody at any Point in the 12-Month Period Following the Child's 3Q05 Legal Discharge date? * Post.5. Were Any of these Referrals Substantiated?**

| Were any of these referrals substantiated? | | | Did child come back into DCF custody at any point in the 12-Month period following the child's 3Q05 legal discharge date? | | |
| --- | --- | --- | --- | --- | --- |
| | | | Yes | No | Total |
| Yes | Post.4. Were there any accepted referrals to Hotline (identifying this child as a victim) in the 12-Month period following child's 3Q05 legal discharge? | Yes | 24 | 4 | 28 |
| | Total | | 24 | 4 | 28 |
| No | Post.4. Were there any accepted referrals to Hotline (identifying this child as a victim) in the 12-Month period following child's 3Q05 legal discharge? | Yes | 14 | 2 | 16 |
| | Total | | 14 | 2 | 16 |
| NA-No subsequent referrals to Hotline | Post.4. Were there any accepted referrals to Hotline (identifying this child as a victim) in the 12-Month period following child's 3Q05 legal discharge? | No | 17 | 52 | 69 |
| | Total | | 17 | 52 | 69 |

The reasons for re-entry varied for the 31 children who returned to care without a substantiation identifying them as a "victim".  Eight children had more than one reason isolated by the reviewer through the record review.  The most frequent reason for re-entry related to medical or mental health needs of the child not being met by the parent or the parent's own mental health or substance abuse issues.

**Table 35:  Reasons for Child's Re-entry without Substantiation of Abuse or Neglect**

| Reason or Issue for Re-Entry | Children Re-Entering with Non-Substantiated Referral | Children Re-entering with No Referral |
| --- | --- | --- |
| Child's Mental Health | 5 | 3 |
| Parent's Mental Health | 5 | 1 |
| Failure to seek medical attention for a child or sibling | 4 | 2 |
| Parent's Substance Abuse/Relapse | 1 | 5 |
| Child's Behavioral Issues | 1 | 1 |
| Overturned Neglect Substantiation | 1 | 0 |
| Parent's Incarceration | 0 | 1 |
| Paternity Tests revealed caretaker was not biological parent | 0 | 1 |
| Child requested return to care | 0 | 1 |
| Suspected Domestic Violence | 0 | 1 |
| Basic Needs/Home Conditions not appropriate | 0 | 2 |

An analysis of the repetition or pattern of issues that resulted in the 55 children entering care in the prior and most recent episode of placement showed that:

- There were different safety factors at the point of each entry for 27 of the cases.
- 16 cases had similarly cited neglect substantiations in both reports to the Hotline. (Two of these cases also had substance abuse as a primary factor in both situations).
- Six cases indicated that the parent's substance abuse or mental health was the primary reason for the child's entry into DCF custody in both episodes.
- Five cases identified the child's mental health needs as the issue in both episodes of placement.
- One case identified substantiated abuse in both entry situations. The initial episode was the result of the mother's actions. The second episode involved the father was given custody of the two children and was overwhelmed by the care of two young children with minimal support/parenting knowledge. DCF attempted to work with the father to address the identified issues. The father was subsequently incarcerated and is now facing deportation to Mexico. TPR has just recently been granted and the Department is seeking possible adoption resource with a Godfather who has expressed interest in caring for the child.

**A Combined Review of Outcome Measure 12:  Multiple Placements
Outcome Measure 14:  Placement within Licensed Capacity, and
Outcome Measure 16:  Worker-Child Visitation for Children in Out of Home
Placement**

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F*. v Rell Exit Plan</u> to
conduct the Outcome Measures 12/14/16 Case Review.  This is a qualitative review
intended to supplement the quarterly data provided by DCF and verified by the Court
Monitor, regarding Multiple Placements (12), Placement within Licensed Capacity (14)
and Worker-Child Visitation for Children in Out-of-Home Placement (16).  **The three
Outcome Measures require that DCF comply and sustain the following level of
practice:**

> **Outcome Measure 12:**
> *"Beginning on January 1, 2004, at least 85% of the children in DCF
> custody shall experience no more than three (3) placements during
> any twelve month period."*

> **Outcome Measure 14:**
> *"At least 96% of all children placed in foster homes shall be in foster
> homes operating within their licensed capacity, except when
> necessary to accommodate sibling groups."*

> **Outcome Measure 16:**
> *"DCF shall visit at least 85% of all out-of-home children at least
> once a month, except for probate, interstate, or voluntary cases.  All
> children must be seen by their DCF Social Worker at least
> quarterly."*

**Review Findings and Trends**
The Monitor's review found that the majority of cases reviewed for the fourth quarter
successfully avoiding overcapacity episodes (90.1%),  limited placements to three or less
(95.3%) and met the monthly out-of-home visitation standard at 94.4% and the quarterly
visitation standard at 99.2%.  It is noted that overcapacity numbers reported within this
document differ in relation to the Department's reporting as a result of methodological
differences in approach to identifying overcapacity.  This review considered all
placements experienced by a given child, every day over the period.  The LINK data
reporting is accurate, but is based upon point in time data (and therefore may miss
overcapacity placements that occur sporadically but which resolve at the point of data
collection).  All parties have agreed to the Department's automated reporting format and
the Monitor has verified the accuracy of the logic and reporting.  The findings provided
within this document are descriptive in nature and offer some insight into the practices or
issues that may lead to the use of overcapacity homes.  Findings do not dispute the
automated reporting results.

Several themes emerged from the reviewers' comments.  These findings include:

- 64.8% of the cases within the sample reflected a level of practice that reviewers determined to be in compliance with practice and policy expectations – adequately assessing both needs and safety for the child in out of home placement. 28.5% of the cases were felt to be marginally successful in this regard, and 6.6% were felt to rank a poor score which reflects a lack of effort to meet the benchmarks and minimal assessment documented. There were no adverse scores.

- Visitation within the out-of-home population scored higher overall than the in-home visitation rank scores. Within the in-home population, the quality of visitation was ranked compliant with expectations in only 40.4% of the sample.

- Narratives do not always indicate if the SW met with the children/youth, biological parent(s), foster parent(s) or providers alone, and often times minimally describe the purpose of the visit or document discussions regarding action steps, goals and planning. 73.1% of the cases indicated that there was a private conversation held with the child on at least one occasion during the quarter. A private conversation with the caretaker was documented in 79.3% of the cases reviewed.

- An assessment of risk and safety during the visit was often not clearly documented. SW's often presented a series of seemingly small "red flags" within LINK narratives that were not assessed as part of the placement dynamic until the situation became stressed to the point of a request for removal. Further, there often was a lack of documented contact between the DCF SW and FASU SW in addressing these identified issues as they arose within in the home until such time that preservation of the placement was jeopardized by the crisis at hand.

- When a SW identifies issues during the course of practice, there are often no follow up narratives documenting actions taken by the Department, providers, family, or child to remedy the issues.

- Case Aide narratives are not always clearly identified as such – leading to the impression that the entries are made by SW.

- Timely entry of narratives appears to be problematic for some workers.

- The average number of placements was 1.84 during the twelve month period. Of the cases in which there was a documented need for a disruption conference, the record documented the conference in only 28.6% of the cases (n=7).

- The overcapacity placements identified were not considered to be at risk for disruption.

- The average number of visits per child over the quarter is 4.24 visits by the DCF SW assigned to the case. Other visits documented included 256 visits by other DCF staff, seven ICPC visits, and 82 private provider visits. When measuring visitation on a child specific level rather than the average of the population as approved within the logic, the rate of visitation drops slightly to 86.7% - still exceeding the once monthly benchmark. In nine of the cases not meeting the benchmark, a change in SW was indicated as having an impact on visitation.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested that the DCF provide the universe of all children that were in DCF custody for at least thirty days in the quarter ending December 31, 2006 (excluding voluntary, interstate and probate cases). It was determined that this universe could serve to provide representative samples for each of the Outcome Measures, 12, 14 and 16 given the parameters of the automated logic. The limitations of this approach were that some children would not be in placement for a full calendar year, or may be in residential facility placement versus foster care placement. However, due to considerations of time and resources, the parties agreed that a statistically valid sample from this universe would yield sufficient numbers for each outcome measure to be descriptively and qualitatively explored.

The Monitor's request was fulfilled with the Department's submittal of an Excel Database including 5,808 children. Sampling methodology required a sample at a 95% confidence level (+/-6%). This resulted in the need to identify 256 children for the sample.

The LINK record review was undertaken in February, March and April 2007. The DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted to ensure that issues of reliability and validity can be addressed prior to initiating the full review.

The universe and sample set population includes children from each of the area offices follows:

**Table 36: Area Office Distribution within the Sample Set (n=256)**

| Area Office | Universe | Frequency | Percent |
|---|---|---|---|
| Bridgeport | 422 | 18 | 7.0 |
| Danbury | 132 | 6 | 2.3 |
| Greater New Haven | 357 | 16 | 6.3 |
| Hartford | 819 | 36 | 14.1 |
| Manchester | 541 | 24 | 9.4 |
| Meriden | 234 | 10 | 3.9 |
| Middletown | 143 | 6 | 2.3 |
| New Britain | 636 | 28 | 10.9 |
| New Haven Metro | 608 | 27 | 10.5 |
| Norwalk | 98 | 3 | 1.2 |
| Norwich | 494 | 23 | 9.0 |
| Stamford | 87 | 4 | 1.6 |
| Torrington | 204 | 9 | 3.5 |
| Waterbury | 656 | 29 | 11.3 |
| Willimantic | 377 | 17 | 6.6 |
| **Total** | 5808 | 256 | 100.0 |

**Demographics**

The sample includes 256 children within 250 cases open during a range of 15 years, with the oldest case open since February of 1992, and the most recent case closed, but subsequently re-opened in February of 2007, just prior to the review.

The reason for case opening was most frequently identified as physical neglect (69.1% of the sample). All reasons identified are reported below. Please note that the total will not equal 256, as more than one identified reason can be identified in each case.

**Table 37: Cause for DCF Involvement at Date of Most Recent Case Opening Prior to December 31, 2006**

| Reason | Frequency Reason Identified | Percentage of Cases with this Reason Identified. |
|---|---|---|
| Physical Neglect | 177 | 69.1% |
| Substance Abuse/Mental Health of Parent | 98 | 38.3% |
| Emotional Neglect | 53 | 20.7% |
| Domestic Violence | 42 | 16.4% |
| Child's TPR prompted new case open | 41 | 16.0% |
| Physical Abuse | 27 | 10.5% |
| Voluntary Services Request | 17 | 6.6% |
| Educational Neglect | 16 | 6.3% |
| Sexual Abuse | 12 | 4.7% |
| Medical Neglect | 11 | 4.3% |
| Abandonment | 10 | 3.9% |
| Emotional Abuse/Maltreatment | 4 | 1.5% |
| FWSN | 3 | 1.2% |
| Moral Neglect | 1 | 0.4% |
| Total | 471 | |

The ages of the child population ranged from two months to eighteen on the date of review. The average age of the children in the sample was 9.2 years. The most frequently reported ages were bi-modal with one year and 15 years, each represented 25 times within the sample. Age at time of most recent placement episode ranged from less than one year old to seventeen years. The most frequently reported age was less than one (49 children). The median age of the sample at time of most recent placement episode was 6.8 years. Age and ethnicity of the sample is reported below:

**Crosstabulation 88: Race (Child or Family Case Named Individual) * Ethnicity (Child or Family Case Named Individual)**

| Race (Child or Family Case Named Individual) | Ethnicity (Child or Family Case Named Individual) | | | | |
|---|---|---|---|---|---|
| | Hispanic | Non-Hispanic | Blank (no Ethnicity selected in LINK) | Unknown | Total |
| Asian | 1 | 0 | 0 | 0 | 1 |
| Black/African American | 1 | 67 | 0 | 1 | 69 |
| White | 39 | 87 | 0 | 2 | 128 |
| UTD | 30 | 1 | 1 | 0 | 32 |
| Multiracial (more than one race selected) | 2 | 23 | 0 | 1 | 26 |
| Total | 73 | 178 | 1 | 4 | 256 |

The most frequently identified treatment planning goal for the population is reunification. Reunification was cited as the permanency goal for 42.2% of the population on December 31, 2006. Eleven of the cases with a goal of reunification failed to have a stated concurrent permanency plan goal (10.2%). Five plans (2.0%) were not approved or were missing altogether for the period so that reviewers could not establish the official goal on December 31, 2006. Three additional plans used permanency goals that are not considered one of the Department's approved goals.

**Table 38:  What is the Child or Family's Stated Permanency Goal on the Most Recent Approved Treatment Plan in Place during the Period?**

| Treatment Plan Goal | Frequency | Percent |
|---|---|---|
| Reunification | 108 | 42.2 |
| Adoption | 64 | 25.0 |
| Transfer of Guardianship | 16 | 6.3 |
| Long Term Foster Care with a licensed relative | 6 | 2.3 |
| APPLA:  Permanent Non-Relative Foster Care | 25 | 9.8 |
| APPLA:  Other | 28 | 10.9 |
| In-Home Goals - Safety/Well-being Issues | 1 | .4 |
| UTD - plan incomplete, unapproved/missing for this period | 5 | 2.0 |
| Goal indicated is not an approved DCF goal | 3 | 1.2 |
| Total | 256 | 100.0 |

Of the 145 children in care greater than 15 of the last 22 months, 65 had TPR filed or granted. Of the children with TPR status at the point of review, the sample ranged from granted dates of September 1997 through March 2007. Sixty-three children had exceptions documented in LINK precluding the filing. 26 cases did not document filing a TPR when it was pivotal considering of the length of time the case was open, case circumstances, and the case goal.

**Crosstabulation 89:   For Child in Placement, Has TPR Been Filed? * Has Child's Length of Stay Exceeded the 15 of the Last 22 Month Benchmark Set by ASFA?**

| For child in placement, has TPR been filed? | Has child's length of stay exceeded the 15 of the last 22 benchmark set by ASFA? | | | |
| | yes | no | TPR has already been filed or granted | Total |
|---|---|---|---|---|
| Yes | 8 | 4 | 65 | 77 |
| No | 17 | 9 | 0 | 26 |
| Exception noted in LINK | 53 | 10 | 0 | 63 |
| Total[27] | 78 | 23 | 65 | 166 |

The work of 217 workers under the supervision of 130 social work supervisors is included in this sample of cases.

### Outcome Measure 12

Outcome Measure 12 was established to monitor the frequency of placements experienced by children in the custody of the Department.  **The measure requires that:**

> *"Beginning on January 1, 2004, at least 85% of the children in DCF custody shall experience no more than three (3) placements during any twelve month period."*

During the Fourth Quarter 2006 the Department reported 96.3% compliance with this measure.  Automated reporting has indicated compliance with this measure since the second quarter 2004 reporting.  The Monitor's finding is consistent with the level of practice reported during the past twelve quarters. A total of 95.3% children had three or fewer placements during the 12-Month period ending December 31, 2006.

**Table 39:  Has this Child Experienced More than Three Placements in the 12-Months Ending December 31, 2006?**

| More than one placement experienced? | Frequency | Percent |
|---|---|---|
| Yes | 12 | 4.7 |
| No | 244 | 95.3 |
| Total | 256 | 100.0 |

The number of reported placements ranged from one to ten, with an average of 1.84 placements.[28]  The percentage of placement episodes is slightly higher for the 13 month to 24 month cohort, but no statistically significant differences were noted.  The mode of placements was one placement, with 124 children remaining in one placement during the quarter.

---

[27] Excludes the 90 cases where the child's goal and length of placement did not require TPR (86) or those where the child had reunified prior to December 31, 2006 (4).

[28] Placements captured do not include respite or hospitalizations of less than seven days.

**Crosstabulation 90:   How Many Consecutive Months has this Child Been in Out-of-Home Placement as of the Date of this Review or Date of Case Closure during the Period? * Has this Child Experienced More than Three Placements in the 12 Months Ending December 31, 2006?**

| How many consecutive months has this child been in out-of-home placement as of the date of this review or date of case closure during the period? | Has this child experienced more than three placements in the 12 months ending 12/31/06? | | |
|---|---|---|---|
| | Yes | No | Total |
| 1-6 months | 3 | 40 | 43 |
| 7-12 months | 1 | 62 | 63 |
| 13-18 months | 3 | 26 | 29 |
| 19-24 months | 2 | 24 | 26 |
| Greater than 24 months | 3 | 88 | 91 |
| Child no longer in placement  ( open as in-home case) | 0 | 4 | 4 |
| Total | 12 | 244 | 256 |

**Table 40:  How Many Placements Has this Child Experienced During This 12-Month Period?**

| Placements | Frequency | Percent |
|---|---|---|
| 1 | 124 | 48.4 |
| 2 | 80 | 31.3 |
| 3 | 40 | 15.6 |
| 4 | 6 | 2.3 |
| 5 | 2 | .8 |
| 6 | 1 | .4 |
| 7 | 1 | .4 |
| 8 | 1 | .4 |
| 11 | 1 | .4 |
| Total | 256 | 100.0 |

The placement count does not count moves to settings already experienced by the child as a change in placement.  This review also identified the number of moves experienced by the child.  During this period, the range of moves experienced was zero to 14, with the mode of moves identified as zero (119 children had no moves during the 12-Month period).   The average number of moves across the period is 0.95.

A disruption case conference is required by policy in situations were a child has experience two foster home disruptions within an eighteen month period for reasons related to the child's behavior or condition.   There were seven situations in which a Disruption Conference was warranted.  Of those situations, two (28.6%) had documented conferences.  In these two cases, the result was a temporary placement followed by hospitalization for evaluation; and the introduction of supports in the foster home along with respite to maintain the placement.

Other reasons for multiple placement moves beyond the child's immediate behavioral issues, are stated below for the sample set with the accompanying number of times isolated by reviewers.  Many reasons for moves are for positive purposes:

- Planned move to lower level of care – 40
- Temporary placement – 37
- Planned move to higher level of care – 27
- Move to a pre-adoptive placement – 20
- Foster Family life circumstances – 15
- Placement with special study – 9
- Delinquency/Detention/Incarceration – 6
- Placement with relative – 5
- Reunited with siblings in care – 5
- Relative not licensable – 2
- CPS report – 2
- Transferred to Tribal Council – 1
- Placement in closer proximity to home – 1

It is encouraging that in many situations, there was a documented effort to planfully match a child to a new placement, and/or support the placement in the period leading up to a move.   However, there still continues to be a lack of documented contact between the Ongoing Services and FASU staff in addressing situations where placements may have been preserved or improved by a collaborative effort to address an increase in behavioral issues or crisis in the foster home.  Collaboration with FASU is not documented on an ongoing basis.   SW's often presented a series of seemingly small "red flags" within LINK narratives that were not assessed as part of the placement dynamic until the situation became stressed to the point of request for removal.

### Outcome Measure 14

Outcome Measure 14 was established to monitor the Department's ability to maintain its foster homes within the stated licensed capacity. **Outcome Measure 14 requires:**

> *"At least 96% of all children placed in foster homes shall be in foster homes operating within their licensed capacity, except when necessary to accommodate sibling groups."*

The Department reported that during the Fourth Quarter, 2006 the agency achieved a 96.4% compliance rate with this measure. This measure has fluctuated slightly over the course of reporting from a low of 88.3% to a high of 97.0%. The average through the Fourth Quarter is 94.7 %. The Department's reporting, as approved by the parties, is a point-in-time reporting process. Our review incorporated the full three month timeframe and identified any situation, of any length, where there was an overcapacity placement. This is a methodologically different approach to the Department's point in time reporting, which isolates one date and reports on all children in care on a given date. This difference in methodology accounts for the disparate results.

Of the 256 children in placement within the sample, 202 were placed in foster care for all or part of the quarter. Of that number, 86.1% were placed in homes which did not exceed licensed capacity. Factoring in the exception for sibling placement, 20 children experienced overcapacity placements. Therefore, the review indicates that the Department achieved a compliance rate of 90.1% when looking at the 202 children across the full period.

In three situations the overcapacity occurred with the expectation that the census in the home would be reduced in the short term due to an imminent move of another child from that placement setting. Seven of the overcapacity situations were in therapeutic foster care homes, so the reviewer did not have access to records to collect data on supports or efforts to reduce the census.

In 11 of the 21 situations in which the overcapacity foster home was a licensed DCF foster home, and the Ongoing DCF SW documented contact with the FASU worker related to planning a move for the child. However, only two provider records contained a specific entry related to changes in the foster parent support plan. In both of these situations, the additional supports were implemented in the home.

To determine if these overcapacity placements were short term in nature, the reviewers looked at how many days a child was in an overcapacity situation. This is shown in the table below with reference to whether the sibling exception was present.

**Crosstabulation 91:  Was the Overcapacity the Result of Sibling Group Placement?
* For How Long was the Placement(s) Overcapacity during the Quarter?**

| Was the overcapacity the result of sibling group placement? | For how long was the placement(s) overcapacity during the quarter? | | | |
|---|---|---|---|---|
| | <7 days | 15-21 days | >28 days | Total |
| **Yes** | 2 | 0 | 6 | 8 |
| **No** | 5 | 1 | 14 | 20 |
| **Total** | 7 | 1 | 20 | 28 |

None of the 28 situations with overcapacity placements were identified by the treatment worker as at risk of disruption as a result of the overcapacity issue.

**Outcome Measure 16**

Outcome Measure 16 was established to monitor the visitation rate with children in DCF placement.  The measure is two fold, in that **Outcome Measure 16 requires that:**

> *"DCF shall visit at least 85% of all out-of-home children at least once a month, except for probate, interstate, or voluntary cases.  All children must be seen by their DCF Social Worker at least quarterly."*

All 256children within the sample were seen by some professional at least once over the quarter.  The number of visits across the quarter by the assigned SW ranged from zero to 19, with an average of four visits, and a mode of 3 visits (80 cases).  The data indicates that the Department achieved 99.2% compliance with the quarterly mandate for visitation by a DCF SW. Out of the five cases in which there was no assigned DCF SW visit, there were three cases with a documented visit by another DCF SW, and two with at least one Interstate Compact on the Placement of Children (ICPC) documented visit.  In following the methodology of establishing the visitation rate within the monthly population and calculating the average for the quarter that is established by the Revised Exit Plan, our data indicates an average of compliance of 94.4% with monthly visitation requirement by DCF or other approved professional.  This is consistent with the Department's automating reporting of 94.7% during the fourth quarter.

Interestingly, however, when measuring visitation on a child specific level rather than an average of the population,222 of the 256 children in the sample, were visited by a DCF (or other acceptable professional) at least once a month during <u>each</u> month for which they were in placement during the quarter.  Performance still exceeds the 85.0% requirement but with a lower percentage rate, as this translates to 86.7% of the children being seen at least one time per month <u>each</u> month during the quarter.  In nine of the cases not meeting the benchmark requirement, the reviewers indicated that there was a worker change which appeared to have an impact on the visitation schedule. Statistics for the rate of visitation by each acceptable party are shown below.

**Table 41:  Statistics Related to Visitation by DCF, ICPC or Identified Private Provider within the 256 Sample Set.**

| | Cases with DCF Assigned SW visits during the quarter. | Cases with Other DCF SW visits during the quarter. | Cases with ICPC visits during the quarter. | Cases with Private Provider visits during the quarter. |
|---|---|---|---|---|
| **Valid Counts** | 256 | 116 | 7 | 36 |
| **Mean Visits** | 4.24 | 2.55 | 1.50 | 1.78 |
| **Median Visits** | 4.00 | 2.00 | 1.00 | 1.00 |
| **Mode** | 3 | 0 | 1 | 0 |
| **Range** | 19 | 16 | 2 | 6 |

The quality of visits was a focus of the review process as well.  The review captured whether private conversations with the children occurred during visitation, the level of engagement efforts with parents who were to reunify with their children, discussions with caretakers related to well-being and permanency, assessment of well-being, risk and safety, supervision, and the provision of services.  At the close of the tool, reviewers were asked to evaluate the overall quality of the visitation based upon the same rank scoring protocol that was used for the in-home visitation cases.

In all, 73.1% of the cases documented private conversation with (or visual assessment in situations where children could not communicate due to age or limitations) the child on at least one occasion during the quarter.  There were 69 situations in which there was documented contact with the identified child(ren) during visits that did occur, but reviewers could not infer from the documentation whether the meetings with children were private.   In the following table, private conversation is shown crosstabulated with whether the child was seen on a monthly basis during the quarter.  This provides a sense of the frequency with which private conversations are documented in the LINK record.

**Crosstabulation 92:  Were there Monthly Face-to-Face Visits Documented for this Child in Placement During the Quarter of Review? * During these Visits, Did the SW Meet with the Child in Private? (alone)**

| Were there monthly Face-to-Face visits documented for this child in placement during the quarter of review? | During these visits, did the SW meet with the child in private? (alone) | | | | | |
|---|---|---|---|---|---|---|
| | Yes, in all three months | Yes, in two months | Yes, in one month | No months | Visually Assessed as Age/ Developmental level precludes communication | Total |
| **Yes** | 39 | 40 | 36 | 52 | 55 | 222 |
| **No** | 0 | 8 | 8 | 17 | 1 | 34 |
| **Total** | 39 | 48 | 44 | 69 | 56 | 256 |

In reviewing the engagement efforts with parents to whom children are reunifying, our review asked:  "Did the DCF Worker have documented Face-to-Face contact with the parent for which reunification is the goal on a monthly or quarterly basis?"   In all there were 113 cases with a goal of reunification for at least one month of the period.  Workers

documented quarterly contact with the identified parent or guardian in 91.2% of the applicable population. Required monthly contact was made in 63.7% of the 113 cases applicable, and in ten of these cases (8.9 %), there was no documented contact with the parent at any point during the quarter.

85.5% of the sample cases had documented conversation with the placement provider during the quarter. *Private* conversation with the child's caretaker (foster parent or residential care provider) was documented in 203 or 79.3 % of the cases.

**Crosstabulation 93:  Did DCF Social Worker Have Documented Private Contact/Conversations with the Foster Parent/Provider During the Quarter * Did the DCF Social Worker Document that the Discussion with the Placement Provider Included Conversation Related to the Child's Well-Being and Any Services in Place at That Time?**

| Did DCF SW have documented private contact/conversations with the foster parent/provider during the quarter? | Did the DCF SW document that the discussion with the placement provider included conversation related to the child's well-being and any services in place at that time? | | |
|---|---|---|---|
| | Yes | No | Total |
| Yes | 194 | 9 | 203 |
| No | 25 | 25 | 50 |
| Total[29] | 219 | 34 | 253 |

The SW documented issues of concern in LINK regarding the placement or well-being of the child in 67 of the cases reviewed.  In 67 cases, the reviewers found evidence of supervision regarding placement or well-being issues in 49 cases (73.1%).

- In 35 of these situations, the SW followed the SWS directives indicated in the LINK narrative.
- In seven cases, there were no SWS directives regarding identified issues.
- In seven additional cases, there was no documented follow up by the SW indicating that they were following the SWS directives as they managed the case going forward.

Comments by the case reviewers indicate that supervision directly impacted the quality of visitation, and that in many instances there was a lack of documented discussion in the SWS conference notes regarding issues identified in the SW or Case Aide narratives. Documentation of safety and well-being assessments were not present in many of the supervisory narratives documented during the period.

There were 43 cases reviewed where the narrative documented a concern that might warrant contact with the FASU (foster care) worker or in fewer instances the PREU (residential facility) to advise them of the possibility of a safety issue within the out-of-home setting or to seek support to assist the worker in improving a situation impacting the well-being of a child in placement.  Of the 43 cases, there was documented contact with the FASU support worker or PREU in 21 cases (48.8%).

---

[29] Total excludes the three cases with no documented DCF SW contact during the quarter.

**Table 42:  Did the DCF Social Worker Advise FASU or the PREU of Any Serious Concerns Arising as a Result of Visits at the Provider Location?**

| Did the DCF SW Advise FASU or PREU of Any Serious Concerns …? | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| Yes | 21 | 8.2 | 8.2 | 8.2 |
| No | 22 | 8.6 | 8.6 | 16.8 |
| N/A - No concerns noted during the quarter | 210 | 82.0 | 82.0 | 98.8 |
| UTD No Face-to-Face visits during quarter | 3 | 1.2 | 1.2 | 100.0 |
| Total | 256 | 100.0 | 100.0 | |

The review evaluated the level of SW responsiveness to requests for assistance from children in placement and providers as well as the timeliness of the SW's response following the request.  There were 49 cases in the sample with documentation of a request for some type of assistance.  In 39 of these cases (79.6%), clear documented SW response was found in LINK.  In six cases (12.2%), there was no documentation of SW follow through.  The reviewer could not determine if follow through had occurred in the remaining four cases (8.2%) because at the point of review there was no pertinent narratives regarding the request in LINK.

**Crosstabulation 94:  Did the Child in Placement or Placement Provider Request Assistance with Service Provision, Clothing, or Other Necessary Item? * If Yes, Did the SW Document His/Her Follow Through with Assistance or Information in a Timely Manner?**

| Did the child in placement or placement provider request assistance with service provision, clothing, or other necessary item? | If yes, did the worker document his/her follow through with assistance or information in a timely manner? | | |
|---|---|---|---|
| | yes | no | Total |
| Yes | 39 | 6 | 45 |
| No | 0 | 4 | 4 |
| Total | 39 | 10 | 49 |

The reviewers ranked the quality of visitation throughout the quarter of October 1, 2006 through December 31, 2006 using the ranking score identified within the directional guide (in italics below).

161

*Optimal Quality – 5*
*The reviewer finds evidence that visits occurred at the benchmark requirement or with greater frequency if necessitated by the facts of the case. During those visits, all essential DCF Policy requirements are met, as are practice expectations within the documentation, including an assessment of needs and safety within the out of home placement and a discussion of the progress toward the treatment plan goals. There is ongoing evidence of discussion related to referrals, services or information.*

*Very Good Quality – 4*
*The reviewer finds evidence that visits occurred at the benchmark requirement. During each visit, essential DCF Policy expectations are substantially present. There is an effort to include an assessment of needs and safety for each visit as well as documentation within the quarter of discussion related to treatment plan goals, follow up on referrals, and the services in place for the child.*

*Marginal Quality – 3*
*While attempts were made to visit the child in placement and comply with DCF Policy requirements, the reviewer finds evidence that visits may not have occurred at the benchmark requirement. An effort is made by the DCF Social worker to follow DCF practice expectations and to document some assessment of needs and safety within the out of home placement. Visits may not indicate follow up discussion documented on referrals, services or information provided.*

*Poor Quality – 2*
*The reviewer finds little evidence that the benchmark for visitation was attempted. The quarterly visitation requirement may be met, however, there is a failure to document compliance with DCF practice expectations regarding visitation with children in out of home placement so that there is no documentation of safety or needs assessment within LINK narratives.*

*Adverse Quality – 1*
*Both DCF Policy and practice expectations were disregarded. The reviewer finds no documentation of visits during the quarter, or the LINK narrative indicates a visitation contact which raises serious concerns and inappropriate response.*

*The determination of specific compliance with policy may be found as stated directly in the worker-child visitation narratives, but can be bolstered by the additional narratives entered throughout the period.*

**Table 43: Overall Rank Score for the Quality of Visitation**

| Rank | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| Optimal Quality | 37 | 14.5 | 14.5% |
| Very Good Quality | 129 | 50.4 | 64.8% |
| Marginal Quality | 73 | 28.5 | 93.4% |
| Poor Quality | 17 | 6.6 | 100.0% |
| Adverse Quality | 0 | 0.0 | 100.0% |
| Total | 256 | 100.0 | |

As shown in Table 43, the reviewers found that 64.8% of the sample had documentation that reflected the SWs achievement of the visitation benchmark of **as well as** a level of documentation indicating compliance with practice and policy expectations and adequate assessment of needs and safety for the child in the out-of-home placement. 28.5% of the cases documented practice that was considered marginal, in that the Department may or may not have met the monthly requirement, but that the documentation indicates considerable effort in that regard. In addition documentation in these marginal situations demonstrates an *effort* to meet the practice and policy expectations including some level of assessment of needs and safety. Lastly, 6.6% of the sample set were scored at the poor ranking level as the record reflected no effort to meet benchmarks and/ or no assessment of safety and well-being during visits that were documented (either by the worker or via the other professionals documenting the visits).

When the visitation work in the out-of-home case sample is compared with the quality of visitation within the in-home population sample, the quality of out-of-home visitation noted is higher overall then with the in-home population. There were no instances of "adverse" quality as was found within the in-home sample set. See comparison below:

**Table 44: Comparison of Quality of Visitation with In-Home and Out of Home Sample Sets**

| Rank Score | Percent in OOH Sample (n=256) | Percent in In-Home Sample (n=250) |
|---|---|---|
| Optimal Quality | 14.5% | 10.0% |
| Very Good Quality | 50.4% | 30.4% |
| Marginal Quality | 28.5% | 40.8% |
| Poor Quality | 6.6% | 17.6% |
| Adverse Quality | 0.0% | 1.2% |
| Total | 100.0% | 100.0% |

## Outcome Measure 13:  Foster Parent Training

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct a qualitative review for Outcome Measure 13:  Foster Parent Training.  This review supplements the quarterly data provided from the Department and CAFAP.

Outcome Measure 13 requires that,

>*Licensed DCF foster or pre-adoptive parents shall be offered 45 hours of post-licensing training within 18 months of initial licensure and at least 9 hours each subsequent year.  This measure does not apply to relative, special study or independently licensed foster parents for who 9 hours of pre-services training is required.*

**Review Findings and Trends**

The Department has consistently reported 100% compliance with the foster parent training measure.  The requirement as written requires the provision of training opportunities.  However, it is clear that the Department is not in compliance with internal policies regarding mandatory training.  This includes training requirements for re-licensure, annual support planning, and support during response or follow up within a foster home facing regulatory violation or substantiations.   Further, while the schedule for training indicates training opportunities statewide, there are some gaps in availability by location, and there continue to be deficits in relation to the FASU's support and provision of foster parent training.  These oversight issues must be adequately addressed to increase and maintain a well-trained population of foster parents through active retention and support activities.

The Department's Policy 41-26-5 requires:

>*"Mandatory post-licensing training consists of forty-five (45) hours of training within eighteen (18) months of initial licensure, as follows:*

>- *9 hours:  "Supporting Relationships Between Children and Their Families"*
>- *9 hours:  "Working as a Professional Team Member"*
>- *27 hours:  Individual selection of Department approved courses as listed on the "Resource Family Support Plan" (DCF-470).*

>*Following the completion of the above 45 hours, licensees must attend nine (9) hours of Department approved training in each subsequent year, which may consist of conferences, classes, symposiums or other types of training which will enhance the skills needed to care for children."*

Our review of the CAFAP training records and provider sample set found that:
- 82.7% of the foster parent Post Pride classes offered during 2006 were held, but many with very small enrollments. The lack of training is one of practice, not documentation, as verified via a comparison of DCF Provider records and CAFAP training database records.

- It appears that the demand for training courses is incongruous with the training requirements and re-licensure protocol established by DCF Policy.
- The Department is less than rigorous in respect to this policy in that of the 40 situations within the sample in which a family was licensed or re-licensed during the period, only 30% had documented the completion of the required training at the time of licensure or re-licensure.
- Modules requiring DCF co-facilitation are still problematic to schedule due to lack of DCF participation.
- Foster parents do not take advantage of the DCF Training Academy course offerings.
- Private Provider home records related to training are not maintained within the DCF provider database.  It is unclear if there are monitoring activities related to training of this population.
- FASU support has a positive impact on training attendance rates during the Fourth Quarter.  Overall number of foster parents within the sample attending classes was 9 foster parents.  The rate of attendance is 55% within the population that had documented FASU visit versus 15.8% for the population that did not have a visit.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the universe of all licensed foster homes available to the Department on December 31, 2006.  This included all active DCF licensed non-relative foster homes, special study foster homes, and licensed relative homes as well as private provider foster homes available via the contracts with various organizations throughout the state.  The universe included the following statewide foster parent provider database.

**Table 45:  Foster Care Providers by Area Office**

| Area Office | Frequency | Percent |
|---|---|---|
| Bridgeport | 359 | 9.6 |
| Danbury | 122 | 3.3 |
| Greater New Haven | 317 | 8.5 |
| Hartford | 434 | 11.7 |
| Manchester | 397 | 10.7 |
| Meriden | 97 | 2.6 |
| Middletown | 147 | 3.9 |
| New Britain | 360 | 9.7 |
| New Haven Metro | 221 | 5.9 |
| Norwalk | 45 | 1.2 |
| Norwich | 392 | 10.5 |
| Out Of State | 61 | 1.6 |
| Stamford | 42 | 1.1 |
| Torrington | 119 | 3.2 |
| Waterbury | 361 | 9.7 |
| Willimantic | 249 | 6.7 |

| | | |
|---|---|---|
| **Total** | 3723 | 100.0 |

The parties agreed upon a sample of 75 foster parent provider records, randomly selected from the supplied universe of 3,723 providers identified by the Department. The sample of 75 foster care providers consisted of 39 DCF non-relative foster care providers, 12 relative foster care providers, 5 special study foster care providers, 16 private provider foster homes, one lapsed license home and two "other" homes. The "other" consisted of an independent foster home and a relative providing foster care but not yet licensed. Licensed bed capacity ranged from zero to four at the point of review, with 40% of the homes having a licensed capacity of three.

A tool was developed and approved by the parties prior to implementation. A pilot test was conducted with minimal changes required.

The records of this 75 case sample were reviewed as well as the quarterly documentation provided. In-person interviews were held with CAFAP staff, and emails and phone interviews with DCF staff provided additional information.

**Descriptive Findings**
Connecticut Association of Foster and Adoptive Parents (CAFAP) publishes a quarterly bulletin, *Communiqué*, which provides all training opportunities over the coming three month period consistent with the Post-PRIDE training curriculum requirements. Of the 173 sessions offered, 143 were held during 2006. CAFAP registered a total of 1,728 foster parents for training modules across the state. Of that total 1,051 foster parents completed the hours required within a single selected module to obtain a certificate of completion. In addition, 8 DCF staff obtained certificates of completion for a module. The 30 sessions not held were cancelled due to lack of enrollment numbers. (Note: CAFAP has accommodated classes with as few as two individuals and as great as 35 during this period.)

CAFAP also continues to struggle with DCF's lack of participation in modules requiring co-facilitation by Department staff. This impacts the ability to plan and implement modules 5, 6 (both required), 8 and 9 – so that these modules are being held with DCF providing "guest speakers" in some instances rather than with the full co-facilitator indicated by the curriculum otherwise they would not be able to be held at all. Effective Foster Parent Training (EFP) for Spanish speaking foster parents is offered several times a year as a group course, but is also provided to the individual as needed. This EFP training is not shown in the table below. The full breakout of the CAFAP Post-PRIDE training opportunities during 2006 is shown in the table below.

**Crosstabulation 95:  Post PRIDE Module Number * Was This Class Held?**

| Post-PRIDE Module | Was the class held? | | |
|---|---|---|---|
| | Yes | No | Total |
| 1:  Foundation for Meeting the Developmental Needs of Children at Risk | 21 | 4 | 25 |
| 2:  Using Discipline to Protect, Nurture and Meet Developmental Needs | 20 | 6 | 26 |
| 3:  Addressing Developmental Issues Related to Sexuality | 19 | 4 | 23 |
| 4:  Responding to the Signs and Symptoms of Sexual Abuse | 16 | 4 | 20 |
| 5:  Supporting Relationships Between Children & Their Families | 9 | 4 | 13 |
| 6:  Working as a Professional Team Member | 10 | 2 | 12 |
| 7:  Promoting Children's Personal and Cultural Identity and Life Books | 15 | 1 | 16 |
| 8:  Promoting Permanency Outcomes | 4 | 0 | 4 |
| 9:  Managing the Fostering Experience | 7 | 0 | 7 |
| 10:  Understanding the Effects of Chemical Dependency on Children and their Families | 13 | 5 | 18 |
| 11: Medically Complex Pediatric Health | 7 | 0 | 7 |
| 15: My Brother, My Sister; Sibling Relations in Foster Care | 1 | 0 | 1 |
| 16: Crisis Intervention | 1 | 0 | 1 |
| Total | 30 | 143 | 173 |

From an alternate perspective, the following table provides a listing of courses by area office designation.  This is followed by a table reflecting the full universe of foster parents on December 31, 2006, as provided by the Department.  The two in conjunction with one another can provide some insight into possible areas of the state in need of additional training opportunities.

**Crosstabulation 96:  What Was the Location of Training Offered * Was this Class Held?**

| What was the location of training offered (% of total offerings) | | Was Class Held? | | |
|---|---|---|---|---|
| | | Yes | No | Total |
| **Bridgeport Area** | Bridgeport (6.9%) | 12 | 0 | 12 |
| | Trumbull (2.3%) | 3 | 1 | 4 |
| **Danbury Area** | Danbury (4.6%) | 8 | 0 | 8 |
| | New Milford (0.6%) | 0 | 1 | 1 |
| **Greater New Haven** | Ansonia (0.6%) | 1 | 0 | 1 |
| | Hamden (0.6%) | 1 | 0 | 1 |
| | Milford (1.2%) | 1 | 1 | 2 |
| **Hartford Area** | Bloomfield (2.3%) | 4 | 0 | 4 |
| | Hartford (5.2%) | 9 | 0 | 9 |
| | West Hartford (0.6%) | 1 | 0 | 1 |
| | Windsor (2.3%) | 4 | 0 | 4 |
| **Manchester Area** | Manchester (3.5%) | 6 | 0 | 6 |
| | Stafford Springs (1.7%) | 2 | 1 | 3 |
| **Meriden Area** | Meriden (2.9%) | 5 | 0 | 5 |
| | Wallingford (0.6%) | 1 | 0 | 1 |
| **New Haven Metro** | New Haven (6.9%) | 11 | 1 | 12 |
| **Middletown  Area** | Middletown (4.6%) | 5 | 3 | 8 |
| | Old Saybrook (2.3%) | 0 | 4 | 4 |
| **New Britain Area** | Bristol (2.3%) | 4 | 0 | 4 |
| | New Britain (3.5%) | 5 | 1 | 6 |
| | Rocky Hill (2.9%) | 4 | 1 | 5 |
| **Norwalk Area** | Norwalk (5.2%) | 5 | 4 | 9 |
| **Norwich Area** | New London (2.9%) | 5 | 0 | 5 |
| | Pawcatuck (1.7%) | 2 | 1 | 3 |
| | Norwich (6.4%) | 10 | 1 | 11 |
| **Stamford Area** | ------------------------------ | -------- | -------- | ------- |
| **Torrington Area** | Torrington (5.8%) | 5 | 5 | 10 |
| | Winsted (0.6%) | 1 | 0 | 1 |
| **Waterbury Area** | Cheshire (1.2%) | 2 | 0 | 2 |
| | Naugatuck (1.7%) | 1 | 2 | 3 |
| | Waterbury (6.9%) | 12 | 0 | 12 |
| **Willimantic Area** | Thompson (0.6%) | 1 | 0 | 1 |
| | Willimantic (8.7%) | 12 | 3 | 15 |
| **2006 Calendar Year Total** | | **143** | **30** | **173** |

There were 46 support workers assigned across the DCF portion of the provider sample. Twenty-five DCF providers showed as active for Medically Complex Foster Care within the service details section of the provider record. However, only eight DCF foster parents were actually identified as Medically Complex Certified[30] by Central Office staff. This may be the result of a coding issue to allow for a higher rate of payment when regular foster parents receive child specific training to provide service to a child with medical needs, but are not actually fully certified.

There is no requirement for DCF FASU support workers to be assigned to the private provider homes. These foster parents are to be supported through their private provider networks. As narratives are minimal or non-existent for many of these homes, and no oversight or assessment is conducted by DCF FASU Support workers, it is unclear how DCF monitor's the level of compliance with training for this population.

CAFAP maintains a database of all training attendance and certifications for Post PRIDE and provides the Foster and Adoptive Support Units with this information on a routine basis so that it can be entered into the provider records. In past reviews we could not ascertain if the lack of training documentation in the provider records was the result of a failure to attend or a failure to document. This review had access to this information from CAFAP regarding training completed during the last year and offers a better opportunity to assess whether DCF provider record documentation is the issue, or if training requirements are not being upheld/supported by the FASU SWs. CAFAP's records were consistent with the data collected, which identifies the lack of training issue as one of practice not documentation.

In addition to the Post-PRIDE modules offered through CAFAP, DCF has a minimal number of slots open to foster parents via the Training Academy. Private providers also offer training opportunities and many of their conferences count toward the total number of hours required. The Training Academy reports that foster parents do not take advantage of the courses available at the Academy. Anecdotally, it appears that private provider and conference training opportunities are attended with greater frequency than the Training Academy courses, however foster parents self report attendance/completion rates and provide the necessary documentation to provide evidence of completion. There were no entries in the training records reviewed to show attendance at Training Academy offerings for the period. This was verified with the Training Academy Director via email.

As the Department implements the proposed changes to foster parent training requirements, specifically allowing for greater flexibility in the training approved for foster parents, documentation issues will present challenges not only due to the issues related to FASU staff support entries in LINK but also due to the limitations of the

---

[30] Medically Complex Certification process under the direction of Nursing in Central Office requires 15 hours of training and verifies current CPR certification by both the foster parent and a back-up resource for those foster parents who opt to care for this special population. Subsequent years training is identical to regularly licensed foster parents; however the CPR certification must also be kept current. Child specific training is also offered to deal with medical needs of children who may not require placement in a medically complex certified home, but who have medical needs requiring such intervention. This would be provided by the medical provider or hospital upon or just prior to placement.

Provider LINK system as the functionality on this side of the data system is not as fully established as the Case Record data collection and reporting capabilities.

Twenty-five DCF licensed foster parents had documented training during the 2006 calendar year. During the fourth quarter 2006 only nine foster parents within our sample attended training.

**Table 46: How Many Hours of Training are Documented for this Foster Parent in the Period of October 1, 2006 through December 31, 2006?**

| Documented Hours | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| **0** | 66 | 88.0 | 88.0 | 88.0 |
| **3** | 1 | 1.3 | 1.3 | 89.3 |
| **4** | 1 | 1.3 | 1.3 | 90.7 |
| **5** | 1 | 1.3 | 1.3 | 92.0 |
| **8** | 1 | 1.3 | 1.3 | 93.3 |
| **9** | 3 | 4.0 | 4.0 | 97.3 |
| **12** | 1 | 1.3 | 1.3 | 98.7 |
| **18** | 1 | 1.3 | 1.3 | 100.0 |
| **Total** | 75 | 100.0 | 100.0 | |

Support visits by FASU SW staff seem to have a positive effect on the training attendance rates of foster providers. Providers with documented visits to the home had a higher rate of training participation during the 2006 calendar year. (55% of those with visits attended training versus 15.8% of those that did not have support visit documented)

**Crosstabulation 97: Did the FASU Support Worker document any visits to this home during the quarter of October 1, 2006 through December 1, 2006? * Has this provider attended any foster parent trainings in the year of January 1, 2006 through December 31, 2006?**

| Did the FASU Support Worker document any visits to this home during the quarter of October 1, 2006 through December 1, 2006? | Has this provider attended any foster parent trainings in the year of January 1, 2006 through December 31, 2006? | | | |
|---|---|---|---|---|
| | Yes | No | UTD- No narratives in LINK | Total |
| **Yes** | 22 | 18 | 0 | 40 |
| **No** | 3 | 15 | 1 | 19 |
| **Total[31]** | 25 | 33 | 1 | 59 |

As stated previously, the Department has consistently reported 100% compliance with the foster parent training measure. The requirement, as written, requires the provision of training opportunities. However, it is clear that the Department is not in compliance with internal policies regarding mandatory training. This includes training requirements for re-licensure, annual support planning, and support during response or follow up within a foster home facing regulatory violation or substantiations. Nor does it appear that DCF

---

[31] Excludes private providers.

monitors the training of private provider supported foster homes for which higher rates are paid in relation to the expertise and experience these homes are to possess although its own policy does have some requirements in this regard.

There were six families that were in the initial post licensure period and required 45 hours of training to be underway or completed at the point of review. All six providers had engaged in some level of training during the 2006 calendar year. As foster parents passed the initial post licensure period, fewer foster parents appear to be completing training. Of the 32 foster parents who were required to complete 9 hours of training during the year, 31.3% had some training documented during the year. The documentation reviewed revealed that only 9 of 21 relative/special study foster parents records identified completion of the required 9 hours of pre-service training.

**Crosstabulation 98: Does this Date (d6) Place the Foster Care Provider within the Initial Post Licensure Training Period, Subsequent Year Training Period, Special Study/Relative Pre-Service, or Private Provider Training Requirement Category* Documentation that this Provider Attended any Foster Parent Trainings in the Year of January 1, 2006 through December 31, 2006?**

| Does this date (d6) place the foster care provider within the initial post licensure training period requirement or subsequent year training requirement | Documentation that provider attended any foster parent trainings in the year of January 1, 2006 through December 31, 2006? | | | |
|---|---|---|---|---|
| | Yes | No | UTD- No narratives in LINK | Total |
| Initial post licensure training requirement 45 hours to be completed[32] | 6 | 0 | 0 | 6 |
| Subsequent licensure training requirement of 9 hours to be complete[33] | 10 | 21 | 1 | 32 |
| Relative/Special Study - 9 hours of pre-service training[34] | 9 | 12 | 0 | 21 |
| Private Provider - 24 hrs initial year or 20 hrs thereafter[35] | 1 | 0 | 15 | 16 |
| Total | 26 | 33 | 16 | 75 |

Barriers to training were identified in seven of the cases reviewed and included: "Training not available in the area during the period", "hours of training", "work schedule", "experienced foster parent – has completed required modules, what next?", "transportation issue", and "DCF worker did not follow up on foster parent request", "other priorities - home placed on hold due to care of elderly parent – no children placed during period."

Of the 59 situations in which the family was a licensed DCF provider, 16 of the providers (32.7%) had a support plan documented within the 2006 calendar year. This is a slight decline over our 2005 reported total of 33.8%.

---

[32] DCF Policy 41-26-5
[33] DCF Policy 41-26-5
[34] DCF Policy 41-17-15.4
[35] DCF Policy 41-5-5

**Crosstabulation 99: Does the Record Indicate that a Support Plan was Developed or Updated to Identify the Training Needs at any Point During the Period Beginning January 1, 2006 through December 31, 2006? * Has this Provider Attended any Foster Parent Trainings in the Year of January 1, 2006 through December 31, 2006?**

| Does the record indicate that a support plan was developed or updated to identify the training needs at any point during the period beginning January 1, 2006 through December 31, 2006? | Has this provider attended any foster parent trainings in the year of January 1, 2006 through December 31, 2006? | | | |
|---|---|---|---|---|
| | Yes | No | UTD- No narratives in LINK | Total |
| **Yes** | 8 | 8 | 0 | 16 |
| **No** | 17 | 25 | 1 | 43 |
| **Total[36]** | 25 | 33 | 1 | 59 |

Forty foster parents were re-licensed during the year reviewed. Of these, 28 or 70% did not have documentation in the provider record of having completing the training requirements.

**Crosstabulation 100: Does this Date (d6) Place the Foster Care Provider within the Initial Post Licensure Training Period Requirement or Subsequent Year Training Requirement? * Was this Provider Licensed/Re-licensed During the Period of January 1, 2006 through December 31, 2006 without Documentation that they Had Completed the Required Number of Foster Parent Training Hours?**

| Does this date (d6) place the foster care provider within the initial post licensure training period requirement or subsequent year training requirement | Was provider licensed/re-licensed during the period of Jan 1, 2006 through Dec 31, 2006 without documentation they had completed the required number of foster parent training hours? | | |
|---|---|---|---|
| | Yes | No | Total |
| **Initial post licensure training requirement 45 hours to be completed** | 0 | 0 | 6 |
| **Subsequent licensure training requirement of 9 hours to be completed** | 12 | 4 | 33 |
| **Special Study - 9 hours of pre-service training** | 6 | 8 | 21 |
| **Private Provider - 24 hrs initial year or 20 hrs thereafter** | 10 | 0 | 15 |
| **Total[37]** | 28 | 12 | 75 |

---

[36] Excludes the16 private provider homes.
[37] Excludes 35 cases in which license renewal did not occur during the period.

**Outcome Measure 17 – Worker/Child Visitation (In-Home)**

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct the Outcome Measure 17 Case Review.  Outcome Measure 17 Case Review is a qualitative review to supplement the quarterly data provided by DCF with logic verified by the Court Monitor, regarding the frequency of Worker-Child Visitation for In-Home Family cases.  **Outcome Measure 17 requires that DCF comply and sustain the following level of practice:**

> *DCF shall visit at least85% of all in-home family cases at least twice a month, except for probate, interstate or voluntary cases.*

The measure also defined actual contact with children as follows:
> 1. Twice monthly visitation must be documented with each active child participant under the age of 19 years who is not in out-of-home placement. Visitation occurring in the school, home or other community setting will be considered for Outcome Measure 17.

After implementing the outcome measure in 2005, it became apparent that automated data reporting could not accurately identify and capture visitation with "all active child participants."  The intricacies and fluidity of family and child relationships are not well suited for automated review and are best reviewed in a qualitative manner.  Agreement was reached to focus on the quantitative requirement of actual documented contact with any active case participants during each period.  The reporting logic excludes all cases not open for the full month in Ongoing Services.

It became apparent during initial analysis and comparison between review and ROM reporting that there were reliability issues.  Identified discrepancies with the ROM database were isolated and re-reviewed.   In several instances ROM logic was unable to distinguish the use of incorrect narrative selection types.  Transfers between offices likewise present a challenge to the ROM logic.  Reviewer errors were primarily the result of a reviewer selecting certain narrative entry types from the LINK record versus all narrative for all three months.  Several reviewers entered data for cases during months in which investigations were responsible for the case or the case was in transition to Ongoing Services.  Necessary corrections were made to the database for all identified reviewer errors to ensure accuracy of this reporting.

**Review Findings and Trends**

The Department has reported compliance with this outcome measure for six quarters, beginning with the Fourth Quarter 2005.  Following the reconciliation process for this review, the Monitor has determined the rate of compliance with Outcome Measure 17 for the Fourth Quarter 2006 sample is 83.7%.  This is consistent with the LINK reporting, which is subject to over reporting by approximately 3.3% if correct selection of narrative entry type, as experienced within this sample, is generalized to the full population.  Department performance hovers at the compliance rate, and has shown significant

173

improvement over the past three-year period. Prior to the Exit Plan, performance reviews cited rates as low as 35% for cases where families were seen twice monthly.

This review found several themes resonated within the reviewers' comments. These included:

- Reviewers felt that the Department achieved overall "very good" or "optimal" scores in 40.4% of the cases reviewed:
  - In 71.9% of the visits documented, there was at least one child successfully engaged in a private conversation with the SW.
  - The review found that 91.6% of the cases did have documented conversation with the parent or guardian regarding their child(ren)'s well-being and service provision on at least one occasion during the quarter.
- In 139 (55.6%) of the 250 cases, there was indication that the worker had concerns related to the child's safety or well-being as a result of the visits or contacts with the family and providers involved in the case. Of these, 119 cases (85.6%) documented discussion/direction provided during supervision regarding these SW's concerns.
- The majority of the cases indicate compliance with the twice monthly requirement.
- Visits are not inclusive of all active case participants. In some cases one or more family members were not seen during the quarter.
- Reviewers' comments indicate that the purpose of visits is not always clearly documented.
- Safety and needs assessments continue to be absent in the documentation of the visits with family.
- Progress toward goals and treatment planning is not routinely documented within narrative discussions.
- Many visits occur outside of the family home and are actually activities such as court or transportation.
- Private interviews with the active case participants under age 19 are not routinely documented.
- Description of the child, family, or home is often repeated verbatim across the period's narratives.
- In cases where supervisory narratives indicated directives, there was often evidence of appropriate SW action. However, reviewers often noted lack of SW follow-up related to issues or concerns raised by children, family or providers. Many of these issues were not documented within supervision, so it is unclear if supervisors were aware of the issues. It cannot be determined at this juncture, if this is a documentation or case practice issue.
- Cases closing during the period appeared to be done in an abrupt manner in many cases. Visitation often ceased as soon as the decision was made to close the case, regardless of the actual timeframe to the official case closing in LINK.
- Visitation Narratives are not always entered in a timely manner.
- Workers may not select the accurate case activity designation in LINK and often fail to identify the actual case participants involved in the episode. This can impact reporting accuracy as previously noted.

- In 11.8% of the cases that did not meet this requirement, reviewers found instances where worker assignment changes appeared to be the cause for lapse in visitation.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all in-home treatment cases open 30 days or more as of December 31, 2006 (excluding probate, interstate and voluntary cases). This request was fulfilled with the Department's submittal of an Excel Database including 737 children. Sampling methodology requires a sample at a 95% confidence level (+/-6%). This resulted in the need to identify 250 families for the sample.

The LINK record review was conducted during March and April 2007. DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted to ensure issues of reliability and validity were addressed prior to initiating the full review. Several minor edits were made prior to conducting the review.

A random sample was drawn from the statewide universe population. After several substitutions for reasons of case type being exclusionary, the final sample included cases from each of the DCF area offices as follows:

**Table 47: Area Office Distribution of OM 17 Sample Set (n=250)**

| Area Office | Universe | Sample |
|-------------|----------|--------|
| Bridgeport | 347 | 23 |
| Danbury | 52 | 3 |
| Greater New Haven | 232 | 15 |
| Hartford | 396 | 26 |
| Manchester | 357 | 22 |
| Meriden | 200 | 14 |
| Middletown | 102 | 6 |
| New Britain | 562 | 35 |
| New Haven Metro | 461 | 29 |
| Norwalk | 90 | 6 |
| Norwich | 365 | 23 |
| Stamford | 158 | 10 |
| Torrington | 54 | 3 |
| Waterbury | 320 | 19 |
| Willimantic | 261 | 16 |
| **Total** | 3957 | 250 |

**Descriptive Analysis**

The sample set of 250 cases included 62 cases under protective supervision during the quarter of review. The cases ranged in length of time open from less than one month to just over eleven years on December 31, 2006. The mean length of time open was thirteen

months. The median was 9 months.  The identified case participant was most likely to be identified as White and Non-Hispanic (51.6%).

**Crosstabulation 101:  What is the Race? * Ethnicity**

| What is the race? | Ethnicity | | | |
|---|---|---|---|---|
| | **Hispanic** | **Non-Hispanic** | **Blank-no ethnicity selected in LINK** | **Total** |
| **American Indian or Alaskan Native** | 0 | 0 | 1 | 1 |
| **Asian** | 0 | 2 | 0 | 2 |
| **Black/African American** | 0 | 54 | 1 | 55 |
| **Native Hawaiian** | 0 | 1 | 0 | 1 |
| **White** | 35 | 129 | 2 | 166 |
| **UTD** | 20 | 3 | 0 | 23 |
| **Multiracial** | 0 | 2 | 0 | 2 |
| **Total** | 55 | 191 | 4 | 250 |

The visitation practices of 199 SWs reporting to 122 SWS were reviewed within the sample set.

Nine of the 15 area offices met the quarterly average requirement of 85% performance for the fourth quarter.  However, only two offices, Greater New Haven, and Waterbury met the requirement in each month of the quarter.  A breakout of the quarter results by month is provided below.  Please note that due to the low numbers in smaller offices, one case could have great impact on the area's performance.  Cases not open for the full month in any given month of the quarter were excluded from the calculation of percentages.

**Table 48:  Percentage of Cases with Two or More Successful Worker Visitation (In-Home)**

| Area Office | October | November | December | Fourth Quarter |
|---|---|---|---|---|
| **Bridgeport** | **87.0%** | 82.6% | **90.0%** | **86.4%** |
| **Danbury** | 66.7% | 66.7% | **100.0%** | 71.4% |
| **Greater New Haven** | **92.9%** | **86.7%** | **100.0%** | **92.9%** |
| **Hartford** | 72.0% | 58.3% | **81.0%** | 70.0% |
| **Manchester** | 80.0% | **86.4%** | 83.3% | 83.3% |
| **Meriden** | 81.8% | 66.7% | 72.7% | 73.5% |
| **Middletown** | 80.0% | **100.0%** | 83.3% | **88.2%** |
| **New Britain** | 78.8% | 84.4% | **86.2%** | 83.0% |
| **New Haven Metro** | 67.9% | 82.1% | 81.5% | 77.1% |
| **Norwalk** | 80.0% | 83.3% | **100.0%** | **85.7%** |
| **Norwich** | **90.9%** | **100.0%** | 77.8% | **89.8%** |
| **Stamford** | 83.3% | **100.0%** | 88.9% | **91.7%** |
| **Torrington** | **100.0%** | **100.0%** | 66.7% | **85.7%** |
| **Waterbury** | **100.0%** | **100.0%** | 93.3% | **98.0%** |
| **Willimantic** | **92.9%** | **92.3%** | 69.2% | **85.0%** |
| **Statewide** | 82.5% | 84.4% | 84.1% | 83.7% |

Eleven of the 93 instances (11.8%) where the monthly visitation rate was not met identified a change in SW assignment as contributing to the failure.   The overall number of visits within the sample set ranged from zero to 8 visits during any given month.

October statewide monthly compliance excluding the 21 cases in which the case was not open a full calendar month is 82.5%.  In October, the worker met with all active case participants under age 19 living in the home in 59.2% of these cases. See table below for October statistics.

**Table 49:  Visits the Ongoing Services SW Made with the Family October 1, 2006 through October 31, 2006?**

| Visits | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| **0** | 12 | 5.2% | 5.2% |
| **1** | 28 | 12.2% | 17.5% |
| **2** | 134 | 58.5% | 76.0% |
| **3** | 36 | 15.7% | 91.7% |
| **4** | 15 | 6.6% | 98.3% |
| **5** | 4 | 1.7% | 100.0% |
| **Total** | 229 | 100.0% | |

November statewide monthly compliance excluding the 19 cases which were not open a full calendar month is 84.4%.  In November, the worker met with all active case participants under the age 19 living in the home in 61.2% of these cases.  See table below for November statistics.

**Table 50:  Visits the Ongoing Services SW Made with the November 1, 2006 through November 30, 2006?**

| Visits | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| **0** | 12 | 5.2% | 5.2% |
| **1** | 24 | 10.4% | 15.6% |
| **2** | 139 | 60.2% | 75.8% |
| **3** | 39 | 16.9% | 92.6% |
| **4** | 13 | 5.6% | 98.3% |
| **5** | 2 | 0.9% | 99.1% |
| **6** | 1 | 0.4% | 99.6% |
| **8** | 1 | 0.4% | 100.0% |
| **Total** | 231 | 100.0% | |

In December, the statewide monthly compliance excluding the 19 cases which were not open a full calendar month is 84.1%.  The worker met with all active case participants under the age 19 living in the home in 63.5% of these cases during December.  See table below for December statistics

**Table 51: Visits the Ongoing Services SW Made with the Family December 1, 2006 through December 31, 2006?**

| Visits | Frequency | Percent | Cumulative Percent |
|---|---|---|---|
| 0 | 4 | 1.9% | 1.9% |
| 1 | 29 | 14.0% | 15.9% |
| 2 | 124 | 59.9% | 75.8% |
| 3 | 30 | 14.5% | 90.3% |
| 4 | 14 | 6.8% | 97.1% |
| 5 | 3 | 1.4% | 98.6% |
| 6 | 2 | 1.0% | 99.5% |
| 7 | 1 | 0.5% | 100.0% |
| Total | 207 | 100.0% | |

Three cases had no documented visits across all applicable months during the quarter (1.2%). This is an improvement over the last comprehensive review findings which identified 3.4% of the cases having no visitation during the period reviewed. Workers documented visitation with all active case participants under the age 19 in each of the three months in 59.7% of the 688 visits documented.

- In 71.9% of the visits documented, there was at least one child successfully engaged in a private conversation with the SW.
- The review found that 91.6% of the cases did have documented conversation with the parent or guardian regarding their child(ren)'s well-being and service provision on at least one occasion during the quarter.
- In 139 of the 250 cases (55.6%), there was indication that the SW had concerns related to the child's safety or well-being as a result of the visits or contacts with the family and providers involved in the case. Of those 139 cases, the SW and social work supervisory narratives of 119 cases (85.6%) indicate that there was discussion/direction provided during supervision regarding the worker's concerns.

**Crosstabulation 102: Did the SW Document Any Concerns Related to the Child(ren) Safety or Well-Being during the Quarter Ending December 31, 2006? * Did the SW Raise these Concerns to the SWS for Case Direction?**

| Did the SW document any concerns related to the child(ren) safety or well-being during the quarter ending December 31, 2006? | Did the SW raise these concerns to the SWS for case direction | | | |
|---|---|---|---|---|
| | Yes | No | N/A - No concerns noted in LINK | Total |
| Yes | 119 | 14 | 6 | 139 |
| No | 1 | 1 | 106 | 108 |
| Total[38] | 120 | 15 | 112 | 250 |

During the visits, narrative entries indicate that there were 73 requests by the family for assistance with service provision, clothing or other necessary items. Of those situations, 50, or 68.4%, had documented follow-through with assistance or the information requested.

---

[38] Excludes the three cases with no face-to-face contact across the quarter.

In looking at the overall quality of visitation the reviewers were asked to rank cases based upon the following scale[39]:

### Optimal Quality – 5
*The reviewer finds evidence that visits occurred at the benchmark requirement or with greater frequency if necessitated by the facts of the case.  During those visits, all essential DCF Policy requirements are met, as are practice expectations within the documentation, including an assessment of needs and safety within the out-of- home placement and a discussion of the progress toward the treatment plan goals.  There is ongoing evidence of discussion related to referrals, services or information.*

### Very Good Quality – 4
*The reviewer finds evidence that visits occurred at the benchmark requirement.  During each visit, essential DCF Policy expectations are substantially present.  There is an effort to include an assessment of needs and safety for each visit as well as documentation within the quarter of discussion related to treatment plan goals, follow up on referrals, and the services in place for the child.*

### Marginal Quality – 3
*While attempts were made to visit the child in placement and comply with DCF Policy requirements, the reviewer finds evidence that visits may not have occurred at the benchmark requirement.  An effort is made by the DCF SW to follow DCF practice expectations and to document some assessment of needs and safety within the out- of-home placement.  Visits may not indicate follow-up discussion documented on referrals, services or information provided.*

### Poor Quality – 2
*The reviewer finds little evidence that the benchmark for visitation was attempted.  The quarterly visitation requirement may be met, however, there is a failure to document compliance with DCF practice expectations regarding visitation with children in out of home placement so that there is no documentation of safety or needs assessment within LINK narratives.*

### Adverse Quality – 1
*Both DCF Policy and practice expectations were disregarded. The reviewer finds no documentation of visits during the quarter, or the LINK narrative indicates a visitation contact which raises serious concerns and inappropriate response.*

---

[39] The determination of specific compliance with policy may be found as stated directly in the worker-child visitation narratives, but can be bolstered by the additional narratives entered throughout the period.

Reviewers felt that the Department achieved overall "very good" or "optimal" scores in 40.4% of the cases reviewed.   In 40.8% of the cases, the reviewers felt the worker did attempt to meet the standard but fell short of the requirement, or failed to document any assessment or follow-up on issues identified in prior visits.  In 17.6% of the cases the reviewers felt that there did not appear to be an effort to make the benchmark, or the narratives were void of assessment.  In 1.2% of the cases, the visitation was seen as adverse, meaning practice expectations were disregarded (the three cases with no visitation documented).

**Table 52:  Overall Quality of Visitation**

| Rank | Frequency | Percent | Cumulative Percent |
|------|-----------|---------|--------------------|
| Optimal | 25 | 10.0 | 10.0% |
| Very Good | 76 | 30.4 | 40.4% |
| Marginal | 102 | 40.8 | 81.2% |
| Poor | 44 | 17.6 | 98.8% |
| Adverse | 3 | 1.2 | 100.0% |
| Total | 250 | 100.0 | |

These qualitative scores highlight the trend data and reviewer comments located throughout the tools completed.  While the number of visits has greatly increased since monitoring of this outcome measure began, the quality of those visits, while moving in the right direction, still remain an area requiring additional work.

## Outcome Measure 18:  Caseload Standards

**Overview**

The DCF Court Monitor's Office was not required by the Revised *Juan F*. v Rell Exit Plan to conduct a qualitative review for Outcome Measure 18:  Caseload Standards.

**Outcome Measure 18 requires that:**

*"By July 1, 2004 the caseload of no DCF Social Worker shall exceed the following caseload standards, with exceptions for emergency reasons on caseloads, lasting no more than 30 days:*

    *A.  Investigators shall have no more than 17 investigative cases at any time.*

    *B.  In-Home treatment workers shall have no more than 15 cases at any time.*

    *C.  Out-of-Home treatment workers shall have no more than 20 individual children assigned to them at any time.  This includes voluntary placements*

    *D.  Adoption and adolescent specialty workers shall have no more than 20 cases at any time.*

    *E.  Probate workers shall have no more than 35 cases at any time.  When the probate or interstate worker is also assigned to provide services to the family, those families shall be counted as in-home treatment cases with a ratio of 1:20 cases.*

    *F.  Social workers with in-home voluntary and interstate compact cases shall have no more than 49 cases at any time.*

    *G.  A worker with a mixed caseload shall not exceed the maximum weighted caseload derived from the caseload standards in A through F above.*

    *H.  These standards supersede those of Order no. 441 dated July 29, 2003."*

**Data Reporting and Findings for Fourth Quarter 2006**

The Department has reported compliance with this standard in 11 of the last 12 quarters reported.  The Monitor has verified this data through review of the daily automated reports available on-line, and spot checking SW desktop information.

The Monitor's Office has not deemed qualitative reviews on this measure necessary given the nature and accuracy of the quantitative reporting.  If found necessary, a targeted review can be undertaken in attempt to analyze issues related to case assignment and selection of assignment types within the population of social workers.

Below is the full caseload reporting for December 31, 2006 and a subsequent table of all workers with caseloads exceeding requirements by area office, assignment, and with the percentage and number of days that that worker has been over the identified requirement.

**Table 53:  Caseload Report on December 31, 2006**

| Area Office | Trainees | Workers | Total Caseload | Adolescent | In Home | CPS | CPS OOH | ICO | Investigation | Permanency | Probate | Voluntary | Voluntary OOH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bridgeport** | 26 | 111 | 1,485 | 178 | 284 | 203 | 245 | 4 | 255 | 42 | 156 | 108 | 10 |
| **Central Office** | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| **Danbury** | 7 | 37 | 489 | 28 | 41 | 71 | 76 | 2 | 147 | 24 | 35 | 65 | 0 |
| **Greater New Haven** | 10 | 84 | 1,166 | 105 | 224 | 185 | 228 | 7 | 200 | 35 | 21 | 141 | 20 |
| **Hartford** | 14 | 143 | 2,345 | 345 | 357 | 382 | 443 | 14 | 398 | 136 | 122 | 131 | 17 |
| **Manchester** | 15 | 109 | 1,527 | 177 | 302 | 236 | 303 | 7 | 261 | 69 | 45 | 109 | 18 |
| **Meriden** | 2 | 50 | 725 | 78 | 174 | 112 | 130 | 2 | 98 | 30 | 35 | 63 | 3 |
| **Middletown** | 11 | 42 | 578 | 53 | 97 | 61 | 88 | 7 | 135 | 17 | 36 | 62 | 22 |
| **New Britain** | 2 | 117 | 1,884 | 191 | 498 | 243 | 350 | 12 | 325 | 147 | 50 | 47 | 21 |
| **New Haven Metro** | 18 | 115 | 1,840 | 231 | 442 | 365 | 325 | 5 | 153 | 57 | 189 | 73 | 0 |
| **Norwalk** | 7 | 23 | 346 | 11 | 91 | 55 | 71 | 1 | 81 | 12 | 8 | 14 | 2 |
| **Norwich** | 20 | 101 | 1,477 | 165 | 323 | 218 | 269 | 14 | 276 | 81 | 50 | 72 | 9 |
| **Stamford** | 1 | 27 | 440 | 29 | 140 | 38 | 52 | 0 | 136 | 8 | 11 | 23 | 3 |
| **Torrington** | 3 | 34 | 582 | 28 | 54 | 106 | 130 | 5 | 123 | 39 | 24 | 61 | 12 |
| **Waterbury** | 18 | 104 | 1,635 | 151 | 293 | 323 | 413 | 9 | 264 | 78 | 51 | 47 | 6 |
| **Willimantic** | 16 | 71 | 1,101 | 91 | 241 | 153 | 205 | 4 | 197 | 85 | 34 | 77 | 14 |
| **Statewide Total** | **170** | **1,170** | **17,622** | **1,861** | **3,561** | **2,751** | **3,328** | **93** | **3,051** | **860** | **867** | **1,093** | **157** |

There were a total of 53 workers over 100% on December 31, 2006.  None of these
workers exceeded the 100% utilization for greater than 30 days.  This would indicate
100% compliance with Outcome Measure 18.   Of the 53 workers exceeding utilization
percent, the average number of days in excess is 13 days at 107.5%.

**Table 54: Workers Exceeding OM18 Utilization by Area Office and Number of Days in Excess on December 31, 2006**

| Office | Unit | % Utilization | Days Over 100% |
|---|---|---|---|
| Danbury | Investigations | 112 | 19 |
| Greater New Haven | Treatment Services | 102 | 12 |
| Greater New Haven | Treatment Services | 103 | 6 |
| Greater New Haven | Treatment Services | 108 | 4 |
| Hartford | Investigations | 106 | 20 |
| Hartford | Treatment Services | 105 | 20 |
| Hartford | Investigations | 112 | 18 |
| Hartford | Investigations | 112 | 14 |
| Hartford | Treatment Services | 105 | 12 |
| Hartford | Treatment Services | 103 | 12 |
| Hartford | Treatment Services | 117 | 11 |
| Hartford | Treatment Services | 103 | 7 |
| New Britain | Training - DCF Staff | 102 | 20 |
| New Britain | Training - DCF Staff | 104 | 20 |
| New Britain | Treatment Services | 102 | 19 |
| New Britain | Training - DCF Staff | 105 | 19 |
| New Britain | Training - DCF Staff | 107 | 18 |
| New Britain | Training - DCF Staff | 115 | 17 |
| New Britain | Training - DCF Staff | 103 | 12 |
| New Britain | Treatment Services | 103 | 12 |
| New Britain | Treatment Services | 107 | 11 |
| New Britain | Adoption | 115 | 11 |
| New Britain | Training - DCF Staff | 102 | 11 |
| New Britain | Treatment Services | 103 | 10 |
| New Britain | Training - DCF Staff | 103 | 8 |
| New Britain | Treatment Services | 113 | 5 |
| New Britain | Treatment Services | 105 | 3 |
| New Britain | Training - DCF Staff | 116 | 3 |
| New Britain | Treatment Services | 102 | 3 |
| New Haven Metro | Treatment Services | 113 | 13 |
| New Haven Metro | Treatment Services | 113 | 12 |
| New Haven Metro | Treatment Services | 102 | 11 |

| Office | Unit | % Utilization | Days Over 100% |
|---|---|---|---|
| **New Haven Metro** | Treatment Services | 101 | 5 |
| **New Haven Metro** | Treatment Services | 102 | 3 |
| **Norwalk** | Training - DCF Staff | 101 | 10 |
| **Norwalk** | Treatment Services | 104 | 3 |
| **Norwich** | Treatment Services | 102 | 5 |
| **Norwich** | Treatment Services | 107 | 3 |
| **Stamford** | Training - DCF Staff | 109 | 25 |
| **Stamford** | Training - DCF Staff | 107 | 20 |
| **Stamford** | Treatment Services | 105 | 14 |
| **Stamford** | Treatment Services | 115 | 3 |
| **Torrington** | Treatment Services | 103 | 19 |
| **Torrington** | Treatment Services | 105 | 14 |
| **Torrington** | Treatment Services | 105 | 11 |
| **Waterbury** | Treatment Services | 110 | 21 |
| **Waterbury** | Treatment Services | 118 | 21 |
| **Waterbury** | Treatment Services | 103 | 13 |
| **Waterbury** | Treatment Services | 105 | 11 |
| **Willimantic** | Treatment Services | 103 | 24 |
| **Willimantic** | Investigations | 118 | 22 |
| **Willimantic** | Investigations | 118 | 21 |
| **Willimantic** | Investigations | 135 | 19 |
| **Statewide Average** | | 107.5 | 13 |

**Outcome Measure 19:  Reduction in the Number of Children Placed in Residential Care**

**Overview**

The <u>Revised *Juan F* Exit Plan</u> requires that,

> "*The number of children placed in privately operated residential treatment care shall not exceed 11.0% of the total number of children in DCF out- of- home care.*
>
> *The circumstances of all children in state and out-of-state residential facilities shall be assessed after the Court's approval of this Exit Plan on a child specific basis to determine if their needs can be met in a less restrictive setting.*

**Data Reporting and Findings**

On December 17, 2006 there were 663 *Juan F* children in residential care settings (excluding children with committed delinquent status).  A total of 225 *Juan F*. children were placed in out of state facilities.  The majority of those placed out-of-state (47.1%) were located within the border states of Massachusetts, Rhode Island or New York.  This is impressive given the recent loss of in-state beds due to PREU determinations to reduce or eliminate program beds within the state.  While the percentage fluctuates across the area offices, the statewide average is compliant with the requirement of no more than 11.0% of the out-of-home population being in placement within residential facilities.

The ASO process has implemented a child specific review so that a re-determination of need for this most restrictive placement setting is periodically undertaken in an effort to identify and then move children in a more timely and planned manner.  Wait lists for step-down placements do exist, as does a need for development of more therapeutic foster care homes and community based services to allow for reunification.  Further reductions in the residential census will be dependent upon the level of success of the current initiatives.

**Methodology**

The Monitor did not conduct a qualitative review of the population in residential care, as Outcome Measure 15:  Needs Met, incorporates this requirement.  However, the LINK logic has been verified and the ROM reports are reviewed by the Court Monitor each quarter.   The following table details the residential population as a factor of all *Juan F*. children in care.

186

**Table 55:  All Children in Placement (excluding Committed Delinquent status CIP) on December 17, 2006**

| Area Office | *Juan F.* Children In Residential Care | *Juan F.* Children In Care | Percentage of *Juan F.* in Residential Care |
|---|---|---|---|
| **Unassigned** | 6 | 97 | **6.2%** |
| **Bridgeport** | 56 | 450 | **12.4%** |
| **Danbury** | 10 | 133 | **7.5%** |
| **Greater New Haven** | 61 | 374 | **16.3%** |
| **Hartford** | 90 | 871 | **10.3%** |
| **Manchester** | 63 | 532 | **11.8%** |
| **Meriden** | 25 | 226 | **11.1%** |
| **Middletown** | 21 | 161 | **13.0%** |
| **New Britain** | 52 | 653 | **8.0%** |
| **New Haven Metro** | 82 | 603 | **13.6%** |
| **Norwalk** | 12 | 94 | **12.8%** |
| **Norwich** | 47 | 488 | **9.6%** |
| **Stamford** | 12 | 90 | **13.3%** |
| **Torrington** | 31 | 215 | **14.4%** |
| **Waterbury** | 53 | 659 | **8.0%** |
| **Willimantic** | 42 | 383 | **11.0%** |
| **Statewide Total** | **663** | **6,029** | **11.0%** |

**Outcome Measure 20: Discharge Measures**
**Outcome Measure 21: Discharge of Mentally Ill or Retarded Children**

**Overview**
This review has been conducted quarterly by the DCF Quality Improvement Division (QID) following Court Monitor approval of the methodology. The QID review identifies two purposes. The first purpose is to determine the percentage of youth who achieved their goals upon discharge from DCF custody (Outcome Measure 20: Discharge Measures), and to report on any documented barriers that prevented successful achievement of this outcome. The second purpose is to determine the extent to which the Department of Children and Families (DCF) submitted "a written discharge plan to either/or DMHAS or DMR for all children" as required (Outcome Measure 21: Discharge of Mentally Ill or Retarded Children). The contents of the Department's Quarterly Review for the Fourth Quarter, 2006 are incorporated in full within this chapter. Monitor's comments and minor edits to non-essential text and formatting have added as necessary. All case identification has been removed to ensure confidentiality.

**Outcome Measure 20** *requires that "at least 85% of all children age 18 or older shall have achieved one or more of the following prior to discharge from DCF Custody:*
  A. *Graduation from High School*
  B. *Acquisition of a GED*
  C. *Enrollment in or completion of college or other post secondary training program full-time*
  D. *Enrollment in or completion of college or other post secondary training part time with part time employment*
  E. *Full time employment*
  F. *Enlistment full time member of military"*

**Outcome 21 requires that** *"DCF shall submit a written discharge plan to either/or DMHAS or DMR for all children who are mentally ill or mentally retarded and require adult services."*

**Review Findings and Trends**
The Department achieved **100%** compliance with Outcome Measure 20. All 44 youth studied in these reviews, who were not screened out per the agreed upon population limiters, achieved one or more of the requirement listed under Outcome Measure 20.

Forty-three youth (97.7%) graduated from high school. One youth (2.3%) earned a GED. Seventeen youth (38.6%) were employed full-time at the point of discharge. Further:

- Eight graduated from high school and were enrolled in or completed full-time post-secondary training.

- Three youth graduated from high school, completed a full-time post-secondary education and obtained full-time employment.

- Fourteen youth graduated from high school and were employed full-time at the time of discharge.

- Two youth graduated from high school and entered the military.

- Thirty-nine of the forty-four (89%) received Independent Living Services.

- Thirty Adolescent Discharge Plans (68%) were completed.

- Fifteen of the twenty youth (75%) had positive adult connections, primarily extended family supports.

- Twelve of the twenty youth (60%) received academic supports.

- Fifteen of the twenty youth (75%) had an Adolescent Discharge Plan.

- With respect to the 20 youth who refused further services against the advise of DCF, findings showed areas that clearly indicated the youth's need for further support and preparation in career and employment skill development:

  o Only two of the 20 (10%) youth had employment skills support.

  o Only four of the 20 (20%) youth received career preparation skills.

  o Only three of the 20 youth (15%) had documentation of an Independent Living Plan in LINK.

  Re-engagement of similarly situated youth should be a focus for the Department.

Of the 29 youth in this study who were determined to require continued adult services upon discharge, there was documentation that 28 youth had referrals packets submitted to DMHAS or DMR for needed services. This results in a 97.0% compliance[40] rate with Outcome Measure 21. For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**
This case review was conducted by the DCF Quality Improvement Division during the Fourth Quarter 2006 and included all youth, 18 years of age or older, who were discharged from the Department's care (defined as the point in time when the child is no longer in foster care under the care and responsibility or supervision of the DCF) between October 1, 2006 and December 31, 2006. Excluded from this group were Juvenile Justice, Interstate, Probate, and Voluntary cases and cases where youth who were 18 and over had cases opened for the sole purpose of making monetary payments on behalf of the youth. This resulted in a review group of 70 youth for this quarter. In accordance with the clarifications made to Exit Plan Outcome Measure 20, there are two subcategories identified in this review that will not be included in determining the final performance percentage for these measures. The first subcategory is those youth with significant or profound developmental delays, or youth who have been clinically diagnosed with Mental Retardation or significant mental health issues. The second subcategory is those youth discharged from the Department after refusing further DCF

---

[40] For the purpose of this review, *Discharge Plan* was defined as the submission of a referral packet requesting young adult services from DMHAS and/or DMR. The submission and acceptance of this referral packet is the starting point for a youth to receive services.

services, who were unwilling to continue with the educational and treatment plan goals recommended by the Department. A total of twenty-six youth will be reported on separately, based on the subcategories defined above.

**Descriptive Findings**
In regard to the first subcategory of youth with significant or profound developmental delays, or youth who have been clinically diagnosed with Mental Retardation or significant mental health issues, there were six individuals who had been diagnosed with Mental Retardation, significant or profound developmental delays or significant mental health issues. This group consisted of one male and five females. Two of the youth were of African American descent; four of the youth were Caucasian. None of the youth were Hispanic. All six youth were twenty-one years old. The educational status was as follows: two youth earned a high school diploma, three were attending high school, and one youth was working towards a GED. The employment status was as follows: two youth were not employed and four youth were employed on a part-time basis. Five of the six youth were also receiving continued services through the Department of Mental Retardation's (DMR) adult programs and the other remaining youth with the Department of Mental Health and Addiction Services.

In regard to the second subcategory of 20 youth discharged from the Department after refusing further DCF services, and who were unwilling to continue with the educational and treatment plan goals recommended by the Department. This group consisted of nine males and eleven females. Of the twenty youth, eleven were Caucasian, six African American, and three were multi-racial. Four of the youth were Hispanic and sixteen were non-Hispanic. Seventeen of the youth were age 18 at the time of discharge and three of the youth were age 19. Regarding their educational status, there were eleven youth who had received special education services and eight who did not; for one youth special education status was unable to be determined according to LINK records. At the point of discharge, eight of these youth were attending high school, four were working towards a GED, and eight had dropped out of high school. A review of the employment status of the twenty youth found one of the twenty youth was employed full-time; two youth were employed part-time, thirteen youth were not employed and the employment status of four youth was unable to be determined according to LINK records. Substance abuse was identified as an issue for seven of the twenty youth in this subcategory. It is noteworthy to report that of the twenty youth who refused the Department's services, nine were referred to DMHAS for continued adult services.

The remainder of the review group was comprised of forty-four youth. There were twenty-four females (55%) and twenty males (46%). The racial make-up of the sample consisted of eighteen African American (41%), twenty-one Caucasian (48%), one Multi-racial (2%), and three youth (7%) were listed as having no race selected in LINK. The ethnic make-up of the sample consisted of thirty-eight youth (86%) identified as Non-Hispanic and five youth (11%) who were Hispanic. There was one youth (2%) whose ethnicity was UTD as documented in LINK.

Other characteristics of this group of forty-four youth are as follows:

Mental/ Behavioral Health
- Thirteen youth (30%) were documented as having been clinically diagnosed with a psychiatric disorder.

- Five youth (11%) had substance abuse identified as an issue at the point of discharge.

- Five youth (11%) were on psychiatric medication at the time of discharge.

- Three youth (7%) were identified as having been hospitalized for psychiatric reasons during the twelve-month period prior to the date of discharge.

- One youth (2%) had been in a residential placement during the twelve months prior to discharge.

Medical
- None of the youth were identified with complex medical needs.

Educational:
- Eighteen youth (41%) were identified as being eligible for special education services.

- Twenty-six youth (59%) were documented as not being eligible for special education services.

The three questions that framed the design of the review and the presentation of the findings are as follows:

*1. What is the total percentage of youth who have achieved one or more of the following prior to discharge from DCF custody?*

    *A. Graduation from High School*

    *B. Acquisition of a GED*

    *C. Enrollment in college or other post secondary training program full-time*

    *D. Enrollment in college or other post secondary training program part time with part-time employment*

    *E. Full-time Employment*

    *F. Enlistment full-time member of the military*

Forty-four of the forty-four youth (100%) in this review achieved one or more of the measures under Outcome Measure 20. The following table illustrates youth who achieved one or more measures by DCF office.

**Table 56: Outcome Measure 20, Discharged Youth who Achieved One or More Achievement Measures, by DCF Office**

| Area Office | Did Youth Achieve One or More Measures Before Discharge? | |
|---|---|---|
| | Yes | No |
| Bridgeport | 8 | 0 |
| Danbury | 2 | 0 |
| Greater New Haven | 1 | 0 |
| Hartford | 7 | 0 |
| Manchester | 4 | 0 |
| Meriden | 1 | 0 |
| Middletown | 2 | 0 |
| New Britain | 4 | 0 |
| New Haven Metro | 3 | 0 |
| Norwich | 5 | 0 |
| Stamford | 1 | 0 |
| Torrington | 1 | 0 |
| Waterbury | 1 | 0 |
| Willimantic | 4 | 0 |
| **Total** | 44 | 0 |
| *The Norwalk Office was omitted from this table because they did not have youth in the study sample.* | | |

Of the 44 youth who met at least one measure, 43 (98%) of them graduated from high school. One youth (2%) earned a GED. Seventeen youth (39%) of the forty-four were employed full-time at the point of discharge. Twenty-seven youth (61%) met two or more measures, i.e., high school graduation or a GED plus one or two others. Of these twenty-seven youth:

- Eight graduated from high school and were enrolled in or completed full-time post-secondary training.

- Three youth graduated from high school, completed a full-time post-secondary education and obtained full-time employment.

- Fourteen youth graduated from high school and were employed full-time at the time of discharge. These included youth who secured employment as retail sales persons, as nursing assistants, and in construction.

- Two youth graduated from high school and entered the military.

The following table illustrates the number of discharged youth who met a specific achievement measure for this review:

**Table 57 :  Specific Achievement Measures Met by Discharged Youth (N=44)**

| Youth's Achievement | Number Attaining Achievement |
|---|---|
| High School Graduation Only | 16 (36%)[1] |
| High School Graduation and Full-Time Post-Secondary Training (5 completed and 3 youth were still attending full-time) | 8 (18%) |
| High School Graduation and Full-Time Employment | 14 (32%) |
| High School Graduation and full time member of the military | 2 (5%) |
| High School Graduation and Full-Time Post Secondary Training and Full-Time Employment | 3 (7%) |
| GED Earned Only | 1 (2%) |
| [1]*Five of the youth listed as "Graduated High School Only" were also employed part-time.* | |

There were thirteen youth age 18 at the time of discharge, of whom all thirteen achieved at least one measure, with four youth achieving a second measure.

There were seven youth age 19 at the time of discharge, all of whom achieved at least one measure, with three youth achieving a second measure.  There were eight youth age 20 at the time of discharge.  All eight youth achieved at least one measure, with six youth achieving a second measure.

Sixteen were age 21 or older at discharge, of which two (13%) achieved one measure.  Eleven (69%) of these 16 youth achieved two measures. Three (18%) of these youth achieved high school graduation, completion of a post-secondary education, and had obtained full-time employment.

At the time of discharge, forty-three youth had graduated high school and one youth had earned their GED.  It is important to note that eight youth also completed a post-secondary education program.

The eight youth completed the following post-secondary education programs:

- Capital Community College – A.S. Criminal & Social Services
- Marikesch Vocational Program – Human Services
- Central CT State University – General Studies
- Training Direct Program – CNA
- Mitchell College – BA Physical Ed & Psychology
- Job Corp – Culinary Art Program
- Porter & Chester – Architectural Design

- Porter & Chester – Computer Assisted Drafting

Additionally, three youth were continuing in college full-time or other post-secondary training program at the point of discharge.

Twenty-five of the forty-four youth (57%) participated in CHAP, and all twenty-five youth achieved at least one measure.  Additionally, 16 of the twenty-five youth (64%) achieved two or more measures.  Of the nineteen youth who did not participate in CHAP, 11 (58%) achieved at least one measure by graduating high school.  Eight (42%) of these nineteen youth achieved two or more measures.  The following is also noted:

- Thirty-nine of the forty-four (89%) received Independent Living Services.  All 39 youth who received Independent Living Services achieved at least one outcome measure, with 23 youth achieving two or more measures.

- This review found thirty Adolescent Discharge Plans (68%) completed.  This review also found thirteen Independent Living Plans (30%) completed.

In conducting the prior quarterly case reviews of Outcome Measure 20, it has been found that three characteristics usually have a negative association with achieving a measure. They are: eligibility for special education, having an identified substance abuse issue at discharge, and the presence of a psychiatric diagnosis.  All three of these characteristics, were identified in this study, but did not prohibit any youth from achieving a measure. There were eighteen youth identified with special education needs, thirteen youth had a psychiatric diagnosis, and five youth were identified with substance abuse issues.

With regard to gender, there were no differences noted in achievement.  There were twenty-four females (55%) and twenty males (45%) in the current review, all of whom achieved at least one measure.  This review group consisted of eighteen African American (41%), twenty-one Caucasian (48%) youth, and two Multi-racial (4%).  The race of three youth (7%) was not identified.  Given the achievement results for these youth, race appeared to have no relationship to the likelihood of achieving a measure. Ethnicity was also not a factor effecting achievement.  Hispanic and non-Hispanic youth all achieved at least one outcome measure.

### 2.  What were the identified barriers to meeting these measures?
A LINK Case Review was used to identify barriers that may have prevented the youth from achieving one or more of the six elements of Outcome Measure 20, prior to discharge from DCF.  In this review, forty-four out of forty-four met an achievement measure; therefore, no barriers were identified to achieving one of the six discharge measures prior to discharge from DCF.

### 3.  What were the reasons for youth refusing services <u>or</u> youth being unsuccessful with post high school/GED education and employment policy requirements?
A LINK Case Review was used to examine the thirty youth who refused continued services from the Department (20 youth) and the youth who were unsuccessful with post high school/GED education and employment policy requirements (10 youth).  Please refer to Appendices 2 and 3 for specific information regarding these thirty youth.

Appendix 4 provides a comparison between youth who refused the Department's services with those who did not in an attempt to determine any key differences between these populations. There are a number of differences noted that may be relevant in this comparison, for example, special education services and substance abuse.

In regard to the twenty youth who were discharged from the Department after refusing further DCF services, the following is noted:

- There were nine males and eleven females.

- Eleven youth were Caucasian, six were African American, and three youth were listed as Multi-racial.

- The ethnicity of the group was composed of four Hispanic youth and 16 Non-Hispanic youth.

- Eleven of the 20 youth (55%) received Special Education Services.

- Six of the 20 youth (30%) had been receiving psychiatric medication.

- Seven of the 20 youth (35%) had substance abuse issues.

A frequent reason for youth refusing or discontinuing services was the youth stating he/she had an alternative living arrangement. This applied to seven of the twenty youth, where they left to live with a boyfriend or girlfriend. Six youth went to live with a parent, while one youth went to live with an extended family member. Other reasons cited were: two youth had mental health and substance abuse issues, two youth had mental health issues, and for two youth, there were no reasons documented in LINK.

There were positive aspects found in the Department's work with these youth, despite the Department's inability to keep these youth involved with us:

- Nineteen of the 20 youth (95%) did have an Adolescent SW assigned to them.

- Eleven of the 20 youth (55%) were receiving Independent Living Services.

- Fifteen of the 20 youth (75%) had positive adult connections, primarily extended family supports.

- Twelve of the 20 youth (60%) received academic supports.

- Fifteen of the 20 youth (75%) had an Adolescent Discharge Plan.

Nonetheless, the findings also showed areas that clearly indicated the youth's need for further support and preparation:

- Only two of the 20 (10%) youth had employment skills support.

- Only four of the 20 (20%) youth received career preparation skills.

- Only three of 20 youth (15%) had documentation of an Independent Living Plan in LINK.

The above findings indicate the need for more work in the areas of career preparation and employment skill development. This could include exposure to the different types of careers and the education required to secure employment in these career choices. This preparation must be matched to the youth's individual abilities given the fact that eleven

of the twenty youth (55%) were receiving special education services. Further exploration and development of employment skills, for example, through job shadowing and apprenticeships, are seen as possible ways to support our youth in continuing their education and securing full-time employment.

These twenty youth were in DCF care an average of 4.5 years, ranging from five months to ten years. They had one to as many as eleven Ongoing Services SWs assigned during their placement history; with an average of five assignments. As noted above, at the time of discharge, nineteen of these youth were assigned an Adolescent SW, who worked with these youth for an average of 2.5 years, ranging from a period of five months to six years and ten months.

In regard to the ten youth who were identified as having met at least one measure and then being non-compliant with post high school/GED education at the time of discharge, the following was found:

- All ten youth were offered services to encourage remaining in DCF care.

- All ten youth had an adolescent worker.

- All ten of the youth had been enrolled and attended a college or a post-secondary program.
    - o  Five youth were enrolled in a community college
    - o  Three youth were enrolled in a technical school
    - o  Two youth were enrolled in college

The reasons for refused or discontinued services for all ten of the youth were as follows:

- Youth was not prepared for a post-education or vocational program.

- Youth failed to attend.

- Youth lost motivation and interest in the program.

- Youth preferred to work and live with his girlfriend.

- Youth had mental health issues.

- Youth was waiting for an inheritance.

- Youth had a disagreement with a teacher and refused to return to an educational program.

- Youth no longer wanted further education.

The above ten youth were in care an average of seven years, ranging from about four to twelve years, having had from three to as many as fifteen SWs (average was six workers assigned). Adolescent SWs provided stability as they assisted these youth ranging from a period of one and one-half to six and one-half years, for an average of a little over four years. This study also noted that six youth had a positive adult connection, with four of these youth having had extended family supports. One youth received support in career planning.

Despite the SW's efforts to encourage these youth, they were not successful in graduating from a post-education/vocational program. Again, these results support the need for other intervention strategies, and further career exploration and preparation for a number of our youth who were not able to achieve their educational goals. It may be noteworthy that of the thirty youth who either refused services or failed to meet post-secondary educational goals, fourteen of them (47%) were special education students, and this may need to be considered when exploring other strategies to achieve successful outcomes for this population.

**4.  *What is the extent to which LINK documentation indicates that a written discharge plan has been submitted to DMHAS and/or DMR for all children who are mentally ill or mentally retarded and require adult services?***

For the purpose of this review, *Discharge Plan* was defined as the submission of a referral packet requesting young adult services from DMHAS and/or DMR. The submission and acceptance of this referral packet is the starting point for a youth to receive services. Additionally, a child/youth reaching the point of discharge from DCF and currently receiving services from either DMHAS or DMR would indicate that the referral had been processed and accepted as part of the youth's discharge plan.

Forty-one of the seventy youth from this review did not require adult services from either DMHAS or DMR. Of the remaining twenty-nine youth, there was documentation that twenty-eight youth (97%) had referrals made to DMHAS or DMR for eligibility determination for adult services.

| **Appendix 1:** |
| **DELETED due to Confidentiality** |

| Appendix 2:  Characteristics of Youth who Refused Services (n=20) |
|---|

| AGE (YRS) | GENDER | IL SERV | EMPLOY-MENT | SPECIAL ED | SUB ABUSE | PSYCH MEDS | REASON REFUSED SERVICES | LENGTH OF TIME IN CARE (YRS.MOS) | # SW ASSIGNED | ADOL SW | LENGTH OF TIME ADOL SW (YRS.MOS) | ADULT CONN-ECTION | SUPPORT: ACADEMIC (A) CAREER (C) EMPLXMT (E) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 | M | No | No | Yes | No | No | No Reason Documented | 2.6 | 6 | Yes | 1.6 | Yes | A |
| 19 | F | No | No | No | No | No | No Reason Documented | 6.5 | 4 | Yes | 4.11 | UTD | A, C |
| 18 | F | Yes | No | No | No | No | ALA | 2.7 | 5 | Yes | 0.9 | Yes | No Info |
| 18 | F | No | No | Yes | Yes | Yes | Live with Parent | 10.5 | 11 | Yes | 6.10 | UTD | A |
| 18 | F | Yes | Yes | No | No | No | ALA | 6.5 | 2 | Yes | 4.9 | Yes | No Info |
| 18 | M | Yes | UTD | Yes | Yes | No | ALA | 7.0 | 5 | Yes | 1.8 | Yes | A |
| 18 | F | Yes | UTD | Yes | Yes | No | ALA | 8.1 | 7 | Yes | 3.4 | Yes | A, C |
| 18 | M | Yes | Yes | Yes | No | Yes | Live with Extended Family | 3.3 | 3 | Yes | 0.9 | Yes | A |
| 18 | F | Yes | No | No | No | No | Live with Parent | 1.1 | 1 | No | NA | Yes | UTD |
| 18 | M | Yes | UTD | Yes | No | Yes | M.H. Issues | 6.4 | 6 | Yes | 1.10 | Yes | A, C |
| 18 | M | No | No | Yes | Yes | No | Live with Parent | 5.3 | 10 | Yes | 2.8 | Yes | A |
| 18 | F | Yes | No | Yes | No | Yes | Live with Parent | 4.1 | 4 | Yes | 4.0 | Yes | A, E |
| 18 | F | No | No | Yes | No | No | Live with Parent | 1.0 | 3 | Yes | 1.3 | Yes | No Info |
| 19 | M | No | No Info | Yes | No | No | ALA | 7.1 | 4 | Yes | 5.10 | No Info | A, C |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Appendix 2 (Continued)** | | | | | | | | | | | | | |
| AGE (YRS) | GENDER | IL SERV | EMPLOY-MENT | SPECIAL ED | SUB ABUSE | PSYCH MEDS | REASON REFUSED SERVICES | LENGTH OF TIME IN CARE (YRS.MOS) | # SW ASSIGNED | ADOL SW | LENGTH OF TIME ADOL SW (YRS.MOS) | ADULT CONN-ECTION | SUPPORT: ACADEMIC (A) CAREER (C) EMPLYMT (E) |
| 18 | F | No | Yes | Yes | Yes | No | ALA | 0.5 | 2 | Yes | 0.5 | Yes | No Info |
| 18 | M | Yes | No | No | No | No | ALA | 5.9 | 7 | Yes | 3.10 | Yes | No Info |
| 19 | M | Yes | No | No | Yes | Yes | M.H., Sub Abuse Issues | 4.6 | 8 | Yes | 1.5 | Yes | E |
| 18 | M | Yes | No | No | Yes | No | M.H., Sub Abuse Issues | 3.5 | 2 | Yes | 1.6 | Yes | A |
| 18 | F | UTD | No | No | No | Yes | M.H. Issues | 1.10 | 4 | Yes | 0.8 | No | No Info |
| 18 | F | No | UTD | UTD | No | No | ALA | 3.4 | 6 | Yes | 2.2 | No Info | A |

**Legend**

**ALA** = Alternate Living Arrangement      **No Info** = No Information Documented in LINK Record      **UTD** = Unable to Determine (Due to Conflicting Documentation)

A composite of these characteristics was developed based on the mode or mean as applicable to the situation.  This identified an 18 year female (56%) having involvement with independent living services (55%), unemployed (60%) with a special education designation (55%).  Adolescent has a 35% chance of substance abuse and 30% chance of being on some type of medication regimen to address mental health issues.  The average time spent in out of care is 4 years six  months. Adolescent was likely to have had 5 social workers assigned during the period of DCF involvement with most recent assignment being that of an Adolescent Worker (95%).  A 75% likelihood of continuing adult education with academic supports in place 60% of the time.  Career and employment supports are less likely, with only 40% and 10% respectively engaged.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Appendix 3:  Characteristics of Youth Non-Compliant With Post-High School Requirements, n=10** ||||||||||||||
| AGE (YRS) | GENDER | IL SERV | EMPLOY-MENT | SPECIAL ED | SUB ABUSE | PSYCH MEDS | REASON NONCOMPLIANT | LENGTH OF TIME IN CARE (YRS.MOS) | # of SW | ADOL SW | LENGTH OF TIME ADOL. SW (YRS.MOS) | ADULT CONN-ECTION | SUPPORT: ACADEMIC (A) CAREER (C) EMPLYMT (E) |
| 18 | F | Yes | No | Yes | No | No | Lost Interest in the Program | 4.3 | 7 | Yes | 1.5 | Yes | No info |
| 19 | F | Yes | Yes | No | No | No | Did Not Want to Continue Education | 7.7 | 7 | Yes | 6.5 | Yes | Career |
| 18 | M | Yes | No | No | Yes | No | Prefers to Work & Live with Girlfriend | 7.1 | 7 | Yes | 5.0 | Yes | No Info |
| 21 | F | Yes | Yes | No | No | No | M.H. Issues | 3.11 | 3 | Yes | 2.10 | Yes | No Info |
| 22 | F | Yes | Yes | No | No | No | Failed to Attend Classes | 9.5 | 7 | Yes | 5.11 | No Info | No Info |
| 20 | F | Yes | Yes | No | No | No | Not Attending, Waiting for an Inheritance | 6.3 | 6 | Yes | 5.2 | No Info | No Info |
| 18 | F | Yes | Yes | Yes | No | No | M.H. Issues | 11.9 | 15 | Yes | 2.7 | Yes | No Info |
| 18 | F | Yes | No | No | Yes | No | Not Prepared | 4.6 | 3 | Yes | 2.1 | No Info | No Info |
| 21 | M | UTD | Yes | No | No | No | Disagreement with Teacher | 9.8 | 4 | Yes | 6.1 | Yes | No Info |
| 18 | M | Yes | Yes | Yes | No | No | Failing Classes | 6.3 | 6 | Yes | 4.11 | UTD | No Info |

**Legend**

**ALA** = Alternate Living Arrangement    **No Info** = No Information Documented in LINK Record    **UTD** = Unable to Determine (Due to Conflicting Documentation)

A composite of this population would result in a 19 year old female (70%) having had independent living services (90%), employed (70%) holding special education status only 30% of the time.  In 80% of the cases, adolescent would not be a substance abuser (80%), would be on no psychotropic medications (100%) and would have spent an average of 7 years one month in DCF care.  During that period, the adolescent would have had an average of six workers and in 100% of the cases would be assigned to an adolescent specialist at the time of discharge.  In 60% of the cases, the adolescent would be continuing with adult education. 90% of the cases had no documentation of supports.

| | AGE | GENDER | RECEIVED IL SERVICES | WERE EMPLOYED | RECEIVED SPECIAL EDUCATION SERVICES | LEVEL OF EDUCATION | HAD SUBSTANCE ABUSE ISSUES | WERE ON PSYCH |
|---|---|---|---|---|---|---|---|---|
| **Appendix 4: Comparison Chart** <br> **Characteristics of Youth Who Refused Services & Youth Who Did Not** | | | | | | | | |
| **SUBGROUP THAT REFUSED SERVICES AND DID <u>NOT</u> MEET A MEASURE (20 YOUTH)** | 18 – 85% <br> 19 – 15% <br><br> Average age 18 | Male 45% <br><br> Female 55% | 55% | 85% | 55% | 40% Attending High School <br><br> 20% Working on GED <br><br> 40% Dropped out | 35% | 30% |
| **YOUTH WHO MET A MEASURE** <br><br> **(44 YOUTH)** | 18 – 30% <br> 19 – 16% <br> 20 – 18% <br> 21 – 18% <br> 22 – 9% <br> 23 – 7% <br> 24 – 2% <br><br> Average age 20 | Male 45% <br><br> Female 55% | 89% | 61% | 41% | 100% High School/GED Graduates <br><br> 25% Completed or Attending College/Post-Secondary Education Programs | 11% | 30% |

## Outcome Measure 22:  Multidisciplinary Examinations (MDEs)

**Overview**
**Outcome Measure 22 requires that** *"at least 85% of the children entering the custody of DCF for the first time shall have an MDE conducted within 30 days of placement."*

The Monitor's Office qualitatively reviews compliance with Outcome Measure 22 as a component of the quarterly Outcome Measure 15 review.  Additionally, the Court Monitor reviews and analyzes the Department's quarterly automated data.  In early August, this Office reviewed the ROM data related to the Fourth Quarter 2006 reporting period.  In all, there were 391 children identified as having entered care for the first time and requiring MDEs during this period[41].  Of that total, 370 or 94.6% were documented as compliant with the 30 day rule.  Upon review of the "non-compliant" population, the Monitor has established that six of the 391 children were exempt from the examination, or from the population for various reasons, and that three actually met the measure, but the MDE was not accurately documented.  Making these corrections to the population, this would result in a compliance rate of **96.9%** (373 children of 385 children with applicable placement situations).

**Methodology**
A qualitative record review was not required for this Outcome Measure. However, the Court Monitor's Office conducted a LINK record review of the data for the 21 non-compliant cases identified through the ROM reports.  Narratives, medical icons and treatment plan documentation were researched in an effort to establish barriers to compliance.

**Review Findings**
The review of the 21 children who did not meet the measure found that nine children (42.9%) did not actually require the MDE per policy.
- Three children actually met the measure.  Two siblings were not documented as having the MDE until the date of the report receipt on 12/7/06 rather than on the date the MDE occurred, 11/8/06.  One had the MDE within 14 days, and it is unclear why the database does not recognize the data field entry.
- Two cases were voluntary placements and did not require MDE.
- One child was in care only 48 hours when OTC was vested with the maternal grandmother.
- One child was adopted on the date indicated as the entry date in the database,
- One adolescent went AWOL shortly after placement and commitment was revoked prior to the 30 day mark.
- One child was hospitalized in both a community hospital and then Riverview for an extended stay prior to the FWSN commitment resulting in the child's placement during the quarter.

---

[41] Per the *Juan F.* Exit Plan "The MDE is not required for children entering care from hospital settings greater than seven days in which age appropriate medical and mental health evaluations have been documented in LINK…. Measure applies only to those case in which a child or youth has entered custody for the first time and that placement exceeds 30 days….if a prior placement episode ended in less than 30 days with no documented MDE the worker may initiate the MDE process as if the most recent placement were an initial placement."

Of those children who did not receive an MDE within 30 days, but for which an MDE was documented, the range in time frames to receipt was 31 to 111 days, with an average length of time to MDE of 61.4 days.  In two situations LINK indicated a barrier to receipt of a timely MDE.  In one situation it was due to miscommunication between DCF and the provider.  An alternate provider was sought to provide the timeliest appointment. It was discovered that the appointment had, in fact, not been accepted due to the provider protocol of not accepting a referral directly from the worker.  In the second situation, the child went AWOL for a period of over thirty days prior to being picked up on a warrant and court ordered to treatment.  All others had no reference to the MDE being untimely.

A variety of formats are currently in use for MDE across the state.  An agreement on one MDE format would benefit all parties (both DCF and provider) that utilize this process. As the Department has now achieved a high rate of compliance with the MDE requirement, the focus now needs to shift to the issues of quality and consistency in reporting for the MDE evaluations across the multiple contracted provider agencies.