_Juan F._ v Rell 2006 Comprehensive Targeted Review Executive Summary
September 24, 2007

## Table of Contents

| Section | Page |
|---|---|
| Introduction | 2 |
| Acknowledgements | 3 |
| Collective Findings | 4 |
| Monitor's Comprehensive Qualitative Report – Findings at a Glance | 6 |
| Outcome Measure 1:  Commencement of Investigations | 8 |
| Outcome Measure 2:  Completion of Investigations | 8 |
| Outcome Measure 3: (Treatment Plans) & Outcome Measure 15 (Needs Met) | 11 |
| Outcome Measure 4: Search for Relatives | 17 |
| Outcome Measure 5: Repeat Maltreatment of Children | 19 |
| Outcome Measure 6: Maltreatment in Out-of-Home Care | 21 |
| Outcome Measure 7: Reunification | 23 |
| Outcome Measure 8: Adoption | 26 |
| Outcome Measure 9: Transfer of Guardianship | 28 |
| Outcome Measure 10: Sibling Placement | 29 |
| Outcome Measure 11: Re-Entry into DCF Custody | 31 |
| Outcome Measure 12: Multiple Placements | 34 |
| Outcome Measure 13: Foster Parent Training | 36 |
| Outcome Measure 14: Placement within Licensed Capacity | 34 |
| Outcome Measure 16: Out-of-Home Visitation | 34 |
| Outcome Measure 17: In-Home Visitation | 38 |
| Outcome Measure 18: Caseload Standards | 41 |
| Outcome Measure 19: Reduction in the Number of Children Placed in Residential Care | 42 |
| Outcome Measure 20: Discharge Measures | 43 |
| Outcome Measure 21: Discharge of Mentally Ill or Retarded Children | 43 |
| Outcome Measure 22: Multi-Disciplinary Examinations (MDE's) | 45 |

<u>***Juan F.* v Rell 2006 Comprehensive Targeted Review**</u>
**Executive Summary**

**Introduction**

The <u>Revised *Juan F.* Exit Plan</u> requires that the *"Court Monitor will conduct case reviews to produce annual reports documenting the Department of Children and Families' performance and progress toward achieving the Outcome Measures defined within this Exit Plan, except Outcome Measures 3 and 15 for which there will be separate quarterly case record reviews. The annual report concerning 2006 data will include a synopsis of the quantitative data provided by DCF in the third and fourth quarters of the calendar year of 2006 as well as the quantitative and qualitative findings from the research questions documented in the attached addendum document. . . . Subsequent annual reports will include a synopsis of the quantitative data provided by DCF as well as the quantitative and qualitative findings for those subsequent calendar years from the research questions documented in the attached addendum document."*

On March 23, 2006 the Court Monitor submitted an overall methodological outline for the Comprehensive Annual Review to the <u>*Juan F.*</u> parties.   Initially, Outcome Measure 5, Outcome Measure 6, Outcome Measure 12, Outcome Measure 16 and Outcome Measure 17 were slated for only quantitative analysis given the verified accuracy of data.   However, upon reconsidering the reporting requirements, and to provide the most informative reporting to the parties, the Monitor added these measures to the qualitative reporting schedule.   The Court Monitor's Office then began preparations to conduct the reviews with the input of all parties and with the assistance of the Technical Advisory Committee (TAC).   The TAC was identified as a component in the <u>Revised Monitoring Order</u> dated October 12, 2005.   Each of the measures was approached systematically with the development of protocols and methodologies which were submitted to each party with sufficient opportunity to comment and contribute to the development of the review process.

To accommodate fiscal and resource restraints within the allotted timeframes, changes were made to the sampling populations.  On December 12, 2006, the Court Monitor proposed changes to the methodology of the 2006-2007 Comprehensive Targeted Case Review.   The reductions in sampling methodology were identified as follows:

- Outcome Measures 1 and 2  - Change sample size from ~238 to a sample of 100
- Outcome Measure 7 -   Change sample size from ~160 to a sample of 80
- Outcome Measure 11 - Change sample size from ~191 to a sample of 68
- Outcome Measure 13 - Change sample size from ~237 to a sample of 70
- Outcome Measure 17 - Change sample size from ~249 to a sample of 100

All parties considered the suggested samples sufficiently robust for evaluating the qualitative aspects of each of the measures.  All quantitative data for these identified Outcome Measures was reviewed on numerous occasions, with query logic verified and corrections implemented as required.  Those measures that presented with persistent data quality issues over the course of time since the <u>*Juan F.* Revised Exit Plan</u> was approved on July 11, 2006, were subject to review at more stringent confidence ratios and margin of errors.  As the sample size and confidence level to review only qualitative data is not detailed in the <u>*Juan F.* v Rell Revised Exit Plan</u> and

there is no controlling language regarding qualitative reviews, a Court Order was not required related to these methodological changes.

This unprecedented review of approximately 2,500 cases provided a unique opportunity to analyze the Department's progress with respect to the Outcome Measures and consider the expectations that we place on DCF as an organization. This review confirms that tremendous progress has been made and sustained for many of the 22 Outcome Measures, but important work remains to ensure that children permanency, well-being and service needs are effectively addressed.

**Acknowledgements**
The Court Monitor would like to acknowledge the continued collaborative efforts of the *Juan F.* parties in developing this review process and the consultations provided by the TAC. Specifically I wish to acknowledge the following individuals who contributed to the development, training, review, data collection, analysis and drafting of this document:

| **DCF Personnel** | **DCF Central Office Administration** | **Technical Advisory Committee** |
|---|---|---|
| Kathy Acosta | Lou Ando | Claire Anderson |
| Debra Collins | Rudy Brooks | Linda Arnold |
| Liz Cyr | Darlene Dunbar | Dick Matt |
| Janet Gonzalez | Susan Hamilton | Judith Meltzer |
| Juliann Harris | Karl Kemper | |
| Marcy Hogan | Brian Mattiello | |
| Doug Howard | | |
| Allon Kalisher | | |
| Stanley Kasanowski | | |
| Wanda Ladson | **Monitor's Staff and Contracted Reviewers** | **Other Stakeholders** |
| Maxine McIntyre | Mary Corcoran | Mark Horwitz |
| Jorge Martinez | Charlene Fleming | CAFAP |
| Fred North | Tom Gallese | |
| Barbara O'Connell | Mary Ann Hartmann | *Juan F.* **Attorneys** |
| Linda Raitt, RN | Susan Marks Roberts | Stephen Frederick, Esq. |
| Kim Somaroo-Rodriguez | Melodie Peet | Marcia Lowry, Esq. |
| Sandra Tapia | Joni Beth Roderick | Ira Lustbader, Esq. |
| Isabel Turmeque | Michelle Turco | Jessica Polansky, Esq. |
| Joan Twiggs | | Ann Rubin, Esq. |
| Rynep VanEldik | | |
| Maribel Vazquez | | |
| Lynette Warner | | |

A number of overarching findings emerged from the targeted reviews conducted over the last six months. The findings confirm the sustained improvements in many areas of case practice that have been highlighted during the course of our quarterly reports. The reviews offered insight into areas where progress has not been adequate, or quality of the work requires continued improvement.

Each of the targeted reviews presents a series of findings that pertain to the specific focus of that Outcome Measure. These findings are narrated within each corresponding chapter within this document. In addition, there are a number of overarching findings that span many, if not all of the measures. These are presented as collective findings below:

*Juan F.* v Rell 2006 Comprehensive Targeted Review Executive Summary
September 24, 2007

---

**Collective Findings**

- The results from the targeted review of approximately 2,500 cases confirm the tremendous progress and improvement in fundamental areas of case practice that has occurred over the course of the past three years.  The Department has elevated its practice in key areas such as:
  - Visitation contact
  - Timely permanency outcomes for children
  - Provision of Multidisciplinary Exams (MDE) for children,
  - Timeliness of investigations
  - Increased emphasis on kinship resource searches,
  - Reduction of residential care placements, particularly those out of state
  - Improved educational/vocational outcomes for youth discharged after age 18

- Despite impressive improvements referenced above, the Department has not been successful in two significant and fundamental areas of practice:  Treatment Planning and Needs Met.

- Appropriate treatment planning remains areas of concern.  The findings indicate that the Department is performing considerably lower than the benchmarks set within the *Juan F.* Revised Exit Plan.  In spite of increased training, resources and numerous initiatives to focus the work, treatment plans are regularly developed without the full participation of the active case participants and often lack:
  - Clear focused goals for the child in placement and/or family
  - Inclusive action steps for the active case participants, providers and DCF,
  - Identification of progress related to the goals set in place during the prior six months

  This is not to say that treatment planning has not shown some improvement.  Several areas of the treatment plan assessment have made gradual progress since implementation of the format currently in use.  Further, progress has been noted due to the statewide implementation of the Family Conference (FC) model which places the focus on appropriate engagement and empowerment of families.  While there is evidence that this process now has a foothold within many area offices, much more work is required to achieve system-wide competency and consistent utilization of this process.

- System gridlock exists in the treatment and placement service array creating a barrier to meeting children and families' needs.  Discharge delays routinely occur at emergency departments (ED), group homes, residential treatment facilities, SAFE homes, and STAR/Shelter programs.  There is a tremendous need for all levels of foster care and adoptive resources.  Wait lists for in-home services and outpatient mental or behavioral health services exist for most area offices.

- The permanency outcome measures (OM7, OM8, and OM9) have been maintained at or above the Exit Plan requirement for three consecutive quarters.  However, while the Department has greatly improved its performance in achieving timely permanency, these measures are predicated on exit cohorts.  Of those children that remain in the system, many have the non-preferred goal "Another Planned Living Arrangement" (APPLA) and

are languishing in the system with insufficient focus on development of connections to lifelong resources, and inadequate life skills training and discharge planning.  More focused attention and actions must be taken on behalf of these children.

- Given the success of the Department in achieving fundamental quantitative changes required by the Exit Plan benchmarks, attention must now focus on improving the quality of efforts.  The targeted review findings suggest numerous opportunities for continued development and improvement.  Continuous quality improvement must be emphasized at all levels of the Department.

- Each targeted review identified the Social Work Supervisor (SWS) as a critical component to producing positive outcomes for children and families.  Competent guidance and support is required to navigate the multiple tasks required on the path to permanency and well-being. In every area measured, reviewers identified accurate assessment, discussion of risk, development of action steps, and follow through within the supervisory process as keys to successful outcomes.

- Appropriate use of the Area Resource Group (ARG) and external consultants in situations of substance abuse, mental health issues and domestic violence remains inconsistent across the cases sampled.  There were many opportunities for ARG consultations that were not utilized - resulting in less robust assessment of risk and safety and less effective treatment planning.

- The culmination of these review efforts provides confirmation that the automated reports produced by the Department for the Exit Plan Outcome Measures accurately represent the levels of performance.  Given the repeated confirmation and verification of the quantitative results for the majority of the measures, attention must now be focused on developing qualitative methodologies for analyzing system strengths and opportunities for development.  The Court Monitor's future reviews will focus on targeted areas of concern related to meeting the needs of children and families.

- The overwhelming expectations and complexities facing DCF staff were noted by reviewers throughout this process.  The current workload, especially for the SW and SWS level staff must be analyzed and considered in the context of producing positive outcomes.  Increasing expectations to meet multiple, overlapping, focused and unfocused, funded and unfunded mandates are compounded by layers of responsibility and new labor intensive processes.  An unmanageable workload will result in inefficient efforts by DCF on behalf of children and families.  Left unchecked, this will create a situation that will threaten the progress that has been achieved.

The following chart provides an overview of the timeframes and populations from which all samples were drawn, as well as our qualitative findings for that measure.  Further, the Monitor's *Juan F.* v. Rell Exit Plan Quarterly Report:  April 1, 2007 – June 30, 2007 includes a table which provides the longitudinal data for each of the fourteen quarters that have been reported to date.

## Monitor's Comprehensive Qualitative Report – Findings at a Glance

| Outcome Measure | Requirement | Baseline | Universe | Sample | Findings |
|---|---|---|---|---|---|
| **OM1:**<br>**Investigation**<br>**Commencement** | ≥ 90% | N/A | All reports accepted at the Hotline during the period of Oct 1, 2006 – Oct 31, 2006 (N= 2,387) | 100 reports | 97.0% |
| **OM2:**<br>**Investigation Completion** | ≥ 85% | 73.7% | All reports accepted at the Hotline during the period of Oct 1, 2006 – Oct 31, 2006 (N =2,387) | 100 reports | 95.0% |
| **OM3:**<br>**Treatment Plans** | ≥ 90% | N/A | 2nd Qtr 2007 ACR schedule | 76 cases | 30.3% |
| **OM4:**<br>**Search for Relatives** | ≥ 85% | 58% | All children that entered DCF custody during the period of April 1, 2006 through June 30, 2006. (N=737) | 196 children | 94.4% |
| **OM5:**<br>**Repeat Maltreatment** | ≤ 7% | 9.3% | All children that experienced substantiated abuse or neglect during the month of July 2006. (N= 876) | 134 children:<br>(67 w/ repeat and 67 w/ no repeat) | 7.6% |
| **OM6:**<br>**Maltreatment in Out-of-Home (OOH) Care** | ≤ 2% | 1.2% | All children that were in out of home placement during the 3rd Qtr 2006. (N=6,688) | 27 children:<br>(12 w/maltreatment and 15 w/no maltreatment) | 0.18% |
| **OM7:**<br>**Reunification** | ≥ 60% | 57.8% | All children discharged via adoption from DCF custody during the 4th Qtr 2006 (N=131) | 71 Children | 64.8% |
| **OM8:**<br>**Adoption** | ≥ 32% | 12.5% | All children discharged from care to reunification during the 4th qtr 2007 (N=327) | 80 Children | 27.5% |
| **OM9:**<br>**Transfer of Guardianship** | ≥ 70% | 60.5% | All children that were discharged from DCF custody during the quarter of Oct 1, 2006 through Dec 31, 2006. (N=106) | 80 Children | 76.3% |
| **OM10:**<br>**Sibling Placement** | ≥ 95% | 57.0% | New sibling entries and changes in sibling placement within full population of all siblings in placement during 4th Qtr 2006. (N=2,333 children) | 604 Children (all identified siblings with change in placement or new entry) | 85.5% |
| **OM11:**<br>**Re-Entry into DCF Custody** | ≤ 7% | 6.9% | All children that were discharged from DCF custody during the quarter of July 1, 2005 through Sept 30, 2005 (excluding Voluntary Service Placements) (N=639) | 113 Children<br>(55 children w/ re-entry date, and 58 children w/ no re-entry date) | 8.6% |
| **OM12:**<br>**Multiple Placements** | ≥ 85% | N/A | All children in DCF custody for at least 30 days in the 4th Qtr 2006 (excluding voluntary, interstate and probate cases (N=5,808) | 256 Children | 95.3% |

## Monitor's Comprehensive Qualitative Report – Findings at a Glance

| Outcome Measure | Requirement | Baseline | Universe | Sample | Findings |
|---|---|---|---|---|---|
| **OM13:**<br>**Foster Parent Training** | 100% | N/A | All licensed foster homes available to the Department on December 31, 2006. (N=3,723) | 75 Foster Homes | Qualitative Findings do not translate to a score. |
| **OM14:**<br>**Placement within Licensed Capacity** | ≥ 96% | 94.9% | All children in DCF custody for at least 30 days in the 4th Qtr 2006 (excluding voluntary, interstate and probate cases.) .(N=5,808) | 202 Children | 90.1% |
| **OM15:**<br>**Children and Families' Needs Met** | ≥ 80% | N/A | 2nd Qtr 2007 ACR schedule | 76 cases | 51.3% |
| **OM16:**<br>**OOH Visitation** | ≥ 85% (Month)<br>100% (Qtr) | 72.0%<br>87.0% | All children in DCF custody for at least 30 days in the 4th Qtr 2006 (excluding voluntary, interstate and probate cases). (N=5,808) | 256 Children | 99.4% (Month)<br>99.2% (Qtr) |
| **OM17:**<br>**In-Home Visitation** | ≥ 85% | N/A | All in-home treatment cases open 30 days or more as of December 31, 2006 (excluding probate, interstate and voluntary cases). (N=737) | 250 Families | 89.2% |
| **OM18:**<br>**Caseload Standards** | 100% | 69.2% | All open cases during 4th qtr 2006: 17,622 cases distributed among 1,340 workers. (including 170 trainees) | N/A | 100.0% |
| **OM19:**<br>**Residential Reduction** | ≤ 11% | 13.5% | All children in placement on Dec 31, 2006. | N/A | 11.0% |
| **OM20:**<br>**Discharge Measures** | ≥ 85% | 61.0% | All youth, 18 years of age or older, discharged from care 4th Qtr, 2006. Excluding from Juvenile Justice, Interstate, Probate, and Voluntary cases opened for the sole purpose of making monetary payments on behalf of the youth. (N=70) | 70 Youth | 100.0% |
| **OM21:**<br>**Discharge to Department of Mental Health and Addiction Services (DMHAS)/Department of Mental Retardation (DMR)** | 100% | N/A | All youth, 18 years of age or older, discharged from care 4th Qtr, 2006 and who require discharge to DMHAS or DMR. Excludes Juvenile Justice, Interstate, Probate, and Voluntary cases opened for the sole purpose of making monetary payments on behalf of the youth. (N=29) | 29 Youth | 97.0% |
| **OM22:**<br>**Multi Disciplinary Exams (MDE)** | ≥ 85% | 5.6% | All Juan F. children entering care for the first time and reaching 30 days in placement during the 4th quarter. (N=388) | 21 children identified as non-compliant with OM22 | 96.9% |

**Outcome Measure 1:  Commencement of Investigations and
Outcome Measure 2:  Completion of Investigations**

**Overview**
The *Juan F*. v Rell Revised Exit Plan requires two performance benchmarks related to child
protective service investigations.  They are Outcome Measure 1:  Commencement of Investigations
and Outcome Measure 2:  Completion of Investigations.  The requirements of these two measures
are defined as follows:

**Outcome Measure 1:  Commencement of Investigations** **requires that**, **"DCF shall assure that
at least 90% of all reports of children alleged to be abused, or neglected, shall be prioritized,
assigned and the investigation shall commence within the timeframes specified below.  If the
report of child abuse or neglect is determined by the DCF Hotline to be…**
   **A.  A situation in which failure to respond immediately could result in the death of, or
       serious injury to a child , then the response time for commencing and investigation is
       *the same calendar day* Hotline accepts the report.**
   **B.  A non-life threatening situation that is severe enough to warrant a 24 hour response to
       secure the safety of the child and to access the appropriate and available witnesses,
       then the response time for commencing an investigation is *24 hours*.**
   **C.  A non-life threatening situations that, because of the age or condition of the child, the
       response time for commencing an investigation is *72 hours*."**

In definitions within the *Juan F*. v Rell Revised Exit Plan document, the "commencement of the
investigation" occurs when the DCF investigator attempts to make face-to-face contact with the
parent or person responsible for the child's care, and or with the child(ren)".  The "attempt at face-
to-face contact" is made "when the investigator visit the home, school or other setting in an effort to
interview the child(ren) and family members regarding the allegation of abuse or neglect." (See
DCF Policy 34-4)

The Department has reported achievement of this measure every quarter since the Fourth Quarter
2004. This review found 97.0% of the case sample (n=100) met Outcome Measure 1 as the response
time achieved within the investigation was within the priority established for response at Hotline.
This is consistent with the Department's reported performance for this measure.

**Outcome Measure 2:  Completion of the Investigation** **requires that "at least 85% of all
reports of alleged child maltreatment accepted by the DCF Hotline shall have their
investigations completed within 45 calendar days of acceptance by the Hotline.**    Guidelines
within the Exit Plan document indicate that completion of the investigation occurs only after the
DCF SWS verifies the determination of substantiation or non-substantiation and enters that in LINK
via the SWS approval of the investigation.

The Department has reported achievement of Outcome Measure 2 consistently since the fourth
quarter 2004.  **Our quantitative findings indicate that 95.0% of the reports accepted for
investigation within our sample had investigations completed within 45 days of the date of
acceptance at Hotline.**  Of those four cases not achieving the benchmark performance, the

completion was documented at 51, 53, 54 and 55 days from date of acceptance.  This is consistent with the Department's LINK reporting for this measure.

**Review Findings and Trends:**
The reviewers identified that 69% of the cases within the sample incorporated a majority of the elements of the risk assessment component measured, but that only 43% incorporated all expected policy elements.   The latter issue may be one of disparity of standards for documentation which vary slightly office by office rather than poor practice.  Overall rankings of the quality of the investigations resulted in 49.0% at a very good or optimal level, 40% at a marginal level, 10% at a poor level and 1.0% scored as adverse.

There are data elements of the protocol left blank in many cases.  Most frequently this was related to descriptive data elements, services, and notification.  In some cases, this deficit was overcome by text within the investigation protocol.  In others it was not.  While there are variations between area offices, the differences are more apparent when the Special Investigation Unit (SIU) conducts investigations.  This unit appears to have different practice guidelines regarding the data elements that are filled out within the investigation protocol document.

While 97.0% of the sample commenced investigations within the specified timeframe, actual contact with alleged child victims was 4.6 days.  Investigators were most successful with the Same Day priority response, in that 92.9% of those cases had documented contact with the alleged victim on the same date of the acceptance.  The 24 hour response and 72 hour response cases achieved contact with the alleged victim within the priority response designation in 54.1% and 47.0% respectively.

In 94.0% of the sample there was documented contact with the child victim.  In the six cases where there was no contact with the alleged victim, reviewers felt that circumstances preventing contact in all but one case were well documented and reasonable.

In 97% of the sample, there was documented contact with the alleged perpetrator(s).  In the three situations where there was no contact with the alleged perpetrator, the circumstances preventing contact were well documented and reasonable.

Use of the Area Resource Group (ARG) in situations of substance abuse, mental health issues and domestic violence remains inconsistent across the investigations sampled.  Reviewers felt that there were many opportunities for ARG consultations that were not utilized - resulting in less robust assessment of risk and safety.  Specifically, reviewers noted 17 cases for which they felt ARG consultation was required, and not included within the process.  As a result, the risk assessments did not appear to be comprehensive and accurate.

Key background and collateral contacts were not always documented.  Fourteen percent of the cases did not have criminal background checks documented.  Twenty percent did not document medical collateral contacts.  Fifteen percent of the cases failed to incorporate interviews with other adult residents in the home where the alleged abuse took place.

In 31.0% of the sample, service needs were identified by the Investigator but no follow up is documented upon disposition of the case. This potentially leaves a family that is not transferred to Ongoing Services no better informed or connected with resources available in the community then when they came to the Department's attention.

In all, 88.7% of the reports with one specific incident date failed to identify that incident date in the appropriate data field. This can be a source of error when reporting on repeat maltreatment as the date of incident and report are often not the same.

The majority of reports in this sample came from mandated reporters outside of the Department. In 74.7% of the cases reported by mandated reporters there was no indication of letters of notification to the reporter regarding the determination of abuse/neglect.

Notification letters or contact with the alleged perpetrator to advise them of the investigation findings is poorly documented. In all, 42% of the sample lacked this documentation.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office created the tool for measurement of Outcome Measure 1 and Outcome Measure 2 with input of all parties in the fall of 2006. The parties agreed with a randomly selected sample of 100 cases. On October 2, 2006 the Monitor's Office requested the universe of all reports of abuse or neglect accepted at the Hotline during the period of October 1, 2006 through October 31, 2006. This allowed an opportunity to conduct a review verifying LINK data reporting related to Outcome Measure 1 and Outcome Measure 2 as well as to provide a universe from which to sample and review more qualitative practice elements regarding investigative practices. The Department provided data which identified 2,387 accepted, unduplicated reports during the quarter. A sample of 100 was selected from that universe. For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

The LINK record review was conducted over the first and second quarters of 2007. DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted and necessary changes resulted to improve validity and reliability of scoring.

**Monitor's Office Case Review for Outcome Measure 3 and Outcome Measure 15**

**Overview**

The *Juan F.* v Rell Revised Exit Plan and subsequent stipulated agreement reached by the parties and court ordered on July 11, 2006, requires the Monitor's Office to conduct a series of quarterly case reviews to monitor Outcome Measure 3 (Treatment Planning) and Outcome Measure 15 (Needs Met).   The implementation of this review began with a pilot sample of 35 cases during the third quarter 2006 and has been conducted quarterly since that time with samples of approximately 70-75 cases.  For the Third Quarter 2007 the sample included 76 cases.

**Outcome Measure 3 requires that,  "….*in at least 90% of the cases, except probate, interstate and subsidy only cases, appropriate treatment plans shall be developed as set forth in the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15" dated June 29, 2006 and the accompanying "Directional Guide for OM3 and OM15 Reviews" dated June 29, 2006."***

**Review Findings and Trends**

The fourth quarter case review data for Outcome Measure 3 indicates that the Department attained the level of "Appropriate Treatment Plan" in 23 of the 76-case sample or **30.3%.**

- This reduction in the treatment plan scores reflects the overarching issue raised by reviewers – the need for greater supervisory oversight in the development of and approval of plans. Currently, plans are often approved that clearly are not in accordance with expected practice. Recent changes in the Administrative Case Review (ACR) SWS role in relation to reviewing plans with an eye to Outcome Measure 3, as well as fulfilling the role of the third party, objective reviewer may improve scores in coming quarters.  However, reviewers have noted many times in the past that the documentation provided by the ACR SWS often addresses action steps, goals, and services, yet fails to be incorporated prior to the approval of the plan. The Ongoing SWS bears a great deal of the responsibility for improving the level of performance for this measure.

- Treatment plans continue to lack inclusive action steps, identified goals for the upcoming six months, identification of services, and the input of providers (other than with foster parents – who are being engaged in discussion with regularity).

- 98.7% of the cases sampled had a plan less than 7 months old at the point of review. Three of the plans not passing (3.9%) did not have SWS approval.  All three of these plans had one or more sections with less than a "very good" rating and would have been deemed inappropriate regardless of approval status.  With respect to accommodating the primary language of clients, 94.7% of the cases had documentation that families' language needs were met (4 cases did not have documentation of meeting language needs).

- In-Home cases (n=22) appear to be most problematic in regards to inclusive and appropriate treatment planning.  In all only 18.2% of the In-Home Cases were deemed as having appropriate treatment plans. Child in Placement cases with CPS designation had the greatest percentage of appropriate treatment planning for the sample set, with 69.6% of those cases deemed appropriate.  Voluntary Service Child in Placement cases were considered appropriate in 60% of the cases reviewed.

- There have been recent changes to the definitions of the APPLA goals, and changes in expectations related to assignment of these less permanent scores. It may be that this transition along with the confusion of implementing this new policy is impacting the scoring for both treatment plans and needs met related to permanency.

- There was documented engagement of foster parents in discussions around treatment planning in 94.4% of the cases sampled. This is the highest rate to date. Mothers (73.8%), and identified support/kin (66.7%) are the next participants most frequently involved in discussions. Attendance rates at the ACRs and Family Conferences remain problematic for most case participants. Reviewers noted a failure to invite adolescents and fathers, and the overall lack of engagement with both children's and parents' attorneys.

As a result of discussion with area offices regarding the in-home cases reviewed, the Monitor has determined a need for a methodological change for the future reviews. Area Offices were identifying cases that they felt had appropriate treatment planning but that were not passing as a result of poor or missing LINK documentation or information known to the SW or SWS that was not represented in the LINK narrative but was of importance to how the treatment planning efforts unfolded. While we feel that scoring has given an accurate accounting of the treatment planning documents and records we reviewed, beginning with the Third Quarter 2007 reviews, we have made a change in approach. Many in-home cases do not have a family conference that typically provides an opportunity for the reviewer to clarify issues or obtain first hand knowledge. Therefore, for all in-home cases where there is no opportunity to attend the family conference and speak with the SWS or SW in person, we will include a brief phone interview with the SWS or SW.

**Outcome Measure 15 requires that, "….*at least 80% of all families and children shall have all their medical, dental, mental health and other service needs met as set forth in the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15 dated June 29, 2006, and the accompanying 'Directional Guide for OM3 and OM15 Reviews dated June 29, 2006."***

**Review Findings and Trends**
The case review data indicates that the Department attained the designation of "Needs Met" in **51.3%** of the 76-case sample.

- Nine of the 11 categories measured within Outcome Measure 15 showed some level of improvement over the prior quarter. The Department shows promising practices in legal action, safety of children in placement, attending to medical needs, and recruitment efforts for the prior period. Most problematic are provision of timely dental services, mental health, behavioral health, and substance abuse services.
- The permanency goals of children appear to have an impact on the ability of the Department to attain a level of practice and service provision that meets the identified needs of children and families. Children with non-preferred treatment planning permanency goals more frequently do not have their identified needs met. APPLA: Permanent Non-Relative Foster Care, APPLA: Other and Long Term Foster Care with a Relative are respectively 33.3%, 42.9% and 33.3% compliant. Preferred goals are compliant at rates greater than 55.0%.

- Structured Decision Making (SDM) training is now completed across the state area offices. The practice shows great promise if DCF maintains the integrity of the scoring protocols' definitions. There is an expected learning curve as SW and SWS work with the assessment tools in establishing both permanency and services needs.
- Of the needs which remained unmet from the prior planning period, mental health services continued to be most prevalent. Most frequently, the barrier documented was "client refusal"; however, reviewers noted that these circumstances often did not have documented engagement efforts such as client contact by SWS or ARG, or collaborative efforts with active providers to engage clients in needed services.
- 68.4% of the cases reviewed had clear documentation of a service need that should have been carried over to the treatment plan reviewed for this quarter, but was not.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology:**

The *Juan F.* v Rell Revised Exit Plan and subsequent stipulated agreement reached by the parties and court ordered on July 11, 2006, requires the Monitor's Office to conduct a series of quarterly case reviews to monitor Outcome Measure 3 (Treatment Planning) and Outcome Measure 15 (Needs Met). The implementation of this review began with a pilot sample of 35 cases during the Third Quarter 2006. During the Second Quarter 2007, the Monitor's Office reviewed a total of 76 cases[1] . Methodology will change with the Third Quarter 2007 reviews in that 50 cases will be reviewed by individual reviewers. This was necessitated by changes in DCF staff assignments and additional monitoring activities resulting from the *Juan F.* v Rell Action Plan.

This quarter's 76 case sample was stratified based upon the distribution of area office caseload on March 1, 2007. The sample incorporated both in-home and out-of-home cases based on the overall statewide percentage reflected at the point that each sample is determined. For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

This is the last quarter where the methodology included pairing of DCF staff with Monitor's Review staff. Within the course of seven to twelve hours, each case was subjected to the following methodology.

1. A review of the Case LINK Record documentation for each sample case concentrating on the most recent six months. This includes narratives, treatment planning documentation, investigation protocols, and the provider narratives for any foster care provider during the last six-month period.
2. Attendance/Observation at the Treatment Planning Conference (TPC)/Administrative Case Review (ACR) or Family Conference (FC)[2].
3. A subsequent review of the final approved plan is conducted fourteen to twenty days following the date identified within the TPC/ACR/FC schedule from which the sample was

---

[1] The Exit Plan required a total of 70 cases be reviewed. Due to rounding and ensuring that each area office had representation of both in-home and out of home case assignments, a total of 76 cases were selected.

[2] Attendance at the family conference is included where possible. In many cases, while there is a treatment plan due, there is not a family conference scheduled during the quarter we are reviewing. To compensate for this, the monitoring of in-home cases includes hard copy documentation from any family conference held within the six month period leading up to the treatment plan due date.

drawn.  Each reviewer completes an individual assessment of the treatment plan and needs met outcome measures and fills out the scoring forms for each.

4. A final meeting with the assigned teammate is held to jointly arrive at the final scores for each section and overall scoring for OM3 and 15. Individual scoring and joint scoring forms are then submitted to the Monitor. (This step may change as determined appropriate by the DCF Court Monitor after evaluation of the process, feedback from review staff and fiscal/staffing considerations.)

Although the criterion for scoring requires consistency in definition and process to ensure validity, no two treatment plans will look alike.  Each case has unique circumstances that must be factored into the decision-making process.  Each reviewer has been provided with direction to evaluate the facts of the case in relationship to the standards and considerations and have a solid basis for justifying the scoring.

In situations where agreement cannot be reached, the team requests that the supervisor become a third voice on those areas of concern.  They present their opinions and findings and the supervisor determines the appropriate score to reflect the level of performance for the specific item(s) and assists them in the overall determination of compliance for OM3 and OM15.  If the team indicates that there are areas that do not attain the "very good" or "optimal" level, yet consensus is the overall score should be "an appropriate treatment plan" or "needs met" the team clearly outlines their reasoning for such a determination and it is reviewed by the Court Monitor for approval of an override exception.  These cases are also forwarded to the Technical Advisory Committee (TAC) for review.  During the Fourth Quarter, there were 19 such cases submitted for consideration/assistance of supervisory oversight.  Of the 19 cases, seven resulted in the approval of an override to allow one or the other measure to achieve a passing score.  These cases will be identified in the overall scoring tables later in this document.

*Juan F.* v Rell 2006 Comprehensive Targeted Review Executive Summary
September 24, 2007

| Table 9:  Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for <u>All Cases</u> Across All Categories of OM3 | | | | | |
|---|---|---|---|---|---|
| Category | Optimal "5" | Very Good "4" | Marginal "3" | Poor "2" | Adverse/Absent "1" |
| **I.1    Reason for DCF Involvement** | 42 (55.3%) | 30 (39.5%) | 4 (5.3%) | 0 (0%) | 0 (0%) |
| **I.2.  Identifying Information** | 3 (3.9%) | 57 (75.0%) | 15 (19.7%) | 1 (1.3%) | 0 (0%) |
| **I.3.  Strengths/Needs/Other Issues** | 17 (22.4%) | 37 (48.7%) | 22 (28.9%) | 0 (0%) | 0 (0%) |
| **I.4.  Present Situation and Assessment to Date of Review** | 17 (22.4%) | 38 (50.0%) | 20 (26.3%) | 1 (1.3%) | 0 (0%) |
| **II.1  Determining the Goals/Objectives** | 15 (19.7%) | 26 (34.2%) | 29 (38.2%) | 6 (7.9%) | 0 (0%) |
| **II.2.  Progress[3]** | 19 (25.0%) | 30 (39.5%) | 22 (28.9%) | 2 (2.6%) | 1 (1.3%) |
| **II.3  Action Steps to Achieving Goals Identified** | 3 (3.9%) | 27 (35.5%) | 37 (48.7%) | 8 (10.5%) | 1 (1.3%) |
| **II.4  Planning for Permanency** | 24 (31.6%) | 34 (44.7%) | 14 (18.4%) | 2 (2.6%) | 2 (2.6%) |

| Table 10:   Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for <u>Out of Home  (CIP) Cases</u> Across All Categories of OM3 | | | | | |
|---|---|---|---|---|---|
| Category | Optimal "5" | Very Good "4" | Marginal "3" | Poor "2" | Adverse/Absent "1" |
| **I.1    Reason for DCF Involvement** | 25 (46.3%) | 26 (48.1%) | 3 (5.5%) | 0 (0%) | 0 (0%) |
| **I.2.  Identifying Information** | 1 (1.9%) | 40 (74.1%) | 12 (22.2%) | 1 (1.9%) | 0 (0%) |
| **I.3.  Strengths/Needs/Other Issues** | 13 (24.1%) | 26 (48.1%) | 15 (27.8%) | 0(0%) | 0 (0%) |
| **I.4.  Present Situation and Assessment to Date of Review** | 16 (29.6%) | 23 (42.6%) | 14 (25.9%) | 1 (1.9%) | 0 (0%) |
| **II.1  Determining the Goals/Objectives** | 8 (14.8%) | 19 (35.2%) | 23 (42.5%) | 4 (7.4%) | 0 (0%) |
| **II.2.  Progress[4]** | 13 (25.0%) | 24 (46.2%) | 13 (25.0%) | 1 (1.9%) | 1 (1.9%) |
| **II.3  Action Steps to Achieving Goals Identified** | 2 (3.7%) | 23 (42.6%) | 23 (42.6%) | 6 (11.1%) | 0 (0%) |
| **II.4  Planning for Permanency** | 14 (25.9%) | 24 (44.4%) | 13 (24.1%) | 2 (3.7%) | 1 (1.9%) |

| Table 11:  Measurements of Treatment Plan OM 3 – Number and Percent of Rank Scores for <u>In-Home Family Cases</u> Across All Categories of OM3 | | | | | |
|---|---|---|---|---|---|
| Category | Optimal "5" | Very Good "4" | Marginal "3" | Poor "2" | Adverse/Absent "1" |
| **I.1    Reason for DCF Involvement** | 17 (77.3%) | 4 (18.2%) | 1 (1.3%) | 0 (0%) | 0 (0%) |
| **I.2.  Identifying Information** | 2 (9.1%) | 17 (77.3%) | 3 (13.6%) | 0 (0%) | 0 (0%) |
| **I.3.  Strengths/Needs/Other Issues** | 4 (18.2%) | 11 (50.0%) | 7 (31.8%) | 0 (0%) | 0 (0%) |
| **I.4.  Present Situation and Assessment to Date of Review** | 1 (4.5%) | 15 (68.2%) | 6 (27.3%) | 0 (0%) | 0 (0%) |
| **II.1  Determining the Goals/Objectives** | 7 (31.8%) | 7 (31.8%) | 6 (27.3%) | 2 (9.1%) | 0 (0%) |
| **II.2.  Progress** | 6 (27.3%) | 6 (27.3%) | 9 (40.9%) | 1 (4.5%) | 0 (0%) |
| **II.3  Action Steps to Achieving Goals Identified** | 1 (4.5%) | 4 (18.2%) | 14 (63.6%) | 2 (9.1%) | 1 (4.5%) |
| **II.4  Planning for Permanency** | 10 (45.5%) | 10 (45.5%) | 1 (4.5%) | 0 (0%) | 1 (4.5%) |

---

[3] Excludes two cases that were newly opened – ranked as N/A- too early to note progress (2.6%).
[4] Excludes two cases that were newly opened – ranked as N/A-too early to note progress (3.7%).

_Juan F._ v Rell 2006 Comprehensive Targeted Review Executive Summary
September 24, 2007

**Table 13:  Measurements of Treatment Plan OM 15 – Percentage of Rank Scores Attained Across All Categories[5]**

| Category | # Ranked Optimal "5" | # Ranked Very Good "4" | # Ranked Marginal "3" | # Ranked Poor "2" | # Ranked Adverse/Absent "1" | N/A To Case |
|---|---|---|---|---|---|---|
| **I.1  Safety – In Home** | 8 (30.8% | 11 (42.3%) | 6 (23.1%) | 1 (3.8%) | 0 (0%) | 50 |
| **I.2  Safety – Children in Placement** | 28 (48.3%) | 24 (41.4%) | 5 (8.6%) | 1 (1.7%) | 0 (0%) | 18 |
| **II.1   Securing the Permanent Placement – Action Plan for the Next Six Months** | 25 (43.1%) | 18 (31.0%) | 14 (24.1%) | 1 (1.7%) | 0 (0%) | 18 |
| **II.2.  DCF Case Management – Legal Action to Achieve the Permanency Goal During the Prior Six Months** | 54 (71.1%) | 20 (26.3%) | 1 (1.3%) | 1 (1.3%) | 0 (0%) | 0 |
| **II.3   DCF Case Management – Recruitment for Placement Providers to achieve the Permanency Goal during the Prior Six Months** | 38 (60.3%) | 14 (22.2%) | 11 (17.5%) | 0 (0%) | 0 (0%) | 13 |
| **II.4   DCF Case Management – Contracting or Providing Services to achieve the Permanency Goal during the Prior Six Months** | 29 (38.7%) | 27 (36.0%) | 19 (25.3%) | 0 (0%) | 0 (0%) | 1 |
| **III.1  Medical Needs** | 35 (46.1%) | 28 (36.8%) | 10 (13.2%) | 1 (1.3%) | 2 (2.6%) | 0 |
| **III.2  Dental Needs** | 43 (56.6%) | 11 (14.5%) | 15 (19.7%) | 3 (3.9%) | 4 (5.3%) | 0 |
| **III.3  Mental Health, Behavioral and Substance Abuse Services** | 19 (27.5%) | 30 (43.5%) | 15 (21.7%) | 5 (7.2%) | 0 (0%) | 7 |
| **IV.1  Child's Current Placement** | 25 (44.6%) | 18 (32.1%) | 13 (23.2%) | 0 (0%) | 0 (0%) | 20 |
| **IV.2  Educational Needs** | 25 (42.4%) | 19 (32.2%) | 10 (16.9%) | 4 (6.8%) | 1 (1.7%) | 17 |

[5] Percentages are based on applicable cases for the individual measure.  Those cases marked N/A are excluded from the denominator in each row's calculation of percentage.  At the point of sampling, the total number identified for the in-home sample was 23 cases. However, a number of cases had both in-home and out of home status at some point during the six month period of review.

## Outcome Measure 4 – Search for Relatives

**Overview**

This review of Outcome Measure 4 – Search for Relatives, is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding the Department's efforts to conduct thorough searches for possible familial and social resources for placement or support of a child who requires out of home placement.  **Outcome Measure 4 requires that DCF comply and sustain the following level of practice:**

> *If a child(ren) must be removed from his/her home, DCF shall conduct and document a search for maternal and paternal relatives, extended formal or informal networks, friends of the child or family, former foster parents, or other persons known to the child.  The search period shall extend through the first six months following removal from home.  The search shall be conducted and documented in at least 85% of the cases.*

The Department has reported compliance with the search for relatives measure in each quarter reported to date from the second quarter 2005 through the third quarter 2006.  Our review is consistent with the Department's reporting of Outcome Measure 4, in that **94.4%** of the children who were in our sample had a documented relative search narrative entered within the LINK record.

**Review Findings and Trends**

As shown below, all but one of the area offices has attained compliance with the measure defined as an entry in the appropriate narrative form regarding relative search.

**Table 17:  Compliance with OM 4 within Each of the Area Office Locations**

| Area Office | Sample | % of Compliance with Measure |
|---|---|---|
| **Bridgeport** | 9 | 100.0% |
| **Danbury** | 3 | 100.0% |
| **Greater New Haven** | 12 | 100.0% |
| **Hartford** | 26 | 80.8% |
| **Manchester** | 25 | 96.0% |
| **Meriden** | 5 | 100.0% |
| **Middletown** | 4 | 100.0% |
| **New Britain** | 22 | 95.5% |
| **New Haven Metro** | 26 | 96.2% |
| **Norwalk** | 4 | 100.0% |
| **Norwich** | 11 | 100.0% |
| **Stamford** | 4 | 100.0% |
| **Torrington** | 4 | 100.0% |
| **Waterbury** | 27 | 88.9% |
| **Willimantic** | 14 | 100.0% |
| **Grand Total** | 196 | 94.4% |

Relative search entries are most often noted in investigation or early after the transfer of the cases with little or no subsequent follow up. While the measure is met, concerted activity appears

minimal in a number of cases with regard to follow up on all potential resources identified. In some cases this is due to placement with a resource early in the process. The failure to thoroughly pursue potential resources impacts identification of placement opportunities in the event of disruption. Even with these limitations, results yielded are impressive. There were 75 foster placements, 5 respite resources and 43 visiting resources identified within the 196 case sample.

In situations where documentation offered insight, the following barriers or issues were identified:

- There is considerable improvement in the consistency of conducting at least one preliminary relative search in comparison with prior reviews. In all, 168 (85.7%) of the cases identified at least one possible relative or known party to be researched. Within these 168 cases, 146 had indication of contact attempted with that resource, and 135 documented interest of the identified resource to be considered for placement or visitation.
- Relative search was too often a once and done entry. In some instances, the narrative entry briefly indicates "no relative resources identified by mother". There is little discussion documented, or follow up once a rapport has been established to revisit the issue with the parent, guardian, other known relatives or children. Reviewers identified 21.4% of the cases as having resources identified, but not pursued.
- Parents sometimes refuse to provide information when first approached and documented follow up at a later date is not readily evident.
- Children and adolescents are often not included in the dialogue to identify relative resources. Only 68.6% of the cases documented any conversation with a child about possible resource.
- Unknown fathers often present challenges and delays in resource identification.
- In many cases relatives often had many of the same CPS, criminal backgrounds, and mental health or substance abuse issues and were therefore are not viable options.
- When placements with relatives are made early in the investigation or Ongoing Services case, further exploration of additional relatives is frequently not documented to prepare for the possible disruption. This lack of planning inhibits timely consideration of alternate placement options which could have been researched and assessed for appropriateness during the initial six month period.
- A portion of the children or adolescents were in a high level of care due to mental health or physical needs. The review found that given this fact, the search was not conducted immediately or was postponed in light of lengthy treatment process. This inappropriate deferral of research inhibits the timely identification of visiting resources and preparation to potentially prepare and meaningfully plan the discharge.
- Paternal relatives are pursued with less frequency than maternal relatives.
- Situations of relatives coming forward and then rescinding the offer to be a resource were noted. Delays in placement with viable relatives can result from these interruptions in planning.
- Interstate compact issues cause delays in assessment of resources.
- Criminal and CPS background checks are sometimes not documented in conjunction with placements. There were 54 instances within this sample that failed to document the

criminal background check.  It is assumed they are completed by FASU as part of the process, but documentation is not consistently incorporated into the LINK record.

- Documentation indicates that prior foster parents are not often considered as possible resource.
- Appropriately, non-custodial parents are given preferential option to become resource. However, it appears in several situations that resource searches are not concurrently pursued when this option is being explored.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all children that entered DCF custody during the period of April 1, 2006 through June 30, 2006.  This request was fulfilled with the Department's submittal of an Excel Database including 737 children.  Sampling methodology required a sample at a 95% confidence level (+/-6%).  This resulted in the need to identify 196 children for the sample. For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

The LINK record review was conducted in the second quarter of 2007.  This allowed for a six-month window of practice upon which to measure the level of performance in regard to "Search for Relatives."   Court Monitor review staff and DCF personnel assisted in the data collection efforts.  A pilot test was conducted and necessary changes and training resulted to improve validity and reliability of scoring.


**Outcome Measure 5 Case Review:  Repeat Maltreatment of Children**


**Overview**

The DCF Court Monitor's Office is required by the Revised *Juan F.* v Rell Exit Plan to conduct a series of reviews on the 22 outcome measures resulting in a full status report in April 2007. This review, Outcome Measure 5 Case Review:  Repeat Maltreatment of Children is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding instances of repeat maltreatment**.  Outcome Measure 5:  Repeat Maltreatment of Children  requires that DCF comply and sustain the following level of practice related to re-entry:**

> ***"No more than 7% of the children who are victims of substantiated maltreatment during any six month period shall be the substantiated victim of additional maltreatment during any subsequent six month period.  This outcome shall begin to be measured within the six month period beginning January 1, 2004."***


**Review Findings and Trends**

The Court Monitor's findings indicate performance at a rate of **7.6%.** This is highly compatible to the Department's automated reports.  Our analysis included the full universe of children with repeat maltreatment (Children with Repeat Maltreatment (N=67) and a like number of Children in Care with No Repeat Maltreatment (n=67).  The review results showed no major factors of significance distinguishing cases with repeat maltreatment from those that did not have repeat maltreatment.  There were, however, several noteworthy trends and qualitative information that resulted from the review:

- Documentation of risk and safety assessments within the supervisory conferences or in the LINK entries for visits with children and families were often lacking.  In 39% of the cases open during the interim period between substantiations the SW and SWS failed to document identification of risks.  In many situations, red flags are identified, but were not incorporated into supervisory discussions.

- Within the sample set, 74.5% of the cases were deemed to have adequate risk assessment activity in the period following the July substantiation.  Of those cases scored as adequate by reviewers, the rate of repeat maltreatment is 50.6%.  Of those deemed inadequate, the rate of repeat maltreatment was higher, at 80%.

- Reviewers identified 14 cases where children in the sample set were reunified yet information documented within the case record raising concerns related to the reunification being rushed, or premature.  Thirteen of these 14 children were in the repeat maltreatment group.

- None of the instances of repeat maltreatment documented in this sample were at the hands of an out of home care provider.  All occurred within the home or community setting.

- The most frequently cited form of repeat abuse or neglect is "physical neglect", often the result of parents' substance abuse or domestic violence episodes.  In all, 41 of the 67 cases documenting repeat maltreatment had the same or very similar allegations raised as identified in the allegation substantiated in July 2006.

- A total of 34.3% of all perpetrators in the sample had three or more substantiations in the last 12-month period.

- Determining the level of impact of service provision as a factor in repeat maltreatment presents unique challenges. Engagement opens families up to additional scrutiny by mandated reporters, and at the same time offers opportunities for growth or rehabilitation. There are also factors beyond program attendance that are related to clients' ability to apply or comprehend the intent and lessons provided.  These are not captured through this record review process but could  be well served by a methodology incorporating interviews of stakeholders in each case sampled.

- The rate of collaboration between the DCF ISW and the Ongoing Services SW was quite high, with 92.6% of the cases sampled documenting some level of contact during the investigation.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all children that experienced substantiated abuse or neglect during July 2006.  On March 28, 2007, the Department provided a universe from the Performance Outcomes for Children (POC) Outcome Measure 5 database of 876 children identified as victims of substantiated abuse or neglect.  Of that number, a system query identified 69 children, or 7.9% of that population as having a repeat incident of substantiation within 6 months of the first incident.  The Monitor's Office initiated a process to review those 69 cases as well as 69 cases in which the system did not identify a subsequent episode.  Upon initial review of the 138 cases, our office found cause to eliminate two cases due to episodes with incidents outside of the period of review.  To be equitable, we also eliminated two cases in which there was no subsequent episode.  The resulting sample therefore includes 134 cases with equal number of repeat maltreatment situations and no repeat maltreatment.

The DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted to ensure issues of reliability and validity can be addressed prior to initiating the full review.  Minor edits resulted to both the tool and directional guide as a result of this process.

## Outcome Measure 6 – Maltreatment in Out of Home Care

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F*. v Rell Exit Plan</u> to conduct an Outcome Measure 6 Case Review:  Maltreatment of Children in DCF Care.  This is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding the instances of maltreatment while in DCF custody.  **Outcome Measure 6:  Maltreatment of Children in DCF Care requires that DCF comply and sustain the following level of practice related to re-entry:**

> *"No more than 2% of the children in out of home care on or after January 1 2004 shall be the victims of substantiated maltreatment by substitute caregivers while in out of home care."*

**Review Findings and Trends**
The Court Monitor's findings indicate compliance was achieved at a rate of 0.18%.  This is highly comparable to the Department's automated reports.

An analysis of the two subsets within the population reviewed (Children Maltreated in Out of Home Care (N=12) and a like number of Children in Care with No Substantiated Maltreatment (n=15) did not identify any major factors of significance distinguishing those cases with repeat maltreatment, from those with not repeat maltreatment.

As the maltreatment rate of 0.18% suggests, there are positive notes regarding case practice. The reviewers indicated that the majority of cases had appropriate action taken by the Ongoing SW in the period of time leading up to the report of alleged abuse or neglect (whether substantiated or not).   In one case, the reviewer noted that the SW proactively used supervision, documented assessment, documented the resulting plan to address "red flags", and initiated consultation within the Department and among providers as necessary to prevent the abuse of the child. Issues were addressed, and the child was prevented from experiencing maltreatment while in out-of-home placement.

Worker-Child visitation appears to have a positive impact on the rate of maltreatment in care. Across the two subsets, visitation met or exceeded monthly standards in 24 cases (88.8%).

Within the 12 cases of substantiated abuse or neglect there were additional regulatory violations cited against the provider.  None of the cases reviewed in either cohort had stand alone regulatory violations.  Reviewers noted that none of the six DCF foster care providers that were substantiated, had documentation of updates to their annual support plans.

Throughout this process, reviewers observed four trends related to maltreatment of children in out of home care.

- The first issue was the lack of coordinated communication between the DCF Ongoing SW, FASU SWs and service providers. In the three month period leading up to the report to the Hotline and during the period shortly thereafter, documented contacts were often limited to narrative lacking collaborative assessment. In only 50% of the 12 cases was there documentation that the Foster and Adoptive Services Unit (FASU) or Program Review and Evaluation Unit (PREU) was informed by the SW or ISW of the incident.
- The second trend relates to workers not assessing or even minimizing the "red flags" that they often document within their own narratives.
- The third trend is related to effective use of supervision. While supervisory conferences are documented in most cases, the actual use of this time to create action steps and follow-up on prior concerns is not often documented as it relates to "red flags". The three month period under review had an average of 3.44 supervisory sessions documented. Frequency of supervision in itself, however, was not felt to be a driving factor in the rate of maltreatment. It was the content of discussion that was significant. In 14 of the cases in which risks were identified by the SW there was no documentation that these issues were raised to the SWS, and 100% had maltreatment substantiations.
- And finally, the reviewers noted that Case Aides' documentation of transport and visitation are routinely not addressed by the SW or SWS. Situations detailed by the case aides are not recognized or discussed at the supervisory level in spite of the noted risks and safety. The role of the Case Aide in contributing to the overall risk assessment ongoing during the life of the case needs to be examined.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all children that were in out of home placement during the third quarter 2006. The Department had some difficulty in provision of the data for this request which resulted in delay. This necessitated changing the period of review to the fourth quarter, 2006. The request was fulfilled with the submission of an Excel Database including 6,688 children (excluding committed delinquent, children in placement as result of ICO, and Probate cases).

DCF provided a universe of 14 children in out of home placement identified as victims of substantiated abuse or neglect and a total population of 6,688 children in care over the period. Per the automated reporting, 0.2% of the population in care during the quarter was victims of substantiated abuse or neglect. This is correct given the logic implemented for reporting which substitutes the reporting date if no incident date is identified. However, upon initial review of the identified cases, two cases actually had an incident of abuse/neglect with an incident date that preceded the start of the period (but were incorrectly reported during the period). Therefore the rate of maltreatment while in care during the fourth quarter was revised to 0.18%.

In order to provide a basis for comprehensive analysis of this outcome measure, the sample included all 12 children who had an incident in the fourth quarter resulting in substantiation and an additional 15 cases randomly selected from the statewide population of children in care, with

or without an investigation undertaken during the period..[6]  This was done to allow a review of case practice issues that may impact the success or barriers of DCF in meeting OM 6.   Due to the low number of maltreatment in care cases upon which this measure can be assessed, we caution against the use of this data for anything other than qualitative or descriptive purposes. Statistical significance should not be determined from one quarter's performance.

A LINK record review was conducted during April-May 2007.  DCF Court Monitor review staff and two DCF personnel assisted in the data collection efforts.  A pilot test was conducted during December to ensure issues of reliability and validity can be addressed prior to initiating the full review.  Minor edits resulted to both the tool and directional guide as a result of this process.


### Outcome 7 - Reunification

**Overview**
The DCF Court Monitor's Office is required by the Revised *Juan F.* v Rell Revised Exit Plan to conduct a series of reviews on the 22 Outcome Measures resulting in a full status report in April 2007.  This review, Outcome Measure 7:  Reunification, is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor regarding the instances of Reunification.  **Outcome Measure 7:  Reunification requires that DCF comply and sustain the following level of practice related to reunification:**
> *"At least 60% of the children who are reunified with their parents or guardians shall be reunified within 12 months of their most recent removal from home."*

The Monitor's Office conducted a qualitative review of 80[7] of the 327 universe of children reunified during the quarter of October 1, 2006 to December 31, 2006 (the universe excludes all children in placement and reunified via Voluntary Service).  A pilot test was conducted during the last week of February to ensure that issues of reliability and validity were addressed prior to initiating the full review.  Following that test, necessary changes and training were made to the review instrument and instructions to improve validity and reliability of scoring.  The LINK record review was conducted between April and June, 2007 by the DCF Court Monitor reviewers and assigned DCF staff.

**Review Findings and Trends**
Our review found that 64.8% of children within our sample reunified within the twelve month timeframe. Since the sample is composed entirely of children that exited DCF custody during the Fourth Quarter 2006, the results are solely applicable to the children within the exit cohort. Results should not be generalized to the entire population of children entering or in DCF custody, though certainly the findings can point to systemic factors in a qualitative manner.

Reviewers felt that the most important element of supervision lacking in the documented notes was a synthesis of factors critical to the case that would provide a thorough assessment of the

---

[6] The two cases originally identified as having incidents within the period were included in the sample of 15.
[7] Due to multiple exclusions of a number of the sample, the review actually resulted in a sample of 71 cases.

case status and direction.  Cases rated as having better overall case practice throughout their episodes tended to also meet the measure for timely reunification more often more often than lower rated cases. A number of factors were found to have statistically significant relationships of varying strengths, regarding achievement of the outcome measure.  In general, cases demonstrating a higher level of complexity, which required service engagement and evaluation and those with multiple risks within the home environment at the point of removal, typically resulted in longer lengths of stay. These factors include:

- Not surprisingly, cases in which the legal status of children remained temporary (96 Hour Hold or OTC) met the measure for timely reunification significantly more often than those children that were committed.
- Cases where children experienced fewer placements resulted in significantly higher rate of reunification within 12 months.
- Situations in which the Parent or Guardian's substance abuse was at least one of the reasons for the child's entry to foster care were significantly less likely to reunify within 12 months than any other combination of reasons for removal.
- Cases that did not require intensive in-home services met the measure for timely reunification significantly more often than those that did require this service.
- Females reunified within 12 months at a significantly higher rate than males.
- Cases in which reviewers saw evidence that both primary and concurrent goals were actively being pursued did not meet the measure more often than those in which a concurrent goal was stated but was not being pursued.
- Cases that did not have gradually increasing visitation between parent/guardian and the child in placement met the measure for timely reunification significantly more often than those that did. (This most likely is due to the shorter lengths of time many of these cases were open)
- Cases that did not have documented discussions of risk factors related to reunification met the measure for timely reunification significantly more often than those that did.
- Four children within the sample and experiencing their first time placement in the episode ending in the Fourth Quarter 2006 re-entered care in the period leading up to our review. While it is not unexpected that reunification discharges would have the highest re-entry rates within the discharge cohort, this is not promising, given that the Exit Plan requires less than 7% within a twelve month period, and the review period was a relatively short period of time.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested that DCF provide the universe of all children discharged from DCF custody during the quarter of October 1, 2006 through December 31, 2006 (excluding Voluntary Service cases).  This request was fulfilled with the submittal of an Excel Database including 327 children.  Sampling methodology agreed upon by the *Juan F.* parties required a sample of 80 cases.  This 80 case sample size equates to a 90.0% confidence interval, $\pm$ 8% margin of error.  For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

*Juan F.* v Rell 2006 Comprehensive Targeted Review Executive Summary
September 24, 2007

There were 16 cases from the initial sample that were excluded from the review because they did not fit the review criteria. Eleven were actually children whose legal discharge dates fell into other quarters (both before and after the quarter), but had been included within the universe due to errors or lack of correct legal documentation. Three additional children had actually not had a legal discharge occur as of the review date, and had been included because of a combination of errors indicating discharge on placements and missing/incorrect legal documentation. There was also one child who actually reached his age of majority so was not technically reunified, and one child placed and reunified by Probation with no legal documentation at all. Seven substitute cases were identified and assigned for review. The remaining 9 cases were not replaced by the DCF supervisor assigned oversight of this measure. This reduced the sample to 71 cases.

A pilot test was conducted during the last week of February to ensure that issues of reliability and validity were addressed prior to initiating the full review. Following that test, necessary changes and training were made to the review instrument and instructions to improve the validity and reliability of scoring. The LINK record review was conducted between April and June, 2007. DCF Court Monitor review staff and three DCF personnel conducted the data collection.

The results of this study must be considered qualitative due to the nature of the sample. Since the sample is composed entirely of children that exited DCF care during Fourth Quarter 2006, the results are solely applicable to that group. Results should not be generalized to the entire population of children either entering or already in DCF care during that time, though certainly the findings can point to systemic factors in a qualitative manner.

## Outcome Measure 8 - Adoption

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* Exit Plan</u> to conduct a series of reviews on the 22 outcome measures.  This review of Outcome Measure 8:  Adoption is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor regarding instances of adoption.  **Outcome Measure 8:  Adoption requires that DCF comply and sustain the following level of practice related to adoption:**

> *"At least 32% of the children who are adopted shall have their adoptions finalized within 24 months of the child's most recent removal from his/her home."*

The Monitor's Office conducted a qualitative review of 80 of the 131 children adopted during the quarter of October 1, 2006 through December 31, 2006.  A pilot test was conducted during in March to ensure that issues of reliability and validity could be addressed prior to initiating the full review.  Following that test, necessary changes and training were made to improve the validity and reliability of scoring. The LINK record review was conducted between April and June 2007 by DCF Court Monitor review staff and DCF personnel.

**Review Findings and Trends**

Since the sample is composed entirely of children that exited DCF care during Fourth Quarter 2006, the results are solely applicable to that group.  Results should not be generalized to the entire population of children either entering or already in DCF care at that time, though certainly the findings can point to systemic factors in a qualitative manner.  A number of factors were found to have statistically significant relationships with the achievement of the outcome measure standard for the group of children reviewed. These factors include:

- 27.5% of the sample (n=80) achieved adoption within the 24 month period.  Compliance for this measure, however is determined on the full universe of children adopted during that period (N=131).  In all, 33.6% of the children adopted during this quarter did so within the 24-month period.
- Children who were less than a year old upon entry into foster care had significantly shorter lengths of time pass between the filing and granting of TPR by the court.
- Younger children were adopted within 24 months significantly more often than older children.  Children's gender, race and ethnicity do not appear to have such a relationship.
- The cases of children that were adopted within 24 months had several factors related to timely decision-making that lead to adoption.  These included:
  - Significantly shorter times from foster care entry to the identification of adoption as their primary permanency goal
  - Significantly shorter times from foster care entry to the filing of TPR
  - Increased use of Legal Risk pre-adoptive foster homes
  - Identification of pre-adoptive resource families more often occurring prior to filing TPR
  - Significantly shorter times from TPR being granted to finalization of the adoption were present within the sample.  In fact, average times from TPR to adoption within this sample were much faster than nationally reported and improved over the previously reported averages for CT.

- Although all seven children that experienced six or more placements did not have timely adoptions, children who were adopted within 24 months did not have significantly better placement stability than those that did not meet the measure
- Children who were adopted within 24 months were <u>not</u> adopted by former foster parents more often than those that did not have timely adoptions.
- The cases of children who were adopted within 24 months had supervision documented within the LINK record that was rated higher than those that did not achieve adoption within the benchmark.  Supervision in such cases was characterized by reviewers as providing a thorough assessment of the case with clear directives and timeframes for social workers that ensured the children's needs were met.
- Children who were adopted within 24 months had cases that were notably higher rated for overall case practice than those that did not meet the measure.

**Methodology**
The Monitor's Office requested the DCF provide the universe of all children that were discharged from DCF custody during the quarter of October 1, 2006 through December 31, 2006.  This request was fulfilled with the submittal of an Excel Database including 131 children. Sampling methodology agreed upon by the parties allowed for a qualitative sample of 80 cases, though quantitatively this sample size equates to an 84.5% confidence interval, $\pm$ 5% margin of error.

A pilot test was conducted during the last week of February to ensure that issues of reliability and validity could be addressed prior to initiating the full review.  A pilot test was conducted and necessary changes and training resulted in improving validity and reliability of scoring. The LINK record review was conducted during between April and June 2007.  DCF Court Monitor review staff and five DCF personnel assisted in the data collection efforts.

The sample set population includes children from each of the Area Offices for a total of 80 cases. For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.
:

## Outcome Measure 9 - Transfer of Guardianship

**Overview**

The DCF Court Monitor's Office is required by the Revised *Juan F.* v Rell Exit Plan to conduct a series of reviews on the 22 outcome measures resulting in a full status report in April 2007. This review, Outcome Measure 9: Transfer of Guardianship (TOG) is a qualitative review that will supplement the quarterly data provided by DCF and verified by the Court Monitor regarding the instances of Transfers of Guardianship (TOG). **Outcome Measure 9: Transfer of Guardianship requires that DCF comply and sustain the following level of practice related to TOG:**

> ***"At least 70% of all children whose custody is legally transferred shall have their guardianship transferred within 24 months of the child's most recent removal from his/her home."***

The Monitor's Office conducted a qualitative review of 80 of the 106 children that were discharged from DCF custody to TOG during the quarter of October 1, 2006 through December 31, 2006. A pilot test was conducted during March to ensure that issues of reliability and validity could be addressed prior to initiating the full review. The LINK record review was then conducted between May and July, 2007, by DCF Court Monitor review staff and DCF personnel.

**Review Findings and Trends**

Since the sample is composed entirely of children that exited DCF care during Fourth Quarter 2006, the results are solely applicable to that group. Results should not be generalized to the entire population of children either entering or already in DCF care at that time, though certainly the findings can point to systemic factors in a qualitative manner. A number of factors were found to have statistically significant relationships with achievement of the outcome measure standard for the group of children reviewed. These factors include:

- Children within the sample achieved timely TOG in 76.3% of the cases reviewed (n=80). The full universe of children with TOG during the quarter (N=106) had timely permanency via TOG in 76.4% cases.
- Children who had TOG occur within 24 months had no statistically significant differences in demographics when compared to those whose episodes lasted longer. However, children within the exit cohort did tend to be slightly older, and were predominantly children of color.
- Cases of children who had TOG occur within 24 months exhibited several signs of timely decision-making by social work staff that included:
  - Shorter times between entry to foster care and identification of the guardian resource
  - Shorter times between entry to foster care and placement with the guardian resource
  - More evidence of family conferencing and other engagement practices
  - Shorter time between identification of TOG as the primary permanency goal and court approval of the TOG
- In only 8 cases (10%) did reviewers believe that TOG was not in the child's best interest at the time of the child's TOG. While all of these cases met the measure, reviewers felt that the children's discharges occurred too quickly for a variety of reasons that most often had to do with concerns about what the families would do after DCF closed its case.

- Reviewers felt that the vast majority of these children received better than average quality case practice from DCF throughout their placement episodes. There were 64 (80%) rated as "Very Good" or "Optimal", and only two cases rated as "Poor." Further, approximately 80% of the 64 cases rated positively achieved the standard for timely guardianship, as did both cases that were rated as receiving "Poor" quality case practice.

**Methodology**

The Monitor's Office requested that the Department provide the universe of all children that were discharged from DCF custody during the quarter of October 1, 2006 through December 31, 2006. This request was fulfilled with the submittal of an Excel Database including 106 children. Sampling methodology agreed upon by the parties allowed for a qualitative sample of 80 cases, though quantitatively this equates to a 92.5% Confidence Interval with a 5% margin of error.

The LINK record review was conducted between May and July 2007. DCF Court Monitor review staff and six DCF personnel assisted in the data collection efforts. A pilot test was conducted during the last week of February to ensure that issues of reliability and validity could be addressed prior to initiating the full review. Necessary changes and training were conducted to improve validity and reliability of scoring.

The sample set population includes children from each of the Area Offices for a total of 80 cases. For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

## Outcome Measure 10: Sibling Placement

**Overview**

The DCF Court Monitor's Office is required by the Revised *Juan F.* v Rell Exit Plan to monitor the Department's performance related to Outcome Measure 10: Sibling Placement. **Outcome Measure 10 requires that,**

*"At least 95% of the siblings entering out-of-home placement shall be placed together unless there are documented therapeutic reasons for separate placements."*

1. *Therapeutic reasons include such things but are not limited to situations where siblings are placed with multiple relatives, one (1) sibling requires hospitalization and others do not, one (1) sibling requires detention, or where siblings were abused by another sibling, etc. The therapeutic reason siblings must be placed apart shall be documented in LINK by the DCF supervisor.*
2. *Siblings are defined as at least two children who share, at minimum, one biological or adoptive parent, or who reside in the home and have relationship through parents/guardians who have an adult legal relationship.*
3. *The universe of siblings is limited to children under the custody of DCF with a legal status of "OTC", "committed", or "commitment-dual." TPR children are excluded from this universe."*

The Department's Office of Results Management and the Quality Improvement Division conducted a 100% review of siblings in placement during the third quarter 2006. The Court Monitor reviewed, edited and approved the methodology prior to the implementation of the internal review. As configured, the review of all subsequent quarters includes only the

population of new sibling entries and changes in sibling placement in effort to establish qualitative practice issues related to siblings in placement.  The Monitor's Office is incorporating the <u>Office of Results Management Fourth Quarter Analysis</u> below in its entirety with redaction of any name-specific data and minor grammatical edits.

**Review Findings and Trends**

For the Fourth Quarter 2006 the Monitor verifies the process that was undertaken and finds DCF to have achieved a statewide rate of **85.5%** compliance with Outcome Measure 10.

- Two Area Offices: Bridgeport and Meriden, achieved the 95% mandate for the Fourth Quarter.
- The main trend surfacing from this review relates to the inaccuracy of data entry by the social work staff.  80% of the 604 siblings reviewed, had valid clinical reasons for separation. However, reviewers found that 75% of those 459 children, who actually did have valid clinical reasons for separation at the time of their placement entry/move during Fourth Quarter 2006, were not properly documented.  (If DCF relied solely on the automated results, a compliance rate of 49.9% would have resulted.)
- 10% of the cases identified as having clinical or therapeutic reasons for sibling separation were found to be related to reasons outside of the agreed upon definition.
- Anecdotal information from contacts with providers and DCF staff alike singled out the inability to recruit a sufficient number of appropriate foster homes as a barrier to maintaining siblings in placement.

It is the Monitor's expectation that as these errors are uncovered, the Department will seek remedies via training and corrections to the problematic data fields to ensure accuracy in the case records and data reporting.  Our office will follow up with the Department to understand the specific action steps that will be taken to address this deficiency.

**Office of Results Management Methodology**

A review file was pulled from LINK on January 4, 2007, representing all *Juan F*. children in care on that date.  This population excluded youth who were over age 18 on that date, as well as those with a legal status of "Statutory Parent", as agreed upon in the Exit Plan definitions for this measure.  Since all children identified as "in the sibling population" and "not with all his/her siblings" were reviewed for the 3Q06 review, only those siblings that experienced new placements (either new removals or placement moves) since the last review were reviewed at this time.  Initially a total of 613 siblings were identified as meeting the review criteria.  Upon review six children were excluded as the service codes entered were incorrectly identified as placements.  The Office of Results Management trained all review staff, and provided ongoing supervision and consultation during the review as needed.

## Outcome Measure 11 Case Review:  Re-Entry into DCF Custody

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct a series of reviews on the 22 outcome measures resulting in a full status report in April 2007. This review, Outcome Measure 11 Case Review:  Re-Entry into DCF Custody, is a qualitative review that will supplement the quarterly data provided by DCF and is verified by the Court Monitor, regarding the instances of re-entry into DCF custody.

**Outcome Measure 11 requires that DCF comply and sustain the following level of practice related to re-entry:**

> *"Of the children who enter DCF custody, seven (7) percent or fewer shall have re-entered care within 12 months of the prior out-of-home placement."*

**Review Findings and Trends**

The Department has asserted compliance with the requirement in two of the quarters reported since the Third Quarter 2005.  The reported performance has ranged from 4.3% to 8.2% during the seven quarters that this automated reporting has been available.  While the automated reports logic accuracy has been verified by the Monitor's Office, placement beginning and end dates and the legal status data entry remain problematic.

For the Fourth Quarter 2006 the Department's re-entry rate was 8.6%.  The following major trends regarding re-entry into DCF custody were observed within the 113 case sample.

- 63.8% of the 80 reunifications to primary caretaker re-entered care within 12 months. Clearly this is the discharge type most likely to result in re-entry.
- None of the 14 adoptions disrupted within the twelve months from finalization.
- 49.1% of the re-entry population (n=55) had different safety factors identified at the time of re-entry to care.
- 29.9% of the re-entry cases (n=55) were related to similar/chronic neglect issues as identified in the initial episode.
- 10.9% of the cases identified parent substance abuse as the primary reason for both episodes of placement.
- Forty-eight of the 55 re-entry cases (87.2%) were open in treatment at the point of re-entry with 30 cases (55.4%) under an order of protective supervision.
- In 36.4% of the re-entries (n=55), reviewers indicated that the discharge from care was premature.  In 16 cases (29.1%), the reviewers indicated that progress had been made and discharge was appropriate, but known risk factors still remained placing the child at risk for re-entry.
- In many re-entry cases, there was a lack of follow up by the assigned SW with service providers prior to reunification.  DCF SW's often did not communicate with community service providers regarding progress or status on the reunifying families post reunification.  This is highlighted in the data which indicates 9.1% of those that re-entered did so primarily due to the child's mental health needs.
- DCF SW and SWS staff are often aware of the risk factors in a case (i.e. Substance Abuse, Domestic Violence, Mental Health of parents or child), yet they are not fully addressed prior to reunification.  Frequently, this leads to the same issues resurfacing

upon reunification – making positive outcomes more tenuous. This is highlighted in a case in which a child was reunified in spite of the parent's mental health issues not being fully addressed prior to reunification. Despite services utilized by the mother, housing remained an issue, and there were signs that her mental health remained unstable (suicidal statements documented). The child re-entered DCF's custody in less than two months when mother attempted suicide at the local shelter.

- In 78.8% of all cases reviewed, reviewers felt that the overall quality of after care planning was of very good or optimal quality. This rate is 84.5% when looking only at the cases which did not re-enter. It drops to 72.7% when looking only at the population which re-entered care.

- There is a lack of post reunification services provided for families. In 28.8% of the cases reviewed, there were service needs identified but not provided post- discharge. Reviewers identified inadequate post-discharge planning and contract limitations in which providers do not serve clients once DCF involvement concludes. In 31 cases that identified service needs, where one or more of these needs was not planned for during discharge, 74.2% re-entered care. Of those cases where identified supports were provided, the rate of re-entry was 39.0%. It was observed that in cases where reunification efforts were successful; DCF often implemented services post reunification that continued for three to six months post reunification. The following case example from the review, documented sound discharge planning in the face of contract limitations. The SW argued that a support service was needed for a successful reunification. The Department arranged to pay for services using flex funds when it was recognized that contractors could not continue with services upon DCF exit. No re-entry was documented.

- Of those 44 instances in which abuse or neglect was alleged in the post discharge period, 28 were substantiated. This is 63.6% of the total reported to Hotline for this sample, and is a much higher rate of substantiation than is found for the general population of reports received at the Hotline.

- The reviewers found that closing summaries were adequate for only 51.3% of the cases closed prior to September 30, 2006. Fourteen cases had no closing summary documented. An additional five cases had inadequate closing summaries when policy expectations were considered.

- In cases where visitation was regularly occurring, protective supervision appears to be a useful tool to maintain and provide ongoing assessments post reunification. However, after reunification, and upon a determination of case closing (which is often a month or so before the actual closing is approved), the frequency of visits declined and narration of assessments was poor during the visits that are documented.

- In 91 cases it was clearly documented that the Supervisor was aware of and discussed some level of risk per the supervisory narrative (this may or may not have been a comprehensive assessment). Of that total, 51.6% re-entered. In the remaining cases, there was no discussion of risk, and the re-entry rate was lower at 31.8%. This is logical, as those cases with documented discussion would have likely have more complex or serious risk associated with it, and therefore would be more at risk for re-entry. The role of supervision during the period leading up to the third quarter 2005 discharge, as it relates to re-entry is, however, difficult to establish. This review did not incorporate SW or SWS interviews. While reviewers pointed to apparent shortcomings of supervision related to assessment, planning, or follow up on directives, we cannot determine if this is

an issue of poor documentation or poor practice.   Future reviews will incorporate interviews with the SW and SWS staff to further explore issues related to supervision.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the Department provide the universe of all children who were discharged from DCF custody during the quarter of July 1, 2005 through September 30, 2005 (excluding Voluntary Service Placements).  This request was fulfilled with the submittal of an Excel Database including 639 children.  Sampling methodology submitted to the parties for approval, required a sample of all children with a re-entry date – and a like number exited during the period, but for which there was no re-entry date.

In order to provide a basis for comprehensive analysis of OM11, the sample included all children who had a re-entry documented (regardless of meeting/not meeting the measure) and a like number of children randomly selected from the statewide population who were discharged, but had no documented re-entry.  This allowed for a review of case practice issues that could impact the success or barriers of the Department in meeting OM 11.   The Department identified 80 children with a re-entry date.  Several were eliminated due to age (over 18) or voluntary service status at the point of re-entry.  Fourteen additional cases were subsequently eliminated from the re-entry cohort early in the review process, as they did not actually exit or re-enter within the specified time frames.  As a result, the sample size was reduced to 55 children with re-entry dates within twelve months, and 58 children who did not re-enter during the twelve month period following discharge in the third quarter 2005.  For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

A LINK record review was conducted during the first quarter 2007.  DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts.  A pilot test was conducted during the last week of November to ensure that issues of reliability and validity were addressed prior to initiating the full review.

The review protocol capture three periods within the life of the case:  the period leading up to the initial entry into DCF custody, the period from that placement to the date of reunification and for those that re-entered or remained participant in an active in-home case, the twelve month period following that reunification date.

**A Combined Review of Outcome Measure 12:  Multiple Placements
Outcome Measure 14:  Placement within Licensed Capacity, and
Outcome Measure 16:  Worker-Child Visitation for Children in Out of Home Placement**

**Overview**

The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct the Outcome Measures 12/14/16 Case Review.  This is a qualitative review intended to supplement the quarterly data provided by DCF and verified by the Court Monitor, regarding Multiple Placements (12), Placement within Licensed Capacity (14) and Worker-Child Visitation for Children in Out-of-Home Placement (16).  **The three Outcome Measures require that DCF comply and sustain the following level of practice:**

> **Outcome Measure 12:**
> ***"Beginning on January 1, 2004, at least 85% of the children in DCF custody shall experience no more than three (3) placements during any twelve month period."***
>
> **Outcome Measure 14:**
> ***"At least 96% of all children placed in foster homes shall be in foster homes operating within their licensed capacity, except when necessary to accommodate sibling groups."***
>
> **Outcome Measure 16:**
> ***"DCF shall visit at least 85% of all out-of-home children at least once a month, except for probate, interstate, or voluntary cases.  All children must be seen by their DCF Social Worker at least quarterly."***

**Review Findings and Trends**

The Monitor's review found that the majority of cases reviewed for the fourth quarter successfully avoiding overcapacity episodes (90.1%),  limited placements to three or less (95.3%) and met the monthly out-of-home visitation standard at 94.4% and the quarterly visitation standard at 99.2%.  It is noted that overcapacity numbers reported within this document differ in relation to the Department's reporting as a result of methodological differences in approach to identifying overcapacity.  This review considered all placements experienced by a given child, every day over the period.  The LINK data reporting is accurate, but is based upon point in time data (and therefore may miss overcapacity placements that occur sporadically but which resolve at the point of data collection).  All parties have agreed to the Department's automated reporting format and the Monitor has verified the accuracy of the logic and reporting.  The findings provided within this document are descriptive in nature and offer some insight into the practices or issues that may lead to the use of overcapacity homes.  Findings do not dispute the automated reporting results.

Several themes emerged from the reviewers' comments.  These findings include:
- 64.8% of the cases within the sample reflected a level of practice that reviewers determined to be in compliance with practice and policy expectations – adequately assessing both needs and safety for the child in out of home placement.  28.5% of the cases were felt to be marginally successful in this regard, and 6.6% were felt to rank a

poor score which reflects a lack of effort to meet the benchmarks and minimal assessment documented.  There were no adverse scores.

- Visitation within the out-of-home population scored higher overall than the in-home visitation rank scores.  Within the in-home population, the quality of visitation was ranked compliant with expectations in only 40.4% of the sample.

- Narratives do not always indicate if the SW met with the children/youth, biological parent(s), foster parent(s) or providers alone, and often times minimally describe the purpose of the visit or document discussions regarding action steps, goals and planning.  73.1% of the cases indicated that there was a private conversation held with the child on at least one occasion during the quarter.  A private conversation with the caretaker was documented in 79.3% of the cases reviewed.

- An assessment of risk and safety during the visit was often not clearly documented.  SW's often presented a series of seemingly small "red flags" within LINK narratives that were not assessed as part of the placement dynamic until the situation became stressed to the point of a request for removal.   Further, there often was a lack of documented contact between the DCF SW and FASU SW in addressing these identified issues as they arose within in the home until such time that preservation of the placement was jeopardized by the crisis at hand.

- When a SW identifies issues during the course of practice, there are often no follow up narratives documenting actions taken by the Department, providers, family, or child to remedy the issues.

- Case Aide narratives are not always clearly identified as such – leading to the impression that the entries are made by SW.

- Timely entry of narratives appears to be problematic for some workers.

- The average number of placements was 1.84 during the twelve month period.  Of the cases in which there was a documented need for a disruption conference, the record documented the conference in only 28.6% of the cases (n=7).

- The overcapacity placements identified were not considered to be at risk for disruption.

- The average number of visits per child over the quarter is 4.24 visits by the DCF SW assigned to the case.  Other visits documented included 256 visits by other DCF staff, seven ICPC visits, and 82 private provider visits.  When measuring visitation on a child specific level rather than the average of the population as approved within the logic, the rate of visitation drops slightly to 86.7% - still exceeding the once monthly benchmark.  In nine of the cases not meeting the benchmark, a change in SW was indicated as having an impact on visitation.

**Methodology**
The Monitor's Office requested that the DCF provide the universe of all children that were in DCF custody for at least thirty days in the quarter ending December 31, 2006 (excluding voluntary, interstate and probate cases).  It was determined that this universe could serve to provide representative samples for each of the Outcome Measures, 12, 14 and 16 given the parameters of the automated logic.  The limitations of this approach were that some children would not be in placement for a full calendar year, or may be in residential facility placement versus foster care placement.  However, due to considerations of time and resources, the parties agreed that a statistically valid sample from this universe would yield sufficient numbers for each outcome measure to be descriptively and qualitatively explored.

The Monitor's request was fulfilled with the Department's submittal of an Excel Database including 5,808 children. Sampling methodology required a sample at a 95% confidence level (+/-6%). This resulted in the need to identify 256 children for the sample.

The LINK record review was undertaken in February, March and April 2007. The DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted to ensure that issues of reliability and validity can be addressed prior to initiating the full review.

The universe and sample set population includes children from each of the area offices for a total of 256 children. For full details of sampling see the ***Juan F.* v Rell 2006 Comprehensive Targeted Review.**

## Outcome Measure 13:  Foster Parent Training

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F.* v Rell Exit Plan</u> to conduct a qualitative review for Outcome Measure 13:  Foster Parent Training. This review supplements the quarterly data provided from the Department and CAFAP.

Outcome Measure 13 requires that,
> *Licensed DCF foster or pre-adoptive parents shall be offered 45 hours of post-licensing training within 18 months of initial licensure and at least 9 hours each subsequent year. This measure does not apply to relative, special study or independently licensed foster parents for who 9 hours of pre-services training is required.*

**Review Findings and Trends**
The Department has consistently reported 100% compliance with the foster parent training measure. The requirement as written requires the provision of training opportunities. However, it is clear that the Department is not in compliance with internal policies regarding mandatory training. This includes training requirements for re-licensure, annual support planning, and support during response or follow up within a foster home facing regulatory violation or substantiations. Further, while the schedule for training indicates training opportunities statewide, there are some gaps in availability by location, and there continue to be deficits in relation to the FASU's support and provision of foster parent training. These oversight issues must be adequately addressed to increase and maintain a well-trained population of foster parents through active retention and support activities.

The Department's Policy 41-26-5 requires:
> *"Mandatory post-licensing training consists of forty-five (45) hours of training within eighteen (18) months of initial licensure, as follows:*

> - *9 hours:  "Supporting Relationships Between Children and Their Families"*

- *9 hours: "Working as a Professional Team Member"*
- *27 hours: Individual selection of Department approved courses as listed on the "Resource Family Support Plan" (DCF-470).*

*Following the completion of the above 45 hours, licensees must attend nine (9) hours of Department approved training in each subsequent year, which may consist of conferences, classes, symposiums or other types of training which will enhance the skills needed to care for children."*

Our review of the CAFAP training records and provider sample set found that:

- 82.7% of the foster parent Post Pride classes offered during 2006 were held, but many with very small enrollments. The lack of training is one of practice, not documentation, as verified via a comparison of DCF Provider records and CAFAP training database records.
- It appears that the demand for training courses is incongruous with the training requirements and re-licensure protocol established by DCF Policy.
- The Department is less than rigorous in respect to this policy in that of the 40 situations within the sample in which a family was licensed or re-licensed during the period, only 30% had documented the completion of the required training at the time of licensure or re-licensure.
- Modules requiring DCF co-facilitation are still problematic to schedule due to lack of DCF participation.
- Foster parents do not take advantage of the DCF Training Academy course offerings.
- Private Provider home records related to training are not maintained within the DCF provider database. It is unclear if there are monitoring activities related to training of this population.
- FASU support has a positive impact on training attendance rates during the Fourth Quarter. Overall number of foster parents within the sample attending classes was 9 foster parents. The rate of attendance is 55% within the population that had documented FASU visit versus 15.8% for the population that did not have a visit.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the universe of all licensed foster homes available to the Department on December 31, 2006. This included all active DCF licensed non-relative foster homes, special study foster homes, and licensed relative homes as well as private provider foster homes available via the contracts with various organizations throughout the state. The universe included the 3723 foster parent provider. A total of 75 foster parent records were selected for the sample. For full details of sampling see the *Juan F.* v Rell 2006 Comprehensive Targeted Review.

The parties agreed upon a sample of 75 foster parent provider records, randomly selected from the supplied universe of 3,723 providers identified by the Department. The sample of 75 foster care providers consisted of 39 DCF non-relative foster care providers, 12 relative foster care

providers, 5 special study foster care providers, 16 private provider foster homes, one lapsed license home and two "other" homes. The "other" consisted of an independent foster home and a relative providing foster care but not yet licensed. Licensed bed capacity ranged from zero to four at the point of review, with 40% of the homes having a licensed capacity of three.

A tool was developed and approved by the parties prior to implementation. A pilot test was conducted with minimal changes required.

The records of this 75 case sample were reviewed as well as the quarterly documentation provided. In-person interviews were held with CAFAP staff, and emails and phone interviews with DCF staff provided additional information.

## Outcome Measure 17 – Worker/Child Visitation (In-Home)

**Overview**
The DCF Court Monitor's Office is required by the <u>Revised *Juan F*. v Rell Exit Plan</u> to conduct the Outcome Measure 17 Case Review. Outcome Measure 17 Case Review is a qualitative review to supplement the quarterly data provided by DCF with logic verified by the Court Monitor, regarding the frequency of Worker-Child Visitation for In-Home Family cases. **Outcome Measure 17 requires that DCF comply and sustain the following level of practice:**

> *DCF shall visit at least 85% of all in-home family cases at least twice a month, except for probate, interstate or voluntary cases.*

The measure also defined actual contact with children as follows:
> 1. Twice monthly visitation must be documented with each active child participant under the age of 19 years who is not in out-of-home placement. Visitation occurring in the school, home or other community setting will be considered for Outcome Measure 17.

After implementing the outcome measure in 2005, it became apparent that automated data reporting could not accurately identify and capture visitation with "all active child participants." The intricacies and fluidity of family and child relationships are not well suited for automated review and are best reviewed in a qualitative manner. Agreement was reached to focus on the quantitative requirement of actual documented contact with any active case participants during each period. The reporting logic excludes all cases not open for the full month in Ongoing Services.

It became apparent during initial analysis and comparison between review and ROM reporting that there were reliability issues. Identified discrepancies with the ROM database were isolated and re-reviewed. In several instances ROM logic was unable to distinguish the use of incorrect narrative selection types. Transfers between offices likewise present a challenge to the ROM logic. Reviewer errors were primarily the result of a reviewer selecting certain narrative entry types from the LINK record versus all narrative for all three months. Several reviewers entered data for cases during months in which investigations were responsible for the case or the case

was in transition to Ongoing Services.  Necessary corrections were made to the database for all identified reviewer errors to ensure accuracy of this reporting.

**Review Findings and Trends**

The Department has reported compliance with this outcome measure for six quarters, beginning with the Fourth Quarter 2005.  Following the reconciliation process for this review, the Monitor has determined the rate of compliance with Outcome Measure 17 for the Fourth Quarter 2006 sample is 83.7%.  This is consistent with the LINK reporting, which is subject to over reporting by approximately 3.3% if correct selection of narrative entry type, as experienced within this sample, is generalized to the full population.  Department performance hovers at the compliance rate, and has shown significant improvement over the past three-year period.  Prior to the Exit Plan, performance reviews cited rates as low as 35% for cases where families were seen twice monthly.

This review found several themes resonated within the reviewers' comments.  These included:

- Reviewers felt that the Department achieved overall "very good" or "optimal" scores in 40.4% of the cases reviewed:
  - In 71.9% of the visits documented, there was at least one child successfully engaged in a private conversation with the SW.
  - The review found that 91.6% of the cases did have documented conversation with the parent or guardian regarding their child(ren)'s well-being and service provision on at least one occasion during the quarter.
- In 139 (55.6%) of the 250 cases, there was indication that the worker had concerns related to the child's safety or well-being as a result of the visits or contacts with the family and providers involved in the case.  Of these, 119 cases (85.6%) documented discussion/direction provided during supervision regarding these SW's concerns.
- The majority of the cases indicate compliance with the twice monthly requirement.
- Visits are not inclusive of all active case participants.  In some cases one or more family members were not seen during the quarter.
- Reviewers' comments indicate that the purpose of visits is not always clearly documented.
- Safety and needs assessments continue to be absent in the documentation of the visits with family.
- Progress toward goals and treatment planning is not routinely documented within narrative discussions.
- Many visits occur outside of the family home and are actually activities such as court or transportation.
- Private interviews with the active case participants under age 19 are not routinely documented.
- Description of the child, family, or home is often repeated verbatim across the period's narratives.
- In cases where supervisory narratives indicated directives, there was often evidence of appropriate SW action.  However, reviewers often noted lack of SW follow-up related to issues or concerns raised by children, family or providers. Many of these issues were not documented within supervision, so it is unclear if supervisors were aware of the issues.  It cannot be determined at this juncture, if this is a documentation or case practice issue.

- Cases closing during the period appeared to be done in an abrupt manner in many cases. Visitation often ceased as soon as the decision was made to close the case, regardless of the actual timeframe to the official case closing in LINK.
- Visitation Narratives are not always entered in a timely manner.
- Workers may not select the accurate case activity designation in LINK and often fail to identify the actual case participants involved in the episode. This can impact reporting accuracy as previously noted.
- In 11.8% of the cases that did not meet this requirement, reviewers found instances where worker assignment changes appeared to be the cause for lapse in visitation.

For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**

The Monitor's Office requested the DCF provide the universe of all in-home treatment cases open 30 days or more as of December 31, 2006 (excluding probate, interstate and voluntary cases). This request was fulfilled with the Department's submittal of an Excel Database including 737 children. Sampling methodology requires a sample at a 95% confidence level (+/- 6%). This resulted in the need to identify 250 families for the sample.

The LINK record review was conducted during March and April 2007. DCF Court Monitor review staff and DCF personnel assisted in the data collection efforts. A pilot test was conducted to ensure issues of reliability and validity were addressed prior to initiating the full review. Several minor edits were made prior to conducting the review.

A random sample was drawn from the statewide universe population. After several substitutions for reasons of case type being exclusionary, the final sample included 250 cases. For full details of sampling see the *Juan F*. v Rell 2006 Comprehensive Targeted Review.

## Outcome Measure 18:  Caseload Standards

**Overview**

The DCF Court Monitor's Office was not required by the Revised *Juan F.* v Rell Exit Plan to conduct a qualitative review for Outcome Measure 18:  Caseload Standards.  **Outcome Measure 18 requires that:**

*"By July 1, 2004 the caseload of no DCF Social Worker shall exceed the following caseload standards, with exceptions for emergency reasons on caseloads, lasting no more than 30 days:*

- ***A.  Investigators shall have no more than 17 investigative cases at any time.***
- ***B.  In-Home treatment workers shall have no more than 15 cases at any time.***
- ***C.  Out-of-Home treatment workers shall have no more than 20 individual children assigned to them at any time.  This includes voluntary placements***
- ***D.  Adoption and adolescent specialty workers shall have no more than 20 cases at any time.***
- ***E.  Probate workers shall have no more than 35 cases at any time.  When the probate or interstate worker is also assigned to provide services to the family, those families shall be counted as in-home treatment cases with a ratio of 1:20 cases.***
- ***F.  Social workers with in-home voluntary and interstate compact cases shall have no more than 49 cases at any time.***
- ***G.  A worker with a mixed caseload shall not exceed the maximum weighted caseload derived from the caseload standards in A through F above.***
- ***H.  These standards supersede those of Order no. 441 dated July 29, 2003."***

### Data Reporting and Findings for Fourth Quarter 2006

There were a total of 53 workers over 100% on December 31, 2006.  None of these workers exceeded the 100% utilization for greater than 30 days.  This would indicate 100% compliance with Outcome Measure 18.  Of the 53 workers exceeding utilization percent, the average number of days in excess is 13 days at 107.5%.

The Department has reported compliance with this standard in 11 of the last 12 quarters reported.  The Monitor has verified this data through review of the daily automated reports available on-line, and spot checking SW desktop information.

The Monitor's Office has not deemed qualitative reviews on this measure necessary given the nature and accuracy of the quantitative reporting.  If found necessary, a targeted review can be undertaken in attempt to analyze issues related to case assignment and selection of assignment types within the population of social workers.

### Outcome Measure 19:  Reduction in the Number of Children Placed in Residential Care

**Overview**

The Revised *Juan F* Exit Plan requires that,

> "*The number of children placed in privately operated residential treatment care shall not exceed 11.0% of the total number of children in DCF out- of- home care.*
>
> *The circumstances of all children in state and out-of-state residential facilities shall be assessed after the Court's approval of this Exit Plan on a child specific basis to determine if their needs can be met in a less restrictive setting.*

**Data Reporting and Findings**

On December 17, 2006 there were 663 *Juan F* children in residential care settings (excluding children with committed delinquent status).  A total of 225 *Juan F*. children were placed in out of state facilities.  The majority of those placed out-of-state (47.1%) were located within the border states of Massachusetts, Rhode Island or New York.  This is impressive given the recent loss of in-state beds due to PREU determinations to reduce or eliminate program beds within the state.  While the percentage fluctuates across the area offices, the statewide average is compliant with the requirement of no more than 11.0% of the out-of-home population being in placement within residential facilities.

The ASO process has implemented a child specific review so that a re-determination of need for this most restrictive placement setting is periodically undertaken in an effort to identify and then move children in a more timely and planned manner.  Wait lists for step-down placements do exist, as does a need for development of more therapeutic foster care homes and community based services to allow for reunification.  Further reductions in the residential census will be dependent upon the level of success of the current initiatives.

**Methodology**

The Monitor did not conduct a qualitative review of the population in residential care, as Outcome Measure 15:  Needs Met, incorporates this requirement.  However, the LINK logic has been verified and the ROM reports are reviewed by the Court Monitor each quarter.

**Outcome Measure 20:  Discharge Measures**
**Outcome Measure 21:  Discharge of Mentally Ill or Retarded Children**

**Overview**
This review has been conducted quarterly by the DCF Quality Improvement Division (QID) following Court Monitor approval of the methodology. The QID review identifies two purposes. The first purpose is to determine the percentage of youth who achieved their goals upon discharge from DCF custody (Outcome Measure 20: Discharge Measures), and to report on any documented barriers that prevented successful achievement of this outcome.  The second purpose is to determine the extent to which the Department of Children and Families (DCF) submitted "a written discharge plan to either/or DMHAS or DMR for all children" as required (Outcome Measure 21:  Discharge of Mentally Ill or Retarded Children). The contents of the Department's Quarterly Review for the Fourth Quarter, 2006 are incorporated in full within this chapter.  Monitor's comments and minor edits to non-essential text and formatting have added as necessary.  All case identification has been removed to ensure confidentiality.

**Outcome Measure 20** *requires that "at least 85% of all children age 18 or older shall have achieved one or more of the following prior to discharge from DCF Custody:*
  *A. Graduation from High School*
  *B. Acquisition of a GED*
  *C. Enrollment in or completion of college or other post secondary training program full-time*
  *D. Enrollment in or completion of college or other post secondary training part time with part time employment*
  *E. Full time employment*
  *F. Enlistment full time member of military"*

**Outcome 21** requires that *"DCF shall submit a written discharge plan to either/or DMHAS or DMR for all children who are mentally ill or mentally retarded and require adult services."*

**Review Findings and Trends**
The Department achieved **100%** compliance with Outcome Measure 20.  All 44 youth studied in these reviews, who were not screened out per the agreed upon population limiters, achieved one or more of the requirement listed under Outcome Measure 20.

Forty-three youth (97.7%) graduated from high school.  One youth (2.3%) earned a GED. Seventeen youth (38.6%) were employed full-time at the point of discharge.  Further:

- Eight graduated from high school and were enrolled in or completed full-time post-secondary training.

- Three youth graduated from high school, completed a full-time post-secondary education and obtained full-time employment.

- Fourteen youth graduated from high school and were employed full-time at the time of discharge.

- Two youth graduated from high school and entered the military.

- Thirty-nine of the forty-four (89%) received Independent Living Services.

- Thirty Adolescent Discharge Plans (68%) were completed.

- Fifteen of the twenty youth (75%) had positive adult connections, primarily extended family supports.

- Twelve of the twenty youth (60%) received academic supports.

- Fifteen of the twenty youth (75%) had an Adolescent Discharge Plan.

- With respect to the 20 youth who refused further services against the advise of DCF, findings showed areas that clearly indicated the youth's need for further support and preparation in career and employment skill development:

  o Only two of the 20 (10%) youth had employment skills support.

  o Only four of the 20 (20%) youth received career preparation skills.

  o Only three of the 20 youth (15%) had documentation of an Independent Living Plan in LINK.

  Re-engagement of similarly situated youth should be a focus for the Department.

Of the 29 youth in this study who were determined to require continued adult services upon discharge, there was documentation that 28 youth had referrals packets submitted to DMHAS or DMR for needed services.  This results in a 97.0% compliance[8] rate with Outcome Measure 21. For more details regarding each of these areas of measurement see the analysis within this chapter.

**Methodology**
This case review was conducted by the DCF Quality Improvement Division during the Fourth Quarter 2006 and included all youth, 18 years of age or older, who were discharged from the Department's care (defined as the point in time when the child is no longer in foster care under the care and responsibility or supervision of the DCF) between October 1, 2006 and December 31, 2006.  Excluded from this group were Juvenile Justice, Interstate, Probate, and Voluntary cases and cases where youth who were 18 and over had cases opened for the sole purpose of making monetary payments on behalf of the youth.  This resulted in a review group of 70 youth for this quarter. In accordance with the clarifications made to Exit Plan Outcome Measure 20, there are two subcategories identified in this review that will not be included in determining the final performance percentage for these measures.  The first subcategory is those youth with significant or profound developmental delays, or youth who have been clinically diagnosed with Mental Retardation or significant mental health issues.  The second subcategory is those youth discharged from the Department after refusing further DCF services, who were unwilling to continue with the educational and treatment plan goals recommended by the Department.  A total of twenty-six youth will be reported on separately, based on the subcategories defined above.

---

[8] For the purpose of this review, *Discharge Plan* was defined as the submission of a referral packet requesting young adult services from DMHAS and/or DMR.  The submission and acceptance of this referral packet is the starting point for a youth to receive services.

### Outcome Measure 22:  Multidisciplinary Examinations (MDEs)

**Overview**
**Outcome Measure 22 requires that** *"at least 85% of the children entering the custody of DCF for the first time shall have an MDE conducted within 30 days of placement."*

The Monitor's Office qualitatively reviews compliance with Outcome Measure 22 as a component of the quarterly Outcome Measure 15 review.  Additionally, the Court Monitor reviews and analyzes the Department's quarterly automated data.  In early August, this Office reviewed the ROM data related to the Fourth Quarter 2006 reporting period.  In all, there were 391 children identified as having entered care for the first time and requiring MDEs during this period[9].  Of that total, 370 or 94.6% were documented as compliant with the 30 day rule.

**Methodology**
A qualitative record review was not required for this Outcome Measure. However, the Court Monitor's Office conducted a LINK record review of the data for the 21 non-compliant cases identified through the ROM reports.  Narratives, medical icons and treatment plan documentation were researched in an effort to establish barriers to compliance.

**Review Findings**
Upon review of the "non-compliant" population, the Monitor has established that six of the 391 children were exempt from the examination, or from the population for various reasons, and that three actually met the measure, but the MDE was not accurately documented.  Making these corrections to the population, this would result in a compliance rate of **96.9%** (373 children of 385 children with applicable placement situations).  The review of the 21 children who did not meet the measure found that nine children (42.9%) did not actually require the MDE per policy.

- Three children actually met the measure.  Two siblings were not documented as having the MDE until the date of the report receipt on 12/7/06 rather than on the date the MDE occurred, 11/8/06.  One had the MDE within 14 days, and it is unclear why the database does not recognize the data field entry.
- Two cases were voluntary placements and did not require MDE.
- One child was in care only 48 hours when OTC was vested with the maternal grandmother.
- One child was adopted on the date indicated as the entry date in the database,
- One adolescent went AWOL shortly after placement and commitment was revoked prior to the 30 day mark.
- One child was hospitalized in both a community hospital and then Riverview for an extended stay prior to the FWSN commitment resulting in the child's placement during the quarter.

---

[9] Per the *Juan F.* Exit Plan "The MDE is not required for children entering care from hospital settings greater than seven days in which age appropriate medical and mental health evaluations have been documented in LINK…. Measure applies only to those case in which a child or youth has entered custody for the first time and that placement exceeds 30 days….if a prior placement episode ended in less than 30 days with no documented MDE the worker may initiate the MDE process as if the most recent placement were an initial placement."

Of those children who did not receive an MDE within 30 days, but for which an MDE was documented, the range in time frames to receipt was 31 to 111 days, with an average length of time to MDE of 61.4 days.  In two situations did LINK indicate a barrier to receipt of timely MDE.  In one situation it was due to miscommunication between DCF and the provider.  An alternate provider was sought to provide the timeliest appointment when it was discovered that the appointment had, in fact, not been accepted due to the provider protocol of not accepting referral directly from the worker.  In the second situation, the child went AWOL for a period of over thirty days prior to being picked up on a warrant and court ordered to treatment.  All others had no reference to the MDE being untimely.  As the Department has now achieved a high rate of compliance with the MDE requirement, the focus now needs to shift to measurement of the quality and consistency in reporting for the MDE evaluations across the multiple contracted provider agencies.