**_Juan F._ Court Monitor's Review of Children
in Overstay Status (≥60 Days) within Temporary
Congregate Care Placement Settings**
and
**_Juan F._ Court Monitor's Review of
Adolescents in Temporary Placement -
Old Shelter Model Facilities**

**Civil Action No. H-89-859 (AHN)
March 17, 2008**

**Submitted by:
_Juan F._ Court Monitor's Office
300 Church Street - 4th Floor
Wallingford, CT  06492
Telephone:  203-741-0458
Fax:  203-741-0462
E-Mail:  Raymond.Mancuso@CT.GOV**

**Table of Contents for Section One:**
**_Juan F._ Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings**

| Report Section One | Page |
|---|---|
| Executive Summary | 5 |
| Introduction to *Juan F*. Court Monitor's Review of Children in Overstay Status (≥60 days) within Temporary Congregate Care Placement Settings | 11 |
| Vignettes | 14 |
| Demographics | 19 |
| Decision to Place at a Temporary Placement Setting | 20 |
| Maintaining Siblings | 21 |
| Prior Placement History | 21 |
| Medical and Psychological Assessment | 23 |
| DSM Diagnosis | 24 |
| Appropriateness of Overstay at Temporary Placement | 27 |
| Barriers to Discharge | 28 |
| Treatment Planning Efforts | 31 |
| Social Worker Visitation with Child in Placement | 31 |
| Visiting Resources | 32 |
| Discharge Planning | 32 |
| Update | 40 |
| Considerations | 51 |

**Table of Contents for Section Two:**
**Adolescents in Temporary Placement - Old Shelter Model Facilities**

| Report Section Two | Page |
|---|---|
| Introduction | 55 |
| Decision to Place at the Shelter | 56 |
| Maintaining Sibling Groups | 56 |
| Prior Placement Histories | 56 |
| Medical and Psychological Assessment | 57 |
| DSM Diagnosis | 58 |
| Discharge Planning Activities | 59 |
| Barriers to Discharge | 60 |
| Social Worker Visitation to Child In Placement | 61 |
| Visiting Resources | 61 |
| Treatment Planning | 61 |
| Considerations | 62 |

**Charts, Crosstabulations and Tables for Section One: *Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings**

| Chart, Crosstabulation or Table | Page |
|---|---|
| Chart 1:  Distribution of Overstay Population within the Temporary Placement Provider Pool on October 1, 2007 | 19 |
| Crosstabulation 1:  Child's Race*Child's Ethnicity | 20 |
| Crosstabulation 2:  Where was the child immediately prior to this temporary setting?*What type of temporary Placement is this provider? | 22 |
| Crosstabulation 3:  What type of temporary placement is this provider?*Are there any needs identified by the MDE or subsequent evaluations that remain unmet and are a barrier to discharge? | 23 |
| Crosstabulation 4:  What type of temporary placement provider is this provider? * Does this child have a diagnosed mental health disorder? | 24 |
| Crosstabulation 5:  Does this child have a diagnosed mental health disorder?* Is medication management in place? | 26 |
| Crosstabulation 6:  What type of temporary placement is this provider?*Is In-Home Services a barrier to discharge? | 28 |
| Crosstabulation 7:  What type of temporary placement is this provider?* Is Community Resources Needed the barrier to discharge? | 28 |
| Crosstabulation 8:  What type of temporary placement is this provider?* Is Placement Resource Required - Family Setting the barrier to discharge? | 28 |
| Crosstabulation 9:  What type of temporary placement is this provider?  Is Placement Resource Required - Facility Setting the barrier to discharge? | 29 |
| Crosstabulation 10:  What type of temporary placement is this provider?* Is "Other Required Resource" the barrier to discharge? | 29 |
| Crosstabulation 11:  What is the current permanency goal?* What is the concurrent permanency goal? | 32 |
| Crosstabulation 12:  Is there a discharge plan identified for this child? * Is this a formal discharge plan that identifies placement, services, visiting resources/transition with input from DCF, SW, SWS, FASU and or provider? | 33 |
| Crosstabulation 13:  Area Office * Is this a formal discharge plan that identifies placement, services, visiting resources/transition with input from DCF, SW, SWS, FASU and or provider? | 34 |
| Crosstabulation 14:  What is the timeframe for discharge? * What type of temporary placement is this provider? | 39 |
| Crosstabulation 15:  Area Office * What is the timeframe for discharge? | 40 |
| Crosstabulation 16:  Placement Provider Name * On December 31, 2007 where was child placed? | 42 |
| Crosstabulation 17:  Area Office * On December 31, 2007 where was child placed? | 46 |
| Crosstabulation 18:  What is the discharge location identified? * What type of temporary placement is this provider? * Area Office | 50 |
| Table 1:  Has this child had a psychiatric or psychological evaluation in the last year? | 24 |
| Table 2:  Frequency of Axis I Diagnosis for Children in Temporary Placement greater than 60 days | 25 |
| Table 3:  Appropriateness of Overstay at Temporary Placement by Placement Provider Type | 27 |
| Table 4:  "Other" barriers preventing discharge from temporary settings | 30 |
| Table 5:  Participants in Discharge Planning | 36 |
| Table 6:  Placements  by Level of Care for those discharged by December 31, 2007 | 41 |
| Table 7:  What was the discharge location identified? | 49 |
| Table 8:  Is there documentation of specific individualized recruitment efforts on behalf of this child? | 49 |

**Charts, Crosstabulations and Tables for Section Two:  Adolescents in Temporary Placement - Old Shelter Model Facilities**

| **Chart, Crosstabulation or Table** | **Page** |
|---|---|
| Crosstabulation 1:  Does child have a diagnosed mental health disorder?* Has this child had a psychiatric or psychological evaluation in the last year? * Is medication management in place? | 57 |
| Crosstabulation 2:  Is there evidence of a CANS referral?* Is there a 469 request actively being attended to for this child? | 60 |
| Crosstabulation 3:  What is the timeframe for discharge?* What is the discharge location identified? | 60 |
| Crosstabulation 4:  What is the current permanency goal? * What is the concurrent permanency goal? | 62 |
| Table 1:  Area Office Distribution | 55 |
| Table 2:  Barriers to discharge from shelter | 61 |

**Section One:**
*Juan F.* **Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings**

### *Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings

**Executive Summary**

The *Juan F.* Action Plan required a review of the population of children in Connecticut who were in overstay status in temporary congregate care placement settings for 60 days or longer on October 1, 2007.  In all, 144 cases were found to meet the criteria for inclusion in our review.  The sample included children in the SAFE Home, STAR, PDC, and Temporary Sub-Acute provider settings.  The Monitor's Office, in conjunction with the Department of Children and Families Quality Improvement Division collected data on this population using the methodology and tools crafted over a period of several weeks with input and agreement from both the plaintiffs and DCF Administration.  Cases were reviewed during the fourth quarter 2007.

The *Juan F.* parties had determined that review of the two remaining older model shelter programs, Salvation Army Youth Emergency Shelter and Marshall House, would be excluded given the impending closing in the first quarter 2008.  However, the Monitor determined this population of 18 children [1] would also be reviewed given concerns regarding discharge planning that were identified in this review (n=144).  These additional data are incorporated as a separate section within this document beginning on page 53.

A decision to follow these cohorts via a longitudinal review and consideration of the need for additional point in time reviews will be points of discussion between the Monitor and the *Juan F.* parties subsequent to the release of this report.  A number of the identified issues related to safety, permanency, and well-being could be better understood through a periodic review of this cohort.

While there is, and always will be, additional work required to continue improvements regarding systemic issues, there were many valiant documented efforts by DCF staff to manage and advocate for services to meet the multiple needs of the children. It must be stressed that many of the cases reviewed demonstrated tremendous commitment by the temporary placement provider community to providing quality care for these children.

During recent visits to temporary congregate care provider programs and specifically in discussion with these providers, it is evident that much of the assessment of the strengths and needs of these children are clearly identified by the clinical staff on site at the STAR and PDC programs and regular updates on individual children are developed and shared by all temporary care providers.  This information is well documented in their files and is reportedly shared with the DCF staff routinely.  A clear disconnect emerges when viewing the providers' feedback in comparison with review findings. The providers' efforts are not consistently translating into comprehensive discharge planning and

---

[1] Note: this total will fluctuate given the continued use of these two placement options.  We have been advised that new entries to these placement settings recently ceased.   The Marshall House and SAYES programs are being phased out and will cease operations effective March 30, 2008 and April 30, 2008 respectively.

informed treatment planning development to address the safety, permanency and well-being needs. LINK narratives, medical, mental health and educational icons are also lacking some of the information that has been established by the providers during the children's stay in their facilities.

While the data collected for this review provides an aggregate picture of the needs and issues of those in temporary placement awaiting discharge we do not want to lose sight of the individual circumstances of the children within the sample group. A set of four vignettes is provided on page 14 of the report to offer this individual perspective and provide a frame of reference for the children we are referencing.

**Highlights of Findings:**

The following is a brief summary of the attached report related to a review of the population of 144 children residing in temporary placements 60 days or longer on October 1, 2007.

1.  Demographics of the sample included 87 males and 57 females with ages ranging from seven months to 18.5 years old on October 1, 2007. Race and ethnicity was most frequently identified as White and Non-Hispanic, followed by Black/African American and Non-Hispanic, and then White and Hispanic.

2.  Of the 144 children, 105 cases (72.9%) had a documented rationale for placement in the temporary congregate care setting. In 39 cases (27.1%), availability alone was the documented rationale. However, in addition to these 39 cases, reviewers detailed instances in which there was another identified consideration cited, (i.e. maintaining siblings together, need for clinical assessment, medical needs, etc.) that could have been met in a family setting, if such resources were available at the time of removal or disruption. Unfortunately, sufficient foster care resources and community resources were not available, resulting in a placement in the congregate care setting.

3.  This population of children often had multiple placements during the previous twelve month period. Eighty-two children, or a total of 56.9%, had two or three placements during the period, and 27 of the children (18.8%) in the population exceeded three placements during the period.

4.  Of the 144 children, 27 had placement in more than one temporary setting during the twelve month period. Thirty-five of the children also had placement in a temporary care setting prior to September 2006.

5.  Of the cases reviewed, 67 children (46.5%) had an identified formal discharge plan from the temporary congregate care setting with an identified discharge placement setting, necessary services, visiting resources, and transitional plans with input from a variety of involved participants. A total of 74 children (51.4%) had an informal plan in place that referenced one or more levels of placement being pursued but had

little to no action steps identified. Three children (2.1%) had no specific planning documented for discharge.

6.  In 95 of the 144 cases (66.0%), the children were deemed 'inappropriately' in overstay status (stays greater than 60 days) in the temporary placement setting as the result of the variety of barriers noted within the full report that follows. This 'inappropriate' designation signified a delay in discharge that was detrimental to the child's well-being and/or permanency needs. The results from Outcome Measure 15 are often negatively impacted by these types of situations noted in the records of these 95 children.

7.  Multiple barriers to discharge were identified for children within this sample.
    *   The inability to locate a family setting was most often the barrier noted (n=93).
    *   This was followed in decreasing order by the need for a facility setting (n=44), and in-home services (n=11).
    *   Eighty-one cases also had a documented "other" barrier. Social Workers and Social Work Supervisors repeatedly indicated that the child was the barrier, rather than the system issues and/or system failures that often led to the increase in acting out behaviors; making placement decisions more difficult. Reviewers indicated that these case records often reflected unaddressed traumas, case management issues (not always related to those staff currently assigned to the case), inadequate discharge planning, multiple moves, ineffectual treatment, and excessive lengths of stay as the genesis of many of the behavioral declines identified as barriers.

8.  Placements to SAFE Homes most frequently occurred (41.8%) as a result of removals from home. Placements to STAR programs were largely the result of disruptions from foster care (both DCF foster care and therapeutic foster care.)

9.  While appropriate consideration appears to be given to use the PDC and STAR programs for children with multiple disruptions and clinical needs, there appears to be an increase in the number of children with multiple moves and clinical needs entering the SAFE Homes as well. Of the 91 children in the SAFE Home population, 53.9% had an Axis I diagnosis. Medication Management was in place for 36.3% of this SAFE Home subsample, and 1:1 services were documented for 11.0% of this population. The needs of these children pose difficulty given the level of clinical staffing available on site at several of these locations. This situation is compounded when local community providers have wait lists for evaluations or therapeutic services.

10. Multidisciplinary Examinations were documented at a rate exceeding the Outcome Measure 22 - Multidisciplinary Examinations requirement, as 140 children or 97.2% documented compliance with the requirement.

11.  Documentation of recent mental health evaluations (within 12 months) was absent in 34 cases, 19 of these 34 children had an Axis I diagnosis that was impacting discharge planning efforts.

12.  A follow-up review of this cohort was conducted 90 days on December 31, 2007 to determine the recent placement status of the children.  Of the 144 children reviewed, 85 children (59.0%) were discharged to another placement setting by December 31, 2007.  Therefore, 59 children remained and were in the temporary placement setting a minimum of 120 days at this juncture[2].

13.  Of those 85 children discharged, 87.1%were placed in a setting identified in the record as of the October 1, 2007 cut-off date.  On the surface this is promising, however the reviewers' comments identified a theme that emerged repeatedly - the identified discharge plan/setting was not always the level of care optimally desired or appropriate.  Approximately one quarter of the 85 children discharged had narratives reflecting changes in the selection of a discharge placement type throughout the child's time at the temporary setting; as efforts to locate the optimal placement and treatment resources over a period of time were not successful.

14.  Many cases had conflicting or incomplete information regarding the child's current behavioral health status.  LINK narratives, medical, mental health and educational icons are also lacking up to date information that has been established by the providers during the children's stay in their facilities.  Providers' efforts are not consistently translating into comprehensive discharge planning and informed treatment planning development to achieve continued safety, permanency and well-being.  Additional information requested from Social Workers and Social Work Supervisors via phone or email often clarified matters, but in many instances this required research in hard copy documentation, or contact with the ARG or provider.

15.  A surprisingly low number of children (2 of 144 or 1.4%) are documented as having learning disorders on the DSM Axis documentation reviewed.  This is significant given the number of children receiving special education services or requiring 504 considerations within this group, and is inconsistent with the number of times educational issues were noted within case narratives and discharge planning.

16.  Ninety-nine children had a least one diagnosed mental health disorder identified.  Medication management to address these disorders was documented in 74 of these instances.

17.  Treatment plans developed after the placement in the temporary setting often failed to have identified action steps for discharge planning activities.

---

[2] Thirty-two children remained in a SAFE Home Setting, eleven children remained at the STAR program setting, eight children remained in the PDC setting, and eight children remained in the temporary sub acute program setting.

- 57.6% failed to have specific action steps for DCF related to discharge of the child from the temporary setting.
- In 56 instances (43.1%) there were no specific goals or action steps for the child related to discharge planning from the temporary setting.
- In the 112 cases with parental or guardian involvement, more than half (55.4%) failed to identify specific action steps for the parent(s) or guardian related to discharging the child from the temporary setting.
- 67.7% failed to have specific action steps for the temporary placement provider related to discharge of the child from the temporary setting.

18.   In 93.8% of the cases reviewed, the social worker met the monthly visitation standard required by <u>Outcome Measure 16 - Social Worker Visitation with Child in Out-of-Home Placement</u>, *but* in only 63% of these visits was there documentation of a discussion with the child's caretakers regarding discharge efforts at those visits.

A wealth of information about the children in temporary congregate care has been gleaned from both the data collection efforts and discussions with the DCF staff and providers serving the children included in this review. Based upon the data analysis from this review of temporary placement cases, a number of recurring themes are evident. Considerations are offered on page 50 of the full report in an effort to illuminate those areas requiring improvement and possible starting points from which the Department may implement corrective actions. Many of these considerations have been the subject of recent discussions and some are actively being addressed. Additional considerations regarding the old model shelters are located on page 61.

### *Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings

**Introduction**

As part of the *Juan F.* Action Plan, a review of the population of children in overstay status in the temporary congregate care placement settings in Connecticut greater than 60 days was required.  The Monitor's Office in conjunction with the Department of Children and Families Quality Improvement Division collected data on this population using the methodology and tools crafted with input and agreement from both plaintiffs and DCF Administration over a period of several weeks.  In all, 144 cases were found to meet the criteria for inclusion in our review.  Cases were reviewed during the fourth quarter 2007.

The review included a reading of LINK case record narratives, and contact with the assigned social worker or social work supervisor requesting their input related to discharge planning and barriers to discharge.  The Court Monitor also attended provider meetings whose membership includes the temporary congregate care providers throughout the year, and visited several temporary placement sites.  This offered additional perspective to the process.

The providers in this cohort of temporary congregate care settings included 18 Safe Homes, two Permanency Diagnostic Centers (PDC), ten STAR Homes, and two Temporary Sub-Acute Centers as follows:

| SAFE Home Providers | | STAR Programs | PDC |
|---|---|---|---|
| Brainard Home (Village for Families & Children) | Rainbow House - Waterbury Youth Services Safe Home | Bristol House - Community Residences | Family & Children's Aid PDC |
| Chapman House - Family Service of Greater Waterbury Safe Home | Safe Harbors (Camp Street) | CARE - Children's Center | Sankofa PDC - Village for Families & Children |
| Community Health Resources Safe Home | Safe Harbors (Parker Avenue) | Kids in Crisis | |
| Community Solutions South Windsor Safe Home | Safe Haven | Manchester House - Community Residences | **Temporary Sub-Acute Center** |
| Starshine Safe Home - Family & Children's Aid, Danbury | Village for Families and Children Safe Home | Miller House - Bridge Family Center | Kids Inn (Boys Village Temporary Sub-Acute) |
| Family & Children's Aid - Shelton Safe Home | Wheeler Clinic Safe Home | Portman House - Community Residences | Wheeler Clinic STAR |
| Grube Safe Home - Waterford Country School Safe Home | Windham Safe Home - WCS | Rita - Waterford Country School | |
| Kids Cottage (Children's Center) | | Thomas Bent - Waterford Country School | |
| Kids in Crisis Nursery | | West Hartford STAR Program | |
| Klingberg Family Centers Safe Home | | Winifred House - Bridge Family Center | |
| Olyniciw Safe Home - Waterford Country School | | | |

The temporary sub-acute facilities were included due to their licensing classification in LINK.  The two older model Shelter programs (Marshall House and Salvation Army Youth Shelter (SAYES) were excluded at the discretion of the parties due to impending closure of those programs by the end of the first quarter 2008.  Subsequently, the Monitor determined that this small population should be reviewed in light of viability of discharge plans and given the impending closure.  These findings are reported separately given the differing time period and slight deviation in methodology from the larger sample set.

The Department has provided a brief description of the levels of care within this temporary placement array to give some context to the similarities and differences.

Initially, the SAFE Homes were intended for children under age 12 and to serve primarily children experiencing a first time placement and the PDCs were intended to serve children who were coming from an existing placement.  While it is still true that the PDCs primarily serve children coming from an existing placement, the SAFE Homes now serve both populations equally.  The primary distinction now is that the PDCs are contracted to provide a higher level of clinical care and the expectation is that the children placed there will be coming with identified mental health and behavioral issues.[3]

### SAFE Homes
This service provides short- term congregate care for children, primarily aged three (3) to twelve (12), who have experienced a removal from their home due to abuse, neglect or other significant risk factors.  The focus of this service is to assist in the stabilization of each child, to avoid multiple initial placements that often accompany emergency removal and to complete a multidisciplinary exam in order to assist with treatment planning.  This service shall accommodate sibling groups.

### Permanency Diagnostic Centers (PDC)
This service provides immediate, overnight care for children who have experienced multiple placements and have significant mental health and/or medical and high-risk behavior management needs.  Clinical assessment, high levels of structure and supervision and care coordination related to family reunification or other permanent placement is provided.

The majority of children and youth served in this program will have likely experienced multiple placements.  They may have experienced abuse, neglect or abandonment and will likely be in crisis as a result of these.  The contractor will likely encounter a variety of special needs including medical concerns mental health and potential high-risk behaviors.

### Short Term Assessment and Respite Homes (STAR Programs)

---

[3] SAFE Home and PDC Definitions provided by Office of Foster Care and Adoption Services Program Supervisor, Sarah H. Gibson, JD, MSW.  STAR program definitions were provided from Dr. Robert Plant.

STAR is a new model of short term care for children and adolescents that provides 24-hour care to children and youth, ages twelve through seventeen who are involved with the child welfare system and require short-term emergency placement. STAR offer children and youth many advantages over the old model Emergency Shelter system. These programs provide greater opportunity for youth to be served in their own communities by providing enhanced statewide geographic coverage. Additional advantages include: smaller settings that reduce the likelihood of institutionalized behaviors and that will support improved supervision and the development of nurturing relationships. Gender specific, trauma informed, and clinically driven services and supports better meet the needs of youth who may have been abused, neglected and/or are struggling with the removal from their home. The program model has been designed according to the following principles and components of care:

- Children and adolescents will be served in small, less institutional settings
- These settings will be geographically proximal to where the children live and/or the DCF area office that supports them
- Services will be gender specific and will include gender-sensitive and culturally competent practices
- Program staffing will provide improved supervision especially during key times of day (e.g., after school, weekends, holidays, etc.)
- Services will be informed by an overarching clinically based philosophy of care that is trauma informed
- An array of on–site clinical services will be provided
- Aftercare services and supports will assist with the transition back home or to other community based settings

**Vignettes**

The data collected for this review provides an aggregate picture of the needs and issues of children and adolescents in temporary placement awaiting discharge.  However, it is easy to lose sight of the circumstances of these individual children.  The following four vignettes are provided to offer perspective and a frame of reference to this population of children[4].

### "Joshua" and "Douglas"

Siblings "Joshua" and "Douglas" are non-Hispanic, African American brothers who were ages 10.5 and 5.5 years old respectively when placed via 96 hour hold in a Safe Home as a result of a drug raid on their home in the spring 2007.  The case had been open for almost one year, at the time of removal due to a substantiation of physical and educational neglect.

The family was known to the Department since 2000.  Prior substantiations included physical neglect, emotional neglect, and medical neglect with substance abuse of the parent identified on more than one occasion.  In spite of several substantiations, this was the first removal for the brothers. The SDM at removal considered the home to be unsafe, and safety risk related to reunification remains "high".

"Joshua" is in fourth grade and is a regular education student diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).  He is on daily medication to address this diagnosis.  He has a therapist and recently began IOP therapy to address trauma due to exposure to long term parental substance abuse by his mother, abandonment by his father, and domestic violence within his home.  His worker describes "Joshua" as handsome and athletic.  He likes to play football.

"Douglas", attends kindergarten and has improved his on-task time once switched into a smaller classroom setting.  While identified as very active, "Douglas" has no identified behavioral health concerns.  He was placed in play therapy to address the trauma of removal, long-term exposure to parental substance abuse, and domestic violence.  He has a history of nocturnal enuresis that has greatly improved since entry into the SAFE Home.  "Douglas" has history of asthma, and was not up to date with immunizations at the time of removal.

Both boys were engaged with therapists within two weeks of removal.  All medical and behavioral health needs identified by the Multidisciplinary Examination (MDE) were attended to in a timely manner.  The boys were routinely transported to visits with their parents in prison on a regular basis.

Treatment plans were completed timely.  While they did not incorporate action steps or goals related to discharge from the SAFE Home, there was a formal documented plan that was developed during meetings with input from the SW, SWS, SAFE Home, and the

---

[4] Names have been changed, and identifying information removed to ensure confidentiality.

Therapeutic Foster Care (TFC) Director entrusted with locating a therapeutic foster home for the siblings.

A TFC home willing to accept the siblings was identified in July 2007. The Department was concurrently researching all relatives that were identified for placement consideration. A relative of "Douglas" living out of state looked promising as a longer term resource for both boys, but due to the delays with ICPC, the Department determined that placement in a foster home would be necessary. Interstate Compact for the Placement of Children (ICPC) is still ongoing as of March 2008.

The Area Office remained adamant about keeping the boys together. A Community Provider clinician and SAFE Home staff agreed that eldest child required TFC level of care and it would be beneficial for the younger child given the trauma of circumstances leading to removal. A home was identified within the first several weeks of placement. Meetings were held and pre-placement visits were scheduled. The first identified placement fell through during this transition when it was identified that "Joshua" could potentially pose a safety risk to the infant child in the home. There were also concerns given the foster mother's work schedule. The TFC agency kept matching efforts going, and another TFC placement was identified. Visits with this family began in September and transition was complete by October 2007.

The children's needs were identified promptly, services were provided quickly to address medical and mental health needs, and concurrent efforts related to licensing a relative were immediately pursued for long term permanency in light of parent's incarceration for the next several years. Communication between the Department and various providers was frequent and purposeful. Delays occurred because of the issues with the initial foster care match but the TFC agency took only two weeks to identify another possible match. Transitional visitation took place until the date of placement in October. The length of stay in the SAFE Home was 206 days.

*Update:* Following a recent court determination, the boys are committed to the Department. The TFC mother appears to be a good match for children's needs, and although behavioral issues have been ongoing, the siblings continue in this home.


**"Tracy"**

"Tracy" is a 13 year old non-Hispanic, African American female adolescent. "Tracy" has been known to the department for over a decade. Her family has had four substantiations which included emotional and physical neglect related to substance abuse. This is the second placement episode for "Tracy" who spent five months in DCF Foster Care in 2004-2005. This most recent out of home placement episode occurred on the date of case opening, in beginning of 2007, when mother brought "Tracy" in to the DCF office due to her pending incarceration. There were no caretakers available to provide care. Due to aggressive behaviors, "Tracy" was placed in a Permanency Diagnostic Center.

"Tracy" is diagnosed with Post Traumatic Stress Disorder (PTSD), and Oppositional Defiance Disorder (ODD). She also has a history of asthma. She is currently taking an anti-depressant drug in attempt to improve aggressive behaviors. An MDE was done timely in March 2007. Recommendations included psychiatric evaluation, dental and vision care, Intensive Outpatient services, and Extended Day Treatment. "Tracy" had the psychiatric evaluation at the PDC in which she was placed. Educational programming was closely monitored. Visits with mother were provided.

The discharge plan at the time of placement was therapeutic foster care. Narrative reveals that a TFC Network referral was made shortly after placement at the PDC. There was a lack of therapeutic family settings to match child to. There was no current DCF-469. No individualized recruitment was noted. Months went by and "Tracy's" behaviors regressed while at the PDC requiring police involvement on more than one occasion. In August, the PDC asked for "Tracy's" removal after several instances in which child was aggressive with other younger children and staff at the PDC. It was noted that "Tracy" shows no remorse after these incidents.

A treatment plan was created in May 2007 and included some steps regarding discharge for child and parent. There were no steps for the providers or DCF. The mother will require a long period of support and training for reunification to be successful. Services are needed now that mother is back in the community. Discharge planning should be more specific relating to these services.

"Tracy" required a more intensive level of care from the point of entry into the PDC to the date of discharge to the residential where she is currently placed. Providers were clear that they could not provide her with the level of care necessary given her individual needs. "Tracy" presented a risk to others at the PDC. There was no formal discharge plan, although there are meetings documented including the therapist, psychiatrist, ARG, SWS, SW and Residential Placement Team. CANS was begun in June but was not submitted until mid August 2007.

*Update:* In December, it was noted that a residential setting may be available for possible placement. This discharge was accomplished in mid-January 2008. Length of stay at the PDC was 348 days.

### "Cheryl"

"Cheryl" is a multi-racial non-Hispanic 16 year old female. "Cheryl" has been diagnosed as having Bipolar Disorder, Mood Disorder-NOS, Substance Abuse, and has had a history of running away from home and engaging in risky sexual behavior. "Cheryl's" family has been known to the Department for over a decade, with multiple unsubstantiated referrals relating to domestic violence prior to the most current substantiation of emotional and physical neglect. There has also been FWSN activity. The most recent case opening was in early 2006. "Cheryl's" father's parental rights were terminated at the request of the mother. Their relationship was domestically violent. Her mother's current paramour is a reported a substance abuser that reportedly shared drugs with "Cheryl".

"Cheryl" has been in foster care for one month in 2006.  The most recent entry into care occurred as the result of the family friend, with whom "Cheryl" was residing via a probate arrangement, reporting she could no longer keep her and that the mother refusing to allow her to return home.  "Cheryl" spent two days in a foster home and was placed at a STAR program in July 2007.  A psychiatric/psychological evaluation was documented and medication management was put into place including a combination of three medications including two anti-psychotic drugs and an anti-depressant.  The MDE was conducted within two weeks of placement.  Mental health needs and substance abuse, the need for a therapeutic mentor, and routine dental care was identified. "Cheryl" also has asthma and currently uses daily medication and fast-acting inhaler to address this as necessary.  "Cheryl" was identified as obese and a smoker. MDE suggests SW should address this with her.

Relative resources were sought.  An older sister emerged as a possible resource,  but the sister failed to follow through with licensing requirements and the Department sought to secure a Group Home level of care after a great deal of discussion with the ARG, SWS, Clinician, "Cheryl", "Cheryl's" attorney and  mother.  (It was documented that while TFC may be an option, the parties felt the group home could better provide life skills and address "Cheryl's" mental health issues.)  Meetings were documented bi-weekly.  The ARG was very active in addressing both educational issues as well as mental health.  The Safe Home clinician was key to helping "Cheryl" accept the Group Home placement, as she had wanted very much to live with her elder sister.  There was a team approach.

The CANs was submitted in a timely manner after the decision to pursue the Group Home, when FASU identified the likelihood that placement would not occur with the sibling or any other relative that had been proposed.  While the treatment plan developed in August 2007 did not include steps related to discharge planning, there was a formal discharge plan identified for the child with input from various DCF staff, the SAFE Home, "Cheryl" and her mother, the attorney, and the Clinician.  Discharge planning was well done after the disappointing follow-through by her relative.  However, the need for a therapeutic mentor and substance abuse treatment did not appear to be addressed while at the temporary placement.  The Mentor service was delayed due to the unknown location of placement post-SAFE Home.  It is unclear why the substance abuse treatment was not pursued more rigorously. "Cheryl" was placed at a Group Home in October 2007.  Length of Stay at the STAR was 106 days.

*Update:*  While "Cheryl" was an exemplary member of the Group Home, in late February 2008 she was reported AWOL after not returning home from her part-time job.  The Group Home reported they would be unable to hold her bed.  Several days later "Cheryl" contacted the Group Home and requested transportation to return.  They advised her that she was no longer a resident.  This situation was not brought to the SW's attention until the SW phoned the mother the following day.  The mother advised SW that she did not know where "Cheryl" was but that she called her to tell her she did try to go back to the Group Home and they refused.  SW contacted the Group Home and was advised that the bed had not yet been allocated to another adolescent.   SW was unable to locate "Cheryl" to return her to the Group Home.  Child remains AWOL.

### "Susan"

"Susan" is an 18 year old white non-Hispanic female diagnosed with ADD, PTSD, Bipolar Disorder and Borderline Personality Disorder. A combination of anti-psychotics and an anti-depressant were included in her medication management. "Susan" was in the 10th grade at the Clinical Day School when she entered a psychiatric hospital in January 2007. "Susan" has a history of suicide attempts, anorexia/bulimia, cutting, inappropriate and risky sexual behaviors, and poor hygiene. She also has asthma which is controlled through daily medication. This is a voluntary services case at the request her adoptive parents. "Susan" was adopted at the age of eight years. She did well with her adoptive family until puberty, when disturbing behaviors began to surface/resurface after years of relatively good mental health. "Susan" is smart, and can advocate for herself. Her adoptive mother is also an avid advocate.

"Susan" was most recently placed into a STAR program in April 2007 from the psychiatric hospital because there were no sub-acute beds available. A sub-acute provider had accepted "Susan" but placement was pending an available bed.

The most recent treatment plan for this child was developed in June 2007 and included steps for the child to work toward discharge, but failed to identify actions necessary for the parent, DCF or providers. The stated permanency goal is APPLA. There is no concurrent plan.

When we first reviewed this case six months into the placement at the STAR, there was no discharge plan. There were options being considered to seek TFC, regular foster care, group home and residential. There had been a great deal of conflict over the level of care required prior to this that seemed to stall placement efforts.

In a meeting in late October 2007 all of the parties met (mother, STAR staff, and DCF) and agreed that child required residential care given her decline since entering the STAR program. A CANS was required to seek this level of care, as the initial CANS had suggested a TFC level and several months had passed with no resource located. The ARG documented a consultation with the SWS on this case. The therapist and mother were of opinion that residential was necessary while DCF began toying with the idea that a DCF foster home with supports may be acceptable. The SWS reported routine, frequent meetings related to discharge, however only two meetings were documented between the DCF staff and the STAR program during the period.

*Update:* Abruptly in December the discharge shifts to group home as a possible bed was located for "Susan". Per the narrative all parties were in agreement with this level of care. In February 2008 "Susan" was placed in a Group Home setting. Length of stay at the STAR was 297 days.

*Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008

**Population Demographics**

There were 91 children in Safe Homes, 13 children in the PDC, 29 in the STAR homes, and 11 within the temporary sub-acute centers in overstay status per the database identified by the Department on October 1, 2007.  At the time of the sample, the highest number of children in any given facility in overstay status were 11 children resident in the Klingberg Family Center Safe Home.

The distribution of the sample of 144 children within this temporary placement provider pool is provided in the following chart:

**Chart 1:  Distribution of Overstay Population within the Temporary Placement Provider Pool on October 1, 2007 (n=144)**



Of the 144 children included in our sample, the range of length of placement as of October 1, 2007 was 60 days to 1,278 days with a median of 183 days at the temporary placement.  The sample population (n=144) included 87 males and 57 females. Ages ranged from seven months to 18.5 years, with an average age of 10.5 years of age. Residents were most frequently identified as White and Non-Hispanic.

Full details related to race and ethnicity are provided in the crosstabulation below.

**Crosstabulation 1:  Child's Race * Child's Ethnicity**

| | | | Child's Ethnicity | | | | |
|---|---|---|---|---|---|---|---|
| | | | Hispanic | Non-Hispanic | Blank (none Selected) | Unknown | Total |
| Child's Race | American Indian/Alaskan Native | Count | 0 | 0 | 2 | 0 | 2 |
| | | % | .0% | .0% | 100.0% | .0% | 100.0% |
| | Black/African American | Count | 1 | 40 | 0 | 0 | 41 |
| | | % | 2.4% | 97.6% | .0% | .0% | 100.0% |
| | White | Count | 23 | 48 | 0 | 1 | 72 |
| | | % | 31.9% | 66.7% | .0% | 1.4% | 100.0% |
| | UTD | Count | 14 | 0 | 0 | 0 | 14 |
| | | % | 100.0% | .0% | .0% | .0% | 100.0% |
| | Multi-racial | Count | 0 | 15 | 0 | 0 | 15 |
| | | % | .0% | 100.0% | .0% | .0% | 100.0% |
| Total | | Count | 38 | 103 | 2 | 1 | 144 |
| | | % | 26.4% | 71.5% | 1.4% | .7% | 100.0% |

Children's legal status was most frequently identified as Committed (92 or 63.9%), followed by TPR/Statutory Parent (18 or 12.5%), OTC (17 or 11.8%) Not Committed (6 or 4.2%) and DCF Custody - Voluntary Services (1 or 0.7%).

**Decision to Place at a Temporary Placement Setting**

Records were reviewed to determine the rationale for the determination for placement in the STAR or Safe Home settings.  Of the 144 children 72.9% had clearly documented rationales for placement in these congregate type settings.  In 39 cases (27.1%), it appeared that availability alone was the deciding factor for placement at the temporary setting.  Documented reasons for the remaining 105 cases included the following:

- 26.2% allowed for siblings to remain together
- 17.2% were selected due to the 24 hour staffing patterns and level of structure/supervision available.
- 18.6% were selected to allow for clinical assessment or immediate therapeutic services
- 6.2% were selected as the child was familiar with the placement due to prior placement experience in the setting
- 2.7% were selected due to concerns regarding sexually perpetrating/reactive children that required close monitoring
- 1.4% were selected as they could meet the needs of medically complex children
- 0.7% was selected to allow for close proximity to parent.

For three of the children, in addition to the identified rationale above there were additional notes related to the availability of Spanish speaking caretakers in the Safe Home setting.

However, many of the documented rationales for selection of this congregate setting over family setting were in fact, secondary in nature as the main rationale was the need for immediate placement and the lack of available and appropriate foster and therapeutic foster homes.  For example, a sibling group of two or three should be able to be accommodated in a family setting, if not immediately then certainly within 60 days of coming into placement.  The pool of medically complex foster parents should be able to accommodate the needs of children requiring medically complex care well within the span of 60 days.  Coordination of community services also plays a role in ability to match to a family setting, as wait lists for counseling services, and evaluations, makes a placement in these programs the most efficient way to provide clinical/therapeutic intervention in a timely manner.

In reviewing placement with the temporary providers by geographic catchment areas of the local office, 50.7% of the placements were within the area served by the assigned DCF Office.  This poses additional burden on both the area office and temporary placement provider related to continuity of both education and established community provider service provision, as well as frequency of visitation with family or kin.

**Maintaining Sibling Groups**
There were 82 children within the sample that were a member of a sibling group having at least one additional sibling in out of home placement.  In 42 cases, the child was in the identified temporary placement setting with one or more of the siblings also in custody.

Valid reasons for separation of siblings were identified in the majority of the situations where siblings could not be maintained in placement together.  These included:
- 16 children were separated for reasons related to mental health needs
- 6 children were separated for safety reasons as inappropriate sexual contact was known to have occurred between siblings
- 5 children were separated from siblings due to medical needs
- 3 children were separated to allow a sibling's placement with a relative resource
- 1 child was separated from sibling that had just reunified with parents under trial home visit
- 1 child was separated from sibling that was resident in a CHAPS program that could not accommodate this younger child.

There were seven situations with siblings in placement for which lack of resource appeared to be the primary reason for separation rather than a clinically based determination. There were four cases in which siblings had TPR status.  In one of these cases, the sibling wanted no further contact with the child in the temporary placement.  In the other three situations, siblings remained in contact but were not designated for the same permanent resource and were therefore not maintained together.

**Prior Placement Histories**
Children within the sample (n= 144) were reviewed for length of current placement episode, and number of placements prior to the temporary setting *during the period of September 1, 2006 through October 1, 2007*.  Of the sample set, placement in this

temporary setting was the first placement in the episode for 62 of the children (43.1%) in the sample. A total of 32 children (22.2%) had experienced one prior placement to the temporary setting during the period (a total of two placements). Twenty-three children (16.0%) had two placements prior to the temporary setting (total of three placements). Sixteen children (11.1%) had three prior placements (for a total of four placements) and 11 children (7.6%) had five or more prior placements during the period.

Current episodes in placement ranged from 63 days to 15.3 years as of October 1, 2007, with an average length of stay of 1.9 years. Thirteen of the children had at least one hospitalization of greater than 24-hour observation; seven had had two such episodes. Children with histories including the hospitalizations in 2007 were most frequently in Safe Homes (7) followed by Sub-Acute Settings (5), and STAR and PDC (4 each).

Twenty-seven of the children had had prior placement in a temporary congregate setting during the year. Thirty-five children had placement experience in a temporary congregate setting at some point prior to 2006.

In 45 instances, children in the sample entered the temporary congregate care placement directly from their home (31.3%), this was followed closely by 41 children disrupting from DCF Foster Care Placements (28.5%). For a full accounting of prior placement settings see the crosstabulation below.

**Crosstabulation 2: Where was the child immediately prior to this temporary setting? * What type of temporary placement is this provider?**

| Where was the child immediately prior to this temporary setting? | What type of temporary placement is this provider? | | | | |
|---|---|---|---|---|---|
| | SAFE Home | PDC | STAR | Sub-Acute | Total |
| Home | 38 | 2 | 3 | 2 | 45 |
| DCF Foster Care | 31 | 1 | 9 | 0 | 41 |
| Therapeutic Foster Care | 5 | 3 | 6 | 1 | 15 |
| Hospital | 3 | 3 | 4 | 5 | 15 |
| SubAcute/PRTF | 0 | 0 | 1 | 0 | 1 |
| Shelter, Safe Home or STAR Program | 0 | 3 | 2 | 3 | 8 |
| Other[5] | 14 | 1 | 4 | 0 | 19 |
| Total | 91 | 13 | 29 | 11 | 144 |

---

[5] Others included: Family friend through informal arrangement (4), Relative (2), Temporary Guardian (2), Detention (2), Homeless Shelter (2) DCF Licensed Relative (2), TFC Respite Home (1), Medically Complex Foster Home (1), Children's Center Crisis Intervention Program (1), Pre-Adoptive Home (1) and AWOL (1).

**Medical and Psychological Assessment**

Of the 144 children within the sample, there were 22 children that did not have a documented Multidisciplinary Examination (MDE) following their date of entry into care.  Of this total, however, 16 children had documented exception codes entered in the appropriate field to identify a circumstance that allowed for exclusion of this requirement.  Upon further review, another two cases met the exception criteria but failed to properly document such.  Although timeliness of the MDE was not a measurement within this review process data indicates a total of 97.2% had an MDE or appropriately documented the exception code.

In eight instances, an assessment or need identified at the MDE was still not fully addressed or resolved at the point of review and was an impediment to discharge.

In 27 cases, reviewers identified treatment interventions previously identified by the MDE or subsequent evaluations that were not fully implemented as of the October 1, 2007 cut-off date.

**Crosstabulation 3:  What type of temporary placement is this provider? * Are there any needs identified by the MDE or subsequent evaluations that remain unmet and are a barrier to discharge?**

| What type of temporary placement is this provider? | Are there any needs identified by the MDE or subsequent evaluations that remain unmet and are a barrier to discharge? | | | |
| --- | --- | --- | --- | --- |
| | yes | no | UTD | Total |
| SAFE Home | 12 | 73 | 6 | 91 |
| PDC | 4 | 8 | 1 | 13 |
| STAR | 8 | 18 | 3 | 29 |
| Sub-Acute | 3 | 7 | 1 | 11 |
| Total | 27 | 106 | 11 | 144 |

As shown in the table above, the PDC provider group had the highest rate of unmet assessments/needs, with 30.8% of the 13 children in their care still awaiting some type of service or assessment identified to assist in the discharge process.

Also of concern is a lack of recent assessment documentation.  In addition to the 11 situations identified above, there were 34 or 23.6% of this population who were identified as having no documented psychiatric or psychological evaluation documented within the last twelve months, but of this total, 19 children were identified as have an Axis I diagnosis that was presumably dictating level of care decisions.  This raises a question as to how discharge planning could be considered informed and accurate given out of date assessments or missing documentation.

Another area of concern is conflicting information in the behavioral health record, case narratives and treatment planning documents.  Frequently the behavioral health profile was incomplete or altogether missing from the LINK record.  When conflicting

information was identified within the record, or no information could be located in relation to diagnosis, reviewers clarified the official diagnosis information with a SW and/or a SWS.  In many cases, this was not readily available to the SW or SWS and required contact with the ARG, the child's clinician, or a review of information not included in LINK before the response could be provided.

**Table 1:  Has this child had a psychiatric or psychological evaluation in the last year**

|  | Frequency | Percent |
|---|---|---|
| **Yes** | 88 | 61.1% |
| **No** | 34 | 23.6% |
| **N/A - Not Indicated by Initial Screening** | 22 | 15.3% |
| **Total** | 144 | 100.0% |

**DSM Diagnosis**

Axis I designated diagnosis (Clinical Disorders and Other Conditions that may be the focus of Clinical Attention) for the 144 children were identified through review of the medical profile, narrative entries, treatment plan documents, and contact with the SWS or SW.  Of the 144 children, forty-five children (31.3%) had no DSM diagnosis on record at the point of review.  Ninety-nine children had at least one identified Axis I diagnosis on record. In many cases, multiple entries were designated (53 children had more than three identified diagnosis on Axis I).

Placement in the more clinical settings (Sub-Acute, PDC and STAR) appears to reflect appropriate consideration of children's behavioral health needs, in that the majority of the children with no clinically diagnosed disorder were placed in the Safe Home setting.  However, the SAFE Home providers, who often are not staffed with on-site clinical personnel, are being used to serve a population of children with diagnosed mental health or behavioral conditions.  Of the 91 children in the SAFE Home subsample, 53.9% had an Axis I diagnosis.  Medication management was in place for 36.3% of this SAFE Home subsample, and 1:1 services were documented for 11.0% of this population.

**Crosstabulation 4: What type of temporary placement is this provider? * Does this child have a diagnosed mental health disorder?**

| What type of temporary placement is this provider? | Does this child have a diagnosed mental health disorder? | | |
|---|---|---|---|
|  | yes | no | Total |
| **SAFE Home** | 49 | 42 | 91 |
| **PDC** | 13 | 0 | 13 |
| **STAR** | 26 | 3 | 29 |
| **Sub-Acute** | 11 | 0 | 11 |
| **Total** | 99 | 45 | 144 |

*Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008

The following table provides a frequency of the Axis I Diagnosis identified for the full sample.

**Table 2:  Frequency of Axis I Diagnosis for Children in Temporary Placement Greater than 60 Days**

| Diagnosis | Frequency | Percentage |
|---|---|---|
| Adjustment Disorder | 45 | 31.0% |
| No Identified Diagnosis | 45 | 31.0% |
| Attention Deficit Hyperactivity Disorder | 35 | 24.1% |
| Post Traumatic Stress Disorder | 34 | 23.5% |
| Oppositional Defiant Disorder | 24 | 16.6% |
| Depressive Disorder (all types) | 21 | 14.5% |
| Mood Disorder | 12 | 8.3% |
| Bipolar Disorder | 10 | 6.9% |
| Reactive Attachment Disorder | 10 | 6.9% |
| Conduct Disorder | 8 | 5.5% |
| Dysthemic Disorder | 8 | 5.5% |
| Disruptive Disorder | 6 | 4.1% |
| Rule Out Post Traumatic Stress Disorder | 6 | 4.1% |
| Rule Out Reactive Attachment Disorder | 6 | 4.1% |
| Asperger's Disorder | 5 | 3.5% |
| Attention Deficit Disorder | 5 | 3.5% |
| Enuresis or Encopresis | 5 | 3.5% |
| Sexual Abuse of Child or Sexually Reactive | 5 | 3.5% |
| Expressive Language Disorder | 4 | 2.8% |
| Intermittent Explosive Disorder | 4 | 2.8% |
| Pervasive Development Disorder | 4 | 2.8% |
| Impulse Control Disorder | 3 | 2.1% |
| Neglect of Child | 3 | 2.1% |
| Psychosis or psychotic features | 3 | 2.1% |
| Rule Out Bipolar Disorder | 3 | 2.1% |
| Autistic Disorder | 2 | 1.4% |
| Generalized Anxiety Disorder | 2 | 1.4% |
| Learning Disorder | 2 | 1.4% |
| Rule Out Mood Disorder | 2 | 1.4% |
| Cognitive Disorders | 1 | 0.7% |
| Fetal Alcohol Syndrome | 1 | 0.7% |
| Hearing Deficit | 1 | 0.7% |
| Mental Disorder due to Medical Condition | 1 | 0.7% |
| Parent-Child Relationship Problem | 1 | 0.7% |
| PICA | 1 | 0.7% |
| Rule Out Explosive Disorder | 1 | 0.7% |
| Rule Out Oppositional Defiant Disorder | 1 | 0.7% |
| Rule Out Psychotic Disorder | 1 | 0.7% |
| Schizophrenia - Paranoid Type | 1 | 0.7% |
| Tourette's Disorder | 1 | 0.7% |

Forty-four of the children with an identified Axis I diagnosis remained in temporary placement (44.4%) at our follow-up review on December 31, 2007.  Of the 45 children with no identified Axis I diagnosis, 15 or 33.3% remained in the temporary placement on December 31, 2007.

A surprisingly low number of children, two of the 144 reviewed, are documented as having learning disorders from the DSM documentation available and reviewed in LINK. This is significant given the number of children receiving special education services or

requiring 504 considerations within this group, and is inconsistent with the number of times educational issues were noted within case narratives and discharge planning. This is a concern, as educational issues that remain unidentified or unaddressed will lead to acting out behaviors making placement planning a more challenging proposition. Use of DCF Educational Consultants as part of the treatment and discharge planning was very infrequently documented. It is unclear if the current staffing levels currently in place are adequate for the demands not only of this population but for the full population of children in placement.

Axis II diagnosis (Personality Disorders/Mental Retardation) was also captured. One hundred and fourteen children did not have an identified Axis II diagnosis identified. Of the thirty children with at least one entry on the Axis II, the majority had a "deferred" status. Those children with documented identified issues are: Borderline Intellectual Functioning (6), Mild/Moderate Mental Retardation (7), Borderline Personality Disorder (1), Rule Out Borderline Personality Disorder (1), Rule Out Cognitive Limitations (1), and Sibling Relational Problem (1). Sixteen of these 30 children (53.3%) remained in temporary placement at the December 31, 2007 follow-up review.

In 74 cases, the reviewer identified the documented use of medication to assist in the treatment of the child. In 19 or 19.2% of the case situations where medication management was expected to be in place given the identification of mental health diagnosis within the record, the reviewer found no medication management documented. There were three situations identified (4.1%) in which a child with no documented mental health diagnosis was documented as receiving medication management.

**Crosstabulation 5:  Does this child have a diagnosed mental health disorder? * Is medication management in place?**

| Does this child have a diagnosed mental health disorder? | Is medication management in place? | | | |
|---|---|---|---|---|
| | Yes | No | Not Required | Total |
| **Yes** | 71 | 19 | 9 | 99 |
| **No** | 3 | 2 | 40 | 45 |
| **Total** | 74 | 21 | 49 | 144 |

Of the full sample of children reviewed, twelve were indicated as having a diagnosed medical condition requiring *special medically complex treatment*. Most frequently noted was asthma (4 cases). This was followed by enuresis, obesity, developmental delays and seizure disorders (each identified 2 times). Acid reflux, diabetes, impacted bowel syndrome, endocrinology/genetic disorder, and spinal fusion were each identified once. Five of these 12 children (41.7%) remained in the temporary care placement as of December 31, 2007.

**Appropriateness of Overstay Status at Temporary Placement**

Of the 144 children in temporary placements greater than 60 days that were reviewed within our sample, reviewers' summaries identified that some children in overstay status (15), were being provided appropriate case management, and discharge planning services with transitions in progress to identified providers or parents/guardians in just slightly over the somewhat arbitrary 60-day mark.  Other children (34) were in overstay status due to a discharge delay, but the planning and placement were deemed acceptable given the identified barrier related to a procedure, or policy requirement; and the delay was felt to have minimal detrimental effect to the child's treatment or permanency needs (and in fact actually often served to stabilize the child's behavioral or mental health situation).

The majority of overstay situations (66.0%), however, were considered 'inappropriate' as there was a lack of identified discharge placement resource willing to accept the child into their program or home; and still others suffered not only from a lack of an available discharge placement resource, but also had issues related to service provision, case management, or other external barriers delaying discharge to the detriment of the child's treatment, well-being, and/or permanency needs.

**Table 3:  Appropriateness of Overstay at Temporary Placements by Placement Provider Type**

|  | Safe Home | PDC | STAR | Sub-Acute | Total | % |
|---|---|---|---|---|---|---|
| **Appropriate:  No Barriers** Discharge is on identified schedule | 12 | 0 | 0 | 3 | 15 | |
| **Acceptable Discharge Delay:**  Identified provider with acceptable delay due to process or procedure (Transitional period beneficial to the safety or well being of child) | 25 | 3 | 6 | 0 | 34 | 34.0% Positive |
| **Not Appropriate:** Lack of identified discharge resource | 40 | 7 | 6 | 4 | 57 | |
| **Not Appropriate:**  Multiple Barriers Identified (other than or in addition to lack of identified discharge resource) | 14 | 3 | 17 | 4 | 38 | 66.0% Negative |
| **Total** | 91 | 13 | 29 | 11 | 144 | 100.0% |

**Barriers to Discharge**

Our review identified multiple barriers to discharge. The need for a family setting was the most often identified barrier for these children. The crosstabulations below provide an accounting of those barriers by temporary placement setting category within the spectrum.

**Crosstabulation 6: What type of temporary placement is this provider? * Is In-Home Services a barrier to discharge?**

| What type of temporary placement is this provider? | Is In-Home Services a barrier to discharge? | | |
|---|---|---|---|
| | yes | no | Total |
| SAFE Home | 9 | 82 | 91 |
| PDC | 0 | 13 | 13 |
| STAR | 1 | 28 | 29 |
| Sub-Acute | 1 | 10 | 11 |
| Total | 11 | 133 | 144 |

**Crosstabulation 7: What type of temporary placement is this provider? * Is Community resources needed the barrier to discharge?**

| What type of temporary placement is this provider? | Is Community resources needed the barrier to discharge? | | |
|---|---|---|---|
| | yes | no | Total |
| SAFE Home | 1 | 90 | 91 |
| PDC | 0 | 13 | 13 |
| STAR | 0 | 29 | 29 |
| Sub-Acute | 1 | 10 | 11 |
| Total | 2 | 142 | 144 |

**Crosstabulation 8: What type of temporary placement is this provider? * Is Placement Resource Required - family setting the barrier to discharge?**

| What type of temporary placement is this provider? | Is Placement Resource Required - family setting the barrier to discharge? | | |
|---|---|---|---|
| | yes | no | Total |
| SAFE Home | 72 | 19 | 91 |
| PDC | 6 | 7 | 13 |
| STAR | 8 | 21 | 29 |
| Sub-Acute | 7 | 4 | 11 |
| Total | 93 | 51 | 144 |

**Crosstabulation 9: What type of temporary placement is this provider? \* Is Placement Resource Required - facility setting the barrier to discharge?**

| What type of temporary placement is this provider? | Is Placement Resource Required - facility setting the barrier to discharge? | | |
|---|---|---|---|
| | yes | no | Total |
| SAFE Home | 15 | 76 | 91 |
| PDC | 6 | 7 | 13 |
| STAR | 20 | 9 | 29 |
| Sub-Acute | 3 | 8 | 11 |
| Total | 44 | 100 | 144 |

**Crosstabulation 10: What type of temporary placement is this provider? \* Is Other Required?**

| What type of temporary placement is this provider? | Is Other Required? | | |
|---|---|---|---|
| | yes | no | Total |
| SAFE Home | 51 | 40 | 91 |
| PDC | 9 | 4 | 13 |
| STAR | 16 | 13 | 29 |
| Sub-Acute | 5 | 6 | 11 |
| Total | 81 | 63 | 144 |

Of the "Other" barriers identified, the largest percentage point to the child's condition, behaviors, or actions in that 30.9% identified the child in one manner or another as the barrier to delay (see rows 1, 4, 12 in the table below).

*Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008

**Table 4: "Other" Barriers preventing discharge from temporary settings:**

|  | Frequency | % |
|---|---|---|
| Child's behaviors/aggression/decompensation/instability | 18 | 22.2% |
| Licensure of relatives/waivers | 13 | 16.0% |
| Assessment/Evaluations Delayed | 7 | 8.6% |
| Child requires slow transition based on history | 5 | 6.2% |
| Supports/Mental Health Services were required for discharge and not in place | 4 | 4.9% |
| ICPC process | 4 | 4.9% |
| Case Management | 4 | 4.9% |
| Failed transitions to identified TFC homes | 3 | 3.7% |
| Educational programming issues were the barrier. | 3 | 3.7% |
| Parent was the barrier | 2 | 2.5% |
| Change in discharge plan to different level of care | 2 | 2.5% |
| Child sabotaged interview | 2 | 2.5% |
| Provider delays once accepted for program | 2 | 2.5% |
| Conflicting opinions related to appropriate level of care upon discharge. | 2 | 2.5% |
| Large sibling group | 2 | 2.5% |
| Medication issue - parental consent | 2 | 2.5% |
| AWOL disrupted discharge plan | 1 | 1.2% |
| CANS process | 1 | 1.2% |
| DMR funding issues delayed construction. | 1 | 1.2% |
| Medical treatment required prior to discharge. | 1 | 1.2% |
| Spanish speaking therapist needed | 1 | 1.2% |
| There are no in-state placements for fire setting children. | 1 | 1.2% |
| Total "Other" | 81 | |

In the majority of these cases where documentation and interview or correspondence with the SW or SWS point to the child as the "other" barrier it is obvious that unaddressed past traumas, case management issues, inadequate discharge planning, multiple moves, and ineffective treatment to address the core issues resulting in acting out behaviors are likely the genesis of the barriers.

Clearly the placement or lack thereof, is the most readily identified barrier. However, this primary barrier appears to stall efforts to address a host of other barriers that may be present as well and must be dealt with sequentially.

- For example, documentation of an educational programming is specified as a barrier in only three cases. However, when interviewed, there were 19 instances in which the SW or SWS mentioned the need to address educational program prior to discharge.
- While SW identified needs for assessment as the barrier in 7 situations, actually, documentation indicates a delay in twelve cases, where there was an identified need for a psychological or psychiatric assessment or evaluation.
- And, while only two cases identified a need for community resource as the barrier, therapy and community supports were the source of additional delay in several instances once the primary barrier of placement was addressed.

- Transitional visits were identified as a barrier in five cases, but were mentioned as needed action steps in 52 cases, which again adds to the length of time in overstay status.

**Treatment Planning Efforts**

Of the 144 children in the sample a review of the dates of most current approved treatment plan identified that on October 1, 2007, 94.4% of the sample, or all but eight children, had an approved treatment plan less than 7 months old on October 1, 2007. Thirteen of the plans preceded the date in temporary placement. Of those 131 approved after the placement many failed to adequately reflect a coordinated discharge plan for the child in the temporary placement setting by not incorporating clear goals and action steps to lead to the desired discharge.

- In 56 instances (42.7%) where treatment plans were developed and approved post placement in the temporary setting, there were no specific goals or action steps *for the child* related to discharge planning from the temporary setting.
- In the 112 cases with parental or guardian involvement, 55.4% failed to identify specific action steps *for the parent(s) or guardian* related to discharging the child from the temporary setting.
- Of the treatment plans developed and approved post placement in the temporary setting, 57.6% failed to have specific action steps *for DCF* related to discharge of the child from the temporary setting.
- Of the treatment plans developed and approved post placement in the temporary setting, 67.7% failed to have specific action steps *for the temporary placement provider* related to discharge of the child from the temporary setting.

In reviewing the permanency plans for this sample population, 95.1% had an approved permanency goal. Ninety of the children had a stated goal of reunification; 84 of these children had an identified concurrent plan. Twenty four children had an APPLA goal. This grouping fared the worst in relation to concurrent planning, as 58.3% failed to identify the required concurrent plan, and of the ten cases which did identify a concurrent plan, half identified an alternative APPLA option rather than a preferred permanency goal.

Twenty one of the children had a primary goal of adoption - of this group of children only 4 identified a concurrent plan. This is a concern given the histories of these children and multiple unsuccessful efforts to date to identify permanent resources.

**Crosstabulation 11:  What is the current permanency goal? * What is the concurrent permanency goal?**

| What is the current permanency goal? | What is the concurrent permanency goal? | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Reunification | TOG | Adoption | LTFC - Relative | APPLA | None | Not Required | Total |
| **Reunification** | 1 | 12 | 44 | 7 | 20 | 6 | 0 | 90 |
| **TOG** | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| **Adoption** | 0 | 0 | 0 | 0 | 4 | 2 | 15 | 21 |
| **LTFC - Relative** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| **APPLA** | 2 | 1 | 0 | 2 | 5 | 14 | 0 | 24 |
| **None** | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 7 |
| **Total** | 3 | 13 | 44 | 9 | 30 | 29 | 16 | 144 |

**Social Worker Visitation with Child in Placement**

In 93.8% of these cases, the social worker met the monthly visitation standard required by Outcome Measure 16.  In 63.0% of the sample, these visits incorporated a discussion with the child's caretakers at the temporary placement in addition to visitation with the child.

**Visiting Resources**

In 139 cases, there was at least one non-DCF visitation resource identified for the child.  In 129 of these cases there was a documented visit(s) occurring on at least one occasion during the past six months.  Anecdotally, however, reviewers made note that a portion of these visits were with prospective foster parents that did not result in placement.  57.6% of the visits occurred on site at the temporary placement setting.

**Discharge Planning**

Reviewers responded to two questions related to the level of discharge planning efforts for the 144 children in this sample.  The first asked, "Is there a discharge plan identified for this child?"  The second asked, "Is this a formal discharge plan that identifies placement options, service needs, visiting resources/transitional plans with input from DCF and the provider?"  In all, 46.5% of the children had a formal discharge plan identified as of October 1, 2007.  A total of 51.4% of the children had an informal process with a desired discharge placement type identified but little to no identified action steps to achieve the discharge (74 children); or had no discharge plan identified at all (3 children).

**Crosstabulation 12:  Is there a discharge plan identified for this child? * Is this a formal discharge plan that identifies placement, services, visiting resources/transition with input from DCF, SW, SWS, FASU and or provider?**

| | | Is this a formal discharge plan that identifies placement, services, visiting resources/transition with input from DCF, SW, SWS, FASU and or provider? | | | |
|---|---|---|---|---|---|
| Is there a discharge plan identified for this child? | | yes | no | N/A - No discharge plan identified | Total |
| Yes | Count | 67 | 71 | 0 | 138 |
| | % of Total | 46.5% | 49.3% | .0% | 95.8% |
| No | Count | 0 | 3 | 3 | 6 |
| | % of Total | .0% | 2.1% | 2.1% | 4.2% |
| Total | Count | 67 | 74 | 3 | 144 |
| | % of Total | 46.5% | 51.4% | 2.1% | 100.0% |

The Middletown Office had detailed plans in place for all four children they were assigned.  Other offices had varying levels of discharge planning in place, with the least informative noted in Norwich (85.7% or 12 of 14 children) and New Haven Metro (72.2% or 13 of the 18 children under their assignment did not have official plans in place).

**Crosstabulation 13:  Area Office * Is this a formal discharge plan that identifies placement, services, visiting resources/transition with input from DCF, SW, SWS, FASU and or provider?**

| Area Office | | Yes | No | N/A - No discharge plan identified | Total |
|---|---|---|---|---|---|
| | | | | | |
| Bridgeport | Count | 3 | 2 | 0 | 5 |
| | % within Area Office | 60.0% | 40.0% | .0% | 100.0% |
| Danbury | Count | 1 | 1 | 0 | 2 |
| | % within Area Office | 50.0% | 50.0% | .0% | 100.0% |
| Greater New Haven | Count | 3 | 4 | 0 | 7 |
| | % within Area Office | 42.9% | 57.1% | .0% | 100.0% |
| Hartford | Count | 10 | 6 | 0 | 16 |
| | % within Area Office | 62.5% | 37.5% | .0% | 100.0% |
| Manchester | Count | 9 | 9 | 0 | 18 |
| | % within Area Office | 50.0% | 50.0% | .0% | 100.0% |
| Meriden | Count | 4 | 5 | 1 | 10 |
| | % within Area Office | 40.0% | 50.0% | 10.0% | 100.0% |
| Middletown | Count | 4 | 0 | 0 | 4 |
| | % within Area Office | 100.0% | .0% | .0% | 100.0% |
| New Britain | Count | 10 | 6 | 0 | 16 |
| | % within Area Office | 62.5% | 37.5% | .0% | 100.0% |
| New Haven Metro | Count | 5 | 14 | 1 | 20 |
| | % within Area Office | 25.0% | 70.0% | 5.0% | 100.0% |
| Norwich | Count | 2 | 12 | 1 | 15 |
| | % within Area Office | 13.3% | 80.0% | 6.7% | 100.0% |
| Torrington | Count | 3 | 1 | 0 | 4 |
| | % within Area Office | 75.0% | 25.0% | .0% | 100.0% |
| Waterbury | Count | 8 | 9 | 0 | 17 |
| | % within Area Office | 47.1% | 52.9% | .0% | 100.0% |
| Willimantic | Count | 5 | 5 | 0 | 10 |
| | % within Area Office | 50.0% | 50.0% | .0% | 100.0% |
| Total | Count | 67 | 74 | 3 | 144 |
| | % within Area Office | 46.5% | 51.4% | 2.1% | 100.0% |

The column header spanning Yes/No/N/A reads: **Is this a formal discharge plan that identifies placement, services, visiting resources/transition with input from DCF, SW, SWS, FASU and or provider?**

In reviewing the discharge planning efforts within the 144 cases, the CANS was submitted in 52 cases, yet in only 27 of these circumstances was this documentation located within the LINK record.  In the remaining cases this information was obtained via contact with the SW or SWS.  In 84 instances, there was evidence of an active DCF-469 in the file, but only 55 of these requests were accurate representations of the known diagnosis and issues identified for the child.  Within the narrative, there was clear

identification of a request for a therapeutic foster care or professional parent level foster home for 45 of the children. Other documented efforts for discharge included 35 instances of relatives undergoing FASU screening for relative licensure, 4 special study screenings, and 11 active ICPC evaluations.

Specific individualized recruitment was identified within 90 of the 144 cases. This included 19 ARE registrations, 29 PPSP contracts, and 78 situations in which FASU was identified as pursing matches or undertaking screening activities on behalf of the child. Additional recruitment efforts included use of the Heart Gallery, Wednesday's Child, Adopt US Kids, Central Office waivers, and multiple referrals to the TFC Network.

Reviewers were asked to identify up to six individuals within each case who were active participants in the development of the discharge plan. This was based on identified participants at discharge planning meetings, narratives, or individuals specifically identified by the SW or SWS when questioned regarding the actions taken toward discharge plan for the child. Reviewers noted many efforts, but the documentation did not suggest a coordination of efforts among the parties that one would expect to be involved in discharge planning activity.

Fifty-one of the cases reviewed identified six active participants in the discharge planning effort (35.4%) On the other end of the spectrum, three cases only identified no discharge planning documented (2.1%). Seventy-six percent of the cases had documentation of supervisory conferencing related to discharge planning. This often included use of the ARG, SWS, and BHPD. Thirty-two cases (22.2%) identified more than the DCF Social Worker involved, but identified no representation from the temporary placement in the discharge planning meetings/decision making process. Congregate provider direct care staff were documented as involved in discharge planning in 31.9% of the cases reviewed.

The following table identifies the aggregate response to this multiple part question related to documented efforts, both formal and informal related to discharge planning activity.

**Table 5:  Participants in Discharge Planning**

| Participant in Documented Discharge Planning | Frequency |
|---|---|
| SW | 141 |
| SWS | 135 |
| Child's Clinician/Therapist | 80 |
| ARG | 62 |
| FASU | 31 |
| Safe Home Staff (excluding therapist/clinician) | 31 |
| DCF Program Supervisor | 30 |
| BHPD | 18 |
| Parent | 18 |
| STAR Staff  (excluding therapist/clinician) | 14 |
| TFC Network | 13 |
| Central Office | 8 |
| Child/Youth | 8 |
| MSS | 8 |
| Child's Attorney | 6 |
| Foster Parents | 5 |
| Psychiatrist | 5 |
| Reunification Worker | 4 |
| DCF Program Director | 3 |
| Mentor | 3 |
| PPSP | 3 |
| DMR | 2 |
| Safe Home Liaison | 2 |
| School Personnel | 2 |
| Therapeutic Group Home Director | 2 |
| ARC Coordinator | 1 |
| CAFAP Liaison | 1 |
| Clinical Director of Group Home | 1 |
| CPT | 1 |
| DCF Area Director | 1 |
| Former Foster Sibling (visiting resource) | 1 |
| ICPC | 1 |
| Medical Review Board | 1 |
| Parent Child Resource Center | 1 |
| PDC staff (excluding therapist/clinician) | 1 |
| Pediatrician | 1 |
| Paternal Grandmother | 1 |
| Probation Officer | 1 |
| Placement Team | 1 |
| Sibling's therapist | 1 |
| Surgeon | 1 |

Safe Home Liaisons were identified in a majority of cases (110) engaging in meetings with the providers related to the children, but with a focus most often on the behaviors or activities of the child during the period rather than a discharge planning agenda.  In only

two of the cases were a liaison readily identified as part of the discharge planning via the LINK record or in discussion with the SW or SWS.

Documentation of the placement visits with children often identified discussion with the temporary providers (STAR, SAFE Homes, PDC staff) but these discussions focused on the behaviors and activities of the child at the placement rather than proactively attending to discharge planning.

Parents and the child/youth were often not incorporated into the formal discharge planning process reminiscent of the lack of action steps in this regard for children and families within the treatment plans overall.  FASU, PPSP, MSS participants were not documented as participants in the majority of cases reviewed.  This is surprising given the identified discharge plans, and level of complex needs of the children within the sample.

Clinical opinions and/or assessments were sought and rendered for 108 of the children. One hundred and twelve cases had indication of the temporary provider clinician weighing in on the child's mental health or placement needs at some point in the last six-month period.  While sometimes noted as a reason for delay in discharge, it is encouraging to see a focus on the pursuit of resources known to the child. One concern noted in this regard is the apparent sequential nature of these efforts rather than concurrent pursuit of multiple resources.

Many cases that identified the submittal of 469 or CANS requests, did so after the resource was located, which appears to indicate informal "workarounds" to the identified policy and processes in place to secure the level of care needed.  Further noted, was the clear pursuit of more than one level of care for discharge in at least 29 cases during the last six month period - suggesting that the discharge placement was based more on availability rather than identified needs.  This is not including those cases in which efforts prior to the six-month period focused on a different level of care resulting in no identified resource, and leading to an increase overstay and deterioration of behaviors then requiring higher level of care.  In nine cases, the CANS submitted had had no response.

One interviewed SWS summed up the many comments captured:   "A paucity of resources dictates discharge planning."  This theme was evident among many cases reviewed.  Additional Reviewers' comments regarding interviews included:
- This is an appropriate level of discharge placement to meet child's needs, but delays in obtaining it are not appropriate.
- DCF Case Aide has come forward to be resource for five-year old after review of 65 homes resulting in no match.  FASU is assessing the home at this point.
- Took time, but discharge to this therapeutic foster home is very appropriate as they are a possible adoptive resource as well.
- Two relative resources were located and pursued, but both fell through.  Search continues.
- Differing opinions on discharge plan and several changes in workers have resulted in delays.  Now DCF indicating a move disrupting the school year would

not benefit child so delay will continue in spite of now having a resource to allow child to finish out the school year

- Ambiguity present as to whether group home or residential is the most appropriate setting.  Stonington accepted child so decision is made.
- A third possible discharge setting, now being explored, is special build group home but realistically this is seven to nine months away, so child remains.
- Child was bumped from the special build group home due to nexus issues.  All options explored to locate a family setting as well.
- Child's age and level of aggression is derailing efforts to locate a therapeutic group home.  May require discharge to detention as a result of this deterioration.
- Child's behaviors have begun deteriorating such that he required hospitalization and now plan will be to discharge from the hospital to a sub-acute setting.
- Discharge efforts are for therapeutic foster care or group home, but will now consider residential as none of the former have been located.
- Discharge is still up in the air dependent upon locating the discharge resource.  Looking at both therapeutic foster homes and special build group homes.
- Discharge plan vacillates depending upon the child's behaviors.   Residential, Therapeutic Group Home and Group Home levels are all on the table.
- Discharge plan was DCF foster care until just recently when TFC home was located.
- Discharge was identified for special build group home, but child in that home has had delay in discharge, so this child remains at the temporary setting with no alternative options.
- Goal was to reunify but there was little to no involvement of the family in any treatment to allow for such.  Residential is now the focus for discharge based upon recommendation from SAFE Home clinician and ARG consult.
- Hillcrest was identified as the discharge location but child was waitlisted for several months with no end in sight.  Area office suggested Brandon in MA as possible placement and this was reviewed by C.O. who approved and began licensing agreement in relatively short order.
- Initial plan was therapeutic foster care, but this was against the advice of the clinician.  Behaviors continued to escalate.  DCF now indicating they are in agreement with higher level of care as identified by the clinician and will pursue via CANS request.
- No final determination on discharge setting as of October 1, 2007 as child requires treatment for sexualized behaviors and fire setting. Denied at all CT group home and residential providers. Referring to both settings in RI and MA.
- Plan was to locate a group home level of care but also considering therapeutic foster care out of state.  Contracted providers in state have no beds available that are a match.
- Plan will be formulated when resource is identified.
- Referrals to the TFC Network have resulted in no placement options so there is currently no plan.

- Residential care appears appropriate given issues, but there has been much vacillating over whether a TFC home or professional parent should be attempted given child's young age.
- Seeking discharge to residential facility until a group home spot can be secured.
- SW indicates plan is dependent upon availability of resource.  There is no plan as no resource has been identified to date.
- SWS indicates that they finally had specifics related to discharge to a therapeutic group home, but child was unaware and went AWOL on the same day this was identified.
- TFC Parent was not getting the support needed for child in her care and requested removal so that she could sign on with professional parenting agency.  Child was reunited with this former foster parent once appropriate supports were provided by the new agency.
- There is a great deal of confusion regarding discharge planning in this case.  Plan initially was therapeutic foster care but no homes were identified, so group home was identified as placement of choice.  None located, so then regular foster care with services was identified as the discharge plan, but mother was not in agreement.  As of October 1, 2007 residential is being pursued.
- Two options are being pursued:  TFC referral as well as special study of Aunt in MA.  Neither have timeframe available.
- Unclear from documentation why TFC is required.  469 has not been submitted and there is no identification of behavioral issues except in the school setting.  Child is not under medication management.  Therapist of the opinion that a DCF foster home with experience could manage this child with appropriate supports.
- Unclear why TFC is being pursued.  Child has no diagnosed clinical issues.
- While TFC home is appropriate and preferable, the identified resource has fallen through, so group home is now being explored.

As of October 1, reviewers were asked to identify the timeframe for discharge in those cases that had a discharge plan identified.  The following crosstabulations provide a look at the timeframes by placement type and area office.

**Crosstabulation 14: What is that timeframe for discharge? * What type of temporary placement is this provider?**

| What is that timeframe for discharge? | What type of temporary placement is this provider? | | | | |
|---|---|---|---|---|---|
| | **SAFE Home** | **PDC** | **STAR** | **Sub-Acute** | **Total** |
| **<15 days** | 13 | 1 | 5 | 0 | 19 |
| **16-30 days** | 11 | 2 | 5 | 2 | 20 |
| **31-45 days** | 7 | 1 | 1 | 0 | 9 |
| **45-60 days** | 7 | 0 | 2 | 0 | 9 |
| **61+ days** | 4 | 2 | 1 | 5 | 12 |
| **None Established** | 49 | 7 | 15 | 4 | 75 |
| **Total** | 91 | 13 | 29 | 11 | 144 |

*Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008

**Crosstabulation 15: Area Office * What is that timeframe for discharge?**

| Area Office | What is that timeframe for discharge? | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | <15 days | 16-30 days | 31-45 days | 45-60 days | 61+ days | None Established | |
| **Bridgeport** | 2 | 1 | 0 | 0 | 1 | 1 | 5 |
| **Danbury** | 0 | 0 | 0 | 1 | 0 | 1 | 2 |
| **Greater New Haven** | 2 | 0 | 0 | 0 | 2 | 3 | 7 |
| **Hartford** | 3 | 3 | 3 | 0 | 2 | 5 | 16 |
| **Manchester** | 3 | 3 | 2 | 1 | 0 | 9 | 18 |
| **Meriden** | 1 | 1 | 1 | 1 | 0 | 6 | 10 |
| **Middletown** | 1 | 1 | 0 | 0 | 1 | 1 | 4 |
| **New Britain** | 2 | 3 | 0 | 0 | 1 | 10 | 16 |
| **New Haven Metro** | 0 | 0 | 0 | 4 | 0 | 16 | 20 |
| **Norwich** | 2 | 1 | 1 | 1 | 0 | 10 | 15 |
| **Torrington** | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| **Waterbury** | 2 | 5 | 0 | 1 | 3 | 6 | 17 |
| **Willimantic** | 1 | 2 | 2 | 0 | 2 | 3 | 10 |
| **Total** | 19 | 20 | 9 | 9 | 12 | 75 | 144 |

**Update**

As a follow up to our initial look at these children on October 1, 2007 our reviewers revisited the placement icons for the sample set as of December 31, 2007. Of the 144 children, 85 had left the temporary congregate care placement as of the December 31, 2007 date (59.0%). 59 children remained in their temporary placement.

Of those discharging from the temporary placement, 74 children or 87.1%, were placed in the level of care identified in the discharge plan in effect on or just prior to October 1, 2007.[6] The 85 children discharged were placed into the following levels of care:

---

[6] However, this number is inflated as reviewers frequently noted that this level of care was one of multiple placement levels attempted prior to or at the same time as that 'officially noted' by the plan.

**Table 6:   Placements by Level of Care for those discharged by December 31, 2007 (n=85)**

| Placement | Frequency | Percent |
|---|---|---|
| **Discharged to TFC or Professional Parent home** | 21 | 24.7% |
| **Discharged to residential setting** | 16 | 18.8% |
| **Discharged to DCF Foster Care** | 15 | 17.7% |
| **Reunified with parent or guardian** | 11 | 12.9% |
| **Discharged to group home setting** | 7 | 8.2% |
| **Discharged to relative foster home** | 7 | 8.2% |
| **Discharge to Pre-Adoptive Foster Care** | 3 | 3.5% |
| **Discharged to Special Study Foster Care** | 3 | 3.5% |
| **AWOL** | 2 | 2.4% |
| **Total** | 85 | 100.0% |

Children were not always discharged to the identified level of care noted on October 1, 2007.  Of the eleven children (12.9%) leaving the temporary placements that did not discharge to the level of care identified, two were AWOL, four were placed in relative foster care, two were placed in DCF foster care, and three were reunified home (two required by court order).  These eleven children were awaiting Group Homes and Therapeutic Foster Care placement.

From the review of the sample data it is evident that the best rate of discharge resulted from the Safe Homes, where 33 or 63.7% of the original Safe Home population was discharge by December 31, 2007.   Children in the STAR placements were the next most likely to discharge with 62.1% of that population discharged.  PDC placements were discharged at a rate of 46.2% and lastly the sub-acute placements were least likely to have successfully discharge with a rate of 27.3% of the population discharging at the end of the calendar year.  CARE, and Kids Inn retained all of the children identified for the sample.  Brainard Home, Community Solutions South Windsor Safe Home, Grube Safe Home, Kids In Crisis, Kids in Crisis STAR, Manchester House, Portman House and West Hartford STAR were able to discharge all children in our sample as December 31, 2007.  The following crosstabulation provides opportunity to look at discharge rates by all temporary providers represented in the review sample.

## Crosstabulation 16: Placement Provider Name * On December 31, 2007 where was child placed?

| Placement Provider Name | On December 31, 2007 where was child placed? | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Remained in temporary placement | Discharged to relative foster home | Discharged to residential setting | Discharged to group home setting | Discharged to TFC or Professional Parent home | Discharged to DCF Foster Care | Discharged to Special Study Foster Care | Reunified with parent or guardian | AWOL | Pre-Adoptive Resource | Total |
| **Brainard Home** | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 6 |
| % within row | .0% | 33.3% | .0% | .0% | .0% | .0% | .0% | 66.7% | .0% | .0% | 100.0% |
| % within column | .0% | 28.6% | .0% | .0% | .0% | .0% | .0% | 36.4% | .0% | .0% | 4.2% |
| **Bristol House** | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| % within row | 50.0% | .0% | 50.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 1.7% | .0% | 6.3% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 1.4% |
| **CARE - Children's Center** | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| % within row | 100.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 1.7% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .7% |
| **Chapman House** | 2 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 7 |
| % within row | 28.6% | .0% | 14.3% | .0% | 57.1% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 3.4% | .0% | 6.3% | .0% | 19.0% | .0% | .0% | .0% | .0% | .0% | 4.9% |
| **Community Health Resources Safe Home** | 1 | 1 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 5 |
| % within row | 20.0% | 20.0% | .0% | .0% | 20.0% | 40.0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 1.7% | 14.3% | .0% | .0% | 4.8% | 13.3% | .0% | .0% | .0% | .0% | 3.5% |
| **Community Solutions South Windsor Safe Home** | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 0 | 0 | 5 |
| % within row | .0% | .0% | .0% | .0% | 60.0% | 40.0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | .0% | .0% | .0% | .0% | 14.3% | 13.3% | .0% | .0% | .0% | .0% | 3.5% |
| **Family & Children's Aid PDC** | 6 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| % within row | 75.0% | .0% | 12.5% | 12.5% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 10.2% | .0% | 6.3% | 14.3% | .0% | .0% | .0% | .0% | .0% | .0% | 5.6% |
| **Family & Children's Aid Safe Home** | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| % within row | 66.7% | .0% | 33.3% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 3.4% | .0% | 6.3% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 2.1% |

*Juan F.* **Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008**

| Placement Provider Name | On December 31, 2007 where was child placed? | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Remained in temporary placement | Discharged to relative foster home | Discharged to residential setting | Discharged to group home setting | Discharged to TFC or Professional Parent home | Discharged to DCF Foster Care | Discharged to Special Study Foster Care | Reunified with parent or guardian | AWOL | Pre-Adoptive Resource | Total |
| **Grube Safe Home** | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| % within row | .0% | .0% | .0% | .0% | .0% | 100.0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | .0% | .0% | .0% | .0% | .0% | 6.7% | .0% | .0% | .0% | .0% | .7% |
| **Kids Cottage** | 7 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 9 |
| % within row | 77.8% | .0% | .0% | .0% | 11.1% | 11.1% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 11.9% | .0% | .0% | .0% | 4.8% | 6.7% | .0% | .0% | .0% | .0% | 6.3% |
| **Kids in Crisis** | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| % within row | .0% | .0% | 100.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | .0% | .0% | 6.3% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .7% |
| **Kids in Crisis STAR** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| % within row | .0% | 100.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | .0% | 14.3% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .7% |
| **Kids Inn** | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| % within row | 100.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 11.9% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 4.9% |
| **Klingberg Family Center Safe Home** | 2 | 0 | 0 | 1 | 1 | 2 | 2 | 3 | 0 | 0 | 11 |
| % within row | 18.2% | .0% | .0% | 9.1% | 9.1% | 18.2% | 18.2% | 27.3% | .0% | .0% | 100.0% |
| % within column | 3.4% | .0% | .0% | 14.3% | 4.8% | 13.3% | 66.7% | 27.3% | .0% | .0% | 7.6% |
| **Manchester House** | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| % within row | .0% | .0% | 66.7% | 33.3% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | .0% | .0% | 12.5% | 14.3% | .0% | .0% | .0% | .0% | .0% | .0% | 2.1% |
| **Miller House** | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| % within row | 50.0% | .0% | .0% | 50.0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 1.7% | .0% | .0% | 14.3% | .0% | .0% | .0% | .0% | .0% | .0% | 1.4% |
| **Portman House** | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| % within row | .0% | .0% | 66.7% | .0% | .0% | .0% | .0% | .0% | 33.3% | .0% | 100.0% |
| % within column | .0% | .0% | 12.5% | .0% | .0% | .0% | .0% | .0% | 50.0% | .0% | 2.1% |

*Juan F.* **Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008**

| | On December 31, 2007 where was child placed? | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Placement Provider Name** | **Remained in temporary placement** | **Discharged to relative foster home** | **Discharged to residential setting** | **Discharged to group home setting** | **Discharged to TFC or Professional Parent home** | **Discharged to DCF Foster Care** | **Discharged to Special Study Foster Care** | **Reunified with parent or guardian** | **AWOL** | **Pre-Adoptive Resource** | **Total** |
| **Rainbow House** | 1 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 7 |
| % within row | 14.3% | .0% | .0% | .0% | 42.9% | 42.9% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 1.7% | .0% | .0% | .0% | 14.3% | 20.0% | .0% | .0% | .0% | .0% | 4.9% |
| **Rita Shelter** | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 4 |
| % within row | 50.0% | .0% | .0% | .0% | 25.0% | .0% | .0% | 25.0% | .0% | .0% | 100.0% |
| % within column | 3.4% | .0% | .0% | .0% | 4.8% | .0% | .0% | 9.1% | .0% | .0% | 2.8% |
| **Safe Harbors** | 1 | 0 | 2 | 1 | 0 | 1 | 1 | 0 | 0 | 2 | 8 |
| % within row | 12.5% | .0% | 25.0% | 12.5% | .0% | 12.5% | 12.5% | .0% | .0% | 25.0% | 100.0% |
| % within column | 1.7% | .0% | 12.5% | 14.3% | .0% | 6.7% | 33.3% | .0% | .0% | 66.7% | 5.6% |
| **Safe Haven** | 2 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 5 |
| % within row | 40.0% | 20.0% | .0% | .0% | .0% | 40.0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 3.4% | 14.3% | .0% | .0% | .0% | 13.3% | .0% | .0% | .0% | .0% | 3.5% |
| **Sankofa House** | 2 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 6 |
| % within row | 33.3% | .0% | .0% | 33.3% | 16.7% | .0% | .0% | .0% | .0% | 16.7% | 100.0% |
| % within column | 3.4% | .0% | .0% | 28.6% | 4.8% | .0% | .0% | .0% | .0% | 33.3% | 4.2% |
| **Thomas Bent Shelter** | 6 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| % within row | 85.7% | .0% | .0% | .0% | 14.3% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 10.2% | .0% | .0% | .0% | 4.8% | .0% | .0% | .0% | .0% | .0% | 4.9% |
| **Village for Families and Children Safe Home** | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| % within row | 66.7% | .0% | .0% | .0% | 33.3% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 3.4% | .0% | .0% | .0% | 4.8% | .0% | .0% | .0% | .0% | .0% | 2.1% |
| **Waterford Country School Safe Home** | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| % within row | 80.0% | .0% | .0% | .0% | 20.0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 6.8% | .0% | .0% | .0% | 4.8% | .0% | .0% | .0% | .0% | .0% | 3.5% |
| **West Hartford STAR** | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 2 |
| % within row | .0% | .0% | .0% | .0% | .0% | 50.0% | .0% | .0% | 50.0% | .0% | 100.0% |
| % within column | .0% | .0% | .0% | .0% | .0% | 6.7% | .0% | .0% | 50.0% | .0% | 1.4% |

*Juan F.* **Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008**

| Placement Provider Name | On December 31, 2007 where was child placed? | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Remained in temporary placement | Discharged to relative foster home | Discharged to residential setting | Discharged to group home setting | Discharged to TFC or Professional Parent home | Discharged to DCF Foster Care | Discharged to Special Study Foster Care | Reunified with parent or guardian | AWOL | Pre-Adoptive Resource | Total |
| **Wheeler Clinic Safe Home** | 3 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 6 |
| % within row | 50.0% | .0% | 16.7% | .0% | 16.7% | .0% | .0% | 16.7% | .0% | .0% | 100.0% |
| % within column | 5.1% | .0% | 6.3% | .0% | 4.8% | .0% | .0% | 9.1% | .0% | .0% | 4.2% |
| **Wheeler Clinic STAR** | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 4 |
| % within row | 25.0% | .0% | .0% | .0% | 25.0% | .0% | .0% | 50.0% | .0% | .0% | 100.0% |
| % within column | 1.7% | .0% | .0% | .0% | 4.8% | .0% | .0% | 18.2% | .0% | .0% | 2.8% |
| **Windham Safe Home** | 5 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 8 |
| % within row | 62.5% | 25.0% | .0% | .0% | 12.5% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | 8.5% | 28.6% | .0% | .0% | 4.8% | .0% | .0% | .0% | .0% | .0% | 5.6% |
| **Winifred House** | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| % within row | .0% | .0% | 100.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| % within column | .0% | .0% | 25.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 2.8% |
| **Total** | 59 | 7 | 16 | 7 | 21 | 15 | 3 | 11 | 2 | 3 | 144 |
| % within row | 41.0% | 4.9% | 11.1% | 4.9% | 14.6% | 10.4% | 2.1% | 7.6% | 1.4% | 2.1% | 100.0% |
| % within column | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

In all, 41% of the population (59 children) within the sample remained in a temporary placement on December 31, 2007. Of these 59 children, reviewers had indicated that 45 had no plan with an established timeframe for discharge on October 1, 2007. Seven of the 59 children awaiting discharge had an official plan for discharge with a date 61 or more days post October 1, 2007. Six should have been in their discharge placement setting per a plan that indicated discharge within 46 to 60 days of October 1, 2007, and one far exceeded the identified discharge plan timeframe established on October 1, 2007 which indicated a discharge imminent within 31 to 45 days.

For an alternate perspective, we reviewed discharges on December 31, 2007 in light of area office assignment. The New Haven Metro and Greater New Haven offices appear to be having the greatest struggle with timely discharge planning. See the table below for full details.

45

## Crosstabulation 17: Area Office * On December 31, 2007 where was child placed?

| Area Office | Remained in temporary placement | Discharged to relative foster home | Discharged to residential setting | Discharged to group home setting | Discharged to TFC or Professional Parent home | Discharged to DCF Foster Care | Discharged to Special Study Foster Care | Reunified with parent or guardian | AWOL | Pre-Adoptive Resource | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bridgeport** | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| **% within Area Office** | 40.0% | 20.0% | 40.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| **% Column** | 3.4% | 14.3% | 12.5% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 3.5% |
| **Danbury** | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| **% within Area Office** | 50.0% | .0% | 50.0% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| **%within Column** | 1.7% | .0% | 6.3% | .0% | .0% | .0% | .0% | .0% | .0% | .0% | 1.4% |
| **Greater New Haven** | 5 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 7 |
| **% within** | 71.4% | .0% | .0% | .0% | 14.3% | 14.3% | .0% | .0% | .0% | .0% | 100.0% |
| **% within Column** | 8.5% | .0% | .0% | .0% | 4.8% | 6.7% | .0% | .0% | .0% | .0% | 4.9% |
| **Hartford** | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 9 | 2 | 0 | 16 |
| **% within Area Office** | .0% | .0% | 12.5% | .0% | 6.3% | 12.5% | .0% | 56.3% | 12.5% | .0% | 100.0% |
| **%within Column** | .0% | .0% | 12.5% | .0% | 4.8% | 13.3% | .0% | 81.8% | 100.0% | .0% | 11.1% |
| **Manchester** | 3 | 3 | 2 | 1 | 5 | 4 | 0 | 0 | 0 | 0 | 18 |
| **% within Area Office** | 16.7% | 16.7% | 11.1% | 5.6% | 27.8% | 22.2% | .0% | .0% | .0% | .0% | 100.0% |
| **% within Column** | 5.1% | 42.9% | 12.5% | 14.3% | 23.8% | 26.7% | .0% | .0% | .0% | .0% | 12.5% |

*Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008

| Area Office | Remained in temporary placement | Discharged to relative foster home | Discharged to residential setting | Discharged to group home setting | Discharged to TFC or Professional Parent home | Discharged to DCF Foster Care | Discharged to Special Study Foster Care | Reunified with parent or guardian | AWOL | Pre-Adoptive Resource | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Meriden** | 4 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 10 |
| **% within Area Office** | 40.0% | .0% | 20.0% | 20.0% | .0% | .0% | .0% | .0% | .0% | 20.0% | 100.0% |
| **% within Column** | 6.8% | .0% | 12.5% | 28.6% | .0% | .0% | .0% | .0% | .0% | 66.7% | 6.9% |
| **Middletown** | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 4 |
| **% within Area Office** | .0% | .0% | .0% | 75.0% | .0% | .0% | 25.0% | .0% | .0% | .0% | 100.0% |
| **% within Column** | .0% | .0% | .0% | 42.9% | .0% | .0% | 33.3% | .0% | .0% | .0% | 2.8% |
| **New Britain** | 6 | 0 | 4 | 0 | 3 | 0 | 2 | 1 | 0 | 0 | 16 |
| **% within Area Office** | 37.5% | .0% | 25.0% | .0% | 18.8% | .0% | 12.5% | 6.3% | .0% | .0% | 100.0% |
| **% within Column** | 10.2% | .0% | 25.0% | .0% | 14.3% | .0% | 66.7% | 9.1% | .0% | .0% | 11.1% |
| **New Haven Metro** | 15 | 0 | 1 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 20 |
| **% within Area Office** | 75.0% | .0% | 5.0% | .0% | .0% | 15.0% | .0% | 5.0% | .0% | .0% | 100.0% |
| **% within Column** | 25.4% | .0% | 6.3% | .0% | .0% | 20.0% | .0% | 9.1% | .0% | .0% | 13.9% |
| **Norwich** | 11 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 15 |
| **% within Area Office** | 73.3% | 13.3% | .0% | .0% | 6.7% | 6.7% | .0% | .0% | .0% | .0% | 100.0% |
| **% within Column** | 18.6% | 28.6% | .0% | .0% | 4.8% | 6.7% | .0% | .0% | .0% | .0% | 10.4% |
| **Torrington** | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| **% within Area Office** | 50.0% | 25.0% | .0% | .0% | 25.0% | .0% | .0% | .0% | .0% | .0% | 100.0% |
| **% within Column** | 3.4% | 14.3% | .0% | .0% | 4.8% | .0% | .0% | .0% | .0% | .0% | 2.8% |

*Juan F.* Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008

| Area Office | Remained in temporary placement | Discharged to relative foster home | Discharged to residential setting | Discharged to group home setting | Discharged to TFC or Professional Parent home | Discharged to DCF Foster Care | Discharged to Special Study Foster Care | Reunified with parent or guardian | AWOL | Pre-Adoptive Resource | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Waterbury** | 5 | 0 | 2 | 1 | 6 | 3 | 0 | 0 | 0 | 0 | 17 |
| **% within Area Office** | 29.4% | .0% | 11.8% | 5.9% | 35.3% | 17.6% | .0% | .0% | .0% | .0% | 100.0% |
| **% within Column** | 8.5% | .0% | 12.5% | 14.3% | 28.6% | 20.0% | .0% | .0% | .0% | .0% | 11.8% |
| **Willimantic** | 5 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 1 | 10 |
| **% within Area Office** | 50.0% | .0% | .0% | .0% | 30.0% | 10.0% | .0% | .0% | .0% | 10.0% | 100.0% |
| **% within Column** | 8.5% | .0% | .0% | .0% | 14.3% | 6.7% | .0% | .0% | .0% | 33.3% | 6.9% |
| **Statewide** | 59 | 7 | 16 | 7 | 21 | 15 | 3 | 11 | 2 | 3 | 144 |
| **% within Area Office** | 41.0% | 4.9% | 11.1% | 4.9% | 14.6% | 10.4% | 2.1% | 7.6% | 1.4% | 2.1% | 100.0% |
| **% within Column** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Of the 59 children remaining in temporary placement on December 31, 2007, the data indicates that the majority were awaiting therapeutic or professional parent level of care (40.7%).

**Table 7:  What was the discharge location identified?**

| Placement Level for Discharge | Frequency | Percent |
|-------------------------------|-----------|---------|
| **Home** | 2 | 3.4 |
| **DCF FC** | 8 | 13.6 |
| **TFC/Professional Parent** | 24 | 40.7 |
| **Residential facility** | 3 | 5.1 |
| **Group Home** | 9 | 15.3 |
| **Other** | 5 | 8.5 |
| **No discharge location identified** | 8 | 13.6 |
| **Total** | 59 | 100.0 |

Of the 59 children remaining, individualized recruitment efforts were identified in locating discharge resources for 57.6% of the population.  This included FASU efforts, PPSP and ARE registration.

**Table 8:  Is there documentation of specific individualized recruitment efforts on behalf of this child?**

| Individualized Recruitment Efforts | Frequency | Percent |
|-------------------------------------|-----------|---------|
| **Yes** | 34 | 57.6 |
| **No** | 25 | 42.4 |
| **Total** | 59 | 100.0 |

A view of this same population is provided below in a crosstabulation identifying both the type of temporary placement and the area office assignment.

49

**Crosstabulation 18: What is the discharge location identified? * What type of temporary placement is this provider? * Area Office**

| What is the Identified Discharge Location? | | What type of temporary placement is this provider? | | | | |
|---|---|---|---|---|---|---|
| | | SAFE Home | PDC | STAR | Sub-Acute | Total |
| **Bridgeport** | **TFC/Professional Parent** | 1 | | | 1 | 2 |
| | **Total** | 1 | | | 1 | 2 |
| **Danbury** | **Residential facility** | | 1 | | | 1 |
| | **Total** | | 1 | | | 1 |
| **Greater New Haven** | **TFC/Professional Parent** | 1 | | | 3 | 4 |
| | **Group Home** | 0 | | | 1 | 1 |
| | **Total** | 1 | | | 4 | 5 |
| **Manchester** | **TFC/Professional Parent** | 0 | 1 | 1 | | 2 |
| | **Other** | 1 | 0 | 0 | | 1 |
| | **Total** | 1 | 1 | 1 | | 3 |
| **Meriden** | **TFC/Professional Parent** | 1 | 1 | 0 | | 2 |
| | **Group Home** | 1 | 0 | 0 | | 1 |
| | **No discharge location identified** | 0 | 0 | 1 | | 1 |
| | **Total** | 2 | 1 | 1 | | 4 |
| **New Britain** | **DCF FC** | 0 | | | 1 | 1 |
| | **TFC/Professional Parent** | 4 | | | 0 | 4 |
| | **Other** | 1 | | | 0 | 1 |
| | **Total** | 5 | | | 1 | 6 |
| **New Haven Metro** | **Home** | 0 | 0 | 1 | 0 | 1 |
| | **DCF FC** | 6 | 0 | 1 | 0 | 7 |
| | **TFC/Professional Parent** | 2 | 1 | 0 | 1 | 4 |
| | **Residential facility** | 1 | 0 | 0 | 0 | 1 |
| | **Group Home** | 0 | 0 | 1 | 0 | 1 |
| | **No discharge location identified** | 0 | 1 | 0 | 0 | 1 |
| | **Total** | 9 | 2 | 3 | 1 | 15 |
| **Norwich** | **TFC/Professional Parent** | 1 | | 0 | | 1 |
| | **Residential facility** | 1 | | 0 | | 1 |
| | **Group Home** | 0 | | 3 | | 3 |
| | **Other** | 1 | | 1 | | 2 |
| | **No discharge location identified** | 3 | | 1 | | 4 |
| | **Total** | 6 | | 5 | | 11 |
| **Torrington** | **Group Home** | | 2 | | | 2 |
| | **Total** | | 2 | | | 2 |
| **Waterbury** | **Home** | 1 | | | 0 | 1 |
| | **TFC/Professional Parent** | 2 | | | 0 | 2 |
| | **Other** | 1 | | | 0 | 1 |
| | **No discharge location identified** | 0 | | | 1 | 1 |
| | **Total** | 4 | | | 1 | 5 |
| **Willimantic** | **TFC/Professional Parent** | 3 | | 0 | | 3 |
| | **Group Home** | 0 | | 1 | | 1 |
| | **No discharge location identified** | 1 | | 0 | | 1 |
| | **Total** | 4 | | 1 | | 5 |

## Considerations

A wealth of information about the children in temporary congregate care has been gleaned from both the data collection efforts and discussions with the DCF staff serving the children included in this review. Based upon the data analysis from this review of temporary placement cases, a number of recurring themes are evident. The following considerations are offered in an effort to illuminate those areas requiring improvement and possible starting points from which the Department may implement corrective actions. Many of these considerations have been the subject of recent discussions and some are actively being addressed.

- The principal barrier causing children to initially enter and then overstay in the temporary settings continues to be a lack of sufficient foster care, therapeutic foster care/professional parents, and adoptive resources. This has to be the focus of more innovative recruitment activities and implementation of new models than the current planning appears to encompass. Also needed is a broader range of communal living opportunities for older adolescents not meeting the specific criteria of current levels of group home settings.

- Every child that remains in a temporary congregate care setting for greater than 60 days should be screened to determine whether there is an appropriate formal discharge plan identified for the child. The plan should be developed as the result of input by all key stakeholders in the child's care - including family members and the child where appropriate. The discharge plan should identify the appropriate level of care at discharge, the timeframe for achieving discharge, placement options being explored, current unmet service needs impacting the discharge planning (i.e. assessments, evaluations), visiting resources, transitional steps necessary to achieve timely discharge. It should include any medical, behavioral health and educational issues that need to be addressed to increase the likelihood of successful placement from the temporary setting. Interdisciplinary case conferences, including individuals with decision-making authority, should be conducted on all cases where there is no formal discharge plan in place, or where the identified discharge plan is no longer viable. Case specific service plans should result from these interdisciplinary case conferences.

- The discharge plan should be reflected in the goals and action steps within the child's treatment plan (and family plan as applicable). To ensure clarity for case participants; if the treatment plan was approved prior to placement in the temporary setting, it should require updating and approval upon development of this individualized plan. This will ensure that the treatment plan reflects the goals for the child, and the required action steps of <u>all</u> stakeholders.

- Given the barriers impacting this population of children, the Department should develop a consistent method for providing aggregate and child specific information that details status and progress of children in temporary settings. This would assist in managing this dynamic population at various stages from entry to exit.

- Every child with a diagnosed medical and/or mental health disorder should have current information related to his or her diagnosis in the appropriate section of the medical record. The diagnosis should be the subject of re-evaluation yearly or more frequently as deemed appropriate by the professional providers attending to the child's care.

○ If appropriate assessments or evaluations are outdated at the point of entry into the temporary congregate care setting, every effort should be made to secure immediate evaluation/assessment (completed with recommendations within 30-45 days). These results must be incorporated into the decision-making process related to the formation of the child's discharge planning as soon as possible.

- Consideration must be given to funding the necessary enhancements to the SAFE Home program model as these providers are increasingly providing care to children with diagnosed mental health and behavioral issues requiring on-site therapeutic interventions. As indicated, of the 91 children in the SAFE Home subsample, 53.9% had an Axis I diagnosis. Medication Management was in place for 36.3% of this SAFE Home subsample, and 1:1 services were documented for 11.0% of this population.

- Changes to the current system of accessing the levels of care sought for children awaiting discharge from temporary settings must be considered a priority. The current system has separate procedures and definitional guidelines that are not well-defined, or readily understood by staff, providers, or families. Department staff and providers alike have commented on their level of frustration navigating within and outside the Department. Valuable time is lost in creating and recreating requests to obtain approval for placement. Further, it is apparent that there are many "work-arounds" or indirect methods to securing a placement. Data indicates that both the DCF-469 and CANS documents are often not submitted until after a resource has been secured - defeating the purpose of the process and current policy. These alternative processes are likely contributors to the continued gridlock. Those that submit the paperwork and do not advocate or seek out options via contacts with the provider community or through Central Office seem to have less success in obtaining timely placement.

- The lack of an immediate provision of services by community service providers to support children discharging to the biological, adoptive or guardian home, foster home, or group home placements needs to be addressed in order to avoid further disruptions resulting from poor support planning and implementation. Currently, wait-lists make immediate provision of in-home and community service unlikely in many areas of the state.

- Current levels of Emergency Mobile Psychiatric Services (EMPS) are not sufficient to reduce the number of emergency placement entries into these temporary settings. Given the high rate of children entering from biological or foster family settings, an increase in this service area is a logical step to reduce the entries into temporary placement settings. However, this service must be supported by an array of available in-home and community services to support the child in the community once the EMPS has sufficiently resolved the immediate crisis and has identified the necessary supports to address its causal factors.

- Trauma-based counseling and providers proficient in the evaluation and treatment of sexualized behaviors of both perpetrators and victims are additional areas where wait-lists appear to be barriers to effective planning.

- The treatment plans of all adolescents, ages 14 and older in care, should be targeted at each Administrative Case Review to ensure clear independent living skills goals with identified

service providers to assist in achieving such goals. Self advocacy skills should also be encouraged. The Adolescent Planning Conference should adhere to policy related to participants and purpose. Both shall be documented in LINK. The practice of holding Adolescent Planning Conferences without the attendance of the adolescent must change. The lack of participation by the adolescent reduces the benefit of holding the conference.

- Concerted efforts should be made to explore all appropriate adult connections for the children in overstay status in temporary settings. Such resources should be reconsidered if circumstances have changed over time and the adults are now in a better position to offer themselves as a positive support to the child.

- As SAFE Homes are being used more frequently to provide placement to children with diagnosed behavioral health issues, on-site clinical services must be increased. Fiscal enhancements and changes to the SAFE Home model to incorporate clinical services have been reviewed and discussed jointly by DCF and providers on a number of occasions. The effectiveness of this model is dependent upon adequate clinical staff to support the child through the temporary placement episode. The ability to achieve fidelity to contract obligations will require increased per diem rates and additional clinical staff.

- Longitudinal studies of this cohort of children and additional point in time reviews should be considered given the need to better understand issues related to the outcomes of permanency, safety and well-being for children experiencing temporary placements. A number of issues raised and discussed in the context of this report would benefit from this further exploration.

**Section Two:**
**Adolescents in Temporary Placement - Old Shelter Care Model Facilities**

### Adolescents in Temporary Placement - Old Shelter Care Model Facilities

**Introduction**

As of January 23, 2008 there were two remaining "old model" shelter care programs in the State of Connecticut.  These two programs, the Salvation Army - Hartford, also known as Marshall House; and the Salvation Army Youth Emergency Shelter of Waterbury, operating as SAYES, are being phased out and will cease operations effective March 30, 2008 and April 30, 2008 respectively.   On January 23, 2008, the placement status indicated a total of 14 DCF adolescents in placement at Marshall House and 9 adolescents in placement at SAYES.  Following an initial screening of these 23 identified adolescents, narratives revealed that three adolescents were actually discharged and two were on continued AWOL[7] status for an extended period of time as of January 23, 2008, but the placements had not been closed out in LINK.  These adolescents were eliminated from our sample leaving 18 adolescents to review.   The resulting distribution of the sample of adolescents within this temporary placement provider pool reviewed is 12 adolescents at Marshall House and 6 adolescents at SAYES.

The sample population included ten males and eight females. Ages ranged from 13 years 6 months to 18 years one month with an average age of 16 years three months as of January 2008.  Residents were most frequently identified as Black/African American (44.4%) followed by White (38.9%) and UTD (16.7%).  A total of 5 children were identified as Hispanic (27.8%).

The Waterbury and New Haven Metro assigned cases appear to be experiencing a higher rate of utilization of these two closing facilities.

**Table 1:  Area Office Distribution**

| Area Office | Frequency | Percent |
|---|---|---|
| Waterbury | 6 | 33.3 |
| New Haven Metro | 4 | 22.2 |
| Bridgeport | 2 | 11.1 |
| Greater New Haven | 2 | 11.1 |
| Hartford | 1 | 5.6 |
| Meriden | 1 | 5.6 |
| Middletown | 1 | 5.6 |
| Torrington | 1 | 5.6 |
| Total | 18 | 100.0 |

Adolescents' legal status was most frequently identified as Committed (11 or 61.1%), followed by TPR/Statutory Parent (4 or 22.2%), OTC (2 or 11.1%) Not Committed (1 or 5.6%).  Area Office case management was most frequently identified as Waterbury (6 or 33.3%), New Haven Metro (4 or 22.2%), Bridgeport and Greater New Haven (each responsible for 2 adolescents or 11.1%) and lastly Hartford, Meriden, Middletown, and Torrington (each having one adolescent or 5.6%).

---

[7] Absent Without Leave.

**Decision to place at a Shelter**

Records were reviewed to determine the rationale for the determination for placement in the shelter. Of the 18 adolescents, it appeared that availability alone was the deciding factor for 16 adolescents (88.9%) placed at the temporary congregate setting versus a foster home setting. The remaining two cases indicated a need for round the clock supervision given the mental health status of adolescents. Both required discharged following evaluations at hospitals[8] when no STAR or Permanency Diagnostic Center (PDC) placements were available.

In reviewing placement with the temporary providers by geographic catchment areas of the local office, 27.8% of the placements were within the area served by the assigned DCF Office. This poses additional burden on both the area office and temporary placement provider related to continuity of both education and established community provider service provision, as well as frequency of visitation with family or kin.

**Maintaining Sibling Groups**

There were four adolescents within the sample that were a member of a sibling group having at least one additional sibling in out of home placement. In all four cases, the child was placed in the shelter while their sibling(s) were in alternate placement settings. In three instances, the sibling remained in the foster home from which the identified adolescent disrupted. In the remaining case, the 13.5 year old adolescent's psychosexual evaluation clinically recommended separation from younger children for safety reasons.

**Prior Placement Histories**

Of the 18 children in the sample, the majority were placed from a DCF foster care setting (55.6%). Three were placed upon release from detention (16.7%). Two were placed following 24-48 hour evaluations at community hospitals (11.1%) in the period immediately preceding shelter placement. Home, AWOL and therapeutic foster care settings were each identified as the prior setting for one child.

Placement in the shelter was the only placement for one of the 18 children during the 12 month period. For six children, the shelter was their second placement during this period. Four children were experiencing their third placement upon entering the shelter. Three children were entering their fourth placement during this period, and for the last four children in the sample, this placement was the fifth (or more) placement during the period.

Four of the children spent some time in detention during this period, and two children experienced psychiatric hospitalizations of seven or more days during the twelve-month period preceding placement at the shelter.

---

[8] In one case, a fifteen year old female adolescent was diagnosed as having dysthymic disorder and adjustment disorder. She has had a series of AWOLs and was placed at a STAR program on December 26, 2007. She went AWOL on December 29, 2007 and remained so until January 7, 2008. She was evaluated in the hospital and subsequently required placement on January 8, 2008 as the STAR bed had been released during the AWOL episode and was assigned to another child. Child was discharged to SAYES with a 1:1 staffing in place. This child managed to AWOL from the shelter and remains whereabouts unknown. The second child is a 17.5 year old male adolescent, diagnosed with dysthymic disorder, gender identity disorder, poly-substance abuse, histrionic and borderline traits. Youth has been involved with juvenile justice system while in the care of his parents. He disrupted from a DCF foster home on December 26, 2007 and was hospitalized for two days for evaluation. Child was placed at Marshall House with 1:1 staffing in place.

**Medical and Psychological Assessment**

Of the 18 adolescents within the sample, there were two adolescents that did not have a documented Multidisciplinary Examination (MDE) following their date of entry into care. Of these two, one adolescent had a documented exception code entered in the appropriate field to identify a circumstance that allowed for exclusion of this requirement. The requirement for MDE per Outcome Measure 22 was met in 94.4% of the cases.

In eight instances, an assessment or need identified at the MDE or subsequent evaluation was still not fully addressed or resolved at the point of review and was an impediment to discharge. These included:

- Individual Counseling - 3 Adolescents
- Mentor - 2 Adolescents
- Partial Hospitalization or Intensive Outpatient Program - 2 Adolescents
- Substance Abuse Treatment - 2 Adolescents
- Psychiatric Evaluation - 2 Adolescents
- Psychological Evaluation - 1 Adolescent
- Medication Management - 1 Adolescent
- Specialized Individual Counseling for Gender Identity Issues - 1 Adolescent

Also of concern, is a lack of recent assessment documentation. Four of the adolescents had no documented psychiatric or psychological evaluation documented within the last twelve months, but had a documented Axis I diagnosis that was presumably dictating level of care decisions. These four adolescents also had no documentation regarding medication management.

**Crosstabulation 1:  Does this child have a diagnosed mental health disorder? * Has this child had a psychiatric or psychological evaluation in the last year * Is medication management in place?**

| Is medication management in place? | | | Has this child had a psychiatric or psychological evaluation in the last year | | |
|---|---|---|---|---|---|
| | | | Yes | No | Total |
| Yes | Does this child have a diagnosed mental health disorder? | Yes | 4 | | 4 |
| | Total | | 4 | | 4 |
| No | Does this child have a diagnosed mental health disorder? | Yes | 4 | 4 | 8 |
| | Total | | 4 | 4 | 8 |
| Not Required (per documentation) | Does this child have a diagnosed mental health disorder? | No | 3 | 3 | 6 |
| | Total | | 3 | 3 | 6 |

**DSM Diagnosis**

Axis I designated diagnosis (Clinical Disorders and Other Conditions that may be the focus of Clinical Attention) for the 18 adolescents were identified through review of the medical profile, narrative entries, treatment plan documents, and contact with the SWS or SW.  Of the 18 adolescents, 6 adolescents (33.3%) had no DSM diagnosis on record at the point of review.  The remaining adolescents ranged from one diagnosis to ten identified diagnosis.  The following table provides a frequency of the Axis I Diagnosis identified for the full sample.

**Table 2:  Frequency of Axis I Diagnosis for Adolescents in Shelters (n=18)**

| Diagnosis | Frequency |
|---|---|
| No Identified Diagnosis | 6 |
| Attention Deficit Hyperactivity Disorder (ADHD) | 3 |
| Oppositional Defiant Disorder (ODD) | 3 |
| Dysthymic Disorder | 3 |
| Post Traumatic Stress Disorder (PTSD) | 2 |
| Major Depressive Disorder | 2 |
| Mood Disorder | 2 |
| Conduct Disorder | 2 |
| Psychosis or psychotic features | 2 |
| Learning Disorder | 2 |
| Substance Abuse | 2 |
| Adjustment Disorder | 1 |
| Bipolar Disorder | 1 |
| Reactive Attachment Disorder | 1 |
| R/O Conduct Disorder | 1 |
| Intermittent Explosive Disorder | 1 |
| Impulse Control Disorder | 1 |
| Drug Exposed Infant | 1 |
| Primary Support Problem | 1 |
| Gender Identity Disorder | 1 |
| Schizoaffective Disorder | 1 |
| UTD | 1 |

On February 15, 2008 the Monitor's Office re-reviewed the placement status for these 18 youth. Seven adolescents had been discharged.  Of those with no Axis I diagnosis, three were discharged to the level of care identified in the discharge planning documentation, and one was discharged to Hamden House STAR program.  Of the three adolescents discharged that had an Axis I diagnosis, none were discharged to the level of care identified in the discharge planning documentation.  One was discharged abruptly to the Hastings House STAR program, one was discharged to Wheeler Clinic's Greenhouse program after a brief stay at Natchaug Hospital, and one was discharged to a DCF licensed foster home.  Of the eleven adolescents remaining:

- Three adolescents were AWOL (All with Axis I diagnosis)
- Three remained at SAYES (one adolescent with identified Axis I diagnosis)
- Five remained at Marshall House (four adolescents identified with Axis I diagnosis)

Axis II diagnosis (Personality Disorders/Mental Retardation) was also identified for the adolescents within this sample. Two adolescents were identified with Axis II traits. Both adolescents were diagnosed with Borderline Intellectual Functioning, one identified as having exposure to lead.  One also had Histrionic traits documented.  A third adolescent had a deferred Axis II.  The remaining 15 had no Axis II Diagnosis.  All three of the adolescents with an entry on Axis II remained in care on February 15, 2008.

Case 2:89-cv-00859-AHN    Document 553-2    Filed 03/24/2008    Page 59 of 62

*Juan F.* **Court Monitor's Review of Children in Overstay Status (≥60 Days) within Temporary Congregate Care Placement Settings and Adolescents in Temporary Placement - Old Model Facilities - March 17, 2008**

Of the full sample of adolescents reviewed, one adolescent was indicated as having a diagnosed medical condition requiring *special medically complex treatment*.  This adolescent had a heart condition and substantial hearing loss.

**Discharge Planning Activities**
Reviewers were asked to identify up to six individuals within each case who were active participants in the development of the discharge plan.  This was based on identified participants at discharge planning meetings, narratives, or individuals specifically identified by the SW or SWS when questioned regarding the actions taken toward discharge planning for the child.  Given the imminent closing of these shelters and, therefore, imperative need for placement and often, therapeutic treatment for these adolescents, it was expected that a multidisciplinary approach to discharge planning would be documented.  This was not the case for the majority of adolescents as shown through the rates of participation below:

- All cases had documentation of supervisory oversight by the SWS and/or PS related to discharge planning.
- Clinical opinions and or assessments were sought and rendered for ten adolescents (55.6%).
- Planning included the documentation of input of varying levels of contributions by additional DCF staff as follows:
    - Area Resource Group (ARG) was consulted in 66.7% cases
    - Foster and Adoptive Services Unit was part of the planning in 16.7%
    - Consultation with the Behavioral Health Program Director in 11.1% cases.
- The Shelter staff was identified as active in discharge planning in 16.7% of the cases reviewed.
- Central Office was involved in planning efforts for one adolescent (5.6%).
- Two adolescents (11.1%) had outside providers (a therapist and the CHAPS program coordinator) involved in planning efforts.
- One case identified the parent and the adolescent as active in discharge planning (5.6%).

In 44.4% of the cases discussions were documented with the shelter care provider related to the child.  As with the large review population in the STAR, SAFE Homes, and PDC these discussions focused on the behaviors and activities of the child at the shelter, rather than proactively attending to discharge planning.  Eight of the adolescents had ongoing visitation by some adult(s) other than the DCF Social Worker while at the shelter.  In eight additional situations, there was an identified adult visiting resource, but visits had not occurred by the date of this review.  Two of the adolescents had no visiting resources identified.

The cases of four adolescents (22.2%) documented specific individualized ongoing recruitment efforts after their placement in the Shelter.  Seven cases identified the submittal of the DCF-469 (six of which were considered accurate per a review of the adolescents' records) and seven cases identified completion and submission of a Child and Adolescent Needs and Strengths (CANS) request. Two cases were noted as having both submissions documented for the adolescent.  In five cases, there were neither a CANS nor DCF-469 submitted although it was expected based on the review of the case.  Two cases were identified as not requiring either form of referral.

**Crosstabulation 2:  Is there evidence of a CANS referral * Is there a 469 request actively being attended to for this child?**

| Is there evidence of a CANS referral | Is there a 469 request actively being attended to for this child? | | |
|---|---|---|---|
| | Yes | No | Total |
| Yes | 2 | 5 | 7 |
| No | 4 | 5 | 9 |
| N/A | 1 | 1 | 2 |
| **Total** | 7 | 11 | 18 |

Reviewers were asked to identify the timeframe for discharge in those cases that had a discharge plan identified.  The following crosstabulation provides a look at the timeframes by identified level of placement discharge.

**Crosstabulation 3:  What is the timeframe for discharge? * What is the discharge location identified?**

| What is the timeframe for discharge? | What is the discharge location identified? | | | | | | |
|---|---|---|---|---|---|---|---|
| | DCF FC | TFC/Professional Parent | Residential facility | Group Home | Other | No discharge location identified | Total |
| **<15 days** | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| **16-30 days** | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| **31-45 days** | 0 | 1 | 0 | 1 | 0 | 0 | 2 |
| **61+ days** | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| **None Established** | 1 | 2 | 4 | 1 | 2 | 3 | 13 |
| **Total** | 1 | 3 | 4 | 4 | 3 | 3 | 18 |

Of the 18 adolescents the data indicates that an equal percentage were awaiting residential or group home level of care (4 adolescents each or 22.2% ), while three or 16.7% were awaiting therapeutic or professional parent level of care and an additional three or 16.7% had no identified discharge location yet identified.  Three children had "other" identified as their discharge location.   These include two special study homes being pursued, and a CHAPS placement. One child was identified as needing a DCF Foster Home.

**Barriers to Discharge**

Of the 18 adolescents reviewed, nine were in the shelter greater than 60 days when we selected the sample.  On February 15, 2008 (or the date of discharge where occurring) the length of stays in the temporary setting ranged from 29 days to 238 days.  The average length of stay on February 15 was 101 days.

Reviewers responded to two questions related to the level of discharge planning efforts for the 18 adolescents in this sample.  The first asked, "Is there a discharge plan identified for this child?"  The

second asked, "Is this a formal discharge plan that identifies placement options, service needs, visiting resources/transitional plans with input from DCF and the provider?"  In all, fourteen or 77.8% of the adolescents had some level of discharge plan identified although only four (22.2%) had a formal documented discharge plan being implemented.

Our review identified multiple barriers to discharge.  The need for a family setting was the most often identified barrier for these adolescents - cited in 61.1% of the cases.   This was a multi-response question resulting in more than one barrier noted for many of the adolescents.  See the table below for the full aggregated listing of barriers identified.

**Table 2:  Barriers to Discharge from Shelter**

| Barrier | Number |
|---|---|
| Family Setting for Discharge | 11 |
| Facility Setting for Discharge | 9 |
| In-Home Services | 2 |
| Awaiting Completion of Evaluations | 5 |
| CANS process | 1 |
| Adolescent AWOL | 2 |
| Medication Management | 1 |
| Physical Preparation of CHAPS Apartment | 1 |

**Social Worker Visitation with Child in Placement**

In 83.3% of these cases, the social worker met the monthly visitation standard required by Outcome Measure 16.  In 44.4% of the sample, these visits incorporated a discussion with the child's caretakers at the shelter, in addition to visitation with the child.

**Visiting Resources**

In 16 cases, there was at least one non-DCF visitation resource identified for the child.  In 50.0% of those cases there was a documented visit with the adolescent on at least one occasion since placement at the shelter. One of these eight cases had the visit(s) held on site at the shelter.

**Treatment Planning**

Seventeen of the adolescents had an approved treatment plan less than 7 months old at the point of review.  Six of the plans preceded the date in temporary placement.  Of those approved after the placement at the shelter, many failed to adequately reflect a coordinated discharge plan for the child in the shelter setting, by not incorporating clear goals and action steps to lead to the desired discharge.  Specifically:

- In only 18.2% of the plans (2 of 11) were there specific goals or action steps for the child related to discharge planning from the shelter.
- None of the nine cases with parental or guardian involvement, had specific action steps for the parent(s) or guardian related to discharging the child from the shelter.
- One treatment plan of the 11 cases had specific action steps for DCF related to the adolescent's discharge from the shelter.
- Of the treatment plans developed and approved post placement in the temporary setting, 18.2% or two of 11 cases, had specific action steps for the temporary placement provider related to discharge of the child from the shelter.

**Crosstabulation 4: What is the current permanency goal? * What is the concurrent permanency goal?**

| What is the current permanency goal? | What is the concurrent permanency goal? | | | | | | |
|---|---|---|---|---|---|---|---|
| | Reunification | TOG | LTFC - Relative | APPLA | None | Not Required | Total |
| Reunification | 0 | 3 | 0 | 2 | 1 | 0 | 6 |
| Adoption | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| LTFC - Relative | 1 | 0 | 1 | 0 | 0 | 0 | 2 |
| APPLA | 1 | 0 | 0 | 1 | 5 | 1 | 8 |
| None | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Total | 2 | 3 | 1 | 3 | 8 | 1 | 18 |

In reviewing the permanency plans for this sample population, 94.4% had an approved permanency goal. Six of the adolescents had a stated goal of reunification; five of these adolescents had an identified concurrent plan. Eight adolescents had an APPLA goal. Six of these eight adolescents' treatment plans (75.0%) failed to identify the required concurrent plan, and of the two cases which did identify a concurrent plan, one identified an alternative APPLA option rather than a preferred permanency goal.

One of the adolescents had a primary goal of adoption - there was no concurrent plan for this adolescent. This is a concern given the history of this adolescent and multiple unsuccessful efforts to identify a permanent resource.

**Considerations**

The conclusions and recommendations of the full sample of children in temporary congregate care settings resonate in large part with this group of 18 adolescents as well. Of primary concern is the lack of appropriate placements to allow for timely discharge. This deficit is compounded by the lack of documented formal discharge planning and relevant treatment planning activities. These planning activities are necessary to secure the most appropriate placement for discharge and continued treatment for these adolescents facing imminent closure of the facilities they currently reside in.

Additionally, a concern is raised related to the high number of AWOL adolescents. Two adolescents were screened out prior to review given the extended period of AWOL as of the date of sampling, and an additional three were on extended AWOL status at the time of review for a total of 21.7% of the originally identified children. In fact the AWOL rate is actually higher, as multiple AWOLs lasting less than a day are not captured as a change in placement, but were documented for several additional adolescents within this sample during this period.