# EXHIBIT A



**A Nonprofit Organization Committed to Improving Outcomes by Improving Practice**

# Adopting a Child Welfare Practice Framework

## Introduction

**T**his paper on creating a practice framework is intended for child welfare professionals in leadership positions interested in grounding and reshaping frontline practice in a thoughtful, integrated model of practice. Its content was heavily influenced by the experience of The Child Welfare Policy and Practice Group, a nonprofit technical assistance organization with a lengthy history in directing and assisting in broad child welfare reform efforts. The Child Welfare Group's experience in managing public child welfare systems, in conducting Qualitative Service Reviews in fifteen states and in training caseworkers and coaching practice at the front line has affirmed the value that a coherent practice model can offer. Most significantly, our organizational interest in the issue stems from the experience of a number of senior staff and consultants as managers of the Alabama child welfare system during implementation of the RC class action settlement and The Child Welfare Group's role as consultant, curriculum developer and court monitor in Utah's David C. settlement. In both states, a practice framework or model (in Alabama it was a set of twenty-nine principles and fifteen statements of class member rights) became the foundation of the reform and contributed heavily to improved outcomes and ultimately exit from court oversight. Both practice frameworks are found in the Appendix.

## What is a Practice Framework?

**A** logical place to begin a discussion about the adoption of a framework for practice is, "What is it?" Borrowing from dictionary and professional literature definitions, a practice framework (sometimes called a practice model) may be defined as:

*Practice – the values, principles, relationships, approaches and techniques used at the system and casework practitioner level to enable children and families to achieve the goals of safety, stability, permanency and well-being.*

*Framework – a structure to hold together or support something; an underlying set of ideas: a set of ideas, principles, agreements or rules that provides the basis or outline for something intended to be more fully developed at a later stage.*

Basically, a practice framework first outlines the values and principles that underlie an approach to working with children and families.  For example, commonly chosen principles include concepts as broad as, *Children should be protected from abuse and neglect* and as discrete as, *Children should be placed in the least restrictive, most normalized environment appropriate to their needs.*  They may contain expectations based on a set of values but important enough to be described as rights such as, *Children have a right to be protected from inappropriate physical or chemical restraints, seclusion and timeout.*  The core principles can establish a moral authority guiding expected practice.

A practice framework may also describe specific approaches and techniques considered fundamental to achieving desired outcomes.  They may include "evidence based" approaches, promising practices and/or approaches believed to be effective through practice based experience.  A principle embodying a specific approach might address expectations for the use of family conferencing as a routine practice such as, *Plans and decisions affecting children and families should be made in a meeting of the family team, including the family and its informal supports as well as relevant professionals.*

Some systems have incorporated explicit organizational principles in their practice framework, extending expectations beyond front-line practice to address issues such as agency leadership and management and/or relationships with the community.

## The Primacy of Practice

The "product" available to at-risk children and families served by child welfare systems is essentially practice. Practice is delivered by public and private case managers, their supervisors and by a variety of social service providers.  Caseworkers make up the majority of staff and whether in public agencies or contract agencies have the most contact and influence with children and their families.  To some extent foster parents could be included in this category, as they also contribute significantly to shaping the lives of children in their care.  Yet much of the attention of the field, especially at the policy and management level, is devoted to management processes, policy and regulation, information systems, documentation and procedural accountability.  Beyond the investment in pre-service training and occasional in-service training session, in many systems little further attention is given to strengthening the ability of front-line staff to help families change.

The Child Welfare Group examined its experience in training and coaching caseworkers and analyzing system performance through use of the Qualitative Service Review (QSR) to identify the factors and conditions in child welfare interventions that facilitate improved outcomes. Aggregating QSR findings, across states in particular, reveals a correlation between certain aspects of practice and improving child and family status. These factors, some of which are also supported by results from promising practices, suggest core elements that should be a foundation for any practice model. Described simply, they are:

- Children and families are more likely to enter into a helping relationship when the worker or supporter has developed a trusting relationship with them. The quality of this relationship is essential to engaging the child and family in a process of change.

- Children and families are more likely to pursue a plan or course of action that they have a key role in designing.

- When children and families see that their strengths are recognized, respected and affirmed, they are more likely to rely on them as a foundation for taking the risks of change.

- Children experience trauma when they are separated from their families. When children must be removed to be protected, their trauma is lessened when they can remain in their own neighborhoods and maintain existing connections with families, schools, friends and other informal supports.

- Assessments that focus on underlying needs, as opposed to symptoms, provide the best guide to effective intervention and lasting change.

- Plans that are needs-based, rather than service driven, are more likely to produce safety, stability and permanency.

- The family's informal helping system and natural allies are central to supporting the family's capacity to change. Their involvement in the planning process provides sustaining supports over time.

- Decisions about child and family interventions are more relevant, comprehensive and effective when the family's team makes them. Families should always be core members of the team.

- Coordination of the activities of case contributors is essential and works most effectively and efficiently when it occurs in regular face-to-face meetings of the family team.

- Reunification occurs more rapidly and permanently when visiting between parents and children in custody is frequent and in the most normalized environment possible. Office based visits and supervised visits are the least normalized environment.

- Success in school is a reliable predictor of child well-being. When the direction of planning for safety, stability and permanency is fully integrated with school needs and plans, children are more likely to make progress in all of these areas.

❑ Children in foster care who are transitioning to adulthood are most successful in achieving independence when they have established relationships with caring adults who will support them over time.

❑ The service array should be sufficiently flexible to be adapted to the unique needs of each child and family. Services and supports best meet child and family needs when they are provided in the family's natural setting or for children in custody, the child's current placement. If services are limited to delivery in a particular place, children often have to move to receive them. Services should be flexible enough to be delivered where the child and family reside.

❑ Many of the services and resources that children and families find most accessible and responsive are those established in their own community, provided within their own neighborhoods and culture.

Fidelity to these principles in practice at the front-line can produce important gains for children and their families. The Qualitative Service Review provides an excellent opportunity to see the positive effects of principle-driven best practice. Examples from reviews may best illustrate how the application of such principles can shape improvements in practice, why these improvements matter and how outcomes are changed. The following excerpts from QSR written case stories provide that insight into the importance of engaging families, working in a team environment and strength/needs based assessment and planning, three areas vital to any practice framework.

### *Child and Family Engagement*

*The reviewers see [the youth's] case as a successful Family Preservation case. The worker established a very positive relationship with [the youth] and his family through excellent engagement skills and genuine caring. It was evident that the DCFS worker "went to bat" for this family and an out-of-home placement and State custody were prevented. Mom's commitment to getting help for her son and keeping him at home have also been essential factors in the success of this case.*

*An excellent strength in this case is the good relationship between the caseworker and the family. It is apparent that the worker genuinely cares for this family, and the family respects and feels very comfortable with the worker. The family stays in contact with the worker even though the case is closed, and this will likely continue for some time. [the youth] states that he just "drops in" at the office to say hello to his worker, which is very remarkable. Certainly the worker is to be commended for the high marks and positive feedback received from the family. There is no question that this relationship has had an impact upon the positive outcome of this case. In addition, the worker kept up with the progress of this family and adapted services according to their needs, which is also to be commended. Of special note is the fact that the caseworker applied for and received special grant money in order for [the youth] to continue in treatment with his therapist even though his case is now closed.*

### *Child and Family Teaming*

*The team has worked closely together over the last four years to help stabilize [this youth] emotionally, to help him graduate from high school, to enroll in college, to prepare him to live on his own and to develop... long-term relationships for [the youth] to fall back on when needed. Team participation has been positive as the caseworker has timed his home visits with the visits from [the therapist] so that the majority of the team was meeting at least once each month. The youth, his foster parents, and his therapist all felt as if they had input to the service plan, and that they are a meaningful part of the child and family team. This frequent and coordinated contact contributed to positive scores in the areas of child and family participation, child and family team and coordination, child and family planning process, plan implementation, and effective results.*

*[the youth] does not realize it, but she is now the child and family team leader. She calls the time and place for the meetings and makes most of the participants aware of the time and place. A majority of the meetings are held at the mental health office, since she is heavily involved and invested in their services. [the youth] has a team of individuals and array of services that have made a great difference in her life and that of [her child]. The Department's attorney stated that because of investment of DCFS in family preservation services this family has remained intact. She stated that several years ago this same case would have been an out-of-home episode. [the youth] has a blatant distrust for the legal system in her life, but sees her DCFS caseworker as more of a trusted friend than as an agency representative.*

### *Assessment and Planning*

*This family had nothing but praise for the caseworker, the division and all other parties affiliated with this case. The parents both state that the service plan is something that they feel they wrote. Both stated that the caseworker heard them and their needs and incorporated them into the service plan. They are happy with the team meetings and the accomplishments that take place in those meetings. They know that the meetings are their meetings and not the Division's.*

*The child and family assessment completed by the team has information from a number of sources and incorporates the family's strengths and needs. The Child and Family Service Plan has been developed from the information from the assessment. The reviewers were impressed with the individualization of the plan. For example, for each objective the caseworker not only included the typical information such as "[the youth] needs to be in a safe, stable, and structured environment that will provide him with his basic needs." but it goes on to include "He needs to have a level of structure and supervision to aid in controlling his*

*behavior." This information came directly from the RTC therapist who indicated to us during our interview with him that [the youth] feels the most comfortable when there is a high degree of structure in his daily life. When the team met with the school prior to [the youth] returning they spent time selecting the teacher with the best combination of nurturing and structure for him so that he could succeed. This was a great example of using the information from the Child and Family Assessment, incorporating it into the CF plan and then making it happen in [the youth's] life. The plan also includes a great analysis of the family and [the youth's] strengths, desired results and steps to meet the needs for each objective. The work is detailed and draws from the assessments, both internal and external. Long term view scored very high on this case because there is a well written statement of the long term view for this case. The team members all understand and agree with it. The major transitions for this child and family have been identified and carefully planned for.*

Assuming that these principles are valid as predictors of improved performance and outcomes, the challenge becomes how systems might produce practice that effectively reflects these principles.

### Changing Practice

Teaching caseworkers to practice consistent with principles such as those above requires a major organizational commitment. First, the system has to decide if it wants to use its usually limited training capacity to teach practice instead of policy. Policy content often crowds out real skill development in pre-service training, meaning workers have learned more about the environment in which they work but little about how to succeed in it. Much conventional child welfare training is topical, with modules addressing issues like investigations, substance abuse, permanency plans and transitions to adult living, lacking an integrated approach to practice.

The two systems that have most intensely focused on practice as the core of reform efforts, Utah and Alabama, organized their training functionally, not topically. Pre-service training follows the process of working with families: engagement/building trusting relationships, team formation and facilitation, assessment, planning and intervention. Each module builds on the others and develops fundamental skills in the five functional areas referenced. A major portion of training is devoted to exploring personal values as a foundation for understanding families. A portion of this values exploration facilitates the reframing of harmful or unproductive family behaviors in the context of history, strengths, stresses and positive intentions. This process helps diminish the differences workers may feel between themselves and families and anchor skills in a set of beliefs about why strength-based approaches work.[1]

---

[1] *In service to full disclosure, The Child Welfare Group staff were heavily involved is helping shape the Alabama curriculum and for developing the Utah curriculum.*

The training curriculum should be based on the principles of the practice framework and reflect a learning design that delivers the following:

- Information – Trainers provide content that informs participants about the policy, practice and legal environment in which they work, the basis for interventions, the circumstances and conditions of the families and children served and their role in meeting child and family needs.
- Modeling – Trainers demonstrate the skills workers are expected to acquire.
- Practice – Participants practice the skills supported by trainer coaching and mentoring.
- Feedback – Participants receive feedback on their performance and guidance regarding areas of strength and those needing additional attention.

Both systems used the training to develop all staff, not just staff newly hired and required that supervisors were trained before experienced staff in their units were trained. Retraining existing staff is essential to insuring that new skills and approaches are accepted and adopted by seasoned workers. Developing supervisory mentoring capacity is vital to assuring sustainability.

Training was also followed by coaching by trained practice experts, who could model the new skills and approaches and mentor workers as they developed competency. The coaches also helped develop the skills of supervisors to permit them to lead the coaching effort with the larger workforce. Coaching is a vital and essential element of successful practice change.

## Why is a Practice Framework Necessary?

Many systems operate without a formal explicit practice framework. However, most have created at least a statement of mission, which may include core values and at least a general set of guiding principles, such as being family-focused or strength-based. General statements of values like these are useful in expressing general practice themes and suggesting a desired approach to work with children and their families. However, they aren't specific enough to guide the creation of policy, training or other practice supports and offer little guidance to the practitioner at the front-line about how they are to be operationalized. As a result, there can be substantial discontinuity between stated values and actual practice.

An argument for creating a practice framework may be most convincingly found in examining the advantages gained by working within explicit principle driven underpinnings.

***A Practice Framework Can Provide a Moral Authority for Practice*** An effective practice framework provides staff with a moral imperative for practice that goes beyond compliance with policy and rules. When internalized, such practices are more likely to be sustained over time and more likely to be applied consistently. As mentioned previously, some practice frameworks elevate certain principles to rights. A common example is *Children should be protected from inappropriate use of medication, seclusion, chemical and physical restraints and time out.* Making this principle an explicit practice boundary, operationalized in standards, training and provider oversight enables practitioners to approach practice based on what is best for children and their families, not just because rules require it.

***A Practice Framework Can Force Attention to How Children and Families Should Experience the System*** When practice frameworks are detailed enough to permit comparison of the principles to actual policy and practice, a constructive tension is produced that can lead to important changes in the approach to practice. For example, in the Alabama RC litigation one of the principles of the settlement (which formed an extensive framework guiding the implementation plan) had a major impact on the approach to service delivery. The settlement included the following principle: *Class members and their families shall receive individualized services based on their unique strengths and needs…The type and mix of services provided shall not be dictated by what is available…Services must be adapted to class members and their families.*

This principle, in conjunction with the principle that children and families should be treated as partners in planning, made it evident that the conventional service array of parenting classes and counseling did not respond to the unique strengths and needs of the families served. To respond to this principle, providers had to diversify their service array and flexible dollars had to be made available to workers at the front-line. Both objectives became a major part of the resource development effort and contributed significantly to the successes of the reform.

***A Practice Framework Can Promote Consistency in Approaches Across the Organization*** In all systems, practice approaches are influenced by emerging trends and evidence, reactions to crises, legislative mandates and the experience and priorities of those in leadership positions. These changes often overlie, rather than replace existing practices, resulting in a patchwork of policies and approaches that do not share an underlying vision. For example, a system engaging in a change process to implement more strength-based, family-centered practice might find itself continuing to use a CPS risk assessment instrument that is largely deficit focused, creating two conflicting cultures of practice. When applied in comparison to current practice, use of a practice framework would help expose such incongruities and foster greater consistency in approach.

Perhaps most importantly, a practice framework can enhance consistency of performance among staff at the front-line. Without the support of an integrated, cohesive and

principle driven framework of practice, implemented through clear policy, effective training and accountability, systems are vulnerable to practice overly dependent on individual values and approach. When staff internalize the principles of practice and are enabled to become competent in applying them in their casework, greater uniformity of action occurs.

***A Practice Framework Guides the Content of Policy*** While the impact of a practice model seems obvious, its reach can be surprising. In a system responding to a practice model principle about the rights of children in out-of-home care to have regular contact with their families, implementation of policy to support the principle had a broad impact on foster parents and residential providers. As part of new policy, children in foster care were given the right to communicate by phone or mail with their parents, a change that initially alarmed foster caregivers about disclosing their location to parents (most of whom already knew where their children were).

Once implemented with training supports and even compensation for the cost of long-distance calls offered, experience revealed that policy safeguards protected those caregivers where there were legitimate safety concerns and that the change was not disruptive to daily life. To the surprise of caregivers, children were generally less disruptive when they could have regular, normalized contact with their family.

Other systems have found that their SACWIS case plan templates prevent the translation of strength and needs based individualized plans into the information system format, undermining the potential of well-crafted child and family plans to achieve needed outcomes. As a result, a number of states have revised their planning format to make them more flexible.

***A Practice Framework Informs the Design of Training*** A well-developed practice framework provides a useful tool by which current training can be assessed for conformity with the system's approach and goals and also will identify new knowledge, skills and abilities that should to be included in new or revised training. Examples include principles such as *Plans and decisions about families shall be created within a child and family team,* which would necessitate training in preparing families to shape and participate in a team and in facilitating family meetings. Another example is a principle mentioned earlier related to resource design and development, *Class members and their families shall receive individualized services based on their unique strengths and needs.* For a system operating on a service driven approach to practice, meaning reliance on a common categorical array of supports provided to most families, shifting to a strengths and needs based approach to practice has significant implications for training redesign. Learning to build on functional family strengths, distinguishing services from needs and individualizing the response to family need requires a very different set of skills that must be supported by policy, training and coaching.

***A Practice Model Can Shape the Design of the Quality Assurance Process*** Quality assurance systems often mirror the same inconsistencies and incongruities with a functional practice framework as may be found in training and policy. One of the best examples of the effect of a practice framework on QA is found in Utah. As a result of a class action settlement in the 1990's, the system adopted an extensive case process review approach that included annual case record reviews of a statistically valid sample size that addressed 180 different items in the settlement agreement. Needless to say, the Department was unable to even document, not to mention comply with, so many requirements and actions, all of which were treated as if they had the same priority.

After being ordered to essentially start over with a new enforceable implementation plan, The Child Welfare Group helped the system develop a practice model, redesign it's training and implement a new QA system that reduced the case process review items to 46, initiated annual regional Qualitative Service Reviews (which assessed practice consistent with the core practice principles) and produced regular outcome reports. These changes not only measurably strengthened practice and outcomes but also aided in the exit of the system from court supervision in 2007.

***A Practice Framework Can Reshape Employee Performance Expectations*** As expectations for the treatment of children and their families change, so should the formal expectations for practitioner performance. Utah is a state that translated its practice framework into written staff performance expectations. The following expectations, influenced by the Utah practice framework principles related to child and family engagement, are cited below:

- Effectively uses engagement skills that include active listening. Provides options, guidance, suggestions and effective feedback across the three stages of exploring, focusing and directing.

- Understands the dynamics of the family within the context of their own family rules, traditions, history and culture. Is sensitive to these differences and incorporates them into the "big picture" as decisions are made.

- Understands the role of the caseworker to the family system.

- Effectively works with each family's resistance as they move through the change process.

- Effectively utilizes the assessment process to develop a working functional assessment, which is modified over time and as the family changes.

- The employee will treat staff, children and their families and others with respect, dignity and fairness at all times regardless of position, assignment,

training or circumstance.  Consideration will be given to the cultural context as decisions are made.

***A Practice Model Can Help Shape the Organizational Design*** Organizational designs, like practice, are heavily influenced by past structures, convenience and trends in organizational development.  For example the business model of "flatter", less hierarchical organizational structures may be seen in some government organizations.  Yet rarely do child welfare systems model their organizational structures on the needs of children and their families or in many cases, practitioners at the front-line.  With organizational implications in mind, a thoughtful review of a practice framework can identify opportunities to strengthen the organization through its design.

One system that followed its practice model faithfully turned its attention to the different philosophies of its three primary (separate) policy offices: CPS, foster care and adoption.  These three units were known for their distinct perspective about families.  The CPS office had a strong deficit focus in its work and strong alliances to law enforcement and prosecution partners.  The foster care office was extremely compliance driven, influenced by federal regulatory requirements, lawsuits and liability concerns in ways that at times seemed to have priority over the experience of the children in care.  And the adoption office was considered elitist and solely child-focused.  In practice, they tended to promote conflicting goals, with CPS issuing policy that fostered an over reliance on removal as a safety mechanism, foster care disproportionately addressing maintenance rather than permanency and adoption, undermining reunification and kinship settings as options.

In support of a more strength-based and family-centered model of practice, the organization combined the policy offices into a single unit, which would be driven by all the practice principles and less programmatic in its support of children and families.  Another system created a resource development office to provide support and technical assistance to county offices working to strengthen and diversify their service array.  A third moved the training office, which had been buried under the human resources office, to a status of prominence within the program division to maximize its influence on front line practice.

## Early Versions of Practice Frameworks

While the concept of a principle driven practice framework is new to many in the field, versions of practice frameworks date back to the System of Care movement in mental health and the development of Wraparound approaches.  Examples from these two approaches are included below.

### Children's Mental Health System of Care Practice Model

*Core Values*

1. The system of care should be child-centered and family-focused with the needs of the child and family dictating the types and mix of services provided.
2. The system of care should be community based, with the focus of services as well as management and decision-making responsibility resting at the community level.
3. The system of care should be culturally competent, with agencies, programs and services that are responsive to the cultural, racial and ethnic differences of the populations they serve.

*Guiding Principles*

- Children with emotional disturbances should have access to a comprehensive array of services that address their physical, emotional, social and educational needs.

- Children with emotional disturbances should receive individualized services in accordance with the unique needs and potentials of each child and guided by an individualized service plan.

- Children with emotional disturbances should receive services within the least restrictive, most normative environment that is clinically appropriate.

- The families and surrogate families of children with emotional disturbances should be full participants in all aspects of the planning and delivery of services.

- Children with emotional disturbances should receive services that are integrated, with linkages between child-serving agencies and programs and mechanisms for planning, developing and coordination of services.

- Children with emotional disturbances should be provided with case management or similar mechanisms to ensure that multiple services are delivered in a coordinated and therapeutic manner and that they can move through the system of services in accordance with their changing needs.

- Early identification and intervention for children with emotional disturbances should be promoted by the system of care in order to enhance the likelihood of positive outcomes.

- Children with emotional disturbances should be ensured smooth transitions to the adult service system as they reach maturity.

- The rights of children with emotional disturbances should be protected and effective advocacy efforts for children and adolescents with emotional disturbances should be promoted.

- Children with emotional disturbances should receive services without regard to race, religion, national origin, sex, physical disability or other characteristics and services should be sensitive and responsive to cultural differences and special needs.[2]

**Wraparound Principles**

Wraparound literature provides a description of the Wraparound approach, which includes the following principles.

### *Ten Principles of the Wraparound Process*

1.  **Family Voice and Choice.** Family and youth/child perspectives are intentionally elicited and prioritized during all phases of the wraparound process. Planning is grounded in family members' perspectives and the team strives to provide options and choices such that the plan reflects family values and preferences.

2.  **Team Based.** The wraparound team consists of individuals agreed upon by the family and committed to them through informal, formal and community support and service relationships.

3.  **Natural Supports.** The team actively seeks out and encourages the full participation of team members drawn from family members' networks of interpersonal and community relationships. The wraparound plan reflects activities and interventions that draw on sources of natural support.

4.  **Collaboration.** Team members work cooperatively and share responsibility for developing, implementing, monitoring and evaluating a single wraparound plan. The plan reflects a blending of team members' perspectives, mandates and resources. The plan guides and coordinates each team member's work toward meeting the team's goals.

---

[2] *From Stroul, B. & Friedman, R. (1986). A system of care for children and youth with severe emotional disturbance (rev. ed., p. 17). Washington, DC: Georgetown University Child Development Center, National Technical Assistance Center for Children's Mental Health.*

5.     **Community-based.** The wraparound team implements service and support strategies that take place in the most inclusive, most responsive, most accessible and least restrictive settings possible; and that safely promote child and family integration into home and community life.

6.     **Culturally competent.** The wraparound process demonstrates respect for and builds on the values, preferences, beliefs, culture and identity of the child/youth and family and their community.

7.     **Individualized.** To achieve the goals laid out in the wraparound plan, the team develops and implements a customized set of strategies, supports, and services.

8.     **Strengths Based.** The wraparound process and the wraparound plan identify, build on, and enhance the capabilities, knowledge, skills, and assets of the child and family, their community, and other team members.

9.     **Persistence.** Despite challenges, the team persists in working toward the goals included in the wraparound plan until the team reaches agreement that a formal wraparound process is no longer required.

10.    **Outcome Based.** The team ties the goals and strategies of the wraparound plan to observable or measurable indicators of success, monitors progress in terms of these indicators, and revises the plan accordingly.[3]

Both the System of Care and Wraparound models provide a simple and clear description of an approach to practice that is easily understood by the field and offer guidance about practice that is specific enough to operationalize. The system of care model has a greater system focus and the Wraparound principles are more focused in front-line practice. The principles inherent in these approaches have produced enough success in their application that they are often found at the core of more recent, comprehensive frameworks for practice. They are now generally considered best practice.

## The Essential Elements of a Practice Framework

---

[3] *Walker, J.S., Bruns, E.J., Adams, J., Miles, P., Osher, T.W., Rast, J., VanDenBerg, J.D. & National Wraparound Initiative Advisory Group (2004). Ten principles of the wraparound process. Portland, OR: National Wraparound Initiative, Research and Training Center on Family Support and Children's Mental Health, Portland State University.*

**P**ractice frameworks currently vary in their scope, from those focused mostly on practice principles to those that also include an organizational focus. Based on organizational experience in working from a practice framework and assisting states in designing and implementing their own, the following principles are recommended as core elements for system practice frameworks. They are also the framework adopted by The Child Welfare Policy and Practice Group.

*Core Principles and Approaches*

## What Are Our Goals for Children and Families?

## Goals

1. To protect children from abuse and neglect.

2. To provide children with stability and timely permanency in their lives.

3. To permit children to live with their own families, when possible, through the provision of services that strengthen families.

4. To enable children to achieve success in school and become stable, gainfully employed adults.

*Practice Principles*

The following principles of practice are the standards to which systems should hold themselves and its service providers accountable. They represent the ambitions of best practice and the belief that children served by the system have a right to the same protection and supports that any parents would expect for their children. The principles of practice set a standard that the system is intent on achieving. The practice principles should be the foundation for improvements in practice, system supports, design of the resource array and accountability.

These principles should be the governing influence for shaping policy design, staff training, resource development and service contract design, supervisory role and accountability, quality assurance and outcome evaluation. The process of designing strategies that effectively implement these principles requires the experience and contributions of all the system's partners: families, staff, the court, providers and communities.

## I. General Principles

*Children should live with their families. Exceptions should be made only when it is not possible through the provision of services (including intensive home-based*

*services), to protect a child living with his/her family from harm or to protect a child from harm upon reunification with his/her family.*

*The most natural and effective way of helping children to achieve safety, permanency and well-being is usually by strengthening the capacity and skills of their own families.*

*The system's efforts to assist children to achieve permanency should be conducted with the urgency appropriate to a child's sense of time.*

*The response to children and families shall not discriminate based on race, sex, religion ethnicity, national origin or sexual preference.*

*Children should have freedom from excessive medication, unnecessary seclusion and restraint.*

## II. Principles Relating to Resource Allocation and Service Design

*Neighborhood and community resources and institutions should be treated as key partners in serving children and families, both in planning for individual families and as a partner in system design and operations.*

*Children and their families should have access to a comprehensive array of services, including intensive home-based services, designed to enable children to live with their families or to achieve timely permanency.*

*Services should be flexible and adapted to child and family needs. Children and families should not be expected to adapt to ineffective services.*

*To enable children to live safely with their families, vigorous early intervention services should be offered to families-at-risk before the risk rises to a level necessitating involuntary intervention.*

*The system should be sensitive to cultural differences and the special needs of minority ethnic and racial groups. Services should be provided in a manner that respects these differences and attends to these special needs. These differences and special needs should not be used as an excuse for failing to provide services.*

## III. Principles Related to Assessment, Planning and Intervention

*Services to children and their families should be planned and delivered through an individualized service plan crafted by the child and family team. Children, their parents, the family's informal support network, caregivers and foster parents should be full participants on this team. Involvement should include regular participation in family team meetings as a point for engagement, assessment, planning intervention and assessment of progress.*

*Children, parents and foster parents should be accurately and timely informed, in language understandable to them, of their rights, the goal for the child/family and their*

*individualized service plans.*

*Children and their families should receive individualized services based on their unique strengths and needs. Children and parents should be encouraged and assisted to articulate their own strengths and needs, the goals they are seeking for themselves and what services they think are required to meet these goals.*

*The assessment process should address the underlying conditions creating the challenges experienced by the child and family, not just the symptoms of functioning. The system's assessment should be developed with the suggestions and contributions of the full family team.*

*The mix of services provided should be responsive to the strengths and needs of the child and his/her family. Conceptualizing the needs-based plan should not be constrained by the availability of services. Where needed services are unavailable, appropriate services should be created.*

*The system should ensure that the services identified in individualized service plans are timely, accessible and responsive to children and families and delivered in a coordinated and therapeutic manner that integrates the efforts of the contributors.*

*The system should carefully monitor implementation of the individualized service plan and the progress being made toward the goal and objectives of the plan.*

*The goal and the objectives of the individualized service plan should be updated as needed. Services identified in the plan should be modified as needed to meet the goal and objectives of the plan (for example, by adding new services or providing services in a different way).*

## IV. Principles Relating to the System's Response to Alleged Child Abuse or Neglect

*The system should respond promptly to reports of abuse and neglect.*

*The response to reports of abuse and neglect and requests for assistance should be met with an offer of help.*

*Where children are found to be unsafe, immediate safety (protection) plans should be implemented.*

## V. Principles Relating to Children Who Must be Placed in Foster Care

*When children cannot live safely with their families, the first considerations for placement should be with kinship connections capable of offering and demonstrating the resource of a safe, stable and appropriate home.*

*Siblings should be placed together. The system should develop a policy identifying circumstances in which exceptions to this principle may be permitted.*

*Children should be placed in their own communities, where they can maintain relationships with family and friends and continue to attend the same school they were in prior to placement.*

*Placements should be made in the least restrictive, most normalized setting responsive to the child's needs.*

*The system should avoid temporary, interim placements. Children should be placed in settings that could reasonably be expected to deliver long-term care if necessary. To this end, the use of congregate shelter placements should be avoided in favor of family based settings. The system should not place children younger than six in congregate settings unless it is necessary to maintain connections with siblings placed in the same setting. When shelter is used, the placement should be short-term.*

*Children should receive prompt and appropriate attention to their health care needs.*

*The system should vigorously seek to assure that children, when in foster care or custody, are integrated to the maximum extent feasible into normalized school settings and activities and achieve success in school.*

*The matter of visiting, both between children in care and their parents and among siblings, should be addressed in the child's individualized service plan. The frequency and circumstances of visiting should depend on age and need. Visiting should be viewed as an essential ingredient of family reunification services. Hence, when the goal is for the child to return home or live with a family member, visiting should be actively encouraged. Visiting plans that require agency oversight or participation should take into account the work, education and obligations on the part of the parents. After hours and weekend visits should be options to permit parents to meet necessary obligations. Visiting may be arranged by the child, the child's parents or family, or the foster parents, as well as by staff and the staff of residential facilities, in accordance with the individualized service plan.*

*Supervision of visiting should be required only when there is a danger that the parent or family member with whom the child is visiting will harm the child unless the visit is supervised.*

*The system should forbid summary discharges of children from placement. The system should develop a policy that describes steps that should be taken prior to a child's discharge from a placement. The system should be based on the philosophy that the disruption of a placement is a failure of the system, not a failure of the child.*

## VI. Principles Related to Transitions from Care to Reunification or Independence

*Families whose children are reunified should receive ongoing supports that will enable them to safely sustain their children in their homes.*

*Youth in custody who are expected to remain in care until adulthood should receive a full array of preparatory supports for independent living, addressing educational, emotional, relationship and vocational development.*

*The system should promote smooth transitions for children to adult service. Planning for youth in custody who will reach adulthood without permanence should connect them with caring adults, both relatives and other resources, whom they can turn to for help after system supports are no longer available.*

### VII. Principles Related to Effective Collaboration with Other Service Systems

*Communication and interaction with the court should reflect timeliness, preparation, knowledge, respect and accuracy.*

*The system should take an active role in seeking to ensure that local education agencies (i) recognize children's educational rights and (ii) provide children with educational services in accord with those rights.* [4]

## Communicating the Practice Framework to the Field

One colleague remarked that for use in the field, a practice framework should be brief enough that you could print it on a napkin. While meant in jest, the advice does capture the need to have a concise practice framework message that has concrete meaning to practitioners. Such shorthand has been used effectively by several systems to express the central approaches within the chosen framework. One used by The Child Welfare Group and Tennessee's DCS is the "Practice Wheel". Within this framework, practice is conceptualized as a process continuously involving engagement, teaming, assessment, planning, intervention and tracking. Core training is organized within these themes and the Qualitative Service Review is used to measure conformity and fidelity to them.

---

[4] *Practice Framework Principles document developed by Paul Vincent, The Child Welfare Policy and Practice Group and Steven D. Cohen, The Annie E. Casey Foundation.*

Visually, the Practice Wheel appears as:



In Indiana, another state where The Child Welfare Group has provided technical assistance, the simple visual of a pyramid called the TEAPI serves the same purpose. It includes the same elements, listing teaming, engaging, assessment, planning and intervening. Like Tennessee, their training is organized along the same themes and their QSR process attends to these core elements. The TEAPI symbol is conceptualized as follows:



In both systems, staff increasingly know what these symbols mean, recognize and understand their priority and are trained to employ them accordingly.

## The Role of Leadership in Using a Practice Framework

Like any change strategy, the effectiveness of a practice framework is dependent on the priority given it by system leadership.  For a practice framework to realize its potential to change practice, it should be seen as an overarching mandate at the state and local management level as well by front-line staff.  Leaders that have successfully employed their practice framework to drive reform demonstrate its influence in their own management decisions, monitor its use and hold staff accountable for its application.  In addition, they regularly assess its impact on outcomes for children and their families.

The payoff, where systems have fully committed to converting to practice consistent with their framework, has been greater unity of effort, more thoughtful and effective decisions about change strategies and most important, improving outcomes for children and families.

*This paper benefitted from the thoughtful input of Child Welfare Group staff and consultants as well as Steve Cohen and Jessie Waldrous of the Annie E. Casey Foundation.*

# APPENDIX

## ALABAMA R. C. CONSENT DECREE GOALS AND PRINCIPLES

The consent decree spells out as the goals of the new system of care, to:

1.  Protect class members from abuse and neglect; and

2.  Enable class members to:

    - live with their families; and when that cannot be achieved through the provision of services, to live near their home;

    - achieve stability and permanency in their living situation;

    - achieve success in school; and become stable, gainfully employed adults.

To achieve these goals, the new system of care is expected to operate according to the following principles:

**1.   Class members shall live with their families.**  Exceptions are to be made only when:

    - it is not possible, through the provision of services (including intensive home-based services), to protect a class member living with his/her family from imminent, serious harm; or

    - it is not possible, though the provision of services, including intensive home-based services, to protect a class member from serious harm upon reunification with his/her family.

**2.   Class members and their families shall have access to a comprehensive array of services, including intensive home-based services, designed to enable class members to live with their families.**

These services should be designed to enhance the natural support networks of class members and their families. Other services to which class members and their families shall have access, if required to enable class members to live with their families, are: parenting skills and household management training; peer support; homemaker services; day care; respite care; help with housing; crisis services; mental health services; services for substance abuse; and "facilitative" services.  Class members and their families shall have access to such services when the class member is living with his/her family or when the goal is for the class member to return home or live with a

relative. When the goal is for the class member to return home, services should also be provided to the parents to prepare and enable them to care for the class member when he/she returns home. When the goal is for the class member to live with a family member, services should be also provided to the family member to prepare and enable the family member to care for the class member.

3. **Class members, while in foster care or DHR custody, shall have access to a comprehensive array of services that address their physical, emotional, social and educational needs.**

4. **Both class members and family members may refuse placement-prevention services.**

   Class members and family members may refuse other services, to the extent permitted under law.

5. **Class members and their families shall be encouraged and supported to access services.**

   To this end, the "system of care" shall develop and implement strategies to promote the utilization of services by class members and their families. These strategies shall include the use of community aides, the provision of transportation services, the development of ethnically and culturally sensitive services and referral to peer support groups. When class members or their families refuse or fail to access services the reasons for their doing so shall be assessed and the services that have been offered shall be modified or alternative services shall be offered to encourage acceptance of services.

6. **Class members and their families shall receive individualized services based on their unique strengths and needs.**

   The strengths and needs of the class member and his/her family shall dictate the type and mix of services provided; the type and mix of services provided shall not be dictated by what services are available. Services must be adapted to class members and their families; class members and their families must not be required to adapt to inflexible, pre-existing services that are unlikely to be effective.

7. **Services to class members and their families shall be delivered pursuant to an individualized service plan.**

   There must be a reasonable prospect that the services provided will achieve their purpose. The services must be of a type and mix likely to achieve the goal for the child. The services must also be of a type and mix likely to be effective in meeting the needs to which the plan is designed to respond.

   a. Individualized service plans shall be based on a comprehensive, individualized assessment of the strengths and needs of the class member and his/her family. In the

case of class members in foster care or DHR custody, this assessment shall include an examination of the class member's (i) developmental, behavioral, emotional, family, and educational history and (ii) strengths and weaknesses in behavioral, emotional, educational and medical/physical areas.

b. Individualized service plans shall include specific services to reinforce the strengths and meet the needs of the class member and his/her family. Each plan shall identify the specific steps to be taken by DHR staff, other service providers, class members and the class members' parents and family toward meeting the short-term and long-term objectives of the plan.

c. The "system of care" shall carefully monitor implementation of the individualized service plan and the progress being made toward the goal and objectives of the plan.

d. The goal and the objectives of the individualized service plan will be updated as needed. Services identified in the plan will be modified as needed to meet the goal and objectives of the plan (for example, by adding new services or providing services in a different way). Steps shall be taken to prevent and address deterioration in the functioning of class members.

**8. The "system of care" shall address the needs of class members believed to be victims of sexual abuse.**

a. Timely, professional assessments shall be conducted of class members believed to be victims of sexual abuse. DHR shall ensure that such assessments provide clear, prescriptive guidelines for treatment of the sexual abuse.

b. The individualized service plans of class members believed to be victims of sexual abuse shall specifically identify both the class member's needs as a sex abuse victim and services to be provided in response to those needs.

**9. Class members, parents and foster parents shall be accurately and timely informed, in language understandable to them, concerning: rights under the decree (including the right to be treated in accordance with the "principles" or "standards"); the goal for the class member; individualized service plans, including objectives; services, including placements; and options.**

**10. Class members, parents, and foster parents shall be encouraged and assisted to articulate their own strengths and needs, the goals they are seeking for themselves and what services they think are required to meet these goals.**

**11. Class members, their parents and foster parents shall be involved in the planning and delivery of services.**

This includes the ISP. The right of class members, parents and foster parents to participate in treatment planning and delivery may be restricted only according to a specified administrative process. DHR shall promulgate a policy, acceptable to both parties, describing under what circumstances and according to what procedures

restrictions may be imposed.

a.  The class member shall be treated as a partner in the planning and delivery of services if the class member is age 10 or older and, if the class member is under the age of 10, when possible.

b.  The class member's parents shall be treated as partners in the planning and delivery of services if the class member is living at home or if the goal is for the class member to return home.

c.  Foster parents shall be treated as partners in the planning and delivery of services whether or not the goal for the class member is to return home.

d.  When necessary, services shall be provided class members and parents to enable them to participate as partners. Such services shall include transportation assistance, advance discussions and assistance with understanding written materials.

**12. The "system of care" shall promote class members' visitation with their parents and family.**

a.  The matter of visitation shall be addressed in the class member's individualized service plan. The frequency and circumstances of visitation shall depend on age and need. Visitation shall be viewed as an essential ingredient of family reunification services. Hence, when the goal is for the child to return home or live with a family member, visitation will be actively encouraged; assistance with transportation will also be provided.

b.  Visitation may be arranged by the class member, the class member's parents or family or the foster parents, as well as by DHR staff and the staff of residential facilities, in accordance with the individualized service plan.

c.  Supervision of visitation shall be required only when there is a danger that the parent or family member with whom the class member is visiting will harm the class member unless the visit is supervised. 'When supervision of visitation is required, such supervision may be provided, as appropriate, by the class member's foster parents, as well as by DHR staff, the staff of residential facilities or other designated persons.

**13. The "system of care" shall be sensitive to cultural differences and the special needs of minority ethnic and racial groups.**

Services shall be provided in a manner that respects these differences and attends to these special needs. These differences and special needs shall not be used as an excuse for failing to provide services.

**14. The "system of care" shall conduct timely investigations of allegations that class members are being abused or neglected while living at home or with a relative or while in foster care or DHR custody.**

**15. The "system of care" shall embrace the philosophy of service delivery in home-based and community-based settings.**

Class members shall receive services in the least restrictive, most normalized environment that is appropriate to their strengths and needs.

a.   Class members shall be placed in the least restrictive, most normalized living conditions appropriate to their strengths and needs. The class member's own home shall be considered the least restrictive, most normal placement. Following are other placements listed in ascending order in terms of restrictiveness: independent living; a foster home; a therapeutic foster home; a group foster home; a group home; a child care institution; an institution. Institutional care shall be used only in an emergency and as a last resort. Class members shall be placed in family settings, whenever they can be cared for in such a setting with supportive services.

b.   Siblings shall be placed together. DHR may promulgate a policy, acceptable to both parties, identifying circumstances in which exceptions to this principle may be permitted.

c.   The "system of care" shall not initiate or consent to the placement of a class member in an institution or other facility operated by DMH/MR or by DYS unless the placement is the least restrictive, most normalized placement appropriate to the strengths and needs of the class member.

d.   Class members, when in foster care or DHR custody, shall be integrated to the maximum extent feasible into normalized leisure and work activities.

e.   DHR shall vigorously seek to assure that class members, when in foster care or DHR custody, are integrated to the maximum extent feasible into normalized school settings and activities.

**16. Class members from Jefferson, Mobile, Montgomery, Madison, Houston, Tuscaloosa, Etowah, Calhoun, Walker, Lee and Dallas counties shall be placed within their home county when removed from their homes.**

Class members from other counties shall be placed within the region in which their home county is located. Exceptions to this principle are to be permitted only in exceptional circumstances with the written permission of the Director of the Division of Family and Children's Services or his/her designee. DHR shall promulgate a policy, acceptable to both parties, that describes when such exceptional circumstances are present.

**17. The "system of care" shall promote permanency in class members' living situations.**

a.   When the goal is that the class member shall return home or be discharged to a family member, the "system of care" shall vigorously seek to achieve this goal.

b.   When the goal of return home or discharge to family has been achieved, the "system of care" shall vigorously seek to avoid reentry of the class member into foster care.

c.   The "system of care" shall make timely, competent decisions concerning whether and when class members should return home.

d.   When a decision is made that a class member should not return home, DHR shall seek a timely dispositional hearing.

e.   When the goal is that the class member not return home, the "system of care" shall vigorously seek a permanent living situation for the class member.

**18. The "system of care" shall promote stability in class members' living situations.**

a.   The "system of care" shall be designed to minimize multiple placements. The "system of care" shall be based on the philosophy that the disruption of a placement is a failure of the system, not a failure of the class member.

b.   Individualized service plans shall identify whether a class member is at risk of experiencing a placement disruption and, if so, will identify the steps to be taken to minimize or eliminate the risk.

c.   Appropriate training will be required for, and appropriate supportive services will be provided to, foster parents and staff of residential facilities in order to minimize placement disruptions. In the case of foster parents, the services shall include intensive home-based services and respite care.

d.   The "system of care" shall forbid summary discharges from placements. DHR shall promulgate a policy, acceptable to both parties, that describes steps that must be taken prior to a class member's discharge from a placement. The policy may permit in exceptional circumstances the placement of a class member in a temporary, emergency setting without prior notice to DHR.

e.   The "system of care" will avoid temporary, interim placements. Class members shall be placed in settings that could reasonably be expected to deliver long-term care if necessary. To this end, DHR will not place class members in shelters unless (i) the full array of services the class member needs can be provided the class member while residing in the shelter and (ii) it is likely that the class member's stay in foster care will not extend beyond his/her stay in the shelter.

f.   The "system of care" will vigorously seek to ensure that law enforcement officers, juvenile court personnel and others do not remove class members from their home and place them in foster care or DHR custody without first notifying the "system of care" and providing the system an opportunity to intervene to prevent the removal or placement.

19. **The "system of care" shall ensure that the services identified in individualized service plans are accessed and delivered in a coordinated and therapeutic manner.**

20. **Services shall be provided by competent staff who are adequately trained and supervised and who have appropriate caseloads.**
    The competence of staff training and supervision, and staff's caseloads shall be deemed adequate when the "system of care" is able to comply with the standards set forth in this decree.

21. **Services provided class members and their families shall meet relevant professional standards in the fields of child welfare, social work and mental health.**

22. **The "system of care" shall require that any behavior modification program employed in the treatment or management of a class member be individualized and meet generally accepted professional standards, including that:**
    a. The program rely primarily on rewards instead of punishments;

    b. The program be based on a careful assessment of the antecedents of the behavior that the program is designed to change; and

    c. The program be consistently implemented throughout the day, including in school, residential and leisure activity settings.

    d. The "system of care" shall take an active role in seeking to ensure that local education agencies and the Alabama Department of Education (i) recognize class members' educational rights and (ii) provide class members with educational services in accord with those rights. Among other things, the "system of care" shall advocate for class members who are subjected to inappropriate and/or illegal disciplinary measures.

23. **The "system of care" shall promote smooth transitions for class members to adult service systems and/or independent living when class members "age out" of the system.**
    The individualized service plans of class members who are expected to "age out" of the system shall provide for such transitions.

24. **The "system of care" shall accord class members the following rights: the right of access to counsel and the courts, the right of access to family members, the right to be free of excessive medication and the right to be free from unnecessary seclusion and restraint.**
    DHR shall promulgate policies, acceptable to both parties, describing and protecting these rights. The policies shall provide that:

    a.   Class members shall be permitted to freely communicate by telephone or mail with (i) legal counsel of the class member's choosing, including the class member's guardian ad litem and (ii) organizations that provide legal services.

b.   Class members shall be permitted to freely communicate by telephone or mail with (i) the class member's parents and family members and (ii) adult friends of the class member including former foster parents. This right may be restricted only pursuant to procedures and in circumstances specifically identified in written policy.

c.   Class members retain the right to communicate and visit with their parents and family even when the class member is in the permanent custody of DHR (i.e., parental rights have been terminated). When the class member is in permanent custody, the matter of his/her communication with parents and family members shall be addressed in the class member's individualized service plan. Such communication may be restricted when it would undermine or defeat attainment of the goal or objectives identified in the plan.

**25. Class members, parents and foster parents shall be made aware, in an effective manner, of the availability of advocacy services to assist them in protecting and advancing their rights and entitlements.**

**26. Class members shall be provided effective assistance and support in applying for SSI benefits. (Where it is necessary that the class member's parents apply for benefits, such assistance and support shall be provided to the parents.)**

**27. Class members shall be enrolled, if eligible, in the EPSDT program and shall receive comprehensive screens that meet the requirements of federal law and are provided according to a professionally acceptable schedule.**

**28. The "system of care" shall promote early identification and timely intervention in order to enhance the likelihood of positive outcomes.**

**29. The "system of care" will identify, assess and disseminate state-of-the-art methods, strategies and materials for serving class members and their families.**

# Utah Division Child and Family Services Practice Model

## Core Values

**Protection.**  Children have the right to be safe from abuse, neglect and unnecessary or needless dependency.  Swift intervention is necessary when this right is violated.

**Development.**  Children and families need consistent nurturing in a healthy environment to achieve their developmental potential.

**Permanency.**  All children need and are entitled to enduring relationships that provide a sense of family, stability and belonging.

**Cultural Responsiveness.**  Children and families have the right to be understood within the context of their own family rules, traditions, history and culture.

**Family Foundation.**  Children can be assured a better chance for healthy personal growth and development in a safe, permanent home with enduring relationships that provide them with a sense of family, stability and belonging.

**Partnerships.**  The entire community shares the responsibility to create an environment that helps families raise children to their fullest potential.

**Organizational Competence.**  Committed, qualified, trained and skilled staff, supported by an effectively structured organization, help insure positive outcomes for children and families.

**Treatment Professionals.**  Children and families need a relationship with an accepting, concerned, empathic worker who can confront difficult issues and effectively assist individuals in their process toward positive change.

These foundation principles will lead to the kind of child welfare practice that the citizens of the state of Utah want.  These principles have already promoted strong performance expectations and have assisted DCFS in identifying the types of skill training needed to increase the effectiveness of child welfare staff.

Though they are necessary to give appropriate direction and to instill significance in the daily tasks of child welfare staff, practice principles cannot stand alone.  In addition to

practice principles, the organization has to provide for discrete actions that flow from the principles. The following list of discrete actions or practice standards, have been derived from national practice standards as compiled by the CWPPG, and have been adapted to the performance expectations that have been developed by DCFS. These practice standards must be consistently performed for DCFS to meet the objectives of its mission and to put into action the above practice principles. These standards bring real-life situations to the practice principles and will be addressed in the Practice Model development and training.

### *Standards of Practice*

1.     Children who are neglected or abused have immediate and thorough assessments leading to decisive, quick remedies for the immediate circumstances, followed by long-range planning for permanency and well-being.

2.     Children and families are actively involved in identifying their strengths and needs and in matching services to identified needs.

3.     Service plans and services are based on an individualized service plan, using a family team (including the family, where possible and key support systems and providers), employing a comprehensive assessment of the child's and family's needs and attending to and utilizing the strengths of the child and his/her family strengths.

4.     Individualized plans include specific steps and services to reinforce identified strengths and meet the needs of the family. Plans should specify steps to be taken by each member of the team, time frames for accomplishment of goals and concrete actions for monitoring the progress of the child and family.

5.     Service planning and implementation are built on a comprehensive array of services designed to permit children and families to achieve the goals of safety, permanency and well being.

6.     Children and families receive individualized services matched to their strengths and needs and, where required, services should be created to respond to those needs.

7.     Critical decisions about children and families, such as service plan development and modification, removal, placement and permanency are, whenever possible, to be made by a team including the child and his/her family, the family's informal helping systems, foster parents and formal agency stakeholders.

8.     Services provided to children and families respect their cultural, ethnic and religious heritage.

9.   Services are provided in the home and neighborhood-based settings that are most appropriate for the child and family's needs.

10.  Services are provided in the least restrictive, most normalized settings appropriate for the child and family's needs.

11.  Siblings are to be placed together.  When this is not possible or appropriate, siblings should have frequent opportunities for visits.

12.  Children are to be placed in close proximity to their family and have frequent opportunities for visits.

13.  Children in placement are provided with the support needed to permit them to achieve their educational and vocational potential with the goal of becoming self-sufficient adults.

14.  Children receive adequate, timely medical and mental health care that is responsive to their needs.

15.  Services are provided by competent staff and providers who are adequately trained and who have workloads at a level that permit practice consistent with these principles.

   The Practice Model informs front-line staff members of what is expected in their daily work and also provides direction to administration on needed administrative resources.  The performance expectations need additional administrative supports, such as adequate funding and staffing, effective training, clear policies and effective administrative structures to assist staff in reaching the above expectations.