UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------------------------------x
JUAN F., et al.,                          :
                        Plaintiffs,       :
                                          :
        v.                                :       CIVIL NO. H89-859 (CFD)
                                          :
M. JODI RELL, et al.,                     :
                                          :       April 13, 2010
                        Defendants.       :
-----------------------------------------------------------x
```

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO VACATE CONSENT DECREE
## AND EXIT PLAN PURSUANT TO FEDERAL RULE 60(b)(5)

### INTRODUCTION

The complaint in this action was filed over twenty years ago, in December of

1989. The Consent Decree that is the subject of the present motion has been in place for

eighteen years, since 1991. Pursuant to Rule 60(b)(5) of the Federal Rules of Civil

Procedure, based on widespread factual and legal changes that have occurred since the

entry of the Consent Decree, prospective enforcement of the Decree is no longer

equitable, and the Decree should therefore be vacated.

There have been sweeping and widespread changes in both Connecticut's child

welfare system and in federal child protection law in the nearly twenty years that have

passed since the entry of the Consent Decree that support relief from the Decree. These

structural and organizational changes and improvements, that have been implemented and

sustained by the Department of Children and Families ("DCF" or "Department") and the

State, along with increased oversight and funding by the federal government, eradicate the

possibility of a reversion to the conditions that existed at the time the complaint was filed in 1989. Moreover, these sweeping institutional changes have remedied any violation of federal law alleged in the complaint, and continued enforcement of the Consent Decree is not supported by any ongoing violation of federal law. Finally, because the objectives of the Consent Decree have been achieved, continued enforcement of the Decree improperly removes control over Connecticut's child welfare system from the State officials charged with responsibility for the welfare of Connecticut's children. The Motion to Vacate should be granted.

## FACTS AND PROCEDURAL BACKGROUND

### 1.    Allegations in Original Complaint.

The class action complaint in this matter was filed on or about December 19, 1989.

The complaint was brought by nine minor plaintiffs on behalf of the following class:

> 1) all children who were, are, or will be in the care, custody, or supervision of defendant Wheaton [the Commissioner of the Department of Children and Youth Services] as a result of being abused, neglected or abandoned, or of being found at risk of such maltreatment; and 2) all children who are, or will be, abused, neglected, or abandoned, or who are or will be at serious risk of such maltreatment, of which DCYS knows, or should know.

(Cmplt. ¶ 26.) The defendants are the Governor of the State of Connecticut and the Commissioner of the Department of Children and Families.[1]

The complaint alleged seven substantive causes of action, two grounded in federal statutes and the remaining five alleging various federal constitutional violations.

---

[1] At the time the original complaint was filed the named defendants were William O'Neill and Amy B. Wheaton. Pursuant to Fed.R.Civ.P. 25(d), when a public official named as a party in an official capacity ceases to hold office during the pendency of an action, "the officer's successor is automatically substituted as a party." Also, at the time the original complaint was filed, the Department of Children and Families was called the Department of Children and Youth Services ("DCYS" or "Department").

CARMODY & TORRANCE LLP
{N0889778.8}  Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
2

Specifically, the complaint alleged that the defendants' "actions and knowing inactions"
deprived the plaintiff class of children of their rights under the Adoption Assistance and
Child Welfare Act of 1980 (42 U.S.C §§ 620-627, 670-679), and the Child Abuse
Prevention and Treatment Act (42 U.S.C. § 5106, et seq.).  In addition, the complaint
alleged that the defendants violated certain rights of the plaintiff class arising under the
First, Ninth, and Fourteenth Amendments to the United States Constitution.  Specifically,
the complaint alleged that the defendants violated the class plaintiffs' rights to a "safe,
decent, and humane environment while in the custody of the State, and right not to be
harmed"; "right to care that is consistent with competent professional judgment"; "right
not to be deprived of state and federally-created liberty and property rights without due
process"; "right to placement in the least restrictive, appropriate placement"; and "rights
to freedom of association and to family integrity" (Id. ¶ 249).  (Cmplt., Third through
Seventh Causes of Action.)  The specific allegations in the complaint are discussed infra
at pp. 25-48.

### 2.    The Original Consent Decree.

In 1991, the parties entered into a Consent Decree.  As set forth in the Consent

Decree:

> This action consisted of broad-scale challenges to the management, policies,
> practices, operations, funding, and protocols of the Connecticut Department of
> Children and Youth Services ("DCYS" or the "Department").  The over one
> hundred issues identified for resolution may be generally separated in the
> following categories:
>
> (1)    Investigation and pre-placement services;
> (2)    Foster care and other out-of-home placements and services;
> (3)    Medical care;
> (4)    Mental health care;
> (5)    Adoption;

(6)    Staffing; and

(7)    Management and systems.

(Consent Decree at 2 (emphasis added).)

The Consent Decree created a DCYS Monitoring Panel to establish "on an annual basis binding timetables and fiscal patterns for the funding of the provisions of this Consent Decree . . . ." (Id. at 5.)  The Consent Decree also makes clear that it represents the culmination of extensive negotiations, that it was entered into in order to avoid the expense and uncertainty of litigation, and that it does not constitute any admission by either side as to the validity of the allegations in the complaint, or the rights of the plaintiff class.  As stated in the Consent Decree:

> The provisions of this Consent Decree . . . have been agreed upon solely as a means to put a reasonable end to this complex case and to avoid the costs, time, and risks that would be involved for the parties to litigate the case in full. In many respects, this Consent Decree embodies a compromise of the issues involved in this case and, while its provisions are binding on the parties herein, its provisions are not to be construed to be statements, rulings, or precedents with respect to the constitutional and other legal rights of persons who are parties or nonparties to this litigation . . . .

(Id. at 6.)

In addition, the Consent Decree explicitly recognizes the far-reaching scope of its "effects upon all aspects of the management, operations, procedures, staffing, and funding of the Department." (Id. at 4.)  To that end, the Decree specifically states that it was "very carefully formulated" to consist of:

> definitive, rational, and fair resolutions of the issues, with reasonable implementation and monitoring provisions to reduce to the extent possible the impact on the Department's operations and funding.

> Thus, this Consent Decree mandates prudent, state-of-the-art, conclusive adjudications; however, it also provides for fiscal and compliance flexibility and reasonableness in the implementation and monitoring of these adjudications.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778.8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

4

(Id. (emphasis added))  The terms of the Decree were also intended to provide full resolution of all of the plaintiffs' claims.  The Decree states, "This Consent Decree satisfies and resolves the claims of the plaintiffs and plaintiffs' class in the above-entitled case as of the date of this Consent Decree."  (Id. at 6.)  Finally, the Consent Decree provided that it could be modified by the Trial Judge "upon appropriate motion filed by any party or the DCYS Monitoring Panel."  (Id. at 120.)

    **3.**       **The Exit Plan.**

On December 23, 2003, the Court ordered the Exit Plan submitted by the Court Monitor.  Dkt. No. 454.  On July 1, 2004, the parties entered into a comprehensive Revised Exit Plan, which was ordered by the Court. On July 7, 2006, the parties entered into a Stipulated Modification to the Revised Exit Plan Dated July 1, 2004, which was also ordered by the Court.  Dkt. No. 520. The July 2004 Exit Plan contains twenty-two specific Outcome Measures designed to remedy the violations alleged in the complaint and to resolve the "over one hundred issues" identified in the Consent Decree.  The Exit Plan contains the following specific Outcome Measures:

    (1)      Commencement of Investigation;

    (2)      Completion of Investigation;

    (3)      Treatment Plans;

    (4)      Search for Relatives;

    (5)      Repeat Maltreatment of In-Home Children;

    (6)      Maltreatment of Children in Out-of-Home Care;

    (7)      Reunification;

    (8)      Adoption;

CARMODY & TORRANCE LLP     50 Leavenworth Street
{N0840976.8} Law               Post Office Box 1110
                             Waterbury, CT 06721-1110  5
                             Telephone: 203 573-1200

(9)     Transfer of Guardianship;

(10)    Sibling Placement;

(11)    Re-Entry into DCF Custody;

(12)    Multiple Placements;

(13)    Foster Parent Training;

(14)    Placement Within Licensed Capacity;

(15)    Childrens' Needs Met;

(16)    Worker-Child Visitation (Out-of-Home);

(17)    Worker-Child Visitation (In-Home);

(18)    Caseload Standards;

(19)    Reduction of Number of Children Placed in Residential Care;

(20)    Discharge Measures;

(21)    Discharge of Mentally Ill or Retarded Children; and

(22)    Multi-Disciplinary Exams.

(Exit Plan at 2.) The Stipulated Modification modified the requirements and criteria for two

of the 22 Outcome Measures: Outcome Measure 3 (Treatment Plans) and Outcome Measure

15 (Childrens' Needs Met). The July 2004 Exit Plan, along with the modifications in the

Stipulated Modification, comprise the current, operative Exit Plan (collectively "Exit

Plan"). Each of the Outcome Measures contains a detailed and precise set of criteria that

establish compliance with that Outcome Measure.

In addition, the Exit Plan contains the following provision regarding its

termination and the jurisdiction of the Court:

> The Defendants must be in compliance with all of the outcome measures, and in
> sustained compliance with all of the outcome measures for at least two quarters

(six months) prior to asserting compliance and shall maintain compliance through any decision to terminate jurisdiction.

(Exit Plan at 3.)  The Exit Plan requires the Court Monitor to "conduct case reviews to produce two annual reports documenting the Department of Children and Families' performance and progress toward achieving the outcome measures defined within this Exit Plan."  (Id. at 4.)

### 4.   Quarterly Reporting by the Court Monitor.

The Court Monitor has prepared four Quarterly Reports each year since the adoption of the Exit Plan in 2004; the most recent of which were issued in December 2009 for the period July 1, 2009 through September 30, 2009 (the "3Q 2009 Report"; Dkt No. 593), and in March 2010, for the period October 1, 2009 through December 31, 2009 (the "4Q 2009 Report; Dkt. No. 603").  These reports are attached hereto as Exhibits A and B. In the 3Q 2009 Report, the Court Monitor reported that DCF was compliant with fifteen of the Outcome Measures, and non-compliant with seven.  (See Ex. A at 6.)  In the 4Q 2009 Report, DCF was reported to be compliant with sixteen Outcome Measures and non-compliant with six.  (Ex. B at 6-7.)

Specifically, the Court Monitor reported that, for the fourth quarter of 2009, DCF was in compliance with the following 16 Outcome Measures:

- Commencement of Investigation;
- Completion of Investigation;
- Search for Relatives;
- Repeat Maltreatment of In-Home Children;
- Maltreatment of Children in Out-of-Home Care;
- Reunification;

- Adoption;

- Transfer of Guardianship;

- Multiple Placements;

- Foster Parent Training;

- Placement Within Licensed Capacity;

- Worker-Child Visitation (Out-of-Home);

- Worker-Child Visitation (In-Home);

- Reduction of Number of Children Placed in Residential Care;

- Discharge Measures; and

- Multi-Disciplinary Exams.

(See Ex. B at 6-7.)  In the 3Q 2009 Report, DCF was reported to be non-compliant with Outcome Measure 20, "Discharge Measures"; a measure that was achieved in the fourth quarter of 2009.  However, as the Monitor reported, the third quarter of 2009 was the first quarter since the fourth quarter of 2004 in which DCF did not achieve this Outcome Measure.  (Ex. B at 4.)

Moreover, these reports also confirm that for the majority of these Outcome Measures, DCF has been compliant for many years.  For example, DCF has been compliant with Outcome Measure 6 for twenty-four consecutive quarters; Measures 12 and 13 for at least twenty-three consecutive quarters; Measures 1 and 2 for twenty-one consecutive quarters; and Measures 4, 16, and 17 for seventeen consecutive quarters. (Ex. B at 8.)

The following are the six specific Outcome Measures the Court Monitor asserts were not met in the fourth quarter of 2009:

CARMODY & TORRANCE LLP
{N0849798.8} Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
8

- Treatment Plans;

- Re-Entry into DCF Custody;

- Sibling Placements;

- Children's Needs Met;

- Caseload Standards; and

- Discharge of Mentally Ill or Retarded Children.

(Ex. B at 6.)

As set forth above, the Consent Decree identified the following broad categories of issues which it was intended to remedy: (1) investigation and pre-placement services; (2) foster care and other out-of-home placements and services; (3) medical care; (4) mental health care; (5) adoption; (6) staffing; and (7) management and systems. (Consent Decree at 2.) The twenty-two specific Outcome Measures contained in the Exit Plan are tied to these categories.

There can be no genuine dispute that the defendants have complied in full with the vast majority of the Outcome Measures in the Exit Plan – setting aside Outcome Measures 3 and 15, which are discussed in detail below – and that the defendants have been in compliance with these measures for significant lengths of time.  Moreover, in those instances where the Court Monitor reports that DCF has not meet the standards set forth in the Outcome Measures, the statistical evidence reveals that, in nearly every case, the percentages by which the Outcome Measures were not met are negligible.

For example, as to Outcome Measure 18 (Caseload Standards), the Court Monitor's report for the third quarter of 2009 stated that this Measure had not been met for the second consecutive quarter, in that there were "5 incidences where a worker

CARMODY & TORRANCE LLP
{N0849778.3}
Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
9

exceeded the caseload standard." (Ex. A at 3-4.)  However, "each of the circumstances was for a brief duration and in each case the social worker exceeded the standard by one or two cases." (Id. at 4.)  In the Monitor's report for the fourth quarter of 2009, the Monitor stated that Outcome Measure 18 had not been met for the third consecutive quarter, but that this was due to "one occurrence where a worker exceeded the caseload standard for a very brief duration, and this worker exceeded the standard by one case." (Ex. B at 4 (emphasis added).)[2]

Likewise, Outcome Measure 21 requires DCF to submit a written discharge plan for all children who are mentally ill or mentally retarded and require adult services.  In the 3Q 2009 Report, the Monitor stated that DCF met this Outcome Measure for 100% of such children for that quarter, and that in 12 of the last 14 quarters, DCF's compliance with this Outcome Measure has been 95% or higher. (Ex. A at 9.)  According to the 4Q 2009 Report, DCF's compliance for that quarter was 97.6%. (Ex. B at 8.)  Similarly, Outcome Measure 11 requires that of all children entering DCF custody, 7% or fewer shall have re-entered care within twelve months.  In the 3Q 2009 Report, the percentage of children re-entering for the quarter was reported to be 9.9%.  By the fourth quarter of 2009, it was 7.8%. (Ex. A at 6; Ex. B at 8.)  Finally, Outcome Measure 10 requires that at least 95% of the siblings entering out-of-home placement be placed together.  The third quarter 2009 percentage compliance was 84.7%; by the fourth quarter of 2009 it was 83.4%. (Id.)

---

[2] In the Report for the second Quarter of 2009, the Monitor reported that this Outcome Measure had been met in full for the prior fifteen months, that the percentage of compliance for the second Quarter was 99.6%. Furthermore, the Court Monitor acknowledged that there were only a "small number" of instances where case workers were over the standards, and then only for "1-10 days."

CARMODY & TORRANCE LLP
{N0849778;8}   Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
10

According to the Court Monitor, the greatest statistical departures from the standards set forth in the Exit Plan are found in Outcome Measures 3 (Treatment Plans) and 15 (Childrens' Needs Met). As measured by the methodology adopted in the July 2006 Stipulated Modification for these two Outcome Measures, compliance for the third quarter of 2009 was 53.8% and 55.8%, respectively. (Ex. A at 6.) For the fourth quarter of 2009 these percentages were reported to be 47.2% and 45.3%. (Ex. B at 6.) These percentages do not, however, accurately depict the success of the Department in meeting the goals and objectives of Outcome Measures 3 and 15, and of providing services to and meeting the needs of Connecticut's children. This single measurement of complex data is misleading, because it confines understanding of performance and masks important progress the Department has experienced in meeting the goals and objectives of Outcome Measures 3 and 15.

The Department submits that a more in depth review of the factors considered in measuring compliance with these measures reveals that, while the Department may not technically be in compliance according to the <u>methodology</u> adopted for these Outcome Measures, the Department is fully meeting the <u>goals</u> of both of these Measures.

Outcome Measure 3 deals with Treatment Plans, and provides in part as follows:

> In at least 90% of the cases . . . clinically appropriate individualized family and child specific treatment plans shall be developed in conjunction with parents, children, providers and others involved with the case and approved by a DCF supervisor within 60 days of case opening in a treatment unit, or a child's placement out-of-home, whichever comes sooner, and for each six (6) month period thereafter.

(Exit Plan at 8.)

As set forth in the Exit Plan, compliance with Outcome Measure 3 requires that 90% of the treatment plans reviewed must satisfactorily meet criteria involving eight

separate categories of review. (Exit Plan at 11.) Each criterion is evaluated on a scale of

one to five, with scores of four or five meeting the legal standard under the Measure.

(DCF Enhanced Analysis Findings, Outcome Measures 3 and 15, 2007-2009, submitted as

Exhibit C.) Although the Court Monitor is afforded discretion to make ranking

adjustments, the review methodology requires that all criteria be fully met in order for the

treatment plan to be deemed "appropriate." (Id.) Therefore, because a treatment plan that

is found "not appropriate" could ostensibly fail to meet only one of the eight criteria, and

with only a "Marginal" rating (or three of five), it is useful to evaluate the Department's

performance in an aggregate format and across all categories to reveal more about the

Department's performance. The Department's success and steady improvements in

meeting Outcome Measures 3 and 15 are best illustrated by the detailed breakdown of the

methodology and criteria for these Outcome Measures set forth in Exhibit C. A summary

view of these successes and improvements follows here.

     For example, for the eleven quarters prior to and including the third quarter of

2009, a total of 617 cases were reviewed, comprising 4,882 individual case elements,

which were ranked according to Outcome Measure 3's methodology. Of those 4,882

individual case elements, 4004, or 82%, were rated by the Court Monitor as "Very Good"

or "Optimal." Taken on an annual basis, the percentage of elements ranked as either

"Very Good" or "Optimal" increased from 74 % for all of 2007, to 87% in 2008 and 88%

in the first three quarters of 2009. Moreover, for example, in the third quarter 2009, of the

eight categories evaluated under this Outcome Measure, the average percent ranking per

category as either "Very Good" or "Optimal" ranged from 63.4% to 100%, with all but

three categories exceeding 85%. Comparing this performance with the same quarter two

years earlier, the Department improved its performance across all categories with percentage changes ranging from 3.5% to 25.4%.

For the five quarters between the second quarter of 2008 and the third quarter of 2009, at least six of the eight categories evaluated under Outcome Measure 3 received an average ranking at – or in excess of – the passing rate standard of 4.0, and the categories that did not reach the 4.0 standard never fell below an average ranking of 3.63. Finally, when the mean of all quarterly rankings across all cases and all categories is computed, it is clear that the Department has exceeded a 4.0 ranking and has done so consistently since the fourth quarter of 2007.

Outcome Measure 15 is titled Childrens' Needs Met, and requires that "[a]t least 80% of all families and children shall have all their medical, dental, mental health and other service needs provided as specified in their most recently approved clinically appropriate treatment plan." Like Outcome Measure 3, Outcome Measure 15 presents a complexity. This measure requires that 80% of the cases reviewed meet 100% of the needs identified across eleven separate categories of review. Again, each of the eleven categories of review is measured on the one to five scale and, again, a finding of failure in even one of the eleven categories is sufficient for a determination of non-compliance with the entire Outcome Measure. To be clear, even if ten out of the eleven needs are fully met, the Department is nonetheless considered to be out of compliance with the entire Outcome Measure for that child. (See Ex. C.)

In the second quarter of 2009, nine of the eleven "need" categories received average scores at – or in excess of – the passing standard of 4.0. The two remaining categories (Safety In-Home and Behavioral Health Services), received median scores of

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

13

3.83 and 3.96, respectively, and have met or exceeded a passing rate standard of 4.0 in previous quarters. (Ex. C) When the mean quarterly rankings across all cases and categories is computed, it is clear that the Department has exceeded a 4.0 ranking across all "needs" categories in each quarter since 2007, with one of the highest composite rankings in the third quarter of 2009. (Id.)

In addition, of the eleven categories evaluated under "Needs Met," the average percent ranking per category as either "Very Good" or "Optimal" ranged from 79.2% to 100%. (Ex. C) Comparing this performance with the same period two years earlier, the Department improved its performance across all but one category, with percentage increases ranging from 0.2% to 10.3%. Finally, for the eleven quarters of measurement pursuant to the Exit Plan preceding the third quarter or 2009, a total of 617 cases were reviewed, comprising 5,467 individual case elements that were ranked according to the Outcome Measure's methodology. Of those 5,467 individual elements, 4552, or 83%, were rated as "Very Good" or "Optimal." Taken on an annual basis, the percentage of elements ranked as either "Very Good" or "Optimal" increased from 79% in 2007, to 86% in 2008, and to 86% in the first three quarters of 2009.

The Department's sustained compliance with the vast majority of the Outcome Measures in the Exit Plan has achieved far in excess of the minimum requirements of the federal statutory and constitutional provisions identified in the complaint. This, in combination with the sweeping institutional improvements and reforms implemented since the commencement of this litigation twenty years ago, and the significant and widespread changes in federal child welfare and protection law in the last twenty years,

mandates termination of the Consent Decree, and the return of responsibility for the

programs and practices of DCF to the state officials responsible for their discharge.

## ARGUMENT

### 1.     Legal Standard.

Federal Rule of Civil Procedure 60(b)(5), Relief from a Judgment or Order,

provides in relevant part as follows:

> (b) Grounds for Relief from a Final Judgment, Order or Proceeding. On motion
> and just terms, the court may relieve a party or its legal representative from a final
> judgment, order, or proceeding for the following reasons:
>                             . . . .
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier
> judgment that has been reversed or vacated; or applying it prospectively is no
> longer equitable . . . .

As interpreted by the United States Supreme Court, the Rule allows a party to

move for modification or termination of a judgment if a significant change in either

factual conditions or law "make[s] compliance with the original decree substantially more

onerous," where the decree "proves to be unworkable because of unforeseen obstacles," or

where "enforcement of the decree without modification would be detrimental to the public

interest." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992).[3]  Although

the decision to modify or terminate a consent decree under Rule 60(b)(5) is within the

discretion of the District Court, "[a] court errs when it refuses to modify an injunction or

consent decree in light of such changes." Agostini v. Felton, 521 U.S. 203, 215 (1997);

see also Rufo, 502 U.S. at 384, 394.

---

[3] "Changed conditions" or other events that were not unforeseen at the time of the original
judgment are not cause for modification or termination of the original order. See, e.g.,
White v. Nat'l Football League, 585 F.3d 1129, 1138 (8th Cir. 2009).

2.      **The Legal Framework.**

In the last two decades, the United States Supreme Court has issued a series of decisions dealing directly with motions brought pursuant to Rule 60(b)(5) in the context of consent decrees that bear directly on the issues here.  A detailed review of these cases, starting with Bd. of Educ. of Okla. City Pub. Sch. v. Dowell, 498 U.S. 237 (1991), and Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), reveals a steady and progressive increase in flexibility of the standards a party is required to meet in order to obtain relief under Federal Rule 60(b)(5) within the context of institutional reform litigation.  These cases confirm that, because of the widespread changes and reforms in Connecticut's child welfare system since the time of the filing of the original complaint, and the fact that there are no ongoing violations of federal law, continued prospective enforcement of the Consent Decree is no longer equitable, and it should therefore be vacated.

In 1991, the Supreme Court issued its decision in Dowell, 498 U.S. 237, one of a number of school desegregation cases that followed Brown v. Board of Education, 347 U.S. 483 (1954).  In Dowell, a group of black students and their parents sued the Board of Education to end segregation in Oklahoma City's public schools.  498 U.S. 237.  The Court found that the Board had engaged in intentional segregation in both schools and housing, and ordered implementation of a plan aimed at desegregating the schools.  Id. at 250.

After complying with the desegregation decree for five years, the Board filed a "Motion to Close Case," which the District Court granted.  The Court found that the original plan had achieved "substantial compliance" with constitutional requirements, and

that there was no evidence that the Board would either dismantle the plan, or return to the prior conditions in the event that the court's jurisdiction terminated. Id. at 241. This order was not appealed. Five years later, demographic conditions had changed, and the Board implemented a new desegregation plan. The plaintiffs moved the Court to re-open the case, claiming that the Board's new plan resulted in a return to segregation. The District Court refused to re-open the case, finding that school personnel and student bodies were integrated, and that services such as transportation and school facilities were "equal and nondiscriminatory." Id. at 242-43.

The Court of Appeals reversed and remanded, ordering the District Court to determine whether the original decree should be lifted or modified. The District Court again concluded that any failures of the new desegregation plan were the result of demographics, and that there was no "discriminatory intent" behind the new plan. The Court vacated the original injunctive decree. The Court of Appeals reversed again, finding that the original desegregation decree should remain in place until the Board could show "grievous wrong evoked by new and unforeseen conditions, and dramatic changes in conditions unforeseen at the time of the decree that . . . impose extreme and unexpectedly oppressive hardships on the obligor." Id. at 244 (internal quotation marks omitted) (citations omitted). The Court of Appeals relied on the Supreme Court's decision in U.S. v. Swift & Co., 286 U.S. 106, 119 (1932) (superseded by rule discussed infra), in imposing the "grievous wrong" standard. The Supreme Court granted certification, and reversed the holding of the Court of Appeals. Id. at 251.

The Court held that the Court of Appeals' reliance on Swift was error: "In the present case, a finding by the District Court that the [school district] was being operated in

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849779.8}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
17

compliance with the commands of the Equal Protection Clause of the Fourteenth

Amendment, and that it was unlikely that the school board would return to its former

ways, would be a finding that the purposes of the desegregation litigation had been fully

achieved." Id. at 247.  The Court held that the language from Swift relied on by the Court

of Appeals "does not provide the proper standard to apply to injunctions entered in school

desegregation cases":

> Such decrees, unlike the one in Swift, are not intended to operate in perpetuity.
> Local control over the education of children allows citizens to participate in
> decisionmaking, and allows innovation so that school programs can fit local needs.
> . . . .
> Dissolving a desegregation decree after the local authorities have operated in
> compliance with it for a reasonable period of time properly recognizes that
> necessary concern for the important values of local control of public school
> systems dictates that a federal court's regulatory control of such systems not
> extend beyond the time required to remedy the effects of past intentional
> discrimination.

Id. at 248.  The Court remanded the matter to the District Court to decide "whether the

Board made a sufficient showing of constitutional compliance as of 1985, when the [new

desegregation plan] was adopted, to allow the injunction to be dissolved." Id. at 249.

One year later the Court decided Rufo v. Inmates of Suffolk County Jail, 502 U.S.

367 (1992).  The plaintiffs in Rufo brought suit to correct what they claimed were

unconstitutional deficiencies in the conditions at the Suffolk County Jail.  502 U.S. 367.

The parties ultimately entered into a consent decree, which required the defendants to

construct a new jail with the goal of generally improving conditions for prisoners and,

specifically, providing single occupancy cells for the inmates.  Following the entry of the

consent decree, the inmate population exceeded projections, and the defendants moved to

modify the decree in order to permit double bunking of some of the inmates.

Like the Court of Appeals in <u>Dowell</u>, the District Court refused to modify the decree, finding that the defendants were required to make the "grievous wrong" showing set forth in <u>Swift</u>, 286 U.S. 106. <u>Rufo, 502 U.S. at</u> 377. The District Court also found that even under a more relaxed "flexible" standard, the defendants would not be entitled to the modification because the single-occupancy cell component of the decree was "perhaps . . . the most important element" of the entire decree. <u>Id.</u> at 377. The Court of Appeals for the First Circuit affirmed. <u>Id.</u>

The Supreme Court granted certification, and reversed the holding of the Court of Appeals. <u>Id.</u> at 393. In doing so, the Court again expressly rejected <u>Swift's</u> "grievous wrong" standard. <u>Id.</u> The Court expanded the holding in <u>Dowell</u>, which was limited to school desegregation litigation, and rejected the <u>Swift</u> standard for cases involving "institutional reform litigation" as a whole:

> The upsurge of institutional reform litigation since <u>Brown v. Board of Education,</u> 347 U.S. 483 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.

<u>Id.</u> at 380. The Court held that the adoption by several of the Courts of Appeals of a "flexible" standard in considering such motions is "often essential to achieving the goals of reform litigation":

> The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to sound and efficient operation of its institutions."

<u>Id.</u> at 381.

The Court rejected the District Court's holdings that the increased prison population was <u>not</u> a changed circumstance warranting modification, or that modification to permit two-person occupancy in some cells would violate the "central" purpose of the original decree:

> Even if the decree is construed as an undertaking by petitioners to provide single cells for pretrial detainees, to relieve petitioners from that promise based on changed circumstances does not necessarily violate the basic purpose of the decree. That purpose was to provide a remedy for what had been found, based on a variety of factors, including double celling, to be unconstitutional conditions in the . . . jail."

<u>Id.</u> at 387. The Court cautioned that a proposed modification to a consent decree "must not create or perpetuate a constitutional violation," and that "a proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." <u>Id.</u> at 391.

The Court also discussed the importance of federalism concerns in the context of institutional reform litigation. Specifically, the Court held that within the confines of the flexibility standard:

> the public interest, and "[c]onsiderations based on the allocation of powers within our federal system," require that the district court defer to local government administrators, who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification.

<u>Id.</u> at 392 <u>quoting</u> <u>Dowell</u>, *supra*, 498 U.S. at 248. Once a party seeking modification of a consent decree establishes the existence of changed circumstances, the party must demonstrate that the proposed modification is "suitably tailored to the changed

circumstances." Id. at 383, 391. The Court remanded the matter to the District Court to apply the flexible standard imposed by the Court.[4] Id. at 393.

Approximately twelve years after Rufo, the Supreme Court issued its decision in Frew v. Hawkins, 540 U.S. 431 (2004). Although Frew was decided on a motion to enforce a consent decree, as opposed to a motion to vacate, the holding is illustrative of the Court's view of judicially imposed control over traditionally state operated administrative programs. See id. In Frew, the plaintiffs challenged the State of Texas' system for administering and implementing Medicaid requirements for certain screening and detection services for children. The District Court entered a consent decree in 1996. In 1998, plaintiffs moved for enforcement of the consent decree. The defendants denied that they were in violation of the decree, and additionally argued that, even if they were not in compliance, the Eleventh Amendment rendered the decree unenforceable. The District Court rejected this argument, and the Fifth Circuit reversed on appeal. In order to resolve a conflict among the Circuits on the Eleventh Amendment issue, the Supreme Court granted certification. Frew, 540 U.S. at 436.

The Supreme Court ultimately held that the Eleventh Amendment does not bar judicial enforcement of federal consent decrees against state officials but, in Part III of its opinion, also noted that the defendant state officials, along with the attorneys general of nineteen states as *amici curiae,* had "legitimate concerns" regarding the enforcement of consent decrees that undermine the "sovereign interests and accountability of state governments":

---

[4] Although Rufo involved a motion to modify, as opposed to vacate, a consent decree, the Second Circuit has applied the Rufo standard in deciding whether to vacate a consent decree. See U.S. v. Eastman Kodak Co., 63 F.3d 95, 102 (2d Cir. 1995).

> If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers.  They may also lead to federal court oversight of state programs for long periods of time even absent an ongoing violation of federal law.

Id. at 441.

The Court discussed its holding in Rufo: "*Rufo* rejected the idea that the institutional concerns of government officials were 'only marginally relevant' when officials moved to amend a consent decree, and noted that 'principles of federalism and simple common sense require the [district] court to give significant weight' to the views of government officials." Id. quoting Rufo, 502 U.S. at 392 (alteration in original).  The Court continued: "The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." Frew, 540 U.S. at 442.[5]

In June 2009, the Supreme Court decided Horne v. Flores, 129 S.Ct. 2579 (2009). In Horne, the plaintiffs claimed that the State of Arizona and other defendants were violating the Equal Educational Opportunities Act ("EEOA"), which requires states to "take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 129 S.Ct. at 2589.  The plaintiffs claimed that defendants were providing inadequate English Language Learner ("ELL") instruction in

---

[5] Although Frew dealt with state oversight of a federal program (Medicaid), other courts have applied Frew where federal courts are involved in monitoring state agencies implementing state programs.  See, e.g., Gonzalez v. Galvin, 151 F.3d 526 (6th Cir. 1998) (integrating and ending discrimination in city police department); Johnson v. Heffron, 88 F.3d 404 (6th Cir. 1996) (constitutional challenge to overcrowding and other issues at Kent County Correctional Facility).

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849779.81}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
22

one school district in Arizona.  The District Court issued a declaratory judgment, finding

that the defendants were in violation of the EEOA because the funding allocated for ELL

instruction was "arbitrary and not related to the actual funding needed to cover the costs of

ELL instruction . . . ."  Id.  Thereafter, the District Court expanded its order to include the

entire State of Arizona, and issued a series of orders and injunctions accordingly.

Subsequently, the state legislature passed a bill that was intended to implement a

"permanent funding solution" to the problems identified by the District Court.  Members

of the state legislature intervened in the action, and filed a Rule 60(b)(5) motion based on

changed circumstances.  The District Court denied the motion, and the Ninth Circuit

affirmed.  The Supreme Court granted certification and reversed:

> [T]he District Court and the Court of Appeals misunderstood both the obligation
> that the EEOA imposes on States and the nature of the inquiry that is required
> when parties such as petitioners seek relief under Rule 60(b)(5) on the ground that
> enforcement of a judgment is "no longer equitable."  Both of the lower courts
> focused excessively on the narrow question of the adequacy of the State's
> incremental funding for ELL instruction instead of fairly considering the broader
> question whether, **as a result of important changes during the intervening
> years, the State was fulfilling its obligation under the EEOA by other means.**
> The question at issue in these cases is not whether Arizona must take "appropriate
> action" to overcome the language barriers that impede ELL students.  Of course it
> does.  But petitioners argue that Arizona is now fulfilling its statutory obligation
> by new means that reflect new policy insights and other changed circumstances.
> Rule 60(b)(5) provides the vehicle for petitioners to bring such an argument.

Horne, 129 S.Ct. at 2588-89 (emphasis added).  The Court specifically noted that when it

enacted the EEOA, Congress "intended to leave state and local educational authorities a

substantial amount of latitude in choosing the programs and techniques they would use to

meet their obligations . . . ."  Id. at 2589.

Relying on Rufo and Frew, the Horne Court confirmed that Rule 60(b)(5) "serves

a particularly important function" in "institutional reform litigation," because "injunctions

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849779.8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

23

issued in such cases often remain in place for many years, and the passage of time frequently brings about changed circumstances – changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights that warrant reexamination of the original judgment." Id. The Court also reiterated the "flexible approach" standard, and the fact that this standard ensures that "responsibility for discharging the State's obligations is returned promptly to the State and its officials" when the circumstances warrant. Id. at 2595. Finally, the Court confirmed that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow from such a violation." Id.

Accordingly, the "critical question" before the Court in Horne was "whether the objective of the District Court's 2000 declaratory judgment order – i.e., satisfaction of the EEOA's 'appropriate action' standard has been achieved. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." Id. (emphasis added) (citation omitted). The Supreme Court held that the Court of Appeals had erred in applying a "heightened standard" to its inquiry by narrowly focusing on whether the current funding complied with the terms of the original District Court order, rather than whether "changed conditions in [the district] provided evidence of an ELL program that complied with the EEOA."

"When the objects of the decree have been attained – namely, when EEOA compliance has been achieved – 'responsibility for discharging the State's obligations [must be] returned promptly to the State and its officials.'" Id. at 2596 quoting Frew, supra, 540 U.S. at 442. The Supreme Court criticized the Court of Appeals for focusing only on whether the terms of the original order had been complied with: "satisfaction of

an earlier judgment is *one* of the enumerated bases for Rule 60(b)(5) relief – but it is not the only basis for such relief," and the Court of Appeals erred in failing to "ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law." Id. at 2597.

Based on the standards articulated by the United States Supreme Court in Dowell, Rufo, Frew, and Horne, the defendants here are entitled to relief from the Consent Decree and Exit Plan, and the Motion to Vacate pursuant to Rule 60(b)(5) should be granted.

   3.   **The Consent Decree Should Be Vacated Because Widespread Reform of Connecticut's Child Welfare System Since the Time of the Filing of the Original Complaint Constitutes Changed Factual Circumstances.**

It cannot be genuinely disputed that Connecticut's child welfare system has been completely transformed in the twenty years since the Consent Decree was entered. This transformation encompasses vastly increased financial resources, and overhaul of the Department's programs, practices, and policies as well as data and outcomes. Today the Department's practices, policies, and outcomes for children bear no resemblance to the child welfare system described in the complaint. Connecticut's accomplishments compare favorably to other child welfare agencies in relation to national benchmarks, and many aspects of Connecticut's programs and practices have been noted by the federal Department of Health and Human Services Children's Bureau in its ongoing review and assessment of the State's child welfare system. The systemic reform of the Department has also been reviewed and favorably assessed by the Juan F. Court Monitor. A detailed snapshot of Connecticut's child welfare system "then" and "now," with appendices, is submitted herewith as Exhibit D. The changes, set forth in categories that track the issues identified in the Consent Decree and Exit Plan, can be summarized as follows.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849998.8}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
25

A.    **Investigations.**

The allegations in the complaint regarding alleged deficiencies in the Department's investigations of reported abuse and/or neglect are two-fold: first, the plaintiffs claim that the Department failed to conduct investigations into reports of abuse and/or neglect received by the Department; and second, that in those instances in which the Department did conduct investigations, those investigations were not completed in a timely manner, and were not always conducted by adequately trained staff.  (See Cmplt. ¶¶ 138, 139.)  The Department has now fully remedied all of the claimed deficiencies in the Department's response to and investigation of reports of abuse and/or neglect.

Specifically, Connecticut has improved child safety through investigations now conducted by highly trained social workers with significantly lower caseloads who routinely initiate and complete investigations in a high quality and timely manner in accordance with federal and state law.  According to the Court Monitor's most recent report, DCF currently initiates timely investigations into **97.8%** of reports made to it in accordance with mandated response time.  (Ex. B at 8.)  Moreover, the percentage of reports for which investigations were commenced has been in the mid to high 90's for the last twenty quarters.  (Id.)  This is a dramatic improvement over the conditions existing when the complaint in this matter was filed, and is well above the "at least 90%" requirement in the Exit Plan.

Similar improvements have been achieved in the time taken to complete investigations.  The requirements imposed by the Exit Plan are that "at least 85%" of reports accepted by DCF Hotline be completed within 45 days.  (Exit Plan at 7.)  Between January 2000 and September 2004, the rate of completing investigations within forty-five

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
26

days fluctuated between a low of 58% in the first quarter of 2001 to a high of 86% by the first quarter of 2003.  Since October 2004, with one exception, the percentage of investigations completed within forty-five days has been over 90%, with the most recent quarter (fourth quarter 2009) having a 94.3% completion rate within forty-five days.  (Ex. B at 8.)  Moreover, according to case reviews completed by the Court Monitor's office in November 2005 and September 2007, reviewers found that nearly 90% of investigations were either "superior" or "good"  (Juan F. Court Monitor's Office, Reports of Case Record Reviews.)

Finally, caseloads for investigators have been lowered drastically since the entry of the Consent Decree, and have been kept stable for several years.  According to the allegations in the complaint, Department intake workers had caseloads of "thirty or more" cases.  (Cmplt. ¶ 216.)  The Exit Plan mandates that DCF Investigators have no more than seventeen cases at any time.  (Exit Plan at 29.)  In December 2009, the average caseload for a DCF investigator was 10.8 cases per worker; the average over the past six years has been 10.01 cases.  (DCF Division of Information Systems—LINK.)

### B.   Pre-Placement Services.

The complaint alleges: "[F]ailure to make reasonable efforts to keep families together by providing to families which are threatened with the removal of a child because of abuse or neglect reasonable and appropriate services to prevent placement into out-of-home care . . . ."  (Cmplt., Introduction, sub-part b.)

Connecticut's record in providing appropriate services to keep families together since the entry of the Consent Decree is likewise laudable.  The number of children in out-of-home placement resulting from abuse or neglect fell 30%, from 5,702 children, in

January 2002, to 3,998 children, in December 2009.  See, Ex. D, Appendix C. Looking

further back to January 2000, when there were 6,183 children in placement resulting from

abuse or neglect, there has been a 35% reduction.  (Ex. D, App. C.; DCF ORE --Chapin

Hall.)[6]  The number of in-home cases has grown 42% over the past 8 years:  In January

2002 the average in-home caseload was 2,835; by November 2009, the average was 4,047.

(Ex. D, App. C.)

     Comparing the average in-home caseload and the number of children in the Juan

F. class in 2002 with today's figures, there is a clear shift of service from out-of-home care

to in-home care: the Department's average in-home caseload is 43% higher today than in

2002.  (Ex. D, App. C.)   In State Fiscal Year ("SFY") 2009, 57,786 children were served

by DCF.  During this twelve month period, 8,003 children were served in out-of-home

care; thus, roughly 86% of all children served were served solely in the home during the

State Fiscal Year.  (DCF ORE.)  On December 16, 2009, 21,262 children were being

served by DCF.  On the same day, there were 3,998 children in placement.  Put another

way, 81% of children were served in their homes.  (DCF ORE.)

### C.    Family Foster Care and Out-of-Home Placements.

The complaint alleges as follows:

1)     Failure to provide minimally-adequate and appropriate care to all of the
children who are placed in foster homes or other substitute care setting.

2)     Failure to place children in the least restrictive, most family-like settings
and in settings which allow them to maintain sibling relationships and are
culturally appropriate.

---

[6] "DCF ORE" refers to the Department's Office of Research and Evaluation, which has
access to the Department's entire LINK database, and the ability to search all Department
data, in order to produce information on the Department's performance, programs and
activities.

CARMODY & TORRANCE LLP   50 Leavenworth Street
{N0849977.8,8}  Attorneys at Law     Post Office Box 1110  28
                       Waterbury, CT 06721-1110
                       Telephone: 203 573-1200

3)    Failure in DCF's use of overcrowded and inadequately trained and
      supervised foster homes that do not conform to nationally accepted
      standards.

4)    Failure to provide adequate training in sexual abuse or to develop sufficient
      specialized sexual abuse services and placements.

5)    Failure to provide foster parents with frequent, routine and supportive
      contact and assure quality through relicensing.

6)    Failure to provide supportive resources such as respite care, day care,
      individual and family counseling and funds for necessary incidental
      expenses.

7)    Failure to provide adequate pre-licensing training is inadequate to prepare
      foster parents and post licensing training is neither required nor
      offered…failure to provide specialized levels of family foster care in a
      statewide system of specialized and treatment foster care…failure to
      provide shelter services and group homes in all regions of the state
      (emphasis on group homes for girls, emergency placements for those aged
      8-13, maternity homes, and therapeutic group homes for adolescents cited).

8)    There is no automated system to track available residential treatment and
      hospital beds and discharge planning is inadequate.

(See Cmplt. ¶¶ 158-197.)  Connecticut's system of providing family foster care has been

completely transformed since the entry of the Consent Decree: Connecticut now has a

foster care system that has a greater capacity for individualized services, family-based

care that is better trained and supported, and is provided with greater financial and clinical

resources.  Connecticut foster care has more effective systems and practice enhancements

that better assure appropriateness of placement.  Steps taken include the following.

In 1996, the Department developed policies, protocols, and centralized resources

for providing post-licensing support and training for foster and adoptive parents.  The

Department contracts with the Connecticut Association for Foster and Adoptive Parents

("CAFAP") to provide post-licensing services, including a 24-hr HELPLINE, peer and

group support forums, legal consultation and trainings/conferences.

In 2001, the Department implemented the Parent Resources for Information, Development and Education ("PRIDE") standard pre-licensing assessment process developed by the Child Welfare League of America.  Department policy requires that all prospective foster care and adoptive parents complete and participate in the assessment process.  The PRIDE process is one component of a comprehensive and multi-faceted licensing assessment process which includes: a home study and multiple home visits completed and conducted by Office of Foster and Adoption Services ("OFAS") support and assessment staff, within 90 days of licensure application; and the prospective family's full and complete participation in the group assessment curriculum covering eight topic areas including, but not limited to: "Working with Birth Families"; "Child Development and Discipline"; and "Sexual Issues and Concerns," which touches on boundaries and considerations when caring for a child victim of sexual abuse.

Department policy now provides for each licensed foster or pre-adoptive parent to complete post-licensing training.  Within the first eighteen months of initial licensure, all parents must complete forty-five hours of mandatory training.  In each subsequent year, all parents must complete nine additional hours of training.  Some exceptions are made for individuals with a child-specific license, e.g., a relative, special study or independent license.  Training is offered by CAFAP and the DCF Training Academy.

In addition to the changed conditions noted above with regard to pre-placement services, the Department has made vast progress in the quality and stability of placements. Overall, considering children who enter the Department's care as a result of abuse or neglect, the placement rate in Connecticut is 3 per 1,000 children in the state's population. This rate is among the lowest in the country – using national foster care data and 2008

population estimates, the national average is 4.1 per 1,000.  (DCF ORE; AFCARS 2006/ 2008 Census Data; see App.C.)  There were 915 children in congregate care settings on December 1, 2009, which represents one-third fewer children when compared to January 1, 2004 (when there were 1,330 children in congregate care settings).  (DCF ORE.)

Since measurement began, in January 2004, the Department has consistently exceeded the Exit Plan's requirement that at least 85% of the children in DCF custody experience no more than three placements during a twelve month period.  (See Exit Plan Outcome Measure 12.)  For the past twenty three quarters this number has never fallen below 90%, and is in fact around 95% for most quarters.  (See Ex. B at 8.)

In SFY 2009, only 1% of the 8,003 children who spent time in out-of-home placement were victims of substantiated maltreatment by their caregiver while in care. Over the course of measuring the rate of maltreatment in foster care for the Exit Plan (based on the Exit Plan specification), the average rate of maltreatment in care was 0.5%, far less than the Exit Plan limit of 2%.  (Id.)  In 2004, the rate was 0.7%.  (Ex. A, at 8.) For the third quarter of 2009, 84.7% of sibling groups were placed together or separated for clinical reasons.  (Ex. A at 6.)  This rate is within one-two percent of the average rate for the fourth quarter of 2006 forward.  (Ex. A at 8.)  In 2004, the Department created and integrated the "Relative Resource Search" LINK Icon.[7]  This enabled the Department to track agency efforts and effectiveness and ultimately measure compliance with Exit Plan

---

[7] In June 1996, LINK was launched as the Department's comprehensive automated case management tool.  Serving as the state's State Automated Child Welfare Information System ("SACWIS"), LINK is required to support the reporting of data to the Adoption and Foster Care Analysis Reporting System ("AFCARS") and the National Child Abuse and Neglect Data System ("NCANDS").  The overall improvements and upgrades in the Department's technology and information systems, including LINK, are discussed infra at pp. 45-49.

CARMODY & TORRANCE LLP
{N0849778.8} at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

31

Outcome Measure 4 (Search for Relatives), which the Department has achieved for seventeen consecutive quarters dating back to the fourth quarter of 2005.  (Ex. B at 8.)

Regular foster care payment rates (higher for therapeutic levels of foster care) currently average $26.67 per day, one of the highest rates in the country.  Adoption.com, Online Guide to Adopting from Foster Care, State resources, Connecticut, http://foster-child.adoption.com/parents/connecticut-5.html (last visited April 9, 2010).   In 1989, DCF had 990 licensed foster homes.  In November 2009, DCF had 2,358 licensed foster homes, as well as an additional 989 private foster homes, for a total of 3,347 foster homes.  This represents a 238% increase in the number of licensed foster homes since the inception of this litigation.  (DCF Foster Care Services Report, November 2009.)  By February 2010, DCF had 2,593 regular foster homes, and 983 therapeutic foster care homes, for a total of 3,576 licensed foster homes. (DCF ORE.)

### D.    Medical and Mental Health Care.

The complaint alleges:

1)    Failure to ensure that all children in care receive adequate medical and mental health assessments and treatment.

2)    Failure to provide specialized substitute care placements for all children with special needs.

3)    No consistent, coordinated and comprehensive system to ensure that the mental and medical health needs of children in care are met, including health screening, routine periodic medical and dental examinations, or a fully documented medical history, continuity in their health care because of inadequate referral and follow-up system or inadequate mechanisms to assure they are receiving necessary and appropriate treatment.

4)    Emergency services are insufficient to meet the need and access to services varies by region.

CARMODY & TORRANCE LLP
Attorneys at Law
{N08497798}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

32

5)      Outpatient services are capped and have waiting lists, assessment and
        diagnostic shelter services are insufficient and special cultural and
        linguistic appropriate services are lacking.

6)      All levels of services are lacking for adolescents in care - limited
        residential level of care is available and the system of care for substance
        abuse services is not coordinated making necessary care and treatment
        delayed or denied.

(Cmplt. ¶¶ 143-152.)

        In 1989, the Department had limited resources to support a social worker's ability
to manage a child's medical and mental health needs.  Today, social workers have multiple
resources available to them, including: Regional Medical Directors who provide
psychiatric consultation on children with behavioral health needs and see children as
needed; the Centralized Medication Unit that reviews and makes decisions regarding
requests for consent by providers to prescribe psychotropic medications for DCF-
committed children and youths; and Health Advocates that assist social workers access
insurance.  In addition, LINK has a medical profile that centralizes medical information in
one location in the case narrative.  The Department has developed this consultation
capacity in order to aid social work staff, better manage access to, and quality of, medical
and mental health services, and provide direct support to the children and families served
by the Department.

        The Department routinely provides necessary medical and mental health care for
the children in its care, and has done so for many years.  The Department now routinely
provides multi-disciplinary examinations ("MDE") for children entering DCF placement
within their first thirty days in care.  Since 2006, the Department has surpassed the
standard to provide these assessments within thirty days of entry for 85% of children first
entering DCF care.  Specifically, since the fourth quarter of 2006, over 90% of all first

CARMODY & TORRANCE LLP
{N0819977938}Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
33

time entries have had an MDE and 93% of all children had their MDE within 30 days of

entry. Exit A at 8. Indeed, Children's Rights acknowledged progress in this area by

stating:

> Connecticut's Department of Children and Families has cleared a longstanding
> backlog of over 1,000 children in foster care awaiting required health check-ups
> and dramatically improved its efforts to assess and plan for the services and
> treatment needed by abused and neglected children, according to a new report
> tracking DCF's progress in implementing sweeping child welfare reforms required
> under court orders secured by Childrens Rights."

Childrensrights.org, Connecticut Successfully Implementing First Steps of Plan to Fix
Child Welfare Problems, http://www.childrensrights.org/news-events/press/connecticut-
child-welfare-agency-succeeding-in-implementing-first-steps-of-plan-to-fix-persistent-
problems/ (last visited April 9, 2010).

In September 2009, the Court Monitor conducted a review on a statewide,

statistically valid sample of 254 children selected from the DCF caseload on June 29,

2009, to determine if the Department was meeting its obligation in providing the required

timely EPSDT screens. The review found that 236 children, comprising 92.9% of the 254

children in the case-sample, were current for their EPSDT medical screens. (Office of

Juan F.Court Monitor, Report of Case Record Review Re: EPSDT Screens.)

DCF and the Department of Social Services have formed the Connecticut

Behavioral Health Partnership ("CT BHP") to plan and implement an integrated public

behavioral health service system for children and families. The primary goal of the

CT BHP is to provide enhanced access to and coordination of a more complete and

effective system of community-based behavioral health services and supports and to

improve member outcomes. Secondary goals include better management of state

resources and increased federal financial participation in the funding of behavioral health

services. The CT BHP is able to generate over 200 reports, including a listing of children

residing in residential facilities, hospital discharge delays, daily census reports, and other aggregated reports to identify practice and outcome trends.

One important effort under the CT BHP was the introduction of Enhanced Care Clinics ("ECC's") in 2007, which focused on expanding access to outpatient and crisis intervention services, and on improving service. Throughout the state there are thirty-five ECC's (twenty-one of which are Outpatient Clinics for children), all of which are specially designated mental health and substance abuse clinics that serve children and families. ECC's receive a 25% increase in their reimbursement rate in exchange for meeting certain criteria, most notably timely access to service requirements. This can involve seeing clients with emergent needs within two hours, seeing clients with urgent needs within two days, seeing clients with routine needs within two weeks, and providing extended coverage outside normal business hours.

An initial focus of the CT BHP has been on diversion from restrictive levels of care to community based alternatives. Notable achievements over the past four years include a 60% decrease in time children are delayed in Emergency Departments, a 64% decrease in the number of discharge delay days on inpatient units, and a 23% decrease in referrals to residential care. To accomplish these milestones, a concomitant increase in the use of community based programs, most notably home based interventions has also been evidenced. The number of admissions to all home-based programs increased from 1337, in Calendar Year ("CY") 2007, to 2057, in CY 2009.

Not surprisingly, HUSKY A expenditures have risen by more than thirty million dollars from SFY 2007 ($94,563,849) to SFY 2009 ($130,578,440). While the HUSKY program experienced an increase in average monthly enrollment from 2007 to 2009

CARMODY & TORRANCE LLP
{N0849778;8} Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
35

(231,625 to 250,397), increased membership alone can not account for the rapid rise in expenditures. The increase can be tracked to the increased utilization of home-based services and the expansion of one of the most intensive home-based services know as IICAPS which expanded from approximately 40 teams to over 100 teams statewide, over a three year period. Outpatient utilization has also experienced a significant rise over the past three years. The number of child outpatient registrations rose by 20.3% over the course of the last calendar year (27,529 registrations in 2008 to 32,024 in 2009), requiring additional Medicaid outlays.

Several important findings have also been recently presented by the CT BHP, which highlight its targeted work, since its inception, in improving the outcomes for children and families accessing Connecticut's public mental health system. In the last three years:

1)    Length of stay in an inpatient hospital bed decreased by 2 days;

2)    The number of discharge delayed days in an inpatient hospital setting decreased by 12%;

3)    Length of stay in Private Residential Treatment Facilities decreased by 47% (378 to 171 days);

4)    94.5% of routine appointments with an Enhanced Care Clinic were offered within 14 days;

5)    Length of stay in all residential settings decreased by 9.5% (350 to 276 days).

(CT BHP Report to the Behavioral Health Partnership Oversight Council, Oct. 14, 2009, at 6, 26; copy submitted as Exhibit E.)

In 1989, the Department's independent living program offered limited programs and other supports to help adolescents prepare for and transition to adulthood. Today, the

Department has comprehensive policy on working with adolescents and offers a full

continuum of services which are detailed in Exhibit D to this brief, including:

1. **Adolescent Specialists:** provide case management services to committed youths (age 14 and older) in out-of-home care where reunification efforts are no longer appropriate.

2. **Treatment Planning:** begins with the Adolescent Planning Conference that provides the roadmap for independent living service delivery, and ends with the Adolescent Discharge Plan that serves as the transition from care plan. During this process, Adolescent Specialist address and document those issues that are specific to the needs of this population.

3. **Medical Coverage:** In Connecticut, any youth who is in a DCF funded placement at the time of their eighteenth birthday is eligible to obtain Medicaid coverage until age of 21. Some youths who remain involved with DCF past age 21 are eligible for continued medical coverage until the age of twenty-three, or until their DCF case closes. The medical coverage provides them a full benefits package, including a broad array of health care screening, diagnosis and treatment services.

4. **Mentoring:** provides a youth with a contact to his/her community other than the DCF Adolescent Specialist. A mentor and youth work together on a one-to-one basis to resolve issues identified by the youth.

5. **Youth Advisory Boards:** Every area office has a Youth Advisory Board comprised of youths in out-of-home care to address departmental policies and procedures involving youth issues and the unique problems of youth transitioning from out-of-home care.

6. **Community Life Skills Programs:** community based life skills education and training programs for youths in foster care and other community settings.

7. **Community Housing Assistance Program (CHAP):** a semi-supervised, subsidized, housing program for youths ready for less supervision and more independence.

8. **Post Secondary Education:** enrollment and support with enrollment in two- year and four-year colleges, as well as vocational, technical, and certification programs. Pupil Services Specialists assist youths to maximize their educational outcomes. College tours are offered annually.

9. **Work/Learn Programs:** comprehensive programs that help youths access a mix of educational, employment and personal development opportunities intended to lead to success in adulthood.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

37

10. **Job Corps/Americorps Programs:** a no-cost educational and vocational training program, administered by the U.S. Department of Labor, that helps youths ages 16 through 23 by providing comprehensive job training and job placement.

11. **Wilderness School:** offers high-impact experiential wilderness programs to foster positive youth development.

12. **Preparing Adolescents for Self Sufficiency (PASS) Group Homes:** provide an environment that fosters optimal individual outcomes in education, vocation, employability, independent living skills, health, mental health, community connections and permanent connections.

13. **Short Term Assessment and Respite Home (STAR):** a temporary congregate care program that provides short-term care, evaluation and a range of clinical and nursing services to children removed from their homes due to abuse, neglect or other high-risk circumstances.

14. **Supportive Work, Education and Transition Program (SWETP):** youth-shared apartments, staff on-site 24/7, with facilities for community areas and educational/vocational services. SWETP provides an environment that fosters individualized maximum outcomes in education, vocation, employability, independent living skills, health, mental health, community connections and permanent connections.

15. **Transitional Living Apartment Program (TLAP):** transitional living clustered apartment settings and home-like settings, with staff on-site 24/7. This program is for youths in out-of-home care who are ready for a less restrictive environment, but not yet ready for independence.

16. **Outpatient Adolescent Substance Abuse Treatment:** outpatient substance abuse treatment including substance abuse screening and evaluation, individual, group and family therapeutic interventions.

17. **Aftercare:** assistance for youths who have completed the required programs and are now fully self-sufficient.

18. **Re-Entry Program:** A youth who is between the ages of eighteen (18) and twenty-one (21) and who has left the care of the Department may be eligible to re-enter the Adolescent Services Program on a case-by-case basis in order to continue their education.

Moreover, community based behavioral health funding totaled $69.2 million in

SFY 2009; more than double the amount spent in SFY 2002 ($32 million).  Since 2005,

DCF has established fifty-four therapeutic group homes for children with behavioral

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849779.8}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
38

health treatment needs; approximately 273 children receive intensive clinical services in the community as a result of this initiative. Intensive in-home clinical services and family support services are available to approximately 3,000 children and their families. Intensive in-home- services, some which did not exist prior to 2004 and most that had very limited availability until recently, include:

- Multi-Systemic Therapy;

- Multidimensional Family Therapy;

- Intensive In-home Child and Adolescent Psychiatric Services;

- Family Support Teams;

- Intensive Community Family Support Services;

- Functional Family Therapy; and

- Family Based Recovery and Building Stronger Families.

### E.    Permanency.

The complaint alleges widespread delays in freeing children for adoption and inadequate recruiting, screening, and licensing of potential adoptive homes. (See Cmplt. ¶¶ 202-207.)

The timeliness of adoptions has increased significantly over the past five years. Compared to the first quarter of 2004, the percentage of children adopted within twenty-four months has, on average, more than tripled over the last eight quarters, ending September 31, 2009. Specifically, in the first quarter of 2004, the percentage of children adopted within twenty-four months was 10.7%; the average quarterly rate for the period between fourth quarter 2007 and third quarter 2009 was 34%. Moreover, during SFY 1997 to SFY 2005, an average of 615 permanent homes (both adoptions and subsidized

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
39

guardianships) were found annually for children in foster care – more than four times the number in SFY 1996.  During SFY 2007, SFY 2008, and SFY 2009, the average annual number of permanent homes found was 865.

From January 2000 through November 2009, there have been 5,467 adoptions. This amounts to an annual average of 547 adoptions.  Further, despite a shrinking population of children in foster care, the Department finalized a large number of adoptions in recent years, with 594 in 2007, 632 in 2008, and 631 in 2009.  (DCF ORE.)

Moreover, DCF has earned over $2 million in federal adoption incentive grants since 1998 (including most recently in 2009), based on DCF's improved performance in achieving adoptions.  (DCF Fiscal Division.)  In addition to the 5,467 adoptions between January 2000 and November 2009, the Department achieved permanency for an additional 4,321 children through transfers of guardianship.  (DCF ORE.)  Of the 5,467 adoptions, 5,275 (96.5%) have been subsidized, and 2,699 of the transfers of guardianship have been subsidized, totaling 8,166 subsidized permanent exits from State care.  (DCF ORE.)

The likelihood and speed of permanency has also steadily increased.  Of the children who entered DCF placement in 1997, 42% exited to a permanent destination within two years, 59% within four years, and 69% to date.  Of the children who entered DCF placement in 2006, 61% exited to a permanent destination within two years, and 77% have exited to a permanent destination within four years.  (DCF ORE.)  The amount of time a child waits to be reunified fell by more than 20% – from 14.2 months in 2006, to 11.2 months in 2009.  Meanwhile, the annual rate of re-entry within one year dropped from 9.5% (ranging from 9% to 10%) for children who were discharged between 2003

and 2005, to around 8.5% for children who were discharged between 2006 and 2008.

(DCF ORE.)

### F.    Staffing and Training.

The complaint broadly attacked the Department's staffing, and the training

provided to staff:

1)    Failure to maintain adequate numbers of caseworkers, support staff, equipment and services.

2)    Failure to provide adequate training in sexual abuse.

3)    Many vacancies are not filled and there is chronic understaffing with dangerously high caseloads that exceed minimally-accepted professional standards.

4)    There are too few clerical and case aide authorized positions and workload inequities existed especially for bilingual staff.

5)    Training falls short of national standards.

6)    Untrained caseworkers assigned cases and went to court prior to completion or even initiation of any formal or basic training.

7)    Supervisors are responsible for an excessive number of cases.

8)    Workers routinely failed to make required visits.

(See Cmplt. ¶¶ 208-226.)

Today, DCF social worker turnover is less than half of what is experienced

nationally and what was previously experienced in Connecticut.  Even when comparing

CY 2000 to CY 2008, DCF reduced its turnover rate for social workers from 9.8% to only

5.65%.  (DCF Human Resources and the American Public Human Services Association

2004 Survey, Ex. D, App. W.)  The Department's workforce has diversified significantly

over the last fifteen years as well.  In 1993, one-third of its workforce was comprised of

persons of color. In 2009, persons of color comprised nearly one-half of the Department's workforce. With respect to the Department's to social work staff, 52.4% of social workers are persons of color, as are 45.2% of supervisors, and 72% percent of case aides. (DCF Division of Diversity and Equity, Ex. D, App. X.)

Also, current DCF social worker caseloads are between fifteen and twenty cases, which is in accordance with Child Welfare League of America ("CWLA") national standards. See Child Welfare League of America, Caseload Standards, http://www.cwla.org/programs/standards/cwlacaseloadstandards.htm (last viewed April 9, 2010). Prior to the Consent Decree, workers typically had caseloads of forty to sixty cases. (Cmplt. ¶ 216.) Along with meeting caseload standards under Outcome Measure 18, the Department has correspondingly maintained a worker to supervisor ratio of five to one, since entering the Exit Plan.

The Department has also drastically increased and improved the training provided to its staff. In SFY 2007 and 2008, the Training Academy conducted the equivalent of approximately 3,036 days of in-service training, and 6,673 days of pre-service training for a total of 9,709 days of training provided to 12,617 staff. (DCF Training Academy Annual Report.)[8] DCF Social Workers are some of the highest paid in the nation with significant increases in pay over time, which have consistently exceeded the rate of inflation. In 1988, the starting salary for a Social Worker was a minimum of $30,295 and a maximum of $36,918. Last year, the starting salary had increased to a minimum of $57,663 and a maximum of $75,897. It is also notable that the range of salary is greater,

---

[8] The DCF Training Academy was agreed to by the parties in the Consent Decree, and was created directly as a result of the entry of the Decree.

permitting the Department to better set a pay rate commensurate with experience.  (DCF Human Resources Data, Ex. D, App. Y.)

The pre-service program for newly hired social workers and trainees is designed to prepare each staff member for effective protective service/child welfare practice, as well as to provide a background in behavioral health and service delivery.  There are several components to the pre-service program: classroom training at the Training Academy, supervised casework experience in a training unit, and area-based activities aimed at enhancing the transfer of learning process.  By way of example, during SFY 2008, the Training Academy trained 148 new staff, broken into seven pre-service groups.  Each new hire attended twenty-five classes and received thirty-three total days of training.
The Training Academy continues to provide pre- service training with a two-tier system.  Cases are assigned on an on going basis, and from the date of hire, new social workers and social worker trainees carry a 100% caseload at the completion of the first four months of training (Tier 1).  The second tier is completed during the fifth to twelfth month of training (Tier II).  Tier II training classes build upon the trainee's experience in the region/area office.  This approach to pre-service training assisted the area offices with caseload utilization without compromising services to children and families.

In 1989, the mandatory training for Social Workers in their first years included no component dealing with sexual abuse.  Sexual abuse training was offered only as an option for staff who had served as social workers for more than two years.  Today, new social workers receive two full days of training on sexual abuse as part of their required pre-service training at the DCF Training Academy.  In addition, all social workers who

CARMODY & TORRANCE LLP
{N0849778;8}  Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
43

transfer to investigations are required to take an eight-day training; one full day of which is now devoted to sexual abuse.

Another major improvement by the Department has been the frequency and quality of social worker visits with children. Exit Plan Outcome Measures 16 and 17 are aimed at this component of the Consent Decree. Outcome Measure 16 is aimed at improving visitation with children in out-of-home placements, and requires that DCF visit "at least 85% of all out-of-home children at least once a month . . . ." (Exit Plan at 27.) In the fourth quarter of 2004, shortly after the inception of the Exit Plan, worker-child visitation for children placed out of the home took place within the required timeframes approximately 80% of the time. (Ex. B at 8.) By 2005, however, the Department was consistently meeting this 85% benchmark and has continued to perform above the minimum standard for visitation outlined in the Exit Plan; at the conclusion of the third quarter of 2009, the Court Monitor reported that this measure had been met in 99.3% of cases; by the fourth quarter of 2009 this percentage was 99.7%. (Id.) Moreover, the Department has met or exceeded this measure for seventeen consecutive quarters. (Id.)

Outcome Measure 17 likewise requires that DCF visit "at least 85% of all in-home family cases at least twice a month . . . ." In-home visitation has followed a pattern similar to that of out-of-home visitation, with the Department now consistently exceeding the Exit Plan visitation standard. (See Ex. B at 8.) In 2004, this Outcome Measure was being met in only about 40% of cases. (Id.) By the first quarter of 2009, this increased to 90.5%, and the second quarter of 2009 percentage was 89.6%. (Id.) The third and fourth quarter percentages were 88.8% and 88.5%, respectively. (Id.) Moreover, this Outcome Measure has also been met for seventeen consecutive quarters. (Id.)

G.      **Management and Systems**.

The original complaint alleged a multitude of deficiencies in the Department's management and systems – deficiencies that pervaded and impacted many of the remaining systemic issues existing when the complaint was filed.  The complaint alleges the following:

1)      Failure to develop and implement appropriate case plans, as required by federal law,  that will assure permanent placements for all children in their custody, either by providing services to families to enable the children to be returned home safely or by timely permanency of the children into permanent homes.

2)      There is an absence of professional judgment used in the development of plans and they are vague and unfocused, contain no meaningful timetables and are written without the consideration of the needs of the child and family.

3)      Plans are not reviewed every six months as required by law, nor are dispositional hearings always held within time limits mandated by federal law.

4)      Information system is insufficient - records are seldom complete and there is no reliable system for identifying individual children in care and tracking action taken for them.

5)      The child welfare agency is "chronically underfunded."

Cmplt. ¶¶198-202, 227-230.

As an initial matter, Connecticut now invests over $870 million annually to serve vulnerable children; an amount nearly three and one half times the amount of the annual budget at the time the Consent Decree became effective in 1991.  (DCF 2009 Comprehensive State Fiscal Report.)

DCF has over 100 Service Types and a range of other services purchased through its Flex Funding, including: mentoring, respite services, wrap services, housing expenses,

and therapeutic and recreational activities for children and youth in out-of-home care.

Contracted Services in SFY 2008 totaled $204 million and an additional $103 million in

Fee- For-Service program spending, for a total of $307 million.  An additional $193

million is spent through DCF's Board and Care Accounts for Adoption and Foster Care

subsidy payments, no nexus education costs, and Flex Fund spending, for a total of **$500

million in purchased services**.  There were 153 contracts entered into in SFY 2008.

The Connecticut Comprehensive Outcomes Review ("CCOR") was developed and

introduced by the Department in 2008 and is modeled on the federal Child and Family

Services Reviews ("CFSR"), which looks at the Department's performance across seven

outcomes in the areas of safety, permanency, and well-being, in a qualitative manner.[9]

Administered by DCF, the CCOR, like the CFSR, is comprised of two phases:

    1.   Area Office Self Assessment - The area office completes a self-assessment
         document that describes their performance across the seven CFSR
         outcomes.  This self-assessment is shared with the review team and serves
         to inform the reviewers of local strengths, areas needing improvement and
         practice issues identified by the local management team.

    2.   On-Site Review - A week-long case review is conducted by a team of
         reviewers on randomly selected cases.  In addition to reviews of the case
         record and interviews with case participants conducted by reviewers,
         CCOR Team Leaders conduct focus groups with local stakeholders and
         providers to identify strengths and areas needed improvement.

To date, the Division of Planning & Best Practices, in partnership with the Office

of the Court Monitor and staff from various other DCF divisions, has reviewed 119 cases

and interviewed approximately 550 case participants and stakeholders in ten DCF Area

Offices.  Reports for each office are completed within forty-five days of the review week

and highlight the strengths and areas needing improvement as identified by the review

---

[9]  The federal CFSR, which is administered by a division of the federal Department of
Health and Human Services, is discussed fully infra at pp. 52-53

team. Each area office is scheduled to be reviewed using this framework every three years.

DCF has prepared a Program Improvement Plan ("PIP") for submission to the Children's Bureau to respond the findings of the 2008 CFSR. An inclusive process was used to gather input from DCF staff at all levels in preparing the plan. The Children's Bureau recently approved the PIP as an effective plan to address the areas found to not be in substantial conformity in the CFSR. Risk Management data are submitted on a monthly basis by all programs, agencies, or institutions currently licensed, contracted, funded, or operated by the Department. Reports are generated on the number served and program accountability, as well as duration of physical restraints, non-serious and serious injuries, and other relevant information. This information is then used as part of the Department's licensing and program oversight responsibilities. (See DCF Policy 31-8-3.)

In 1986, the Department utilized four data management systems that were not integrated, including: Case Management System ("CMS") - containing data on 43,000 cases, of which 11,500 were active; Vendor Payment System ("VPS"); Adoption Resource Exchange System ("ARES"); and Careline System ("VSAM-DMS"). Since that time, the Department has substantially improved its data management:

- In June 1996, LINK was launched as the department's comprehensive automated case management tool. Serving as the state's State Automated Child Welfare Information System (SACWIS), LINK is required to support the reporting of data to the Adoption and Foster Care Analysis Reporting System (AFCARS) and the National Child Abuse and Neglect Data System (NCANDS). LINK has replaced the functions of pre-existing systems and CMS data has been migrated to LINK.

- Today, LINK is a fully-integrated system serving more than 3,100 end-users in multiple locations statewide that supports the critical mission of the Department of Children and Families. The overall LINK functionality is separated into four primary areas: **Service Management** - providing workers and supervisors with tools to better manage service delivery to

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849776.8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

47

children and families; **Provider Management** - providing tools to manage foster homes; **Financial Management** - supporting the business of the department by allowing users to perform fiscal management tasks, assure proper payment for services, and claim associated federal reimbursement; and **Common Application Functions** - those functions that are common and required by more than one LINK sub-system. These support the technical infrastructure of LINK, DCF business activities, or are stand-alone business functions themselves.

- Since March 2004, DCF has been engaged in a unique collaboration with the Chapin Hall Center for State Foster Care and Adoption Data at the University of Chicago whose mission is to support child welfare agencies in using longitudinal data and cutting-edge information technology to improve outcomes for children by monitoring their foster programs more effectively and evaluating how their investments are achieving desired results. Through Chapin Hall, DCF is able to access data and generate a variety of individual or aggregated reports (based on DCF foster care and adoption administrative records submitted to Chapin Hall who organizes these data into a robust and flexible longitudinal database). The Department also receives technical assistance and training in using the database and has become part of a professional community of child welfare administrators who share best practices with peers and expert researchers in the field.

- Since August 2004, the department has used Results-Oriented Management (ROM) as a tool to assist child welfare management to achieve critical outcomes for children and families. Drawing from LINK data and available through the Department's intranet, managers can examine case-level data using several views on performance. ROM has been an invaluable tool to assist with pro-active decision making and monitoring impact of effort.

- In July 2009, DCF made an important effort to develop, implement and evaluate an enhanced data collection and reporting system for DCF funded programs. The purpose of this initiative, Programs and Services Data Collection and Reporting System ("PSDCRS"), is to create an effective, efficient, and value-laden information system for describing the populations served and identifying client and program level outcomes. PSDCRS will yield credible, quality and timely data, which is essential to managing and influencing policies, programs and research agendas. PSDCRS is a web-based application and its primary goals are to improve user friendliness, make the data more useful for program and clinical management, and create a more efficient service system.

(Ex. F; Ex. D, see Apps. AA and BB.)

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;6}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
48

In <u>Horne v. Flores</u>, supra 129 S.Ct. at 2601, the Supreme Court held that "[s]tructural and management reforms in [the municipality] constitute another relevant change in circumstances [in a Rule 60(b)(5) inquiry.]" <u>Id.</u> at 2604. Like many of the child welfare and protection laws at issue here, the EEOA at issue in <u>Horne</u> granted the states "broad latitude to design, fund, and implement ELL programs that suit local needs and account for local conditions." <u>Id.</u> at 2605. "A proper Rule 60(b)(5) inquiry should recognize this and should ask whether, as a result of structural and managerial improvements, [the municipality] is now providing equal educational opportunities to ELL students." <u>Id.</u>

In the case before this Court, DCF has successfully implemented and sustained massive systemic improvements since the entry of the Consent Decree. These reforms also bear directly on this Court's inquiry into whether changed factual circumstances support the finding that ongoing enforcement of the Consent Decree and Exit Plan is not equitable. Defendants respectfully submit that they do. Given the extensive and presumably uncontroverted evidence of the systemic overhaul and resulting dramatic improvements in the Department since the time that this litigation commenced, and in accordance with the mandates of F.R.Civ.P. 60(b) and applicable case law, the Motion to Vacate should be granted.

4. **<u>Changes in the Law Since the Entry of the Consent Decree and Exit Plan Mandate Relief From the Consent Decree and Conclusion of Court Oversight.</u>**

In addition to the significant and unprecedented changes in DCF since the entry of the Consent Decree and Exit Plan, it also cannot seriously be disputed that the legal landscape in the area of child welfare and protection has changed drastically since the

entry of the Consent Decree. These changes in federal legislation have brought about far greater oversight of state child welfare programs and, in the context of the present Consent Decree, virtually nullify the possibility of a return to conditions existing at the time the Consent Decree was entered.

A comprehensive and detailed summary of the changes in this area of the law is best illustrated in a publication issued in February 2009, by the Child Welfare Information Gateway, part of the United States Department of Health and Human Services ("HHS"), Administration for Children and Families, Children's Bureau, titled "Major Federal Legislation Concerned with Child Protection, Child Welfare and Adoption." As this title makes clear, the document provides a summary and overview of major federal legislation in the last thirty-five years directed at improving the welfare of children in this country. A copy of this document is attached hereto as Exhibit F.

As explained by HHS: "The primary responsibility for child welfare services rests with the States, and each State has its own legal and administrative structures and programs that address the needs of children and families. However, States must comply with specific Federal requirements and guidelines in order to be eligible for Federal funding under certain programs." (Ex. F at 1.) Not only does the passage of federal legislation in this area require federal departments and agencies "to issue or amend Federal policy and regulation," but also the passage of new federal legislation "prompts responses at the State level, including enactment of State legislation, development or revision of Sate agency policy and regulations, and implementation of new programs." (Id. at 2.)

The report also contains a timeline of the legislation, which shows that between 1988 (one year prior to the filing of the complaint) and February 2009, the legislature passed <u>twenty</u> pieces of federal legislation, classified by HHS as "major," aimed at improving the welfare of children in this country.  (<u>See</u> Ex. F at 3.)  A partial list of legislation passed during this period includes the following: the Child Abuse Prevention, Adoption and Family Services Act of 1988; the Family Preservation and Support Services Program Act of 1993; the Adoption and Safe Families Act of 1997; the Child Abuse Prevention and Enforcement Act of 2000; the Keeping Children and Families Safe Act of 2003; the Fair Access Foster Care Act of 2005; and the Child and Family Services Improvement Act of 2006.  The major provisions of each of these acts, including requirements imposed on the states through the federal legislation, are set forth in detail in Exhibit F.

The 1994 Amendments to the Social Security Act ("SSA") authorize HHS to review State child and family service programs to ensure conformity with the requirements of Titles IV-B and IV-E of the SSA.  The focus is on States' capacity to create positive outcomes for children and families and on the results achieved by the provision of appropriate services.

On January 25, 2000, HHS published a final rule in the Federal Register to establish a new approach to monitoring State child welfare programs.  Under the rule, which became effective March 25, 2000, States are assessed for substantial conformity with certain Federal requirements for child protective, foster care, adoption, family preservation, family support, and independent living services. The Children's Bureau, division of HHS, administers the review system, known as the Child and Family Services

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778.8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

51

Reviews ("CFSRs").  See U.S. Department of Health and Human Services,

Administration for Children & Families, Children's Bureau, Child and Family Services

Reviews, Fact Sheet, http://www.acf.hhs.gov/programs/cb/cwmonitoring/recruit/cfsrfactsh

eet.htm (last viewed April 9, 2010).  In the 2002 and 2008 CFSR of Connecticut, the

federal review team found the state to be in Substantial Conformity for its overall service

array (CFSR Item 35) and resource development (Systemic Factor V).  Moreover, the

State's overall service array (CFSR Item 35) and ability to individualize services to meet

children's needs (CFSR Item 37) were both found to be a "Strength."  (See Connecticut

Child and Family Services Review, Executive Summary & Final Report (April 2009), Ex.

G.)

The CFSR also surveys states and reports on specific criteria and outcomes that

bear directly on the issues in the Consent Decree and Exit Plan.  For example, the 2002

CFSR identified DCF's quality assurance system as an area of "Strength."  Notably, the

findings of the state's 2008 CFSR again identified DCF's quality assurance system overall

as an area of strength.  (Ex. G at 19.) The CFSR also rates states on several composite

measures related to permanency.  In both federal fiscal years 2008 and 2009, Connecticut

exceeded the federal composite standard for "Timeliness of Adoptions," with composite

scores of 113.6 and 115.3 respectively.  The national standard is 106.4 or higher.  (See

Connecticut Child and Family Services Review, Data Profile (December 7, 2009), Ex. H.)

The CFSR's systemic factor related to Staff and Provider Training incorporates an

assessment of the State's training provided to new caseworkers, the ongoing training provided

to agency staff, and both initial and ongoing training provided to foster and adoptive parents.

Connecticut was found to be in substantial conformity with the systemic factor of Staff and

Provider Training. (Ex. G at 14.)   Specifically, the CFSR determined that the State provides

CARMODY & TORRANCE LLP
{N0849778;8}      Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

52

initial training for staff that is sufficient to prepare them for the duties required by their jobs. (Id.)  The CFSR also determined that the State's training program for foster and adoptive caregivers is generally effective in addressing the skills and knowledge necessary for them to parent the children in their care. (Id.)

One additional piece of recent legislation that deserves particular note is the Fostering Connections to Success and Increasing Adoptions Act, H.R. 6893; P.L. 110-351 ("Fostering Connections"), which was signed into law in 2008.  Fostering Connections has at least two provisions that directly bear on the Outcome Measures in the present case. Specifically, Fostering Connections requires states placing children in out of home placements to first attempt to place children in their home school district – a federal mandate that directly correlates to the plaintiffs' complaint that Department does not take sufficient steps to place children in geographic proximity to their biological parents and/or siblings.  In addition, Fostering Connections also requires states to place siblings together when it is in their best interests, and to provide "frequent" visitation and other contacts when they are not placed together.

Finally, since the entry of the Consent Decree, the Department has received in excess of  ONE BILLION dollars ($1,000,000,000) from the federal government in federal funding programs.  The receipt of these funds is conditioned on the State's meeting the requirements and mandates of these federal statutes.  A detailed breakdown of federal dollars received by the Department is set forth in Exhibit I.  It cannot be seriously disputed that there have been significant changes in federal law in the area of child protection and welfare since the entry of both the Consent Decree and the Exit Plan.

In addition to these sweeping changes in federal legislation, there have been significant developments in Connecticut law since the commencement of this litigation

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849773.3}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
53

that have likewise altered the legal landscape under which this Court should consider the present motion.  Moreover, changes in Connecticut law have also impacted the manner in which the Department is required to proceed in cases in which abused or neglected children have been removed from their homes.  See An Act Concerning Child Protection and Establishing Multidisciplinary Teams to Respond to Reports of Child Abuse, Public Act 98-241.  Briefly stated, the statute establishes a procedure by which the Department may seek a ruling from the Court as to whether it must continue reunification attempts between an abused or neglected child and his or her parents, and sets forth certain criteria under which the Court is required to say no.  See id.  The statute also requires the Department to petition for termination of parental rights under certain specified situations.  See id.  Finally, the statute mandates the timing and procedure for examining permanency plans and reviewing and extending commitments to DCF, and requires treatment plans to include permanency placement goals.  See id.  All of these statutory procedures and mandates bear directly on many of the Outcome Measures in the Exit Plan.

Just as the Supreme Court in Horne directed that a District Court considering a Rule 60(b)(5) motion look to systemic changes and reforms in the underlying defendant agency,  the Court likewise held that changes in federal law must be considered to be potential changed circumstances in the context of such a motion. Specifically, in Horne, the Supreme Court considered the passage of a single piece of federal legislation –the "No Child Left Behind" Act -- to bear directly on the issue of changed circumstances in the law, and held that the Court of Appeals had erred in failing to consider the legislation. See, Horne, 129 S.Ct. at 2601: "Congress' enactment of [NCLB] represents another potentially significant 'changed circumstance'" in that the statute "marked a dramatic shift

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778,8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

54

in federal education policy." Here, the defendants have identified twenty pieces of

"major" federal legislation that provide ample grounds for this Court to conclude that

changed circumstances in the law since the entry of the Consent Decree warrant relief

from the Consent Decree and Exit Plan.

5.   **The Changes to the Factual and Legal Landscape Over the 20 Years Since the Entry of the Consent Decree Make Continued Prospective Enforcement of the Decree Inequitable; Therefore the Motion to Vacate Should be Granted.**

The Second Circuit considered a motion to modify a consent decree in the wake of

Frew and Rufo, in Barcia v. Sitkin, 367 F.3d 87 (2d Cir. 2004). In Barcia, a consent

decree was entered in 1983 and was the result of litigation challenging the "practices and

procedures of the Unemployment Insurance Appeal Board" – the entity responsible for

determining eligibility for unemployment benefits in the State of New York. 367 F.3d at

90. The decree imposed substantial procedural safeguards on the defendants, and also

permitted the plaintiffs to monitor the Board's compliance by giving plaintiffs' counsel

access to current and prior case files. The Board moved for modification of the decree to

eliminate the monitoring requirement: "the Board asked the District Court to declare that

the Board was in substantial compliance with the Consent Judgment and, accordingly, to

terminate the monitoring rights of plaintiffs' counsel." Barcia, 367 F.3d at 97.

The Board argued that the modification was warranted by both changes in the law

and changes in factual circumstances. Specifically, the Board argued that holdings by the

Second Circuit subsequent to the entry of the consent decree made clear that "plaintiffs'

due process claim underlying the Consent Judgment's imposition of monitoring upon the

Board is no longer viable" and that "principles of federalism, 'emphasized' in [recent

Second Circuit case law] and in recent Supreme Court decisions, also support termination

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778.8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

55

of the monitoring provisions." Id. at 98. The "change in facts" argued by the Board was its own "recent record of substantial compliance with its obligations under the Consent Judgment." Id. The District Court denied the Board's motion to modify, finding that there had not been either a significant change in the governing law or in the factual circumstances that would warrant the modification, and the Board appealed.

On appeal, the Board claimed that the District Court erred in considering certain statistical information on the Board's current "procedural violation" rate in rejecting the Board's "changed factual circumstances" argument, on the grounds that the Consent Decree itself contained no requirement that the violation rates considered by the District Court be below a certain percentage point in order for the Board to be in compliance with the terms of the decree. Id. at 103. The Board contended that other, non-statistical evidence of its improvements demonstrated that it was substantially in compliance with the terms of the Decree. The Court disagreed: "Turning to the data on the relevant [violation] rates, we note, as did the District Court, that procedural violations continue to occur in roughly 33% of the cases and that approximately 25% of the cases contain a serious violation. . . . These statistics do not support a conclusion that the District Court, which has had jurisdiction over the Consent Judgment for over twenty years, abused its discretion in determining that the Board is not in substantial compliance." Id. at 104.

Although the Second Circuit rejected the defendants' argument that Frew constituted a "significant change in existing law" and ultimately affirmed the District Court's denial of the motion to modify, the Court at the conclusion of its opinion, again briefly discussed Frew:

> Notwithstanding our conclusion that the District Court did not err in refusing at this time to modify the Consent Judgment, we recognize that adherence to the 8%

remedy-rate goal originally identified by the Board – **or any preconceived benchmark** – may not prove realistic or dispositive in measuring the degree to which the Board is in compliance with the Consent Judgment. Returning to *Frew*, we note the Supreme Court's instruction that a federal court "must exercise its equitable powers to ensure that when the objects of [a consent] decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." We also note the Board's concession at oral argument that its original goal of an 8% remedy rate may have been too ambitious, asserting that it is "proving to be very hard" to reach that rate. The District Court should be mindful of these considerations, and the twenty-year history of the Consent Judgment, in future proceedings in this case.

Id. at 104-05 quoting Frew, 540 U.S. at 442 (emphasis added) (alteration in original) (citation omitted).

Unlike in the present case, the defendant in Barcia did not point to any wide-sweeping systemic reform in support of its motion to modify, but rather simply pointed to its own "recent record of substantial compliance" as constituting changed factual circumstances. Nor could the defendant point to twenty or so pieces of major federal legislation that had been passed during the time the decree in Barcia was in place that had radically changed the entire legal landscape under which the defendants were operating and which foreclosed the possibility of a return to prior conditions.

Here, in contrast, DCF has gone far beyond showing a recent record of substantial compliance – it has documented two decades of significant and unprecedented improvement in Connecticut's entire child welfare system. Unlike the 25% "serious violation" rate or the 33% overall violations rate occurring in Barcia, the technical deviations from only a small number of Outcome Measures in the present case, coupled with the documented widespread institutional improvements in all facets of DCF's services and infrastructure over the last twenty years, warrant a finding that the Consent Decree and Exit Plan in the present case should be vacated.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;5}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

57

Other courts considering motions to terminate consent decrees in circumstances more similar to those in the present case have held that the significant factual changes warranted termination of the subject decrees. In <u>Basel v. Bielaczyz</u>, No. 74-40135-BC 2009 WL 2843906 (E.D. Mich. Sept. 1, 2009), the court granted the defendant's motion to vacate a consent decree pursuant to Rule 60(b)(5) due to a significant change in factual conditions and a finding that further enforcement of the decree would be detrimental to the public interest.

The plaintiffs brought suit to remedy the inability to obtain hearings and administrative action from the State of Michigan Department of Social Services ("DSS"). <u>Id.</u> In 1977, the parties agreed to the entry of a consent judgment enjoining DSS from denying claimants definitive administrative actions and hearings and requiring certain staffing by DSS to facilitate hearings and case management. <u>Id.</u> After years of improvements and compliance with the consent judgment, DSS moved to dissolve the injunction and terminate the consent judgment. <u>Id.</u>

Based on <u>Rufo</u>, the <u>Basel</u> court reasoned that, if a significant change in either factual conditions or in law would render continued enforcement of the decree detrimental to the public interest, then the judgment could be terminated. <u>Id.</u> The court found that the circumstances over the last thirty years mandated vacating the consent judgment under Rule 60(b)(5). <u>Id.</u> The main objective of the consent judgment was to remedy the backlog of hearing requests and to provide for the sharing of information with claimants' counsel. Both these objectives were found to have been achieved. In addition, major changes in Michigan's welfare system in the 30 years since the entry of the decree made it "highly questionable" that the plaintiff class even had viable federal claims at the time the

motion to vacate was filed. These factors combined to result in the court's decision to vacate the decree.

Likewise, in <u>U.S. v. Bd. of Educ. of Chicago</u>, 663 F. Supp. 2d 649 (N.D. Ill. 2009), the court terminated and vacated a long standing consent decree aimed at achieving desegregation of the City's public schools on finding that the defendant was in compliance with the terms of the operative decree and where circumstances giving rise to the decree had long since disappeared.

There, the original decree was designed to remedy eight specific discriminatory policies that the defendant Board was alleged to have been engaged in. Over the years the decree was modified several times, based on reports which demonstrated a material change in the demographics of the City and after it was determined that the Board of Education had adopted many of the changes required under the original decree. Ultimately, in 2009, the Board demonstrated that it had complied in good faith with the decree for a reasonable time, that it eliminated all vestiges of segregation to the extent practicable, had demonstrated a good faith commitment to the constitutional rights of the citizens, and that the Board had achieved a unitary status. <u>Bd. of Educ. of Chicago</u>, 663 F.Supp. at 658. The court found that these factors, primarily the unitary status that the Board had achieved, combined with the tenuous jurisdiction the federal court held on the matter, warranted the termination of the decree. <u>Id.</u> at 662.

In the present case, the widespread changes and improvements in the DCF over the last twenty years are such that continued enforcement of the Consent Decree and Exit Plan is inequitable and not in the public interest. The budget and staffing increases, as well as drastic increases in services and programs, has fully cured all deficiencies alleged in the

CARMODY & TORRANCE LLP
{N0849773;3}Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
59

complaint, and has brought the Department far above minimum compliance with the statutory and constitutional violations alleged. Given that the changed factual circumstances at DCF have resulted in compliance with the main objectives in the Consent Decree and Exit Plan, continued court oversight and enforcement are not warranted.

Moreover, there can be no contention that the federal legal landscape in the area of child protection law has not been significantly altered in the last twenty years. Federal funding and oversight of many programs also removes the possibility of a return to the conditions existing at the time of the original complaint. As was the case in <u>Horne</u>, *supra*, 129 S.Ct. 2579, this Court should focus on whether the underlying objectives of the Consent Decree have been satisfied, rather than insistence on technical compliance with the terms of the Exit Plan. The Motion to Vacate Should be Granted.

### 6. <u>The Consent Decree and Exit Plan in the Present Case Should Be Vacated Because There Are No Ongoing Violations of Any Federal Law Alleged in the Complaint.</u>

The original complaint in this case alleged federal statutory violations of the Adoption Assistance and Child Welfare Act of 1980 (42 U.S.C §§ 620-627, 670-679), and the Child Abuse Prevention and Treatment Act (42 U.S.C. § 5106, et seq.). In addition, the complaint alleged that the defendants violated certain rights of the plaintiff class children arising under the First, Ninth, and Fourteenth Amendments to the United States Constitution. Because there are no ongoing statutory or constitutional violations, continued prospective enforcement of the Decree is no longer warranted, and control over the State's child welfare system should be returned to the state officials whose duty it is to oversee this system.

CARMODY & TORRANCE LLP
{N0849775.1}Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

60

In considering the lack of continuing violations of federal law, it is crucial to remember that the Consent Decree here identified "over one hundred" issues that were intended to fully satisfy all of the claims made by the plaintiff class. After nearly twenty years under the jurisdiction of this Court, the <u>only</u> remaining "issues" are those Outcome Measures described above. And, to the extent that the Department has fallen short of full compliance with these measures, it has, for the most part, been less than fully compliant by a modest amount. As mandated by the United States Supreme Court: "<u>The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials</u>." <u>Frew</u>, *supra*, 540 U.S. at 442 (emphasis added).

Moreover, the Supreme Court has made clear that once the underlying violation of federal law has been cured, and there is no evidence that the defendant intends to return to its prior behavior, federal judicial oversight should end, and that authority and oversight must be returned to the state and local officials who are charged with it. In <u>Horne</u> the Court rejected the lower court's insistence on strict compliance with the terms of the District Court's orders, and instead instructed the lower courts to determine whether the defendants were in fact complying with the applicable statute – even if the compliance was achieved in a manner other than that specifically set forth in the original order. 129 S.Ct. 2579. Here, there can be no question that the defendants today are fully compliant with each of the federal laws that, at the time the complaint was filed, were allegedly violated.

In this case, the object of the Consent Decree was to remedy the "over one hundred" issues and widespread deficiencies in Connecticut's child welfare system. The

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

61

tremendous improvements and systemic changes instituted during the twenty years this

litigation has been pending have fully remedied these deficiencies, and the defendants'

current, technical and minor non-compliance with a small number of Outcome Measures

simply does not support a finding that there are ongoing violations that rise to the level of

federal statutory or constitutional deprivations.  Because the objects of the Consent Decree

have been met, and there are no continuing violations of any federal law, this Court should

return the "responsibility for discharging the State's obligations" to the State and its

officials.

         A.      **No Statutory Violations.**

       As an initial matter, the plaintiff class cannot assert any ongoing "violation" of

either the Adoption Assistance and Child Welfare Act of 1980 (42 U.S.C §§ 620-627,

670-679) ("AACWA") or the Child Abuse Prevention and Treatment Act (42 U.S.C. §

5106, et seq.) ("CAPTA").  Courts that have considered challenges to state procedures

under these statutes have held that both the AAWCA and CAPTA are federal funding

statutes, and that no private right of action exists under either statute.  See, e.g., In re Eden

F., 250 Conn. 674, 692-93 (1999) (federal  Adoption Assistance and Child Welfare Act of

1980 "'is an appropriations act and does not apply to individual actions or judicial

findings . . . but merely sets forth general guidelines for a state's continued eligibility to

receive funds for foster care maintenance.'") quoting In re Cynthia A., 8 Conn.App. 656,

664 (1986); Alger v. County of Albany, 489 F. Supp. 155 (N.D.N.Y 2006) (neither the

AACWA nor CAPTA provide for private rights of action – they are funding statutes

only); Daniel H. v. City of New York, 115 F.Supp.2d 423, 428 (S.D.N.Y. 2000)(no

private right of action under AACWA)  Doe v. District of Columbia, 93 F.3d 861, 865

(D.C.Cir. 1996)(no private right of action under CAPTA); <u>Tony L By and Through</u>

<u>Simpson v. Childers</u>, 71 F.3d 1182, 1190 (6th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1212

(1996)(same); <u>Jordan v. City of Philadelphia</u>, 66 F.Supp.2d 638, 648-49 (E.D.Pa.

1999)(same).  Because there is no recognized right of private action under either statute,

there simply cannot be any ongoing "violation" of either statute that would warrant

continued enforcement of the Consent Decree.

Moreover, plaintiffs cannot claim that defendants are not otherwise in compliance

with these statutes.  As set forth above, these statutes provide mechanisms for states to

receive federal funding by demonstrating to the satisfaction of the federal government that

the state is meeting certain requirements in its provision of services to children.  Also as

set forth above, Connecticut has received over two million dollars in federal adoption

incentive grants, and one billion dollars in additional federal funds under these and other

federal statutes and programs since the Consent Decree was entered. (Ex. I.)

### B.        There Are No Ongoing Constitutional Violations.

In addition to the two statutory causes of action, the complaint contains five counts

in which the defendants are alleged to have violated the plaintiff class's rights under the

First, Ninth, and Fourteenth Amendments to the United States Constitution.  In the Third

Cause of Action the plaintiffs claim that the defendants violated their rights to "a safe,

decent and humane environment while in the custody of the State, and right not to be

harmed." (Cmplt. ¶ 241.)  Specifically, the plaintiffs claim:

> Defendants have failed to develop and maintain a complete continuum of care in
> all Regions, including services, placements, and programs which are staffed by
> appropriately qualified, trained and supported persons, which are adequately
> monitored, which are not overcrowded, which meet nationally-recommended
> standards, and which adequately meet physical, emotional, medical, psychological,
> and developmental needs of plaintiffs and the members of their class.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
63

(Cmplt. ¶ 241.)  The Fourth Cause of Action alleges that "Defendants actions and

inactions in failing to provide children in their custody and/or under their supervision with

care consistent with competent professional judgment has caused plaintiffs and the

members of their class to be deprived of their rights under the Fourteenth Amendment to

the United States Constitution."  (Cmplt. ¶ 243.)  The Fifth Cause of Action alleges that

plaintiffs were deprived of the right not to be deprived of state and federally-created

liberty and property rights without due process.  (See Cmplt. ¶ 245.)  Specifically, it is

alleged that the plaintiffs were denied their rights to:

> [P]rompt investigation of all referrals regarding children who are abused,
> neglected, or at risk; the right to protection when DCYS investigations substantiate
> harm or danger; the right to careful supervision when in DCYS care, to such
> DCYS contact as is necessary to promote their safety and support, and to
> maintenance of such records as are necessary for such proper supervision; the right
> to adequate food, clothing, shelter, and medical and mental health care services
> while in care; and the right to safe and secure out-of-home placements which are
> appropriately licensed.

(Cmplt. ¶ 245.)

The Sixth Cause of Action alleges that the plaintiffs were denied their rights to

placement in the least restrictive appropriate placement.  They claim specifically as

follows:

> Defendants' failure to establish and implement a full continuum of services and
> placements in all Regions and to make appropriate placements for each child has
> caused plaintiffs and members of their class to be placed in inappropriate
> placements and in placements which are more restrictive than necessary to provide
> them with appropriate care and treatment and to protect them from harm, thereby
> violating plaintiffs rights under the Fourteenth Amendment . . . .

(Cmplt. ¶ 247.)

Finally, the plaintiffs allege that they have been denied their rights to freedom of

association and family integrity by the defendants' "failing to place children in DCYS

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778.8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

64

care in close proximity to their parents; failing to provide services necessary to enable children in DCYS care to remain together or to be reunified whenever appropriate; failing to place siblings in need of out-of-home placements in the same placements; and failing to facilitate visitation between children and parents, and children and their siblings." (Cmplt. ¶ 249.) There are no ongoing violations of any of these alleged rights; therefore, continued enforcement of the Consent Decree is not equitable, and the Motion to Vacate should be granted.

As an initial matter, as with their statutorily-based claims, it is doubtful that the plaintiff class ever had a viable claim under the Fourteenth Amendment for violation of their right to placement in the "least restrictive, appropriate placement." Courts considering this issue have generally found that the Fourteenth Amendment does <u>not</u> require the state to provide children in foster care with an optimal level of care or treatment, or to provide children in such care with the "least restrictive" placement possible. <u>See</u> <u>Marisol A. v. Giuliani</u>, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) (dismissing allegations of due process violations for failing to place child in a least restrictive, optimal placement); <u>see also</u> <u>Charlie H. v. Whitman</u>, 83 F. Supp. 2d 476, 507 (D. N.J. 2000) (dismissing substantive due process claim of children in state custody on grounds that plaintiffs had no due process right "to be housed in the least restrictive, most appropriate and family-like placement while in state custody."); <u>Del A. v. Roemer</u>, 777 F.Supp. 1297, 1319-20 (E.D. La.1991) (no right to be placed in least restrictive foster care arrangement); <u>B.H. v. Johnson</u>, 715 F.Supp. 1387, 1397-98 (N.D. Ill.1989) (no right to be placed in least restrictive setting possible).

Likewise, plaintiffs' Seventh Cause of Action is not viable.  As set forth above, the plaintiffs claim that their rights to family integrity were being violated because the defendants failed to place children in DCF custody in "close proximity" to their parents, failed to "provide services necessary to enable children in DCYS care to remain together or to be reunified whenever appropriate"; failed "to place siblings in need of out-of-home placements in the same placements"; and failed "to facilitate visitation between children and parents, and children and their siblings." (Cmplt. ¶ 249.)  Although the courts have recognized that the right to "family autonomy and privacy" is protected under the federal Constitution, see, e.g., Stanley v. Illinois, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . and the Ninth Amendment"), the right is usually recognized in the context of a parent's right to prevent removal of a child from the family home.

Moreover, in this context, the courts focus on the limitations on the right to family integrity and hold that the right may be revoked entirely when doing so is in the best interest of the child: "Where . . . there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents custody without parental consent or a prior court order." Brenna v. Wood, No. 3:03-CV-01101, 2006 WL 2331011 (D.Conn. Aug. 8, 2006), quoting Pace v. Montalvo, 186 F. Supp. 2d 90, 98 (D.Conn. 2001).  Conversely, there is no recognized federal constitutional right – as alleged by the plaintiffs here – for a

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849776;8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

66

child removed from parental custody to be geographically located near his or her parents, or his or her siblings.[10]

In addition, there are no ongoing constitutional violations of any other rights alleged by the plaintiff class. Although courts have specifically recognized that children involuntarily placed in state custody have constitutionally recognized rights to "basic human needs" such as "food, clothing, shelter, medical care, and reasonable safety," DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 200 (1989), the Constitution does not require an "optimal level of care" for these children. Charlie H, 83 F. Supp. 2d at 507 citing B.H. v. Johnson, 715 F. Supp. at 1397-98; see also, Doe v. New York City Dept. of Soc. Servs., 670 F. Supp. 1145, 1172 (S.D.N.Y. 1987) (citing to, "Taken together, [Youngberg v. Romeo, 457 U.S. 307 (1982) and Parham v. J.R., 442 U.S. 584 (1979)] establish the entitlement of those groups [involuntarily committed mentally retarded persons and children voluntarily committed to state mental hospitals] to minimally adequate food, clothing, shelter, medical care [and] safety . . . ."). The facts set forth above at pp. 26- 49 establish beyond any reasonable question that the plaintiff class of children has been provided with levels of care that rise far above the constitutionally mandated provision of "minimally adequate" treatment and services that provide the plaintiffs with their "basic human needs."

---

[10] As set forth above, federal legislation (specifically, Fostering Connections) requires states placing children in out of home placements to first attempt to place children in their home school district, and also requires states to place siblings together when it is in their best interests, and to provide "frequent" visitation and other contacts when they are not placed together. The Department's documented compliance with this and other federal statutory mandates, as evidenced by the Department's receipt of federal funding pursuant to these statutes, likewise renders plaintiffs' claims here without merit.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

67

Moreover, although the plaintiffs may claim that there are isolated instances in which children in DCF custody received inadequate care or treatment, it is settled law that plaintiffs alleging constitutional violations caused by the actions or inactions of state officials cannot point to isolated instances in which minimum standards may not have been met; rather, plaintiffs must demonstrate a pattern of <u>systemic</u> failure to provide those rights recognized and protected under the federal Constitution.  <u>See, e.g.</u>, <u>Soc'y for Good Will to Retarded Children, Inc. v. Cuomo</u>, 737 F.2d 1239, 1245 (2d Cir. 1984).  In <u>Soc'y for Good Will to Retarded Children</u>, the court found that the District Court's conclusion that plaintiffs in a state facility for the care and treatment of mentally retarded children received constitutionally inadequate medical care was clearly erroneous:

> While there have been occasions when patients' specific medical problems have been treated improperly, <u>the district court's decision should not have been based on isolated instances of improper treatment,</u> <u>but on a finding that medical care was inadequate on a class-wide basis. Isolated instances of inadequate care, or even of malpractice, do not demonstrate a constitutional violation.</u>

737 F.2d at 1245 (emphasis added); <u>see also</u> <u>Doe</u>, <i>supra</i>, 670 F.Supp. at 1178 ("Where the issue of a constitutionally protected liberty interest in certain conditions and treatment is raised, the test for determining the adequacy of those conditions hinges upon two factors: (1) the exercise of professional judgment; and (2) <u>whether they are isolated examples or a common occurrence</u>." (emphasis added)); <u>Falter v. Veterans Admin.</u>, 632 F. Supp. 196, 202 (D. N.J. 1986) (stating that isolated incidents of improper conduct by individuals or staff in a psychiatric hospital are not sufficient to sustain class-wide relief); <u>Seide v. Prevost</u>, 536 F. Supp. 1121, 1135 (S.D.N.Y 1982) (finding that people in State custody have a constitutional right to safety in State custody, that right to protection is not activated by an isolated mishap); <u>Spence v. Staras</u>, 507 F.2d 554, 557 (7th Cir. 1974)

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}                    50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200                    68

(reasoning that mere negligence on the part of hospital employees resulting in isolated incidents of assault or abuse by fellow inmates is not sufficient to cause a constitutional deprivation, but finding more than isolated incidents); Shepherd v. Dallas County, 591 F.3d 445, 455 (5th Cir. 2009) (stating that there needs to be a demonstration of "an established rule or restriction" or an "intended condition or practice" before a finding that a constitutional protection has been violated).

In the present case, the plaintiff class can – at best – demonstrate what amounts to isolated instances in which a very small number of Outcome Measures have not been met by a very small percentage. These isolated instances of noncompliance however, are wholly insufficient to support a finding that the federal constitutional rights of the plaintiffs are being denied on a class-wide basis. Because the plaintiffs cannot point to any ongoing constitutional violations, and because it is clear that the underlying objectives of the Consent Decree and Exit Plan have been met, the Motion to Vacate should be granted.

7. **The Defendants Have Implemented a Durable Remedy, and Shown an Extended Period of Sustained Compliance With the Terms of the Consent Decree and Exit Plan.**

The Supreme Court in Bd. Of Education v. Dowell, supra, 498 U.S. 237, 249, found evidence of the defendant's good faith compliance with the terms of the court's desegregation order to be "obviously relevant" to the District Court's determination of whether to dissolve the underlying decree. While the Supreme Court held that the District Court "need not accept at face value" the defendant's statement that it would cease discriminating in the future, the Court also found that the passage of time since the entry of the original decree "enables the District Court to observe the good faith of the school

CARMODY & TORRANCE LLP
Attorneys at Law
{N0845778.6}
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
69

board in complying with the decree." <u>Id</u>. at 249.  The Court directed that the "District

Court should address itself to whether the Board had complied in good faith with the

desegregation decree since it was entered, and whether the vestiges of past discrimination

had been eliminated to the extent practicable." <u>Id</u>. at 249-50.

As set forth above, the defendants in this case have demonstrated a sustained

period of compliance with the vast majority of the requirements of the Consent Decree

and Exit Plan. The best evidence of this "durable remedy" is found in the reports of the

Court Monitor, which in many instances confirm years of compliance on the part of the

defendants. <u>See</u>, Ex. A at 7-8; Ex. B at 7-8, and discussion <u>supra</u> at 7-11. This period of

sustained, good faith compliance also provides compelling evidence that there is no

danger of a return to pre-Consent Decree conditions should this Court grant the motion to

vacate.

> **8.    <u>Continued Enforcement of the Consent Decree and Exit Plan
> Improperly Removes Control Over the State's Child Welfare System
> From Local Officials and Continued Enforcement Is Therefore Not in
> the Public Interest.</u>**

Finally, the Motion to Vacate the Consent Decree and Exit Plan should be granted

because federalism concerns prohibit continued federal court oversight of state officials

and programs once the objectives of the original decree have been met.  In the present

case, there can be no question that oversight of Connecticut's child welfare system is

entrusted to state officials with specialized knowledge and insight into the needs of

Connecticut's children, and that continued enforcement and court oversight of this matter

impinges heavily on the responsibility of local officials: consent decrees in institutional

reform litigation "bind state and local officials to the policy preferences of their

predecessors and may thereby 'improperly deprive future officials of their designated

legislative and executive powers.'" Horne, *supra*, 129 S.Ct. at 2594. Furthermore,

> states and localities 'depen[d] upon successor officials, both appointed and elected,
> to bring new insights and solutions to problems of allocating revenues and
> resources' . . . 'where state and local officials . . . inherit overbroad, outdated
> consent decrees that limit their ability to respond to the priorities and concerns of
> their constituents, they are constrained in their ability to fulfill their duties as
> democratically-elected officials.

Id. These concerns mandate the Supreme Court's requirement of applying the "flexible"

standard to motions to terminate consent decrees for the express purpose of ensuring that

"responsibility for discharging the State's obligations is returned promptly to the State and

its officials when the circumstances warrant." Id. at 2596, quoting Frew, 540 U.S. at 442.

As the discussion above makes clear, the massive and unprecedented restructuring and

improvement to all facets of Connecticut's child welfare system, over the last twenty

years, has fully effected the purposes of the Consent Decree, and current circumstances

warrant returning control of the system to the state and local officials responsible for its

administration.

Furthermore, returning control of the system to the state is warranted due to the

unquestionably severe impact the Consent Decree has on state budget priorities and

allocations. Both the terms of the Consent Decree and the Exit Plan impose restrictions

and demands on local budget priorities. The Consent Decree mandates that "[t]he State of

Connecticut shall pay for, and fund, the costs for the establishment, implementation,

compliance, maintenance, and monitoring of all mandates in this Consent Decree and all

determinations and directives of the DCYS Monitoring Panel as may be set forth in

Manuals, memoranda, or other materials issued in the performance of its duties."

(Consent Decree at 114.) Similarly, the 2004 Exit Plan requires that "The Defendants

shall provide funding and other resources necessary to fully implement the Exit Plan."
(Exit Plan at 4, ¶ 7.) As the Supreme Court reiterated in Horne, "federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities." Horne, supra, 129 S.Ct. at 2593-94.

   In the present case, there can be little doubt that continuation of the current oversight of the Consent Decree and Exit Plan has a significant and unwarranted effect on state budget priorities.  The direct costs of the Consent Decree and Exit Plan oversight alone have cost the taxpayers of Connecticut substantially more than $10 million since 1991.  The State has paid plaintiffs' attorney's fees and costs for "monitoring" the Consent Decree and Exit Plan in an amount estimated to be well in excess of $2 million. During the same period, defendants have incurred attorney's fees and costs for outside counsel of approximately $624,000.  In addition, the State has paid more than $7 million to fund the operations of the Office of the Juan F. Court Monitor.  The proposed operating budget for the Office of the Juan F. Court Monitor for the fiscal year beginning in July of 2010 is nearly $1 million.  Defendants estimate that, taken together, these direct costs of Consent Decree and Exit Plan oversight are far in excess of $10 million.  While the defendants concede that these costs were necessary at the outset of this litigation nearly twenty years ago,  the defendants have herein shown that, for many reasons, continued enforcement of the Consent Decree and Exit Plan are inequitable and unnecessary, and the citizens of this State should no longer be compelled both to incur these ongoing costs and to permit the state's welfare system to remain outside of the control of the state officials who are charged with its administration.  The Motion to Vacate should be granted.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0849778;8}       50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110   72
Telephone: 203 573-1200

## CONCLUSION

This Court has had jurisdiction over this matter for nearly twenty years, during which time there have been major and unprecedented improvements in literally every facet of Connecticut's provision of services for children.  In fact, the Department has presented unassailable evidence of the complete overhaul of every facet of the Department since the commencement of this litigation, and has documented dramatic improvements in every area of services and programs provided to Connecticut's children.  Continued oversight of this matter by the Court is both unnecessary and unwarranted under established principles of law mandated by the United States Supreme Court.  Therefore, the Motion to Vacate the Consent Decree and Exit Plan should be granted.

THE DEFENDANTS,


By_____
　　Ann H. Rubin (ct04486)
　　arubin@carmodylaw.com
　　Anne D. Peterson (ct20181)
　　apeterson@carmodylaw.com
　　Carmody & Torrance LLP
　　50 Leavenworth Street
　　P. O. Box 1110
　　Waterbury, CT  06721-1110
　　Phone:  (203) 573-1200
　　Fax:  (203) 575-2600

CARMODY & TORRANCE LLP
{N0849778;8}　Attorneys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

73

## **CERTIFICATION OF SERVICE**

I hereby certify that on the above date, a copy of the foregoing was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of

this filing will be sent by e-mail to all parties by operation of the court's electronic filing

system or by mail to anyone unable to accept electronic filing as indicated on the Notice

of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


_____

Ann H. Rubin

CARMODY & TORRANCE LLP
{N0849778.8}ys at Law

50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200

74