*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

# *Juan F.* v. Lamont Exit Plan Status Report
## Civil Action No. 2:89 CV 859 (SRU)

Submitted by:
DCF Court Monitor's Office
300 Church Street, 4th Floor
Wallingford, CT 06492
Tel: (203) 741-0458
Fax: (203) 741-0462
Email: raymond.mancuso@ct.gov

1

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____

**Table of Contents**
***Juan F.* v. Lamont Exit Plan Status Report**
**March 2022**

| Section | Page |
|---------|------|
| Highlights | 3 |
| ***Juan F.*** Exit Plan Outcome Measure Overview Chart | 5 |
| ***Juan F.*** Pre-Certification Review Status Update (October 1, 2021 - March 1, 2022) | 8 |
| Continuous Quality Improvement | 14 |
| Outcome Measure 3: (Remaining Domains: Present Situation and Assessment to Date of Review and Determining the Goals and Objectives) | 17 |
| Additional Qualitative Questions Related to Outcome Measure 4:  Case Practice and Needs Met | 20 |
| Court Monitor's Review of the Timeliness of Case Plans - Sample of In-Home Cases Active more than 85 days as of September 2021 (n=206) | 22 |
| Court Monitor's Review:  SW/Client Face to Face Visitation during October 2021 | 24 |
| Court Monitor Review of Permanency Goal Attainment | 30 |
| DCF Court Monitor Exit Plan Monitoring of Services Post Majority (SPM) Cases:  September Case Management Snapshot (n=60) | 43 |
| DCF Racial Justice Initiatives | 48 |

_____

## *Juan F.* v. Lamont Exit Plan Status Report
### Highlights

Prior to the September 2021 Status Report, the Court Monitor engaged in a series of discussions with the parties regarding the next steps for determining if full compliance with the 2017 Revised Exit Plan has been sufficiently achieved and sustained to support a request for exiting the *Juan F.* case.  The parties agreed to pause on further review of Outcome Measure 3 for the Second and Third Quarters of 2021 so that a thorough analysis of the findings and further discussion with the parties could take place.  Ultimately, it was agreed that the Court Monitor's efforts should turn to focusing on the remaining non-certified aspects of the 2017 Revised Exit Plan and specific structural aspects of DCF that warrant a status report to assess the agency's capacity to sustain improvements and potentially support exit from the consent decree in this action.  These efforts involved further review of the outstanding Outcome Measure 3 domains of "Assessment" and "Goals" for in-home cases.  In addition, the parties agreed with the Court Monitor's suggestion that we proceed simultaneously to the final step of the 2017 Revised Exit Plan.  Paragraph 11 of the plan calls for a final validation review of any Outcome Measures or related issues post pre-certification of all the Outcome Measures that are deemed necessary by the Court Monitor.  After discussion with both parties, it was agreed that given the challenges brought on by the ongoing pandemic and the evolving case management directives, the validation review would also focus on:

- Timeliness of In-Home case planning
- Face-to Face visitation
- Review of Permanency
- Review of SPM cases
- Review of Racial Justice initiatives and corresponding data points

On November 12, 2021, the summary document Notice of Process for Remaining Precertification and Reviews was filed with the Court.

During the course of all reviews conducted for the points above, the Court Monitor continued to follow the protocol established by the Department's Strategic Planning Division throughout the pandemic.  Areas of concern involving risk, safety, or case management practice were forwarded to the Department's chain-of-command via the "red flag" designation.  This allowed for the heightened attention to specific cases of concern. The findings for each of the five reviews conducted for final validation follow beginning on page 17.  During the last two months, while work on this report was underway the parties requested and the Court Monitor agreed to also assess an additional structural area of direct relevance to DCF's ability to sustain its performance on the Outcome Measures, Continuous Quality Improvement.  The findings are reported on page 14.

The Court Monitor's findings regarding the remaining 2017 Revised Exit Plan Outcome Measures and obligations indicate the Department has met and sustained compliance with the 2017 Revised Exit Plan Outcome Measures.  In addition, the findings from the additional reviews agreed upon by the parties in November 2021 and filed with the Court on December 11, 2021, demonstrate that despite the numerous challenges that currently exist, the Department is providing case management and related services that meet the needs of the children and families served by DCF.  The work of improving the State of Connecticut's child welfare efforts will need to robustly continue despite the notable achievement of the *Juan F.* standards.  While this

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

Status Report is not intended as an exhaustive overview of the Department's historic and present efforts to comply with the requirements of the governing orders in this case, the findings in this Status Report confirm that DCF has put structures in place that should enable it to sustain the measurable improvements it has made under the *Juan F.* Consent Decree, and to navigate the inevitable challenges that the Department will face in the years ahead.  These structures and improved, innovative and exciting initiatives that are currently in progress, as well as the Department's substantial ongoing Quality Improvement efforts, are only possible if DCF continues to commit to adequate staffing and sufficient funding for services to children and families.  Without such staffing and funding, there is substantial risk that the progress that has been made will not be sustained – to the great detriment of the children and families served by DCF.

It is worth re-emphasizing that exceptional work continues to be performed by DCF and their partners during this difficult period of the ongoing pandemic.  Commissioner Dorantes and her Executive Team continue to respond to the everchanging circumstances and emerging challenges of the pandemic.  Communication by the DCF Administration has remained frequent, honest, and effective with both her staff and external stakeholders.  Throughout the various phases of the pandemic, there is recognition that the impact on families has been substantial with significant challenges to regular visitation, timely court intervention, consistent therapeutic interventions, and many other elements of life.  The committed effort by all the DCF staff in the regions, facilities, and Central Office despite challenges, barriers, and evolving directives related to the pandemic has been notable.  The Court Monitor's Office is impressed with the continued efforts by dedicated foster parents (Core, Kinship, and the Therapeutic Foster Care families) to meet the needs of the children in their homes despite the challenges that COVID-19 presents for them.  Their dedication is to be commended.  The private non-profit provider network continues to respond robustly despite the ongoing impact of the pandemic to their workforce on hiring, retention, and stability.  Continued utilization of both in-home and virtual intervention strategies to try to meet the family's visitation needs has greatly assisted family and children during this extraordinary time of need and trauma.  DCF staff (Regional and Central Office) continue to support foster parents, older adolescents (especially those now transitioning from the agency), families serviced in their homes, and work as partners with the community providers on a regular basis.  Behavioral Health staff from Central Office, facilities, and the regions continue to provide invaluable consultation and services.  Information Systems, CT-Kind, Help Desk, and staff from the Academy for Workforce Development continue to support and improve the newly created teleworking environment.  Fiscal and Engineering staff have ensured that staff are provided with the proper safety equipment and make ongoing improvements to the various office infrastructure throughout the agency.

For historical perspective the DCF quarterly reporting for all Exit Plan measures is charted on pages five through seven below:

| 2017 Revised Exit Plan Performance Chart | | | | | | |
|---|---|---|---|---|---|---|
| **Outcome Measure** | | | **Performance** | | | |
| Outcome # | Description | Pre-Certified | Measure | Final Performance[1] | Baseline Performance Date | Baseline Performance[2] |
| **OM 1** | Commencement of Investigation | November 2018 | ≥ 90% | 96.30% | 4Q 2004 | 91.2% |
| **OM 2** | Completion of Investigation | August 2020 | ≥ 85% | 92.80% | 1Q 2004 | 64.2% |
| **OM 3** | Case Plans | January 2022 | ≥ 90% | See OM 3 Domain Performance Chart on page 6 | 3Q 2004 | 10.0% |
| **OM 4** | Needs Met | September 2021 | ≥ 85% | See OM 4 Domain Performance Chart on page 7 | 4Q 2004 | 56.0% |
| **OM 5** | SW/Child Visitation (In-Home) | September 2021 | ≥ 85% | 90.10% | 4Q 2004 | 39.0% |
| **OM 6** | Caseload Standards | January 2020 | 100% | 100% | 1Q 2004 | 69.1% |
| **OM 7** | Repeat Maltreatment (In-Home) | July 2014 | ≤ 7% | 4.7% | 1Q 2004 | 9.4% |
| **OM 8** | Maltreatment of Children in OOH Care | October 2014 | ≤ 2% | 0.20% | 1Q 2004 | 0.5% |
| **OM 9** | Re-Entry into DCF Custody | January 2016 | ≤ 7% | 7.7% | 3Q2005 | 6.4% |
| **OM 10** | SW/Child Visitation (Child in Placement) | April 2012 | ≥ 85% (M) | 95.8% | 1Q 2004 | 72.0% |

[1] Final Performance is defined as DCF's most recent performance as reflected in the Exit Plan Status Report of March 2022.

[2] Baseline performance is defined as the first reported quarter performance following entry of the 2004 Exit Plan. Several benchmark performance totals established for 1Q2004 were subject to correction upon improvements in the data definitions and calculations of the automated reporting. These corrected totals were reported in quarterly reporting but not applied retroactively to the established benchmarks. This filing verifies corrected benchmarks where applicable. Because performance data on each of the specific domains under Outcome Measures 3 and 4 was not reported until 2011, the earliest domain specific performance in 2011, specifically for Q2 of 2011, is used here. For reference, for this same baseline data set in 2011, the overall composite performance was 44.4% for Outcome Measure 3 (*i.e.*, cases in which all domains were at or above 90%) and 53.7% for Outcome Measure 4 (*i.e.*, cases in which all domains were at or above 85%. The 2011 data is not publicly available but has been provided to the Parties by the Court Monitor.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

| Outcome Measure 3: Case Plan Domain Performance Chart | | | | | | |
|---|---|---|---|---|---|---|
| Domains | | | Performance | | | |
| Domain # | Descriptions | Pre-Certified | Measure | Final Performance | Baseline Performance Date[3] | Baseline Performance |
| OM 3.1 | Tx Plan: Case Plan Approval | February 2019 | ≥ 90% | 96.20% | 3Q 2011 | 84.9% |
| OM 3.2 | Tx Plan: Family's Language Needs | February 2019 | ≥ 90% | 96.20% | 3Q 2011 | 94.3% |
| OM 3.3 | Tx Plan: Reason for DCF Involvement | August 2019 | ≥ 90% | 92.5% | 3Q 2011 | 96.2% |
| OM 3.4 | Tx Plan: Identifying Information | February 2019 | ≥ 90% | 92.50% | 3Q 2011 | 94.3% |
| OM 3.5 | Tx Plan: Child/Family Engagement | October 2021 | ≥ 90% | 90.60% | 3Q 2011 | 58.5% |
| OM 3.6 | Tx Plan: Situation & Assessment | January 2022 | ≥ 90% | 90.90% | 3Q 2011 | 52.8% |
| OM 3.7 | Tx Plan: Goals/Objectives | January 2022 | ≥ 90% | 96.40% | 3Q 2011 | 60.4% |
| OM 3.8 | Tx Plan: Progress | October 2021 | ≥ 90% | 86.8 | 3Q 2011 | 73.6% |
| OM 3.9 | Tx Plan: Action Steps | October 2021 | ≥ 90% | 81.10% | 3Q 2011 | 56.5% |
| OM 3.10 | Tx Plan: Planning for Permanency | October 2021 | ≥ 90% | 92.50% | 3Q 2011 | 84.9% |

_____

[3] 3rd Quarter 2011 reflects the initial performance for Outcome Measure 3 domains based upon the blind sampling methodology.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

| | | **Outcome Measure 4: Needs Met Domain Performance Chart** | | | | |
|---|---|---|---|---|---|---|
| | **Domains** | | | **Performance** | | |
| Domain # | Descriptions | Pre-Certified | Measure | Final Performance | Baseline Performance Date[4] | Baseline Performance |
| OM 4.1 | Needs Met Risk: In-Home | September 2021 | ≥ 85% | 86.2% | 3Q 2011 | 92.8% |
| OM 4.2 | Needs Met Risk: Child-in-Placement | January 2018 | ≥ 85% | 100% | 3Q 2011 | 96.9% |
| OM 4.3 | Needs Met Permanency: Securing Permanent - Action Plan | January 2018 | ≥ 85% | 96% | 3Q 2011 | 90.6% |
| OM 4.4 | Needs Met Permanency: DCF Case Mgt - Legal Action to Achieve Permanency | January 2018 | ≥ 85% | 96.2% | 3Q 2011 | 96.2% |
| OM 4.5 | Needs Met Permanency: DCF Case Mgt - Recruitment of Placement Providers | January 2018 | ≥ 85% | 100% | 3Q 2011 | 88.2% |
| OM 4.6 | Needs Met Permanency: DCF Case Mgt - Contracting/Providing Services | September 2021 | ≥ 85% | 86.8% | 3Q 2011 | 71.7% |
| OM 4.7 | Needs Met: Medical Needs | January 2018 | ≥ 85% | 92.5% | 3Q 2011 | 88.7% |
| OM 4.8 | Needs Met: Dental Needs | February 2020 | ≥ 85% | 86.8% | 3Q 2011 | 83.0% |
| OM 4.9 | Needs Met: Mental Health, Behavioral Health, and Substance Abuse | September 2021 | ≥ 85% | 86.8% | 3Q 2011 | 75.5% |
| OM 4.10 | Needs Met: Child's Current Placement | January 2018 | ≥ 85% | 95.8% | 3Q 2011 | 93.8% |
| OM 4.11 | Needs Met: Education | January 2018 | ≥ 85% | 94.0% | 3Q 2011 | 84.3% |

---

[4] 3rd Quarter 2011 reflects the initial performance for Outcome Measure 15 domains based upon the blind sampling methodology.

_____

### *Juan F.* Pre-Certification Review-Status Final Update (March 2022)

The Department is currently operating under the 2017 Revised Exit Plan, in which the Court Monitor is required to conduct what the parties and the Court Monitor refer to as "Certification" reviews as follows:

> *The Defendants must be in compliance with all of the outcome measures, and in sustained compliance with all of the outcome measures for at least two quarters (six months) prior to asserting compliance and shall maintain compliance through any decision to terminate jurisdiction. The Court Monitor shall then conduct a review of a statistically significant valid sample of case files at a 96% confidence level, and such other measurements as are necessary, to determine whether Defendants are in compliance. The Court Monitor shall then present findings and recommendations to the District Court. The parties shall have a meaningful opportunity to be heard by the Court Monitor before rendering his findings and recommendations.*

In recognition of the progress made and sustained by the Department with respect to a number of Outcome Measures, and the fact that the well-being of the *Juan F.* class members will be promoted by the earliest possible identification and resolution of any quantitative or qualitative problems affecting class members that may be identified by the review required by Revised Exit Plan (¶5), the parties and the Court Monitor agreed that it is in the best-interests of the *Juan F.* class members to create a "Pre-Certification" review process. It was intended that this "pre-certification" process may obviate the need to implement the full certification review for certain outcome measures after sustained compliance is achieved for all Outcome Measures.

The agreed "Pre-Certification" process that parties and the Court Monitor created, ordered by the court on December 13, 2017, is as follows:

> If DCF has sustained compliance as required by the Revised Exit Plan for at least two consecutive quarters (6 months) for any Outcome Measure ("OM"), the Court Monitor may, in his discretion, conduct a "pre-certification review" of that OM ("Pre-Certification Review"). The purpose of the Pre-Certification Review is to recognize DCF's sustained improved performance, to identify and provide a prompt and timely opportunity to remedy any problem areas that are affecting the well-being of *Juan F.* class members, and to increase the efficiency of DCF's eventual complete compliance and exit from the Consent Decree.

> Other than conducting the Pre-Certification Review earlier than the review mandated by Revised Exit Plan (¶5), the Pre-Certification Review will be conducted in accordance with the provision for review as described in the Revised Exit Plan (¶5) unless otherwise agreed upon by the parties and the Court Monitor.

> If the Pre-Certification Review does not identify any material issues requiring remediation, and no assertions of noncompliance with the specific Outcome Measures(s) at issue are pending at the time Defendants assert sustained compliance with all Outcome Measures, the Parties agree that the full review as per paragraph 5 of the Revised Exit Plan will not be required after the Defendants assert sustained compliance with all Outcome Measures. Upon Defendants' assertion of sustained

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

compliance with all Outcome Measures, the parties, with the involvement and consent of the Court Monitor, agree to present for the Court's review, any agreement to conduct less than the full review process required by Revised Exit Plan (¶5) for any specific Outcome Measures, as a proposed modification of the Revised Exit Plan.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____

All ten of the <u>2017 Revised Exit Plan</u> are now pre-certified.  The status of all precertification findings of the <u>2017 Revised Exit Plan</u> Outcome Measures is found in the table that follows:

| 2017 Measure | 2006 Outcome Measure | Statement of Outcome | Status |
|---|---|---|---|
| OM1 | **OM1: Commencement of Investigations** | At least 90% of all reports[5] must be commenced same calendar day, 24 hours or 72 hours depending on the response time designation. | Pre-Certified November 2018 |
| OM2 | **OM2: Completion of Investigation** | At least 85% of all reports of alleged child maltreatment accepted by the DCF Careline   shall have their investigations completed within 45 calendar days of acceptance by the  Careline. | Pre-Certified August 2020 |
| OM3 | **OM3: Case Plans** | Except probate, interstate, and subsidy only cases, appropriate case plans shall be  developed as set forth in the "DCF Court Monitor's Protocol for Outcome Measures 3  and 4" and the accompanying "Directional Guide for Outcome Measures 3 and 4  Reviews" attached collectively as Appendix B hereto. The enforceable domains of this Outcome Measure shall not include the 'overall score' domain.   The domains in Appendix B for  which compliance at 90% or better has been met for a quarter and then sustained for an additional quarter as of the date of this 2017 Revised Exit Plan, shall be considered to  have achieved Pre-Certification. Currently, three of the ten domains: Case Plan Approval, Family and Child Language Needs Accommodation, and Identifying Information have achieved two quarters of compliance.<br><br>For each of domain, once compliance at 90% or better has been met for a  quarter and then sustained for an additional quarter, that domain shall also be considered to have achieved Pre-Certification.<br>Once all of the domains achieve Pre-Certification, then Outcome Measure 3  shall be  considered to have achieved Pre-Certification and subject to the process in Paragraphs 10 and 11 hereof as to whether a final review is required in connection with a request to terminate jurisdiction over this action | Pre-Certified March 2022 |

_____

[5] Except Probate and Voluntary cases.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

| 2017 Measure | 2006 Outcome Measure | Statement of Outcome | Status |
|---|---|---|---|
| **OM4** | **OM15: Needs Met** | Families and children shall have their medical, dental, mental health, and other service needs met as set forth in the "DCF Court Monitor's Protocol for Outcome Measures 3 and 4" and the accompanying "Directional Guide for Outcome Measures 3 and 4 Reviews", attached collectively as Appendix B hereto. The enforceable domains of this Outcome Measure shall not include the "all needs met" domain.  The domains in Appendix B for which compliance at 85% or better has been met for a quarter and then sustained for an additional quarter as of the date of this 2017 Revised Exit Plan, shall be considered to have achieved Pre-Certification.<br><br>Those domains include:<br>• Risk: Child-in-Placement<br>• Securing the Permanent Placement<br>• DCF Case Management-Legal action to achieve the permanency goal in the prior six months<br>• DCF Case Management-Recruitment for placement providers to achieve permanency goal during the prior six months<br>• Child's current placement<br>• Education<br><br>For each of the remaining domains, once compliance at 85% or better has been met for a quarter and then sustained for an additional quarter, that domain shall also be considered to have achieved Pre-Certification. The remaining domains include:<br>• Risk: In-Home<br>• DCF Case Management - Contracting or providing services to achieve permanency during the prior six months;<br>• Medical needs;<br>• Dental needs;<br>• Mental health, behavioral and substance abuse services.<br><br>Once all of the domains achieve Pre-Certification, then Outcome Measure 4 shall be considered to have achieved Pre-Certification and subject to the process in Paragraphs 10 and 11 hereof as to whether a final review is required in connection with a request to terminate jurisdiction over this action. | Pre-Certified all remaining domains September 2021 |

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____

| 2017 Measure | 2006 Outcome Measure | Statement of Outcome | Status |
|---|---|---|---|
| OM5 | **OM 17: Worker-Child Visitation (In-Home)** | DCF shall visit at least 85% of all in-home family cases at least twice a month, except for probate, interstate or voluntary cases.<br>Definitions and Clarifications:<br>1. Twice monthly visitation must be documented with each active child participant in the case. Visitation occurring in the home, school or other community setting will be considered for Outcome Measure 17. | Pre-Certified September 2021 |
| OM6 | **OM18: Caseload Standards** | The caseload of no DCF social worker shall exceed the following caseload standards, with exceptions for emergency reasons on caseloads, lasting no more than 30 days. Additionally, the average caseload of all caseload carrying DCF social workers in each of the following categories shall not exceed 0.75 (*i.e.*, 75% utilization) of these maximum caseload standards:<br><br>A. Investigators shall have no more than 17 investigative cases at any time.<br>B. In-home treatment workers shall have no more than 15 cases at any time.<br>C. Out-of-home treatment workers shall have no more than 20 individual children assigned to them at any time. This includes voluntary placements.<br>D. Adoption and adolescent specialty workers shall have no more than 20 cases at any time.<br>E. Probate workers shall have no more than 35 cases at any time. When the probate or interstate worker is also assigned to provide services to the family, those families shall be counted as in-home treatment cases with a ratio of 1:20 cases.<br>F. Social workers with in-home voluntary and interstate compact cases shall have no more than 49 cases at any time.<br>G. A worker with a mixed caseload shall not exceed the maximum weighted caseload derived from the caseload standards in A through F above. | Pre-Certified January 2020 |

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

| 2017 Measure | 2006 Outcome Measure | Statement of Outcome | Status |
|---|---|---|---|
| **OM7 (to be maintained)** | **OM 5: Repeat Maltreatment of Children** | No more than 7% of the children who are victims of substantiated maltreatment during any six-month period shall be the substantiated victims of additional maltreatment during any subsequent six-month period.  This outcome shall begin to be measured within the six-month period beginning January 1, 2004. | Pre-Certified* July 2014 |
| **OM8 (to be maintained)** | **OM6: Maltreatment of Children in Out-of-Home Care** | No more than 2% of the children in out of home care on or after January 1, 2004 shall be the victims of substantiated maltreatment by substitute caregivers while in out of home care. | Pre-Certified October 2014 |
| **OM9** | **OM 11: Re-Entry into DCF Care** | Of the children who enter DCF custody, seven (7) percent or fewer shall have re-entered care within 12 months of the prior out-of-home placement. | Pre-Certified January 2016 |
| **OM10** | **OM 16: Worker/ Child Visitation (Child in Placement)** | DCF shall visit at least 85% of all out-of-home children at least once a month, except for probate, interstate, or voluntary cases. All children must be seen by their DCF Social Worker at least quarterly. | Pre-Certified April 2012 |

---

* Pre-Certification granted subject to verification of correction to ROM system reporting.

_____

## Continuous Quality Improvement (CQI)

The Court Monitor is confident that the DCF has the necessary infrastructure to continually improve performance related to the achievements made through the *Juan F.* Consent Decree implementation.  DCF has many ongoing efforts to improve their performance in this area of the work.  The Bureau of Strategic Planning, which includes CQI, ACR, and Data, Reporting and Evaluation, leads the statewide CQI activities specific to case practice service delivery and is also leading the CQI efforts related to the Department's Family First Prevention Plan implementation.

Moving forward internal monitoring will provide the needed oversight to inform agency initiatives.  The current administration has made critical and sustained investments in ongoing Continuous Quality Improvement (CQI).  DCF has maintained six (6) Program Supervisors dedicated to CQI along with several other dedicated CQI positions.  In 2019, CQI activities were centralized under the Bureau of Continuous Quality Improvement, and this has allowed for consistent, statewide implementation of practice review and strategy development for improvement efforts.

Consistent with DCF's commitment to being a continuous learning environment to improve outcomes, CQI relies on both qualitative and quantitative data to guide improvement efforts and recognizes the importance of partnership with the field, child welfare leadership and key stakeholders.  In Calendar Year (CY) 2021, CQI conducted over 1,900 case practice reviews, and 11,000 Administrative Case Reviews (ACRs).  Since 2019, the Agency has also maintained 15 case reviews per month utilizing the Federal Review Tool, which provides the agency with key data, qualitative and quantitative, specific to performance out the federal measures related to safety, permanency, and well-being.  CQI continues to produce monthly statewide reports that reflect quantitative and qualitative findings; and these findings are reviewed at the local level, in leadership and CQI team meetings, to inform improvement strategy development.  This reporting informs ChildStat conversations as performance data across the seven (7) Key Results (identified below) are reviewed and discussed at each meeting.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____



As part of agency CQI processes, many reports are reviewed at the local level, in leadership and CQI team meetings and used to inform improvement strategy development.  This work informs consistent statewide ChildStat conversations, which is discussed in more detail on page 30, as performance data across key results is reviewed and discussed.  For those unfamiliar with ChildStat, this important Quality Improvement model was initially developed in New York and adopted by Michigan. Connecticut ChildStat is a management process aimed at providing accountability and transparency to the agency, while improving on the overall quality of child welfare.  The three core features of ChildStat are:

- Review agency-wide practice of the Department of Children and Families' area office performance as compared to statewide performances.
- Strengthen the performance and practice through the synthesis and analysis of both qualitative and quantitative data.
- Collaborate with regional leaders, community advocates, and state officials to address issues of racial inequality in child welfare within the state.

In partnership with the Academy for Workforce Development, staff in the Bureau of Strategic Planning developed a curriculum for the Data Leaders' Institute, which was offered to agency Directors to increase capacity in using and understanding data in preparation for ChildStat.

Integral to the success of DCF's quality improvement efforts is the value leadership across the agency has placed on data and performance accountability as an opportunity to learn and improve.  Staff at all levels in the agency utilize both LINK and ROM (Results Oriented Management) reports to assess performance related to key measures and outcomes, and a public-

_____

facing version of ROM is currently under design and expected to be made available in the next several months.

DCF is invested in continuing to build staff capacity for CQI.  In the fall of 2021, CQI staff participated in the Applied Analytics training offered through Casey Family Programs and delivered by Mathematica.

The Department has implemented a Research to Practice committee that meets monthly and includes partners from the UCONN School of Social Work who led the Performance Improvement Center (PIC) for the agency's Differential Response System (DRS) practice[6], agency child welfare staff from leadership and area office field investigators, representatives from the CQI as well as the Academy for Workforce Development.  This group has identified key research priorities related to agency practice, for example, assessing the efficacy of CSF (Community Support for Families).  UCONN presented their findings to the Research to Practice Committee, along with an infographic depicting key findings, and a communication plan for sharing with the field was developed.  This work is ongoing, and response has been positive.

DCF, along with over 26 other jurisdictions, is engaged in the National Partnership for Child Safety (NPCS) established in partnership with Casey Family Services.  The NPCS mission is applying safety science and sharing data to develop strategies in child welfare to improve safety and prevent child maltreatment fatalities.  CT continues to implement Special Qualitative Reviews (SQRs) on child maltreatment fatalities and near misses, using a standardized tool, staff interviews and case record reviews.  Data is aggregated and shared as part of the SQR governance committee where improvement strategies are developed and implemented.

Lastly, the Bureau of Strategic Planning is currently engaged with the Capacity Building Center for States as well as Casey Family Programs for additional consultation as the agency expands its CQI infrastructure to support successful implementation of the agency's Family First Prevention Plan upon receiving ACF approval.  This work will be ongoing in 2022.

---

[6] In 2006, DCF began developing a Differential Response System (DRS) delivery model which is a strength-based family centered approach to partnering with family supports to protect children and enhance parental capacity.  Also known as "dual track", "multiple track" or "alternative response", this approach appreciates the variation in reports and the value of responding differentially depending on the nature of the report.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

### Outcome Measure 3
### (Remaining Domains: Present Situation and Assessment to Date of Review and Determining the Goals and Objectives)

Per the methodology referenced within the summary to a December 11, 2021, pleading entitled <u>Notice of Filing Summary of Process to Be Implemented by the Court Monitor</u>, the Court Monitor's Office conducted a review of a sample of 55 cases with case plans due within the 4th Quarter of 2021.  This review utilized the established Outcome Measure 3 methodology, but by agreement of the parties the primary focus was on the two remaining specific domains that were not pre-certified for this Outcome Measure: Present Situation/Assessment at time of Case Plan and Determining the Goals/Objectives.

The review also sought to ensure that case plans continued to be reviewed and approved by the SWS and that families' language needs were accommodated.  Following a review of the data collected it is found that:
- 98.2% of the sample had a SWS approved case plan and language needs were accommodated.
- "Present Situation/Assessment" at time of Case Plan - 90.9%
- "Determining the Goals/Objectives" - 96.4%

This review sample demonstrated a great deal of quality case planning and case management service to the children and families.

The finding for "Present Situation and Assessment to Date of Review" reflects a determination of 90.9% compliance.  Although the "Present Situation and Assessment to Date of Review" sections of eight case plan documents were marginal in this domain, in four of those cases the Court Monitor Reviewers identified that the overall assessment work reflected appropriate assessment, case planning and service provision.  In these four instances, while there was a deficit noted within the case plan document, the reviewers found the case planning requirements elsewhere in the file. In those cases, the override was exercised so that a total of four case plans (4/55) remained marginal.  There was also one case in which the written section in the case plan was adequate however, the actual case planning activity detailed in the case record was designated as marginal.  This case was overridden in the opposite direction and thus deemed marginal.  Therefore, the domain is scored as 90.9% (50/55).

As noted above, the sample met the requirement outright for the 90% requirement related to "Determining the Goals/Objectives" which was compliant within 96.4% within this sample. Case plans were also overwhelmingly approved with documented use of interpreters and translators as needed (both were scored compliant at 98.2%). All Outcome Measure 3 domains are now pre-certified based on the results of this review.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

The table below indicates the performance related to the 90% benchmark requirement and the sample sets since the first quarter reviewed via the 2017 Revised Exit Plan.

| Outcome Measure 3 Results for the Remaining Domains of Present Situation and Assessment as of the Date of Review and Determining the Goals/Objectives | | | | |
|---|---|---|---|---|
| Quarter of Review | Has the Case plan been approved by the SWS? | Was the family or child's language needs accommodated? | Present Situation and Assessment to Date of Review | Determining the Goals/ Objectives |
| Total Statewide 4th Quarter 2021 | 98.2% | 98.2% | 90.9% | 96.4% |
| Total Statewide - 3rd Quarter 2021 | N/A | N/A | N/A | N/A |
| Total Statewide - 2nd Quarter 2021 | N/A | N/A | N/A | N/A |
| Total Statewide - 1st Quarter 2021 | 96.2% | 96.2% | 66.0% | 73.6% |
| Total Statewide - 4th Quarter 2020 | 94.5% | 98.2% | 89.1% | 81.8% |
| Total Statewide - 3rd Quarter 2020 | N/A | N/A | N/A | N/A |
| Total Statewide - 2nd Quarter 2020 | N/A | N/A | N/A | N/A |
| Total Statewide - 1st Quarter 2020 | 96.2% | 98.1% | 71.7% | 84.6% |
| Total Statewide - 4th Quarter 2019 | 92.5% | 92.5% | 69.8% | 66.0% |
| Total Statewide - 3rd Quarter 2019 | 92.6% | 92.6% | 57.4% | 68.5% |
| Total Statewide - 2nd Quarter 2019 | 92.5% | 92.5% | 45.3% | 71.7% |
| Total Statewide - 1st Quarter 2019 | 96.2% | 94.3% | 52.8% | 67.9% |
| Total Statewide - 4th Quarter 2018 | 96.2% | 92.5% | 47.2% | 64.2% |
| Total Statewide - 3rd Quarter 2018 | 98.1% | 96.3% | 57.4% | 79.6% |
| Total Statewide - 2nd Quarter 2018 | 94.3% | 94.3% | 50.9% | 60.4% |
| Total Statewide - 1st Quarter 2018 | 84.2% | 81.5% | 51.9% | 53.7% |
| Total Statewide - 4th Quarter 2017 | 86.8% | 81.1% | 32.1% | 58.5% |
| Total Statewide - 3rd Quarter 2017 | 96.2% | 96.2% | 47.2% | 62.3% |
| Total Statewide - 2nd Quarter 2017 | 88.7% | 81.5% | 42.6% | 66.7% |

The table following on page 18 indicates the crosstabulation for "Present Situation and Assessment to Date of Review" with "Quality of DCF's case planning practice, referral and provision of services was adequate to meet the children and family's needs, resolve presenting issues and advance the case to safe and appropriate closure during the PUR".

| Present Situation and Assessment to Date of Review * Quality of DCF's case planning practice, referral and provision of services was adequate to meet the children and family's needs, resolve presenting issues and advance the case to safe and appropriate closure during the PUR? Crosstabulation | | | | | |
|---|---|---|---|---|---|
| | | Quality of DCF's case planning practice, referral and provision of services was adequate to meet the children and family's needs, resolve presenting issues and advance the case to safe and appropriate closure during the PUR? | | | Total |
| | | Marginal | Very Good | Optimal | |
| Present Situation and Assessment to Date of Review | Marginal | 4 | 4 | 0 | 8 |
| | Very Good | 1 | 38 | 5 | 44 |
| | Optimal | 0 | 0 | 3 | 3 |
| Total | | 5 | 42 | 8 | 55 |

Children, families, and key case participants were involved in the development of the case plan in the six months leading up to the case plan approval at varying rates of success during this period which included the shifting of engagement to virtual and back again to in-person. Rates of participation are slightly decreased from the last time this process was monitored in the 1st Quarter 2021.  Attendance rates at ACR's (in person or virtual) continues to be an area needing improvement despite the automated notifications to the case participants prior to the identified ACR dates and the use of teleconference to conduct the meetings.

| 4th Quarter 2021 Engagement in Case Planning and CPC/ACR Attendance Rates | | |
|---|---|---|
| Case Participant | Participated in Case Planning (all cases) | Attended CPC/ACR (CIP only - includes virtual attendance) |
| Child Age 12+ | 83.3% | 20.0% |
| Mother | 86.4% | 29.4% |
| Father | 45.5% | 13.3% |
| Foster Parent | 100.0% | 57.1% |
| Service Providers | 55.3% | 17.9% |
| Child's Attorney/GAL | 71.1% | 55.0% |
| Parent's Attorney | 48.6% | 23.5% |
| Other DCF Staff | 96.7% | 16.7% |
| Others | 87.5% | 85.3% |

**Additional Qualitative Questions Related to Outcome Measure 4: Case Practice and Needs Met**

Outcome Measure 4 was pre-certified with the Status Report of September 2021.  Individual domains were not assessed as part of this final review process.  However, as part of the agreement in conducting these reviews, qualitative questions were included related to risk and safety, barriers to permanency and case management and service provision given the shifts in practice for contact standards from in-person to virtual and back again during the last two years. 90.9% of the cases reviewed (50/55) were found adequate quality related to case planning/case management to meet priority needs.

| Quality of DCF's case planning practice, referral and provision of services was adequate to meet the children and family's needs, resolve presenting issues and advance the case to safe and appropriate closure during the PUR? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | Marginal | 5 | 9.1 | 9.1 | 9.1 |
| | Very Good | 42 | 76.4 | 76.4 | 85.5 |
| | Optimal | 8 | 14.5 | 14.5 | 100.0 |
| | Total | 55 | 100.0 | 100.0 | |

90.9% of 55 cases reviewed (50/55) were identified as having adequately assessed and addressed risk and safety via utilization of formal and informal assessment and visitation.

| DCF adequately assessed and addressed risk factors and safety of the children within this case during the PUR of review (formal and informal) | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | Marginal | 5 | 9.1 | 9.1 | 9.1 |
| | Very Good | 42 | 76.4 | 76.4 | 85.5 |
| | Optimal | 8 | 14.5 | 14.5 | 100.0 |
| | Total | 55 | 100.0 | 100.0 | |

In all, 74.5% of the cases (41/55) did not have significant barriers to permanency documented in the six months reviewed.  Of those 14 cases that did have barriers, reviewers found that six (6) (42.9%) had court related delays.  The other eight cases included identification of internal case management (examples: untimely legal filing, delayed referral, subsidy negotiation) or service provision (examples: delay in psychological testing, provider contact deficits, wait list for adult DDS services, foster parent ambivalence, placement disruption). One case was a Services Post Majority (SPM) client currently facing a six-year sentence.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

| During this PUR were their significant barriers to permanency having a negative impact on attaining the identified goal? | | | | | |
|---|---|---|---|---|---|
| | | Frequency | Percent | Valid Percent | Cumulative Percent |
| Valid | Yes | 14 | 25.5 | 25.5 | 25.5 |
| | No | 41 | 74.5 | 74.5 | 100.0 |
| | Total | 55 | 100.0 | 100.0 | |

Some additional key points taken from the review of the 55 cases included:
- In 92.6% of the CIP cases, SW visitation was identified as of adequate quality.
- In 83.3% of the in-home cases, SW visitation with children was identified as adequate.
- 96.7% of the visitation with the primary parent(s) living in the household of in-home cases was identified as adequate.
- 55.0% of visitation/contact with non-custodial parents in in-home cases was identified as adequate.[7]

_____

[7] Visitation is a continued ongoing focus for the DCF.  Months in which virtual visitation was the expectation saw an increase in contacts with the non-custodial parent. During the month reviewed, COVID played a large factor in the success of in person contact with non-custodial parents.  The agency expectation during this period was that contacts would be in person. COVID rates were on the rise and many clients were not willing to engage in in-person visitation.

21

**Court Monitor's Review of the Timeliness of Case Plans - Sample of In-Home Cases Active more than 85 days as of September 2021 (n=206)**

The Court Monitor's Office selected a sample of 206 in home cases from the LINK in-home case monitoring report on September 8, 2021. This snapshot was stratified by office and resulted in the following sample:

| Area Office | %of Caseload | Full Sample | Cases Identified with "No Case Plan" | Cases with Approved Case Plans |
|---|---|---|---|---|
| Bridgeport | 7% | 15 | 0 | 15 |
| Danbury | 4% | 9 | 1 | 8 |
| Hartford | 11% | 22 | 1 | 21 |
| Manchester | 9% | 18 | 1 | 17 |
| Meriden | 2% | 5 | 0 | 5 |
| Middletown | 4% | 8 | 0 | 8 |
| Milford | 9% | 18 | 0 | 18 |
| New Britain | 10% | 21 | 0 | 21 |
| New Haven | 10% | 21 | 0 | 21 |
| Norwalk | 7% | 14 | 2 | 12 |
| Norwich | 10% | 21 | 0 | 21 |
| Torrington | 3% | 6 | 0 | 6 |
| Waterbury | 9% | 19 | 1 | 18 |
| Willimantic | 4% | 9 | 0 | 9 |
| **Statewide** | | **206** | **6** | **200** |

The sample consisted of in-home cases including both cases subject to initial case planning activities upon transfer from Intake/Investigations (open greater than 85 days, but less than six months) and those with longer history and subsequent planning required (ACR scheduled each 180 days with 25-day approval period, or 205 days).

There were 86 cases that were identified as initial case plans and 120 which were subject to subsequent case planning. **Of the 206 cases selected for review, 200 (97.1%) had an approved case plan less than 7 months old at the point of review.** The six cases that did not have an approved case plan were brought to the attention of the DCF Area Office for follow up. They were maintained within the sample.

The Court Monitor's final determination of compliance, **allowing for the discretionary exceptions identified below, is an overall rate of compliance with the timeliness requirement of 181 of the 206 case plans reviewed, or 87.9% achieving the standard.** It appears that initial case plans are more likely to be non-compliant with the requirement to be approved within 85 days of the disposition than with the requirement that a subsequent plan being approved at 205-day intervals from the prior ACR schedule date. Subsequent case plans had a rate of compliance with timeliness of case planning of 90.0% (of 121 cases reviewed, 109 were timely). Initial case plans were 84.7% compliant with the case plan approval requirement (of 85 cases reviewed 72 were found timely). Documentation within the non-compliant cases other than those exceptions below did not reflect any rationale for delays.

The secondary review found 9 exceptions in which a delay cited by the initial reviewer was one warranting the Court Monitor's discretionary override consideration and the resulting overall achievement of 87.9%.  These included:

- One case in which there was a technical LINK issue resulting in delay and which was remedied immediately upon identification
- Two cases in which the delay occurred to accommodate the families' schedule.
- One case in which the SW was directed to await provider feedback to form full assessment within a closing case plan.
- Five cases in which the approvals were documented within five days of the identified due date - weekend or holiday factored in, not an egregious delay.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

---

### Court Monitor's Review:  Social Worker (SW)/Client Face-to-Face Visitation during October 2021

As determined by the Court Monitor a snapshot was taken of visitation efforts during the month of October 2021. The protocol used was developed jointly with the Department and used throughout the 2020 and 2021 QI efforts to determine the Department's continued compliance with visitation requirements.  This period involved the return to in-person visitation from virtual visitation mandates in place during COVID-19 restrictions.  Paraphrasing the requirements of visitation:

- Children in Placement (CIP) shall be visited a minimum of once per month in person in their out of home placement setting or as directed by the Social Work Supervisor (SWS).
- In-Home case participants shall be visited in person a minimum of twice month unless otherwise directed by the SWS or as required for newly transferred cases.

50 cases were selected from the total caseload of CIP cases and in-home case assignments for a total of 100 cases reviewed.  The distribution of those cases included:

| Crosstabulation:  Office * Case Type | | | |
|---|---|---|---|
| **Office** | **Case Type** | | **Total** |
| | **CIP** | **In-Home** | |
| **Bridgeport** | 3 | 4 | 7 |
| **Danbury** | 3 | 2 | 5 |
| **Hartford** | 5 | 5 | 10 |
| **Manchester** | 4 | 4 | 8 |
| **Meriden** | 2 | 2 | 4 |
| **Middletown** | 2 | 2 | 4 |
| **Milford** | 3 | 5 | 8 |
| **New Britain** | 6 | 5 | 11 |
| **New Haven** | 4 | 4 | 8 |
| **Norwalk** | 2 | 4 | 6 |
| **Norwich** | 5 | 4 | 9 |
| **Torrington** | 2 | 2 | 4 |
| **Waterbury** | 6 | 4 | 10 |
| **Willimantic** | 3 | 3 | 6 |
| **Total** | 50 | 50 | 100 |

We reiterate at the onset of the findings of this review, that reviewers did not engage with the SW or SWS as part of the methodology.  The parties agreed to have the Court Monitor review only one month of documentation and limit the review to the electronic record.  There were no interviews with staff.  As we are aware, there are some phone calls/texts that do not get transcribed into the electronic LINK data.  In our previous reviews, SW and SWS were often able to recall and provide additional clarification or information related to those contacts.  Given the purpose of this review, time constraints and available resources, this more rigorous exploration was not employed.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

**Contacts with Children in Placement Cases**
In response to questions related to visitation with CIP during the month of October, the review found that the 85% visitation measure was exceeded. **In all, 47 children, or 94% had at least one documented in-person visit documented during the period of review.**

| SW/CIP Monthly Contact | | | | |
|---|---|---|---|---|
| | Frequency | Percent | Valid Percent | Cumulative Percent |
| In Person | 47 | 94.0 | 94.0 | 94.0 |
| Virtual Only | 1 | 2.0 | 2.0 | 100.0 |
| No Contact | 2 | 4.0 | 4.0 | 98.0 |
| Total | 50 | 100.0 | 100.0 | |

One child (2%) had a virtual visit documented per a SWS directive. The child is residing out of state with relative working toward Subsidized Transfer of Guardianship (STOG) and is seen virtually once month with the expectation of a quarterly in person visit.  Two children had no visits documented during the period under review. In one scenario, the 17-year-old was AWOL for the period of review with efforts to locate documented. In the other, a 14-year-old was in a Short-term Family Integrated Therapy (SFIT) placement then placed in a therapeutic foster home.  There were no documented CIP visits by the assigned SW.  This did not result in a "red flag, however, as a supervised visit between the child and mother was documented by a covering SW during the month, and a subsequent visit was noted in November.  In looking at the quality of visitation documented, the reviewers indicated that the visitation documented was of appropriate quality (documentation reflected meaningful engagement which addressed safety, well-being and service provision progress or barriers) as well as quantity in 94.0% of the cases.

| Quality of SW Visitation with CIP | | |
|---|---|---|
| | Frequency | Percent | Cumulative Percent |
| Adequate | 47 | 94.0 | 94.0 |
| Inadequate | 3 | 6.0 | 100.0 |
| Total | 50 | 100.0 | |

Contact with the parents of the CIP was documented in 24 of the 50 cases reviewed.  Allowing for the 11 cases in which the CIP parents were TPR or deceased, the Department documented appropriate contact with the parents of the sample of CIP in 61.5%[8] of the cases during the month of October.

_____

[8] As with visitation/contact with non-custodial parents in in-home cases in footnote 2 on page 21, months in which virtual visitation was the expectation saw an increase in contacts with the parents of a child in placement (CIP). During the month reviewed, COVID played a large factor in the success of in person contact with parents of a CIP. The agency expectation during this period was that contacts would be in person. COVID rates were on the rise and many clients were not willing to engage in in-person visitation.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____

| SW/Parent Contact in CIP Cases | | | | |
|---|---|---|---|---|
| **Contact Documented** | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **Yes** | 24 | 48.0 | 48.0 | 48.0 |
| **N/A - TPR or deceased** | 11 | 22.0 | 22.0 | 70.0 |
| **No** | 15 | 30.0 | 30.0 | 100.0 |
| **Total** | 50 | 100.0 | 100.0 | |

## Contacts with In-Home Case Participants

Reviewers were asked if there were successful contacts with In-Home Case clients during the month of October.  100% of the cases had at least one in person contact with at least one case participant living in the home.

| Successful In-Home Contacts | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **In-Person** | 45 | 45.0 | 45.0 | 45.0 |
| **Virtual and In Person** | 5 | 5.0 | 5.0 | 100.0 |
| **Total** | 50 | 50 | 100.0 | |

**The In-Home Cases were visited per Consent Decree required twice monthly frequency in 88.0% of the sample cases**.

| Crosstabulation:  Frequency of visitation Directed by SWS * Visits matched directive | | | | |
|---|---|---|---|---|
| **SWS Directed Visitation** | **Visits matched directive** | | | |
| | **No** | **UTD** | **Yes** | **Total** |
| **> Standard Policy** | 3 | 0 | 0 | 3 |
| **No Directive** | 0 | 13 | 0 | 13 |
| **Standard Policy** | 2 | 0 | 32 | 34 |
| Total | 5 | 13 | 32 | 50 |

As shown in the crosstab above, reviewers noted that there were no directives or SWS narratives related to expectations for visitation in 13 of the 50 In-Home cases reviewed.  Three cases documented directives for frequency greater than the standard.  None of the three cases with directives for greater than the standard visitation rate met the directed frequency of visitation (2x per week for one case of HRNB and weekly for two others)  but the twice monthly standard was met in these three cases.  Of the 13 cases with no documented direction related to frequency, nine cases met the twice monthly expectations of visits to the home**.**  Factoring in these 12 cases (those with no directives but visitation and those with a higher directive as noted above, twice monthly in person visitation was documented in 88% of the in-home sample cases (44/50 cases sampled).

In addition to in-person contacts reviewers noted the following additional contact types during the month:

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____

| Other Documented Contact | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **Email** | 6 | 6.0 | 6.0 | 6.0 |
| **None** | 21 | 22.0 | 22.0 | 77.0 |
| **Telephone** | 20 | 20.0 | 20.0 | 97.0 |
| **Text** | 3 | 3.0 | 3.0 | 100.0 |
| **Total** | 100 | 100.0 | 100.0 | |

Looking beyond the frequency, reviewers indicated whether the quality of the documented visitation was sufficient for both child case participants and the primary caretaker within the in-home case sample (documentation reflected meaningful engagement which addressed safety, well-being and service provision progress or barriers).  The following indicates the reviewers' opinions related to quality of visitation as it related to engagement and/or observations of all case participants to address safety and well-being during those visits.

The reviewers found the quality of visitation contact with the primary caregiver(s) sufficient in 86% of the in-home cases reviewed.

| Was the Quality of Visitation contact with Primary Caregiver(s) Sufficient? | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **No** | 7 | 14.0 | 14.0 | 14.0 |
| **Yes** | 43 | 86.0 | 86.0 | 100.0 |
| **Total** | 50 | 100.0 | 100.0 | |

The reviewers considered the visit documentation and concerted efforts to engage parents during the period and found the quality of visitation contact with the child household members in the in-home cases was sufficient in 80% of the cases reviewed.  In most of the negative responses, visits were conducted in-person, and may have met the twice monthly standard, but failed to document contact with a particular child, or include observations of all the children in a meaningful manner.  As mentioned prior in this document, the agreed upon review methodology was limited in that no interviews with the SW or SWS were held to gather additional information not documented within the month's visitation narratives.

| Was the Quality of Visitation Contact with In-Home Children Sufficient? | | | | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Valid Percent** | **Cumulative Percent** |
| **No** | 10 | 20.0 | 20.0 | 20.0 |
| **Yes** | 40 | 80.0 | 80.0 | 100.0 |
| **Total** | 50 | 100.0 | 100.0 | |

**Parent/Child Visitation**
Per policy, the Commissioner shall ensure that a child's visits with his or her parents occur as frequently as reasonably possible, based upon consideration of the best interests of the child, including the age and developmental level of the child, and shall be sufficient in number and

duration to ensure continuation of the relationship. Visitation plans are to be established and revisited as the case warrants.

Reviewers collected the frequency and quality of visits with parents of children in placements and noted the that: Of the 50 CIP cases, visitation should have occurred between the mother and child(ren) in 42 cases (8 cases involved a deceased mother or mother whereabouts unknown).

In person visits were documented between mothers and children-in-care in 20 of the 42 applicable cases during the month of October. Two additional cases documented virtual visits due to COVID-19 concerns. This results in an applicable percentage rate of 52.4% of the cases documenting supervised visits with the mother where active in the case. Refusal of offered visits occurred by the parent in 6 of the 42 cases and by the youth/adolescent in two of these 42 cases. In two cases it was unclear if visitation occurred, and methodology did not include contact for clarification purposes, so these were marked as UTD. There were no documented visits in five of the 42 cases inclusive of a mother case participant during the month with an active mother during the PUR. (Two of these 5 instances were COVID-19 related cancellations: in one instance the SW tested positive for COVID-19 the day of the scheduled visit causing last minute cancellation, in another the mother had concerns she was positive and cancelled the visit. In the other three instances while the child/parent did not visit during the month, there was visitation offered consistently which was documented in the month prior or post the PUR. 86.4% (19 of the 22 cases with visits documented in person or virtual) reflected quality observations/interactions during the visits.

| Mother and Child(ren) Supervised Visitation | | | |
|---|---|---|---|
| **Supervised Visits** | **Frequency** | **Percent** | **Cumulative Percent** |
| **Face to Face Visits Occurred** | 20 | 40.0 | 40.0 |
| **N/A -Parent Deceased or TPR** | 11 | 20.0 | 60.0 |
| **Parent Refused Visit** | 6 | 12.0 | 74.0 |
| **None** | 5 | 10.0 | 84.0 |
| **N/A - Parents Whereabouts Unknown** | 2 | 4.0 | 88.0 |
| **UTD** | 2 | 4.0 | 92.0 |
| **Virtual Visits Occurred** | 2 | 4.0 | 96.0 |
| **Youth Refused Visit** | 2 | 4.0 | 100.0 |
| **Total** | 50 | 100.0 | |

Of the 50 cases, visitation was applicable between father and child(ren) in 36 cases (14 cases involved a deceased father or father whereabouts unknown). Of those 36 cases, in-person visits were documented between father and child in 11 cases and an additional two cases documented virtual visits due to COVID-19 concerns for a total of 36.1% of cases documenting supervised visitation during month captured. In the 23 instances where visits were not held, the father refused in three of the cases and in one case the youth/adolescent refused to visit. While visits or efforts to facilitate visits may have occurred in the month prior or post the PUR, there was no documentation regarding the facilitation or concerted efforts to facilitate a father/child visits in 15 of the sample cases during the month. Reviewers offered an assessment related to this lapse as 5 of these 15 cases were still deemed to be of appropriate quality when factoring in additional

information outside of the month's review.  100% of the 13 cases with documented supervised visits (in person or virtual) reflected quality observations/interactions during the visits.

| Father and Child(ren) Supervised Visitation | | | |
|---|---|---|---|
| **Supervised Visits** | **Frequency** | **Percent** | **Cumulative Percent** |
| None | 15 | 30.0 | 30.0 |
| N/A - Parent Deceased and/or TPR | 13 | 26.0 | 56.0 |
| Face to Face Visits Occurred | 11 | 22.0 | 78.0 |
| N/A Parents Whereabouts Unknown | 5 | 10.0 | 88.0 |
| Parent Refused | 3 | 6.0 | 94.0 |
| Virtual Visit Occurred | 2 | 4.0 | 98.0 |
| Youth Refused | 1 | 2.0 | 100.0 |
| **Total** | 50 | 100.0 | |

When parent/child visits were supervised, the individual responsible for the supervision was most frequently identified as the SW (not necessarily the assigned SW).  Others noted in LINK included in this responsibility follow (some cases included more than one supervised visit during the month):

| Facilitation of Supervised Visits | | |
|---|---|---|
| **Visit Supervisor** | **Frequency** | **Percent** |
| Case Aide | 5 | 20.8 |
| Foster Parent | 6 | 25.0 |
| Provider Agency | 4 | 16.7 |
| SW | 9 | 37.5 |
| **Total** | 24 | 100.0 |

The review also captured references in LINK (e.g., Supervisory conferences or contacts with foster parents) of contacts between children and parents outside of the LINK documented supervised visits by the SW.  These included contacts via social media, telephone calls and texts.

_____

**Court Monitor Review of Permanency Goal Attainment**

As indicated in the comprehensive review conducted in 2006-2007 the Department had achieved and maintained the required permanency benchmarks in the former Outcome Measures 7,8 and 9 based upon the agreed upon exit cohort methodology of the original Exit Plan.  These measures continued to be monitored until it was determined that the required benchmarks were achieved and held for at least than two consecutive quarters at which time, the Court Monitor pre-certified them as achieved.

"Adoption within 24 months" (Outcome Measure 8) and "Transfer of Guardianship within 24 months" (Outcome Measure 9) were both pre-certified in January 2013." Outcome Measure 7 - Reunification within 12 Months" was pre-certified in April of 2015.  These measures were based upon exit cohorts, and which are no longer used as part of the Exit Plan federal review process. For reference, the *Juan F.* Outcome Measures required the following benchmark performance rates with respect to the three identified Permanency Outcome Measures:

- OM7 - ≥ 60% of discharges to Reunification will occur within 12 months
- OM8 - ≥ 32% of discharges to Adoption will occur within 24 months
- OM9 - ≥ 70% of discharges to Guardianship will occur within 24 months

The negotiated 2017 Revised Exit Plan removed these measures from oversight. Since that time, DCF has shifted reporting focus from exit cohorts to entry cohort reporting.  This reporting is used to inform the Round 3 Federal CSFR standards.  The Department is now operating under the premise that all permanency, regardless of Reunification, Adoption or TOG, should be achieved within 12 months of entry to care for ≥40.5% of children in placement.  (This methodology does not consider age out after age 18 with the goal of Other Planned Permanency Arrangement (OPPLA) as permanency achieved.)

Through its diligent efforts the Department achieved permanency for 1,571 children during 2021. The impact of COVID is reflected in the reduction of all forms of permanency outcomes during 2020 when the courts were heavily impacted by closures and delays.  A three-year view of 2019 to 2021 is shared below.

| Permanency Achieved | Calendar Year 2019 | Calendar Year 2020 | Calendar Year 2021 |
|---|---|---|---|
| **Reunification** | 845 | 693 | 621 |
| **Adoption** | 580 | 307 | 507 |
| **Transfer of Guardianship** (*TOG, STOG, PTOG, SPTOG*) | 427 | 270 | 443 |
| **Total Children Reaching Permanency** | 1852 | 1270 | 1571 |

National aggregate data shows a slowdown in permanency.  As the U.S. Department of Health and Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau most recent AFCARS report: Preliminary FY[1]2020 Estimates as of October 04,2021-No.28 indicates, of the 407,493 children in foster care nationwide on September 30, 2021 58% have been in care 12 months or more.  The median length of stay is 14.6 and the mean is 21 months.  The report notes the overall decline in both the number of new foster care entrants and exits and mentions some of the same barriers that are known here in Connecticut related to COVID-19 impact.

Reviews conducted by the Court Monitor's Office indicate that while timeliness has been impacted, the goal of permanency for children is being achieved and the Department is placing increased focus on both the children identified as "long-stayers" as well as those newly entering custody.  Results for achieving the federal 12-month permanency goal have been hovering in the mid to high 20% range of compliance throughout the 2021 year.  The Department has been transparent regarding the negative impact that COVID-19 has had upon the timelines to permanency as quarantining and court closures began in March 2020, and the CPS and judicial systems developed virtual means to continue to move the work forward.  In addition, record reviews indicate that the Departments successful efforts to utilize relative/fictive kin resources in a robust 60% of the placement cases impacts timeliness of the Department's permanency efforts.  Placement with kin resources has been especially impactful on improving the timeline for achieving Reunification.  However, permanency decisions related to Adoption or Transfer of Guardianship by the families are more time consuming and must be nurtured in many cases.  Nevertheless, regardless of the goal, the placement of children within their family sphere has proven to be instrumental in assisting children in in a myriad of ways through the challenges and trauma of removal from their parents/guardians.  The Department has undertaken multiple steps to push forward with timely permanency for all children in care.  These efforts are noted in the ChildStat and Transformational Zone efforts that follow.

The concerted efforts to achieve the 40.5% federal standard have included efforts from all regions using a form of rapid permanency reviews (RPR) to decrease time to permanency for "long-stayers", defined for DCF as, "children in care at least 24 months who are legally freed for adoption and in a permanent home." Embedded in RPR are key CQI processes designed to not only identify barriers to permanency and mitigate those, but also what Casey Family Programs refers to as an accountability for outcomes which includes regular, ongoing follow up to examine RPR data and assess outcomes, including those children in the cohort and their permanency status.  RPR is also designed to raise systemic issues to the Management and Executive Team for strategy development.

The RPR process was initially rolled out by the Agency, in partnership with Casey Family Programs, as a pilot in three area offices between December 2020 and January 2021 with sixty-eight (68) children meeting the criteria for review.  RPR was subsequently rolled out statewide in December 2021 and January 2022 with 128 children meeting the criteria.  As part of the 2020-2021 pilot, 75% have achieved permanency to date and 22% of children in the round completed in January 2022 have achieved permanency already.  This **promising shift in practice is a key**

strategy the Department will continue to implement to positively impact permanency for children in care and mitigate barriers to timely permanency.

In April 2021, the Department implemented it's first round of ChildStat, a management accountability and quality improvement process that uses a unique combination of aggregate data analysis and case dialogue to drive positive outcomes for children and families."[9]  ChildStat is focused on the DCF's 7 Key Results and agency performance related to the established Aspiration Targets and includes consistent reporting across area offices, allowing comparisons to be made across offices.  Critical to ChildStat is the work that is ongoing between ChildStat rounds which includes the ongoing review of data, identification of performance challenges and key barriers to progress, along with the implementation of strategies for improvement.  ChildStat meetings are attended by all agency leadership and are facilitated by the Director of Continuous Quality Improvement as the presenting staff walk through their slide deck to discuss their data, performance on the Key Results, progress or challenges since the last meeting and strategy implementation.  Consistent performance and case practice reviews fosters a culture of accountability and use of data that is a critical component of a well-functioning CQI system.

In addition, the Waterbury Office has implemented a Transformational Zone to address some of the permanency needs identified as challenges for DCF within Round 3 CSFR findings.  This promising process includes collaborative work with the Waterbury Court, the AG's office, the Court Improvement Program Leadership, regional staff and child welfare leadership to identify barriers and strategies that have a connection to the court to move permanency work forward.  Strategies employed included: Rapid Permanency Reviews (RPR), a Transformation Zone Strategy Log, Legal Rapid Reviews and a specific docket management strategy through the Waterbury Court.

For Waterbury, the Rapid Permanency Review is a process that began with identifying a cohort of "Long Stayers" - those in a foster care family setting greater than two years with TPR granted and the goal of adoption. A universe for the office was identified and the committee selected 30 children to focus on with this process.  Of the 30 children initially identified pre-COVID-19, 25 have been adopted.  One child is in a stable placement and now has a goal of other planned permanency arrangement (OPPLA) having recently successfully met goals for part time employment and driver's permit.  The remaining children include a child currently at St. Francis for Specialized Care, a sibling group of two in a stable home which is unwilling to adopt, and a child in a TFC home, stable but awaiting a permanency resource, and a child in foster care with outreach to a relative out of state.  The region has employed the use of the regional adoption specialist, HEART Gallery (A traveling photographic and audio exhibit created to find forever families for children in foster care), Adoption Resource Exchange (ARE), and Lexus/Nexus searches for relatives during the period.

Region V is the first in the state to have fully launched a Transformation Zone with the court in Waterbury.  This collaborative process has resulted in positive changes not only within the operations of the area office, but also at the court.  Waterbury was selected as the first transformation zone because data analyses reflected that they had the highest volume and most significant delays.  Strategies implemented by the court included changes related to docket management and how cases were scheduled as well as the scheduling of Judicial Pre-Trials to

---

[9] https://www.aecf.org/resources/implementing-childstat

resolve cases before trial. The ongoing court collaboration includes the routine review and discussion of court data as strategies are implemented. Waterbury Court data reflects filings are down: 81 new filings were added in January 2022 compared to 98 added in January 2021. In January 2021, Waterbury Court had 547 pending cases at the end of the month compared to 326 in January 2022, a reduction of 211. This collaborative process has resulted in positive changes to how the legal process moves - with an eye to file joint filings at nine months where possible.

To supplement the RPR and assess permanency for another distinct cohort of children in care, in collaboration with the agency's Legal Division, Legal Rapid Reviews were conducted for a subset of the 96 identified children ages 0-5 with permanency goal TOG/Adoption. Permanency was achieved for 67% of the cohort. Delays noted for the remaining children include court pending (19%) and Agency pending (14%) upon most current review. A subset of the remaining children in care 13-18 months will become the focus of a smaller cohort going forward to see if increased program managerial oversight can impact 35 children with a reunification goal.

To address filing delays specific to TPR, the Waterbury Office also implemented a strategy involving the joint filing of TPR when filing a permanency plan with a goal of adoption where possible. This initial cohort included 34 children for whom permanency plans with an adoption goal were filed and although only 4 (12%) had TPR filed with the plan, an additional 24 were subsequently filed. Implementation of this strategy has benefitted the area office in that it has led to a consistent process for notification and oversight for permanency plans submitted with a goal of adoption and is used by management in daily operations.

In addition to the efforts in Waterbury noted above, at the current time, Bridgeport has begun implementation of a Transformation Zone and has identified additional strategies that will be employed.

- Relative Resources: The collaboration with the court will include an identification process in the courtroom to ensure relative resource searches are performed at the time of removal. Led by SCJM; parents would be required at the 10-day OTC hearing to notify DCF of any relatives or kin that could be vetted as potential placement resources, and SCJM would also order DCF to assess these resources within 30 days at a follow up hearing. Parents as well as the child's attorneys would be ordered to provide DCF with available resources if parents are failing to provide DCF with this information.

- Judicial Pre-Trial Mediation: A forum for all stakeholders involved in a child's case to meet and discuss permanency, barriers to achievement, strategies for moving forward, and whether a modification of a proposed or already identified plan should be revised.

- Legal Rapid Reviews: Similar to reviews implemented in Waterbury, but instead reviewing a cohort of children in care over 12 months, with a permanency goal of reunification.

- Judicial Pre-Trial Mediation: A forum for all stakeholders involved in a child's case to meet and discuss permanency, barriers to achievement, strategies for moving forward, and whether a modification of a proposed or already identified plan should be revised.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

Specific to the 12-month goal, the Department data provided below provides a snapshot of the statewide entrance cohort data of the DCF population cohorts for those who achieved permanency in twelve months of entering care during the period of January 1, 2020, through January 31, 2021.  Pending permanency noted in the chart below is indicative of a child on a trial home visit at the point of reporting.



This same data depicted in table format illustrates the most up to date cohort data available.

34

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

| | Jan 2020 | | Feb 2020 | | Mar 2020 | | Apr 2020 | | May 2020 | | Jun 2020 | | Jul 2020 | | Aug 2020 | | Sep 2020 | | Oct 2020 | | Nov 2020 | | Dec 2020 | | Jan 2021 | | Total: Jan 2020 - Jan 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % | Count | % |
| **Total** | 176 | 100.0% | 148 | 100.0% | 211 | 100.0% | 165 | 100.0% | 190 | 100.0% | 193 | 100.0% | 168 | 100.0% | 192 | 100.0% | 177 | 100.0% | 137 | 100.0% | 153 | 100.0% | 145 | 100.0% | 163 | 100.0% | 2218 | 100.0% |
| **Achieved permanency in less than 12 months** | 38 | 21.6% | 37 | 25.0% | 58 | 27.5% | 50 | 30.3% | 47 | 24.7% | 48 | 24.9% | 41 | 24.4% | 43 | 22.4% | 43 | 24.3% | 36 | 26.3% | 43 | 28.1% | 33 | 22.8% | 51 | 31.3% | 568 | 25.6% |
| **Permanency in less than 6 months** | 20 | 11.4% | 14 | 9.5% | 35 | 16.6% | 26 | 15.8% | 33 | 17.4% | 31 | 16.1% | 29 | 17.3% | 35 | 18.2% | 28 | 15.8% | 30 | 21.9% | 24 | 15.7% | 22 | 15.2% | 22 | 13.5% | 349 | 15.7% |
| **Permanency in 6 – 11 months** | 18 | 10.2% | 23 | 15.5% | 23 | 10.9% | 24 | 14.5% | 14 | 7.4% | 17 | 8.8% | 12 | 7.1% | 8 | 4.2% | 15 | 8.5% | 6 | 4.4% | 19 | 12.4% | 11 | 7.6% | 29 | 17.8% | 219 | 9.9% |
| **Pending Permanency** | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 1 | 0.6% | 4 | 2.1% | 0 | 0.0% | 1 | 0.6% | 2 | 1.0% | 0 | 0.0% | 0 | 0.0% | 2 | 1.3% | 0 | 0.0% | 1 | 0.6% | 12 | 0.5% |
| **Permanency not achieved in 12 months** | 138 | 78.4% | 111 | 75.0% | 152 | 72.0% | 114 | 69.1% | 139 | 73.2% | 145 | 75.1% | 126 | 75.0% | 147 | 76.6% | 134 | 75.7% | 101 | 73.7% | 108 | 70.6% | 112 | 77.2% | 111 | 68.1% | 1668 | 73.9% |
| **Entered Care During** | Jan 2019 | | Feb 2019 | | Mar 2019 | | Apr 2019 | | May 2019 | | Jun 2019 | | Jul 2019 | | Aug 2019 | | Sep 2019 | | Oct 2019 | | Nov 2019 | | Dec 2019 | | Jan 2020 | | Jan 2019 - Jan 2020 | |

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

**Snapshot Permanency Review and Vignettes**

As identified in the November court filing, the Court Monitor identified a snapshot sample of 18 children achieving permanency during the fourth quarter 2021 to provide some qualitative data related to the population.  The sample of 18 included six children who had achieved one of the identified desired goals:  Reunification, Adoption, Transfer of Guardianship (this category is inclusive of all forms of Transfer of Guardianship including Subsidized Transfer of Guardianship, Permanent Transfer of Guardianship or Permanent Subsidized Transfer of Guardianship (TOG, STOG, PTOG, PSTOG)).  Each region had three of the 18 children included in the sample set.

Demographics for the sample identified the following:

- nine male/nine female
- six children were Black/African American
- one child was Multiracial
- 11 children were White
- six children had ethnicity identified as Hispanic (Puerto Rican or Other Hispanic)

Ages of the children ranged from one to 17 at the point of goal achievement.

- average age of the child at goal attainment for the full sample was seven ,
- average age of the child at goal attainment for adoption was five,
- average age of the child at goal attainment for reunification seven, and
- for transfer of guardianship average age of the child at goal attainment was 11.

Length of stay (LOS) for the full sample ranged from 2.8 months to 48.7 months.  The average across all 18 children was 26.4 months.

- Adoption LOS ranged from 17.4 months to 48.7 months with an average of 34.1 months
- Reunification LOS ranged from 2.8 months to 20.3 months with an average of 11.8 months
- Transfer of Guardianship LOS ranged from 13 months to 71 months with an average of 33.3 months

Looking at LOS related to racial identification

- The LOS for Black/African Americans children regardless of goal was 20.5
- The LOS for White children regardless of goal was 30.2
- The LOS for Multiracial child was 20.2

Reviewers identified many instances of diligent work in effecting the outcomes for these 18 children during the period of this pandemic.

Vignettes of a subset (6) of the 18 cases reviewed are provided and are representative of concerted efforts to overcome barriers to goal attainment through work underway achieve permanency via Adoption (2), Transfer of Guardianship (all types) (2) and reunification (2):

36

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

**Vignette 1 - Region 4**
**Reunification Achieved 20.3 Months from Date of Entry into Care**

The family case opened in March of 2020.  Initially, the family included two medically fragile infants born in February 2020.  Our identified child and her sibling were removed from the parents in April 2020 and were placed in a non-relative foster home.  This was the only placement.  Both parents had mental health issues and father also has a history of substance use and a lengthy childhood involvement with CPS including placement.  There were issues of IPV between the couple.  Both siblings were committed in late summer of that same year.

The parents engaged in services and the goal was reunification with a concurrent goal of adoption.  Maternal and paternal relatives out of state were identified as possible resources as part of concurrent planning.  The parents continued to receive services with slow but steady progress.  Services in Connecticut continued until the parents stated that they needed to move out of state to live with the father's parents.  By this time, mother was pregnant with her third child.  The couple relocated and the infant was born.  CPS in the receiving state had a family agreement with paternal grandmother that she would supervise all contact while the parents and child were living with her.  This safety plan was a result of a referral to that state's CPS by the CT SW.  The family engaged in all services in that state and in the late Spring of 2021, the safety plan was discontinued.  The family remained with the paternal grandparents.

The parents visited virtually and began in-person visits in Connecticut in August of 2021.  These visits were once a month and then increased to twice a month until reunification occurred on in early winter 2021.  The out of state CPS reports were positive, supporting reunification for both children. All services that were provided in Connecticut were replicated/continued through the efforts of the out of state CPS. In addition to this CPS oversight, the Connecticut DCF Social Worker made an in-person visit to meet grandmother prior to reunification.

CT DCF provided reunification services, IPV and parenting while the parents were in CT.  Case management, visitation, supervision, RRG consults and AAG consults were all held in a timely manner. Visitation with the foster parents was consistent and supportive.  Birth to three services were provided to both children while in CT.  There were no significant barriers with the court or because of COVID-19.  The time was required to allow the parents to progress - which extended the period to reunification beyond 12 months.  The Department utilized the ICPC with both sets of grandparents while the parents were living in CT for concurrent planning goal of adoption.  Teamings were held on three occasions attempting to move the case forward.

Although the 12-month timeframe was not met, extended time was required given the DCF continued assessment which supported the parents in reunification at 20.3 months.  Engagement narratives depicted the parents' favorable opinion of all the work that the Department did to ensure that our identified child and her sibling were reunified.

37

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____

## Vignette 2 - Region 2
## Reunification Achieved 4.6 Months from Date of Entry into Care

The referral which brought this toddler into care involved a car accident that mother had with child in the car while under the influence. Father was incarcerated and not a resource.  The case was already open at that point of referral.

Family was known to the DCF.  Mother has several other children who are not in her care. Her history includes TPR'd children and children who are with relatives or their respective fathers. Mother has a significant mental health and substance use history.  The child entered care in June 2021 under an OTC.  Initially, the child was placed in a non-relative foster home. Regular visitation with the child was provided to mother upon placement.  Relatives were explored during a CRM and no relatives or resources were found to be appropriate. Commitment was obtained a month later in July and child was placed with mother on a committed status in a women's program for substance abusing mothers.  A Multi-Disciplinary Evaluation (MDE) was completed timely and recommended a Birth-to-Three referral.  This service was completed in August 2021 with no services recommended.

Mother was engaged throughout the case; father was contacted and did not follow through on recommendations for services and was eventually reincarcerated. Mother actively engaged in mental health and substance abuse services at the inpatient program and received medication management from her community provider.  Mother successfully attended the recommended in-patient women's programs and was referred to a temporary apartment through the women's program.  Once in the apartment, her attorney filed a motion to change disposition to protective supervision, which was granted in the fall of 2021.

COVID-19 appears to have played no role as a barrier in the case, there appeared to be no barriers to reunification.  This child was reunified with mother, first on a committed basis within one month of coming into care, and then legally within 5 months of coming into care.  At the time of the review, the case remains open under an order of protective supervision.

The Department continued to visit the mother and child per policy and diligently checked with collaterals to ensure mother's compliance with specific steps.  Supervision and managerial oversight were consistent throughout the case.  At one point early in the case it appeared that mother was going to be discharged from the program and the Department took proactive planning steps to take the child into care if needed. Other concrete services such as debit cards, a bus pass and referrals to diaper and food banks were documented throughout the case to assist mother.

_____

## Vignette 3 - Region 3
## Adoption Finalized November 2021 at 49 Months in Care

Child was a four-year-old at the time permanency was achieved through adoption.  Child is one of a large sibling group who all achieved permanency at the time of this review. Child came into the Department's care in 2017 due to parental substance abuse and a long CPS history.  Termination of Parental Rights (TPR) trial dates were set for April 2019 but rescheduled twice so it was December 2019 before all TPR three trial dates were held.  TPR was granted in July 2020, and it was noted that the decision was delayed due to the pandemic as the Department was expecting a decision in April 2020.  An appeal was filed and heard; subsidy paperwork was documented in supervision during January 2021.

This child had five foster placements during his episode in care.  He was initially placed in a CORE foster home along two siblings for one month in 2017.  This was not a long-term placement and he transitioned to a second CORE foster home for a month until a relative foster home was secured for three siblings including the child identified for this review. This was thought to be a permanent placement, but at two years into placement, an investigation resulted in disruption, when the relative requested the children's removal.  At this point the siblings were registered on Adoption Resource Exchange (ARE); a PPT meeting was held, and a family was secured for the three children. Transitional visits appropriately occurred, and the sibling group moved to a pre-adoptive foster home.  The older sibling disrupted placement in August 2020 and subsequently the remaining children disrupted when the foster parents reported they were no longer a permanent resource.  The children remained in the home while a third pre-adoptive home was secured, visits took place with transition to this home in the Spring of 2021. Following the required placement period, the adoption subsidy packet was finalized, and in November, the court granted the adoption.

There were barriers that played a role in the child not receiving timely permanency first of which was delays within the court system. Prior to the pandemic, the TPR petition was filed in August 2018; without any reason provided, the scheduled trial dates were canceled and did not conclude until December 2019; 15 months after the filing of the petition.  Due to the pandemic, the 120-day decision should have been cited in April 2021 but was not given until July 2021.  Mother did file an appeal that was heard and rejected.  Secondly, there were placement disruptions:  initially with the relative foster home and then the first identified pre-adoptive home which added to the delay.  Child and his sibling did achieve permanency with their third pre-adoptive family in November 2021. While failing to meet the outcome measure, permanency was achieved due to continued and concerted efforts of the DCF to overcome barriers which presented.

DCF documented timely and appropriate engagement with mother and father from the date of child's placement.  There were ongoing Regional Resource Group (RRG) consults documented.  Mother and father were offered services; referrals were made timely.  Mother and fathers' compliance and cooperation varied over the course of the child's placement.  Supervised visitation was provided to mother and father until the TPR decision and a final visit was documented.  Concerted efforts were documented throughout.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

---

**Vignette 4 - Region 6**
**Adoption Achieved at 22.8 Months from Entry to Care**

Child is a 2-year-old female who entered DCF care on in January 2020. She was immediately placed in the care of maternal relatives along with her half-sibling. The case opened due to mother's substance use and mental health. Father also has issues with mental health and substance use. The parents are no longer in a relationship which was inclusive of Intimate Personal Violence (IPV).

The relative foster parents were licensed timely with the license being approved within four months of placement. They expressed a continued commitment to their niece throughout. They committed to adopting both children if they could not return home. Child's half sibling was reunified with her biological father. The relative foster parents facilitated visitation with mother. They were unwilling to do so with father.

Child was committed to DCF in the winter of 2020.  There was some level of delay in commitment hearings due to COVID-19; however, the Department did not falter in moving forward with filings supporting TPR and adoption while the Order of Temporary Custody (OTC) was in place.  DCF filed the TPR on or about in the first months of 2021. The plea hearing was held timely, but the trial was not set until October 2021. Mother continued to verbalize her consent, but father contested.  The TPR trial occurred as scheduled and the TPR was granted on second day of trial. The Social Worker had worked on the subsidy and adoption forms and quickly completed and filed the paperwork. The adoption was granted on prior to the end of the year.

The Department maintained consistent contact with both parents via phone contact from the time of child's entry into care until the TPR was granted. The parents were consistently offered services to address their issues. Neither complied with services for any significant period. DCF maintained contact with providers and stakeholders.  There were supervised visits provided to the parents, though many were missed. There was about a six-month period during the initial COVID-19 pandemic when these visits offered were virtual.  The Department continued to offer the parents supervised visitation and services up until the time of the TPR. The Regional Resource Group (RRG) was utilized when needed. There was a period in spring of 2020 where services appeared a bit delayed due to COVID-19 closures, but this was not more than a few months. The child was safe and did well in placement; there are no medical, physical, or developmental concerns. She will continue to be connected to her mother and maternal relatives post adoption.  The TPR was finalized at 22.8 months. The petitions were filed timely. Delays that did occur were due to the COVID-19's impact on the court. DCF nicely compensated for the delay by preparing and quickly processing the adoption post-TPR.

40

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

**Vignette 5 - Region 5**
**Transfer of Guardianship Review 71 Months from Date of Entry into Care**

This case opened in May 2014 due to mother's neglect of her children.  The mother had mental health issues and an Intimate Personal Violence (IPV) history.  She was homeless at the time of the report.  Fathers were not able to be a resource for the children. The 12-year-old child identified for this review came into care via OTC in the Fall 2015 and was committed in early 2016.  He was placed in a CORE foster home which remained in place to the fall of 2019 when foster parent requested removal.  He was then placed a Therapeutic Foster Care (TFC) home with two siblings.  His other siblings in care were in proximity and sibling visitation was consistent.

The original plan was reunification which continued until 2018.  Reunification efforts with mother failed and his father indicated that he was not able to be a resource for him.  TPR was delayed for two years. Delays were due to COVID-19 and the fact that the court required more efforts made with father.  He contested the TPR. In February of 2021, the Department referred the father for reunification services.  After two months, father agreed to PTOG and the Department withdrew the TPR and filed the guardianship petitions in the Summer of 2021.  Mother agreed with the adoption and the child also stated on several occasions that he wanted to be adopted by his foster family.  This was discussed in detail with the child and foster family, and they decided that instead of dragging this out any further they would agree to PTOG.  The hearing was delayed from September of 2021 to October of 2021 because the court failed to get a translator for the father.

This child is a special education student.  He has been on medication and attending individual therapy since placement in 2015.  There was an impact related to COVID-19.  The provider had staffing issues and from August of 2020 until March of 2021, the child had no consistent individual therapy.  He was on a waiting list for 6 months.  There also appeared to be issues with assignment of the TFC case manager over the last year, with several changes in clinicians.

Child visitation was routinely in compliance with mandates and supervision was held monthly. It does not, however direct what to do with father's objection to the permanency goal of adoption except to offer him reunification services to comply with the court's objection.  Case management work with the father was inconsistent at points during the episode. This caused delays in permanency.  Father also does not speak English.  It appears the social worker used translator services; however, it wasn't until the adult son reached out and helped to translate his father's position that his position was understood.  The notion of adoption versus PTOG should have been discussed with father much earlier as it had been with mother.  These internal issues as well as COVID-19 court closings caused a lengthy delay in permanency.

_____

**Vignette 6 - Region 1**
**STOG at 31 months from entry into foster care**
This adolescent's four placement episode lasted 29 months, three days shy of the youth turning 18 years old.  This family case most recently opened in April 2019 due to concerns of mental health and substance abuse.  Mother has three children and there are three fathers.  The family has a long history due to mother's substance abuse and mental health issues.  This adolescent has had four placement episodes during his lifetime: with this episode beginning May 2019 and ending with his STOG to Maternal Grandmother (MGM) in October 2021.

The adolescent was placed via a family arrangement with MGM when the latest report accepted.  A Considered Removal Meeting (CRM) was held with the decision for the child to remain with MGM; she provided care in the past.  An OTC was filed and granted, and later commitment was ordered in November 2020.

MGM was licensed timely to child's entry into care by the Summer of 2019.  This has been the adolescent's only placement during this placement episode.  The adolescent is Department of Developmental Services (DDS) eligible.  He has a positive relationship with MGM.  The Department has documented appropriate visitation this this youth; always interviewing him privately and then in the presence of MGM; noting their interactions and bond.

The Department documented timely and adequate engagement with mother.  She was offered services and her compliance and cooperation varied over the course of the child's placement.  Mother initially was against STOG to her mother but eventually she agreed it was in the best interest for him.  MGM stated she supervised contact between mother and the child.  There was some documented engagement with father, who reported in the beginning of placement that he was not a resource. At times during his child's placement, he was incarcerated.  There was mention that MGM supervised contact between the child and father as well.

The court approved the permanency plan of reunification with either parent concurrent with plan of STOG to MGM in September 2019.  The narrative indicated a permanency hearing occurred in early 2020. Trial dates were set for May 2020 but noted to be rescheduled to July 2020 due to COVID-19.  However, there appears to have been further court delays as the next legal narrative occurs in September 2020 - documenting the approval of the permanency plan of STOG to MGM.  There is then a gap in legal narratives with the next entry in October 2021 indicating that the judge granted the STOG to MGM.

There were two barriers that played a role in child not receiving timely permanency.  The court system presented a barrier to achieving the permanency plan given COVID-19 related delays.  In September 2020 there was an IPV incident where both MGM and her husband were arrested for Disorderly Conduct.  Appropriate safety assessments were completed and there was a CPS case open to address concerns.  Both caregivers participated in and successfully completed IPV-FAIR services.  MGM and Step Maternal Grandfather (SMGF) were appropriately seen and interviewed regarding their case throughout their case.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

---

**DCF Court Monitor Exit Plan Monitoring of Services Post Majority (SPM) Cases:
September Case Management Snapshot (n=60)**

The Court Monitor agreed to undertake a snapshot sample of the SPM universe and review
September activity related to case management in general and more specifically compliance with
client visitation and contacts with family and providers, safety/risk assessment, supervision, and
discharge planning if applicable as the COVID-19 Moratorium on SPM[10] discharges ended.

Of the 3,481 children in the care and custody of the Department on 1/1/2022, including youth
receiving services post majority given they are at least 18 years old, 1,331 are aged 12 years and
older.
For calendar year 2021, a total of 1,197 children and youth were placed into the care of custody
of the Department of which 268 were aged 13-17 years old. This represents 22.4% of all
admissions.

In the calendar year 2021, a total of 44 children, ages 18 years and over, re-entered the
Department's care. This number is lower than in previous calendar years, perhaps due to the
pandemic related federal moratorium on adolescent exits from care beginning in 2020. Youth
who enter DCF care are eligible to receive supports up through 23 years of age if criteria are met.

As noted in the newly promulgated policy and practice guide of August 12, 2021, DCF had
completed a robust evaluation of its adolescent policy and practice and adopted new strategies

> "*(I)n order to change these outcomes and ensure lifelong wellbeing and success
> for young adults, the Transitional Supports and Success (TSS) Division began
> work with several partners to shape a new approach for Transitional Age Youth
> (TAY, young persons 16 years- 23 years). The work began at the end of August,
> 2020. The purpose was to establish a consistent and recognizable approach to
> adolescent practice that would improve outcomes. The shared focus of the team
> was driven to ensure that all youth, have relationships, supports, and
> opportunities to thrive as they launch into adulthood. Over several months,
> stakeholder feedback was incorporated into a framework that embeds shared
> values and aspirations into the work with TAY. The approach is abbreviated
> V.I.T.A.L. (Voice and Choice, Innovative, Thorough and Accountable, Authentic
> Youth Engagement, Life Launch). Our work focused on impacting four broad
> areas cited as barriers to successful transitions of youth out of care: Lack of
> supportive relationships, educational challenges, housing instability, and
> economic challenges (i.e., employment, financial capability). Policy revisions
> focused on removing barriers that prevent the most vulnerable cohorts of young
> adults from achieving success. New policy adjustments accounted for the
> inevitability that all youth at one point or another make big mistakes and that
> systems and policies will protect them when those mistakes happen. A new
> practice guide sharpened focus on increasing tangible competencies as well as*

---

[10] In July 2021, a memorandum was issued to direct case work of SPM to ensure that all clients approaching
discharge at the close of the expiring moratorium have in place a concrete transition plan be developed that
addressed four critical domains: (1) income security, (2) food security, (3) housing stability and (4) adequate pro-
social network.  The divisions providing the infrastructure around this process included: Legal (800's processing),
NYTD Liaisons, Transitioning Youth for Success, Strategic Planning Bureau, PSE and the Child Welfare Bureau.

*soft skills young adults need to thrive as adults. The framework was influenced by more than three decades of psychology research that shows that a focus on process instead of intelligence or ability is essential to lifelong success. Four specific areas of practice were bolstered: Improving functional assessments of TAY, integrating that assessment into case planning, enhancing coaching, and improving living arrangement planning. Capturing youth voice in individual case planning and to fuel Department efforts was the bedrock of V.I.T.A.L."*

At the time of the Court Monitor's sampling on September 15, 2021 there were 603 clients identified as SPM within the LINK reporting.  The sampling was pulled based upon the percentage of SPM clients within the area offices and resulted in the following regional distribution:

- Region I:  8 SPM Clients
- Region II:  11 SPM Clients
- Region III:  13 SPM Clients
- Region IV:  11 SPM Clients
- Region V:  11 SPM Clients
- Region VI:  6 SPM Clients

The 10% sample included 33 males and 27 females ranging in age from 18 to 24 in September 2021. The racial make-up of the sample included one (1) Asian, 22 Black/African American, three (3) Multi-Racial, one (1) Unknown race and 33 White SPM clients.  Ethnicity was identified as Hispanic for 16 of the 60 clients.

The reviews were completed from mid-October to November 30, 2021 and the PUR was the month of September 2021.

**Review Findings:**

Of specific interest to the parties was the discharge planning efforts for any client identified for discharge because of the end of the moratorium on October 1, 2021. In 17 of the 60 cases the documentation reflected that the client was in process of discharge at the end of the PUR given the end of the moratorium on older youth exiting care.  The Department had an overwhelmingly positive outcome related to the quality of case management and discharge planning.  In all 97.1% of these 17 cases documenting clearly identified efforts to identify supports, housing, and community resources prior during the month prior to closing the case.  In the one case that was not well documented related to Department efforts it was noted that the client was non-compliant with group home rules and had become aggressive requiring his discharge in August. He had previously refused recommended services and reported he was employed but would not provide/disclose information regarding his employer.  He identified family resources and a girlfriend as supports.

The review of the sample set, 55 of 60 SPM clients' records (91.7%) had current case plans documented in LINK at the time of review.

Supervision was documented during the month of September for 52 or 86.7% of the 60 cases. Of the 52 cases with documentation, the reviewers' opinions of the quality of that supervision in addressing safety and well-being was sufficient in 51 cases.  In the one case identified with

marginal quality, the focus was on placement issues only, which is appropriate as an area of focus, but not to the exclusion of other areas of case management related to safety and well-being.

In all, 83.3% of the cases had documented contact (in-person or virtual) during the month of September 2021.

- Five of the cases with SW visitation included more than the benchmark visit required inclusive of both types of contact within the month.
- 38 of the cases documented at least one in-person visit during the month, and
- 7 documented at least one virtual contact documented during the month.

Of the 10 cases that had no contact, reviewers identified the following circumstances:

- One (1) client was AWOL for several months, located upon incarceration on September 1, 2021.  SW made multiple attempts to schedule visit.  The social worker was unsuccessful in scheduling until October.
- One client had a virtual visit in August 2021 as documented within ongoing provider reports submitted during the PUR.
- A 23-year-old client was set to transition to DMHAS-YAS and was employed full time.  The client was non-compliant with visitation but had regular phone contact with the SW.
- One client moved out of state and has not maintained efforts to visit virtually though efforts were documented by SW to do so.
- One client had been non-compliant with visitation and program requirements for a lengthy period.  A face to face was documented in August.  (Youth was accepted to DMHAS-YAS but refused. Form 800 was to be hand delivered in October.)
- SPM client was whereabouts unknown since January 2021.  Last contact was email in March 2021.  Case was closed October 1, 2021.
- SW and client spoke frequently on phone during September but there was no visit.  Last SW visit was face to face visit documented in August 2021.
- Two clients were not seen during the month via virtual or in person visit but SW did interact with client during teleconference for ACR in September.

In all, 83.3% of the cases reviewed were found to have a combined contact with child, caretakers and providers to sufficiently address issues of safety and well-being.  The ten cases which did not achieve a rating of sufficient included:

- Three cases in which Client SW visitation as inadequate.
- Two cases in which there was inadequate contact with providers.
- One case in which client was whereabouts unknown during the PUR.
- One case in which the client was incarcerated with no visitation.
- One case in which the client had visit during the month, however had several AWOL incidents with no safety assessment documented by SW or SWS.
- One case in which efforts were made to contact client who moved out of state, but these were not successful.
- One in which the client was victim to a crime, subsequently quitting work and the record reflected no provider contact to inform safety and well-being assessment during the PUR.

An area which might require further review by the Department is related to contact with the parent/guardian of the SPM client where this individual was involved or supportive of the client's programming.  In the 35 cases with involved parents, the SW documented contact with the parent/guardian in only one case during the month of review.  This could be a documentation issue, and it is unclear what the expectations are related to this type of contact for the SPM clients.

In the 32 cases with a caretaker involved in the housing of the SPM client (foster parent or group home staff), the Department documented a September contact with that identified provider in 62.5% of the cases.

In the 48 cases with active community providers involved with the SPM client, the Department documented a September contact for 66.7%.  There were six cases with service disruption during the month of September.  None of these disruptions were COVID-19 related.  Reasons for disruption included: SPM client non-compliance (3), Client AWOL (1), and one instance in which collaboration with DDS and DOC was required prior to onset of service.

Educational programming was in place for 41 of the of the 60 SPM clients (68.3%) during September.  Of the 41 clients, 35 (85.4%) were actively engaged during the month of September.  The remainder were non-compliant.

Thirty-two of the clients were employed during the month of September.  Of that total, there were only two documented cases in which employment was negatively impacted by COVID-19.

In 7 cases there was a medical issue noted in the record that warranted assistance by DCF social worker to resolve a barrier or secure needed services.  In four of those instances (57.1%) there was clear documentation that the SW addressed the situation adequately.  In the remaining three there was discussion of the issue, but no documented assistance provided to secure the needed service within the period under review.  (Cardiac follow up, migraine medication management, Blood pressure medication management).

**Programmatic Developments**

As the V.I.T.A.L. practice model has been implemented, increased and important collaborations with outside providers has enhanced the Department's ability to tackle the work with this population.  Linda Dixon, Ph.D., DCF's Administrator of Transitional Supports and Success, has been interviewed related to the success of LifeSet programming in Connecticut's programming for adolescents.  A link to that important advancement of the work is imbedded here for ease of reference.[11]

Additionally, the Department has reported successful implementation of collaborations with other state agencies and private providers as follows:

> *Collaboration with Sister State Agencies and Private Organizations Has Been Ongoing and Has Included:*

---

[11] https://youthvillages.org/what-makes-lifeset-different-6-questions-with-linda-dixon-of-connecticut-dcf/

- o *Developed a partnership with Department of Energy and Environmental Protection (DEEP) to pay young adults in environmental conservation service at the Wilderness School this summer.*
- o *Wrote a Memorandum of Understanding (MOU) with the Department of Motor Vehicles (DMV) that streamlines the process for youth to obtain non-driver's identification and driver's licenses.  This will include adding a mobile serve that visits area offices, adding a pre-check of documents, creating a designated day for youth in DCF care to obtain a license, and streamlining an interagency exchange of funds, etc.*
- o *Met with the Banking Commission and compiled a list of banks that offer financial literacy programs through schools.*
- o *Recruited private providers to offer life skill courses at Department of Corrections (DOC) facilities serving young adults.*
- o *Jordan's Furniture donated $1,000 vouchers to for 20 Transition Aged Youth (TAY)to be used for furniture.*
- o *Partnering with two community partners to provide enhanced mentoring service for LGBTQIA+ youth, This increased the catchment area to cover the entire state, and structured the mentoring to focus on housing and vocational challenges.*
- o *Started a consortium of paid young adults to work in tandem with providers serving TAY to develop a manual that embeds V.I.T.A.L. values and principles into the work.*

- o *The Adolescent Certification process was launched in partnership with the Academy for Workforce Development leading to a greater set of knowledge and expertise for Adolescent Workers.*
- o *A team developed a Health and Wellness Curriculum for adolescents.*

The DCF Adolescent division also indicated that during the 2021-2022 academic year "transitional aged youth (TAY) are attending over 75 colleges and universities across the country - as far away as Utah and Florida. Some adolescents are staying local and are enrolled in one of 14 community colleges. Our youth will also take part in vocational, technical and job training programs leading to careers as electricians, cosmetologists, phlebotomists, welders, and many other trades. " And further, "the Department has contracted with Sun Scholars to provide academic tutoring and coaching, career coaching, advocacy, and life skills support for this population. The program also helps students find internships and other professional development opportunities.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022
_____

## DCF Racial Justice Initiatives

DCF has had a focus on racial justice dating back at least to 2012. In response to the rise of racial unrest in 2019 and the disproportionate impact of COVID-19 on black and brown communities, in 2020 the agency began more focused efforts to spark change. The role of the Statewide Racial Justice Workgroup (SRJWG) was highlighted and bolstered through additional efforts of Senior Leadership.

DCF leadership training materials of June 2020 best describes the process implemented throughout this period.

"This renewed and bold mission is anchored in three foundational themes:

1) ***Safe and Sound - A culture of safety:*** A culture of safety is one in which our values, attitudes, and behaviors support psychological and physical safety for staff, and the families and children we serve. As a culture of safety, Safe and Sound is rooted in the principles of respect, trust, candor, equity and racial justice. Put into action, this enables us to be engaged, supportive, accountable, and open to learning. It empowers us to make sound decisions and competently provide services that help children and families achieve safe and healthy outcomes. It requires us to *regulate* our own emotions; *relate* to others authentically; *rise* in bold and brave ways; *reason* with sound decisions; and *respond* with intentional respect.



2) ***Differentiating equality, equity, and justice:*** Language matters in the work of becoming anti-racist. While some differences may seem nuanced and insignificant on the face, the impacts and resulting outcomes are dramatic. Thus, while equality can sometimes serve as a catch-all word, referring to individuals receiving the same treatment, services, and supports, regardless of need, equality does not account for inputs and opportunities. Thus, the language of anti-racist work first requires a focus on equity, reinforcing that we are providing people with the services and supports they need, rather than simply offering everyone the same. And then it further requires a shift to justice, recognizing and eliminating the barriers to equal access and opportunity.

*Juan F.* v. Lamont Exit Plan Status Report
March 2022

_____



*Graphic initially developed by Craig Froehle.*

3) ***Moving from a racial justice lens to anti-racist action***: Having a racial justice
   lens, which DCF has strived to achieve through years of awareness building,
   dialogues, and intentional technical assistance, helps shift the ways staff see,
   perceive, and relate to children, families, staff, and partners. This lens of
   consciousness, awareness, and intentionality is necessary for justice, but is not
   sufficient to move the needle in the ways the Department has set out to do. In
   order to achieve and sustain outcomes for children, families, staff, and
   communities of color, the Department must boldly engage in anti-racist action.
   As described by Ibram X. Kendi and others, anti-racist action requires
   "purposeful, intentional activities that go to the heart of institutional and
   systemic racism and dismantle it entirely for all people of color who are
   discriminated against, including Blacks, Latinx, and indigenous people."

DCF is committed to embedding a racial justice focus across the agency, and this commitment
has demonstrated progress on key outcomes and identified areas where measurable results have
not been as significant.  As DCF moves to a prevention model framework and implementation of
the Prevention Plan, it is expected that the agency will see gains in continuing to reduce
disproportionality and disparity through ongoing partnerships with communities, families, and
providers to prioritize child maltreatment prevention and distinguishing this from poverty and
child neglect.

When reviewing and disaggregating data across race/ethnicity as related to the key safety
measure "Recurrence of Maltreatment within 12 Months", DCF has seen improved performance
across all racial and ethnic groups.  In fact, all groups meet the national standard of <=9.1%; and
where they were previously <4 points apart across race/ethnicity, they are now <2 points apart.

DCF has also seen improvement in the disparity rates for children entering care.  In SFY12,
Black children were 4.13 times as likely than their white counterparts to enter care. In SFY21,
this dropped to 2.55.  Similarly, in SFY12 Hispanic children were 2.86 times as likely to enter

care when compared to their white counterparts and this decreased to 1.69 times more likely in SFY21.  While this represents notable improvement, DCF recognizes disparity still exists. DCF will continues to implement initiatives and strategies as it strives to eliminate disparate outcomes.

Another key success for DCF across all groups is the relative care placement rates, in which all cohorts of children have exceeded the aspirational target of 90% and whereas groups were previously <3 points apart, they are only about 1 point apart. This reflects placement in a relative care setting between 94.7%-95.6% of the time.  Across the four groups, Hispanic, Black, Other and White, permanency in 12 months is now <3 points apart when they had been <9 points apart at times.  This represents progress in that the groups experience similar performance for this measure. DCF continues implement strategies and activities to continue to raise the standard for all children.

DCF Pathways Data continues to reveal considerable overrepresentation of African American and Hispanic/Latinx children, and the data reflects increased disparities with respect to accepted FAR and accepted Investigations.  A key strategy to impact the disproportionate numbers of children of color reported to DCF for abuse and neglect is community and stakeholder engagement as DCF shifts to a prevention model that distinguishes between child maltreatment and poverty/neglect.

DCF continues to draw on the strong data and CQI infrastructure to support the evaluation of practice and outcomes with a racial justice focus.  Divisions across the agency have implemented change initiatives as a means of helping DCF become a more racially just agency with outcomes intended to eliminate disparity and promote equity.  All data is disaggregated by race/ethnicity and as strategies for improvement are implemented, DCF will continue to assess equity in outcome improvement.

On February 15, 2022, the Department submitted a comprehensive report to the Connecticut Legislature.  This report, "Connecticut General Statute (C.G.S) Section 17a-6e Report on the Department of Children and Families' Racial Justice Data, Activities and Strategies" provides details on the goals, efforts and achievements of the Department related to achieving anti-racist practice across the organization. This full report can be accessed via this link: https://portal.ct.gov/-/media/DCF/RACIAL-JUSTICE/FINALSFY2021CGS17a6edocx.pdf