# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUAN F., et al., | |
| Plaintiffs, | |
| v. | Case No. 89-CV-859-SRU |
| LAMONT, et al., | |
| Defendants. | |

## JOINT MOTION TO TERMINATE JURISDICTION AND CLOSE CASE

Over the past 32 years, the Connecticut Department of Children and Families ("DCF") has made organizational and operational changes that have dramatically improved the way the agency provides services to children and families in Connecticut.  These changes have positively impacted children and families involved with DCF.  The Department has also implemented policies and practices that are designed to ensure that these improvements will be sustained.

Most recently, DCF's court-ordered obligations were set forth in a 2017 Revised Exit Plan (Doc. No. 778).  Because DCF has complied fully with both the terms and intent of the 2017 Revised Exit Plan and related court orders, the Plaintiffs and Defendants ("Parties") respectfully submit that this Court's continued oversight is no longer necessary and should end.

Accordingly, pursuant to section nine of the 2017 Revised Exit Plan and Federal Rule of Civil Procedure 60(b)(5), the Parties jointly move this Court for an order terminating jurisdiction over the 2017 Revised Exit Plan and closing the case in accordance with the Proposed Order submitted herewith.

1

## BRIEF HISTORICAL OVERVIEW

Over three decades ago, in December 1989, the instant federal civil rights class action seeking prospective declaratory and injunctive relief was brought on behalf of all children involved in the Connecticut child welfare system, both at the "front end" of the system whose families were the subject of allegations of abuse, neglect, or abandonment and who faced possible investigation, family separation, and removal from home, as well as children removed and placed into "out of home" foster care.[1]  Those children—represented by several individual named plaintiffs and their "next friend" adult plaintiffs—asserted that structural failures in Connecticut's child welfare system harmed the Plaintiff Class and placed them at risk of harm, in violation of their federal constitutional and statutory rights.[2]

The complaint specifically alleged, *inter alia*, that DCF failed to make reasonable efforts to keep families together, failed to adequately investigate child abuse and neglect complaints, and failed to provide adequate safety, oversight and health care services to the Plaintiff Class. *See* Doc. No. 1.  The complaint summarized the factual assertions in the case as follows:

a) "defendants' failure to provide adequate protective services to children who are abused, neglected or who are at risk of abuse, neglect, and maltreatment, including their failure to ensure that all reports regarding these children are investigated and responded to promptly by caseworkers who are trained adequately and appropriately;

b) defendants' failure to make reasonable efforts to keep families together by providing to families which are threatened with the removal of a child because of

---

[1] The Plaintiff Class, as defined in the 2017 Revised Exit Plan, has remained constant: "A. All children who are now, or will be, in the care, custody, or supervision of the Commissioner of the Department of Children and Families as a result of being abused, neglected or abandoned or being found at risk of such maltreatment; and B. "All children about whom the Department knows, or should know by virtue of a report to the Department, who are now, or will be, abused, neglected, or abandoned, or who are now, or will be, at serious risk of such maltreatment." *See* Doc. No. 778, at 3.

[2] The complaint named the following defendants in their official capacities:  William O'Neill (then-Governor of the State of Connecticut) and Amy B. Wheaton (then-Commissioner of the Connecticut Department of Children and Youth Services or DCYS).  *See id.*  The agency was subsequently renamed the Department of Children and Families ("DCF"), and that name is used throughout this motion for simplicity.

abuse or neglect reasonable and appropriate services to prevent placement into out-of-home care;

c) defendants' failure to provide minimally-adequate and appropriate care to all of the children who are placed by them into foster homes or other substitute care settings, including their failure to place children in the least restrictive, most family-like settings and in settings which allow them to maintain sibling relationships, their use of overcrowded and inadequately trained and supervised foster homes that do not conform to nationally-accepted standards, their failure to ensure that all children in care receive adequate medical and mental health assessments and treatment and adequate and consistent parenting and nurturance, and their failure to provide specialized substitute care placements for all children with special needs;

d) defendants' failure to develop and implement appropriate case plans that will assure permanent placements for all children in their custody, either by providing services to families to enable the children to be returned home safely or by timely placement of the children into other permanent homes."

*See* Compl., Doc. No. 1, at 1-2.

The complaint alleged that, as a result of those structural failures, "Connecticut's child welfare system endangers children it is charged to protect, causes harm to children it is charged to help, and has been allowed to deteriorate to a state of systemic, ongoing crisis." *See id.* at 2-3. It further alleged that "[t]his crisis has caused, and is causing, irreparable injury to the thousands of children involved" in the system.[3] *See id.*

From the outset, the Parties and the Court endeavored to resolve the disputes through mediation.[4] With the Parties' consent, United States District Judge Alan H. Nevas appointed a three-member mediation panel consisting of a representative of the Plaintiffs, a representative of

---

[3] The Plaintiffs lodged claims for declaratory and prospective injunctive relief pursuant to 42 U.S.C. 1983, including claims arising under: (1) the Federal Adoption Assistance and Child Welfare Act of 1980; (2) the Federal Child Abuse Prevention and Treatment Act; (3) the right to safe, decent, and humane environment when in state custody under the Fourteenth Amendment; (4) the right to care that is consistent with competent professional judgment under the Fourteenth Amendment; (5) the right not to be deprived of state and federally-created liberty and property rights without due process under the Fourteenth Amendment; (6) the right to placement in the least restrictive, appropriate placement under the Fourteenth Amendment; and (7) the right to freedom of association and to family integrity under the First, Ninth, and Fourteenth Amendments. *See* Doc. No. 1, at ¶¶ 236-249.

[4] Neither a motion to dismiss nor answer was ever filed in light of the Parties' early settlement efforts.

the Defendants, and Senior United States District Judge Robert C. Zampano (the "DCF Panel"). *See* Doc. No. 117. After five months of reviewing documents, interviewing DCF employees, and holding public hearings, the DCF Panel proposed a 120-page consent decree that set forth a detailed plan to improve DCF operations ("Initial Consent Decree"). The Initial Consent Decree was approved and adopted as an injunctive court order by Judge Nevas on January 7, 1991, compliance with which, per a later order dated December 1, 1992, was to be overseen by a court monitor (the "Court Monitor"). *See* Doc. Nos. 90, 166.

The Initial Consent Decree included, among other focuses, the following major substantive areas and corresponding obligations:

- Investigations and pre-placement (or pre-removal) services;
- Foster care and out-of-home placements and services;
- Medical care;
- Mental health care;
- Adoption;
- Staffing; and
- Management and Information Systems.

*See* Consent Decree, Doc. No 90, at 2.

Additionally, the Initial Consent Decree required the development of an implementation manual for specific substantive sections of the decree. Over the course of nineteen months, under the guidance of the DCF Panel, the Parties stipulated that comprehensive requirements to implement the Initial Consent Decree would be set forth in twelve jointly-developed manuals.[5] *See* Doc. No. 161. The manuals were adopted as enforceable court orders and were incorporated into the Initial Consent Decree on September 3, 1992. *See* Doc. No. 162.

---

[5] The following manuals were issued: (1) Hotline Manual; (2) Intake and Investigation Manual; (3) Treatment Manual; (4) Regional Resource Group/Community Consultants Manual; (5) Family Training and Supports Manual; (6) Adoption Manual; (7) Voluntary Services Manual; (8) Contracts Manual; (9) Quality Assurance Manual; (10) Health Management Unit Manal; (11) Training Academy Manual; and (12) Central and Regional Office Manual. *See* Doc. No. 162.

4

Several major reforms were developed over the next decade.  Among them were the creation of the Health Management Unit, the Training Academy, and a centralized hotline (the "Careline").[6]  *See* Doc. No. 117; Doc. No. 284.  Each is briefly discussed in turn below.

The Health Management Unit was broadly tasked with "reviewing, developing, and implementing policies, standards, proposals, procedures and programs relating to all aspects of the medical and mental health and substance abuse of the children under the supervision, care or custody of the Department."  *See* Doc. No. 117, at 13.  The Unit was also charged with developing appropriate training, alongside the Training Academy, "to educate foster parents, prospective adoptive parents, and DCYS personnel concerning all aspects of the health of children."  *See id.*; DCYS Health Management Unit Manual, at 2.   The Health Management Unit was, moreover, responsible for coordinating programs and activities relating to the health of children in DCYS's custody and evaluating the quality of health care being received by children in out-of-home placements.  *See* DCYS Health Management Unit Manual, at 2.

The Careline created a centralized statewide system that received and screened all intakes and reports of child abuse and neglect before referring reports to regional offices for investigation.  *See* DCYS Hotline Manual, at 2.  The Careline created a central intake through which all reports of child abuse or neglect would be received, processed, and assessed twenty-four hours a day, seven days a week. *See id.*  Those calls would then be directed, as needed, to regional intake units, regional treatment units, quality assurance, police, or voluntary units, and/or community-service providers.  *See id.*  By 1999, the Careline had received and processed thousands of reports of abuse and neglect in a streamlined, timely manner.  *See* Doc. No. 284, at 4.

---

[6] The Training Academy is now known as the Academy for Workforce Development.

The Training Academy was charged with offering state-of-the-art, high-quality, competency-based, and culturally responsive training.  *See* DCYS Training Academy Manual, at 2.  The Training Academy provided pre-service preparation and in-service training for all DCF employees, as well as training for foster parents and contracted service providers, which helped ensure that those individuals possessed the necessary information, knowledge, and skills to serve children in their care.  *See id.*; *see* Doc. No. 294, at 4.

Although the number of DCF staff nearly doubled in the 1990s, during the first decade under the Initial Consent Decree, *see* doc. no. 284, at 4, early resource deficiencies encumbered the agency and slowed the progress of reform.  In the spring of 1993, Plaintiffs asserted that DCF (a) could not hire enough case workers necessary to meaningfully lower caseloads, as required under the Initial Consent Decree; and (b) could not provide per diem support payments to foster parents at 100% of the United States Department of Agriculture ("USDA") foster-parent rates, as also required.  *See* Doc. No. 169.

The Plaintiffs invoked the dispute resolution process set forth in the Initial Consent Decree, and the Court Monitor found that the Defendants did not have a plan that would achieve substantial compliance.  *See* Doc. No. 169.  After a hearing in June 1993, Judge Nevas adopted as a court order the Court Monitor's findings of fact and recommendations, which required a phased timetable for additional hiring and obligated the Defendants to reimburse foster parents at 100% of the USDA foster-parent rates by a specified date.  *See* Doc. No. 169.  The Defendants appealed, arguing, *inter alia*, that their substantial compliance with the Initial Consent Decree foreclosed judicial intervention.  *See Juan F. v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994).  The Second Circuit affirmed Judge Nevas's ruling, concluding that "the decree does not contemplate

anything less than 100% compliance" and that Judge Nevas's order required specific timetables to bring the Defendants into full and timely compliance. *See id.*

The impact of early resource shortages was serious. For example, Plaintiffs alleged that too few foster families were being recruited and retained, too many children were being unnecessarily institutionalized, and too many children were being moved frequently from one foster home or facility to another. *See* Doc. No. 284. At the same time, the Parties, the Court Monitor, and the Court all agreed that the sheer volume of obligations in the Initial Consent Decree and manuals was too proscriptive, and that a more outcome-based approach could accelerate necessary improvements. Upon the recommendation of the Court Monitor and the Court, and to develop a streamlined path toward eventual termination of court oversight, the Parties agreed to enter into an 18-month period of transition and negotiated the Transition/Exit Plan dated February 20, 2002 ("the Transition/Exit Plan"). *See* Doc. No. 413. The Transition/Exit Plan listed outcomes for over twenty performance measures that the Defendants were required to meet at measurement periods ending 4, 8, 12, and 16 months following the effective date of the Transition/Exit Plan (March 1, 2003). *See id.* Upon the expiration of the transition period, all obligations set forth in the Initial Consent Decree and manuals, with limited exceptions, were to be replaced by a set of final outcome and performance measures. *See id.*

DCF struggled to comply with the Transition/Exit Plan. Following a noncompliance hearing in July 2003, the Court Monitor found that DCF failed to maintain the maximum case load standards and the required number of staff positions, and recommended that DCF take a number of steps to maintain the necessary staffing and case load levels. *See* Doc. No. 440. Judge Nevas approved and adopted those findings and recommendations shortly thereafter. *See* Doc. No. 441.

Noncompliance persisted, and in October 2003, the Parties negotiated a stipulation establishing a Transition Task Force, which Judge Nevas approved and entered. *See* Doc. No. 447. The Transition Task Force was comprised of the Court Monitor, the Commissioner of DCF, and the Secretary of the Connecticut Office of Policy Management ("OPM"), and "assume[d] all decision-making authority having a substantial impact on the safety and welfare of members of the Juan F. class." *See id.* Disagreements within the Transition Task Force would be appealed to the Governor, and the Court would serve as the final arbiter. *See id.* The Court also directed the Court Monitor to simultaneously develop a Final Exit Plan. *See* Doc. No. 454.

A Final Exit Plan was thereafter submitted, approved, and ordered by the Court in December 2003. *See* Doc. No. 454. The Final Exit Plan detailed outcome measures governing twenty-two structural areas of DCF's operation, which were designed to address known areas of deficiency or concern while dramatically streamlining the breadth and proscriptive detail of the Initial Consent Decree and manuals.[7] *See id.* Sustained compliance with all of the outcome measures was a prerequisite for requesting termination of the Court's jurisdiction. *See id.* The Final Exit Plan, moreover, provided that the "Defendants shall provide funding and other resources necessary" for full implementation. *See id.* Consistent with the Final Exit Plan, a Revised Monitoring Order was signed by the Court, in which the Monitor "assume[d] any and all duties" set forth in the October 7, 2003 Order. *See* Doc. No. 455, at 1. A Revised Exit Plan was filed on July 1, 2004, which clarified the measurement procedures for each outcome measure.

---

[7] The outcome measures assessed: (1) commencement of investigation; (2) completion of investigation; (3) treatment plans; (4) search for relatives; (5) repeat maltreatment of in-home children; (6) maltreatment of children in out-of-home care; (7) reunification; (8) adoption; (9) transfer of guardianship; (10) sibling placement; (11) re-entry into DCF custody; (12) multiple placements; (13) foster parent training; (14) placement within licensed capacity; (15) children's needs met; (16) worker-child visitation (out-of-home); (17) worker-child visitation (in-home); (18) caseload standards; (19) reduction in number of children placed in residential care; (20) discharge measures; (21) discharge of mentally ill children; and (22) multi-disciplinary exams. *See* Doc. No. 454.

In 2004, a number of structural changes were launched, including the creation of a system of neighborhood-based service delivery; the employment of 145 new permanent social workers, supervisors, and case aids; enhanced support to families and children returning home from residential treatment, including development of family support teams, treatment foster care, group homes, and wrap-around services; and the provision of emergency services.   In the following year, 2005, Ray Mancuso was appointed as the sole Court Monitor.  *See* Doc. No. 500.

DCF thereafter made progress in meeting a number of the outcome measures.  For example, in June 2006, DCF for the first time met Outcome Measure 22, which required that at least 85% of all children entering DCF custody have a multi-disciplinary exam ("MDE") conducted within 30 days of entering out-of-home placement.  *See* Doc. No. 515-1, at 4.  That was a significant requirement with direct health care benefits to children in the Plaintiff Class, because the MDE comprehensively assessed the wellbeing of children entering the foster care system and established a baseline for health, dental, mental health, and developmental issues. *See* Doc. No. 536-2, at 6.  At the start of the Final Exit Plan in 2003, only 5.6% of children entering DCF foster care custody received a multi-disciplinary exam; however, with "sustained focus on front-line staff, coordination and collaboration of DCF and service providers, concentrated efforts of the DCF management team, and the support of the Governor's office and the legislature," DCF's performance dramatically improved to 91.1% percent in a little over two years.  *See id.*

Despite those advances, DCF struggled to achieve and sustain progress on other outcome measures, and two in particular:  Outcome Measure 3, governing treatment plans, and Outcome Measure 15 (now Outcome Measure 4), governing the meeting of children's service needs.  The Parties and the Court Monitor believed that the current methodology to assess Outcome

Measures 3 and 15 did not yield information that fully reflected DCF's work, and proposed a revised methodology that embraced a more qualitative approach.  *See* Doc. No. 515-1, at 17. Following negotiations with the Court Monitor and the Parties, the Revised Exit Plan was modified on July 11, 2006 ("2006 Revised Exit Plan"), primarily to change the methodology by which Outcome Measures 3 and 15 were calculated.[8]  *See* Doc. No. 454, 520, 523.

Unfortunately, DCF did not make steady improvement on Outcome Measures 3 and 15, which prompted the Plaintiffs to notify the Defendants of actual or likely non-compliance with those two outcome measures in May 2008.  *See* Doc. No. 563.  With the assistance of the Court Monitor, the Parties reached a negotiated stipulation that set forth additional remedies designed to move DCF toward compliance on the two outcome measures.  *See id.*  Among other things, DCF agreed to partner with a technical assistance committee of national experts to develop targeted reform plans.  *See id.*  The Court approved the stipulation in July 2008.  *See id.*

DCF subsequently began implementing an array of initiatives to reduce reliance on institutions and other group facilities ("congregate care facilities"); strengthen its efforts to recruit, retain, and support foster families; clear its backlog of overdue health care screens; and address other unmet needs of children in its custody.  Those initiatives proved insufficient, however, and the percentages of cases with adequate case plans and in which children's needs were met remained low.  *See, e.g.*, Doc. No. 582, at 4.

Then, in 2010, the Defendants moved to vacate the 2006 Revised Exit Plan entirely, terminate jurisdiction, and close the case pursuant to Federal Rule of Civil Procedure 60(b)(5).

---

[8] In particular, treatment plans were to be developed, and children and families were to have their health and service needs met, in accordance with the "DCF Court Monitor's 2006 Protocol for Outcome Measures 3 and 15" dated June 29, 2006 and the accompanying "Directional Guide for OM 3 and OM15 Reviews" dated June 29, 2006.  *See* Doc. No. 520.  Those documents set forth comprehensive case review guidelines to ensure consistent assessment of performance on each of the specific domains within Outcome Measures 3 and 15, as well as for overall compliance with those outcome measures.

*See* Doc. No. 607. After full briefing and an evidentiary hearing, United States District Judge Christopher F. Droney[9] issued a ruling and opinion denying the Defendants' motion. *See* Doc. No. 640.

The trajectory of DCF's reforms toward achieving full compliance and exit turned a corner in 2011. Joette Katz, then-Connecticut State Supreme Court Justice, was appointed as DCF Commissioner by then-Governor Dannel Malloy, and immediately sought to overhaul DCF's organizational structure: staff from the administrative offices in Hartford were transferred to regional offices, which allowed them to better serve families, and regional administrator positions for each of the state's six regions were established, providing a more direct line from the central office to the field. *See* Doc. No. 651.

In addition, Commissioner Katz spearheaded fundamental policy changes that emphasized a family-centered approach to all service delivery at DCF. As one example, Commissioner Katz announced directives calling for dramatically reduced reliance on institutions and other group facilities (both in and out-of-state) for youth in foster care. *See* Doc. No. 656. Those policies reflected the policy imperative, maintained in full force through today at DCF, that children do better in families, especially their own immediate and extended kinship families, and that with very rare exceptions, institutions and other forms of congregate care should be used only as a short-term treatment modality, not as a form of placement for children.

Commissioner Katz also implemented structural improvements designed to build trust with families, such as requiring case workers to notify parents and guardians in advance of a visit, and implemented the Differential Response System, which avoided formal investigation and the possibility of removal and family separation by supporting families with lower risk

---

[9] The case was transferred from Judge Nevas to Judge Droney on January 26, 2009. *See* Doc. No. 573.

profiles with referrals to voluntary community-based services.  *See* Doc. No. 657.  Moreover,

under Commissioner Katz's leadership, DCF launched a "teaming" process that preceded and

followed removals, in which families and DCF would collaboratively develop plans to keep

children home or rapidly return children home to their families and communities.  *See* Doc. No.

670.

Many of the outcome measures—from search for relatives (Outcome Measure 4)[10] to

minimizing multiple housing moves for children in foster care (Outcome Measure 12)[11] to

reduction in the number of children in residential facilities (Outcome Measure 19)[12]—were

shortly met.  *See* Doc. No. 690.  The use of relative or "kinship" care as a housing placement for

youth in foster care dramatically increased as the number of children in restrictive congregate

care facilities plunged.  For example, in 2011, 919 children and youth were living in congregate

care facilities; just three years later, in 2014, that number was cut by more than half, to 347

children.  *See* Doc. Nos. 651, 694.  Relatives and kin were a primary placement for 16.9% of

children in care on April 1, 2011; by September 1, 2014, they were a primary placement for over

one-quarter—27.8%--of children.   *See* Doc. No. 651, at 31; *see also* Doc. No.  690, at 48.  By

2018, the last full year of Commissioner Katz's tenure, the number of children and youth in

congregate setting dropped to 235 and the percent of children with a primary placement with kin

increased to 34.3%.  *See* Doc. No. 792-2, at 51, 52.

---

[10] Outcome Measure 4 states: "If a child(ren) must be removed from his or her home, DCF shall conduct and document a search for maternal and paternal relatives, extended formal or informal networks, friends of the child or family, former foster parents, or other persons known to the child. The search period shall extend through the first six (6) months following removal from home. The search shall be conducted and documented in at least 85.0% of the cases."

[11] Outcome Measure 12 states: "Beginning on January 1, 2004, at least 85% of the children in DCF custody shall experience no more than three (3) placements during a twelve month period."

[12] Outcome Measure 19 states: "The number of children placed in privately operated residential treatment care shall not exceed 11% of the total number of children in DCF out-of-home care."

DCF's investments into community-based mental health and other supportive services, however, struggled to adapt to the consequences of reduced institutionalization and fewer children entering the out-of-home foster care system.  As a result, monitoring reports concluded that many children did not receive the services they needed to be properly supported and treated in the community.  *See, e.g.*, Doc. No. 723, 786.

Additionally, staffing shortages negatively impacted outcome measure performance. Plaintiffs alleged that front-line staffing shortages, exacerbated by hiring freezes and reductions, resulted in excessive caseloads for hundreds of caseworkers.  *See* Doc. No. 695, at 4; and that those factors, in turn, compromised the quality of front-line case management services and outcome measure performance.  *See* Doc. No. 698.

The Parties thereafter negotiated the 2016 Revised Exit Plan, which reflected the Defendants' sustained progress toward meeting their obligations to date, and the commitments needed to ensure adequate resources and to reach further progress towards full compliance and exit. *See* Doc. No. 710.  The Defendants requested that the Court's approval be delayed until the plan could be submitted for approval by the Connecticut General Assembly—a request the Plaintiffs did not join.  *See id.*  The agreement was ultimately rejected by the General Assembly on February 1, 2017; the parties therefore continued to operate under the terms of the 2006 Revised Exit Plan.  *See* Doc. No. 710-1, at 4; Doc. No. 729.

That same day, on February 1, 2017, the Plaintiffs provided notice of actual or likely non-compliance with the 2006 Revised Exit Plan, asserting DCF's repeated noncompliance with the Treatment Planning and Children's Needs Met outcome measures, among others, and highlighting asserted persistent service and community-based resource gaps.  *See* Doc. No. 723-2.  The Parties could not reach an agreement on the issues relating to the alleged noncompliance,

and agreed that the Court Monitor should propose his own findings, conclusions, and recommendations to the Court for modification of the 2006 Exit Plan. *See* Doc. No. 729.

The Court Monitor's report, which was issued on May 1, 2017, found that the Defendants were in non-compliance with the 2006 Revised Exit Plan and in particular, with the provision that the Defendants "shall provide funding and other resources necessary to fully implement the Exit Plan." *See* Doc. No. 729. The Court Monitor observed that the current caseloads "overwhelm an individual social worker and do not allow them to meet the fundamental requirements of their jobs," and that "[w]aitlist[s] and shortages in community services exist for both specific services and in certain parts of the state." *See id.* The Court Monitor concluded that DCF needed to hire the necessary staff and provide the necessary services to cure the deficiencies. *See id.*

The Parties and the Court Monitor thereafter negotiated and agreed to the 2017 Revised Exit Plan—the operative exit plan—which United States District Court (now Chief) Judge Stefan R. Underhill adopted as a court order on December 13, 2017.[13] *See* Doc. No. 778. The 2017 Revised Exit Plan provided a framework that focused on the individual domains comprising Outcome Measure 3 (Treatment Planning) and Outcome Measure 4 (Children's Needs Met), required lowering the average caseloads by 25% in addition to the caseload maximum limits, and mandated the development of a strategic plan of "cross cutting" initiatives designed to move DCF towards full compliance and exit. *See id.* Importantly, the 2017 Revised Exit Plan again required the Defendants to "provide funding and other resources necessary to fully implement and achieve sustained compliance." *See id.*

---

[13] The case was reassigned to Judge Underhill on January 24, 2012. *See* Doc. No. 659.

In 2019, Vannessa Dorantes was appointed as DCF Commissioner.  Commissioner

Dorantes, a social worker by training who began her career at DCF in 1992 as one of the early

hires required by the Initial Consent Decree, was a DCF Regional Administrator at the time; she

immediately committed to continuing and expanding the progress of her predecessor and to

working towards both transforming DCF's work and achieving full compliance with and exit

from the Consent Decree.

At the time of Commissioner Dorantes' appointment, there were 5 measures still not met:

Revised Outcome Measure 2 (Completion of the Investigation/FAR); Revised Outcome Measure

3 (Case Plans); Revised Outcome Measure 4 (Children's Needs Met); Revised Outcome Measure

5 (Worker-Child Visitation (In-Home); and Revised Outcome Measure 6 (Caseload Standards).

Commissioner Dorantes committed to practice shifts to address these remaining measures.  For

example, a predictive hiring model was instituted in 2019, resulting in sustained reduced

caseload ratios. Qualitative assessments were now conducted within the 45-day timeframe for

completion of investigations.  The quality of In-Home visits improved, and additional time was

devoted to household members and the observation of families' living conditions.  The agency

also began focusing particular attention on certain identified areas of the Case Plan and Needs

Met measures.

As discussed below, under Commissioner Dorantes' leadership, improvements under the

governing 2017 Revised Exit Plan accelerated and full, sustained compliance has now been

reached.  Further, the Department has implemented a framework to advance racial justice

initiatives, and adopted a new adolescent practice model to further elevate DCF's case practice.

Finally, DCF has improved performance management, case review, and quality improvement

infrastructures.   The Defendants are now well-positioned to move forward without judicial oversight.

## I.   STANDARD OF REVIEW

A district court may relieve a party from a "final judgment, order, or proceeding" when "the judgment has been satisfied, released, or discharged."  Fed. R. Civ. P. 60(b)(5).  On this motion, the Parties jointly submit that termination of jurisdiction and case closure are appropriate because the Defendants have fully satisfied the terms of the 2017 Revised Exit Plan.  *See* Doc. No. 778.

The Supreme Court has instructed a district court, when applying Rule 60(b)(5) to an institutional-reform consent decree, to "exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials."  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004)**;** *accord Horne v. Flores*, 557 U.S. 433, 450 (2009); *Juan F. v. Rell*, No. 3:89-CV-859, 2010 WL 5590094, at *3 (D. Conn. Sept. 22, 2010) (Droney, J.) ("the 'critical question' is whether the objective of the original declaratory judgment order has been achieved").  If a "durable remedy has been implemented," continued enforcement of the decree is unnecessary.[14] *See Horne*, 557 U.S. at 450.

In this action, the Parties have frequently narrowed and updated the governing court orders, by submitting proposed modifications to the governing consent decree that have been approved by the Court, including further defining the objective of the decree and prerequisites to

---

[14] Because a consent decree is both an injunctive order and a contract, the doctrine of substantial performance may be employed.  *See Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020); *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011).  "Substantial performance, or substantial compliance, exists when the consent decree's fundamental purpose has been accomplished, and any deviations from the decree are 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intend[ed] to accomplish.'"  *Peery*, 977 F.3d at 1075 (internal citations omitted).

the Defendants' requesting termination of jurisdiction.  That was accomplished most recently in the 2017 Revised Exit Plan approved by the Court.  *See* Doc. No 778, at 9 ("simultaneous compliance with all of the Revised and Pre-Certified Outcome Measures is a prerequisite to seeking termination of jurisdiction over all of the Outcomes Measures and this action."*).*

## II.    DISCUSSION

DCF has accomplished the objective of the 2017 Revised Exit Plan—to achieve the measurable and sustained improvements in the areas defined by the Outcome Measures contained therein and as validated by the Court Monitor.  As discussed below, all outcome measures have now been met, sustained, and pre-certified.  Additionally, and importantly, as reflected in the numerous monitoring reports, the Defendants have developed and maintained critical structures underlying a durable remedy, which, as noted by the Court Monitor and stipulated by the Parties, have allowed DCF to fully achieve and sustain the outcome measures. If fully supported and maintained, those structures will allow DCF to continue and grow its success going forward and adapt to new challenges that will inevitably arise.

For all of those reasons, Defendants have fully and substantially complied with the 2017 Revised Exit Plan and continued court oversight is no longer needed.

### A.    Defendants Have Achieved Pre-Certification on All Remaining Outcome Measures in the 2017 Revised Exit Plan and Have Sustained Compliance.

The 2017 Revised Exit Plan delineates six remaining outcome measures that must be achieved, as summarized below:

> 1.    Revised Outcome Measure 1 (Commencement of Investigation/FAR): DCF shall assure that at least 90% of all reports of children alleged to be abused, or neglected, shall be prioritized, assigned and the investigation/FAR (Family Assessment Response) shall commence within the specified time frames.

2.  Revised Outcome Measure 2 (Completion of the Investigation/FAR):  At least 85% of all reports of alleged child maltreatment accepted by the DCF Careline shall have their investigations completed within 45 calendar days of acceptance by the Careline.

3.  Revised Outcome Measure 3 (Case Plans):  Except probate, interstate, and subsidy only cases, appropriate case plans shall be developed as set forth in the "DCF Court Monitor's Protocol for Outcome Measures 3 and 4" and the accompanying "Directional Guide for Outcome Measures 3 and 4 Reviews" attached as Appendix B to the 2017 Revised Exit Plan.  The enforceable domains of this Outcome Measure shall not include the "overall score" domain.  The domains in Appendix B for which compliance at 90% or better has been met for one quarter and then sustained for another quarter as of the 2017 Revised Exit Plan, shall be considered to have achieved Pre-Certification. . . . For each domain, once compliance at 90% or better has been met for one quarter and then sustained for an additional quarter, the domain shall also be considered to have achieved Pre-Certification Once all of the domains achieve Pre-Certification, then Outcome Measure 3 shall be considered to have achieved Pre-Certification and subject to the process in Paragraphs 10 and 11 hereof as to whether a final review is required in connection with a request to terminate jurisdiction over this action.

4.  Revised Outcome Measure 4 (Children's Needs Met):  Family and children shall have their medical, dental, mental health, and other service needs met as set forth in the "DCF Court Monitor's Protocol for Outcome Measures 3 and 4" and the accompanying "Directional Guide for Outcome Measures 3 and 4 Reviews," attached as Appendix B to the 2017 Revised Exit Plan.  The enforceable domains of this Outcome Measure shall not include the "all needs met" domain.  The domains in Appendix B for which compliance at 85% or better has been met for a quarter and then sustained for an additional quarter, shall be considered to have achieved Pre-Certification.  Once all of the domains achieve Pre-Certification, then Outcome Measure 4 shall be considered to have achieved Pre-Certification and subject to the process in Paragraphs 10 and 11 hereof as to whether a final review is required in connection with a request to termination jurisdiction over this action.

5.  Revised Outcome Measure 5 (Worker-Child Visitation (In-Home):  DCF shall visit at least 85% of all in-home family cases at least twice a month, except for probate, interstate, or voluntary cases.

6.  Revised Outcome Measure 6 (Caseload Standards):  The caseload of no DCF social worker shall exceed the specified case load standards, with exceptions for emergency reasons on caseloads, lasting no more than 30 days.  Additionally, the average caseload of all caseload carrying DCF social workers in each of the specified categories shall not exceed 0.75 (i.e., 75% utilization) of the specified maximum caseload standards.

*See* Doc. No. 778, at 4-6.

The individual domains under Revised Outcome Measure 3 (Case Plans)—which, as described above, require pre-certification on an individual domain basis—are as follows:

- Has the Case Plan been approved by the SWS?
- Was the family or child's language needs accommodated?
- Reasons for DCF involvement
- Identifying Information
- Engagement of Child and Family
- Present Situation and Assessment to Date of Review
- Determining the Goals/Objections
- Progress
- Action Steps to Achieving Goals Identified for the Upcoming Six Month Period
- Planning for Permanency

*See* App'x B to Exit Plan, Doc. No. 778-2.

The individual domains under Revised Outcome Measure 4 (Children's Needs Met)—which also require pre-certification on an individual domain basis—are as follows:

- Risk:  In-Home
- Risk:  Child in Placement
- Permanency:  Securing the Permanent Placement – Action Plan for the Next Six Months
- Permanency:  DCF Case Management – Legal Action to Achieve the Permanency Goal During the Prior Six Months
- Permanency:  DCF Case Management. – Contracting or Providing Services to Achieve the Permanency Goal during the Prior Six Months
- Well-Being:  Medical Needs
- Well-Being:  Dental Needs
- Well-Being:  Mental Health, Behavioral and Substance Abuse Services
- Well-Being:  Child's Current Placement
- Well-Being:  Education

*See id*.

The 2017 Revised Exit Plan also sets forth four previously pre-certified outcome measures that must be sustained:

1. Revised Outcome Measure 7 (Repeat Maltreatment of Children):  No more than 7% of the children who are victims of substantiated maltreatment during any six-month period shall be the substantiated victims of additional maltreatment during any subsequent six-month period.

2.  Revised Outcome Measure 8 (Maltreatment of Children in Out-of-Home Care): No more than 2% of the children in out-of-home care shall be the victims of substantiated maltreatment by substitute caregivers while in out-of-home care.

3.  Revised Outcome Measure 9 (Re-Entry into DCF Custody):  Of all children who enter DCF custody, 7% or fewer shall have re-entered care within 12 months of the prior out-of-home placement.

4.  Revised Outcome Measure 10 (Worker-Child Visitation (Out-of-Home):  DCF shall visit at least 85% of all out-of-home children at least once a month, except for probate, interstate or voluntary cases.  All children must be seen by their DCF social worker at least quarterly.

*See* Doc. No. 778, at 7.[15]  No outcome measures other than those in the 2017 Revised Exit Plan are or have been subject to further monitoring, review, or court action.  *See* Revised Exit Plan, Doc. No. 778, at ¶ 6.

Under the 2017 Revised Exit Plan, the Defendants "must be in compliance with all of the outcome measures, and in sustained compliance with all of the outcome measures for at least two quarters (six months) prior to asserting compliance and shall maintain compliance through any decision to terminate jurisdiction."  *See* Doc. No. 778, at ¶ 9.  In recognition of the fact that the well-being of the class members will be promoted by the earliest possible identification and resolution of problems affecting class members, and to expedite DCF's eventual compliance and successful exit, the Parties and the Court Monitor agreed to create a "Pre-Certification" review process approved by the Court.  The Pre-Certification process is described in paragraph 10 of the 2017 Revised Exit Plan as follows:

---

[15] The 2017 Revised Exit Plan also identified four additional outcome measures—Outcome Measure 11 (Placement within Licensed Capacity), Outcome Measure 12 (Multiple Placements), Outcome Measure 13 (Sibling Placement), and Outcome Measure 14 (Reduction in the Number of Children in Residential Capacity)—that must be sustained.  However, the parties agreed to requesting the Court's termination of jurisdiction over those outcome measures if the Defendants "sustain compliance with the measures through the end of the Second Calendar Quarter 2018 (June 30, 2018).  *See* Doc. No. 778, at ¶ 6.  Because compliance was sustained through June 30, 2018, jurisdiction over those measures was terminated in August 2018; Outcome Measures 11 through 14 are therefore not at issue here.  *See* Doc. No. 797.

20

If DCF has met the requirements for any Revised Outcome Measure and sustained compliance for at least one (1) additional and consecutive quarter (6 months total), the Court Monitor shall conduct a "pre-certification review" of that Outcome Measure ("Pre-Certification Review") . . . . If the Pre-Certification Review with respect to a particular Revised Outcome Measure: (a) does not identify any material issues requiring remediation; and (b) [has] no assertions of noncompliance with the specific Revised Outcome Measure(s) at issue are pending at the time Defendants assert sustained compliance with the Outcome Measures; and (c) the Court Monitor has not identified any material issues requiring remediation subsequent to the Pre-Certification, the final review as per paragraph 11 of the 2017 Revised Exit Plan will not be required after the Defendants assert compliance with all Outcome Measures.

*See* Revised Exit Plan, Doc. No. 778, at ¶ 10. Paragraph 11 of the Revised Exit Plan, in turn,

provides:

To seek termination of the Court's jurisdiction over this action, Defendants may not seek to terminate jurisdiction over individual Outcome Measures; rather, simultaneous compliance with all of the Revised and Pre-Certified Outcome Measures is prerequisite to seeking termination of jurisdiction over all of the Outcome Measures and this action. If Defendants assert compliance and request termination of jurisdiction over this action, the Court Monitor shall, prior to the Court's adjudication of the Defendants' motion, determine which, if any, Outcome Measures require a final review in order to assess the Defendants' achievements, subject to Paragraph 10 of this 2017 Revised Exit Plan.

*See* Doc. No. 778, at 9.[16]

As reflected in the Court Monitor's Exit Plan Status Report filed October 14, 2021 that

covered the period from October 1, 2020 through March 31, 2021, two Outcome Measures—

Outcome Measure 5 (In-Home Visitation) and Outcome Measure 4 (Needs Met)—were newly

pre-certified, an accomplishment the Monitor described as "noteworthy" and "well-deserved."

*See* Doc. No. 817-2, at 3. As a result, all that remained to be pre-certified were two domains

under Outcome Measure 3 (Case Plans): "Present Situation and Assessment to Date of Review"

---

[16] Paragraph 11 continues: "For any Outcome Measures requiring a final review, the Court Monitor shall conduct a review of a statistically significant valid sample of case files at the 96% confidence level, and such other measures as are necessary, to determine whether Defendants are in compliance with their obligations. The Court Monitor shall then present findings and recommendations to the District Court in connection with the Defendants' request for termination of jurisdiction over this action." *See id.* As noted, the pre-certification reviews and agreed validation processes more efficiently replaced the final review process.

and "Determining the Goals/Objectives." *See id.* at 3-4.   Moreover, each of the formerly pre-certified outcome measures had been maintained. *See id.* at 30. The Court Monitor credited DCF for performing "exceptional work" and making "substantial progress." *See id.* at 3.[17]

The Parties thereafter agreed that the Court Monitor would review a limited sample of cases to assess the two remaining domains under Outcome Measure 3 that had slipped during the first quarter of 2021 to determine if precertification was appropriate. *See id*. at 4, 8.  The Court Monitor's findings from that review—as set forth in the Status Report dated March 8, 2022 (Doc. No.  821-2))—supported pre-certification, with the Court Monitor observing a "great deal of quality case planning and case management service to the children and families."[18]  *See Id.* at 17.)

DCF's progress in meeting and sustaining the 2017 Revised Exit Plan outcome measures is reflected in the following charts, taken directly from the Court Monitor's Exit Plan Status Report of March 2022. *See id.* at 5-7.   For each outcome measure, the chart notes: (i) when the outcome measure was pre-certified, (ii) the outcome level required under 2017 Revised Exit Plan, (iii) DCF's final performance, (iv) the date of DCF's baseline performance, and (v) DCF's baseline performance.  Outcomes 3 and 4 are presented in multiple charts because the measure changed from 2004 to 2017.  In 2004, those measures captured a composite score reflecting, for Outcome Measure 3, the percentage of cases in which all 10 domains were at 90% or better, and for Outcome 4, the percentage of cases in which all 11 domains were at 85% or better.  In 2017,

---

[17]  As noted in the October 14, 2021 Exit Plan Status Report, the Parties and the Court Monitor agreed that the six-month period of Q2 and Q3 of 2017 would not require a formal report, but rather the Court Monitor would conduct a more targeted validation of specific Outcome 3 and 4 domains and several structural aspects of the agency.  *See* Doc. No. 817.

[18]  Specifically, the "Determining the Goals/Objectives" domain achieved a score of 96.4%, and the "Present Situation and Assessment to Date of Review" domain achieved a score of 90.9%.  *See id.* at 6.

those measures were modified to capture whether each domain for Outcome 3 achieved 90% or better, and whether each domain for Outcome 4 achieved 85% or better.

| 2017 Revised Exit Plan Performance Chart | | | | | | |
|---|---|---|---|---|---|---|
| **Outcome Measure** | | **Performance** | | | | |
| Outcome # | Description | Pre-Certified | Measure | Final Performance[1] | Baseline Performance Date | Baseline Performance[2] |
| **OM 1** | Commencement of Investigation | November 2018 | ≥ 90% | 96.30% | 4Q 2004 | 91.2% |
| **OM 2** | Completion of Investigation | August 2020 | ≥ 85% | 92.80% | 1Q 2004 | 64.2% |
| **OM 3** | Case Plans | January 2022 | ≥ 90% | See OM 3 Domain Performance Chart on page 6 | 3Q 2004 | 10.0% |
| **OM 4** | Needs Met | September 2021 | ≥ 85% | See OM 4 Domain Performance Chart on page 7 | 4Q 2004 | 56.0% |
| **OM 5** | SW/Child Visitation (In-Home) | September 2021 | ≥ 85% | 90.10% | 4Q 2004 | 39.0% |
| **OM 6** | Caseload Standards | January 2020 | 100% | 100% | 1Q 2004 | 69.1% |
| **OM 7** | Repeat Maltreatment (In-Home) | July 2014 | ≤ 7% | 4.7% | 1Q 2004 | 9.4% |
| **OM 8** | Maltreatment of Children in OOH Care | October 2014 | ≤ 2% | 0.20% | 1Q 2004 | 0.5% |
| **OM 9** | Re-Entry into DCF Custody | January 2016 | ≤ 7% | 7.7% | 3Q2005 | 6.4% |
| **OM 10** | SW/Child Visitation (Child in Placement) | April 2012 | ≥ 85% (M) | 95.8% | 1Q 2004 | 72.0% |

---

[1] Final Performance is defined as DCF's most recent performance as reflected in the Exit Plan Status Report of March 2022.

[2] Baseline performance is defined as the first reported quarter performance following entry of the 2004 Exit Plan. Several benchmark performance totals established for 1Q2004 were subject to correction upon improvements in the data definitions and calculations of the automated reporting. These corrected totals were reported in quarterly reporting but not applied retroactively to the established benchmarks. This filing verifies corrected benchmarks where applicable. Because performance data on each of the specific domains under Outcome Measures 3 and 4 was not reported until 2011, the earliest domain specific performance in 2011, specifically for Q2 of 2011, is used here. For reference, for this same baseline data set in 2011, the overall composite performance was 44.4% for Outcome Measure 3 (*i.e.*, cases in which all domains were at or above

90%) and 53.7% for Outcome Measure 4 (*i.e.*, cases in which all domains were at or above 85%. The 2011 data is not publicly available but has been provided to the Parties by the Court Monitor.

| Outcome Measure 3: Case Plan Domain Performance Chart | | | | | | |
|---|---|---|---|---|---|---|
| Domains | | Performance | | | | |
| Domain # | Descriptions | Pre-Certified | Measure | Final Performance | Baseline Performance Date[3] | Baseline Performance |
| OM 3.1 | Tx Plan: Case Plan Approval | February 2019 | ≥ 90% | 96.20% | 3Q 2011 | 84.9% |
| OM 3.2 | Tx Plan: Family's Language Needs | February 2019 | ≥ 90% | 96.20% | 3Q 2011 | 94.3% |
| OM 3.3 | Tx Plan: Reason for DCF Involvement | August 2019 | ≥ 90% | 92.5% | 3Q 2011 | 96.2% |
| OM 3.4 | Tx Plan: Identifying Information | February 2019 | ≥ 90% | 92.50% | 3Q 2011 | 94.3% |
| OM 3.5 | Tx Plan: Child/Family Engagement | October 2021 | ≥ 90% | 90.60% | 3Q 2011 | 58.5% |
| OM 3.6 | Tx Plan: Situation & Assessment | January 2022 | ≥ 90% | 90.90% | 3Q 2011 | 52.8% |
| OM 3.7 | Tx Plan: Goals/Objectives | January 2022 | ≥ 90% | 96.40% | 3Q 2011 | 60.4% |
| OM 3.8 | Tx Plan: Progress | October 2021 | ≥ 90% | 86.8 | 3Q 2011 | 73.6% |
| OM 3.9 | Tx Plan: Action Steps | October 2021 | ≥ 90% | 81.10% | 3Q 2011 | 56.5% |
| OM 3.10 | Tx Plan: Planning for Permanency | October 2021 | ≥ 90% | 92.50% | 3Q 2011 | 84.9% |

---

[3] 3rd Quarter 2011 reflects the initial performance for Outcome Measure 3 domains based upon the blind sampling methodology.

| Outcome Measure 4: Needs Met Domain Performance Chart | | | | | | |
|---|---|---|---|---|---|---|
| Domains | | Performance | | | | |
| Domain # | Descriptions | Pre-Certified | Measure | Final Performance | Baseline Performance Date[4] | Baseline Performance |
| OM 4.1 | Needs Met Risk: In-Home | September 2021 | ≥ 85% | 86.2% | 3Q 2011 | 92.8% |
| OM 4.2 | Needs Met Risk: Child-in-Placement | January 2018 | ≥ 85% | 100% | 3Q 2011 | 96.9% |
| OM 4.3 | Needs Met Permanency: Securing Permanent - Action Plan | January 2018 | ≥ 85% | 96% | 3Q 2011 | 90.6% |
| OM 4.4 | Needs Met Permanency: DCF Case Mgt - Legal Action to Achieve Permanency | January 2018 | ≥ 85% | 96.2% | 3Q 2011 | 96.2% |
| OM 4.5 | Needs Met Permanency: DCF Case Mgt - Recruitment of Placement Providers | January 2018 | ≥ 85% | 100% | 3Q 2011 | 88.2% |
| OM 4.6 | Needs Met Permanency: DCF Case Mgt - Contracting/Providing Services | September 2021 | ≥ 85% | 86.8% | 3Q 2011 | 71.7% |
| OM 4.7 | Needs Met: Medical Needs | January 2018 | ≥ 85% | 92.5% | 3Q 2011 | 88.7% |
| OM 4.8 | Needs Met: Dental Needs | February 2020 | ≥ 85% | 86.8% | 3Q 2011 | 83.0% |
| OM 4.9 | Needs Met: Mental Health, Behavioral Health, and Substance Abuse | September 2021 | ≥ 85% | 86.8% | 3Q 2011 | 75.5% |
| OM 4.10 | Needs Met: Child's Current Placement | January 2018 | ≥ 85% | 95.8% | 3Q 2011 | 93.8% |
| OM 4.11 | Needs Met: Education | January 2018 | ≥ 85% | 94.0% | 3Q 2011 | 84.3% |

[4] 3rd Quarter 2011 reflects the initial performance for Outcome Measure 15 domains based upon the blind sampling methodology.

As the charts illustrate, the outcome measure data show dramatic improvements. For example, before switching to a domain-specific approach to case planning, in 2004 compliance with case planning was at only 10%. Now, for each domain, 90% of case plans include critical information, including case plan approval, family's needs discussion, reason for DCF involvement, identifying information, child and family engagement, situation and assessment, plan goals and objectives, and planning for permanency. In terms of meeting children's service needs, in 2004, before switching to a domain-specific approach, compliance with "needs met" was at only 56%. Now, for each domain, 85% of children's files revealed their needs met, including: in-home safety, out-of-home safety, securing permanency action plan, legal action to achieve permanency, recruitment of placement providers, case management and contracting services, medical needs, dental needs, behavioral health needs, current placement needs and education needs.

Additional outcome measure successes are worth highlighting. For example, DCF visited only 33% of all in-home family cases at least twice a month in 2004; now, DCF social workers visit 90% of all-in home cases at that level of frequency, and in its pre-certification review, the Court Monitor validated the *quality* of these visits in addition to the quantity. *See* Doc. No. 817-2, at 24. The percentage of children experiencing repeated substantiated maltreatment has been cut in half—from 9.3% in 2004 to 4.7% in 2021. And, whereas only 69.2% of social worker's caseloads were below the applicable maximum limits in 2004, all caseloads are at acceptable levels now.[19]

---

[19] The Parties recognize that in the October 2021 Monitoring Report, performance was slightly below the requirement for Outcome Measure 3.8 (Treatment Plan: Progress), Outcome Measure 3.9 (Treatment Plan: Action Steps), and Outcome Measure 9 (Re-Entry into DCF Custody). The Court Monitor and Parties are in agreement that those minor performance drops in these three out of the twenty-nine remaining measures (including domains under Outcome Measures 3 and 4) do not undercut pre-certification and a finding of substantial compliance and a durable

With the agreement of the Parties, the Court Monitor set forth the form of a potential final validation review as required prior to the termination of jurisdiction under section 10 of the 2017 Revised Exit Plan.  *See* Doc. No. 819 (filed with the Court on November 12, 2021).  In addition to assessing two remaining Outcome Measure 3 domains, that review addressed the following areas:  (1) the sufficiency of case management, safety, and visitation to address concerns related to the pandemic's impact on case management; (2) the timeliness of case planning related to in-home cases; (3) the resumption of quality face-to-face visits; (4) permanency efforts to address the backlog that occurred during the pandemic; (5) the services supporting the transition of older youth ("SPM" cases) from DCF custody in light of the expiration of the State's pandemic moratorium on closing housing and service supports for older youth; (6) DCF's cross cutting efforts to address racial equity for children and families; (7) the durability of structures in place to address emerging service and well-being issues; and (8) the approval and review of case plans by the SWS and the accommodation of families' language needs   *See* Doc. No. 817-2, at 4; Doc. No. 819-1, at 1-2.

As previously noted, the Court Monitor's final status report was filed on March 8, 2022. The Court Monitor's review revealed strong performance on the areas relating to the remaining outcome measures.  With respect to Outcome Measure 3, case plans were approved and language needs were accommodated in 98.2% of cases.  *See* Doc. No. 821-2, at 17.  Additionally, the rate of compliance for case plan timeliness was 87.9%., and 97.1% of cases had an approved case

---

remedy under the 2017 Revised Exit Plan.  Indeed, the Court Monitor still found that DCF "has maintained their performance with the previously pre-certified Outcome Measures" in the October 2021 status report.  *See* Doc. No. 817-2, at 30.  The Court Monitor reached that same finding in his final review, concluding that DCF "has met and sustained compliance with the 2017 Revised Exit Plan Outcome Measures" and that DCF continues to provide case management and related services "that meet the needs of the children and families served by DCF." *See* Doc. No. 821-2, at 3.

plan less than seven months old at the point of review. *See id.*, at 22. Regarding older youth transitional (SPM) cases, the review identified "an overwhelmingly positive outcome related to the quality of case management and discharge planning," with 97.1% of the cases reviewed documenting clear efforts to identify supports, housing, and community resources during the month prior to case closure. *See id.*, at 44. Moreover, 91.7% of the older youth transitional case sample had current case plans documented at the time of review. *See id.*

With respect to Outcome Measure 4, the Court Monitor found 90.9% of the cases had adequate quality related to case planning to meet priority needs and had adequately assessed and addressed risk and safety. *See id.*, at 20. With respect to Outcome Measure 5 (worker-child visitation in in-home cases), 88% of cases had at least two monthly in-person visits. *See id.* at 26. Finally, with respect to Outcome Measure 10 (worker-child visitation in out-of-home cases), 94% of children-in-placement cases had at least one documented in-person visit. *See id.* at 25.

Based on the foregoing findings, the Court Monitor concluded that DCF "has met and sustained compliance with the 2017 Revised Exit Plan Outcome Measures" and that DCF "is providing case management and related services that meet the needs of the children and families served by DCF." *See id.* at 3. The Court Monitor further noted that "improved, innovative and exciting initiatives" are currently in progress. *See id.* at 4. The Court Monitor's final review, therefore, amply supports the termination of jurisdiction.

**B.** **Defendants Have Developed and Maintained Critical Structures That Have Allowed DCF to Achieve and Sustain Full Compliance with the Outcome Measures, which if Maintained Will Allow DCF to Maintain and Grow its Success and Navigate Emerging Challenges**.

The Defendants' ability to achieve the objective of this action – to meet and sustain the outcome measures in the 2017 Revised Exit Plan – did not occur spontaneously. Rather, those measurable and durable improvements for children and families were the result of the

Defendants' development and maintenance of critical structures – staffing structures, services structures, management and oversight priorities and policies.  Those "cross cutting" structures not only drove and ultimately enabled DCF to achieve all of the outcome measures, but they will also – *if fully supported going forward* – allow DCF to maintain and expand its successes and navigate future challenges.  The structural improvements have been the subject of numerous reports of the Court Monitor as well as strategic planning at DCF.  Supporting all of them has been the vital "funding and other resources necessary" to fully implement and achieve substantial compliance with the 2017 Revised Exit Plan."  *See* Doc. No. 778 at 3, Section 3.  Key structural improvements are highlighted below.

### 1.  *Maintaining Caseload Limits Across the DCF Workforce*

As summarized above (*see* p. 23, *supra*), the Court Monitor pre-certified DCF's compliance with the caseload standards (Outcome Measure 6) in the January 2020 monitoring report.  *See* Doc. No. 801-2, at 3.  As the Court Monitor has underscored, high caseloads "overwhelm an individual social worker and do not allow them to meet the fundamental requirements of their jobs."  *See* Doc. No 729, at 13.  Indeed, DCF's progress towards compliance and exit has slowed when caseloads were too high and greatly accelerated when caseloads were maintained within court-ordered limits.[20]

---

[20] *Compare* July 2015 Exit Plan, Doc. No. 698, at 4 ("Excessive workloads compromise the quality of the Department's case management services, including the case record documentation."), *with* October 2014 Exit Plan Quarterly Report, Doc. No. 689, at 7 ("[T]he hiring of additional staff and the timely refilling of vacant positions is allowing the Department to provide relief to staff and enable them to better address the multiple case management mandates required of them."); February 2020 Exit Plan Quarterly Report, Doc. No. 801-2, at 21 ("Reasonable caseload sizes and relative stability in the workforce allow the Department to better concentrate on the best practice issues so important to the outcomes for children and families"); *see id.* ("It already appears from recent monitoring activity that meeting [caseload standards] is now having a positive impact on the family and child related outcome measure that remain to be pre-certified. Reasonable caseload sizes and relative stability in the workforce allow the Department to better concentrate on the best practice issues so important to the outcomes for children and families."); *see also* August 2018 Exit Plan Status Report, Doc. No. 786, at 5 ("The extended staffing freezes and subsequent hiring of large blocks of staff that occurred over the last 4 years created an unstable, constantly transitioning environment that did not lend itself to positive outcomes. During those periods in which staffing was more sufficient and stable the outcomes tracked greatly improved.").

As DCF similarly noted in its 2018 *Juan F.* Strategic Plan: "[I]ncreasing the number of social workers should reduce caseload sizes . . ., support timely quality visitation . . ., case planning and service engagement . . .  and quality Investigation/FAR and Assessments."  *See* Doc. No. 782-1, at 59.  Moreover, "[s]uch an intervention should aid with better client engagement and more timely and robust documentation."  *See id.*  As demonstrated in the monitoring reports, those areas of practice indeed improved as social worker hiring increased and caseloads decreased.[21]  Moreover, DCF now engages in "predictive hiring," so the agency stays ahead of expected fluctuations in staffing.[22]  *See* Doc. No. 801-2, at 4.

### 2. *Ensuring DCF is a Family Centered Practice*

DCF has developed into an agency with a family centered practice.  Among other things, that means DCF supports family preservation at the "front end" of the child welfare system, prioritizing and maximizing the occurrence of families staying together, and avoiding the trauma of investigation, family separation and removal into foster care.  It also means that DCF supports maximizing the role of relative and kinship caregivers in the child welfare system.  And it further means that DCF supports maximizing the successful reunification of children with their families, or long-term placement with kin or with other supported guardianships.  Key aspects of these overall structural improvements are:

---

[21] *See, e.g.*, September 2020 Exit Plan Status Report, Doc. No. 807, at 9 ("The maintenance of [caseload/staffing] standard allowed workers relief from excessive caseload size and has assisted the Department in improving their performance on many foundational practices such as contact and visitation, engagement, assessment, documentation in the case record, ensuring that family's needs are met, service coordination and the pre-certification of the remaining Outcome Measures such as Outcome Measure 2 (Completion of Investigation/FAR) presented in this report."); Exit Plan Status Report October 2021, Doc. No. 817-2, at 3 (attributing "great progress" in case planning in part to "maintenance of appropriate staffing levels").

[22].  Importantly, for the last several years, DCF has submitted a monthly caseload report to the DCF Monitor, which sets forth caseworker caseloads and the precise number of workers above the caseload standards. *See* Doc. No. 792, at 20-21.

- *Family Preservation Services*.  DCF strategically developed a service array of evidence–based interventions designed to keep children safe at home and improve adult parental capacity.  Such programs include: (i) Family Based Recovery (FBR), which consists of intensive in home substance abuse treatment services for parents and very young children designed to prevent out of home placement; (ii) Intimate Partner Violence Intervention, which are services designed to address partner violence in the home without the need to remove children; (iii) Multi-Dimensional Family Therapy (MDFT), which are evidence-based services designed to address youth delinquency behaviors through parent coaching with the goal of preventing family separation; (iv) Triple P-evidence-based parenting skills development intervention designed to improve parental capacity; and (v) Community Supports for Families, which are designed to provide support systems for families after DCF's direct involvement ends.

- *Innovative Initiatives for Early Intervention and Service Referrals*.  DCF launched the Prevention Services Pilot in the 2021/22 academic school year with a goal of improving outcomes for children and families through increasing connections to services and supports in the community and avoiding unnecessary involvement with the child protection system.  For this pilot, three DCF investigation social workers, serving as Family Support Liaisons (FSLs), have been assigned to two elementary schools and one PreK-8th grade school in the city of Waterbury.  The FSLs partner with school professionals to address a variety of issues, including access to basic needs/supports such as housing, attendance/chronic absenteeism concerns, behavioral/mental health needs and other systemic challenges impacting families within the school community.  The FSLs offer supports to school staff and parents/caretakers not involved with DCF, by sharing information on resources, establishing connections to local community service providers, promoting awareness of services and referrals, and offering guidance/training to school staff concerning the obligations of mandated reporting.

- *Differential Response System (DRS)*.  *See* https://portal.ct.gov/DCF/DRS/Home. In 2006, DCF began developing a DRS delivery model which is a strengths-based family centered approach to partnering with family supports to protect children and enhance parental capacity.  Also known as "dual track," "multiple track," or "alternative response," this approach appreciates the variation in the nature of reports and the value of responding differentially depending on the nature of the report.   In May 2012, DCF implemented a Family Assessment Response (FAR) that was designed to separate low and moderate risk families from more serious cases, so that DCF (in those cases) could provide additional supports or services through community partner agencies, without the need for child protection agency involvement.  By utilizing DRS, DCF is able to strengthen existing families, which is often critical to improving children's long-term well-being.  As the FAR response has continued to increase, the 12-month subsequent substantiation rate (SSR) has consistently remained between 6.5% and 7.5%. *See* DCF Annual Progress and Service Plan 2022, at https://portal.ct.gov/-/media/DCF/DataConnect/Federal/APSR-2022-Amended-92921.pdf

- *Considered Removals*.  Child and Family Teaming Continuum has been a core part of the Department's move to a more family-centered, strength-based practice to fully engage families in developing and identifying solutions to lead to better outcomes for children and families.  On February 13, 2013, as a key component of the continuum, DCF implemented Considered Removal – Child and Family Team Meetings (CR-CFTM).  CR-CFTMs are held when a child is being considered for removal as a result of a safety factor being identified.  The CR-CFTM is designed to engage the family and their supports in safety planning efforts and placement decisions.  The meeting results in a "live decision" around child removal and is run by an independent facilitator.  Since implementing CR-CFTMs in 2013, the percent of meetings held prior to removal has continued to increase, and after these meetings, overwhelmingly, placement is not recommended.  The implementation of CR-CFTM, in addition to the FAR response and increased availability of family preservation services have contributed to a much smaller population of children in placement (CIP); in January of 2006 there were 6,203 CIP, compared to 3,284 CIP in January of 2022.

- *Maximizing children in kinship placements*.  The use of relatives (kin) and fictive kinship placements has continued to be central to the work of the agency. While removal and family separation should be avoided entirely, when children cannot safely remain in their homes they should live with relatives or someone they know.  The use of relative/kin and special study (fictive kin) placements has significantly improved since 2006, when about 25.9% of children were placed with someone they knew, to 42.3% placed with someone they know on January 1, 2022.  DCF has also made significant progress in identifying kin resources as a first placement when children enter care. In January 2022, about 41.3% of children entering care entered to a kinship placement, compared to just 18.6% in 2006.  The following table reflects the agency's progress since 2006 as related to kinship placements based on children in care as of the annual observation date (point in time).

| Observation Date | Kin/Fictive |
|---|---|
| 1/1/2006 | 25.9% |
| 1/1/2007 | 25.3% |
| 1/1/2008 | 24.4% |
| 1/1/2009 | 23.3% |
| 1/1/2010 | 21.0% |
| 1/1/2011 | 21.1% |
| 1/1/2012 | 26.9% |
| 1/1/2013 | 29.3% |
| 1/1/2014 | 32.5% |
| 1/1/2015 | 35.8% |
| 1/1/2016 | 40.6% |
| 1/1/2017 | 41.6% |
| 1/1/2018 | 40.9% |
| 1/1/2019 | 44.0% |
| 1/1/2020 | 45.0% |
| 1/1/2021 | 43.9% |
| 1/1/2022 | 42.3% |

- *Applying Neuroscience in Early Childhood and Adolescent Development and Expanding Trauma Informed Practice and Culture*.  DCF implemented an Early Childhood Child Welfare Practice Guide detailing the specific interventions needed for children 0-5 involved in the child protection system at any stage, in home or in foster care.  The practice guide was developed using the latest technology and science research related to brain development of infants, toddlers and very young children.

### 3.  *Minimizing the Use of Institutions and Other Group Facilities*

A central theme in the governing 2017 Revised Exit Plan and prior court orders in this case has been the reduction in the use of institutions and other group facilities, and only using such non-family facilities as short-term treatment modalities and not as placements for children and youth.  That effort has drastically reduced the number of children sent to out-of-state residential facilities, which was a serious concern early in the case, and ultimately greatly limited the use of any institutional or group facilities of any kind for children and youth in out of home foster care in the DCF system.  The following data and chart illustrate how dramatically this aspect of DCF has improved.

| CT DCF Dashboard Reports:  Children in Congregate Care Placements | | | | |
|---|---|---|---|---|
| CIP DASHBOARD | % of Total CIP in Placement | # in Congregate Care Subgroups | | |
| Observation Date | Congregate Care | # Out-of-State | Age >=13 | Age 12 and Under |
| 1/1/2006 | 27.8% | 290 | 1382 | 340 |
| 1/1/2007 | 28.1% | 291 | 1427 | 346 |
| 1/1/2008 | 28.5% | 318 | 1364 | 293 |
| 1/1/2009 | 28.7% | 334 | 1332 | 258 |
| 1/1/2010 | 30.1% | 342 | 1244 | 246 |
| 1/1/2011 | 29.7% | 363 | 1216 | 200 |
| 1/1/2012 | 27.3% | 217 | 1112 | 116 |
| 1/1/2013 | 22.8% | 75 | 856 | 58 |
| 1/1/2014 | 20.9% | 33 | 761 | 59 |
| 1/1/2015 | 16.1% | 13 | 597 | 39 |
| 1/1/2016 | 13.1% | 11 | 485 | 36 |
| 1/1/2017 | 11.1% | 5 | 443 | 37 |
| 1/1/2018 | 11.2% | 9 | 437 | 36 |
| 1/1/2019 | 7.5% | 8 | 298 | 27 |
| 1/1/2020 | 7.2% | 6 | 267 | 26 |
| 1/1/2021 | 7.1% | 5 | 249 | 25 |
| 1/1/2022 | 6.9% | 5 | 203 | 24 |

### 4.   *Providing Community Based Mental Health and Other Supportive Services*

Recent monitoring reports reflect DCF's deep investment in community-based mental health and other supportive services for children and families.  The 2018 Strategic Plan outlined a myriad of strategies to improve performance on meeting children's community based mental health and behavioral needs, from expanding availability of behavioral health services to enhanced tracking on system waitlists, to clearing the backlog of background checks to be completed for therapeutic foster care providers.  *See* Doc. No. 782-1, at 68-84.  Appended to the plan was an analysis of the gaps and needs of the current service array and an identification of the specific services that could be enhanced.  *See id.*, at 78-83.

By 2019, DCF launched a number of those services, including Project SAFE to provide substance abuse services to adult caregivers, and added teams to offer multi-dimensional therapy for families, in-home services for young adults, and mentorship for fathers.  *See* Doc. No. 792-2, at 6.  DCF also sought applications to design and deliver a development, training, consultation, and clinical quality assurance program to support DCF and their funded multi-dimensional family therapy service providers.  *See* Doc. No. 792-2, at 6.  Those measures proved effective,

and by October 2021, DCF pre-certified all of the Children's Needs Met measure domains, including the mental health, behavioral health, and substance abuse services domain—an accomplishment the Court Monitor described as "noteworthy" and "well-deserved." *See* Doc. No. 817-2, at 3.

The Court Monitor's latest report found that, notwithstanding the challenges of the COVID-19 pandemic, the limited number of incidents of unmet needs has remained stable. *See* Doc. No. 817-2, at 3. Additionally, the private non-profit provider network continues to offer vital interventions virtually, and DCF staff continue to support foster parents, children, and families in their communities. *See id.* at 3.

### 5. *Embedding a Racial Justice Focus Across the Agency*

As identified in the *Juan F.* 2018 Strategic Plan, DCF has made a commitment to eliminate racial disparity in all areas of its practice. To that end, the Department ensures that it evaluates its progress through a racial justice lens (e.g., "*who* is better off"). That includes ensuring that there are numerous reports, dashboards, data tools, and filters that allow the Department to disaggregate its data by race and ethnicity. Such analyses allow DCF to assess its progress in reducing disproportionality across its pathway (e.g. decision points/events). *See* Doc. No. 782-1, at 58. Additionally, the Department created a Statewide Racial Justice Workgroup (SWRJWG) that is organized around four areas: Policy and Practice; Workforce and Development; Contracts and Procurement; and Community. *See id.*

As discussed in the Court Monitor's final Status Report of March 8, 2022, DCF has made significant strides embedding racial justice initiatives through its practice. DCF has also identified both measurable improvements and areas that present challenges for the future. For example, DCF has seen improved performance across all groups for one of the key safety

measures, Recurrence of Maltreatment within 12 Months.  When disaggregating by race/ethnicity, all groups meet the national standard of <=9.1% and where they were previously <4 points apart, they are now <2 points apart.   DCF has also seen marked improvements in disparity rates for children entering out of home custody.  In SFY12, Black children were 4.13 times as likely than their white counterparts to enter care and in SFY21, this dropped to 2.55. Similarly, in SFY12 Hispanic children were 2.86 times as likely to enter care when compared to their white counterparts and this decreased to 1.69 in SFY21.  While this represents notable improvement, DCF recognizes that disparities remain and will continue to implement initiatives and strategies as it strives to eliminate disparate outcomes.

Another key success for DCF across all groups is providing family-based placements, in which all groups have exceeded the aspirational target of 90% and whereas groups of youth by race were previously <3 points apart, they are now only about 1 point apart, reflecting placement in a family setting between 94.7%-95.6% of the time.  Across the four groups, Hispanic, Black, Other and White, achieving permanency in 12 months is now <3 points apart when they had been <9 points apart at times.  While this represents progress in that the groups experience similar performance, DCF acknowledges that performance is below the standard for all children and has implemented strategies to address this.  DCF continues to draw on the strong data infrastructure in order to support the evaluation of practice and outcomes through a racial justice lens.  Divisions across the agency have implemented change initiatives as a means of helping DCF become a more racially just agency with outcomes intended to eliminate disparity and promote equity.  *See* Doc No. 821-2, at 50.

### 6. *Supporting Older Youth*

DCF's work to support older youth, including in their life skills development helping to ensure the availability of housing, health care and other supports, is critical to supporting their safety and wellbeing as young adults. DCF has previously implemented a number of strategies to support older youth who have come into contact with the child welfare system, including collaborating with the Department of Labor on youth employment opportunities, developing alternative approaches aimed at doing outreach in the community (e.g., employers, support services, mentors, special training for foster/adoptive parents), and working with Adolescent Units to resurrect adolescent advisory boards on a regional basis. *See* March 2006 Report, Doc. No. 513-3, at 28.

By 2011, the Court Monitor found that DCF had achieved pre-certification on the outcome measure relating to older youth under the 2006 Final Exit Plan—Outcome Measure 20—which required "85.0% of all children age 18 or older shall have achieved one or more of the following prior to discharge from DCF custody: (a) Graduation from High School; (b) Acquisition of GED; (c) Enrollment in or completion of college or other post-secondary training program full-time; (d) Enrollment in college or other postsecondary training program part-time with part-time employment; (e) Full-time employment; (f) Enlistment full-time member of the military." *See* January 2018 Monitoring Report, Doc. No. 781-1, at 16. Significantly, DCF sustained that progress for nearly every quarter through 2017, when that outcome measure was removed from the Court's jurisdiction. *See id.* at 13; Doc. No. 778, at 8.

More recently, in October 2021, DCF developed revised policy and practice guides for the transitional adolescent youth ("TAY") whom it works with, which are intended to "provide youth progressively more control over their planning and to make system adjustments based on

37

feedback for those with lived experiences." *See* Doc. No. 817-2, at 6.  The Court Monitor has

noted that, in accordance with those policies, DCF has:  (1) developed a partnership with the

Academy for Workforce Development to revamp the adolescent certification process; (2)

initiated a team to develop the Health and Wellness Curriculum for adolescents; (3) released a

new RFP for enhanced mentoring service for LGBTQIA+ that will triple the budget and increase

the catchment area to include the entire state; (4) launched a partnership with D.E.E.P to pay

young adults in environmental conservation service with the Wilderness School; (5) created an

MOU with the Department of Motor Vehicles ("DMV") that streamlines the process for youth to

obtain identification and drivers licenses; and 6) partnered with the Banking Commission and

compiled a list of banks that offer financial literacy programs through schools.  *See* Doc. No.

817-2, at 6-7.

        One of the areas for assessment in the Court Monitor's final status report included DCF's

program for supporting older youth, both those heading toward reaching age 18 and those who

reach the age of majority.  *See* Doc No. 821-2, at 41.  As discussed in that report of March 8,

2022, particularly in the wake of the COVID-19 pandemic, DCF has increased its service array

for older youth.  After sampling 10% of the SPM clients, 17 of them were in the process of

discharging and were identified as having positive outcomes related to the quality of case

management and discharge planning in that there were clearly identified efforts to identify

supports, such as housing and community resources during the month prior to case closing. *See*

*id.* at 42.  Overall, the Department engaged with youth through case contacts and case planning.

In 91.7% of the sample, there was a current case plan documented at the time of review and

83.3% of the cases had documented contact in September. *See id.  See also*

https://portal.ct.gov/DCF/Adolescent-Services/VITAL/VITAL-POLICIES.

### 7.   *Building and Supporting Community and Agency Partnerships and Supporting the Contracted Services Array*

DCF has made substantial progress with ensuring the sufficiency and efficacy of DCF's contracted service array.  The 2018 Strategic Plan announced a number of strategies toward that end, including:  (1) maintaining a contract procurement and oversight structure ("SARA"); (2) enhancing tracking on service system waitlists; (3) implementing a comprehensive redesign of DCF's SDM environment to better ensure quality risk and needs assessment; (4) using the SARA structure to assess adequacy, needs, gaps, and congruence of service array with children's and families' needs; (5) implementing the Enhanced Service Coordination strategies to ensure appropriate referrals to in-home referrals, prioritize use of internal clinical sources, and ensure consistent use of multidisciplinary consultations on high priority cases; (6) launching the universal referral form; (7) implementing Active Contract Management to improve contract management through data-driven program/contract oversight and performance management; (8) enhancing the therapeutic foster care structure to support timely placement, placement stability, increased oversight, and positive discharges through re-establishing of the Service Area Lead Agencies (SALAs); and (9) implementing a rigorous quality oversight process to monitor foster care post-licensing training compliance, with a focus on ensuring that foster parents have the tools and resources to support permanency.  *See* Doc. No. 782-1, at 68-69.

Since the development of the 2018 Strategic Plan, DCF has remained committed to maintenance of an efficient service array to meet the needs of children and families. After several iterations of workgroups charged with monitoring the oversight of services (Systems Community of Practice, SALA's, SARA and SAW-SARA Area Workgroup), in February 2020, the Department performed a LEAN-sponsored Process Mapping to design the current workgroup – the Service Outcome Advisory Committee (SOAC).  Building on the work of the previous

workgroups, SOAC utilizes a continuum of stakeholders both internal and external to the Department including end users, to develop and implement standardized, formal and where appropriate, evidence-based Performance Outcome Measures (POMs) in each of its contracts.

The goal of SOAC is to implement Performance Outcome Measures, inclusive of metrics and/or data points, that clearly establish a goal for the program, a key program element that correlates to the goal and a measurable objective for the provider to meet for each of its individual service types. The identified outcome measures contain cross-cutting themes across bundled service arrays and incorporate a defined link to at least one of the DCF Key Results. After delayed implementation of SOAC due to the COVID-19 pandemic, two service types, Fatherhood Engagement Services (FES) and Safe Family Recovery (SAFE FR) have been reviewed. POMs for FES were finalized and approved in August 2021. SAFE FR was launched in December 2021. The SAFE Family Recovery team is in the process of finalizing their POMs for review and approval by SOAC. This cutting edge, comprehensive approach to the oversight of the service array system provides the necessary infrastructure to ensure that children and families are better off after receiving DCF services.

In 2020, DCF launched an Enhanced Service Coordination ("ESC") model statewide to monitor utilization trends and service capacities and to coordinate clinical and multidisciplinary consults with DCF's clinical teams, social work staff, and providers. *See* Doc. No. 801-2, at 10. The ESC program also enables DCF to capture data to inform real-time decision making, such as improvements to case practice, additional services available in the community, and any gaps in service array. *See id*. Each region's ESC helps DCF staff navigate the vast service array and offers guidance in identifying services that best meet the needs of DCF families, ultimately allowing DCF to better connect families to the services they need. *See id.* With technical

support from the Government Performance Lab (GPL) from Harvard University, the ESC Program has helped to streamline this service coordination model for four of the Department's parenting support services: Intensive Family Preservation (IFP), Reunification and Therapeutic Family Time (RTFT), Parenting Support Services (PSS) and Child First.  To complement this expansion and ensure consistency and data tracking for the service types, the Division also played an integral role in supporting the statewide launch of the Universal Referral Form (URF).

ESC was newly introduced in four of DCF's six regions roughly two months before the COVID-19 pandemic shutdown. While stay at home orders and office closures had agency wide impact on service provision, the Systems Division's ESC team, which included 6 service coordinators, an ESC Statewide Supervisor, and a GPL fellow, were able to maintain regular communication with stakeholders including DCF social workers, supervisors, and service providers to support continuity of services throughout the COVID pandemic. Furthermore, despite COVID-19 challenges, the Systems Division worked closely with DCF's Central Office Program Leads and the provider network to reduce disruption of service delivery.

Throughout the pandemic, the Systems Division continued to collect data through an ESC log and dashboard tools that enabled the team to analyze race/ethnicity data from each ESC service type in real time and compare trends across regions.  These dashboards are routinely shared with regional leadership and providers to highlight timeliness, service match, utilization data to support real-time, data-driven conversations, troubleshoot issues and assess performance.

The Systems Division has remained committed to ensuring that families' service needs are prioritized and when referrals are made, families are connected with "best fit" services to meet their needs in an equitable manner.  The following next steps outline work currently

underway to guide further expansion of ESC, broadly apply lessons learned and ensure this work will inform broader performance management activities related to our service system:

- Expansion of ESC to additional service types and ensure that the best practices from ESC are applied more consistently across the service array;

- Continue the promotion of timely, accurate, and consistent service referrals and data collection through the continued expansion of the automated URF;

- Continue the development of effective Quality Assurance (QA) measures, in collaboration with other Divisions, to assess where services are successful in achieving positive outcomes that may include, but are not limited to:

  a. Reducing entries into foster care;

  b. Reducing repeat maltreatment; and

  c. Improving timely permanency.

The launch of ESC has helped DCF maintain a clear focus on developing an internal quality assurance structure to evaluate whether the right clients are being referred to the right service. With SOAC and ESC now launched statewide, DCF is well equipped to sufficiently monitor the Needs Met outcomes including ways to assess and address racial and ethnic disparate outcomes for families served by DCF, consistent with the Department's racial justice mandate and overall mission.

### 8. *Promoting Continuous Quality Improvement*

A key component of the 2018 Strategic Plan is developing infrastructure to continually improve performance. *See* Doc. No. 782-2. As reflected in the March 2022 Status Report, "The Court Monitor is confident that the DCF has the necessary infrastructure to continually improve performance related to the achievements made through the *Juan F.* Consent Decree implementation" so that "moving forward internal monitoring will provide the needed oversight to inform agency initiatives. The current administration has made critical and

sustained investments in ongoing Continuous Quality Improvement (CQI)".  *See* Doc. No. 821-2, at 14.

In 2021, DCF rolled out the Connecticut ChildStat program ("ChildStat"), a management process aimed at "providing accountability and transparency to the agency, while improving on the overall quality of child welfare."  *See* Doc. No. 817-2, at 6.  The three core features of ChildStat are as follows: (1) "Review agency-wide practice of the Department of Children and Families' area office performance as compared to statewide performances;" (2) "Strengthen the performance and practice through the synthesis and analysis of both qualitative and quantitative data."; and (3) "Collaborate with regional leaders, community advocates, and state officials to address issues of racial inequality in child welfare within the state."  *See id.*  According to the Court Monitor, each regional office has engaged in the process with "impressive results."  *See id.*

DCF has facilitated two rounds of ChildStat with the third round scheduled to launch in April/May 2022.  While ChildStat culminates in a presentation and conversation with Executive Leadership, it is those activities between rounds that reflect the culture and value of CQI.  Each region has implemented CQI teams led in partnership between QI staff and regional staff.  These teams review data, develop and implement strategies and monitor progress.  These strategies and results are part of each ChildStat presentation.

DCF has maintained its investment in Continuous Quality Improvement and has the competencies and infrastructure to continue to effectively monitor its performance.  Case practice reviews occur routinely by QI staff and these reviews include:  Caseworker visitation, in-home case practice reviews, DRS, SPM practice, Case Plans, Careline reports.  In CY 2021, DCF conducted over 1900 reviews, in addition to 11,000 Administrative Case Reviews (ACRs) to assess case planning and permanency for children in placement.   DCF continues to partner

with UCONN School of Social Work and has created a Research to Practice committee which meets monthly and includes representatives from multiple agency divisions including CQI, Child Welfare and the Academy for Workforce Development.  DCF's commitment to being a data informed and data driven agency has led to a culture whereby CQI is embraced and expected. The commitment to CQI has been key in DCF's sustained progress and will be essential in continued progress.  *See* Doc. No. 821-2, at 14.

## CONCLUSION

After years of monumental effort and commitment from the Parties and the Court Monitor, DCF has accomplished the objective of the 2017 Revised Exit Plan — to achieve the measurable and sustained improvements in the areas defined by the Plan's Outcome Measures as validated by the Court Monitor.  Critical Outcome Measures that have been met include those relating to investigations and family assessment/differential response cases, case planning, meeting service needs, visitation, caseloads, maltreatment, and reentry.  In addition to achieving all the required Outcome Measures, DCF has developed significant durable reform structures, also validated by the Court Monitor, that have promoted, and will continue to promote, the safety, permanency, and well-being of the children and families under its supervision.  Those reforms include maintaining adequate resources across the agency, ensuring adequate workloads for DCF staff, preserving families by avoiding family separation and maintaining family connections, minimizing the use of institutions and other group facilities, embedding a racial justice lens across the agency, building a robust network of community-based supportive services, supporting older youth, developing community and private sector partnerships, and implementing robust continuous quality improvement structures.

For all the foregoing reasons, the Parties respectfully request that the Court grant this motion and enter the proposed order terminating jurisdiction and closing the case.

Dated: March 14, 2022                    Respectfully submitted,

FOR PLAINTIFFS

_/s/_____

**CHILDREN'S RIGHTS, INC.**
Ira Lustbader
Federal Bar No. ct23551
88 Pine Street, 8th Floor
New York, NY 10005
Tel: (212) 683-2210
Fax: (212) 683-4015
ilustbader@childrensrights.org

_/s/_____

**WOFSEY, ROSEN, KWESKIN &
KURIANSKY, LLP**
Steven M. Frederick
Federal Bar No. ct08743
600 Summer Street
Stamford, CT 06901-1490
Tel: (203) 327-2300
Fax (203) 967-9273
sfrederick@wrkk.com

FOR DEFENDANTS

_/s/_____

**CONNECTICUT OFFICE OF THE
ATTORNEY GENERAL**
Joseph Rubin
Federal Bar No. ct00068
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5318
joseph.rubin@ct.gov